# Exhibit A



EXHIBIT 13
*A. Stimson*
McCARTHY REPORTING SERVICE
11-29-22 7W

### Activity

-------------------------------------------------------------------------------

Checked/Unchecked Indicator: No
Type: CVM          Name: Doctoral Review
Status: Completed
Original Notify Date: 11/09/2020
Notify Date: 11/09/2020
Due Date:
Subject: Doctoral Review- Etiology
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Lahey, Philip
Action: R/L's Supported

Request Fields

------------------------------------------------------------------------

Claim Overview: Tanga, Emi 11/09/2020 13:04:42: IN is a 64 yr old ophthalmologist
on claim due to lumbar, herniated disc, scar tissue, multi level disc,
degeneratation spinal stenosis, nerve impairment, cervical herniated disc. IN
indicates his medical condition is due to injuries from 5/23/82 and 11/xx/93.
Medical information has been received from IN and reviewed in CA and Forum with OSP
and doctotal review was recommended. Per APS, IN AP indicates his condition is due
to accident.


Medical Issue to be addressed: What is the etiology of the medical condition(s)
causing IN's R&Ls that are precluding him from working?


Created By: Tanga, Emi
Created Date: 11/09/2020 13:04:42       Create Site: Worcester

Response Fields

------------------------------------------------------------------------

Response: Lahey, Philip 11/11/2020 10:13:04: OSP OPINION - Referral and Response
Form


SECTION 2 - Completed by OSP
Claimant Name: Richard J Leung
Claimant Number: 17839700

Completion Date: 11/11/20

Name of reviewing operations physician (OSP):  Philip Lahey MD

Specialty of reviewing operations physician:  Orthopedic Surgery

R & L as stated by AP(s): Restrictions: 6/17/20 APS- no bending, lifting, turning,
examination of patients, and other procedures performed by a surgical
ophthalmologist whose duties involve sitting/leaning in forward position with arms
extended, using hands repetitively for extended periods of time. Duration 5/29/20-
permanent.
Limitations: same as above. Patient should not be working as a surgical
ophthalmologist b/c of chronic pain causing safety issues for his patients and
further damage to spine of patient.
Assessment: ongoing back pain, treatment plan includes medications and PT.
States R&Ls are a result of an accident.

Medical Issue:  What is the etiology of the insured's current R&Ls?


Conclusions:
R & L Supported


Analysis/Rationale:

I have completed a full review of the medical record, including the report clinical consultant Kimberly Doxstader, RN. prepared on 10/29/20 I will not repeat the data summarized in the clinical consultant's report here, but I incorporate that summary by reference.  While I have reviewed the records, summaries, and opinions others have prepared, I have performed my own independent analysis and formed my own conclusions. My analysis and conclusion follow.

The insured is a 65 year old Ophthalmologist who was working as a surgical intern in May of 1082 when he was lifting a patient and injured his low back. He eventually developed left leg pain. A CT scan revealed a congenitally slightly narrowed central canal and a disc bulge at L4-5 on the left. There were also changes at L5-S1. His symptoms persisted and the insured underwent a lumbar laminectomy with lumbar L4-5 discectomy and L4-5, S1 foraminotomy on 2/16/83. Over the course of the next several years he continued to complain of back and left leg pain despite conservative therapy consisting of PT, ESIs and medication. In 1992 the insured had been performing exercises in order to rehab his lumbar spine when he lifted a weight and felt a "pop" in his neck. He then developed pain radiating to the right trapezius and eventually numbness in the right thumb and index finger. Because of persistent symptoms and radicular complaints on 1/5/94 an MRI of the cervical spine was completed demonstrating a bilobed C5-6 disc herniation, the largest component of which extended into the right C5-6 foramen causing moderate stenosis. There was minimal ventral cord impingement present but no cord compression was clearly identified. The insured experienced chronic cervical complaints characterized by chronic pain with intermittent severe flareups following this event. He was treated nonoperatively but followed closely. The insured received multiple cervical MRI's that showed possible progression of the disc herniation and on 1/19/04 he underwent a C5-6 ACDF. The surgery went well, the fusion incorporated, but the insured continued to experience, along with his lumbar spine, episodes of severe neck pain with radicular symptoms.  The insured has continued to work despite the worsening of the complaints until 2020. Serial MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. The insured is being followed by Pain Management and receives prescriptions for Valium and Dilaudid for management of his pain. The level of symptoms and the intensity of treatment leads to support for his R&Ls.
The etiology of the current condition that leads to the R&Ls is degenerative disc disease of the cervical and lumbar spine. The insured's symptoms started with a lumbar disc herniation at L4-5 and have continued since that time. The disc herniation was resected and the insured now has multiple level involvement. It is a diffuse process in his lumbar spine and not localized to L4-5. Discectomy is associated with an increased risk of degenerative changes progressing through life. It is not proven that this progression is caused by the herniation, the surgery or other factors. His current condition is diffuse and multilevel.
The same can be said for the cervical spine. The insured herniated the C5-6 disc when lifting a weight. This herniation was eventually excised and the level fused. His current diagnosis is degenerative disc disease. It involves multiple levels of the cervical spine.
The lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. One could not reasonably conclude that

if these events did not occur, the insured would not be suffering from degenerative disc disease with its associated R&Ls. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current R&Ls.

I have considered any potential comorbid conditions individually and collectively and they do not impinge upon the insured's claimed impairment.

Referral Questions and Answers:
What is the etiology of the insured's R&Ls?
Degenerative disc disease of the cervical and lumbar spine.

Next Steps:
AP contact

OSP Signature Block:
Name: Philip Lahey MD
State of Licensure: Massachusetts
Board Certification: American Board of Orthopaedic Surgeons

Unum
I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment for which I am by training and experience capable to assess.

Completed By: Lahey, Philip
Completed Date: 11/11/2020 13:06:26        Complete Site: Worcester

# Exhibit B



## Designated Medical Officer (DMO) Review Response

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of DMO Review:** 12/07/2020

### Conclusion

Concur with OSP opinion.

