Michael B. Horrow, State Bar No. 162917
Nichole D. Podgurski, State Bar No. 251240
DONAHUE & HORROW LLP
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245
Tel: (310) 322-0300
Fax: (310) 322-0302
Email: mhorrow@donahuehorrow.com
        Npodgurski@donahuehorrow.com

Russell G. Petti, SBN 137160
The Law Offices of Russell G. Petti
466 Foothill Blvd., # 389
La Canada, California 91011
818 952-2168 Telephone
818 952-2186 Facsimile
Email:  Rpetti@petti-legal.com

Attorneys for Plaintiff
Richard J. Leung, M.D.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. LEUNG, M.D., | CASE NO: 3:22-cv-00767-W-JLB |
| Plaintiff, | PLAINTIFF RICHARD J. LEUNG, M.D.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT |
| vs. | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 to 10, inclusive, | |
| | NO ORAL ARGUMENT PURSUANT TO LOCAL RULE |
| Defendants. | |
| | DATE:      August 28, 2023 |
| | COURT:   Before the Honorable Thomas J. Whelan, United States District Judge |

Counsel of record for Plaintiff Richard J. Leung, M.D. respectfully submit the enclosed Memorandum of Points and Authorities in support of his Motion for Partial Summary Judgment.

Dated: July 24, 2023

Michael B. Horrow
Nichole D. Podgurski
Donahue & Horrow LLP

Russell G. Petti
The Law Offices of Russell G. Petti

By: _____S/*Michael B. Horrow*_____
          Michael B. Horrow
   Attorneys for Plaintiff Richard Leung, M.D.

# Table of Contents

I.  Introduction and summary of argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Statement of relevant facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  Dr. Leung's policies provided lifetime benefits for a disability caused by an accident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  Dr. Leung injures his lumbar spine while lifting a patient when he was working at the Veterans' Administration. . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.  Dr. Leung has continuing symptoms of his lumbar spine injury. . . . . . . . 6
    D.  Dr. Leung injured his cervical spine while receiving therapy for the injury in his lumbar spine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    E.  Dr. Leung continues to suffer symptoms from his lumbar injury and his cervical injury worsens and eventually requires surgery. . . . . . . . . . . . . . 8
    F.  Dr. Leung struggles from the symptoms of his injuries and then in 2020 is forced to go on disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    G.  UNUM determines that Dr. Leung's disability was caused by a sickness rather than accidental injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    H.  The Department of Labor File contains significant evidence, including two IMEs, showing that Dr. Leung's disability is due to injuries. . . . . . . . . 12
        1.  The Alksne letter establishes that Dr. Leung would suffer continued symptoms even after the 1983 surgery. . . . . . . . . . . . . . . . . . 12
        2.  The Levine IME establishes that the injury to Dr. Leung's cervical spine is due to an injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        3.  The Einbund IME establishes that the cause of Dr. Leung's disability is accidental injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    I.  None of UNUM's claims handlers or any of the physicians it hired saw the Department of Labor file. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    J.  UNUM's post-litigation claims handling ignored significant evidence that Dr. Leung was disabled from accidental injury rather than sickness. . . . 17
        1.  The Alberstone Report contained significant evidence that Dr. Leung's disability is due to an injury but it was not provided to UNUM's claims handlers and physicians . . . . . . . . . . . . . . . . . . . . . . . 17
        2.  UNUM failed to review the DOL file or the Alberstone Reports when, post litigation, it obtained these documents. . . . . . . . . . . . . 19
            a.  UNUM's designee testified as to UNUM claims handling, and his testimony was not limited to pre-litigation matters . . . . 19
            b.  UNUM failed to consider, post-litigation, whether its denial was correct in light of the Alberstone reports and the DOL file. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    A.  An insurer's duty of good faith and fair dealing requires it to make a reasonable investigation and seek out evidence that may support a claim. 20
    B.  An insurer's duty of good faith continues even after the commencement of litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    C.  UNUM breached the duty of good faith by not obtaining the DOL file prior to deciding his disability was due to sickness. . . . . . . . . . . . . . . . . . . . . 22
    D.  UNUM breached its duty of good faith by failing to reconsider its decision when it received the DOL file and the Alberstone reports. . . . . . . . . . . . 24

IV.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

**Table of Authorities**

2

**California Cases:**

3

*California Physicians' Serv. v. Superior Ct.*,
   9 Cal. App. 4th 1321 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4

*Carlton v. St. Paul Mercury Ins. Co.*,
   30 Cal. App. 4th 1450 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5

6

*Chase v. Blue Cross of California*,
   42 Cal. App. 4th 1142 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7

*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

8

*Gomez v. Acquistapace*,
   50 Cal.App.4th 740 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

9

10

*Gourley v. State Farm Mut. Auto. Ins. Co.*,
   53 Cal. 3d 121 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11

*Hughes v. Blue Cross of N. California*,
   215 Cal. App. 3d 832 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

12

13

*Jordan v. Allstate Ins. Co.*,
   148 Cal. App. 4th 1062 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14

*KPFF, Inc. v. California Union Ins. Co.*,
   56 Cal.App.4th 963 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15

16

*Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*,
   78 Cal. App. 4th 847 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17

*Silberg v. California Life Ins. Co.*,
   11 Cal. 3d 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18

19

*White v. W. Title Ins. Co.*,
   40 Cal. 3d 870 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

20

21

**Other Authority:**

22

Cal. Labor Code § 3600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23

*California Practice Guide: Professional Responsibility & Liability*,
   (Rutter Group, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

24

25

26

27

28

1  **Memorandum of Points and Authorities**

2  I.  **Introduction and summary of argument.**

3      Dr.  Richard Leung was, at the time of his disability, covered by five disability

4  insurance policies issued by UNUM Life Insurance Company of America ("UNUM").

5  The policies all provided for lifetime benefits if Dr. Lueng's disability was due to an

6  injury but only 24 months of benefits if it was due to a sickness.

7      When UNUM decided Dr. Leung was disabled by sickness it had failed to obtain

8  his workers' compensation file maintained by the Department of Labor ("DOL").  This

9  file contained powerful evidence, including two independent medical exams, showing

10  Dr. Leung's disability was due to an accidental workplace injury.  The documents

11  UNUM did have showed that the DOL had determined Dr. Leung's disability was due

12  to an injury and its failure to obtain this file constitutes bad faith as a matter of law.

13      UNUM finally obtained the DOL file, but only after its decision denying lifetime

14  benefits and Dr. Leung brought this lawsuit.  In addition Dr. Leung's counsel provided

15  UNUM with two reports by Board-Certified Neurosurgeon Carey Alberstone, M.D.

16  whose opinions, unlike the physicians that UNUM paid to review Dr. Leung's file,

17  were based on his review of the films of Dr. Leung's various x-rays and MRIs.

18  Because UNUM's duty of good faith continues despite the litigation it was legally

19  required to consider whether, due to this new evidence, its decision was in error.  It

20  failed to do so, in a second act constituting bad faith as a matter of law.