### DMO Analysis

The insured is a 65-year-old Ophthalmologist who was working as a surgical intern in May of 1982 when he was lifting a patient and injured his low back. He eventually developed left leg pain. A CT scan revealed a congenitally slightly narrowed central canal and a disc bulge at L4-5 on the left. There were also changes at L5-S1. His symptoms persisted and the insured underwent a lumbar laminectomy with lumbar L4-5 discectomy and L4-5, S1 foraminotomy on 02/16/1983. Over the course of the next several years he continued to complain of back and left leg pain despite conservative therapy consisting of PT, ESIs and medication. In 1992 the insured had been performing exercises in order to rehab his lumbar spine when he lifted a weight and felt a "pop" in his neck. He then developed pain radiating to the right trapezius and eventually numbness in the right thumb and index finger. Because of persistent symptoms and radicular complaints on 01/05/1994 an MRI of the cervical spine was completed demonstrating a bilobed C5-6 disc herniation, the largest component of which extended into the right C5-6 foramen causing moderate stenosis. There was minimal ventral cord impingement present but no cord compression was clearly identified. The insured experienced chronic cervical complaints characterized by chronic pain with intermittent severe flareups following this event. He was treated nonoperatively but followed closely. The insured received multiple cervical MRI's that showed possible progression of the disc herniation and on 01/19/2004 he underwent a C5-6 ACDF. The surgery went well, the fusion incorporated, but the insured continued to experience, along with his lumbar spine, episodes of severe neck pain with radicular symptoms. The insured has continued to work despite the worsening of the complaints until 2020. Serial MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. The insured is being followed by Pain Management and receives prescriptions for Valium and Dilaudid for management of his pain. The level of symptoms and the intensity of treatment leads to support for his R&Ls.

The OSP has supported R&Ls. The question regards the etiology of the insured's current condition. The OSP has stated "The lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. One could not reasonably conclude that if these events did not occur, the insured would not be suffering from degenerative disc disease with its associated R&Ls. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current R&Ls." The AP has stated that the current condition is a result of an accident.

The cervical MRI performed on 01/05/1994 revealed C5-6 bilobed disk herniation and disc bulges at C3-4 and C4-5.

The cervical MRI performed on 11/02/1995 revealed mild disc bulging at C3-4 and C4-5 with resolution of the C5-6 disc herniation.

The cervical MRI performed on 04/28/1999 revealed C4-5 facet hypertrophy and C5-6 disc herniation with spondylosis.

MRI of the cervical spine on 09/22/2002 revealed disc protrusion at C4-5 and stable degenerative changes at C3-4 and C5-6.

MRI of the lumbar spine on 09/02/2006 revealed degenerative changes at L3-4 and L4-5.

MRI of the cervical spine on 05/19/2010 revealed C5-6 ACDF and multilevel facet arthritis with C4-5 spurring.

MRI of the lumbar spine on 04/20/2011 revealed degenerative changes at L3-4 and L4-5.

MRI of the lumbar spine on 01/14/2013 revealed L4-5 bilateral facet arthropathy.

MRI of the lumbar spine performed on 09/21/2015 revealed degenerative changes at L3-4 and L4-5.

MRI of the cervical spine on 09/21/2015 revealed stable post-op changes at C5-6 and multilevel degenerative changes at other levels.

MRI of the lumbar spine performed on 04/17/2017 revealed previous L5-S1 decompression, L3-4 and L4-5 degeneration with severe L3-4 spinal stenosis.

MRI of the lumbar spine performed on 04/03/2020 revealed previous L5-S1 decompression, L3-4 and L4-5 degeneration with severe L3-4 spinal stenosis.

The MRI of the cervical spine performed on 04/03/2020 revealed previous C5-6 fusion with moderate-to-severe degeneration at C4-5 and C6-7 with C4-5 spinal stenosis.

The lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur that the insured would not develop degenerative disease with its associated restrictions and limitations. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. Therefore, I agree with the OSP opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

**DMO Signature Block:**

Name:    Steven Milos  M.D.
State of Licensure:    IL#036113850
Board Certification:    Orthopedic Surgery
Unum

# Exhibit C



Activity
--------------------------------------------------------------------------------

Checked/Unchecked Indicator: No
Type: CVM          Name: Addendum-Doctoral
Status: Completed
Original Notify Date: 02/19/2021
Notify Date: 02/19/2021
Due Date:
Subject: Doc Addendum- Etiology
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Lahey, Philip
Action: Other: Acc/Sick; Pre-Ex, Clarification

Request Fields
------------------------------------------------------------------------
Brief Summary / History of File: IN is a 65 yr old ophthalmologist claiming TD due
to lumbar, herniated disc, scar tissue, multi level disc, degeneratation spinal
stenosis, nerve impairment, cervical herniated disc. IN indicates his conditions
are a result of injury.

Per your review of the medical information, the etiology of IN's medical condition
causing R&Ls are Degenerative disc disease of the cervical and lumbar spine.

IN's AP has reponded to your OSP letter.

Statement of Issue: Does the new information available change your opinion
regarding etiology?
If no, next steps.

Created By: Tanga, Emi
Created Date: 02/19/2021 10:32:49          Create Site: Worcester

Response Fields
------------------------------------------------------------------------
Response: Lahey, Philip 02/20/2021 13:55:37:
SECTION 2 - Completed by OSP


Addendum

Claimant: Richard J Leung
Claim #17839700
Date: 2/20/21
Name of reviewing operations physician (OSP):
Specialty of reviewing OSP physician:
DBS: Emi Tanga


I have received and reviewed the AP response from doctor moon. The AP disagrees
with me in my opinion that the insurance current spine disabilities and impairments
which have been supported are a result of diffuse degenerative disc disease and not
due to the industrial injuries of 1982 and 1993. He justifies his opinion on the
fact that he has continued to be symptomatic in both the cervical and lumbar spine
since the initial dates of injuries receiving extensive ongoing medical treatment
on a consistent basis until the present. He goes on to state that the surgeries to
both the cervical and lumbar spine were not curative and he continued to have
ongoing symptoms requiring medical treatment. He states that both the injury of
1982 and the herniated disc of 1993 were accepted and recognized as workers
compensation injuries dating back to 1982. Dr Moon refers to a 1983 letter sent by

--------------------------------------------------------------------------------
*Claimant Name: Richard J Leung*     Claim #:   17839700

UA-CL-IDI-001687

*Ex* 14

the surgeon stating that "this was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent Fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date." He also refers to his neurosurgeon in 2004 stating that he is fully aware of the fact that he may require further surgery at C 4-5 depending on his progress. He states that the MRI of April 3rd 2020 shows a stable fusion however there is severe bilateral foraminal stenosis at C-4-5 and C6-7 with compression of the exiting nerve roots. He states unequivocally that this complication of adjacent segment disease at both levels immediately above and below his fusion is well documented in medical literature and is due to the increased biomechanical stress placed on the adjacent disc levels. He states that the most recent MRI of the lumbar spine on June 5th 2020 shows a previous posterior decompression and laminectomies at L5-S1 as well as an abnormal signal seen in the epidural space at the adjacent L4-5 level especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral L5 nerve roots. There is evidence of a disc extrusion and annular fissure at L4-5. There is evidence of an annular fissure at L3-4 as well as severe spinal stenosis at that level. It is his opinion that the causation of the insured's cervical spine and lumbar spine injuries as well as ongoing chronic pain and disability are the direct result of the industrial injuries that he sustained in 1982 in 1993. He states that he continued to remain symptomatic in both the neck and low back despite ongoing surgery to the cervical and lumbar spine. He states further "it is my opinion that Dr Leung's current pain and disability as well as the degenerative finding seen on MRI of both the cervical spine and lumbar spine are indeed directly related to his industrial injuries, residual L 4-5 disc injury, and complications related to the cervical and lumbar spine surgeries."