21      In 1982 Dr. Leung was working for the Veterans Administration ("VA") when he

22  injured his lumbar spine helping lift a patient.  This injury caused low back pain and

23  pain radiating into his leg.  The DOL, the VA's workers' compensation insurer, covered

24  this injury and provided for its treatment.  In 1983 Dr. Leung had surgery for this injury

25  which was only partially successful.  As such, Dr. Leung's injury to his lumbar spine

26  caused continuing symptoms of pain and radiculopathy and required regular evaluation

27  and treatment.

28  ///

In 1993 Dr. Leung was undergoing therapy for this injury when he injured his cervical spine when working with a rowing machine. This injury caused neck pain as well as pain and numbness radiating out into Dr. Leung's arm and hand. The DOL had Dr. Leung examined by a specialist, who concluded that this new injury was caused by his 1982 workplace injury and should also be covered. Dr. Leung had continued conservative treatment for both injuries however, when the symptoms of his cervical injury became unmanageable he had another surgery in 2004. Again this surgery was only partially successful and Dr. Leung's symptoms from both injuries continued. Dr. Leung continued to work dispute these symptoms, relying on therapy, chiropractic treatment and narcotic painkillers. However, in 2020 Dr. Leung's symptoms because too much for him to bear and he went on disability.

Dr. Leung made disability claims both to UNUM and to the DOL. The DOL, unlike UNUM, had Dr. Leung examined by a specialist who, after reviewing his extensive medical records and the films from his various x-rays and MRIs, determined Dr. Leung was disabled from his initial workplace injury.

The DOL file contained these two IMEs, as well as records showing the history of the injuries to Dr. Leung's spine, the symptoms they caused and his regular treatments for them. However, UNUM never obtained this file, in spite of the facts that (1) documents it did have showed the DOL had found his spinal condition was due to an injury and (2) one of its own claims handlers recognized the file's significance and requested that UNUM obtain it. Instead, when it decided Dr. Leung's disability was due to a congenital spinal condition it relied on the opinions of three physicians who neither examined Dr. Leung or reviewed the films from his various x-rays and MRIs.

After litigation commenced Dr. Leung's counsel retained Dr. Alberstone, a surgeon and neurologist who, unlike UNUM's file review physicians, reviewed the films of Dr. Leung's x-rays and MRIs. He wrote compelling reports showing these films established Dr. Leung's disability was injury based. In addition UNUM finally
///

obtained the DOL file.  However UNUM ignored this new evidence and did not utilize it to reconsider whether its decision was in error.

California law is clear that an insurer has a duty of good faith to seek out evidence to support an insured's claim.  Here, when UNUM failed to obtain the DOL file, knowing the DOL had concluded Dr. Leung's problems were due to accidents and not a pre-existing congenital condition, it committed bad faith as a matter of law.

In addition, California law is clear that an insurer's duty of good faith continues during litigation. So, when UNUM failed to even look at this evidence to see whether it merited a changed decision this was, again, bad faith as a matter of law.

## II.    Statement of relevant facts.

### A.    Dr. Leung's policies provided lifetime benefits for a disability caused by an accident.

At the time of his disability Dr. Leung was covered under five disability policies issued by UNUM (Leung Ex. A-E).  Four of the policies (Ex. A-D) contain language that if the disability is due to an accident, benefits continue "for as long as total disability continues, if total disability began prior to age 65 policy anniversary.  (*See e.g.* Ex. A, pg. 5).   If the disability is due to a sickness these policies only provide lifetime benefits "if total disability began prior to age 55 policy anniversary." Otherwise, benefits are paid "to the later of (A) age 65 policy anniversary or (B) 24 months."  (*See e.g.* Ex. A, pg. 5).

The fifth policy (Ex. E) contains a "Lifetime Accident Benefit Rider."  (Ex. E, pg. 15).   Under the terms of this Rider UNUM must continue payment of benefits if "the insured is totally disabled" and the disability "is the result of injury which occurred before the policy anniversary when his age was 65 . . ." (Ex. E, pg. 15).  However, if the disability is not due to a accident the rider does not apply and benefits are only paid "to the later of (A) 65 policy anniversary or (b) 24 months after disability payments begin."  (Ex. E, pg. 4).

///

As such, the key issue in this case is whether Dr. Leung's disability is due to an accidental injury or a sickness.

**B.    Dr. Leung injures his lumbar spine while lifting a patient when he was working at the Veterans' Administration.**

Dr. Leung is a physician who, prior to his disability, worked as a Ophthalmologist.  He graduated from the University of Maryland Medical School in 1981.  After his graduation he interned at the University of California San Diego, in general surgery. (Leung Decl., ¶ 3).

As part of his internship Dr. Leung was assigned to work at the Veterans Administration Medical Center ("VA").  In May of 1982 he was working in the VA's Intensive Care Unit when a large patient with a life threatening emergency arrived.  In order to get the patient onto an ICU bed Dr. Leung, along with some other staff members, lifted the patient onto the bed.  While doing this Dr. Leung felt a "pop" in his lower back.  (Leung Decl., ¶ 4).

Over the next few days Dr. Leung suffered from increased pain and tightness in his lower back.  He developed pain in his left leg and numbness in his left foot.  The pain was made worse by standing.  Eventually he went to the emergency room and the physician there ordered a CAT scan.  (Leung Decl., ¶ 5).

On June 17, 1982 Dr. Leung saw Dr. Kenneth Ott, M.D. who, upon reading the scans, told Dr. Leung he had bulges in two discs in his lower back, specifically the discs at L4-5 and L5-S1.  One of these bulges was compressing a nerve as it exited Dr. Leung's spinal column.  Dr. Ott recommended conservative therapy and followed Dr. Leung's clinical course for the next six or seven months.  (Leung Decl., ¶ 6).

Over this period Dr. Leung's symptoms from his spinal injury continued to increase.  His pain was increasing as was the numbness in His leg.  It was difficult for him to walk more than half a mile and he experienced a slight "foot drop" where he could not flex his right foot or ankle.  It became apparent that conservative therapy was not going to work and that he needed surgery.  (Leung Decl., ¶ 7).

In January 1983 Dr. Leung consulted with Dr. John Alksne, who was Chief of Neurosurgery at UCSD.  He had previously worked closely with Dr. Alksne during his two neurosurgery rotations and chose him to perform the surgery.  (Leung Decl., ¶ 8).

The surgery, which involved a lumbar diskectomy at L4-5 and foraminotomy at L4-5 and SI was done on February 16, 1983.  There were significant complications during the surgery and afterward Dr. Leung was in intense pain and developed an infection with fever.  He was held in the hospital for ten days.  (Leung Decl., ¶ 9).

Afterwards, Dr. Alksne told Dr. Leung that the surgery had not been completly successful in resolving the problems with his lumbar spine.  He advised Dr. Leung to avoid strenuous activities and heavy lifting and that it was possible that he might need additional surgery.  After the surgery Dr. Leung was off work until July of 1983. (Leung Decl., ¶ 10).