My opinion remains unchanged. The insured's preoperative CT scan in 1982 revealed congenital changes of spinal stenosis associated with a trefoil shaped canal. Additionally, within the neurosurgeon's operative note it is mentioned " laterally there was considerable compression from the medial placed facets." Is my opinion that when the surgeon stated in his letter that "this was not adequately decompressed at the time of his original surgery," he is referring to the fact that the facets were anatomically narrowing the canal and to fully decompress the medially placed facets this would potentially destabilize the segment and potentially lead to the necessity of a fusion. The record does not indicate that a fusion has been required. The dura was torn during surgery but the tear was recognized and repaired.

Adjacent segment disease is well recognized. I do believe that this plays a role in the insured's progressive degeneration of the spine. I am not able to conclude that it is the sole cause or even the major cause. For example, there is evidence of preexisting disc degeneration: 1/5/94 MRI cervical spine, "The intervertebral discs show varying degrees of degenerative desiccation throughout the cervical spine. Axial sections beginning at C3-4 show mild symmetric bulging of the C3-4 disc. Minimal C 4-5 disc bulging is seen which is symmetric." There was mild foraminal narrowing on the right of C3-4, C5-6 and C6-7. There is evidence of congenital abnormalities that can predispose to symptomatic degenerative disc disease (congenital spinal stenosis in the lumbar spine.)

Nevertheless, the insured did have progression of his degenerative disc disease over the years which is well documented in the record with multiple MRI's. He was able to work until the degeneration became so severe that his R&Ls prevented him from performing the demands of his profession. The periodic episodes of increased low back pain are typical of those who suffer from degenerative disc disease. My opinion remains that the etiology of the current R&Ls is degenerative disc disease of the cervical and lumbar spine.

Next Steps: DMO addendum


Signature Block:

Name:  Philip Lahey MD
Licensure:  MA
Board Certification:  American Board of Orthopedic Surgery

I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment for which I am by training and experience capable to assess.

Completed By: Lahey, Philip
Completed Date: 02/20/2021 13:55:37     Complete Site: Worcester

# Exhibit D


## Designated Medical Officer (DMO) Review Response

**Claimant Name:**   Richard J Leung

**Claim Number:**   17839700

**Date of DMO Review:**   02/23/21

### Conclusion

Concur with OSP opinion.

### DMO Analysis

The additional records were reviewed.

The OSP is of the opinion that the insured's restrictions and limitations are caused by degenerative disc disease of the cervical and lumbar spine.

The AP is of the opinion that the insured's current pain and disability as well as the degenerative
findings seen on MRI of both the cervical spine and lumbar spine are directly related to his industrial
injuries, residual L 4-5 disc injury, and complications related to the cervical and lumbar spine surgeries.

The lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur that the insured would not develop degenerative disease with its associated restrictions and limitations. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. Therefore, I agree with the OSP opinion. The additional information did not change that opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

### DMO Signature Block:

Name:     Steven Milos M.D.
State of Licensure:     IL#036113850
Board Certification:     Orthopedic Surgery
Unum

# Exhibit E



EXHIBIT 21
H. Stimson
McCARTHY REPORTING SERVICE
11-29-22 TW

## Paper Independent Medical Exam (IME) Response

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of Paper IME:** 05/28/2021

**Response to Questions:** From your review of the records provided, please respond to the following questions, including your rationale for each response.

Provider Questions: Please review the medical file and reply to the following

### 1. What is the etiology of the insureds current impairing lumbar conditions?

In a June 17, 1982 note by Dr. Kenneth OTT, the medical record initially reported that the claimant injured his back while lifting a patient as an intern. He reported a CT of the Lumbar spine showing an L4/5 disc bulge. On February 16, 1983 the claimant underwent an L4/5 and L5/S1 laminectomy. A report from Dr. Alksne, the surgeon on June 14, 1983 reported that the claimant did well. There are three MRI studies without clinical accompaniment from 1985, 1988, and 1992. All studies show an essentially similar study. There are post-operative findings, always seen, and a reported disc bulge or herniation at L4/5. There is no other pathology mentioned.

Dr. Charles Jablecki, M.D first evaluated the claimant on January 4, 1994. He evaluated him on a regular, at times almost a monthly basis, until October 3, 2014, when the doctor closed his practice. In the initial evaluation, he stated that there was of residual low back pain which can flair up. There were episodes of spasms and increased pain. The initial examination with Dr. Jablecki found that the left gastrocnemius reflex was reduced. It is most likely that this reflex change was related to the prior disc herniation and surgery. An absent reflex is not an impairing condition. The reports from Dr. Jablecki over the next ten years of treatment most commonly reflects the continued bouts of back pain and spasm the claimant has, however for the most part the examination remains the same with limited motion in the lower back with tenderness and spasm, and an absent reflex. The motor and sensory and gait examinations were almost always reported as normal and there are periods where there is a positive straight or crossed straight leg raise test which coincides with the degree of pain the claimant is reporting.

After Dr. Jablecki closed his office, the claimant's care was taken over by Dr. Moon. The last evaluation by Dr. Moon in the record is June 2, 2020, however, there is a February 2021 letter written by him. Over this period of time, the claimant's low back complaints are reported as becoming more constant and severe. He is treated with chronic opioid medications for this, as well as an attempt at interventional pain management. The constant examination findings during this period are decreased range of motion in the lower back and a slow unassisted gait.

Review and comparison of the claimant's MRI testing is necessary.

1- An MRI of the lumbar spine was performed on March 15, 1985, that demonstrated decreased disc height at L4-5 consistent with previous surgery, some epidural fibrosis at the left L4-5 neural foramen, and a moderate posterior disc bulge compressing the thecal sac
2- MRI was performed on August 27, 1992, showing residual and/or recurrent central and left-sided disc herniation at L4-5 without significant change from the August 8, 1988 (not included in record)

---

3- January 14, 2013 repeat MRI of the lumbar spine was performed. L3/4 stable degenerative changes, mild to moderate central and foraminal stenosis; Reported new inflammatory changes at both L4-5 facet joints and right-sided epidural space endplates. At L4-5 the thecal sac is relatively capacious, the right lateral recess is narrowed. There is left perineural scarring at L5. The left L4 neural foramen is widely patent. L5/S1 normal.