Given that the Dr. Leung had injured his back while working at the VA his injury was covered by workers' compensation.  The Department of Labor acted as the VA's workers' compensation carrier.  (Leung Decl., ¶ 12; Horrow Decl., ¶ 18).  On June 14, 1993 Dr. John Alksne wrote to the DOL's Evelyn Gong informing her that the surgery had not been completely successful and Dr. Leung would need additional treatment. Ms. Gong responded that the DOL would authorize the future treatments.  (Horrow Decl., ¶ 19-20, Ex. N 1,2).

On July 15, 1983 Dr. Leung wrote his own letter to Ms. Gong.  He informed her that, although he had resumed work he continued to have symptoms from the work-related injury and that "it appears inevitable that I will require additional surgery." (Leung Decl., ¶ 13; Ex. F).

It is important to note here that, prior to the May of 1982 injury, Dr. Leung led an active lifestyle and his lumbar spine had always been pain free and problem free.  This changed after the May 1982 injury and he never recovered full function of his lumbar spine after the February 1983 surgery.  Afterward he had continued pain, stiffness and spasms in his lower back.  He was not able to lift as much as he previously did and his

1  ability to run and play sports was significantly reduced.  He had difficulty sleeping
2  because of the pain and sometimes even narcotic pain medication did not give him
3  appropriate relief.  (Leung Decl., ¶ 11).

4          C.      **Dr. Leung has continuing symptoms of his lumbar spine injury.**

5          Sometime around May of 1983 Dr. Leung moved to Los Angeles for an
6  Ophthalmology residency at Los Angeles County-U.S.C. Medical Center.  He began
7  treating with Dr. Leon Wiltse, an orthopaedic back specialist, for the residual symptoms
8  of his May, 1982 spinal injury.  In February of 1985 Dr. Wiltse recommended that Dr.
9  Leung began a formal program of physical therapy for his inured spine known as "back
10 school."  In the course of this program Dr. Leung was provided with various exercises
11 to perform at home.  (Leung Decl., ¶ 14).

12         On March 15, 1985, because of Dr. Leung's continuing back symptoms, Dr.
13 Wiltse had him undergo an MRI which showed a spinal injury at the L4-5 disc.  By
14 August of 1988, with his symptoms continuing in spite of the physical therapy he was
15 doing, Dr. Wiltse suggested he see a chiropractor and wrote to the DOL recommending
16 approval of this treatment.  (Leung Decl., ¶ 15).

17         In an attempt to address his spinal pain Dr. Leung treated with a chiropractor, Dr.
18 Leroy Perry, from October 1987 to June 1988.  Dr. Perry's treatment included
19 ultrasound, TENS and manipulation.  None of these treatments provided more than
20 temporary relief.  (Leung Decl., ¶ 16).  Then, around December of 1988 Dr. Leung
21 began experiencing more serious low back pain with pain radiating down his left leg.
22 On January 25, 1989 he saw Dr. Wiltse about this, who said this was likely instability at
23 the L4 level.  He recommended an MRI of the lumbar spine.  (Leung Decl., ¶ 17).

24         Dr. Leung relocated to San Diego in November of 1988 to open his practice as an
25 Ophthalmologist.  He continued to have serious pain in his lumbar spine, which radiated
26 down his left leg.  At this point he just accepted that he was going to have to live with
27 this and worked around it.  However, on February 8, 1992 Dr. Leung had an episode
28 where his back went out with a significant spasm and midline shift of the upper torso.

He went to the Sharp Memorial Hospital emergency room where he was given a Valium I.V.   Not surprisingly, an MRI showed that the cause of his symptoms was disc herniation at L4-5.  (Leung Decl., ¶ 18).

> D.   **Dr. Leung injured his cervical spine while receiving therapy for the injury in his lumbar spine.**

Dr. Leune engaged in substantial physical therapy for the injury to his lumbar spine.  In 1993 he was receiving this therapy at a physical therapy and sports center that operated out of the same medical building where he was working.  He worked with trainers from the center to strengthen his lower back in an attempt to address his symptoms of lower back pain.  (Leung Decl., ¶ 19).

Sometime around mid-to-late November of 1993 Dr. Leung was working with one of these trainers on a rowing machine.  She put too much weight on the machine and Dr. Leung felt a pop in his neck when he tried to lift it.  Later that night he developed severe neck pain radiating into his upper back and shoulder.  Over the ensuing weeks the pain increased in intensity and he started having tingling in my right thumb and index finger.  (Leung Decl., ¶ 19).

On January 4, 1994 Dr. Leung began treating with Dr. Charles Jablecki, a neurologist.  Dr. Jablecki opined that the November 1993 injury had caused a right C6 radiculopathy.  He also diagnosed Dr. Leung with lumbosacral spine disease from his 1982 injury.  An MRI showed a disc protrusion at C5-C6 which, according to Dr. Jablecki, was causing the pain in Dr. Leung's shoulder and numbness and tingling in his right arm.  (Leung Decl., ¶ 20).

Dr. Jablecki referred Dr. Leung to a neurosurgeon, Dr. Joel Ray, to evaluate whether he needed surgery on his cervical spine.  Dr. Ray concurred with his diagnosis of a disc protrusion at C5-C6 and lumbasacral spine disease but, fortunately, opined that surgery was not needed at that time.  Dr. Leung consulted with Dr. Ray numerous times up through January 5, 1996 when he confirmed, again, that Dr. Leung had injuries to his lumbar and cervical spines.  (Leung Decl., ¶ 22-23).

On May 31, 1995, at the DOL's request, Dr. Leung had a "second-opinion examination" with Dr. Mark Levine, a neurologist.  Dr. Levine had been retained by the DOL to offer an opinion on whether the DOL was required to cover the treatment for Dr. Leung's cervical spine.  After examining Dr. Leung and reviewing his medical records Dr. Levine determined that, because the cervical spine injury occurred when Dr. Leung was receiving therapy for the work-related injury to his lumbar spine, treatment for it should be covered by the DOL.  (Leung Decl., ¶ 24).

Once again, it is important to note that, again, prior to the November 1993 rowing injury Dr. Leung had been completely pain free in his neck and shoulder and had never before experienced any tingling and numbness in his arm.  And, after the rowing injury up to the present Dr. Leung was never been free from pain in his neck and shoulder area as well as other symptoms of damage to his cervical spine.  (Leung Decl., ¶ 21).

E.   **Dr. Leung continues to suffer symptoms from his lumbar injury and his cervical injury worsens and eventually requires surgery.**

During 1997 up through 2001 Dr. Leung received therapy from T.H.E. Clinic with Peter Egoscue for the injuries to his lumbar and cervical spine.  He also continued his regular consultations with Dr. Jablecki for the injuries to his cervical and lumbar spine.  (Leung Decl., ¶ 25).