4- September 21, 2015 MRI of the lumbar spine, progressive L3-4 disc degeneration, moderate to severe central canal and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots Stable degenerative and postop changes at L4-5 with lateral recess stenosis worse on right and fibrosis of left L5 root. L5/S1 mild bulge no stenosis.

5- The MRI of the lumbar spine on April 17, 2017 reports previous L5-S1 decompression, previous L5-S1 laminectomy, evidence of epidural fibrosis, L4-5 mild posterior disc extrusion, severe facet hypertrophy, L3-4 persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots.

6- MRI of the lumbar spine done on 04/03/2020 shows L3/4 progression of severe central stenosis; Remainder of degenerative disc and facet changes are unchanged and stable.

When comparing the MRI  studies it is important to realize that the MRIs were done at different times, perhaps on different machines, and read by different radiologists.

The MRI findings show that there were expected post-operative changes at L4/5 after the 1982 surgery. There were boney defects from the laminectomies, degenerative changes, and loss of disc height due to the discectomy. There was expected epidural fibrosis at the laminectomy site and involved nerve roots. The significant analysis at L4/5 was that the changes were for the most part although reported as stable, there was a pattern of slow degeneration causing the development of foraminal stenosis and impingement of the L4 and L5 nerve roots, which can also be commonly seen over many years.

There is no significant pathology noted at L5/S1 on any study.

The L3/4 disc space however shows a constant progression of degeneration and developing stenosis. The January 14, 2013 repeat MRI of the lumbar spine demonstrated  L3/4 stable degenerative changes, mild to moderate central and foraminal stenosis. The September 21, 2015 MRI of the lumbar spine, progressive L3-4 disc degeneration, moderate to severe central canal, and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots. The MRI of the lumbar spine on April 17, 2017 at  L3-4 thee is persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots.
The MRI of the lumbar spine done on 04/03/2020 shows L3/4 progression of severe central stenosis.

Based on the medical reports and the MRI findings the etiology of the claimant's impairment is progressive degenerative changes at the L3/4 and L4/5  disc spaces.

## 2. Is there a medical relationship between the insureds current impairing lumbar conditions and the May 1982 reported injury?

The injury which resulted in the operation performed in 1982 does not contribute to the current impairing condition. There has been a degeneration of the lumbar spine at both L3/4 and L4/5 as a result of aging, and what is generally called wear and tear. There is no indication based on the medical record that the initial herniation in 1982 or the surgery played a part in accelerating the degeneration. The degeneration at L3/4 was rapidly progressive and that at L4/5 was fairly slow. If the prior injury had contributed to the current condition there would have been a more rapid degeneration at L4/5 than L3/4. In further support of this opinion, it should be noted that there was a laminectomy at L5/S1 as a result of the 1982 injury, but there was no progression of degeneration at that level.

If the injury and surgery accelerated the degeneration at L4/5 it should have also done so at L5/S1. It is a very common pattern that natural degeneration occurs at L3/4 and L4/5 and spares L5/S1.

## 3. What is the etiology of the insured's current impairing cervical conditions?

The claimant's neck complaints appear to start as the result of an event while at the gym at the end of 1993. The record does not specifically offer a date. As a result of this, the claimant began treatment with Dr. Charles Jablecki, M.D. who evaluated the claimant for the first time on January 4, 1994. This 1994 report stated that there was a six-week history of pain in the neck, on the right side of the neck, and posterior shoulder that occurred while exercising in the gym. He saw a physical therapist. He then developed numbness and tingling in the right thumb and index finger, which was related to head and neck motion. Significant examination findings were normal sensation throughout except for reduced sensation along the tips of the thumb and index finger on the right. There is a positive Phalen's sign and Tinel sign at the wrist on the right, suggesting carpal tunnel syndrome. An EMG of the right upper extremity was performed on January 4, 1994, which was reported as normal. MRI of the cervical spine done on January 5, 1994, reported a large disc herniation at C5-6;  at C3/4 there is a mild disc bulge no compression, and at  C4/5 there is disc bulge no compression. It further reported varying degrees of degeneration throughout the spine. Cervical spine x-rays on January 5, 1994 showed disc space narrowing at C5-6 and mild foraminal narrowing at C3-4, C5-6, and C6-7 on the right.  The claimant was referred for physical therapy to his neck.

Dr. Jablecki evaluated him on a regular, at times almost monthly basis until October 3, 2014, when the doctor closed his practice.  Multiple follow-up visits with Dr. Jablecki took place, and there were periods of exacerbation of pain including pain developing in the left arm.  A course of conservative care was initiated.  Examination always remained significant for decreased sensation in the thumb and index finger on the right. The claimant's treatment history is summarized, listing dates, complaints MRI results, and examination findings from a sampling of the approximate 16 years of treatment.

The claimant was referred to Dr. Phil Lahey for a neurosurgical evaluation on May 27, 1994. No surgery was planned or undertaken.

The November 18, 1994 note from Dr. Jablecki states that this claimant has been attending physical therapy for the neck for over 10 months.  The claimant's examination has not changed over this period of time.

On January 26, 1995, the claimant reported to Dr. Jablecki that he developed severe pain radiating down the left arm.  There was no other change in complaints and the examination remained unchanged.

Evaluation by Dr. Jablecki occurred on August 18, 1998, there was a report of aggravation of the cervical spine pain by a motor vehicle accident on February 27, 1997.  There were intermittent physical therapy sessions during this entire period.  His examination at that point continued to show decreased sensation along the length of the volar aspect of the right thumb and index finger and his reflexes were all reported normal in the lower extremities.

An MRI of the cervical spine was performed on 11/02/1995, it showed mild disc bulging at C3-4, C4-5 unchanged,  and interval resolution of the disc herniation at C5-6 with a mild asymmetric bulging present.

There is a December 1st, 1995 note written by Dr. Jablecki stating that the original MRI showed a C5-6 improved but the C4-5 disc worsened.

On August 12th, 1997, Dr. Jablecki wrote that during an ophthalmologic examination, the claimant's head was tilted and his right hand went numb. The examination found that there was decreased sensation in the volar aspect of the right thumb and index finger, however, normal sensation on the corresponding digits on the left.

The October 20th, 1998 visit with Dr. Jablecki indicated, he had several flare-ups of his pain. Examination remains unchanged with a normal left-hand sensation.