On October 1998 Dr. Jablecki wrote a letter stating his opinion that the injury to Dr. Leung's cervical spine that he suffered in November of 1993 was a direct consequence of the work-related injury in 1982.  Dr. Jablecki stated that this was because Dr. Leung was receiving treatment for the 1982 injury at the time of the November 1993 injury.  (Leung Decl., ¶ 26).

During a March 27, 2001 consultation Dr. Leung told  Dr. Jablecki that the symptoms of his cervical spine injury were causing problems and that the pain would flare up if he tried to lift anything heavy, for example his children.  Dr. Leung also reported a buzzing sensation in his right hand.  (Leung Decl., ¶ 28).

///

In response Dr. Jablecki referred Dr. Leung to Dr. Sam Maywood, who diagnosed him with C5-6 radiculopathy and gave him three spinal injections in April and June of 2001.  The injections provided only temporary relief.  By August of 2001 the symptoms of Dr. Leung's cervical injury were increasing and Dr. Jablecki referred him to a neurosurgeon, Dr. Richard Ostrup.  (Leung Decl., ¶ 29).

Dr. Leung saw Dr. Ostrup on September 14, 2001.  According to Dr. Ostrup Dr. Leung's symptoms of pain and numbness in his hand were caused by a damaged disc at C5-C6.  Surgery was discussed but Dr. Leung wanted to hold off for now.  (Leung Decl., ¶ 30).

Over the next few years Dr. Leung continued to consult with Dr. Jablecki and received regular physical therapy.  The symptoms of his cervical and lumbar injuries waxed and waned; some months were better than others and some months were worse.  At one point in late 2003 the symptoms of Dr. Leung's neck injury were bad enough that he was scheduled for surgery.  However, they improved somewhat and surgery was deferred.  (Leung Decl., ¶ 31).

However in October of 2003 the symptoms of Dr. Leung's cervical injury flared with increased pain in his neck and buzzing in his hands.  A November 2003 MRI showed his condition was getting worse.  It appeared at that point the surgery on Dr. Leung's spinal surgery was inevitable.  (Leung Decl., ¶ 32).

The surgery was performed by Dr. Ostrup on January 19, 2004.  He performed a cervical diskectomy at C5-6 and a fusion of those two vertebrae.  The surgery went well and Dr. Leung was able to return to work in about four months.  He still had some symptoms of numbness in my hands but they were improved.   Dr. Leung requested and received physical therapy to address the continuing symptoms of his cervical and lumbar injuries.  (Leung Decl., ¶ 33).

///

///

///

**F.    Dr. Leung struggles from the symptoms of his injuries and then in 2020 is forced to go on disability.**

Unfortunately, the relief from the surgery was short lived.  During the summer of 2004 Dr. Leung had increased pain radiating into his arm as well as numbness.  His low back pain was also causing problems.   Over the next few weeks the flare resolved and Dr. Leung returned to a "baseline" level of pain and stiffness in his cervical and lumbar spine.  (Leung Decl., ¶ 34).

This became the pattern for the next decade or so.  Dr. Leung suffered from constant pain and stiffness in his lumbar and cervical spine which, every few months, would flare in intensity.  He had regular consultations with Dr. Jablecki as well as physical therapy, and periodic MRI or CT scans to monitor the condition of his spine.  (Leung Decl., ¶ 35).

On October 3, 2014 Dr. Jablecki retired from practice.  He referred Dr. Leung to Dr. Michael Moon, a pain specialist, who took over his care.  Otherwise, things carried on before, with periodic flareups which would eventually subside to a baseline level of pain.  (Leung Decl., ¶ 36).

During this period the symptoms of the injuries to his cervical and lumbar spines had a significant impact on Dr. Leung's ability to work as an ophthalmologist.  He needed to lean forward to examine patients at the slit lamp and this put stress on his lower back.  To get a complete exam when looking at the retinal with an indirect ophthalmoscope he had to bend and flex his spine to create the correct angles to see the structures properly.  Cataract surgery required sitting on a hard stool at strange angles for hours at a time.  All of these caused stress on Dr. Leung's lower back as well as his upper back and there were days when he left the operating room unable to turn his head or feel his hands.  However, he was able to work through the pain, taking nonsteroidal anti-inflammatory drugs like Vioxx as well as narcotic painkillers like Valium in order to help manage his symptoms.  (Leung Decl., ¶ 27).

///

1    At the beginning of 2020 Dr. Leung's condition began to deteriorate.  On
2  February 17, 2020, after a busy day in the clinic, he had severe low back and neck pain.
3  While trying to operate on February 19th he had extreme pain in his lower and upper
4  back and was experiencing increased numbness in his hands.  In response to these
5  increased symptoms Dr. Leung began increasing the dosage of the Valium he was
6  taking.  (Leung Decl., ¶ 37).

7    By March of 2020 Dr. Leung was experiencing some loss of motor function loss
8  in his arm.  Eventually, by May of 2020 he no longer believed that he could function
9  effectively as an ophthalmologist.  As such, he went out on disability in May of 2020.
10  (Leung Decl., ¶ 38).

11    G.    **UNUM determines that Dr. Leung's disability was caused by a sickness rather than accidental injury.**

12
13    On June 17, 2020 Dr. Leung submitted a claim to UNUM under his five
    disability policies.  As explained above, each of these policies provides lifetime benefits
14  if the disability begins before age 65 and is due to an accident.  However, the policies
15  also provide that if disability is due to a sickness the insured is only entitled to lifetime
16  benefits if his disability begins prior to age 55.  Otherwise, benefits under the policies
17  are limited to 24 months.  (Leung Decl., ¶ 39).

18    Dr. Leung's last day of work prior to his disability was May 28, 2020.  This date
19  is after his 55th birthday but before his 65th birthday.  As such, the fact that Dr. Leung's
20  disability is obviously due to two accidental injuries is obviously significant.  (Leung
21  Decl., ¶ 40).

22    When UNUM decided Dr. Leung's claim it agreed he was disabled.  However,
23  according to its letter of March 24, 2021, UNUM determined that Dr. Leung's disability
24  was due to a sickness rather than an accidental injury.    (Leung Decl., ¶ 41; Ex. H).
25  According to UNUM's letter:

26    He [UNUM's physician] opined that it is unreasonable to conclude that the
27    L4-5 and C5-6 disc herniations caused the diffuse process that have led to

28  ///

1   your current restrictions and limitations. He concluded the medical
2   condition causing your restrictions and limitations is degenerative disc
    disease, thus, etiology is sickness.

3   (Ex. H, pg. 4).

4   **H.  The Department of Labor File contains significant evidence, including two IMEs, showing that Dr. Leung's disability is due to injuries.**

5
6   Given that Dr. Leung's 1982 injury to his lumbar spine occurred while he was

7   working at the VA his treatment for that injury, as well as treatment for his 1993

8   cervical injury, has been covered by the DOL, the VA's workers' compensation insurer.