On October 28, 1998, Dr. Jablecki wrote this letter is to reiterate the position stated in my letter of January 18, 1994. In that letter it indicated there it is more probable than not that the cervical spine problem which is symptomatic at this time is an indirect complication of the original work injury of 1982, for which the claimant underwent surgery. He further states that the reason for this is that of compensatory hip tilt due to back spasm.

April 27, 1999, evaluation by Dr. Jablecki notes that symptoms remain aggravated by various head positions. Examination again remains unchanged.

Dr. Jablecki had performed a repeat EMG on August 27, 1999, of the right and left upper extremities, they were read as normal.

MRI of the cervical spine was performed on April 28, 1999, the impression is C4-5 facet hypertrophy, mild disc bulge, mild right-sided neural foraminal narrowing, at C5-6 small disc herniation with uncovertebral spondylosis, and bilateral neural foraminal narrowing, right greater than left.

On January 9, 2001 repeat physical with Dr. Jablecki noted recurrent flare-ups of pain in his neck. The examination finds that there was a very mild limitation of range of motion of his neck, with some limitation of motion of his lower back. There were no Tinel signs at the wrists. Straight leg raising was unremarkable. Reflexes in the upper extremities were normal. Strength was normal. Again, there was a fixed decreased sensation in the right thumb and index finger and now again noted reduced sensation in the left thumb and index finger.

March 28, 2002 reevaluation by Dr. Jablecki finds limitation of motion in his cervical spine. No spasms in the cervical musculature. The range of motion in his lumbar spine is slightly restricted. Spasms in the right lumbosacral paraspinal muscles. Strength in the upper extremities was normal. Strength in the lower extremities was normal.

The MRI report of the cervical spine performed on September 22, 2002, finds interval progression of the left posterior paramedian focal disc protrusion at C4-5. At C3-4 present minimal right posterior paramedian focal disc protrusion without stenosis. At C5-6 a stable posterior disc bulge with uncovertebral spondylosis and facet joint hypertrophy, more pronounced on the right than on the left. Moderate narrowing of the right foramen at C6.

On October 23rd, 2003 Dr. Jablecki notes in the examination, this was essentially unchanged from all the previous examinations. He notes an MRI done on September 22, 2002, of the cervical spine, impression reported as interval progression of the left posterior focal disc herniation at C4-5, stable degenerative changes at C3-4, C5-6 from the prior examinations.

MRI of the cervical spine done on November 22, 2003, C3-4 disc bulge and mild neural foraminal narrowing; C4/5 minimal if any worsening if left paracentral disc protrusion, which flattens the left ventral cord without significant stenosis. Slight right foraminal narrowing; C5/6 slight improvement in moderate disc osteophyte complex with mild to moderate spinal stenosis and moderate to severe left foraminal narrowing.

On December 9, 2003, the claimant was re-evaluated by Dr. Ostrup, a neurosurgeon. No examination is noted, but a surgical recommendation was made. The claimant underwent a cervical discectomy and fusion at C5-6 on January 19, 2004, by Dr. Ostrup. The initial note by Dr. Ostrup says that the patient is fully aware of the fact that he could require at treatment at C4-5 level. We talked about doing two levels at this time, but he is not eager for that.

On May 6, 2004, Dr. Ostrup writes that the claimant is three and a half months status post his cervical fusion. He is doing well. His x-rays look good. The fusion is not completely incorporated. He still complains of some paresthesias, but he is definitely better. He still complains of neck pain and the claimant has reached MMI from this surgery.

CT of the cervical spine was performed on July 15, 2004. It shows interval discectomy at C5-6, moderate central stenosis due to the osteophytes narrowing, moderately severe on the right. There is also mild neuroforaminal narrowing at C4-5 on the left.

On January 12, 2006 evaluation by Dr. Jablecki notes neck pain, bilateral shoulder pain, paresthesias in both hands, flare-ups of pain in the back and neck. His examination finds limited motion in his cervical and lumbar spine with tenderness. Motor, sensory and reflex examinations were unchanged from the previous.

In the March 25, 2010 evaluation, Dr. Jablecki finds no change in his examination, but he again continues to complain of recurrent flare-ups of his back and neck problems.

MRI of his cervical spine was performed on May 19, 2010, the report, indicates at the time, alignment and bone incorporation of the C5-6 ADCF, C3/4 mild bilateral foraminal narrowing; C4/5 andular bulging moderate central and mild bilateral foraminal narrowing; C5/6 no stenosis, C6/7 early degenerative disease no stenosis.

October 3, 2014, Dr. Jablecki reports there have been several flare-ups with his neck pain and associated numbness and tingling in the upper extremities. There was limited motion in all directions of the cervical and lumbar spines. The upper extremity, sensory-motor, and reflex examination are unchanged as is the lower extremity examination and he reports that the claimant can walk on his heels and toes.

The last note written by Dr. Jablecki was October 3, 2014. In that note, Dr. Jablecki writes that the current complaints are flare-ups of neck pain, numbness and tingling in the upper extremities, and low back pain. Examination of the cervical spine was limited in all directions. Upper extremity coordination was normal. The reflexes were normal. Strength was normal. The sensation had the fixed deficit in the thumb and index finger and two-point-discrimination again remains normal.

The claimant's care was taken over by Dr. Moon, who evaluated the claimant on 08/19/2015, the report states that this was a re-evaluation. He states he has neck pain radiating into the right scapula. He uses Valium to sleep. Objective findings are cervical paraspinal musculature spasms, decreased range of motion in the neck, decreased sensation of digits one, two, three bilaterally.

MRI of the cervical spine done on September 21, 2015, C3/4 bilateral facet degeneration with foraminal narrowing; progressive spondylosis at C4-5 with facet degeneration and hypertrophy. Moderate narrowing of both C5 neural foramen, worse on the right; stable postoperative changes at C5-6; C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left. Moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen.

On 04/27/16, Dr. Moon notes that the patient is now using Dilaudid for his flare-ups. He has increasing difficulty doing his surgery as an ophthalmologist. Examination finds that he is in mild discomfort, in addition to decreased range of motion of the cervical and lumbar spines.

MRI of the cervical spine done on 11/22/16 shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4.

On 11/28/2016, the claimant returns to Dr. Moon on an emergent basis. He was treated in the emergency department and re-evaluated after the claimant experienced a flare-up of the neck pain radiating down his arms bilaterally to the elbows. There is no report of any trauma in this report. The exam notes decreased range of motion in his neck. Limited extension and flexion of the lower back. Tenderness of the paraspinal muscles. Normal reflexes and strength in the lower extremities.