9   As such, the DOL maintains a substantial file which shows it determined that all of Dr.

10  Leung's spinal problems were due to injuries.  As such, the file shows the DOL

11  authorized treatment for those injuries and, eventually, accepted that Dr. Leung was

12  disabled due to those injuries.  (Horrow Decl., ¶ 18).   This evidence, which UNUM

13  failed to obtain before deciding Dr. Leung's claim strongly supports that his disability is

    due to injury.

14
15  **1.  The Alksne letter establishes that Dr. Leung would suffer continued symptoms even after the 1983 surgery.**

16  On June 14, 1983 Dr. John Alksne, the surgeon who performed Dr.  Leung's

17  February 1983 lumbar spine surgery, wrote to the DOL's Evelyn Gong.  In his letter Dr.

18  Alksne informed Ms. Gong that Dr. Leung "is making a satisfactory recovery following

19  his decompressive lumbar laminectomy, but he continues to have a moderate amount of

20  back and leg pain."  As such, Dr. Alksne reported that he had counseled Dr.

21  Leung "to avoid strenuous activities and heavy lifting" because the surgery had not

22  completely resolved the issues with Dr. Leung's lumbar spine:

23      A follow-up CT scan shows an adequate decompressive laminectomy, but
        some significant encroachment on the nerve root foramina by
24      hypertrophied facets.  This was not decompressed at the time of the
        original surgery, because of the fear of making his spine unstable and
25      possibly requiring a subsequent fusion.

26  (Horrow Decl. ¶ 19-20, Ex. N, pg. 1).

27  As such, Dr. Alksne wrote that Dr. Leung might require additional surgery for his

28  lumbar injury: "Nevertheless, if his symptoms should continue or increase in severity, it

1 might be necessary to perform further surgery at a later date.  (Horrow Ex. N, pg. 1).

2 On June 27, 1983 Mr. Gong responded that "[a]uthorization is given for further surgery,

3 if it becomes necessary."  (Ex. N, pg. 2).

4           **2.**      **The Levine IME establishes that the injury to Dr. Leung's cervical spine is due to an injury.**

5

6       In his Declaration Dr. Leung describes how he injured his cervical spine in

7 November of 1993 while receiving therapy for the injury to his lumbar spine.  The DOL

8 file shows that, on May 31, 1995, it had Dr. Leung undergo an Independent Medical

9 Examination ("IME") with a neurologist Mark Levine, M.D. to determine whether

10 treatment for this new injury should be covered by the DOL.  (Horrow Decl., ¶ 23; Ex.

11 O).

12       Dr. Levine conducted an examination of Dr. Leung and reviewed his medical

13 records and MRIs.  Based on this he concluded, first, that Dr. Leung's continuing pain

14 and radiculopathy in his lower back was due to his original 1982 injury to his lumbar

15 spine:

16         [T]he patient does suffer residuals of the original lumbarsacral disc herniation, status post laminectomy, with residual compressive L4/L4 radiculopathy on the left.  The clinical and x-ray/imaging studies document this adequately.

17

18 (Horrow Ex. O, 15).

19       Significantly, Dr. Levine rejected the position later taken by the UNUM file

20 review physicians that the lumbar spine symptoms were not due to an injury but rather

21 to a congenital defect in Dr. Leung's spine.  Rather, after examining Dr. Leung and

22 examining his MRI films–neither of which were done by any of UNUM's

23 physicians–Dr. Levine concluded that the congenital stenosis in Dr. Leung's spine

24 would not have caused the symptoms absent the injury:

25         There is no industrial or preexisting disability.  In my opinion the congenital spinal stenosis at L4 and over the sacral area as described, appears to be rather mild and would not have produced symptoms absent the disc herniation caused by the work-related injury of 5/23/82.

26

27 ///

28

1   (Ex. O, pg. 16).  Dr. Levine also concluded that because the injury to Dr. Leung's spine

2   "occurred during a program of back strengthening exercises prescribed for the original

3   injury of 5/23/1982" it should be covered by the DOL.  (Ex. O, pg. 15-16).

4          Dr. Levine also found that the prognosis of Dr. Leung's lumbar spine injury was

5   "fair" but would likely have continuing symptoms and require additional treatment.  Dr.

6   Levine opined that "it is probably that there will be recurrent exacerbations of pain, but

7   in all probability this can be managed conservatively."  (Ex. O, pg. 16-17).

8          As to Dr. Leung's cervical injury, Dr. Levine opined that prognosis was "more

9   guarded" due to the "sensory changes in the index finger and thumb of the dominant

10  right hand."  He stated that "if symptoms progress . . . more aggressive, *i.e.* surgical,

11  intervention would be indicated."  (Ex. O, pg. 17).

12         Consistent with Dr. Levine's conclusions the DOL approved various treatments

13  for the injuries to both Dr. Leung's lumbar and cervical spine.  These treatments include

14  therapy, spinal injections, imaging, a spinal allograft, and surgery.  (Horrow Decl., ¶ 29;

15  Ex. P).

16                    3.    **The Einbund IME establishes that the cause of Dr. Leung's**
                           **disability is accidental injury.**
17

18         After Dr. Leung became disabled in May of 2020, because his disability was due

19  to his VA injury he submitted a claim for disability benefits to the DOL.  In order to

    determine (1) whether Dr. Leung was disabled and (2) whether his disability was due to
20
    the injury suffered while working at the VA the DOL scheduled him for another IME.
21
    (Horrow Decl., ¶ 30).
22
           Dr. Leung was notified of the IME by a letter from the DOL dated January 25,
23
    2021.  This letter instructed Dr. Leung to provide the examining physician with the
24
    actual films from any recent x-rays, CAT scans, or MRIs.  (Horrow Ex. Q).
25
           The IME was performed on March 29, 2021 by Dr. Michael Einbund, an
26
    Orthopaedic Surgeon.  Like Dr. Levine and unlike any of UNUM's reviewing
27
    physicians, Dr. Einbund examined Dr. Leung (Horrow Ex. R, pg. 26) and also reviewed
28

the actual films from his various diagnostic scans (Ex. R, pg. 10).  He also performed a comprehensive review of Dr. Leung's medical records.  (Ex. R, pg. 15).  Given that the DOL's file was more comprehensive and complete this included numerous medical records that were not available to UNUM's file reviewers.  (Horrow ¶ 33).

In his report Dr. Einbund concluded that Dr. Leung had impairments to his cervical and lumbar spine:

> Essentially, there are multilevel degenerative disc disease spanning both spine segments the cervical and lumbar spine. There is nerve root impingement in the cervical and lumbar spine. The results also reveal post surgical changes.

(Ex. R, pg. 29).  Dr. Einbund also concluded that these conditions were disabling:

> Mr. Richard J. Leung is not currently capable of returning to his date of injury job as a physician. He has limitations of function as well as cognitive concerns noting his use of narcotic medications as prescribed by Dr. Moon.