The claimant was evaluated by Dr. Ostrup, neurosurgeon on March 6, 2017. The physical exam noted there is tenderness to palpation over the neck. He was not taken through a full range of motion. He did not detect any weakness. There was a diminished right biceps reflex. There were no pathologic reflexes, or atrophy or sensory loss.

On 03/29/17 Dr. Moon reports that the claimant had a cervical epidural and did not receive any benefit. The examination appears to be essentially unchanged.

On May 16, 2017, Dr. Ostrup evaluated the claimant. Examination reports no significant changes. The recommendation is cervical discectomy and fusion C4-5, C3-4, and a lumbar decompression at L3-4.

January 15, 2020, the claimant reports to Dr. Moon he is experiencing constant chronic neck pain, he continues to experience chronic back pain. The examination is essentially unchanged. The treatment plan continues to be narcotic analgesics.

MRI of the cervical spine done on 04/03/2020 shows C2/3 broad-based disc bulge flattening thecal sac; C3/4 broad-based posterior disc bulge slightly improved severe left and mod right foraminal stenosis compression left C4 root; C4/5 Disc osteophyte complex severe bilateral foraminal stenosis compressing both C5 roots; stable ACDF C5-6, no stenosis; C6/7 disc osteophyte complex effacing thecal sac. Compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left-sided foraminal stenosis compressing the existing left C4 nerve roots. Stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots.

In summary the impairment of the claimant's cervical spine is chronic discogenic neck pain with a radicular component, related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. The major complaint has always been axial neck pain. The constant examination findings have always been cervical tenderness/spasms with decreased range of motion, and decreased sensation in the right first and second digit. Although MRI findings have continually worsened over time, the examination did not, and the complaint of pain slowly increased until it became constant.

**4. Is there a medical relationship between the insured's current impairing cervical conditions and the November 1993 reported injury?**

The MRI findings have shown progressive disc bulging and arthritic changes from the initial 1994 through 2020 studies. The 1994 study showed a disc bulge at C3/4 and C4/5 with a herniation at C5/6 and with varying degrees of degeneration throughout the cervical spine. It was presumed that the accident at the gym caused the herniations, however, it is equally probable that the bulges and herniations were present and were exacerbated by the event. The progression of degeneration at C3/4 and C4/5 took place both prior to and after the C5/6 fusion. The MRI findings at C5/6 really did not progress and remained stable with no significant neural compression. There was a reported motor vehicle accident on February 27, 1997, which Dr. Jablecki reported caused an aggravation of the cervical spine pain, which is a likely occurrence.

There is a drastic change in the MRI of the cervical spine done on 11/22/16. It shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4. Although there is no documentation of trauma this study is consistent with a recent event that caused edema in the ligaments. This is usually from a flexion/extension injury which was recent.

On October 28, 1998, Dr. Jablecki wrote this letter is to reiterate the position stated in letter of January 18, 1994. In that letter, it indicated there it is more probable than not that the cervical spine problem which is symptomatic at this time is an indirect complication of the original work injury of 1982, for which the claimant underwent surgery. He further states that the reason for this is that of compensatory hip tilt due to back spasm. This opinion has no real scientific basis. The claimant might have pain due to this reasoning, but it would be muscular and not cause discogenic and osteogenic changes in the spine.

The injury of 1994 apparently caused the herniation at C5/6. The claimant eventually underwent surgery for this in 2004. There are findings of disc bulges at C3/4 and C4/5 with varying degrees of degeneration throughout the cervical spine at the time of the original 1994 MRI. The changes at C3/4 and C4/5 were pre-existing to the injury. The MRI studies showed progressive changes and worsening at these levels prior to the 2004 surgery, so to imply that the changes were not due to adjacent level disease. The degenerative changes at C6/7 were not noted on MRI until 2010 which was six years after the surgery. This period of time would also not be considered as adjacent level degeneration, as the span was so long. There was also an intervening motor vehicle accident in 1997 which was documented as exacerbating the cervical spine condition. The 2016 MRI indicates that there was some other non-documented event that caused the worsening of the MRI findings. Finally, there were no significant progressive MRI changes at C5/6 the operated level.

Within reasonable medical probability, there was no significant contribution from the injury on November 1993 to the current impairing conditions.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

Marvin Friedlander M.D.
Board Certified Neurological Surgery
NJ#25MA05251300

# Exhibit F


## Paper Independent Medical Exam (IME) Response

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of Paper IME:** 09/16/21

**Response to Questions:** From your review of the records provided, please respond to the following questions, including your rationale for each response.

### On 09/02/21, the Insured submitted a letter from Dr. Ostrup dated 07/30/2021. Does this information change your prior opinion(s)? Please explain

I have reviewed the letter summited by Dr. Ostrup, as well as the letter of appeal.

With regard to the comments in the second and third paragraph of Dr. Ostrup's letter, regarding the cervical spine, the doctor indicates that "Although I suspect genetics are playing a significant role, I also suspect there is a component of adjacent level disease." The claimant believes the symptoms have been present since the time of his original injury, and not related to the possibility of adjacent level disease. The doctor further states that there is no diagnosis for the cervical complaints and no treatment is in order. The doctor comments on a recent (but undated) magnetic resonance imaging (MRI) finding that there is moderate stenosis at C3/4 and to a lesser degree at C4/5. This gives the indication that there is less weight to the concept of normal degenerative changes or perhaps that the claimant had another, later, injury to the neck that is causing the current problem. It is their contention that the current problem is due to the original injury. To be clear adjacent level disease usually occurs either one level above or below a prior fusion. It would be extremely rare for the disc two levels above the fusion would deteriorate to a greater extent than the one immediately adjacent to the fusion, as suggested by Dr. Ostrup.

A review of the original documentation submitted finds that this reported MRI finding, assuming there are no other findings present on this MRI which were not disclosed by Dr. Ostrup, was most likely from the May 2010 MRI.

There is an MRI of the cervical spine done on 09/21/2015 indicating C3/4 bilateral facet degeneration with foraminal narrowing; progressive spondylosis at C4-5 with facet degeneration and hypertrophy. Moderate narrowing of both C5 neural foramen, worse on the right; stable postoperative changes at C5-6; C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left. Moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen. This study indicates that there is a slow degenerative process that has occurred now eleven years after the surgery and over 20 years from the original accident.

More importantly, an MRI of the cervical spine done on 11/22/2016 shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4.

This MRI gives the indication that there has been some undisclosed injury to the neck that has occurred to cause these findings. The claimant, according to Dr. Moon, on 04/27/2016 had begun using opioid pain medications and is now having problems working. It is unclear how long the claimant was using Dilaudid and if there was any non-documented event to cause this and to explain the MRI findings.