(Ex. R, pg. 31).  Most significantly, Dr. Einbund concluded that the cause of the disability was the work accident that occurred in 1982 while Dr. Leung was working at the VA:

> The mechanism of injury while lifting a heavy client/patient who weight [sic] approximately 300 lbs., with the assistance of a colleagues is consistent with the diagnosis of disc displacement which is the accepted work related condition. The natural progression of this condition as well as having been treated with fusion at the C5-C6 and having put added stress to the adjoining levels has in part resulted in the noted degeneration.

(Ex. R, pg. 30).  Based on Dr. Einbund's report and conclusions, on July 21, 2021 the DOL concluded that Dr. Leung is disabled due to his work related injury.   (Horrow Ex. S).

## I.     None of UNUM's claims handlers or any of the physicians it hired saw the Department of Labor file.

In spite of its obvious significance none of UNUM's claims handlers or reviewing physicians have ever seen the evidence in the DOL file.  This is in spite of the fact that at least one of UNUM's claims handlers recognized the workers' compensation file was important to the determination of whether Dr. Leung's disability was due to sickness or injury.

Specifically, during her deposition UNUM's Lisa Sullo, testified that she recognized the potential importance of obtaining the workers' compensation file:

> [A] Workers' Comp claim would assist us in reviewing if the injuries are still there, what the basis of that Workers' Comp claim was for, or if the Workers' Comp claim was not approved, if it was approved, if he had a -- if he had recovered. Things of that nature.

(Horrow Ex. T, pg. 3:19-24). As a result, Ms. Sullo made a request that UNUM obtain Dr. Leung's workers' compensation file "to confirm Acc [accident] vs. Sick [sickness]." (Horrow Ex. U).

That Ms. Sullo was right and UNUM needed to obtain the DOL file was obviously correct. At that point UNUM had significant evidence in its own claim file that Dr. Leung not only had an active workers' compensation claim but it had been approved by the DOL. For example, Dr. Alksne's June 14, 1983 letter to the DOL's Ms. Gong, referenced above, is contained in UNUM's claim file. (Horrow Ex. N, pg. 1). This letter shows that the DOL had accepted coverage for Dr. Leung's spinal injury, meaning it had found that it was due to a workplace injury.

Similarly, UNUM's claim file contains a May 27, 1994 report by Dr. Joel Ray to the DOL. (Horrow Ex. U). According to Dr. Ray's report he was treating Dr. Leung for the injury to his cervical spine. This confirms that the DOL had also approved treatment for Dr. Leung's cervical injury. And, again, this shows the DOL recognized that the damage to Dr. Leung's cervical spine was due to a workplace injury.

However, according to Adam Stimson, who was in charge of Dr. Leung's claim as well as UNUM's designee, UNUM never obtained Dr. Leung's workers' compensation file. (Horrow Ex. I, pg. 6:21-7:9). He recognized that Ms. Sullo had made a request for the file but has no knowledge as to why there was no follow-through on this request. (Ex. I, pg. 9:8-11:19). As a result, at the time he approved UNUM's determination that Dr. Leung was disabled due to a sickness Mr. Stimson had only a vague understanding that Dr. Leung even had a workers' compensation claim. (Ex. I, pg. 7:2-8:22).

1    Further, during his deposition Mr. Stimson testified that he did not know why the

2  DOL was copied on all the reports of Dr. Moon, Dr. Leung's treating physician:

3    Q.    Is it your understanding that Dr. Moon was copying the U.S.
          Department of Labor regarding his progress notes on Dr. Leung

4          because Dr. Leung had an active Workers' Compensation claim?

5    A.    Again, I'm not sure of the reason.

6  (Ex. I, pg. 12:18-23).

7    Similarly, all of UNUM's reviewing physicians had no idea that Dr. Leung even

8  had a workers' compensation claim with the DOL, much less that the DOL had

9  determined that Dr. Leng's spinal problems were all due to accidental injury.  Dr.

10 Friedlander testified that "I have no idea, even to this moment, that he has an active

11 claim."  (Horrow Ex. K, pg. 5:6-15).  Dr. Milos testified he had no knowledge of why

12 Dr. Moon was copying the DOL on all his reports.  (Horrow Ex. M, pg. 3:13-20).

13 Similarly, Dr. Lahey testified that he had no knowledge that Dr. Leung had an active

14 workers' compensation claim as of May 2020.  (Horrow Ex. L, pg. 5:22-24:1).

15    J.    **UNUM's post-litigation claims handling ignored significant evidence
            that Dr. Leung was disabled from accidental injury rather than**

16          **sickness.**

17    As explained below, the duty of good faith and fair dealing that UNUM owes to

18 Dr. Leung continues even after the commencement of this litigation.  That duty *requires*

19 UNUM to consider new information it receives that supports Dr. Leung's claim.

20 UNUM violated that duty by ignoring significant evidence it obtained post-litigation

21 showing that Dr. Leung's disability was due to injury, not sickness.

22          1.    **The Alberstone Report contained significant evidence that Dr.
                  Leung's disability is due to an injury but it was not provided to**

23                **UNUM's claims handlers and physicians.**

24    After the commencement of litigation Dr. Leung's counsel retained Dr. Cary D.

25 Alberstone, who is board certified in Surgery and Neurological Surgery and is a

26 specialist in brain and spinal surgery.  Dr. Alberstone was  asked to opine on whether

27 Dr. Leung's cervical and lumbar conditions are based on a sickness or an accidental

28 ///

1  injury.  He was also asked to opine on the opinions of UNUM's physicians.  (Horrow

2  Decl., ¶ 48

3       Dr. Alberstone generated a number of reports.  His initial report is dated August

4  9, 2022 (Ex. W).  This report was produced to UNUM on August 15, 2022.  (Horrow

5  Decl., ¶ 49).  UNUM's counsel confirmed by email that the report would be sent to

6  UNUM.  (Horrow Decl., ¶ 49; Ex. Y).

7       A second report that Dr. Alberstone  drafted after reviewing the deposition

8  testimony of the physicians UNUM used to determine whether  Dr. Leung's disability

9  was due to sickness or injury is dated February 16, 2023.  (Harrow Decl., ¶ 49; Ex. X).

10  This report was produced to UNUM as part of Dr. Leung's expert disclosure on April

11  10, 2023.  (Horrow Decl., ¶ 49).

12       There is a key distinction between Dr. Alberstone's reports and those of UNUM's

13  review physicians.  Specifically, UNUM's denial relied on opinions by  Dr. Marvin

14  Friedlander, Dr. Philip Lahey, and Dr. Steven Milos.  These physicians did not examine

15  Dr. Leung and, importantly, did not review the actual MRI and x-ray films that were

16  taken of Dr. Leung's spine.  (Horrow ¶ 15; Ex. K, pg. 3:11-14; Ex. L, pg. 4:16-21; Ex.

17  M, pg. 4:24-5:11).  Rather, they relied entirely on the various written reports by the

18  radiologists who actually did review the films.  Dr. Alberstone, however, had access to

19  ten MRI's of Dr. Leung's spine and two x-rays (Ex. W, pg. 2), and his opinions were

20  informed by his review of these scans.