The most recent MRI documented done on 04/03/2020 shows C2/3 broad-based disc bulge flattening thecal sac; C3/4 broad-based posterior disc bulge slightly improved severe left and mod right foraminal stenosis compression left C4 root; C4/5 Disc osteophyte complex severe bilateral foraminal stenosis compressing both C5 roots; stable ACDF (anterior cervical discectomy and fusion) C5-6, no stenosis; C6/7 disc osteophyte complex effacing thecal sac. Compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left-sided foraminal stenosis compressing the existing left C4 nerve roots. Stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots. These findings are consistent with degenerative disc disease, are so temporally removed from both the original surgery and the original accident to be considered as being related to those events.

With regard to the assertion that the claimant has failed back syndrome as a result of the original injury and the subsequent surgery, this opinion is unfounded. Failed back is a condition in which there is continued back or radicular pain even though there is no definable pathology to explain this. This clearly is not the case. I refer you to the original report I wrote on 05/28/2021, bottom of page one, where I perform a Polk analysis on the MRI studies that the claimant had. These studies show the progression of the degenerative changes at L4/5 and L5/S1. There is recurrent disc herniation seen at L4/5 in 1992( referenced to being seen in 1988). This disc herniation cannot be ascribed to the prior injury or surgery due to the time interval. These changes cannot be attributed to adjacent level disease, as there was no fusion performed in the past. Dr. Ostrup does report that there currently is surgical pathology present in the claimant's lumbar spine. There are defined progressive changes in the lumbar spine that have been developing over this long period of time which explains the chronic back pain. It is not realistic to consider that the current condition is related to the original surgery and accident.

Although I do respect Dr. Ostrup's opinion, I respectfully disagree with it, and it has not changed my opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

Marvin Friedlander M.D.
Board Certified Neurological Surgery
NJ#25MA05251300

# Exhibit G

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF CALIFORNIA
2

RICHARD J. LEUNG, MD,
3      Plaintiff

4  VS.

5  UNUM LIFE INSURANCE
COMPANY OF AMERICA; AND
6  DOES 1 THROUGH 10,          C.A. NO.:
INCLUSIVE,
7      Defendants              3:22-CV-00767-W-JLB

8

9

10

11      VIDEOTAPE DEPOSITION of ADAM STIMSON taken at

12  the request of the plaintiff pursuant to the

13  applicable provisions of the Massachusetts

14  Federal Rules of Civil Procedure before

15  Teresa Rose Wood, a notary public in and for the

16  Commonwealth of Massachusetts, on November 29,

17  2022, commencing at 9:30 A.M. at the offices of

18  Bachrach & Bachrach, 490 Shrewsbury Street,

19  Worcester, Massachusetts.

20

21

22

23

24

1      A.    I don't know specifically, I think

2  it's more -- I don't know specifically.

3      Q.    Has Doctor Friedlander ever had his

4  medical license suspended?

5      A.    I don't know.

6      Q.    Have you ever gone onto Google and run

7  an internet search on Doctor Friedlander to see

8  if his medical license has been suspended?

9      A.    No.

10      MR. BERNACCHI:  Objection.  Let me

11  just make a standing objection lacks foundation.

12  I object to all this testimony unless there's

13  actual evidence produced that his license has

14  been suspended.

15      Q.    Do you know whether

16  Doctor Friedlander's medical license was

17  suspended for falsely misrepresenting the state

18  of his medical practice?

19      A.    No.

20      Q.    Who was responsible for selecting

21  Doctor Friedlander to do a medical review in the

22  Leung file?

23      A.    I don't know, I think it's a similar

24  process, I think, I'm not sure, using Dane Street

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

I, TERESA ROSE WOOD, a notary public in and for the Commonwealth of Massachusetts, do certify that pursuant to appropriate notice of taking deposition, there came before me the subject deponent, who was by me duly sworn; that said witness was thereupon examined under oath and said examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am not a relative or employee or counsel or attorney for any of the parties, or a relative or employee of such counsel or attorney, nor am I financially or otherwise interested in the outcome of the action.

Witness my hand and official seal at Worcester, Massachusetts, this 15th day of January, 2023.

My Commission Expires
January 20, 2023

_____
Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control of the certifying reporter.

1          <u>SIGNATURE PAGE</u>

2          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
3                   C.A. NO.:
                 3:22-CV-00767-W-JLB
4    _____

5
     RICHARD J. LEUNG, MD,                    )
6            Plaintiff                        )
                                              )
7    VS.                                      )
                                              )
8    UNUM LIFE INSURANCE COMPANY OF           )
     AMERICA; AND DOES 1 THROUGH 10,          )
9    INCLUSIVE,                               )
             Defendants                       )
10   _____

11

12

13

14

15          I, ADAM STIMSON, do hereby certify that I

16   have read the foregoing, and it is a true

17   transcript of the testimony given by me at the

18   taking of the subject deposition.

19

20          *Adam Stimson*
21   _____
            ADAM STIMSON
22
            2/1/2023
23   _____
                    DATE
24   TW - November 29, 2022

# Exhibit H

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF CALIFORNIA
2


3
RICHARD J. LEUNG, MD,
4     Plaintiff

5  VS.

6  UNUM LIFE INSURANCE
   COMPANY OF AMERICA; AND
7  DOES 1 THROUGH 10,          C.A. NO.:
   INCLUSIVE,
8     Defendants                3:22-CV-00767-W-JLB

9

10

11     VIDEOTAPE DEPOSITION of SHANNON CARTIER taken

12  at the request of the plaintiff pursuant to the

13  applicable provisions of the Massachusetts

14  Federal Rules of Civil Procedure before

15  Teresa Rose Wood, a notary public in and for the

16  Commonwealth of Massachusetts, on November 30,

17  2022, commencing at 9:10 A.M. at the offices of

18  Bachrach & Bachrach, 490 Shrewsbury Street,

19  Worcester, Massachusetts.

20

21

22

23

24

```
 1          A.      I believe so, yes.
 2          Q.      And the outside doctor is
 3   a Doctor Marvin Friedlander; is that correct?
 4          A.      Yes.
 5          Q.      And tell me, if you could, please,
 6   everything you know about Doctor Friedlander's
 7   background, training and experience?
 8          A.      All that I know is outlined in his
 9   reviews that he's a Board certified neurosurgeon.
10          Q.      Other than understanding that
11   Doctor Freidlander is a Board certified
12   neurosurgeon, do you know anything else about his
13   background, training and experience?
14          A.      I do not.
15          Q.      Do you know whether or not
16   Doctor Friedlander is employed by Dane Street as
17   part of one - as one of its directors?
18          A.      I do not.
19          Q.      Do you know whether Doctor Friedlander
20   has any financial interest in Dane Street?
21          A.      I do not.
22          Q.      Do you know whether Doctor Friedlander
23   has ever had his medical license suspended?
24               MR. BERNACCHI:  Objection, assumes
```

facts not in evidence, but go ahead.