21       This is a significant difference, like comparing the testimony of a witness who

22  witnessed a car accident first-hand to a witness who learned about the accident from a

23  newspaper account.  Dr. Alberstone makes this point himself in his February 14, 2023

24  report: "Without reviewing the films, I would submit that the doctors whose depositions

25  I read are at a significant disadvantage to opine about this case."  (Ex. X, pg. 2).

26       In fact, Dr. Alberstone's review of the actual films demonstrated that UNUM's

27  physicians' theories that the disability was due to degenerative changes or some

28  congenital factors are wrong.  Were that the case, Dr. Alberstone opined, the damage to

Dr. Leung's spine would encompass large sections of Dr. Leung's spine. Instead, the films show that the injuries to Dr. Leung's cervical and lumbar spines are limited to the levels damaged during the injuries and the level immediately adjacent.

> UNUM's argument that his injuries today are due to diffuse degenerative changes [are] not consistent with Dr. Leung's history of symptoms, which began on the date of injury, were not present before, and have not resolved since. Nor is the defense's argument consistent with the imaging evidence which implicates only the originally affected levels and those immediately adjacent to them.

(Horrow Ex. W, pg. 28).

### 2. UNUM failed to review the DOL file or the Alberstone Reports when, post litigation, it obtained these documents.

#### a. UNUM's designee testified as to UNUM claims handling, and his testimony was not limited to pre-litigation matters.

Mr. Stimson was UNUM's designed witness regarding its determination that Dr. Leung's disability was due to a sickness rather than an injury. He was also testifying as to all aspects of UNUM's investigation and handling of Dr. Leung's claim.

Specifically, Mr. Stimson was designated as UNUM's assigned witness on the following subject: "[T]he investigation and evaluation of Richard J. Leung, M.D.'s claim for disability insurance benefits . . ." (Ex. J, pg. 2). He was also designated to testify about "UNUM Life Insurance Company's decision regarding that Richard J. Leung, M.D.'s disability is due to a sickness." (Ex. J, pg. 2).

Nothing in this description limits the scope of Mr. Stimson's testimony to the time of the denial. As such, to the extent that UNUM did *any* post-litigation consideration of new evidence, Mr. Stimson should have known about it and been able to testify about it.

#### b. UNUM failed to consider, post-litigation, whether its denial was correct in light of the Alberstone reports and the DOL file.

Mr. Leung's counsel provided Dr. Einbund's report to UNUM in discovery on December 29, 2022. (Horrow Decl., ¶ 46). UNUM subsequently sought the DOL's ///

1 entire file, which the DOL produced to it on February 3, 2023.  (Horrow Decl., ¶ 46;
2 Ex. V).

3   As explained above, the DOL file contains significant information, including the
4 IME's of Dr. Einbund and Dr. Levine, showing that Dr. Leung's injury is based on an
5 accidental injury.  However, after receiving this new information there is no indication
6 that UNUM took any steps at all to evaluate it or re-consider its decision that Dr.
7 Leung's disability is based on a sickness.  (Horrow Decl., ¶ 47).  In fact, UNUM's own
8 expert, Debra Connor, has opined that UNUM has no obligation to reconsider its
9 decisions, post-litigation, in light of new evidence.  (Horrow Decl., ¶ 53-55).

10   UNUM also made no attempt to evaluate the Alberstone reports and reconsider,
11 based on the reports, whether its decision that Dr. Leung's disability was due to a
12 sickness was correct.  This is clear from the testimony of Mr. Stimson, who testified
13 that he had never even *seen* the any of Dr. Alberstone's report, much less evaluated
14 whether his opinions had any impact on UNUM's claims decision.  (Ex. I, pg. 13:18-
15 14:13).

16   Similarly, Dr. Friedlander testified has never been provided with the Alberstone
17 report to review (Ex. K, pg. 4:13-22).  Dr. Lahey (Ex. L, pg. 3:4-9) and Dr. Milos (Ex.
18 M, pg. 6:1-14) also testified they had never seen the report.

19 III. **Argument.**

20   A. **An insurer's duty of good faith and fair dealing requires it to make a
21 reasonable investigation and seek out evidence that may support a claim.**

22   According to *Chase v. Blue Cross of California*, 42 Cal. App. 4th 1142, 1152
23 (1996), an insurer's duty of good faith to its insured "requires the insurer to give at least
24 as much consideration to the welfare of its insured as it gives to its own interests"
25 (attribution omitted).

26   This duty requires an insurer to fully investigate claims as well as search for
27 evidence it reasonably believes will show that the claim should be paid.  According to
28 *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979), "it is essential that an

insurer fully inquire into possible bases that might support the insured's claim." As stated in *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847 (2000):

> Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim. "[T]he covenant of good faith and fair dealing implied in all insurance agreements entails a duty to investigate properly submitted claims."

*Id.* at 879-80 (quoting from *KPFF, Inc. v. California Union Ins. Co.*, 56 Cal.App.4th 963, 973 (1997)).

This duty affirmatively requires an insurer to locate and obtain evidence that might support an insured's claim. For example, in *Hughes v. Blue Cross of N. California*, 215 Cal. App. 3d 832 (1989) a health insurer refused to pay for a mental patient's hospitalization, claiming it was not medically necessary. The court found that the insurer's failure to obtain all relevant medical records prior to its decision supported the jury's finding of bad faith. "In reviewing the medical necessity of hospitalization, this duty of investigation surely entails an obligation to make reasonable efforts to obtain all medical records relevant to the hospitalization. *Hughes*, 215 Cal. App. 3d at 846. The *Hughes* Court found that "[t]he covenant of good faith and fair dealing, however, places the burden on the insurer to seek information relevant to the claim." *Hughes*, 215 Cal. App. 3d at 846.

### B. An insurer's duty of good faith continues even after the commencement of litigation.

California law is clear that an insurer's duty of good faith does not terminate just because litigation has commenced. This was the holding of *White v. W. Title Ins. Co.*, 40 Cal. 3d 870 (1985), a case involving a title insurer that had failed to note the existence of a water easement on property that was being sold. The buyer of the property filed suit and, after the commencement of litigation, the title insurer offered a number of "low ball" settlement offers. The trial court allowed evidence of the offers to show the insurer's bad faith.

///

On appeal the insurer argued "that all evidence relating to events after plaintiffs filed suit should have been excluded on the ground that, once suit has been filed, the insurer stands in an adversary position to the insured and no longer owes a duty of good faith and fair dealing." *White*, 40 Cal. 3d at 885. The Court disagreed: "It is clear that the contractual relationship between insurer and the insured does not terminate with commencement of litigation." *Id.* "Defendant's proposed rule," the Court reasoned, "would encourage insurers to induce the early filing of suits, and to delay serious investigation and negotiation until after suit was filed when its conduct would be unencumbered by any duty to deal fairly and in good faith." *White*, 40 Cal. 3d at 886.