    A.    I do not.

    Q.    Did you do any independent research on Doctor Friedlander's background, training and experience prior to having him do reviews in connection with the Leung claim?

    A.    No, and I wouldn't have known who Dane Street was selecting anyways (sic), I wouldn't have known that information.

    Q.    Why wouldn't you have known who Dane Street was selecting?

    A.    Within that process I have no involvement so Dane Street handles selecting the actual physician, and I don't know who that physician is until I get the actual report.

    Q.    So how does Dane Street know that you want a specific doctor or a specific medical specialty?

    A.    In this case, the file was sent for what's called an IME prep by a Doctor Chris Bartlett, and in that referral or template review, he selected the appropriate - what he thought was the appropriate specialty to complete further review.

1  COMMONWEALTH OF MASSACHUSETTS

2  WORCESTER, SS.

3      I, TERESA ROSE WOOD, a notary public in and

4  for the Commonwealth of Massachusetts, do certify

5  that pursuant to appropriate notice of taking

6  deposition, there came before me the subject

7  deponent, who was by me duly sworn; that said

8  witness was thereupon examined under oath and

9  said examination reduced to writing by me; and

10  that the deposition is a true record of the

11  testimony given by the witness.

12      I further certify that I am not a relative or

13  employee or counsel or attorney for any of the

14  parties, or a relative or employee of such

15  counsel or attorney, nor am I financially or

16  otherwise interested in the outcome of the

17  action.

18  Witness my hand and official seal at Worcester,

19  Massachusetts, this 15th day of January, 2023.

20  My Commission Expires
    January 20, 2023

21                      _____
                             Notary Public

22

23      The foregoing certification of this transcript
    does not apply to any reproduction of the same in
    any respect unless under the direct control of

24  the certifying reporter.

1          <u>SIGNATURE PAGE</u>

2          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA

3                    C.A. NO.: 3:22-CV-00767-W-JLB

4     _____

5
      RICHARD J. LEUNG, MD,                    )
6          Plaintiff                           )
                                               )
7     VS.                                      )
                                               )
8     UNUM LIFE INSURANCE COMPANY OF           )
      AMERICA; AND DOES 1 THROUGH 10,          )
9     INCLUSIVE,                               )
           Defendants                          )
10    _____

11

12

13          I, SHANNON CARTIER, do hereby certify that

14    I have read the foregoing, and it is a true

15    transcript of the testimony given by me at the

16    taking of the subject deposition.

17

18

19          *Shannon Cartier*
      _____
20          SHANNON CARTIER

21

22          February 1, 2023
      _____
23                  DATE

24    TW - November 30, 2022

# Exhibit I

 1                UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RICHARD J. LEUNG, M.D.,         :

 5                  Plaintiff,       :   Case No.
                                         3:22-cv-00767-W-JLB
 6            v.                     :

 7   UMUN LIFE INSURANCE COMPANY     :
     OF AMERICA, and
 8   DOES 1 through 10,              :
     inclusive,
 9                                   :
                  Defendants.
10   ---------------------------

11

12

13

14    VIDEOTAPED DEPOSITION OF MARVIN E. FRIEDLANDER, MD

15                 APPEARING REMOTELY FROM

16              UNION COUNTY, PENNSYLVANIA

17

18                  December 8, 2022

19                     9:13 a.m.

20

21

22

23   REPORTED BY:
     JENNIFER D'ANGELO, RPR, CCR-NJ
24   APPEARING REMOTELY FROM PHILADELPHIA COUNTY,
     PENNSYLVANIA
25

```
 1                    MR. HORROW:  It's vague and

 2          ambiguous.

 3     BY MR. BERNACCHI:

 4     Q.     You put in a lot of effort and you were paid

 5     $425, according to Mr. Horrow?

 6     A.     420.

 7     Q.     $420 --

 8                        MR. HORROW:  It wasn't according to

 9          me, it was according to Dr. Friedlander.

10                        THE WITNESS:  Yes.

11     BY MR. BERNACCHI:

12     Q.     Why did you put so much effort in the

13     report?

14     A.     This is how a report is written.

15     Q.     One final question for you.

16          On your CV that we originally showed you,

17     Mr. Horrow, I think it was the first exhibit he

18     referenced, you have a designation as medical

19     director on your -- on your resume for Dane Street.

20     Do you recall that?

21     A.     Yes.

22     Q.     Okay.  What was your purposes in identifying

23     yourself as a medical director?

24     A.     That is the generic term used by utilization

25     review companies for doctors who review cases.
```

1  Q.      Okay.  So that wasn't Dane Street, that was

2  your terminology; correct?

3  A.      That is -- that is the industry standard

4  terminology for someone doing my job, yes.

5                  MR. BERNACCHI:  Okay.  I have no

6          further questions.

7                  EXAMINATION

8  BY MR. HORROW:

9  Q.      Dr. Friedlander, because Mr. Bernacchi

10  raised it, I'm interested to know, for $420, if you

11  worked --

12  A.      It was too cheap, if that's what you're

13  getting at.

14  Q.      I know, but let's do it this way.  I'm going

15  to take 420 --

16  A.      It's $50 an hour.

17  Q.      Slightly above, I have $52.50 an hour.  Does

18  that sound about right?

19  A.      Yes.

20  Q.      Dane Street hasn't offered to pay you one

21  dime to review any additional information, films,

22  x-rays, or your file to prepare yourself here today;

23  is that right?

24  A.      Correct.

25  Q.      Okay.  Mr. Bernacchi objected based on the



1                    REPORTER'S CERTIFICATE

2

3        I, the undersigned Certified Shorthand Reporter

4    holding a valid and current license issued by the State

5    of California, do hereby certify:

6

7        That said proceedings were taken down by me in

     shorthand at the time and place therein set forth and

8    thereafter transcribed under my direction and

9    supervision.

10

11       I further certify that I am neither counsel for nor

12   related to any party to said action nor in any way

13   interested in the outcome thereof.

14

       Before completion of the deposition, review of the

15   transcript [ ]was [X]was not requested.

16

17       The dismantling, unsealing, or unbinding of the

18   original transcript will render the Reporter's

19   certificate null and void.

20

21       IN WITNESS WHEREOF, I have subscribed my name on

     this date: December 29, 2022.

22

23

24        _____

25                 Certified Shorthand Reporter