Numerous Courts have followed *White*'s holding. According to *California Physicians' Serv. v. Superior Ct.*, 9 Cal. App. 4th 1321, 1326 (1992), "when a contractual relationship between parties continues in effect after litigation commences, the contractual duties of fair dealing and good faith remain in force. And, as noted in *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1076, n. 7 (2007):

> We note, lest there be any confusion on the point upon remand, that the fact that this litigation had commenced did not excuse Allstate from the continuing responsibility to fully investigate Jordan's claim.

C.   **UNUM breached the duty of good faith by not obtaining the DOL file prior to deciding his disability was due to sickness.**

An insurer breaches its duty of good faith when its claims handling conduct is not only wrong but unreasonable. *Gourley v. State Farm Mut. Auto. Ins. Co.*, 53 Cal. 3d 121, 127 (1991). Further, "[w]hile the reasonableness of an insurer's claims handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and but one inference can be drawn from the evidence." *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal. App. 4th 1450, 1456 (1994).

UNUM breached its duty of good faith and fair dealing to Dr. Leung by failing to obtain the DOL workers' compensation file prior to deciding his disability was caused by a sickness. At the time of this decision UNUM had sufficient evidence in its own file to show that the DOL was paying for treatments for Dr. Leung's cervical and

1   lumbar injuries.  For example, Dr. Alksne letter to the DOL's Ms. Gong reported on the

2   partial success of the surgery to Dr. Leung's lumbar spine, informing her that additional

3   treatment would be required.  (Ex. N, 1).  And Dr. Ray's report to the DOL (Ex. U)

4   regarding his treatment for Dr. Leung's cervical spine showed that the DOL was

5   providing coverage for that injury as well.

6       Workers' compensation, of course, only covers workplace *injuries*.  Cal. Labor

7   Code § 3600; *Also*, *Gomez v. Acquistapace*, 50 Cal.App.4th 740, 748 (1996).  So before

8   UNUM decided Dr. Leung's disability was due to a sickness it had direct knowledge

9   that the DOL had determined Dr. Leung's injuries were the result of an injury.

10  Knowing this, a reasonable insurer, recognizing its burden "to seek information relevant

11  to the claim" *Hughes*, 215 Cal. App. 3d at 846, would have recognized that the DOL

12  likely had evidence it did not have and obtained its file.

13      Instead, UNUM ignored the issue.  The man in charge of Dr. Leung's claim, Mr.

14  Stimson, had only a vague notion that Dr. Leung may have had a workers'

15  compensation case.  He had no idea of why Dr. Moon–who, remember, did not begin

16  treating Dr. Leung until 2014–was copying the DOL on all his treatment notes.  One

17  claims handler, Ms. Sullo, recognized that the workers' compensation file would assist

18  in making the sickness/accident decision, but her request for the DOL file was ignored.

19      Had UNUM obtained the DOL file it would have learned that the DOL's

20  acceptance of responsibility for Dr. Leung's treatment and disability was based on two

21  separate IMEs which both determined that his back problems were caused by a

22  workplace injury.  The two IME physicians, Dr. Levine and Dr. Einbund, both

23  examined Dr. Leung, reviewed the actual films of his MRIs and x-rays, and reviewed

24  extensive medical records not available to its own file review physicians.  Had UNUM

25  compared the DOL's evidence this with its own evidence–three file reviews by

26  physicians who did not examine Dr. Leung and did not review his films–it would have

27  necessarily concluded that it was making a mistake.

28  ///

D.    **UNUM breached its duty of good faith by failing to reconsider its decision when it received the DOL file and the Alberstone reports.**

As explained above, California law is clear that UNUM's duty of good faith to Dr. Leung did not evaporate just because he instituted this litigation.  And this duty of good faith requires UNUM to "fully inquire into possible bases that might support the insured's claim." *Egan*, 24 Cal. 3d at 819.  As such, when UNUM finally received the significant evidence in the DOL file and the Alberstone reports showing that Dr. Leung's disability was due to an injury it had an obligation under California law to review that evidence and reconsider whether its original decision was the correct one.

But UNUM has not only refused to consider of this newly obtained evidence it contends that it has no obligation to do so.   Relying on "industry practice" UNUM's designated expert, Ms. Connor, claims that UNUM has no obligation to even look at this new evidence:

> When a claim has been closed by an insurer and claimant has chosen to file a lawsuit, the ongoing duty of good faith may be satisfied through the process of litigation. Thus, once the claimant decides to pursue a decision from a court of competent jurisdiction it is not industry practice or appropriate for the claim department to reopen a closed claim and to actively manage a closed claim that is the subject of litigation.

(Horrow Decl., ¶ 54; Ex. A).  This statement is contrary to *White* which, as explained above, holds that an insurer may not use the presence of litigation as a shield to avoid its duty of good faith to its insured.

In fact, Ms. Connor is stating that any reconsideration of UNUM's decision will be done by its litigation counsel.  This is inconsistent with UNUM's duty of good faith, which requires it to "to give the interests of the insured at least as much consideration as it gives to its own interests." *Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 460 (1974).   UNUM's litigation counsel, on the other hand owes an unquestioning duty of loyalty only to UNUM.  "The most fundamental quality of the attorney-client relationship is the *absolute and complete fidelity* owed by the attorney to his or her client." *California Practice Guide: Professional Responsibility & Liability* (Rutter Group), Chpt. 3-E, §3:187 (italics in original).  Not only does UNUM's litigation

1    counsel owe no duty to look after Dr. Leung's interests but counsel is ethically

2    forbidden from doing so. "*[A]n attorney is precluded from assuming any relation*

3    *which would prevent him from devoting his entire energies to his client's interests.*"

4    *Flatt v. Superior Ct.*, 9 Cal. 4th 275, 289 (1994) (italics in original).

5        The DOL file includes opinions by two truly independent medical specialists that

6    Dr. Leung's disabling spinal conditions are due to workplace injury. This should have a

7    reasonable insurer to at least question the correctness of its decision, based as it was on

8    three physicians who never examined Dr. Leung or reviewed the films of his spinal

9    injuries. It would be one thing if UNUM considered this new evidence and, in some

10   reasoned manner, determined it was not sufficient for it to change its position. But, Dr.

11   Leung submits, for UNUM to reject this evidence out-of-hand constitutes bad faith as a

12   matter of law.

13   IV.    **Conclusion.**

14        For the foregoing reasons, this Court should order:

15      ●    That UNUM's failure to obtain the DOL prior to deciding Dr. Leung's

16           claim constituted bad faith; and

17      ●    After litigation commenced, UNUM's failure to re-evaluate Dr. Leung's

18           claim in light of the DOL file and the Alberstone reports constituted bad

19           faith.

20   Dated: July 24, 2023               Michael B. Horrow

21                                  Nichole D. Podgurski
                                     Donahue & Horrow LLP

22                                  Russell G. Petti

23                                  The Law Offices of Russell G. Petti

24                          By: _____ S/*Michael B. Horrow*_____

25                                   Michael B. Horrow
                                      Attorneys for Plaintiff

26                                       Richard J. Leung, M.D.

27

28