Michael B. Horrow, State Bar No. 162917
Nichole D. Podgurski, State Bar No. 251240
DONAHUE & HORROW LLP
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245
Tel: (310) 322-0300
Fax: (310) 322-0302
Email: mhorrow@donahuehorrow.com
       Npodgurski@donahuehorrow.com

Russell G. Petti, SBN 137160
The Law Offices of Russell G. Petti
466 Foothill Blvd., # 389
La Canada, California 91011
818 952-2168 Telephone
818 952-2186 Facsimile
Email: Rpetti@petti-legal.com

Attorneys for Plaintiff
Richard J. Leung, M.D.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. LEUNG, M.D., <br><br> Plaintiff, <br><br> vs. <br><br> UNUM LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 to 10, inclusive, <br><br> Defendants. | CASE NO: 3:22-cv-00767-W-JLB <br><br> DECLARATION OF MICHAEL HORROW IN SUPPORT OF PLAINTIFF RICHARD J. LEUNG M.D.'S MOTION FOR PARTIAL SUMMARY JUDGMENT <br><br> NO ORAL ARGUMENT PURSUANT TO LOCAL RULE <br><br> DATE:       August 28, 2023 <br> COURT:    Before the Honorable Thomas J. Whelan, United States District Judge |

I, Michael B. Horrow, M.D. declare as follows:

1.     I am counsel of record for plaintiff Richard J. Leung, M.D.  I make this Declaration in support of Dr. Leung's motion for partial summary judgment.

2.     The issue in this case is whether the defendant, UNUM Life Insurance Company of America ("UNUM"), improperly denied Dr. Leung lifetime benefits on his five policies of disability insurance when it concluded that his disability was due to sickness rather than accidental injuries.

3.     The basis of Dr. Leung's present motion is that UNUM, acting unreasonably and in bad faith, failed to obtain highly relevant documents before it decided his claim.  In addition, after the commencement of litigation UNUM received, both from my office and from its receipt of Dr. Leung's workers' compensation file, significant evidence showing that his disabling spinal injuries were caused by two accidental injuries.  California law is clear that UNUM's duty of good faith to Dr. Leung continues after the commencement of litigation and, as such, it had an obligation to at least consider whether that new evidence should cause it to change its decision. Instead it completely ignored that evidence and, in doing so, violated its duty of good faith as a matter of law.

### Dr. Leung's policies provided lifetime benefits for a disability caused by an accident.

4.     At the time of his disability Dr. Leung was covered under five disability policies issued by UNUM (Leung Ex, A-E).  Four of the policies (Ex. A-D) contain language that, in the event of disability based on an accident, disability payments continue "for as long as total disability continues, if total disability began prior to age 65 policy anniversary."  (*See e.g.* Ex. A, pg. 5).

5.     If the disability is due to a sickness, these policies only provide lifetime benefits "if total disability began prior to age 55 policy anniversary."  Otherwise, benefits are paid "to the later of (A) age 65 policy anniversary or (B) 24 months."  (*See e.g.* Ex. A, pg. 5).

6.     The fifth policy (Ex. E) contains a "Lifetime Accident Benefit Rider." (Ex. E, pg. 15).   Under the terms of this Rider UNUM must continue payment of benefits if "the insured is totally disabled" and the disability "is the result of injury which occurred before the policy anniversary when his age was 65 . . ."  (Ex. E, pg. 15).

7.     However, if the disability is not due to a accident the rider does not apply and benefits are only paid "to the later of (A) 65 policy anniversary or (B) 24 months after disability payments begin."  (Ex. E, pg. 4).

**UNUM's corporate designee was required to disclose all aspects of UNUM's investigation, including post-litigation investigation.**

8.　On November 29, 2022 I took the deposition of Adam Stimson. A true and correct copy of relevant portions of his deposition transcript is attached to this Declaration as Exhibit I.

9.　Mr. Stimson was deposed on his own knowledge and actions regarding UNUM's determination that Dr. Leung's disability was due to a sickness rather than an injury. However, he was also testifying as to all aspects of UNUM's investigation and handling of Dr. Leung's claim. A true and correct copy of the Notice of Deposition for Mr. Stimson and UNUM's Fed. R. Civ. Proc. 30(b)(6) designee is attached to this Declaration as Exhibit J.

10.　Specifically, Mr. Stimson was designated as UNUM's assigned witness on the following subject: "[T]he investigation and evaluation of Richard J. Leung, M.D.'s claim for disability insurance benefits . . ." (Ex. J, pg. 2). He was also designated to testify about "UNUM Life Insurance Company's decision regarding that Richard J. Leung, M.D.'s disability is due to a sickness." (Ex. J, pg. 2).

11.　Nothing in this description limits the scope of Mr. Stimson's testimony to the commencement of litigation. As such, to the extent that UNUM did *any* post-litigation consideration of new evidence Mr. Stimson should have known about it and been able to testify about it.

**None of UNUM's file review physicians reviewed the actual films of Dr. Leung's spine.**

12.　I have reviewed UNUM's claim file. The file indicates that Dr. Leung's lumbar and cervical spine has been the subject of numerous MRIs, CT scans, and x-rays. The film from these scans were read by radiologists, who wrote reports as to their interpretation of the scan. These various radiology reports are contained in UNUM's claim file. However the films themselves are not included in the claim file.

13.　I confirmed with UNUM's FRCP 30(b)(6) designee, Mr. Stimson, that UNUM's claim file did not contain any actual films. (Ex. I, pg. 3:10-5:18). As such

1  UNUM and the reviewing physicians it used to determine whether Dr. Leung's

2  disability was due to sickness or injury did not have access to the actual film taken

3  during the scans of Dr. Leung's spine.  Rather, they were limited to the second hand

4  information of what the reviewing radiologist reported.

5       14.    During the depositions I took in this case I confirmed that UNUM and its

6  reviewing physicians did not review the films taken of Dr. Leung's spine.  The

7  physicians UNUM paid to review Dr. Leung's claim were Dr. Marvin Friedlander, Dr.

8  Philip Lahey, and Dr. Steven Milos, and true and correct copies of excerpts from their

9  deposition transcripts are at Exhibit K (Dr. Friedlander), Exhibit L (Dr. Lahey), and

10 Exhibit M (Dr. Milos).  None of these physicians actually examined Dr. Leung, rather

11 all they did was review whatever documents UNUM chose to provide for them.  And I

12 confirmed in deposition that none of these physicians reviewed any films.

13      15.    According to Dr. Friedlander:

14      Q. At any point in time in doing your review on the Dr. Leung file, did you
        ever review actual diagnostic films?

15
        A. No.
16
   (Ex. K, pg. 3:11-14).
17
        16.    Dr. Lahey also confirmed that he did not review any films:
18
        Q      Have you ever reviewed any actual MRIs of Dr. Leung, the actual
19             films?

20      A      No.

21      Q      Have you ever asked to see the actual MRI films on Dr. Leung?

22      A      No.

23 (Ex. L, pg. 4:16-21).  Similarly, UNUM's Dr. Milos did not review any films and never

24 asked to review any films.  (Ex. M, pg. 4:24-5:11).

25 **The Department of Labor File contains significant evidence, including two IMEs,
   showing that Dr. Leung's disability is due to injuries.**

26
        17.    As Dr. Leung explains in his concurrently filed Declaration, his disability
27
   stems from a work related accidental injury to his lumbar spine that he suffered in 1982
28

1  when he was working for the Veterans Administration ("VA"). He suffered another

2  injury to his cervical spine in 1993 while receiving therapy for the 1982 injury.

3       18.    The Department of Labor ("DOL") acted as the VA's workers'

4  compensation insurer and has compiled an extensive file on Dr. Leung's injuries and

5  the treatments required for those injuries. I have reviewed this 4157 page file, which

6  contains significantly more medical records and a more detailed history of Dr. Leung's

7  treatment than UNUM's claim file. The DOL file shows that the DOL concluded that

8  all of Dr. Leung's spinal problems were due to injuries and, as such, it authorized

9  treatment for those injuries and, eventually, accepted that Dr. Leung was disabled due to

10  those injuries.

11       19.    For example, on June 14, 1993 Dr. John Alksne, the surgeon who

12  performed Dr. Leung's February 1983 lumbar spine surgery, wrote to the DOL's

13  Evelyn Gong. A true and correct copy of this letter is attached to this Declaration as

14  Exhibit N, pg. 1.

15       20.    In his letter Dr. Alksne informed Ms. Gong that Dr. Leung "is making a

16  satisfactory recovery following his decompressive lumbar laminectomy, but he

17  continues to have a moderate amount of back and leg pain." As such, Dr. Alksne

18  reported that he had counseled Dr. Leung "to avoid strenuous activities and heavy

19  lifting." These continued symptoms were because the surgery had not completely

20  resolved the issues with Dr. Leung's lumbar spine:

21          A follow-up CT scan shows an adequate decompressive laminectomy, but
        some significant encroachment on the nerve root foramina by

22          hypertrophied facets. This was not decompressed at the time of the
        original surgery, because of the fear of making his spine unstable and

23          possibly requiring a subsequent fusion.

24  (Ex. N, pg. 1).

25       21.    As such, Dr. Alksne wrote that Dr. Leung might require additional surgery

26  for his lumbar injury: "Nevertheless, if his symptoms should continue or increase in

27  severity, it might be necessary to perform further surgery at a later date." (Ex. N, pg.

28  1).

1    22.    On June 27, 1983 Mr. Gong responded to Dr. Alksne's letter, writing that
2    "[a]uthorization is given for further surgery, if it becomes necessary."  (Ex. N, pg. 2).
3    23.    In his Declaration Dr. Leung describes how he injured his cervical spine in
4    November of 1993 while receiving therapy for the injury to his lumbar spine.  The DOL
5    file shows that on May 31, 1995 it had Dr. Leung undergo an Independent Medical
6    Examination ("IME") with a neurologist, Mark Levine, M.D., to determine whether
7    treatment for this new injury should be covered by the DOL.  A true and correct copy of
8    Dr. Levine's report is attached to this Declaration as Exhibit O.
9    24.    Dr. Levine conducted an examination of Dr. Leung and reviewed his
10   Leung's medical records and MRIs.  Based on this he concluded, first, that Dr. Leung's
11   continuing pain and radiculopathy in his lower back was due to his original injury to his
12   lumbar spine:

13       [T]he patient does suffer residuals of the original lumbarsacral disc
         herniation, status post laminectomy, with residual compressive L4/L4
14       radiculopathy on the left.  The clinical and x-ray/imaging studies document
         this adequately.
15
16   (Ex. O, pg. 15).

17   25.    Significantly, Dr. Levine rejected the position that was later taken by
18   UNUM's file review physicians that the lumbar spine symptoms were not due to the
19   injury but rather to a congenital defect in Dr. Leung's spine.  Rather, after examining
20   Dr. Leung and reviewing his MRI films–neither of which were done by any of
21   UNUM's physicians–Dr. Levine concluded that the congenital stenosis in Dr. Leung's
22   spine would not have caused the symptoms absent the injury:

23       There is no industrial or preexisting disability.  In my opinion the
         congenital spinal stenosis at L4 and over the sacral area as described,
         appears to be rather mild and would not have produced symptoms absent
24       the disc herniation caused by the work-related injury of 5/23/82.

25   (Ex. O, pg. 16).

26   26.    Dr. Levine also concluded that because the injury to Dr. Leung's spine
27   "occurred during a program of back strengthening exercises prescribed for the original
28   injury of 5/23/1982" it should be covered by the DOL.  (Ex. O, pg. 15-16).

27.     Dr. Levine testified that the prognosis of the lumbar spine injury was "fair." He opined that "it is probable that there will be recurrent exacerbations of pain, but in all probability this can be managed conservatively." (Ex. O, pg. 16-17).

28.     As to the cervical injury, Dr. Levine opined that prognosis was "more guarded" due to the "sensory changes in the index finger and thumb of the dominant right hand." He stated that "if symptoms progress . . . more aggressive, *i.e.* surgical, intervention would be indicated." (Ex. O, pg. 17).

29.     Consistent with Dr. Levine's conclusions the DOL approved various treatments for the injuries to both Dr. Leung's lumbar and cervical spine. These treatments include therapy, spinal injections, imaging, a spinal allograft, and surgery. Examples of some of these authorizations are grouped at Exhibit P.

30.     After he became disabled in May of 2020, because his disability was due to his VA injury Dr. Leung submitted a claim for disability benefits to the DOL. In order to determine (1) whether Dr. Leung was disabled and (2) whether his disability was due to the injury suffered while working at the VA, the DOL scheduled him for another IME.

31.     Dr. Leung was notified of the IME by a letter from the DOL dated January 25, 2021. A true and correct copy of this letter is attached to this Declaration as Exhibit Q. Significantly, this letter instructed Dr. Leung to provide the examining physician with the actual films from any recent x-rays, CAT scans, or MRIs.

32.     The IME was performed on March 29, 2021 by Dr. Michael Einbund, an Orthopaedic Surgeon. A true and correct copy of Dr. Einbund's IME report is attached to this Declaration as Exhibit R.

33.     Like Dr. Levine, and unlike any of UNUM's reviewing physicians, Dr. Einbund examined Dr. Leung (Ex. R, pg. 26) and also reviewed the actual films from his various diagnostic scans (Ex. R, pg. 10). He also performed a comprehensive review of Dr. Leung's medical records. (Ex. R, pg. 15). Given that the DOL's file was more comprehensive and complete than UNUM's claim file this included numerous

medical records that were not available to UNUM's file reviewers.  In his report Dr.

Einbund concluded that Dr. Leung had impairments to his cervical and lumbar spine:

> Essentially, there are multilevel degenerative disc disease spanning both spine segments the cervical and lumbar spine. There is nerve root impingement in the cervical and lumbar spine. The results also reveal post surgical changes.

(Ex. R, pg. 29).

34.    Dr. Einbund also concluded that these conditions were disabling:

> Mr. Richard J. Leung is not currently capable of returning to his date of injury job as a physician. He has limitations of function as well as cognitive concerns noting his use of narcotic medications as prescribed by Dr. Moon.

(Ex. R, pg. 31).

35.    Most significantly, Dr. Einbund concluded that the cause of the disability

was the work accident that occurred in 1982 while Dr. Leung was working at the VA:

> The mechanism of injury while lifting a heavy client/patient who weight approximately 300 lbs., with the assistance of a colleagues is consistent with the diagnosis of disc displacement which is the accepted work related condition. The natural progression of this condition as well as having been treated with fusion at the C5-C6 and having put added stress to the adjoining levels has in part resulted in the noted degeneration.

(Ex. R, pg. 30).

36.    Based on Dr. Einbund's report and conclusions on July 21, 2021the DOL

concluded that Dr. Leung is disabled due to his work related injury.   A true and correct

copy of the DOL's letter is attached to this Declaration as Exhibit S.

**None of UNUM's claims handlers or physicians saw
the Department of Labor file.**

37.    In spite of its obvious significance none of UNUM's claims handlers or

reviewing physicians have ever seen the evidence in the DOL workers' compensation

file.  This is in spite of the fact that at least one of UNUM's claims handlers recognized

the workers' compensation file was important to the determination of whether Dr.

Leung's disability was due to sickness or injury.

38.    Specifically, on February 23, 2023 I took the deposition of Lisa Sullo, who

had been one of UNUM's claims handlers working on Dr. Leung's file.  A true and

1  correct copy of excerpts of Ms. Sullo's deposition transcript is attached to this

2  Declaration as Exhibit T.

3      39.     During her deposition Ms. Sullo, testified that she recognized the potential

4  importance of obtaining the workers' compensation file:

5      [A] Workers' Comp claim would assist us in reviewing if the injuries are
       still there, what the basis of that Workers' Comp claim was for, or if the
6      Workers' Comp claim was not approved, if it was approved, if he had a --
       if he had recovered.  Things of that nature.
7
8  (Ex. T, pg. 3:19-24).  As a result, Ms. Sullo made a request that UNUM obtain Dr.

9  Leung's workers' compensation file "to confirm Acc [accident] vs. Sick [sickness]."  A

10 true and correct copy of Ms. Sullo's request is attached to this Declaration as Exhibit U.

11     40.     In fact, UNUM's claim file contains substantial evidence that Dr. Leung

12 not only had an active workers' compensation claim but that it had been approved by

13 the DOL.  For example, Dr. Alksne's June 14, 1983 letter to the DOL's Ms. Gong,

14 referenced above, is contained in UNUM's claim file.  (Ex. N, pg. 1).  This letter shows

15 that the DOL had accepted coverage for Dr. Leung's spinal injury, meaning it had found

16 that it was due to a workplace injury.

17     41.     Similarly, UNUM's claim file contains a May 27, 1994 report by Dr. Joel

18 Ray to the DOL.  A true and correct copy of that report is attached to this Declaration as

19 Exhibit U.

20     42.     According to Dr. Ray's report to the DOL, he was treating Dr. Leung for

21 the injury to his cervical spine.  This shows that the DOL had also approved treatment

22 for Dr. Leung's cervical injury, which indicates that it recognized that the damage to

23 Dr. Leung's cervical spine was also due to a workplace injury.

24     43.     However, according to UNUM's designee, Mr. Stimson, UNUM never

25 obtained Dr. Leung's workers' compensation file. (Ex. I, pg. 6:21-7:9).  He recognized

26 that Ms. Sullo had made a request for the file but has no knowledge as to why this was

27 never done. (Ex. I, pg. 9:8-11:19).  As a result, at the time he approved UNUM's

28 determination that Dr. Leung was disabled due to a sickness Mr. Stimson had only a

1 vague understanding that Dr. Leung even had a workers' compensation claim. (Ex. I,

2 pg. 7:2-8:22).

3      44.     Further, during his deposition Mr. Stimson testified that he did not know

4 why the DOL was copied on all the reports of Dr. Moon, Dr. Leung's treating

5 physician:

6      Q.     Is it your understanding that Dr. Moon was copying the U.S.
            Department of Labor regarding his progress notes on Dr. Leung

7             because Dr. Leung had an active Workers' Compensation claim?

8      A.     Again, I'm not sure of the reason.

9 (Ex. I, pg. 12:18-23).

10      45.     Similarly, all of UNUM's reviewing physicians had no idea that Dr. Leung

11 even had a workers' compensation claim with the DOL, much less that the DOL had

12 determined that Dr. Leung's spinal problems were all due to accidental injury. Dr.

13 Friedlander testified that "I have no idea, even to this moment, that he has an active

14 claim." (Ex. K, pg. 5:6-15). Dr. Milos testified he had no knowledge of why Dr. Moon

15 was copying the DOL on all his reports. (Ex. M, pg. 3:13-20). Similarly, Dr. Lahey

16 testified that he had no knowledge that Dr. Leung had an active workers' compensation

17 claim as of May 2020. (Ex. L, pg. 5:22-6:1).

18      46.     My office provided Dr. Einbund's IME report to UNUM in discovery on

19 December 29, 2022. UNUM subsequently sought the DOL's entire file, which the DOL

20 produced to it on February 3, 2023. A copy of the DOL email showing the production

21 is attached to this Declaration as Exhibit V.

22      47.     I submit the DOL file contains significant information, including the

23 IME's of Dr. Einbund and Dr. Levine, showing that Dr. Leung's injury is based on an

24 accidental injury. However, after receiving this new information there is no indication

25 that UNUM took any steps at all to evaluate it or re-consider its decision that Dr.

26 Leung's disability is based on a sickness.

27 ///

28 ///

**The Alberstone Reports contained significant evidence that Dr. Leung's disability is due to an injury but it was not provided to UNUM's claims handlers and physicians.**

48.    After the commencement of litigation my law firm retained Dr. Cary D. Alberstone, who is board certified in Surgery and Neurological Surgery and is a specialist in brain and spinal surgery. I asked him to opine on whether Dr. Leung's cervical and lumbar conditions are based on a sickness or an accidental injury. I also asked him to opine on the findings of UNUM's physicians.

49.    Dr. Alberstone generated a number of reports. His initial report, dated August 9, 2022, is attached to this Declaration as Exhibit W. A second report that he drafted after reviewing the deposition transcripts of Drs. Lahey, Friedlander and Milos, dated February 16, 2023, is attached to this Declaration as Exhibit X. My office produced Exhibit W to UNUM on August 15, 2022. UNUM's counsel, Keiko Kojima, confirmed by email that the report would be sent to UNUM. A true and correct copy of Ms. Kojima's email is attached to this Declaration as Exhibit Y. Exhibit X was produced to UNUM as part of Dr. Leung's expert disclosure on April 10, 2023.

50.    There is a key distinction between Dr. Alberstone's reports and those of Lahey, Friedlander, and Milos. As noted above, the three UNUM physicians testified that they did not have access to Dr. Leung's actual spinal scans and instead relied on the reports of the radiologists who interpreted those scans. Dr. Alberstone, however, had access to ten MRI's of Dr. Leung's spine and two x-rays (Ex. W, pg. 2), and his opinions were informed by his review of these scans. I submit this is a significant difference, like comparing the testimony of a witness who saw a car accident first-hand to a witness who learned about the accident from a newspaper account. Dr. Alberstone makes this point himself in his February 14, 2023 report: "Without reviewing the films, I would submit that the doctors whose depositions I read are at a significant disadvantage to opine about this case." (Ex. X, pg. 2).

51.    In fact, Dr. Alberstone's review of the actual films demonstrated that UNUM's physicians' theories that the disability was due to degenerative changes or

some congenital factors are wrong.  Were that the case, Dr. Alberstone opined, the damage to Dr. Leung's spine would encompass large sections of Dr. Leung's spine.  Instead, the films show that the injuries to Dr. Leung's cervical and lumbar spines are limited to the levels damaged during the injuries and the level immediately adjacent:

> UNUM's argument that his injuries today are due to diffuse degenerative changes [are] not consistent with Dr. Leung's history of symptoms, which began on the date of injury, were not present before, and have not resolved since.  Nor is the defense's argument consistent with the imaging evidence which implicates only the originally affected levels and those immediately adjacent to them.

(Ex. W, pg. 28).

52.     UNUM made no attempt to evaluate Dr. Alberstone's reports and reconsider, based on the reports, whether its decision that Dr. Leung's disability was due to a sickness was correct.  This is clear from my deposition of Mr. Stimson who was UNUM's designee with respect to UNUM's investigation of Dr. Leung's claim.  As noted above, the scope of his testimony was not limited just to pre-litigation investigation.  And Mr. Stimson's testimony, as well as that of his attorney, was that he had never even *seen* any of Dr. Alberstone's reports, much less evaluated whether his opinions had any impact on UNUM's claims decision.  (Ex. I, pg. 13:18-14:13).  Similarly, Dr. Friedlander testified has never been provided with the Alberstone report to review (Ex. K, pg. 4:13-22), as did  Dr. Lahey (Ex. L, pg. 3:4-9) and Dr. Milos.  (Ex. M, pg. 6:1-14).

53.     In fact, UNUM believes that it has no obligation, under its view of the duty of good faith and fair dealing, to evaluate new evidence, post-litigation, to see if it justifies reconsidering its decision.  This is apparent in the statements of its own designated expert.

54.     Specifically, on April 10, 2023 UNUM served its Expert Disclosure Statement.  Included with that statement was a report by Debra Connor, who was designated to opine on the adequacy of UNUM's claims handling.  With respect to an

///

insurer's obligation to reconsider a claim denial in light of post-litigation evidence Ms. Connor says the following:

> When a claim has been closed by an insurer and claimant has chosen to file a lawsuit, the ongoing duty of good faith may be satisfied through the process of litigation. Thus, once the claimant decides to pursue a decision from a court of competent jurisdiction it is not industry practice or appropriate for the claim department to reopen a closed claim and to actively manage a closed claim that is the subject of litigation.

A true and correct copy of the relevant page of Ms. Connor's report is attached to this Declaration as Exhibit Z.

55.     As such it appears that, as a matter of policy and its understanding of "industry practice" UNUM has never had any of the post-litigation evidence evaluated to determine if it should have paid Dr. Leung's claim.  Its failure to conduct such an investigation violated the duty of good faith that it owed to Dr. Leung.

I Declare under Penalty of Perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was made on July 24, 2023 in El Segundo, California.


 S/*Michael B. Horrow*
 Michael B. Horrow

# EXHIBIT I

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF CALIFORNIA
2

3  RICHARD J. LEUNG, MD,
       Plaintiff

4  VS.

5  UNUM LIFE INSURANCE
   COMPANY OF AMERICA; AND
6  DOES 1 THROUGH 10,        C.A. NO.:
   INCLUSIVE,
7       Defendants           3:22-CV-00767-W-JLB

8

9

10

11       VIDEOTAPE DEPOSITION of ADAM STIMSON taken at

12  the request of the plaintiff pursuant to the

13  applicable provisions of the Massachusetts

14  Federal Rules of Civil Procedure before

15  Teresa Rose Wood, a notary public in and for the

16  Commonwealth of Massachusetts, on November 29,

17  2022, commencing at 9:30 A.M. at the offices of

18  Bachrach & Bachrach, 490 Shrewsbury Street,

19  Worcester, Massachusetts.

20

21

22

23

24

Exhibit I, 1

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFF:

3    MICHAEL B. HORROW, ESQ.
     DONAHUE & HORROW, LLP
4    1960 E. Grand Ave., Suite 1215
     El Segundo, California   90245
5
     FOR THE DEFENDANTS:
6
     MICHAEL B. BERNACCHI, ESQ.
7    BURKE, WILLIAMS & SORENSEN, LLP
     444 South Flower Street, Suite 2400
8    Los Angeles, California   90071

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit I, 2

1  internal Unum documentation or material that, you

2  know, that represents essentially the claim file.

3      Q.     What is the purpose of the claim file?

4      A.     I would say it's a representation or

5  it's a, maybe that's not a great word, it's, it's

6  the record, so to speak, of written

7  communications, verbal communications, medical

8  records, internal analysis, things of that nature

9  that are used as the claim is managed.

10      Q.     Does the claim file have any actual

11  films like MRIs, CT-scans or X-rays?

12      A.     It may, I would, I would need to go

13  through each page.  I know that there's various

14  medical records, there may be actual films in

15  there, I'm not sure.

16      Q.     But that's my question.  Are you aware

17  as you sit here today whether or not the claim

18  file maintained by Unum on Doctor Richard Leung's

19  file includes actual films, actual MRIs, actual

20  CT-scans, actual X-rays?  If you know you know,

21  if you don't know you don't know.

22      A.     I don't know, again I would say that

23  there's a possibility that there are actual scans

24  within the medical records.  I know that there

Exhibit I, 3

are reports of those diagnostics.

Q.     Right, we know there are reports because I have the paper as well.  I'm asking if there's actual films.  Do you know whether there are any actual films, MRIs, CT-scans or X-rays in the claim file maintained by Unum on Doctor Richard Leung?

A.     Again I would say I don't know without looking, without reviewing each page of the claim file as it sits there.

Q.     Right, so you've brought the claim file with you today?

A.     I brought the Bates stamped copy of the claim file with me today, yes.

Q.     In the Bates stamped claim file that you have with you today, does that Bate stamped claim file include any actual films, MRIs, CT-scans or X-rays?

A.     Again I don't know.

Q.     Well, you have it in front of you, correct?

A.     Yes.

Q.     Okay, why don't you just leaf through the file and tell me whether there's any actual

Exhibit I, 4

1    films in there.

2         A.      Sure.

3                 (Witness complies.)

4         Q.      And not reports, just actual films.

5                 MR. BERNACCHI:   Just for

6    clarification, copies of films or actual films?

7                 MR. HORROW:   Films, copies of films.

8         A.      I just want to make reference here, as

9    I'm looking through, and if you want I can

10   reference the Bates stamped pages, No. 58 and 59,

11   they appear to be photographs, I wouldn't

12   consider these to be films, but just to make that

13   distinction.

14        Q.      Yeah, they're not MRIs or X-rays or

15   CTs, right?

16        A.      I don't believe so.  They look to be

17   what I would categorize as personal photographs,

18   if you will.

19        Q.      Well, let me ask you something, have

20   you ever seen an actual MRI film?

21        A.      I believe I have.

22        Q.      Have you ever seen an actual CT-scan?

23        A.      I believe I have.

24        Q.      Have you ever seen an actual X-ray?

                    Exhibit I, 5

1          A.     I believe that was myself.

2          Q.     Did you agree with Ms. Tanga's

3    recommendation on the etiology determination on

4    the Leung claim?

5          A.     Generally speaking, yes, I know that

6    there is some more context to my response to her

7    recommendation, but generally speaking I was in

8    agreement with her etiology recommendation.

9          Q.     The etiology recommendation was to

10   determine whether Doctor Leung's claim was due to

11   an accident or a sickness, correct?

12         A.     Generally speaking, yes, I think that

13   the policies may use slightly different language,

14   but essentially, yes.

15         Q.     Ms. Tanga's recommendation for the

16   etiology determination was that Doctor Leung's

17   claim and disability was due to sickness,

18   correct?

19         A.     Generally speaking, yes, that's my

20   recollection.

21         Q.     Now, you knew when you approved the

22   etiology determination on Doctor Leung's claim as

23   a sickness that Doctor Leung had a

24   Workers' Compensation claim with the

Exhibit I, 6

1    U.S. Department of Labor, correct?

2          A.    I think we were aware, or I was aware

3    that there was I guess what I would categorize as

4    Workers' Compensation involvement, or that there

5    was a mention of that, I'm not sure specifically

6    I knew there was a claim, so to speak, but I was

7    aware of Workers' Compensation being involved at

8    some point in the file or, excuse me, at the time

9    that the etiology recommendation was completed.

10         Q.    Right, so, but my question was a

11   little different.  What's the difference between

12   involvement and whether there's a

13   Workers' Compensation claim?  You seem to make a

14   distinction between those, I want to understand

15   that.

16         A.    I don't recall specifically if there

17   was a claim, so to speak, and I'm not sure what

18   their, their, the language that Workers' Comp,

19   Compensation uses as opposed to, you know, what

20   we use here at Unum.

21         Q.    When you approved the recommendation

22   made by Ms. Tanga of an etiology that

23   Doctor Leung's claim was due to sickness, you

24   didn't know whether or not Doctor Leung had an

Exhibit I, 7

          actual Workers' Compensation claim with the
          U.S. Department of Labor; is that correct?
                    MR. BERNACCHI:   Objection, misstates
          his testimony.
             A.    I don't recall if I was aware that
          there was an actual claim or not, I guess, as I
          had said before, my best recollection is that I
          was aware of Workers' Compensation involvement,
          it may have been that I understood that there was
          a claim or not, I don't remember sitting here
          now.
             Q.    Well, as best as you can recall
          sitting here now, what was the full extent of
          what you understood Workers' Compensation had
          with respect to Doctor Leung's claim, whether it
          was just involvement, whether he actually made a
          claim, whether the claim was approved, tell me
          what the full extent of your knowledge was.
             A.    Yeah, I think as I had just testified,
          I think that I would categorize it as being aware
          of Workers' Compensation involvement, that's the
          extent of my -- as I recall, um --
             Q.    Did you know when you approved the
          etiology determination made by Ms. Tanga that

                         Exhibit I, 8

1  Exhibit 4?

2      A.    Sure, if I could read it from the

3  record?

4      Q.    Yeah, please.

5      A.    Requestered (sic), excuse me,

6  requested Workers' Comp file to confirm A-C-C

7  versus S-I-C-K.

8      Q.    So on July 7, 2020, Lisa Sullo, who

9  you were supervising, and you had met with five

10  days earlier, documents in the file that she is

11  requesting the Workers' Comp file to confirm

12  accident versus sickness, right?

13      A.    That's what her note indicates here,

14  yes.

15      Q.    And accident versus sickness again is

16  that etiology review, right?

17      A.    Generally speaking, when we're

18  referring to accident versus sickness, we're in

19  the process, or it's in the reference to the

20  etiology of the -- the cause of the disability.

21      Q.    As of July 7, 2020, etiology had not

22  been determined, correct?

23      A.    That's correct, and there's no

24  indication, as I recall prior to this, that the

Exhibit I, 9

reason for the Workers' Comp file was to confirm accident versus sickness, that's not indicated in the forum discussion, as I had testified earlier, I think it has, it can have multiple purposes, that's not identified as the reason to request a Workers' Comp file.

Q.     But that's not what she wrote here. What she wrote here was the reason to request the Workers' Comp file was to confirm accident versus sickness, correct?

A.     That's what she, as the author of this activity created, again created and completed by herself, that's what she states here, yes.

Q.     Did anyone during the forum on July 2, 2020 discuss whether the Workers' Comp file on Doctor Leung was needed to confirm accident versus sickness?

MR. BERNACCHI:  Objection.  Asked and answered.  You can go ahead.

A.     Not that I can recall specifically, again I am aware of the request, the notation to request the Workers' Comp claim file, there's no reason given specifically in that forum.

Q.     Do you agree with Ms. Sullo's note of

July 7, 2020 that the Workers' Comp file was
being requested to confirm accident versus
sickness?

A.     No, not necessarily.

Q.     And why not?

A.     Again, as I just stated, I think, as I
recall during that forum meeting, there may have
been multiple reasons, or there could be
information that can be used for various purposes
in the Workers' Compensation file, if we did
receive it, not specifically for our purposes of
identifying the etiology of the disability,
that's not stated, and I don't recall having that
conversation during that forum.

Q.     Have you ever discussed with Ms. Sullo
this note of July 7, 2020, Exhibit 4, where she
indicates that the Workers' Compensation file on
Doctor Leung was being requested to confirm
accident versus sickness?

A.     I don't recall having a conversation
with her specifically about this, no.

Q.     Later on in Exhibit 4, there are two
additional dated entries, do you see that?

A.     Yes.

Exhibit I, 11

1      A.      As I had said earlier, you know, I

2  did very likely, I think, as I had said, briefly

3  reviewed the records, I don't recall all of the

4  information that's on every page necessarily.

5      Q.      Well, did you take note of the fact

6  that Doctor Moon's progress notes regarding his

7  examinations of Doctor Leung, each one of the

8  progress notes copied the U.S. Department of

9  Labor?

10      A.      I think, as I had just said, I don't

11  recall every piece of information so I don't

12  recall that specifically necessarily.

13      Q.      Do you know why Doctor Moon was

14  copying the U.S. Department of Labor as part of

15  the progress notes that he was preparing on

16  Doctor Leung?

17      A.      Not necessarily.

18      Q.      Is it your understanding that

19  Doctor Moon was copying the U.S. Department of

20  Labor regarding his progress notes on

21  Doctor Leung because Doctor Leung had an active

22  Workers' Compensation claim?

23      A.      Again, I'm not sure of the reason.

24      Q.      Do you know whether or not a

Exhibit I, 12

1    says during that initial phone call, yes, he

2    says, he references 1983 in the

3    Workers' Compensation claim.

4         Q.    Okay.

5              MR. HALLOW:  Why don't we take a break

6    for lunch.

7              MR. BERNACCHI:  How long do you want

8    to take?

9              THE VIDEOGRAPHER:  We're now going off

10   the record.  The time is 12:59 P.M.

11             (Recess taken at this time.)

12             THE VIDEOGRAPHER:  We're now going

13   back on the record.  This is tape number 3.

14   The time is 1:55 P.M.

15        Q.    Mr. Stimson, you understand you're

16   still under oath?

17        A.    Yes.

18        Q.    Do you know who Doctor Cary Alberstone

19   is?

20        A.    Not specifically, no.

21        Q.    Have you ever reviewed a report by

22   Doctor Cary Alberstone regarding the etiology of

23   Doctor Leung's disability?

24        A.    I may have, I don't recall

Exhibit I, 13

1    specifically, I'm not familiar with the name.

2                MR. BERNACCHI:  I'm going to represent

3    that he's not been provided the report basically.

4                MR. HORROW:  Okay, so I'm going to

5    mark as Exhibit 11 this report, here you go, you

6    can give that to the witness when you're done.

7                (Witness reviewing document.)

8                (Deposition Exhibit No. 11 marked.)

9        Q.    I'll ask you if you have ever seen

10   Exhibit 11, a report by Doctor Alberstone dated

11   August 9, 2022?

12       A.    I don't believe I've seen this before,

13   no.

14       Q.    Do you know whether or not

15   Exhibit 11 is part of the claim file?

16                MR. BERNACCHI:  Don't speculate.

17       A.    I don't know.

18       Q.    If you wanted to know whether

19   Exhibit 11 was part of the claim file, how would

20   you go about doing so?

21       A.    I could go back and look through the

22   Bates stamped copy that I have, I don't -- it

23   doesn't look familiar, I don't believe it's in

24   the copy that I have, I'm not sure how I would

Exhibit I, 14

1          <u>SIGNATURE PAGE</u>

2          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA

3                    C.A. NO.:
                  3:22-CV-00767-W-JLB

4    _____

5
     RICHARD J. LEUNG, MD,                      )
6          Plaintiff                            )
                                                )
7    VS.                                        )
                                                )
8    UNUM LIFE INSURANCE COMPANY OF             )
     AMERICA; AND DOES 1 THROUGH 10,            )
9    INCLUSIVE,                                 )
           Defendants                           )
10   _____

11

12

13

14

15          I, ADAM STIMSON, do hereby certify that I

16   have read the foregoing, and it is a true

17   transcript of the testimony given by me at the

18   taking of the subject deposition.

19

20          *Adam Stimson*
21   _____
           ADAM STIMSON
22
            2/1/2023
23   _____
                  DATE
24   TW - November 29, 2022


                    Exhibit I, 15

1        <u>ERRATA SHEET</u>

2

DEPONENT:  ADAM STIMSON
3   C.A. NO:   3:22-CV-00767-W-JLB
DATE TAKEN: November 29, 2022 - Leung, MD VS UNUM

4

5        I WISH TO MAKE THE FOLLOWING CHANGES
IN THE FOREGOING TRANSCRIPT OF MY DEPOSITION:

6   <u>PAGE</u>    <u>LINE</u>    <u>CHANGE OR CORRECTION AND REASON</u>

7

8    <u>8</u> / <u>6</u>   /   last name misspelled, should be Stimson

9   <u>59</u> / <u>17</u>   /   1st sentence should say "I don't know that's correct."

10       /       /   (no comma)

11   <u>60</u> / <u>17</u>   /   claim determination (not determining)

12   <u>71</u> / <u>8</u>   /   rationale (not rational)

13   <u>188</u> / <u>15</u>   /  etiology is sickness (not etiology or sickness)

14       /       /

15       /       /

16       /       /

17       /       /

18       /       /

19       /       /

20       /       /

21       /       /

22

23   <u>DATE:</u>  2/1/2023      _____
                                    *Adam Stimson*
24   TW - November 29, 2022        ADAM STIMSON

Exhibit I, 16

EXHIBIT J

MICHAEL B. HORROW (SBN 162917)
NICHOLE D. PODGURSKI (SBN 251240)
DONAHUE & HORROW, LLP
1960 E. Grand Ave., Suite 1215
El Segundo, California 90245
Telephone: (310) 322-0300
Facsimile: (310) 322-0302
Email: mhorrow@donahuehorrow.com
Email: npodgurski@donahuehorrow.com

Attorneys for Plaintiff, RICHARD J.
LEUNG, MD

# UNITES STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. LEUNG, MD<br><br>             Plaintiff,<br><br>      vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 through 10, inclusive,<br><br>             Defendants. | CASE NO.: 3:22-cv-00767-W-JLB<br><br>**NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS**<br><br>Date:      November 29, 2022 &<br>             November 30, 2022<br><br>Time:      9:00 a.m. (PST)<br><br>Location: Bachrach & Bachrach<br>             by McCarthy Reporting<br>             490 Shrewsbury Street – LL<br>             Worcester, MA 01604 |

– 1 –

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 1

TO DEFENDANT AND ITS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 30 *et seq.*, the attorneys for Plaintiff, RICHARD J. LEUNG, M.D. (hereinafter "Plaintiff") will take the following videotaped depositions on the following dates and times:

| DATE | TIME | DEPONENT |
|---|---|---|
| November 29, 2022 | 9:00 a.m. (EST) | F.R.C.P. 30(b)(6) witness(es) on behalf of defendant UNUM Life Insurance Company regarding the investigation and evaluation of Richard J. Leung, M.D.'s claim for disability insurance benefits under UNUM Life Insurance Company's Policy Numbers LAN661286, LAD016015, LAN780636, LAN782020, and LAN782990. |
| November 29, 2022 | To follow | Adam T. Stimson, an individual |
| November 30, 2022 | 9:00 a.m. (EST) | F.R.C.P. 30(b)(6) witness(es) on behalf of defendant UNUM Life Insurance Company's decision regarding that Richard J. Leung, M.D.'s disability is due to a sickness. |
| November 30, 2022 | To follow | Shannon Cartier, an individual |

Said depositions will take place at Bachrach & Bachrach, by McCarthy Reporting, located at 490 Shrewsbury Street – LL, Worcester, MA 01604.

Said depositions will take place before a shorthand reporter under oath. Said depositions will be recorded stenographically and will be videotaped and/or audiotaped. If videotaped, it is intended for possible use at trial. In the event that the depositions are not completed on the above date, the depositions will continue to such other date as are convenient to counsel, from day to day until completed.

Further, pursuant to F.R.C.P. Rules 30, *et seq.*, the witness(es) are required to bring with him or her at the above time and place the following ORIGINAL documents, which are in his or her possession or under his or her control, or which are

– 2 –

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 2

in the possession or under the control of his or her attorney:

## DEFINITIONS AND INSTRUCTIONS

In answering these requests, you are required to furnish information not only within your own knowledge or obtainable by you, but any information or knowledge in the possession of or obtainable by your attorneys, investigators, adjusters, insurance carrier, representatives, agents, or anyone acting on your behalf or their behalf.

If you are unable to answer the request in full after exercising due diligence to secure the information to do so, answer as completely as possible and then explain the reason you are unable to answer more fully, and state the name, address (business and residence), and telephone number (business and residence) of any person or persons able to supply the information or document.

If you determine that any request is not applicable, and consequently deserves no answer, state in detail why it is not applicable.

(1) As used herein, the terms "YOU", "YOUR" or "UNUM LIFE INSURANCE COMPANY OF AMERICA" refer to Defendant UNUM LIFE INSURANCE COMPANY OF AMERICA, and all present and former agents, divisions, subsidiaries, successors and assigns, officers, directors, employees, investigators, consultants, advisors, accountants, attorneys, and all other persons or entities acting on behalf of UNUM LIFE INSURANCE COMPANY OF AMERICA.

(2) "DR. LEUNG" refers to Plaintiff RICHARD J. LEUNG, MD.

(3) "POLICIES" refers to Disability Income Policy Nos. LAN661286, LAD016015, LAN780636, LAN782020, and LAN782990, issued by UNUM LIFE INSURANCE COMPANY OF AMERICA to DR. LEUNG and which is the subject of this litigation.

(4) "CLAIM" and/or "CLAIMS" means a demand for insurance benefits under UNUM LIFE INSURANCE COMPANY OF AMERICA's disability income insurance POLICY.

DONAHUE & HORROW LLP

— 3 —

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 3

DONAHUE & HORROW LLP

(5)     As used herein, "CLAIMS AGENT" means "claims agent" as it is defined in the California *Code of Regulations*, Section 2695.2(d), i.e., any "insurance agent" (as that term is defined in the California *Code of Regulations* Section 2695.2(h)) or other person licensed by the Commissioner or employed by an insurer, who conducts an INVESTIGATION of a claim on behalf of an insurer.

(6)     As used herein, the terms "DOCUMENT(S)" and "WRITING(S)" have the same meaning and are used in the broadest possible sense.  "DOCUMENT(S)" and "WRITING(S)" include all "writings," "recordings," and "photographs" as defined in Federal Rules of Evidence Rule 1001, which states "(a) "Writing" consists of letters, words, numbers, or their equivalent set down in any form; (b) A "recording" consists of letters, words, numbers, or their equivalent recorded in any manner; (c) A "photograph" means a photographic image or its equivalent stored in any form." "DOCUMENT(S)" and "WRITING(S)" also include all handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored.

(7)     As used herein, the term "DOCUMENTS" means each and every document, whether an original or copy, known to you or which you can locate or discover by reasonably diligent effort, within your custody, possession or control, or the custody, possession or control of your present or former attorneys, accountants, insurance carriers, representatives, employees and/or agents.

(8)     As used herein, the term "INVESTIGATION," "INVESTIGATE," or any form of the term, means "INVESTIGATION" as it is defined in the California *Code of Regulations*, Section 2695.2(k), as: "all activities of an insurer or its claims agent related to the determination of coverage, liabilities or nature and extent of loss

– 4 –

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 4

or damages for which benefits are afforded by an insurance policy…and other obligations or duties arising from an insurance policy."

(9)    As used herein, the term "COMMUNICATION" means any transmission of information from one person or entity to another, other than by document, including (without limitation) by personal meeting, conference, conversation, telephone, radio, telegraph, electronic mail, teleconference, etcetera.

(10)    If the responding party objects to the demand for inspection of an item or category of item, the response shall:

      a.  identify with particularity any document, communication, or tangible thing falling within any category of item in the demand to which an objection is being made, and

      b.  set forth clearly the extent of, and the specific ground for, the objection.

If an objection is based on a claim of privilege, the particular privilege invoked shall be stated.

## DOCUMENTS REQUESTED

The following designated items for discovery and production pertain to the POLICIES (Disability Income Policy Nos. LAN661286, LAD016015, LAN780636, LAN782020, and LAN782990) issued to DR. LEUNG by UNUM LIFE INSURANCE COMPANY OF AMERICA.

1.    A true and correct copy of the following items which has been kept in the regular course of business:  The POLICIES issued by UNUM LIFE INSURANCE COMPANY OF AMERICA to DR. LEUNG as referenced in the Complaint, including all attachments, endorsements, amendments, and/or riders from date of first issue to the present.

2.    True and correct copies of the following items which have been kept in the regular course of business:   Any and all DOCUMENTS or COMMUNICATIONS comprising the complete CLAIM file (including, but not limited to, home office,

– 5 –

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 5

1  regional office, local or other office) pertaining to the CLAIM listed above, including,

2  but not limited to, the file folder or file;

3      (a)   All inter-office memoranda, email, computer notes or other

4          form of DOCUMENTS or COMMUNICATIONS of any

5          employee of UNUM LIFE INSURANCE COMPANY OF

6          AMERICA relating to the initial processing of the CLAIM

7          listed above when UNUM LIFE INSURANCE COMPANY

8          OF AMERICA first received said CLAIM;

9      (b)   All inter-office memoranda, email, computer notes or other

10         form of DOCUMENTS or COMMUNICATIONS from any

11         employee of UNUM LIFE INSURANCE COMPANY OF

12         AMERICA relating to the continued processing of DR.

13         LEUNG's CLAIM listed above;

14     (c)   All DOCUMENTS or COMMUNICATIONS between DR.

15         LEUNG and UNUM LIFE INSURANCE COMPANY OF

16         AMERICA, including all forms concerning the CLAIM listed

17         above;

18     (d)   All DOCUMENTS or COMMUNICATIONS between DR.

19         LEUNG and any third party concerning the processing,

20         acceptance, and/or denial of the CLAIM listed above;

21     (e)   All medical and INVESTIGATIVE reports concerning DR.

22         LEUNG and the CLAIM listed above, and all DOCUMENTS

23         or COMMUNICATIONS between UNUM LIFE

24         INSURANCE COMPANY OF AMERICA and any third

25         party concerning said report or reports;

26     (f)   All photographs, motion pictures, videotapes, tape recordings

27         (or transcripts of tape recordings) or INVESTIGATIVE

28

Exhibit J, 6

reports of UNUM LIFE INSURANCE COMPANY OF
AMERICA concerning DR. LEUNG taken by or on behalf of
UNUM LIFE INSURANCE COMPANY OF AMERICA,
relating to the processing and/or or denial of the CLAIM
listed above;

(g)   All other DOCUMENTS or COMMUNICATIONS
correspondence, telephone notes, Telex, and fax pertaining to
the processing of the above CLAIM in the possession of
UNUM LIFE INSURANCE COMPANY OF AMERICA not
designated in requests identified as (a) through (f) above; and

(h)   All file folders or file jackets and adjacent or related exhibit
folders in which DOCUMENTS, COMMUNICATIONS or
other materials or items described in requests identified as (a)
through (f) above are filed or maintained.

3.    True and correct copies of the following items which have been kept in
the regular course of business:  All DOCUMENTS or COMMUNICATIONS
comprising the complete CLAIM file (including, but not limited to, home office,
regional office, local or other office) pertaining to any other CLAIM submitted by
DR. LEUNG under the subject POLICIES.

4.    True and correct copies of the following items which have been kept in
the regular course of business:  The complete CLAIMS manuals and/or procedures
manuals, POLICIES statements, bulletins, DOCUMENTS, COMMUNICATIONS or
memoranda which set forth company practices or policies regarding the handling,
processing and/or INVESTIGATION of CLAIMS submitted by YOUR insured and
which were in effect or which were utilized by YOU, and/or any claims administrator,
at the time DR. LEUNG's CLAIM(s), submitted pursuant to the above-referenced
POLICIES (Disability Income Policy Nos. LAN661286, LAD016015, LAN780636,

DONAHUE & HORROW LLP

– 7 –

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN
INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR
PRODUCTION OF DOCUMENTS

Exhibit J, 7

1  LAN782020, and LAN782990), was handled, processed and/or investigated.

2       5.    True and correct copies of the following items which have been kept in

3  the regular course of business:  All additions, revisions, deletions or other changes that

4  have been made in the above-referenced claims manuals and/or procedures manuals

5  from the time DR. LEUNG's CLAIM(s) was submitted up to and including the

6  present.

7       6.    True and correct copies of the following items which have been kept in

8  the regular course of business:  All other DOCUMENTS and COMMUNICATIONS

9  including, but not limited to, inter-office memoranda, notes, files, or reports outlining

10 or describing procedures for claims handling, processing and investigation and which

11 were in effect or which were utilized by YOU, and/or any claims administrator, at the

12 time DR. LEUNG's CLAIM(s) was handled, processed and/or investigated.

13      7.    Any and all DOCUMENTS and COMMUNICATIONS which support

14 each and every fact upon which YOU base YOUR allegation that DR. LEUNG is not

15 entitled to benefits under the POLICIES.

16      8.    Any and all DOCUMENTS and COMMUNICATIONS between UNUM

17 LIFE INSURANCE COMPANY OF AMERICA and any other doctor, nurse,

18 physician, hospital and/or medical service provider regarding DR. LEUNG and/or the

19 subject CLAIM(s).

20      9.    Any and all DOCUMENTS and COMMUNICATIONS regarding

21 conversations between UNUM LIFE INSURANCE COMPANY OF AMERICA and

22 any other doctor, nurse, physician, hospital and/or medical service provider regarding

23 DR. LEUNG and/or the subject CLAIM(s).

24      10.    The name and curriculum vitae ("CV") or resume of any doctor or nurse

25 who reviewed DR. LEUNG's medical records and/or claim file on behalf of UNUM

26 LIFE INSURANCE COMPANY OF AMERICA.

27      11.    Any and all surveillance tapes and/or reports regarding DR. LEUNG.

28

Exhibit J, 8

12.     Any and all transferable skills and/or vocational analysis by UNUM LIFE INSURANCE COMPANY OF AMERICA with regard to the subject CLAIM and/or DR. LEUNG.

13.     Any and all labor market surveys and reports by UNUM LIFE INSURANCE COMPANY OF AMERICA with regard to the subject CLAIM and/or DR. LEUNG.

14.     True and correct copies of the following items which have been kept in the regular course of business:  The complete and original underwriting file (including, but not limited to, home office, regional office, local or other office) pertaining to the above mentioned POLICIES including, but not limited to: the file folder or file folders themselves, adjacent exhibit folders, all DOCUMENTS, COMMUNICATIONS and INVESTIGATIVE reports directly pertaining to the above mentioned POLICIES, including, but not limited to, inter-office memoranda or notes pertaining to the issuance of the above mentioned POLICIES and any and all DOCUMENTS, COMMUNICATIONS or statements made between UNUM LIFE INSURANCE COMPANY OF AMERICA and any other party, person or entity, which directly pertains to issuance of the POLICIES to DR. LEUNG.

15.     True and correct copies of the following items which have been kept in the regular course of business:  The complete underwriting manuals and/or procedures manuals, POLICIES statements, bulletins, DOCUMENTS, COMMUNICATIONS or memoranda which set forth company practices or policies regarding the handling, processing and/or investigation/underwriting of insurance POLICIES applications submitted to UNUM LIFE INSURANCE COMPANY OF AMERICA and which were in effect or which were utilized by YOU at the time DR. LEUNG's application for the POLICIES (Disability Income Policy Nos. LAN661286, LAD016015, LAN780636, LAN782020, and LAN782990) were submitted.

16.     If YOU are relying upon advice of counsel as a defense in this case:

-- 9 --

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 9

DONAHUE & HORROW LLP

(a) Any and all DOCUMENTS and COMMUNICATIONS upon which YOU base YOUR reliance on the advice of counsel as a defense in this case with regard to any of the causes of action alleged in the Complaint;

(b) Any and all DOCUMENTS and COMMUNICATIONS advising other UNUM LIFE INSURANCE COMPANY OF AMERICA employees, managers or agents of the advice of counsel;

(c) Any and all DOCUMENTS and COMMUNICATIONS pertaining to telephone conversations between the counsel providing the advice and UNUM LIFE INSURANCE COMPANY OF AMERICA with regard to the subject advice;

(d) The complete file regarding DR. LEUNG and/or the subject CLAIM of the attorney, or his/her employer, that provided the advice of counsel;

(e) Any and all DOCUMENTS and COMMUNICATIONS pertaining to conversations between the counsel providing the advice and UNUM LIFE INSURANCE COMPANY OF AMERICA with regard to the subject advice;

(f) Any and all DOCUMENTS and COMMUNICATIONS upon which the attorney providing the advice relied upon and/or reviewed with regard to the advice prior to providing the advice; and

(g) Any and all DOCUMENTS and COMMUNICATIONS in UNUM LIFE INSURANCE COMPANY OF AMERICA's possession regarding what the advice of counsel was and how the decision was made to provide the advice.

Exhibit J, 10

DONAHUE & HORROW LLP

17.    All DOCUMENTS which YOU maintain support YOUR contention that DR. LEUNG is not entitled to monthly benefits under the subject POLICIES.

18.    All DOCUMENTS which YOU maintain support the contention that DR. LEUNG committed fraud, including any file from any Special Investigation(s) Unit that in any way pertains to Dr. Leung.

19.    A true and correct copy of all sales and promotional marketing materials, including but not limited to sales brochures, pamphlets, and handouts, printed and distributed by YOU in the State of California to sell, market, promote or discuss the features, advantages and benefits of POLICIES (Disability Income Policy Nos. LAN661286, LAD016015, LAN780636, LAN782020, and LAN782990), two years before the date of the policy was sold.

20.    A true and correct copy of all signatures and/or certificates of completion demonstrating that all individuals who conducted any INVESTIGATION and evaluation on YOUR behalf related to DR. LEUNG's CLAIM for benefits under the POLICIES underwent California Fair Claims Training from 2016 to the present in accordance with regulation 2695.6 of Title 10, Chapter 5, Subchapter 7.5 of the California *Code of Regulations*.

21.    Any and all CTs and MRIs, including all, CTs and MRIs for all imaging studies in YOUR possession of DR. LEUNG. This request specifically asks for actual imaging, not reports.

22.    True and correct copies of the following items which have been kept in the regular course of business: The complete claims manuals and/or procedures manuals, policy statements, bulletins, documents, communications or memoranda which set forth company practices or policies regarding the handling, processing and/or investigation of claims that in any way relate to the POLICIES and

      a)  An etiology review;

NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Exhibit J, 11

   b) Handling a claim related to the POLICY provisions related to a total disability due to a "sickness or injury".

23. Produce true and correct copies of all training materials used by YOU, including but not limited to, any manuals, handouts, flyers, and power point presentations, that in any way relate to handling:

   a) an etiology review under the POLICIES.

   b) handling a claim related to the POLICY provisions related to a total disability due to a "sickness or injury".

Dated: October 6, 2022    DONAHUE & HORROW LLP

            MICHAEL B. HORROW
            NICHOLE D. PODGURSKI
            Attorneys for Plaintiff

Exhibit J, 12

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1960 E. Grand Avenue, Suite 1215, El Segundo, California 90245.

On, **October 6, 2022,** I served the following document(s) described as: **NOTICE OF TAKING THE VIDEOTAPED DEPOSITIONS OF F.R.C.P. 30(b)(6) WITNESS(ES), ADAM T. STIMSON, AN INDIVIDUAL, AND SHANNON CARTIER, AN INDIVIDUAL VIA VIDEOCONFERENCE AND REQUEST FOR PRODUCTION OF DOCUMENTS** on the interested parties in this action.

[X] by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

## SEE ATTACHED SERVICE LIST

[X] by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows: (AS INDICATED BELOW)

[X]   **BY MAIL:**
As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid at El Segundo, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   **BY ELECTRONIC MAIL**
A copy of which was sent to the email addresses listed on the Service List.

[ ]   **BY FEDERAL EXPRESS/OVERNIGHT MAIL:**
I placed a true copy of thereof in a sealed Federal Express overnight envelope. The overnight envelope was taken to the Federal Express drop off located at 1960 E. Grand Avenue, El Segundo, CA 90245.

[ ]   **BY TELEFAX**
A copy of which was placed on our inter-office fax machine and telefaxed to all numbers on the attached service list, after which I received a facsimile confirmation sheet indicating that all pages went through successfully.

[ ](State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X] (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **October 6, 2022,** at El Segundo, California.

Bianca Benavides

1

PROOF OF SERVICE

Exhibit J, 13

| | |
|---|---|
| Daniel W. Maguire<br>Keiko K. Kojima<br>dmaguire@bwslaw.com<br>kkojima@bwslaw.com<br>BURKE WILLIAMS & SORENSEN LLP<br>444 South Flower Street, Suite 2400<br>Los Angeles, CA 90245<br>T: (213) 236-0600<br>F: (213) 236-2700<br><br>*Attorneys for Defendant UNUM Life*<br>*Insurance Company of America* | |

EXHIBIT K

<pre>
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RICHARD J. LEUNG, M.D.,        :

 5                Plaintiff,       :   Case No.
                                        3:22-cv-00767-W-JLB
 6          v.                     :

 7   UMUN LIFE INSURANCE COMPANY   :
     OF AMERICA, and
 8   DOES 1 through 10,            :
     inclusive,
 9                                 :
                Defendants.
10   ---------------------------

11

12

13

14    VIDEOTAPED DEPOSITION OF MARVIN E. FRIEDLANDER, MD

15               APPEARING REMOTELY FROM

16             UNION COUNTY, PENNSYLVANIA

17

18                 December 8, 2022

19                   9:13 a.m.

20

21

22

23   REPORTED BY:
     JENNIFER D'ANGELO, RPR, CCR-NJ
24   APPEARING REMOTELY FROM PHILADELPHIA COUNTY,
     PENNSYLVANIA
25
</pre>

```
1    APPEARANCES:

2

3         DONAHUE & HORROW, LLP
          BY:   MICHAEL B. HORROW, ESQUIRE
4         mhorrow@donahuehorrow.com
          1960 E. Grand Avenue, Suite 1215
5         El Segundo, California  90245
          (310) 322-0300
6              Attorney for Plaintiff

7

8         BURKE, WILLIAMS & SORENSEN, LLP
          BY:   MICHAEL BERNACCHI, ESQUIRE
9         mbernacchi@bwslaw.com
          444 South Flower Street, Suite 2400
10        Los Angeles, California  90245
          (213) 236-0600
11             Attorney for Defendant

12

13   ALSO PRESENT:  Aleisha Catts, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```



1          them -- an E-mail to them with a copy to

2          intake at Dane Street, so it's on their

3          record somewhere else aside from the person

4          I contacted.  And then they will send me

5          back an E-mail saying that they're going to

6          get information, there's no more

7          information, to hold the case until I get --

8          something like that.  They'll respond

9          somehow.

10   BY MR. HORROW:

11   Q.      At any point in time in doing your review on

12   the Dr. Leung file, did you ever review actual

13   diagnostic films?

14   A.      No.

15   Q.      MRIs?

16   A.      No.

17   Q.      At any point in time in doing your review of

18   the Dr. Leung file, did you ever ask anyone to

19   provide you the actual MRI films?

20   A.      That's -- that's generally -- not just for

21   Dane Street, but that's generally not done.

22   Q.      What do you mean it's generally not done?

23   A.      It is rare, except when you're -- when

24   you're the treating doctor or doing your report for

25   a plaintiff, it is very rare that you actually get

1          incomplete hypothetical.

2                    Go ahead, Doctor, if you know.

3                    THE WITNESS:  I think what I would

4          charge would be the going rate that my

5          office requires.  Okay?

6   BY MR. HORROW:

7   Q.       And what's that range?

8   A.       $450 an hour.

9   Q.       Have you submitted any additional bills to

10  UNUM, Dane Street, or its lawyers for work done on

11  the Leung file?

12  A.       No.

13  Q.       Do you know who Dr. Cary Alberstone is?

14  A.       No.

15  Q.       Have you been provided a copy of a report

16  done by Dr. Cary Alberstone on the Leung file?

17  A.       If it was in the documents that I reviewed

18  initially or the two documents I read for the

19  addendum, then yes.  If it wasn't in there, I did

20  not see it.

21  Q.       Dr. Alberstone's report is from August 2022.

22  A.       No, I did not see it.

23  Q.       Since Dr. Alberstone's report is from

24  August 2022, we can agree you have never seen it and

25  it's never been provided to you; is that correct?

1    Q.       As of the time you did your review on the

2    Dr. Leung file in 2021, did Dr. Leung have an active

3    ongoing workers' compensation claim, to your

4    knowledge?

5    A.       I don't know.

6    Q.       Did anyone ever tell you, either from Dane

7    Street, from UNUM, or UNUM's counsel, that at the

8    time you did your review in 2021, that Dr. Leung had

9    an ongoing existing workers' compensation claim?

10                     MR. BERNACCHI:   Objection to the

11              extent it calls for attorney-client

12              privilege.   But other than counsel, feel

13              free to answer.

14                     THE WITNESS:   I have no idea, even

15              to this moment, that he has an active claim.

16   BY MR. HORROW:

17   Q.       All right.   So even as of today, the date of

18   your deposition here under oath, you don't know

19   whether Dr. Leung has an active existing workers'

20   compensation claim in the State of California; is

21   that correct?

22   A.       Correct.

23   Q.       Is there a reason why you did not ask Dane

24   Street for the actual MRIs or x-rays to do your

25   Dr. Leung review?

Marvin Friedlander, M.D
Richard J. Leung vs. UNUM Life Insurance Company

1224148

REPORTER'S CERTIFICATE

1

2

3    I, the undersigned Certified Shorthand Reporter

4    holding a valid and current license issued by the State

5    of California, do hereby certify:

6

7    That said proceedings were taken down by me in

     shorthand at the time and place therein set forth and

8    thereafter transcribed under my direction and

9    supervision.

10

11    I further certify that I am neither counsel for nor

12    related to any party to said action nor in any way

13    interested in the outcome thereof.

14

     Before completion of the deposition, review of the

15    transcript [ ]was [X]was not requested.

16

17    The dismantling, unsealing, or unbinding of the

18    original transcript will render the Reporter's

19    certificate null and void.

20

     IN WITNESS WHEREOF, I have subscribed my name on

21    this date: December 29, 2022.

22

23

24    _____

25                       Certified Shorthand Reporter



EXHIBIT L

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


RICHARD J. LEUNG, MD

       Plaintiff,

     VS.                   NO. 3:22-cv-00767-W-JLB

UNUM LIFE INSURANCE COMPANY
OF AMERICA; and DOES 1 through
10, inclusive,

       Defendants.
_____




VIDEOTAPED DEPOSITION OF PHILIP LAHEY, M.D.

APPEARING REMOTELY FROM

WORCESTER, MASSACHUSETTS



Monday, January 9, 2023

11:04 a.m.




REPORTED BY:

Karine Sepedjian

CSR No. 12515, CSR

APPEARING REMOTELY FROM LOS ANGELES COUNTY, CALIFORNIA

Exhibit L, 1

1  REMOTE APPEARANCES:

2

3      FOR THE PLAINTIFF:

4            MICHAEL B. HORROW, ESQ.
             DONAHUE & HORROW, LLP
5            1960 East Grand Avenue, Suite 1215
             El Segundo, CA 90245
6            (310) 322-0300
             mhorrow@donahuehorrow.com
7
       FOR THE DEFENDANTS:
8
             MICHAEL BERNACCHI
9            BURKE WILLIAMS & SORENSEN LLP
             444 South Flower Street, Suite 2400
10           Los Angeles, CA 90245
             (213) 236-0600
11           mbernacchi@bwslaw.com

12     ALSO PRESENT:

13           ROB DENOS,
             Videographer
14

15

16

17

18

19

20

21

22

23

24

25

Exhibit L, 2

 1    surgery, you would refer those patients out to a                11:18

 2    neurosurgeon; is that right?                                     11:18

 3         A    Or an orthopedic surgeon, yes.                         11:18

 4         Q    Are you familiar with a doctor by the name of          11:18

 5    Dr. Cary Alberstone?                                             11:18

 6         A    No.                                                    11:18

 7         Q    Have you ever reviewed a report prepared by            11:18

 8    Dr. Alberstone in connection with his review of the              11:18

 9    Dr. Leung file?                                                  11:18

10         A    Not that I am aware of.                                11:18

11         Q    Now, you did two reviews in the Leung file             11:18

12    that I can see; is that correct?                                 11:18

13         A    Yeah.                                                  11:18

14         Q    One was November 11, 2020; correct?                    11:18

15         A    I will take your word for that.  I don't have          11:18

16    the date.                                                        11:18

17         Q    Why don't we do it this way.  In advance of            11:18

18    today's deposition, I sent along a bunch of documents            11:18

19    that came from the claim file.  If you have those in             11:18

20    front of you, I can easily point you to the dates of             11:18

21    your reviews.                                                    11:19

22         A    Yes, I do.                                             11:19

23         Q    Do you need to access them?                            11:19

24         A    No.  I got it.  If you can just give me the            11:19

25    page numbers.                                                    11:19

Exhibit L, 3

1     Q    And you reviewed what Dr. Milos indicated in    11:22

2  his DMO reports; correct?    11:22

3     A    Well, let me put it this way.  I didn't do a    11:22

4  formal review, but when I did my addendum, I saw that he    11:22

5  had agreed with me, and that's why we had to do the    11:22

6  addendum.  So I asked him to do an addendum as well.    11:22

7  After that, you know, I don't really check -- or I    11:22

8  didn't check on what happened after that.  So I was --    11:22

9  yeah.    11:22

10     Q    So the reason why I am asking is because    11:22

11  Dr. Milos was deposed in this case.  He gave testimony    11:22

12  under oath.  And I wondered if you have been provided    11:22

13  that transcript and had a chance to review what    11:22

14  Dr. Milos said.    11:22

15     A    Yeah, as I said, I have not.    11:22

16     Q    Have you ever reviewed any actual MRIs of    11:23

17  Dr. Leung, the actual films?    11:23

18     A    No.    11:23

19     Q    Have you ever asked to see the actual MRI    11:23

20  films on Dr. Leung?    11:23

21     A    No.    11:23

22     Q    Is there a reason why not?    11:23

23     A    Well, because -- There are several reasons,    11:23

24  but I guess the main reason is that, you know, I trust    11:23

25  the radiologist to report the findings probably better    11:23

Exhibit L, 4

1    radiologists who did any of the interpretation of the          11:25

2    MRIs on Dr. Leung?                                              11:25

3           A     No.                                                11:26

4           Q     Did you have discretion in 2020 and 2021 to        11:26

5    ask for the actual MRI films before giving your opinion         11:26

6    in connection with the Leung file?                              11:26

7           A     Yes, I could have, yes.                            11:26

8           Q     Did you, at any time, ask anyone at Unum to        11:26

9    provide you the actual MRI films?                               11:26

10          A     No.                                                11:26

11          Q     In doing your work on the Leung file, did you      11:26

12   speak to any spine surgeons to ask their opinions in            11:26

13   connection with their review of the MRIs?                       11:26

14          A     No.                                                11:26

15          Q     You understood that Dr. Leung had a workers'       11:26

16   compensation injury; is that correct?                           11:26

17          A     Yes, I did understand that.                        11:26

18          Q     As of May 2020, Dr. Leung was claiming             11:26

19   disability from being able to perform his occupational          11:26

20   duties as a surgical ophthalmologist; correct?                  11:27

21          A     Correct.                                           11:27

22          Q     You understood as of May 2020, when Dr. Leung      11:27

23   was claiming disability from performing his duties as a         11:27

24   surgical ophthalmologist, that he had an active existing        11:27

25   ongoing workers' compensation claim; correct?                   11:27

Exhibit L, 5

1    A    I am not sure I knew that.                    11:27

2    Q    Did you ever review the actual workers'      11:27

3 compensation file on Dr. Leung's claim?              11:27

4    A    Well, I reviewed the medical records from -- 11:27

5 that had been referred to workers' comp.             11:27

6    Q    All of the medical records or just some of   11:27

7 them?                                                 11:27

8    A    Whatever I had in the file.                   11:27

9    Q    Right.  So -- But you were at the mercy of    11:27

10 whatever Unum provided to you; correct?             11:27

11    A    Absolutely.  Absolutely.                     11:27

12    Q    So did you ever say to anyone at Unum, "You  11:27

13 know what?  He has an active existing workers'      11:27

14 compensation claim here in May 2020.  I need a copy of 11:27

15 the workers' compensation file to understand the    11:27

16 trajectory of his claim"?                           11:28

17    A    No.                                          11:28

18    Q    Did you have authority to ask for his actual 11:28

19 workers' compensation file, on Dr. Leung's claim?   11:28

20    A    I have authority to ask.  I don't know if I  11:28

21 have authority to get.                              11:28

22    Q    That's the same with the actual MRIs.  You   11:28

23 have authority to ask but you don't have authority to 11:28

24 get the actual MRI films; right?                    11:28

25    A    I have authority to ask.                     11:28

Exhibit L, 6

1           REPORTER'S CERTIFICATE

2

3

4           I, KARINE SEPEDJIAN, CSR No. 12515, Certified

5    Shorthand Reporter, certify:

6           That the foregoing proceedings were taken before

7    me at the time and place therein set forth, at which

8    time the witness was put under oath by me;

9           That the testimony of the witness, the questions

10   propounded, and all objections and statements made at

11   the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13          That a review of the transcript by the deponent

14   was not requested;

15          That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17          I further certify that I am not a relative or

18   employee of any attorney of the parties, nor financially

19   interested in the action.

20          I declare under penalty of perjury under the laws

21   of California that the foregoing is true and correct.

22          Dated this 11th day of January, 2023.

23

24          _____
            KARINE SEPEDJIAN, CSR No. 12515

25

Exhibit L, 7

EXHIBIT M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------------------------------------

RICHARD J. LEUNG, MD,

        Plaintiff,

      vs.              Case No.
                         3:22-cv-00767-W-JLB


UNUM LIFE INSURANCE COMPANY
OF AMERICA; and DOES 1 through 10,
inclusive,

        Defendants.

------------------------------------------------------------


Deposition of STEVEN MILOS, M.D.

Friday, December 9, 2022

11:26 a.m.

at

COURTYARD BY MARRIOTT ROCKFORD
7676 East State Street
Rockford, Illinois 61108


Stenographically reported by:
Maria V. Camera, Court Reporter

Exhibit M, 1

1           Deposition of STEVEN MILOS, M.D., a

2    witness in the above-entitled action, was taken at the

3    instance of the Plaintiff, under and pursuant to the

4    provisions of Chapter 804 of the Wisconsin Statutes, and

5    pursuant to Notice, before me, MARIA V. CAMERA, Court

6    Reporter, and Notary Public in and for the State of

7    Wisconsin, at COURTYARD BY MARRIOTT, 7676 East State

8    Street, Rockford, Illinois 61108, on the 9th day of

9    December, 2022, commencing at 11:26 a.m. and concluding

10   at 1:08 p.m.

11

12                  A P P E A R A N C E S

13                  DONAHUE & HORROW, by
                    Mr. Michael Horrow
14                  1960 East Grand Avenue, Suite 1215
                    El Segundo, California 90245
15                  appeared on behalf of the Plaintiff.

16                  BURKE WILLIAMS & SORENSEN LLP, by
                    Mr. Michael Bernacchi
17                  444 South Flower Street, Suite 2400
                    Los Angeles, California 90245
18                  appeared on behalf of the Defendants.

19                  ALSO PRESENT:  Mr. Tony Micheletto,
                    Videographer.

20

21

22

23

24

25

Exhibit M, 2

1    certification or education goes into becoming a

2    qualified medical examiner in the State of

3    California, correct?

4  A  Correct.

5  Q  And you don't know whether a qualified medical

6    examiner in the State of California has anything to

7    do with the workers' compensation system in

8    California, correct?

9  A  Correct.

10 Q  And every progress note that you read for Dr. Moon

11   copied the U.S. Department of labor, right?

12 A  Correct.

13 Q  Why was Dr. Moon copying the U.S. Department of

14   Labor with progress notes for examinations of

15   Dr. Leung in 2020?

16      MR. BERNACCHI:  Objection.  Lacks

17   foundation.  Calls for speculation.

18      MR. HORROW:  If you know.

19      MR. BERNACCHI:  If you know.

20      THE WITNESS:  Yeah, I don't know.

21 BY MR. HORROW:

22 Q  When you were doing your review in 2021, did you

23   consider that Dr. Leung was receiving medical

24   treatment in 2020 from Dr. Moon for his workers'

25   compensation injury suffered in 1982?

Exhibit M, 3

```
 1    A    Hard to estimate.  I do probably -- I would say
 2         anywhere, on average, maybe five reviews a day, so
 3         about 20 reviews a week, something like that.
 4    Q    How long have you been doing 20 reviews a week, on
 5         average, for Dane Street?
 6    A    About five years.
 7    Q    The agreement that you have with Dane Street tells
 8         you how much you are going to be compensated for
 9         your reviews; is that correct?
10    A    Correct.
11    Q    Do you know who Dr. Philip Lahey is?
12    A    I do not know him.
13    Q    Do you know what kind of physician Dr. Lahey is?
14    A    I don't know offhand, but I do remember it was
15         mentioned in the report.
16    Q    Do you know whether Dr. Philip Lahey, who did a
17         review in the UNUM case for Dr. Leung's file,
18         whether he's a spine surgeon?
19    A    I believe he's a pain management physician.
20    Q    So the answer is it's your understanding that
21         Dr. Philip Lahey is not a spine surgeon; is that
22         correct?
23    A    Correct.
24    Q    In doing your work on Dr. Leung's file, did you
25         ever review actual MRI films?
```

Exhibit M, 4

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you ever review any actual X-ray films on |
| 3 | | Dr. Leung? |
| 4 | A | No. |
| 5 | Q | Did you ever review any actual CT scans on |
| 6 | | Dr. Leung? |
| 7 | A | No. |
| 8 | Q | Did you ever ask, in order to do your review on |
| 9 | | Dr. Leung's file, to see the actual MRIs, X-rays, |
| 10 | | or CT scans? |
| 11 | A | No. |
| 12 | Q | Is there a reason why you did not ask to see the |
| 13 | | actual MRIs on Dr. Leung? |
| 14 | A | I went on the reports that were provided. |
| 15 | Q | I realize you went on the report.  My question is |
| 16 | | is there a reason you didn't ask for the actual |
| 17 | | MRIs? |
| 18 | | MR. BERNACCHI:  Objection.  Asked and |
| 19 | | answered.  Go ahead, Doctor. |
| 20 | | THE WITNESS:  I don't typically ask for |
| 21 | | the images. |
| 22 | BY MR. HORROW: | |
| 23 | Q | Why do you not typically ask for the MRI images |
| 24 | | when you do your medical reviews? |
| 25 | A | I just go based on the report. |

Exhibit M, 5

| | | |
|---|---|---|
| 1 | Q | Do you know who Dr. Cary Alberstone is? |
| 2 | A | Not off the top of my head. |
| 3 | Q | Have you heard his name before as a board certified |
| 4 | | spine surgeon in California? |
| 5 | A | I have not. |
| 6 | Q | So I imagine -- well, let me withdraw that. |
| 7 | | It would be correct to say that you have |
| 8 | | never been provided Dr. Alberstone's August 2022 |
| 9 | | report in connection with his work on this file; is |
| 10 | | that correct? |
| 11 | A | Not unless it was included in the records that I |
| 12 | | reviewed. |
| 13 | Q | Right.  Well, it was from August 2022 -- |
| 14 | A | Correct.  Yes, I have not. |
| 15 | Q | Now, you did what's called a DMO review; is that |
| 16 | | right? |
| 17 | A | Correct. |
| 18 | Q | Designated medical officer review; is that right? |
| 19 | A | Correct. |
| 20 | Q | And what is your understanding a designated medical |
| 21 | | officer does? |
| 22 | A | So it's basically just sort of a referee exam or |
| 23 | | tiebreaker.  So basically the AP or treating |
| 24 | | provider renders an opinion, and then the MSO or |
| 25 | | medical -- designated medical provider that reviews |

Exhibit M, 6

1   STATE OF WISCONSIN )
                        ) SS
2   MILWAUKEE COUNTY    )

3                   I, MARIA V. CAMERA, Court Reporter, and

4   Notary Public in and for the State of Wisconsin, do

5   hereby certify that the preceding deposition was

6   recorded by me and reduced to writing under my personal

7   direction.

8                   I further certify that said deposition

9   was taken before me at COURTYARD BY MARRIOTT, 7676 East

10  State Street, Rockford, Illinois 61108, on the 9th day

11  of December, 2022, commencing at 11:26 a.m. and

12  concluding at 1:08 p.m.

13                  I further certify that I am not a

14  relative or employee or attorney or counsel of any of

15  the parties, or a relative or employee of such attorney

16  or counsel, or financially interested directly or

17  indirectly in this action.

18                  In witness whereof, I have hereunto set

19  my hand and affixed my seal of office at Milwaukee,

20  Wisconsin, on this 20th day of December, 2022.

21

22  _____
    MARIA V. CAMERA - Notary Public
23                              In and for the State of Wisconsin

24  My commission expires January 25, 2023.

25

Exhibit M, 7

# EXHIBIT N

D022 12

# UNIVERSITY OF CALIFORNIA, SAN DIEGO

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO  SANTA BARBARA · SANTA CRUZ

DIVISION OF NEUROLOGICAL SURGERY
(619) 294-5540

UNIVERSITY OF CALIFORNIA MEDICAL CENTER
SAN DIEGO
UNIVERSITY HOSPITAL
225 DICKINSON STREET
SAN DIEGO, CALIFORNIA 92103

June 14, 1983

*A13 - 679 763*

Evelyn Gong
U.S. Department of Labor
OWCP
450 Golden Gate Avenue
Box 36066
San Francisco, CA 94102

Re: LEUNG, Richard

Dear Ms. Gong:

Dr. Richard Leung who is a patient of mine is making a satisfactory recovery following his decompressive lumbar laminectomy, but he continues to have a moderate amount of back and leg pain, aggravated by activity and relieved by rest. For that reason, I have counseled him to avoid strenuous activities and heavy lifting. A follow-up CT scan shows an adequate decompressive laminectomy, but some significant encroachment on the nerve root foramina by hypertrophied facets. This was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date.

Sincerely yours,

John F. Alksne, M.D.

OWCP 13
DFEC

JUN 20 1983

**U.S. Department of Labor**

June 27, 1983

Employment Standards Administration
Office of Workers' Compensation Programs
450 Golden Gate Avenue, P.O. Box 36066
San Francisco, CA 94102



File Number: A13-679763
Leung, Richard J.

University of California Medical
Center, San Diego
University Hospital
225 Dickinson Street
San Diego, CA 92103

Dear Dr. Alksne:

This is regarding Dr. Richard Leung, who is a patient of yours,
and your report of 6/14/83.

Authorization is given for further surgery, if it becomes
necessary.

Sincerely,


Evelyn Gong
Claims Examiner


cc: Richard J. Leung             cc: Veterans Administration
    363 Nautilus St.                 VA Medical Center
    La Jolla, CA 92037               Attn: Personnel/05F
                                     3350 La Jolla Village Dr.
                                     San Diego, CA 92161

EXHIBIT O

### Mark C. Levine, M.D.

Neurology

3456 Camino Del Rio North, #100

San Diego, California 92108

(619) 584-8700

RECEIVED

JUL 2 5 1995

MEDICAL

**May 31, 1995**

U.S. Department of Labor
Employment Standards Administration
Office of Workers'Compensation Programs
71 Stevenson Place, P.O. Box 3769
San Francisco, California 94119-3769

Attn: Senen Bagos, Jr.  RE: RICHARD J. LEUNG, M.D.
 EMP: U.S. Dept. of
 Veterans Affairs
 DOI: 5/23/82
 DOE: 5/31/95
 CL#: 92123 13-679763

Dear Mr. Bagos:

Thank you for referring Dr. Richard J. Leung for a second
opinion examination. He was examined by me on May 31, 1995
in my private office in El Cajon. I have reviewed the
medical file and the "Statement of Accepted Facts."

### HISTORY OF INJURY AS RELATED BY PATIENT:

Dr. Richard J. Leung is a 39-year-old right-handed, married
Caucasian gentleman, who is self-employed as a physician in

Exhibit O, 1

his specialty of ophthalmology in San Diego.  He relates that
on May 23, 1982, while serving an internship through the
University of California at San Diego, and rotating through
the Veterans Administration Medical Center in La Jolla, he
was assisting to lift a 300-pound patient from a gurney; he
developed low back pain with sciatic radiation and a
diagnosis of herniated L4/L5 disc (and some disc protrusion
at L5/S1), was made.  He underwent surgical decompression and
discectomy approximately 9 months later, performed by
Dr. Alksne, of the UCSD Department of Neurosurgery after
preliminary MR scanning and myelography.  He relates that
while he obtains marked relief from his sciatic radiation, he
continued to have low back pain associated with spasms in the
lumbosacral area and which has persisted to the present, with
intermittent flare-ups.  He has received a variety of
treatments over the years, including chiropractic
manipulation.  During his residency at the University of
Southern California Medical School in Los Angeles, he was
under the treatment of Leon Wiltse, M.D., of Long Beach, who
instructed him in a program of exercises and referred him for
physical therapy, which he continues to this date.

Dr. Leung entered practice in San Diego in 1988.  He
continued to have relatively milder episodes of low back
pain, in spite of his exercise program.  In 1991, he had an
acute severe low back spasm and his body tilted to the right.
At that time he saw a chiropractor (Nancy Gold, D.C.) whose
treatment afforded considerable benefit, and he was able to
resume doing his low back exercises.

In November 1993, while doing therapeutic low back exercises,
the patient suddenly experienced a "ripping in my neck," and

Exhibit O, 2

then within 24 hours he began to experience pain radiating
into the right medial scapular area. The pain was increased
on neck turning to the left. He received physical therapy
and massage, and shortly after that (probably in early
December 1993), he began to experience numbness in the right
thumb and index finger and contiguous area of the right hand
(i.e. C6 distribution). In early January 1994, he sought
neurological evaluation from Charles Jablecki, M.D., who
ordered MR scanning of the cervical spine and identified a
C5/C6 disc herniation with compromise of the right C6 nerve
root. Dr. Jablecki has continued to treat Dr. Leung with
medication, rest as needed, exercises, and physical therapy.
The therapy has included manual traction, icing and neck
muscle strengthening; Dr. Leung initially received therapy
several times a week, but now is receiving therapy once a
week and this produces adequate relief so he is able to
continue his practice of ophthalmology.

The patient had been restricted to lifting not over 20 pounds
since the original injury, but found that after his neck
injury, symptoms in the neck and right upper extremity have
been brought on by lifting as little as 10-15 pounds, or even
wearing the indirect ophthalmology headgear for examinations.
Coughing or performing the Valsalva maneuver can also
increase pain and numbness in his neck and right hand.

Dr. Leung has also been seen in neurosurgical consultation by
Joel W. Ray, M.D. He has been referred to this office for a
second opinion in regard to his low back; however, Dr. Leung
feels that his major problem is related to his cervical disc
and emphasizes that this problem resulted from treatment
prescribed for his accepted low back injury.

Exhibit O, 3

DOL 003660

## CURRENT COMPLAINTS:

1. <u>Cervical and Scapular Pain.</u>  The patient describes a dull
   aching in the cervical and scapular area, primarily on
   the right side, extending across the trapezius towards
   the shoulder into the scapular area and into the right
   dorsal paraspinal region.  The discomfort is intensified
   by lifting over 10 to 15 pounds, and also by wearing the
   indirect ophthalmological headgear necessary for
   examination and surgery.  The pain is also increased by
   coughing and the Valsalva maneuver at times.

   Dr. Leung does not actually describe L'hermitte's-type
   sensations through his body, though occasionally
   paresthesias occur in the left lower extremity in the L5
   distribution associated with severe neck pain; this
   consists of fleeting paresthesias occurring
   intermittently over one to two hours.

   Symptoms are increased by hyperextension of the neck or
   back and relieved by neck flexion.

   The patient states that manual traction, icing and neck
   muscle strengthening exercises are performed in the
   course of physical therapy, now reduced to once a week,
   and producing relief which enables him to function in his
   profession.

2. <u>Numbness of the Right Index Finger and Thumb.</u>  This has
   been present since the neck injury seven months ago.  Dr.
   Leung states that this is a constant subjective sensory
   change, not associated with classical radicular pain down

Exhibit O, 4

DOL 003661

Case No: 130679763          Page No: 496          Rec'd Date: 01/22/2001

the arm, but also increased with coughing and the Valsalva maneuver, and present in proportion to the intensity of the cervical discomfort. He is not aware of actual wasting and weakness of muscles in his right upper extremity. The numbness presents an inconvenience, but is not sufficiently intense so that it interferes with grasping function with his right hand and fingers.

3. <u>Low Back Pain</u>. The pain in the low back is also a dull ache present much of the time, and associated with a few twinges of discomfort into the left lower extremity. There is some wasting of muscles of the left calf, but no cramping and no actual persistent sensory deficit in the left lower extremity. Coughing or straining do not appear to aggravate pain in the low back, but extension of the back or repetitive bending or lifting over 10 to 15 pounds will increase the discomfort.

The patient denies difficulty with gait or balance, or problems with bowel or bladder function.

Currently, Dr. Leung is taking light Vicodin, Flexeril, and Voltaren as needed; he also uses Pepcid for gastrointestinal side effect from these medications.

**JOB DESCRIPTION:**

The current job description is that of a practicing ophthalmologist, which involves primarily standing, bending or twisting in the course of surgery, and using his hands (particularly the dominant right hand in the course of surgery).

Exhibit O, 5

DOL 003662

## PAST MEDICAL HISTORY:

The patient underwent a tonsillectomy at age 5, repair of a
deviated nasal septum at age 22 (this resulted from an injury
playing intramural football in college), and the lumbar
laminectomy and discectomy in 1983.

The patient is taking Claritin and an inhaler for nasal
allergies.  He reports allergy to griseofulvin and Relafen
(which cause a rash), and to alcoholic beverages, spinach and
rare beef (which produces congestion and a flush).   The
patient drinks very sparingly and does not smoke.  He lists
keyboard music and medical writing as hobbies.

## FAMILY HISTORY:

The family history is noncontributory.  The patient's father,
age 71, has coronary artery disease and hypertension; his
mother, age 67, is in good health.  The patient is the third
of six children; he has one older brother and one older
sister, and three younger sisters, all of whom are in good
health.

## REVIEW OF MEDICAL FILE:

1.  UCSD MEDICAL RECORDS, MAY 19, 1882 THROUGH JUNE 19, 1983

    The history of the low back injury is essentially as
    described.  The patient subsequently developed radicular
    pain into the left lower extremity, associated with an
    absent left ankle jerk and mild left extensor hallucis
    longus weakness.  MR scanning confirmed L4/L5 disc

Exhibit O, 6

DOL 003663

bulging with spinal stenosis and compromise of the left
L5 root. He underwent lumbar laminectomy with fairly
good result, but he continued to have low back and leg
pain. A follow-up CT scan was reported as showing
"adequate decompressive laminectomy but some significant
encroachment on the nerve root foramina by hypertrophy
facets." The neurosurgeon, John F. Alksne, M.D., felt
that the original decompression may not have been
adequate, but further laminectomy was not performed for
fear of causing spinal instability. It was recognized
that this might have to be performed at a later date.

2. **NEUROSURGICAL FOLLOW-UP REPORTS, KENNETH OTT, M.D.**

Dr. Ott had followed Dr. Leung over the prior year though
he did not perform the laminectomy (which was carried out
by Dr. Alksne in February 1983). Dr. Ott confirmed the
original diagnosis of disc herniation and did recommend
that surgery be performed as proposed by Dr. Alksne. Dr.
Ott had examined Dr. Leung for a second opinion in early
January 1983 and recorded findings similar to those noted
by Dr. Alksne.

3. **ORTHOPEDIC/SPINE SURGERY EVALUATION AND FOLLOW-UP, 1985
TO 1988**

Dr. Leung had been under the care of Leon W. Wiltse,
M.D., of Long Beach. It was noted that when the patient
attempted more vigorous activity, the low back and left
sciatic pain recurred. He was referred to a back school
and continued on an exercise program along with Feldene.
There is a follow-up note in August 1986, recording

Exhibit O, 7

DOL 003664

similar symptoms and Dr. Wiltse approved a trial of
chiropractic manipulative therapy along with
iontophoresis, which apparently helped.  There is a
letter dated 1/25/89 from Dr. Wiltse to the U.S.D.O.L.,
indicating that the last visit was on July 29, 1988.  At
that time Dr. Leung had increased low back and left
sciatic pain, along with numbness of the toes of the left
foot; unfortunately, he had also developed esophagitis
with ulcer secondary to anti-inflammatory medication for
which he was receiving treatment.  Dr. Wiltse repeated
spine films and noted the postoperative changes and
possibly some spinal instability.  Examination was
essentially unchanged from before.  MR scanning of the
lumbosacral spine was done in August 1988, at which time
a chymopapain injection at L4/L5 and possibly a
percutaneous discectomy were discussed, but apparently no
further invasive procedures were performed.

4.  A brief supplemental report from Bradley W. Frederick,
    D.C., dated 10/11/88, in which it is recorded that Dr.
    Leung was considered to be permanent and stationary with
    intermittent exacerbations requiring treatment as needed.

5.  There are several notes, probably from the patient's
    physical therapist, between February 1992 and October
    1992.  These were related to episodes of pain in the low
    back with left lower extremity radiculitis, and on
    several occasions the patient complained of neck
    stiffness with pain towards the right shoulder.  There is
    an emergency visit dated 10/24/92 at which time the
    patient was complaining primarily of right low back pain.

Exhibit O, 8

DOL 003665

As I read the notes, it does not appear that cervical
radicular pain was present at any time.

6. **NEUROSURGICAL EVALUATION AND FOLLOW-UP, JOEL W. RAY, M.D.**

Dr. Ray initially evaluated Dr. Leung on May 27, 1994.
No history of the neck injury was recorded. However, Dr.
Ray had reviewed Dr. Charles Jablecki's evaluations and
agreed that the patient had a right C6 radiculopathy in
addition to the prior lumbosacral discogenic disease with
persistent radicular symptomatology.

There is a follow-up note dated 6/24/94, in which it was
noted that the patient had had exacerbations of neck and
right upper extremity pain, and on examination, radicular
pain in the right C6 root distribution could be
reproduced. Dr. Ray agreed that the patient could
continue to receive conservative therapy.

The most recent follow-up note by Dr. Ray is dated August
18, 1994, in which the physical findings and symptoms
were largely unchanged.

7. **NEUROLOGICAL EVALUATION AND FOLLOW-UP, CHARLES K.
   JABLECKI, M.D.**

Dr. Jablecki initially evaluated Dr. Leung on January 4,
1994, obtaining a history that while participating in
exercises for his low back six weeks previously, he
developed right-sided neck pain which radiated into the
right upper extremity, followed about three weeks later
by cervical pain flare-up while working on a computer.

Exhibit O, 9

DOL 003666

The prior history of work-related disc herniation at
L4/L5 requiring surgical decompression, but followed by
recurrent episodes of low back pain with left lower
extremity radiculitis, was noted.  On examination there
was limitation of neck movement with reproduction of
right upper extremity radicular pain in a C6 root
distribution.  A positive Tinel's sign on the right was
also noted.  Lower extremity findings were unchanged.
Dr. Jablecki initiated cervical traction and ordered
imaging studies of the cervical spine, and prescribed
Relafen as a nonsteroidal anti-inflammatory.

Electrodiagnostic testing at the time of this evaluation
of the right upper extremity was entirely normal.

Dr. Jablecki specifically recorded that the rowing
exercises which the patient was performing at the onset
of his symptoms were specifically prescribed to
strengthen the muscles in the back as a form of home
therapy for treatment of this low back injury, and thus
the cervical radiculitis - due to C5-C6 disc herniation,
encroaching on the neural foramina (more on the right
side) was work-related.

In the course of follow-up evaluations, the clinical
findings remain largely unchanged.  There was no actual
weakness, but right biceps and wrist jerks were reduced
and sensory changes consistent with a C6 dermatome loss
persisted.  Over the ensuing two to three months on
appropriate physical therapy including cervical traction,
symptoms did remit to some extent, but exacerbations
occurred from time to time.  Neurosurgical consultation

Exhibit O, 10

DOL 003667

with Joel Ray, M.D. was requested (see above), and conservative measures continued. Dr. Jablecki continued to follow Dr. Leung at intervals of 1 to 2 months, and physical therapy was continued. The most recent report is dated April 20, 1995, at which time the patient was still complaining of right neck and shoulder area pain, triggered by neck hyperextension and occasionally occurring spontaneously during the night, associated with loss of sensitivity on the tip of the right thumb and index fingers, but the patient had sufficiently good dexterity to continue his ophthalmological practice without difficulty. Dr. Jablecki also noted that the patient had had some symptoms of a left C6 radiculopathy which had improved. His diagnoses included an active right C6 radiculopathy, and improved left C6 radiculopathy, and lumbosacral spine disease as recorded previously. He recommended continuing physical therapy, oral steroids as needed, and other symptomatic measures. Definitive surgical treatment, i.e. C5-6 discectomy, was also discussed.

## REVIEW OF X-RAYS/IMAGING STUDIES:

No x-rays are available for review. There are reports of the initial lumbosacral studies in 1982 and 1983, the follow-up lumbar myelogram in June 1983, MR scanning of the lumbosacral spine performed in Long Beach in 1988, and a follow-up MRI of the lumbosacral spine at Sharp and Children's Center on 8/27/92; this latter scan was compared with prior MRIs, and it was noted that there was "residual and/or recurrent central and left-sided disc herniation at L4/L5 without significant change from 8/8/88."

Exhibit O, 11

DOL 003668

The MRI of the cervical spine, performed on <u>1/5/94</u> at Sharp
and Children's revealed a bi-lobed C5/C6 disc herniation, the
largest component of which extended into the right C5/C6
foramen causing moderate stenosis.

### PHYSICAL EXAMINATION:

Dr. Leung is a well-developed, rather muscular gentleman,
about 1.72 meters tall and weighing 80 kg.  There is no
pallor or adenopathy, though there is a little excess
sweating.  Pulse is 64 regular, blood pressure is 110/70 in
both arms, and respiration is 18.

Ears, nose and throat are normal, as are heart and lungs.
Abdomen was not examined.  Joints move freely.  Extremities
are unremarkable with good pulses.  Tinel's, Adson's and
Phalen's signs are negative.

The lumbar laminectomy scar is well-healed; there is some
left paraspinal tightness with mild reduction of spinal
extension, but good forward spinal flexion.  However,
straight leg raising at 85° to 90° causes a little local
discomfort, particularly on the left side, but no classical
sciatic radiation.

Neck mobility is fairly good, though there is some reduction
of extension (to about 15°), and slight pain on forced
extension and rotation to either side, but not on flexion.
L'hermitte's sensations are not induced.  There are no
cervical bruits.

Exhibit O, 12

DOL 003669

There was some tightness over the right cervical paraspinal
and trapezius upper scapular complex.  There are no trigger
points.

| Measurements: | RIGHT (Dominant, upper extremity symptomatic) | LEFT (Lower extremity, symptomatic) |
|---|---|---|
| Arm, midlevel | 34.2 cm (13-1/2") | 33.6 cm (13-1/4") |
| Forearm & Elbow | 29.8 cm (11-3/4") | 29.2 cm (11-1/2") |
| Calf maximal | 40 cm (15-3/4") | 40 cm (15-3/4") |
| Grasp, Jamar | | |
| second notch | 40/37/36 kg (88/82/80 lbs) | 42/40/34 kg (92/88/75 lbs) |

The patient did appear to be exerting maximally; there did
appear to be slight reduction of grasp strength with the
nondominant right hand.

It is noted that the patient is rather well-muscled,
considering the reduced level of activity imposed by his
injuries.

#### NEUROLOGICAL EXAMINATION:

The patient is alert, oriented appropriately with clear
speech and clearly above-average fund of information and
cognitive abilities.  Head is of normal size and shape.
Pupils are 3 mm and reactive.  Ocular movements are full and
fundi are normal.  Cranial nerves I through XII are intact.

Exhibit O, 13

DOL 003670

Gait is normal, including heel, toe and tandem, and the
Romberg is negative. There is no drift or posturing of the
upper extremities, and the Barre is negative. There are no
fasciculations or obvious muscle wasting. There may be
slight weakness of the left extensor hallucis longus muscle,
but no weakness of intrinsic hand muscle. There are no
involuntary movements or changes in muscle tone.

There is hypesthesia and hypalgesia over the right thumb and
index finger, more in the palm than on the dorsum, and not
extending onto the hand. Elsewhere all sensory function is
normal.

| REFLEXES: | RIGHT | LEFT |
|---|---|---|
| DJ | 1-2 | 1-2 |
| TJ | 2 | 1 |
| WJ | 1-2 | 1 |
| Abdominals | 2 | 2 |
| KJ | 2 | 2 |
| HJ | Trace | Trace |
| AJ | Trace to 1 | 0 |
| Plantars | Flexor | Flexor |

### DIAGNOSIS:

1. C5/C6 disc herniation, with C6 radiculopathy on the
   right.

2. Lumbosacral musculoligamentous straining injury,
   resulting in L4/L5 disc herniation with L5 and S1
   radiculopathy on the left, status post laminectomy with

Exhibit O, 14

DOL 003671

recurrent and/or persistent compressive radiculopathy
with recurrent exacerbations.

## DISCUSSION:

In reply to the specific posed in relation to this second
opinion request:

1. Yes; the patient does suffer residuals of the original
   lumbosacral disc herniation, status post laminectomy,
   with residual compressive L4/L5 radiculopathy on the
   left.  The clinical and x-ray/imaging studies document
   this adequately.

2. The history available indicates that the condition/
   disability recorded on Dr. Jablecki's examination of
   1/4/94 and 1/18/94, occurred during a program of back
   strengthening exercises prescribed for the original
   injury of 5/23/82.  Thus, this condition - C5/C6 disc
   herniation with right C6 motor and sensory
   radiculopathy - was precipitated by factors as described
   in the Statement of Accepted Facts.

3. This is not an aggravation of the original injury; the
   cervical disc herniation represents a new injury which
   appears to be a complication of treatment prescribed for
   the original injury.

   As such, this new injury does not cause an aggravation
   of the original injury, but presents a different
   situation related to treatment and the long-term

Exhibit O, 15

DOL 003672

prognosis quite different from that of the original
injury.

4.  The subjective complaints include pain in the cervical
    area, extending across the trapezius and left shoulder
    area and radiating into the left upper extremity in a C6
    root distribution, numbness of the tips of the right
    thumb and index finger, and persistent low back pain
    with intermittent exacerbations of left lower extremity
    radicular pain with some numbness consistent with the
    root involvement.

    Objective factors of disability include the reflex
    asymmetry in the right upper extremity, sensory deficit
    consistent with a partial right C6 radiculopathy, the
    surgical scar from lumbar laminectomy with residual
    reflex and possibly mild motor abnormalities in the left
    lower extremity, and the abnormalities recorded on prior
    x-ray and imaging studies of the lumbosacral spine
    (persistent and/or recurrence of L4/L5 disc herniation)
    and the findings on the MRI of the cervical spine
    (C5/C6) of bi-lobed disc herniation with predominant
    encroachment on the right C6 neural foramen).

5.  There is no industrial or preexisting disability.  In my
    opinion, the congenital spinal stenosis at L4 and over
    the sacral area as described, appears to be rather mild
    and would not have produced symptoms absent the disc
    herniation caused by the work-related injury of 5/23/82.

6.  The prognosis in regard to the lumbosacral disc
    herniation is fair; it is probable that there will be

Exhibit O, 16

DOL 003673

recurrent exacerbations of pain, but in all probability this can be managed conservatively.

The prognosis in regard to the cervical disc herniation is more guarded. There is sensory change in the index finger and thumb of the dominant right hand, in an individual who requires fine manual dexterity for his professional activity (ophthalmologic surgery), and if symptoms progress and/or otherwise interfere with these activities, more aggressive, i.e. surgical, intervention would be indicated. However, the current measures directed toward the cervical spine appear to be sufficient and maintain the patient's functional capacity.

Please feel free to contact me if you require additional information and/or any clarification.

Sincerely,

MARK C. LEVINE, M.D.
Diplomate in Neurology, ABPN

MCL/pe
d/t:6/29/95
H366.SD

EXHIBIT P



Fiscal Agent Services
PO Box 8300
London, KY 40742



U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs

11/5/2003

Charles K. Jablecki, M.D.
550 Washington Street, Suite 221
San Diego, CA 92103

Claimant Name: Richard Leung
Claimant ID: 130679763
Authorization Number: 03308724

The request for authorization for **10/28/2003 to 12/28/2003** has been reviewed and
authorized as follows:
72141    MRI neck / spine
99214    Office / outpatient visit
97110    Physical therapy  8 visits
80054    Comprehensive metabolic panel
80061    Lipid panel

In the event that there are any changes to the authorization (i.e., date of service, provider or
procedure), please contact our office to avoid any delays in the processing of your bills.  If
you have any questions, please contact us at 866-335-8319.

Sincerely,
ACS Prior Authorization Department

Exhibit P, 1

DOL 003107

**MEMO TO THE DISTRICT MEDICAL CONSULTANT
ELLEN PICHEY, M.D.**

**Date: 12/29/2003**

Case Number: 130679763

**Claimant Name:** Richard Leung

**Date of Injury:** 5/23/82

**Accepted Condition(s):** sacroiliac strain; degneration of intervertebral disc; displacement of cervical intervertebral disc without myelopathy

**Issues for discussion:**
Should the C5-C6 discectomy be authorized? In addition, should a discectomy of the C4-5 region be authorized as well?

Alexis Lara
Claims Examiner

**Dr. Pichey's Comments:**

The surgery at both levels can be authorized.

Ellen Pichey, M.D.
OWCP District Medical Consultant
Date of Response: 12/29/03

***OASIS case instructions:*** Print only bookmarked documents

Exhibit P, 2

DOL 003025

-1163494067

DOLA3700-R001 0011899

Fiscal Agent Services
PO Box 8300
London, KY 40742

U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs

NEUROSURGICAL MEDICAL CLINIC
501 WASHINGTON ST SUITE 700
SAN DIEGO    CA  92103

March  6, 2004

CLAIMANT NAME:        RICHARD    J LEUNG
CLAIMANT ID:        13067976 3  01
AUTHORIZATION NUMBER:    00000000040 1440 1
PROVIDER NUMBER:        00019790 2000

The request for authorization for 01/19/04 to 01/19/04 has been reviewed
and authorized as follows:

20931    SPINAL BONE ALLOGRAFT            1 UNITS, $    0.00

The service that is requested is payable for the condition accepted by OWCP.
It is your responsibility to ensure you have the correct ICD9 code from the
claimant for their accepted condition when you bill for the service.

In the event that there are any changes to the authorization (i.e., date of
service, provider or procedure), please contact our office to avoid any
delays in the processing of your bills.  If you have any questions, please
contact us at 866-335-8319.

Sincerely,
ACS Prior Authorizations Department

13067976 3

Exhibit P, 3

DOLA3700-R001  0000168

Fiscal Agent Services          U.S. Department of Labor
PO Box 8300                    Employment Standards Administration
London, KY 40742               Office of Workers' Compensation Programs

July 20, 2004

RICHARD       J LEUNG
PO BOX 473
RANCHO SANTA FE       CA  92067

CLAIMANT NAME:       RICHARD      J LEUNG
CLAIMANT ID:        130679763    01
AUTHORIZATION NUMBER:   000000004202778

The request for authorization for 07/20/04 to 09/20/04 has been reviewed
and authorized as follows:

72050    X-RAY EXAM OF NECK SPINE          1 UNITS, $     0.00
72125    CT NECK SPINE W/O DYE             1 UNITS, $     0.00

The service that is requested is payable for the condition accepted by OWCP.
It is your responsibility to ensure you have the correct ICD9 code from the
claimant for their accepted condition when you bill for the service.

In the event that there are any changes to the authorization (i.e., date of
service, provider or procedure), please contact our office to avoid any
delays in the processing of your bills.  If you have any questions, please
contact us at 866-335-8319.

Sincerely,
ACS Prior Authorizations Department

Exhibit P, 4

DOL 002975

DOLA3700-R001A 0000375 FECA

Fiscal Agent Services          U.S. Department of Labor - FECA
PO Box 8300                    Employment Standards Administration
London, KY 40742               Office of Workers' Compensation Programs

November 18, 2005

INNOVATIVE PHYSICAL THERAPY
5920 FRIARS RD  SUITE 102
SAN DIEGO        CA  92108

Claimant Name:       RICHARD      J LEUNG
Claimant ID:         130679763   01
Authorization Number:  802005110900426
PROVIDER NUMBER:        126702200
System Auth Number: 5313001111 5313001112 5313001113 5313001114

The request for authorization for 11/04/05 to 12/04/05 has been reviewed
and authorized as follows:

| | | | |
|---|---|---|---|
| 97140 | MANUAL THERAPY | 4 UNITS, $ | 0.00 |
| 97110 | THERAPEUTIC EXERCISES | 4 UNITS, $ | 0.00 |
| 97535 | SELF CARE MNGMENT TRAINING | 4 UNITS, $ | 0.00 |
| 97014 | ELECTRIC STIMULATION THERAPY | 4 UNITS, $ | 0.00 |

The service requested is authorized for the condition(s) accepted by OWCP.
It is your responsibility to ensure you have the correct ICD9 code from the
claimant for their accepted condition when you bill for this service.  This
authorization does not guarantee payment as billed.  Billings are subject to
systematic review for propriety.  Additionally, the OWCP Fee Schedule
applies to billed amounts.

In the event that you wish to change the procedure authorized (i.e., date of
service, provider or procedure), please submit your change request via
facsimile to 800-215-4901 using the prior authorization template, which can
be found on our website.

For faster service, you are now able to seek, and, for routine care, receive
medical authorizations online.  Please begin using our website at
http://owcp.dol.acs-inc.com/portal/main.do to submit your authorization
requests.  If you do not have access to the website, you may continue to
submit your prior authorization requests to us via our toll free facsimile
line at 800-215-4901 using the prior authorization templates provided to you
in your welcome packet.

Sincerely,
ACS Prior Authorizations Department

Exhibit P, 5

DOL 002677

DOLA3700-R001A 0000575 FECA

Fiscal Agent Services          U.S. Department of Labor - FECA
PO Box 8300                    Office of Workers' Compensation Programs
London, KY 40742

October  7, 2015

MICHAEL MOON MD AMC
5348 CARROLL CANYON ROAD
SUITE 101
SAN DIEGO          CA  92121

Claimant Name:        RICHARD        J LEUNG
Claimant ID:          130679763    01
Authorization Number:  802015100500172
PROVIDER NUMBER:         127169100
System Auth Number: 5278900305

The request for authorization for 10/01/15 to 12/01/15 has been reviewed
and authorized as follows:

62311    INJECT SPINE LUMBAR/SACRAL            1 Units

The service requested is authorized for the condition(s) accepted by OWCP.
It is your responsibility to ensure you have the correct ICD9 code from the
claimant for their accepted condition when you bill for this service.  This
authorization does not guarantee payment as billed.  Billings are subject to
systematic review for propriety.  Additionally, the OWCP Fee Schedule
applies to billed amounts.

ATTENTION:  Effective October 1st, 2006, your ACS OWCP Provider Number
must be in box 33 of a HCFA or box 51 of a UB.  If the number is not
included on the form, your bill will be returned.

In the event that you wish to change the procedure authorized (i.e., date of
service, provider or procedure), please submit your change request via
facsimile to 800-215-4901 using the prior authorization template, which can
be found on our website.

For faster service, you are now able to seek, and, for routine care, receive
medical authorizations online.  Please begin using our website at
http://owcp.dol.acs-inc.com/portal/main.do to submit your authorization
requests.  If you do not have access to the website, you may continue to
submit your prior authorization requests to us via our toll free facsimile
line at 800-215-4901 using the prior authorization templates provided to you
in your welcome packet.

Sincerely,
ACS Prior Authorizations Department

Exhibit P, 6

DOL 001789

DOLA3700-R001A 0001022 FECA

Fiscal Agent Services        U.S. Department of Labor - FECA
PO Box 8300                  Office of Workers' Compensation Programs
London, KY 40742

December 18, 2018

INNOVATIVE PHYSICAL THERAPY, INC
5030 CAMINO DEL LA SIESTA
#220
SAN DIEGO        CA  92108

Claimant Name:        RICHARD        J LEUNG
Claimant ID:          130679763    01
Authorization Number:   802018121701393
PROVIDER NUMBER:        611860600
System Auth Number: 8351903035 8351903036

The request for authorization for 12/14/18 to 06/14/19 has been reviewed
and authorized as follows:

97014 50 ELECTRIC STIMULATION THERAPY            6 Units
97012 50 MECHANICAL TRACTION THERAPY             6 Units

The service requested is authorized for the condition(s) accepted by OWCP.
It is your responsibility to ensure you have the correct ICD9 code and/or
ICD10 code from the claimant for their accepted condition when you bill for
this service. This authorization does not guarantee payment as billed.
Billings are subject to systematic review for propriety.  Additionally,
the OWCP Fee Schedule applies to billed amounts.

ATTENTION:  Effective October 1st, 2006, your Conduent OWCP Provider Number
must be in box 33 of a HCFA or box 51 of a UB.  If the number is not
included on the form, your bill will be returned.

In the event that you wish to change the procedure authorized (i.e., date of
service, provider or procedure), please submit your change request via
facsimile to 800-215-4901 using the prior authorization template, which can
be found on our website.

For faster service, you are now able to seek, and, for routine care, receive
medical authorizations online.  Please begin using our website at
https://owcpmed.dol.gov to submit your authorization requests.
If you do not have access to the website, you may continue to submit
your prior authorization requests to us via our toll free facsimile
line at 800-215-4901 using the prior authorization templates provided to you
in your welcome packet.

Sincerely,
Conduent Prior Authorizations Department

Exhibit P, 7

DOL 001224

EXHIBIT Q

U.S. DEPARTMENT OF LABOR

DFELHWC-FECA, PO Box 8311
LONDON, KY 40742-8311

**Want Faster Service?**
**Upload a document at <u>ecomp.dol.gov</u>**

January 25, 2021

Date of Injury: 05/23/1982
Employee: RICHARD J. LEUNG

RICHARD J LEUNG
1388 KETTNER BLVD
UNIT 2801
SAN DIEGO, CA 92101

Dear Sir/Madam:

An appointment has been made for you to obtain a second opinion assessment of your work related condition. This evaluation will provide us with additional evidence on the nature of your condition, the extent of disability, and appropriate treatment.

*** Please see the attached letter for the time, date and location of your appointment. ***

If x-rays have been taken or you have undergone a recent CAT scan, MRI or myelogram in connection with your injury, please bring the films with you to the examination or arrange to have them sent to the physician's office prior to the examination. Please also bring with you copies of any medical reports that were completed within the last thirty (30) days.

The doctor is a specialist in the field of Orthopedics. It may be necessary to refer you to other specialists in order to render a complete decision in your claim. The examining physician will discuss this with you if such referral is necessary.

Please call the physician's office to confirm this appointment. Make sure you give the physician's office your full name and file number when you call.

Rescheduling of the appointment date and time is strongly discouraged, and should only be done in emergency situations. If you must reschedule, please call me directly.

Please carefully review the instructions that appear on the attached page.

*If you have a disability and are in need of communication assistance (such as alternate formats or sign language interpretation), accommodation(s) and/or modification(s), please contact OWCP.*

Exhibit Q, 1                                                      DOL 000788

If you have any questions, you may contact me at 202-513-6900, extension .

Sincerely,

Federal Employees Program

DEPARTMENT OF VETERANS AFFAIRS
VETERANS HEALTH ADMINISTRATION
SAN DIEGO HEALTHCARE SYSTEM
3350 LA JOLLA VILLAGE DRIVE
SAN DIEGO, CA 92161

# EXHIBIT R

## Orthopaedic Surgery

1125 East Seventeenth Street
Suite E-218
Santa Ana, California 92701-2231
(714) 835-3031
Fax (714) 835-6546

Michael J. Einbund, M.D., Inc.

Jacob Rabinovich, M.D., APC

Joseph S. Klemek, M.D., Inc.

*Diplomates*
*American Board of Orthopaedic Surgery*

Inland Empire Office
4156 10th Street
Riverside, CA 92501-3181
(951) 684-8844 Office
(951) 684-8866 Fax

March 29, 2021

Claims Examiner:  Greg D.

RE:      LEUNG, RICHARD, M.D.
DOI:     05/23/1982
DOS:     03/29/2021
EMP:     Department of Veterans Affairs
FILE #:  130679763

### SECOND OPINION ORTHOPAEDIC EVALUATION

The following is a narrative report of the evaluation of the Second Opinion in the Specialty of Orthopedic Surgery regarding Richard Leung, M.D., a 65-year-old male. The patient was seen and examined by me in my Santa Ana office on March 29, 2021.

The information contained in this report was obtained by interview and examination of the patient, review of the Statement of Accepted Facts, as well as review of available medical records.

### REASON FOR REFERRAL:

The purpose of today's examination is to determine if the claimant still has objective residuals of his accepted conditions as described in the SOAF, along with treatment recommendations and appropriate work restrictions.

### STATEMENT OF ACCEPTED FACTS DATED 01/27/2021:

Richard J. Leung was employed by the Department of Veterans Affairs as a Physician in San Diego, California.  On 06/18/1982 Richard J. Leung filed a claim for a work related injury that occurred on 05/23/1982.



Exhibit R, 1

DOL 000401

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 2

Due to the lack of available information regarding this claim, it is unclear as to the claimant's mechanism of injury. Please discuss and annotate the history of the claimant's injury.

The case was accepted for the following conditions:

Displacement of Cervical Intervertebral Disc Without Myelopathy
Sprain of Other Specified Sites of Sacroiliac Region
Sprain of Right Ankle
Degeneration of Lumbar or Lumbosacral Intervertebral Disc

Other pertinent medical treatment includes:

The claimant has had the following medical procedures in relation to his accepted conditions:

1983 (Date Unknown) Laminectomy/Discectomy L4-L5
01/19/2004 Discectomy C5-C6
03/13/2017 Epidural Injections.

Richard J. Leung stopped work on 06/27/1982 and has not returned. The claimant was in the first year residency while employed at the Veterans Administration. He left and went into private practice. He has been in private practice since that date. His claim had been administratively closed, but this was in error as he has been receiving treatment for his accepted conditions since the date of his injury. He recently, 05/2020, was unable to return to his regular practice and has been on the rolls of OWCP since 05/29/2020.

## HISTORY OF PRESENT ILLNESS:

*The following information was obtained from the patient on today's date and from the review of the Statement of Accepted Facts:*

The patient states that in May 1982, while working for the Department of Veterans Affairs as a resident physician, he was assisting a client with a life-threatening emergency. He recalls that his colleagues and he had to lift the client who weighed approximately 300 pounds. On the count of three, they quickly moved the critically ill client from the stretcher onto the ICU bed and in the process, Dr. Leung had to



Exhibit R, 2

DOL 000402

Physician:   Michael J. Einbund, M.D.
RE:         LEUNG, RICHARD, M.D.
FILE #:     130679763
DOS:      03/29/2021
Page 3

reach across the stretcher and experienced a popping sensation in his lower back region.

Over the next few days, he developed increasing pain and tightness in his lower back, as well as pain and numbness to the outer aspect of his left leg and plantar left foot.

A few days after the subject incident, the patient presented to the emergency room, most likely at the VA Medical Center, and ordered a CT scan, which was noted to be one of the first CT scanners in the country at the time. He does not believe he was taken off work.

In June 1982, the patient consulted a neurosurgeon, Dr. Kenneth Ott, who reportedly diagnosed him with a bulging disc at L4-L5 and L5-S1 that was compressing on the exiting nerve root. Dr. Ott referred him for physical therapy which he received for 6-7 months.

As a result of the pain, numbness and weakness progressing in his left leg and developing a slight foot drop on the left, he consulted another neurosurgeon, Dr. John Alksne. Dr. Alksne performed an L4-L5 lumbar laminectomy and discectomy in February 1983. Following the surgery, he had to stay in the hospital for 10 days due to a wound infection and fever.

On March 15, 1985, he underwent a lumbosacral MRI, which showed decreased height and signal intensity at L4-L5 disc consistent with degeneration and previous surgery, moderate posterior disc bulge with impression on the anterior aspect of the thecal sac, more pronounced on the left than the right, obliteration of normal fat in the proximal left L4 and L5 neural foramina, most likely secondary scarring.

The patient states that he did not return to his job at the Department of Veterans Affairs. He started working as an ophthalmologist in a private practice. He states that his job duties as an ophthalmologist have taken a huge toll on his neck and upper and lower back. He recalls that he had to lean forward for prolonged periods of time while sitting or standing and had to hunch over, bend forward and flex his back and maintain fixed positions for prolonged periods of time while examining or treating his patients, whether surgically or on an outpatient basis. He also states that while doing refraction examinations for glasses, it was necessary for him to stand and hold up his arm for several minutes and this also caused him neck and back pain. He states that there were days when he was completely unable to turn his head or feel his hands while performing surgeries.



DOL 000403

Physician:     Michael J. Einbund, M.D.
RE:            LEUNG, RICHARD, M.D.
FILE #:        130679763
DOS:           03/29/2021
Page 4

In 1993, the patient developed neck and upper extremity complaints when he ruptured a cervical disc while receiving therapy for his back with a therapist, Char Self. As he tried to lift a set of weights, he experienced a popping sensation in his neck after only one repetition. That same night, he developed severe neck pain that radiated to his upper back and scapular region with subsequent radiation of pain and paresthesias in his upper extremities.

Over the course of the years since the injury, he has been treated by numerous medical providers. He does not recall all dates of service at this time. He recalls treating with Dr. Leroy R. Perry, Jr., a chiropractor. He saw Dr. Leon L. Wiltse, an orthopedic back specialist, who recommended "back school." He had several emergency room visits at Sharp Memorial Hospital. He saw John Bolan, P.A.

He recalls that Dr. Charles J. Jablecki, a neurologist, performed electromyogram and ultimately became his treating physician in January 1994. As a result of his numerous flare-ups, he has been placed on steroid medication, including Medrol Dosepak and prednisone. He recalls that Dr. Jablecki recorded approximately 25 low back flare-ups and about 19 neck flare-ups between 2002 and 2014.

He saw Gunnar T. Mossberg, P.T., for the cervical spine starting on January 11, 1994. He also saw Dr. Jewell West Ray, a neurosurgeon on May 27, 1994. He was seen by Dr. Sam Maywood, a pain management specialist, in 2001 and received three cervical spinal injections that same year. He consulted Dr. Richard C. Ostrup, a neurosurgeon, for his cervical spine on September 14, 2001.

On January 19, 2004, the patient underwent an anterior cervical discectomy and fusion at C5-C6 with Dr. Ostrup. The patient was unable to work for several weeks following the surgery. Postoperatively, he suffered numerous flare-ups of his cervical spine.

In 2011, he received two lumbar injections from Dr. Keith Kortman. He then commenced treatment with Dr. Michael Moon in pain management and received several cervical and lumbar epidural steroid injections, as well as medications starting in 2014.

In 2017, Dr. Ostrup recommended anterior cervical discectomy and fusion at C4-C5 and C3-C4.



Exhibit R, 4

DOL 000404

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 5

Over the course of his treatment, the patient was treated with seven different nonsteroidal medications for pain and another seven narcotic pain medications. At one point, he believes that one of these medications caused him to develop high blood pressure.

The patient developed extensive internal medicine related conditions, for which he is taking medications. Because he has been on Plavix and aspirin since having a myocardial infarction in March 2019, the combination of these medications has limited his ability to receive any further pain management injections.

In 2020, he saw Dr. Lindy First and was treated with physical therapy at Innovative Physical Therapy. He also consulted with Dr. Nathaniel Chuang, a neuroradiologist, who interpreted his MRI scans.

On April 3, 2020, the patient underwent his most recent cervical MRI, which revealed a previous anterior and interbody spinal fusion at C5-C6, with associated susceptibility artifact; straightening of the normal cervical lordosis; mild apparent T2 hyperintensity in the posterior atlantooccipital membrane, interspinous ligaments at C2-C3 through C7-T1 which might reflect cervical strain or trauma; moderate to severe C4-C5 and severe C6-C7 disc degeneration; mild to moderate C4-C5 spinal stenosis; bilateral neuroforaminal narrowing and nerve root impingement at C3-C4, C4-C5 and C6-C7.

Also on April 3, 2020, the patient underwent his most recent lumbar MRI, which revealed previous posterior decompression and laminectomies at L5-S1; abnormal T1 hypointense signal seen in the epidural space at adjacent L4-L5 level, especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral traversing L5 nerve roots; moderate L3-L4 and moderate to severe L4-L5 disc degeneration; severe L3-L4 spinal stenosis; L3-L4 with mild posterior disc extrusion, left paracentral annular fissure, facet and ligamentum flavum hypertrophy, and severe impingement of the bilateral traversing L4 nerve roots; bilateral neuroforaminal narrowing and impingement of the bilateral L3 nerve roots; L4-L5 with mild posterior and right foraminal broad extrusion, and left paracentral annular fissure; moderate to severe facet hypertrophy, narrowing of the lateral recesses, and impingement of the bilateral traversing L5 nerve, right more than left; bilateral neuroforaminal narrowing with impingement of the bilateral L4 nerve roots, left greater than right.

On January 21, 2021, the patient last saw Dr. Ostrup, at which time, he was recommended future lumbar spine surgery in the form of multilevel fusion, particularly



Exhibit R, 5

DOL 000405

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 6

at L4-L5 and L5-S1. He was advised to avoid activities that triggered his back pain, as well as activities that would trigger his neck complaints.

Due to the patient's inability to function normally any longer as a result of his neck and back pain, Dr. Leung was forced to retired as an ophthalmologist in May 2020.

The patient summarized by saying that his injury resulted in almost 40-year history of treatment for his low back and neck complaints, including being seen by six neurosurgeons, one orthopedic spine specialist, two neurologists, three chiropractors, two acupuncturists, nine physical therapists and three pain management specialists. He additionally states that he "attended back school and went through the Egoscue Chronic Pain and Posture Therapy clinics twice." He has undergone therapies including traction, manipulation, electro stimulation, ultrasound, laser, ice and heat. He had two major spine surgeries and received eight epidural steroid injections to his neck and lower back by three different doctors. He had several emergency room visits due to unbearable back and neck pain. He had five CAT scans and a total of 16 MRI scans, as well as four electrodiagnostic studies.

The patient does not recall receiving any other medical treatment for the above-mentioned complaints.

**CURRENT TREATMENT**:

The patient's symptoms have worsened over the past year, despite receiving anti-inflammatories, stretching exercises, physical therapy and intermittent injections.

Dr. Ostrup is currently treating for his neck and back.

The patient is also currently being seen by his pain management specialist, Dr. Michael Moon, with the last visit on March 15, 2021, for constant neck and back pain rated 8-9/10, with radiation to both upper and lower extremities and associated paresthesias. He was given medication and continued on physical therapy and home exercises; cervical and lumbar epidurals were held off due to his MRI and cardiac issues.

Currently, he is also been receiving physical therapy at Innovative Physical Therapy for his neck and lower back, which provides temporary relief. He is feeling very stiff in the morning and has "difficulty moving the back around."



Exhibit R, 6

DOL 000406

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 7

He currently takes Valium for spasm and sleep, as well as Dilaudid for pain.

The patient states that he has not received any other medical treatment for the above-mentioned complaints.

### PRIOR/SUBSEQUENT INJURIES:

The patient denies any other prior or subsequent injury or problem with his neck, lower back, sacroiliac region, upper or lower extremities.

### CHIEF COMPLAINTS:

The patient currently complains of the following:

1.  **Neck**: The patient is experiencing continuous neck pain with radiation to both arms. He is losing strength in the right worse than left arm. He has numbness and tingling in both hands and fingers. He has associated headaches. There is severe morning neck stiffness. He does get constant cracking and locking sensations. His pain is aggravated with difficulty with tilting his head up or down or moving the head from side to side, worse on the left, as well as with prolonged positioning of the neck. He avoids sudden movements of the neck. He cannot lift more than 10 pounds. He reports sleeping difficulties.

2.  **Mid and Lower Back**: The patient is experiencing continuous mid and lower back pain, with pain over the piriformis and sciatic notch region, with radiation of shooting pain to the bilateral legs, feet and toes. He has numbness and tingling in both legs and feet, equally. His left hip flexors are very tight and he has difficulty stretching. Coughing, sneezing and any Valsalva maneuver aggravate the lower back and lower extremities. Pain increases with prolonged standing and sitting activities, as well as with lifting, carrying, pushing and pulling. His weight capacity is about 10 pounds. He cannot squat, stoop, jump, run or bend forward, sideways or backwards due to back pain. He has difficulty getting up from a seated position and getting in and out of a car. He has to modify the way he performs most activities to avoid low back pain. He reports that "certain shoes" can throw his back and has resorted to wearing Asics running shoes with special insoles to support his back. He denies current bowel or bladder dysfunction, but had issues in the past. He reports sleeping difficulties. Additionally, upon waking up in the mornings, he immediately stretches and does 10 minutes of light core exercises and states that without



Exhibit R, 7

**DOL 000407**

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 8

this, his back would be out for a few days, which would only be helped with physical therapy, pain medication, Valium and rest.

3. **Right Ankle**: The patient does not recall suffering any ankle injuries.

The patient offers no other orthopaedic complaints pertaining to the current claim.

## WORK STATUS:

At the time of the incident, the patient was employed as a Department of Veterans Affairs, as a resident physician, commencing employment in 1981.

He last worked for the Department of Veterans Affairs on June 30, 1982.

In approximately July 1982, he finished his residency and took time off for his back until his back surgery in 1983. He went back to training in July 1983 and then continued working private practice. He was taken off work for about a month after his neck surgery in 2004 and then worked until May 2020.

Currently, the patient is not employed and retired as an ophthalmologist on May 29, 2020. He has not worked anywhere since.

The patient is currently receiving benefits from the Department of Labor.

## JOB REQUIREMENTS:

At the time of the subject injury, the patient's job duties consisted of managing an outpatient eye clinic; examining and diagnosing patient's eyes and visual conditions; performing eye surgeries and biopsies; using slit lamps, ophthalmoscopes, lenses, gonioscopes, lasers and other surgical instruments and equipment; prescribing treatments such as medication, corrective lenses, surgery, therapies and referrals; communicating with patients' families; working with nurses and other doctors and collaborating with other specialists in determining treatment plans; certifying the legally blind patients; managing mental disorders that affect vision; educating patients about their condition and associated treatment plan. He worked on average of 60-75 hours per week.

The physical aspects associated with his position consisted of standing, walking and running for prolonged periods of time; repetitively leaning forward and maintaining a



Exhibit R, 8

**DOL 000408**

| | |
|---|---|
| Physician: | Michael J. Einbund, M.D. |
| RE: | LEUNG, RICHARD, M.D. |
| FILE #: | 130679763 |
| DOS: | 03/29/2021 |
| Page 9 | |

fixed position, mostly while sitting down, as well as standing up. He states that due to having to work with several patients who have unusual body types, he had to hunch over when looking into the retina and he was required to bend and flex his back to see the structures properly. He performed cataract surgeries that also required sitting on a hard stool at "strange angles for hours upon hours," which affected his upper and lower back. He performed gripping and grasping, fine finger manipulation and using hands to handle, control and feel objects, tools and controls. He also was reaching in all directions, performed occasional squatting and stooping. He had to understanding speech of other people and speak clearly so listeners could understand. He had to make quick and precise adjustments to machine controls. He was required to have the ability to focus on one source of sound and ignore others.

## PAST MEDICAL HISTORY: (Not mentioned in the above history)

| | |
|---|---|
| Allergies To Medication: | Griseofulvin; NSAIDs; Relafen; morphine. |
| Current Medications: | Valium 10 mg q h.s. p.r.n. anxiety and insomnia; aspirin 81 mg; carvedilol 12.5 mg; clopidogrel bisulfate 75 mg; lisinopril 2.5 mg; nitroglycerin 0.4 mg; Repatha SureClick 140 mg; sildenafil citrate 100 mg; sulindac 200 mg prn; vitamin D 1000 IU. |
| Medical: | Ruptured right calf; CAD; myocardial infarction March 2019; fatigue; hyperlipidemia; hypertension; long-term use of NSAIDs; chest pain. |
| Surgical: | Tonsillectomy; deviated septum repair; cardiac stent placement March 2019. |
| Trauma: | The patient denies any other trauma including motor vehicle accidents, work-related injuries, sports-related injuries, fractures, lacerations, falls, knife/gunshot wounds, or burns. |



Exhibit R, 9

**DOL 000409**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 10

## FAMILY STATUS:

The patient is divorced and has two children.  He denies smoking tobacco.  He drinks alcoholic beverages socially and consumes an average of two servings of caffeinated beverages a day.

## REVIEW OF DIAGNOSTIC STUDIES:

**03/15/1985** - MRI of the lumbosacral spine from Huntington Medical Research Institute.  **Impression:**  Decreased height and signal intensity L4-L5 disc consistent with degeneration and previous surgery.  Moderate posterior disc bulge with impression on the anterior aspect of the thecal sac, more pronounced on the left than on the right.  Obliteration of normal fat in the proximal left L4 and L5 neural foramina, most likely secondary to scarring.

**01/04/1994** - Electrodiagnostic study of the right upper extremity from Charles K. Jablecki, M.D.  **Clinical impression:**  The EMG and nerve conduction studies are normal.

**01/05/1994** - Cervical spine x-ray from San Diego Diagnostic Radiology.  **Impression:**  Mild disc space narrowing C5-C6.  Mild foraminal narrowing on the right at C3-C4, C5-C6 and C6-C7.

**04/28/1999** - MRI of the cervical spine and cord from Sharp Outpatient Pavilion Imaging Center.  **Impression:**  C4-C5 facet joint hypertrophy and mild right sided neural foraminal narrowing.  C5-C6 disc herniation with uncovertebral spondylosis and bilateral neural foraminal narrowing, right greater than left.

**09/22/2002** - MRI of the cervical spine and cord from Sharp and Children's MRI Center.  Comparison to 03/02/2001.  **Impression:**  Interval progression of a left posterior paramedian focal disc protrusion at C4-C5.  Stable degenerative changes at C3-C4 and C5-C6.

**11/22/2003** - MRI of the cervical spine and cord from Sharp and Children's MRI Center.  Comparison to 09/22/2002.  **Impression:**  (1) Slight worsening of moderate C4-C5 left paracentral broad disc protrusion, which flattens the left ventral cord surface and cause a mild spinal canal narrowing.  Uncovertebral and facet hypertrophy with slight right C4-C5 neural foraminal narrowing.  (2) Minimal improvement in moderate C5-C6 broad disc osteophyte complex with associated mild to moderate



Exhibit R, 10

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 11

spinal stenosis.  Uncovertebral and facet hypertrophy with moderate to severe right and mild to moderate left neural foraminal narrowing.  (3) Uncovertebral hypertrophy with mild right C3-C4 neural foraminal narrowing.

**01/19/2004** - 8:20 a.m. study of x-ray of the cervical spine intraoperative from Scripps Hospital La Jolla.  **Impression:** Cervical spine seen to top of C6 vertebra.  A metal paper clip is projected over the upper C5 vertebra and C4-C5 disc space.  Normal sagittal alignment as far as visualized.  Endotracheal tube.

**01/19/2004** - 9:10 a.m. study of x-ray of the cervical spine intraoperative from Scripps Hospital La Jolla.  **Impression:** Cervical spine seen to lower C6 vertebra.  New anterior metal surgical retraction device.  New anteriorly placed metal needle marks the anterior C5-C6 disc space.  Unchanged metal paper clip over C4-C5 disc space region and endotracheal tube.  Stable normal sagittal alignment.

**01/19/2004** - 10:35 a.m. study of x-ray of the cervical spine intraoperative from Scripps Hospital La Jolla.  **Impression:** Interval C5-C6 anterior interbody fusion with anterior metal fusion plating, normal appearing sagittal alignment as far as visualized.

**03/01/2004** - X-ray of the cervical spine from Sharp Outpatient Pavilion Imaging Center.  **Impression:** Status post C5-C6 interbody fusion.  Normal alignment.

**04/28/2004** - X-ray of the cervical spine from Sharp Outpatient Pavilion Imaging Center.  Comparison to 03/01/2004.  **Impression:** Stable appearance of the anterior spinal fusion.

**07/14/2004** - X-ray of the cervical spine from Sharp Outpatient Pavilion Imaging Center.  Comparison to 04/28/2004 and 03/01/2004.  **Impression:** No significant interval change in the postoperative and degenerative findings.

**07/14/2004** - X-rays of the lumbar spine from Sharp Outpatient Pavilion Imaging Center.  **Impression:** Degenerative, postoperative and congenital anomalous changes.  The body of the report indicated there was a prior L5 laminectomy.  L5 was a transitional vertebra with partial sacralization particularly on the left with mild sclerosis of the left L5 transitional transverse process and sacral ala.  There were facet degenerative changes more pronounced on the left than the right at the lumbosacral junction, transitional sacral level.  There was disc space narrowing at all levels most pronounced at L4-L5 and L5-S1 with mild retrolisthesis of L4 on L5 (transitional) and hypertrophied facet joints.



Exhibit R, 11

**DOL 000411**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 12

**07/15/2004** - CT of the cervical spine without contrast from Sharp Outpatient Pavilion Imaging Center.  Comparison to cervical MRI 11/22/2003.  **Impression:**  Interval discectomy and fusion at C5-C6.  There is moderate central spinal stenosis at this level due to posterior osteophytes and bilateral neural foraminal narrowing, moderately severe on the right.

**09/15/2004** - X-rays of the cervical spine from Sharp Outpatient Pavilion Imaging Center.  Comparison to 07/14/2004.  **Impression:**  No significant change.

**06/24/2005** - MRI of the lumbosacral spine without and with contrast from Sharp and Children's MRI Center.  Comparison to prior MRI of 06/08/2001 and x-rays 07/14/2004.  **Impression:**  Small central and left sided disc herniation L4-L5 without significant change over the past four years.

**09/16/2004** - MRI of the cervical spine and cord without contrast from Sharp and Children's MRI Center.  Comparison to MRI 11/22/2003 and CT 07/15/2004.  **Impression:**  (1) C5-C6 anterior spinal fusion and discectomy with residual but improved mild posterior broad based endplate spurring and decreased and now mild residual spinal stenosis.  Improved now mild to moderate right neural foraminal narrowing with no significant left neural foraminal narrowing appreciated. (2) Stable minimal right C3-C4 paracentral disc bulging and mild left C4-C5 paracentral broad disc protrusion. (3) Cervical spinal cord maintains normal signa intensity.

**10/19/2004** - X-rays of the cervical spine, flexion and extension only, from Sharp Outpatient Pavilion Imaging Center.  Comparison to 09/15/2004.  **Impression:** Status post C5-C6 fusion; adequate range of motion.

**09/02/2006** - MRI of the lumbosacral spine without and with contrast from Sharp and Children's MRI Center.  Comparison to 06/24/2005.  **Impression:**  No change from 06/24/2005.  Stable degenerative disc disease and posterior and left sided disc protrusion at L4-L5.  Stable moderate central canal and lateral recess narrowing at L3-L4 due to a broad disc bugle.  No epidural fibrosis.  **Addendum:**  The study was reviewed at Dr. Leung's request.  The focal left paramedian disc protrusion described at the L4-L5 level is unchanged since 06/24/2005 but sufficient in size and location to explain the patient's L5 radiculopathy.

**06/04/2007** - MRI of the right knee from Sharp and Children's MRI Center.  **Impression:** Subtle horizontal tear involving the posterior horn of the medial meniscus.  Mild degenerative change of the patellofemoral joint.  Small joint effusion.



Exhibit R, 12

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 13

**05/19/2010** - MRI of the cervical spine from Imaging Healthcare Specialists. **Conclusion:** Anatomic alignment and bony incorporation following C5-C6 ACDF. Mild to moderate multilevel facet osteoarthritis, with left sided posterior bone spurring at C4-C5. No focal disc protrusion or nerve root impingement. **Addendum:** There is a previous cervical spine MRI scan from Sharp and Children's MRI center dated 09/16/2004. Since that study, the C5-C6 interbody fusion has solidified. In addition, the posterior left sided C4-C5 annular disc bulging, hypertrophic bone spurring and bilateral foraminal stenosis has increased. This is abutting the ventral surface of the spinal cord and displacing the cord posteriorly, new since the previous injury.

**04/20/2011** - MRI of the lumbar spine without and with contrast from Sharp and Children's MRI Center. Comparison to 09/02/2006. **Impression:** (1) Compared to 09/02/2006, again seen is previous bilateral L4-L5 posterior decompression surgery and hemilaminectomies. There is mild left and moderate right enhancing scar tissue in the lateral recesses with involvement of the transverse right L5 nerve root. There is a persistent moderate annular disc osteophyte complex with slight increase in size of 5 mm, anteroposterior, moderate, central, right paracentral and foraminal disc extrusion. There is slight impingement of the exiting right L4 nerve root and significant impingement of the bilateral traversing L5 nerve roots, right worse than left. (2) Worsening L3-L4 degenerative disc disease with mild to moderate annular disc bulging and a small left foraminal disc protrusion impinging the exiting left L3 nerve root and the bilateral traversing L4 nerve roots. There is moderate L3-L4 spinal stenosis. (3) Moderate L3-L4 degenerative facet arthropathy.

**09/02/2011** - MRI of the right ankle read by Greg Anderson, M.D. Comparison to digitized outside MRI 09/02/2006. **Conclusion:** No osseous mass, mild tendinosis of the posterior tibialis.

**01/14/2013** - MRI of the lumbar spine without and with contrast from Sharp and Children's MRI Center. Comparison to 04/20/2011. **Impression:** New inflammatory changes involving both L4-L5 facet joints and the right sided epidural space, endplates and paravertebral soft tissues.

**09/21/2015** - MRI of the cervical spine without contrast from Sharp and Children's MRI Center. Comparison to 09/16/2004. **Impression:** Stable postoperative changes at C5-C6. Progressive uncovertebral spondylosis and facet joint degeneration at other levels with secondary neural foraminal narrowing.



Exhibit R, 13

**DOL 000413**

Physician:  Michael J. Einbund, M.D.
RE:       LEUNG, RICHARD, M.D.
FILE #:   130679763
DOS:      03/29/2021
Page 14

**09/21/2015** - MRI of the lumbar spine without contrast from Sharp and Children's MRI Center.  Comparison to 01/14/2013.  **Impression:**  Progressive L3-L4 disc degeneration with secondary spinal canal, neural foraminal, lateral recess stenosis. Stable degenerative and postoperative changes at L4-L5.

**11/22/2016** - MRI of the cervical spine without contrast from Sharp and Children's MRI Center.  Comparison to 09/21/2015.  **Impression:**  (1) Previous anterior and interbody fusion at C5-C6.  (2) Mild edema seen in the posterior atlantooccipital membrane and interspinous ligaments between C1-C2 and C5-C6, consistent with strain or recent trauma.  (3) Increasing asymmetric moderate left and mild right C3-C4 and minimal bilateral C4-C5 facet joint fluid raises the possibility of recent distraction injury.  Facet degenerative arthrosis may have a similar appearance, especially given the presence of a developing 6 mm posterior left C3-C4 facet synovial cyst.  Infection and facet septic arthritis are considered unlikely.  (4) Persistent C6-C7 moderate 6 mm left paracentral and foraminal disc extrusion and moderate to severe left C7 neural foraminal narrowing.  (5) Additional moderate left C3-C4 and bilateral C4-C5 neural foraminal narrowing.  (6) Moderate C3-C4 and mild to moderate C4-C5 spinal stenosis.  Mild spinal cord compression at C3-C4.  No convincing spinal cord edema.

**04/17/2017** - MRI of the lumbar spine without contrast from Sharp and Children's MRI Center.  Comparison to MRI 01/14/2013 and 09/21/2015, CT abdomen and pelvis 03/17/2013.  **Impression:** (1) Compared to 09/21/2015, no dramatic interval change. (2) Again seen are previous L5-S1 posterior decompression laminectomies.  Previous postcontrast study from 01/14/2013 better demonstrates mild to moderate epidural scar tissue at L4-L5 with involvement of the exiting right L4 and bilateral exiting L5 nerve roots, right more than left.  (3) L4-L5 with mild posterior broad disc extrusion, severe facet hypertrophy and possible increase in mild impingement of the left L4 nerve root.  Otherwise, persistent significant impingement of the bilateral traversing L5 nerve roots at this level, and mild impingement of the right L4 nerve root.  (4) L3-L4 with persistent moderate to severe spinal stenosis and impingement of the bilateral traversing L5 nerve roots, left more than right, and to a much lesser degree, the bilateral exiting L4 nerve roots.

**08/30/2018** - MRI of the cervical spine without contrast from Sharp and Children's MRI Center.  Comparison to 11/22/2016.  **Impression:** Multilevel disc degeneration with uncovertebral spondylosis, facet joint hypertrophy, mild canal stenosis and bilateral neural foraminal narrowing.



Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 15

**04/03/2020** - MRI of the cervical spine outside films review from Sharp Memorial. **Impression:** (1) Previous anterior and interbody spinal fusion at C5-C6 with associated susceptibility artifact. (2) Straightening of normal cervical lordosis may reflect patient positioning and/or muscle spasm. Mild apparent T2 hyperintensity in the posterior atlantooccipital membrane, and interspinous ligaments at C2-C3 through C7-T1 may reflect cervical strain or trauma. (3) Moderate to severe C4-C5 and severe C6-C7 disc degeneration. (4) Mild to moderate C4-C5 spinal stenosis. (5) Considerable bilateral neural foraminal narrowing and nerve root impingement at C3-C4, C4-C5 and C6-C7.

**04/03/2020** - MRI of the lumbar spine without contrast from Imaging Healthcare Specialists. Comparison to outside MRI 09/21/2015. **Conclusion:** Slight progression of severe canal stenosis at L3-L4. Remainder of the multilevel degenerative disc and facet degenerative changes and postoperative changes are stable.

> **04/03/2020** - MRI of the lumbar spine outside films review from Sharp Memorial; this report was brought in by the patient. **Impression:** (1) Previous posterior decompression and laminectomies at L5-S1. Abnormal T1 hypointense signal is seen in the epidural space at adjacent L4-L5 level, especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral traversing L5 nerve roots. (2) Moderate L3-L4 and moderate to severe L4-L5 disc degeneration. (3) Severe L3-L4 spinal stenosis. (4) L3-L4 with mild posterior disc extrusion, left paracentral annular fissure, facet and ligamentum flavum hypertrophy, and severe impingement of the bilateral traversing L4 nerve roots. Bilateral neural foraminal narrowing and impingement of the bilateral L3 nerve roots. (5) L4-L5 with mild posterior and right foraminal broad disc extrusion, and left paracentral annular fissure. Moderate to severe facet hypertrophy, narrowing of the lateral recesses, and impingement of the bilateral traversing L5 nerve roots, right more than left. Bilateral neural foraminal narrowing with impingement of the bilateral L4 nerve roots, left greater than right.

## REVIEW OF MEDICAL RECORDS:

Medical records from the following facilities have been reviewed and are acknowledged:

1. **Scripps Memorial Hospital La Jolla**
   a) **Richard Ostrup, M.D.**
2. **Innovative Physical Therapy San Diego**



Exhibit R, 15

DOL 000415

Physician:     Michael J. Einbund, M.D.
RE:            LEUNG, RICHARD, M.D.
FILE #:        130679763
DOS:           03/29/2021
Page 16


3.   **Neurosurgical Medical Clinic**
     a)   **Richard Ostrup, M.D.**
4.   **Pain Care of San Diego**
     a)   **Michael Moon, M.D.**
5.   **Sharp Memorial**
     a)   **Kirk P. Burgamy, M.D.**
6.   **Charles K. Jablecki, M.D.**
7.   **Surgical Center of San Diego**
     a)   **Michael Moon, M.D.**
8.   **San Diego Imaging**
     a)   **Keith E. Kortman, M.D.**

<u>PERTINENT MEDICAL RECORDS</u>:

**01/04/1994** - Neurological Evaluation from Charles K. Jablecki, M.D. He had neck and right shoulder pain and numbness and tingling in the right hand, which began about six weeks ago. Six weeks ago while carrying out exercise in a gym, a rowing activity, he developed some pain in the right side of his neck and posterior shoulder. About three weeks ago, he began to note numbness and tingling in the right thumb and index finger. A week later, his numbness in the thumb continued to come on periodically and related to head and neck motions. History of the 1982 injury was reviewed. He complained of neck pain, with no pain at rest but pain with hyperextension of his head on the right side of his neck. He had numbness and tingling in the right thumb and index finger present much of the time, primarily present along the radial aspect of the right index finger and the opposing surface of the right thumb. He had numbness in the left thumb on two occasions, with brief episodes of numbness and tingling. He had low back pain that was mild to moderate at baseline, with flare ups to severe with tilting of the trunk to the right. Cervical exam noted slight limitation of cervical motion. Sensation was slightly reduced over the tips of the right thumb and index finger. Tinel sign was positive at the right median nerve at the wrist. There was a well healed scar over the lumbosacral spine measuring 4 inches. There was tenderness over the left low back with pain on motion to the left. Straight leg raising was to 60 degrees, right and left, without back or leg pain. **Clinical impression:** (1) Right C6 radiculopathy manifest by positional right neck/shoulder pain and paresthesias in the right thumb and index finger. (2) Tinel sign at the right median nerve at the wrist, of unknown significance. (3) Lumbosacral spine disease, status post discectomy at L4-L5 in 1983, residual back and left buttock pain frequent with episodes of spasm and increased pain about every 3-4 weeks, residual loss of left external hamstring and Achilles reflex and minimal weakness of the left gastrocnemius



Physician:     Michael J. Einbund, M.D.
RE:            LEUNG, RICHARD, M.D.
FILE #:        130679763
DOS:           03/29/2021
Page 17

muscle evidence on toe lift exercises. (4) Episode of numbness left thumb of uncertain origin. Plan was for plain films of the cervical spine, MRI of the cervical spine, gentle cervical traction and use of a home unit and Relafen. He was to discontinue NSAIDs.

**01/18/1994** - Neurological Evaluation from Charles K. Jablecki, M.D. He began physical therapy following the completion of plain films and MRI of the cervical spine. He noted aggravation of his neck and shoulder pain after therapy and switched facilities, now was improving. He had pain in the right side of the neck and hyperextension of the head, radiating to the shoulder with increased numbness and tingling in the thumb and index finger. He had decreased sensation over the top of the right thumb and right index finger. He had one or two episodes of numbness in the left thumb over the paste two weeks. **Clinical impression:** (1) Cervical spine disc disease, C5-C6 disc protrusion, bilobed herniation to the right greater than left C5-C6 foramen, right C6 radiculopathy manifest by positional right neck/shoulder pain and paresthesias in the right thumb and index finger and decreased sensation on the tip of the right thumb. (2) Left C6 radiculopathy manifest by very occasional numbness in the left thumb. (3) Tinel sign at the right median nerve at the wrist, of unknown significance. (4) Lumbosacral spine disease, status post discectomy at L4-L5 in 1983, residual back and left buttock pain frequent with episodes of spasm and increased pain about every 3-4 weeks, residual loss of left external hamstring and Achilles reflex and minimal weakness of the left gastrocnemius muscle evidence on toe lift exercises. (5) Episode of numbness left thumb of uncertain origin.

**04/05/1995** - Report from Charles K. Jablecki, M.D. Diagnosis for which physical therapy would be administered included active cervical spine disc disease, with disc protrusion at C5-C6, with radicular symptoms of numbness and tingling in both hands, the right more than the left, affecting the thumb and index fingers primarily. Specific functional deficits to be treated included the spinal nerve root irritation causing pain, numbness and tingling in the hands affecting his ability to use the hands. There was limitation of neck motion and neck pain. Specific functional goals of additional therapy included improving range of motion of the neck. Page 2 with additional answers was not available for review.

**12/09/2003** - Workers' Compensation Interval Report from Richard Ostrup, M.D. He was last seen a year ago. He recently had a significant flare up. He had numbness in the index finger and thumb. A follow up cervical MRI was reviewed. He might have to give strong consideration to surgical intervention with a C5-C6 discectomy, possibly also at C4-C5.



Exhibit R, 17

**DOL 000417**

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 18

**01/19/2004** - Operative Report from Scripps Memorial Hospital La Jolla, dictated by Richard Ostrup, M.D. **Preoperative and postoperative diagnosis:** Cervical stenosis at C5-C6 with bilateral upper extremity radiculopathies. **Procedure:** (1) Anterior cervical discectomy at C5-C6 using microscopic technique. (2) Arthrodesis C5-C6. (3) 8 x 10 mm DePuy bone allograft. (4) Anterior instrumentation C5-C6 (two levels) using 18 mm small stature Synthes plate.

**05/26/2011** - Operative Report from San Diego Imaging, dictated by Keith E. Kortman, M.D. **Indication:** Prior L4-L5 discectomy, right sided low back and leg pain. **Procedure:** CT-guided right L5 transforaminal epidural corticosteroid injection and right L4-L5 facet intra-articular corticosteroid injection.

**10/27/2011** - Operative Report from San Diego Imaging, dictated by Keith E. Kortman, M.D. **Indication:** Low back and right leg pain, previously responsive to CT guided L4-L5 facet joint and L5 transforaminal epidural corticosteroid injection, respectively. **Procedure:** CT-guided right L5 transforaminal epidural corticosteroid injection and bilateral L4-L5 facet intra-articular corticosteroid injections.

**10/19/2015** - Operative Report from Surgical Center of San Diego, dictated by Michael Moon, M.D. **Preoperative and postoperative diagnoses:** Chronic low back pain; lumbar degenerative disc disease; lumbar spondylosis; previous lumbar laminectomy; lumbar radiculopathy. **Operation:** Lumbar translaminar epidural steroid injection at the L3-L4 level. Lumbar epidurogram.

**10/03/2016** - Operative Report from Surgical Center of San Diego, dictated by Michael Moon, M.D. **Preoperative and postoperative diagnoses:** Chronic low back pain; lumbar spondylosis and degenerative disc disease; previous lumbar laminectomy; lumbar radiculopathy. **Operation:** Lumbar translaminar epidural steroid injection at the L3-L4 level. Lumbar epidurogram.

**11/22/2016** - ED Note from Sharp Memorial, dictated by Kirk P. Burgamy, M.D. He complained of neck pain. He had atraumatic posterior neck pain that was present for the past few days. He woke up with the pain. He had a massage the day before which failed to alleviate his symptoms. He had chronic paresthesias in both hands that did not change. He had mild worsening pain, left greater than right, in the trapezius area radiating to the left upper arm. Pain was 10/10. Exam noted slight decreased motion of the neck. There was mild tenderness both midline and paracervical regions that reproduced pain. MRI was reviewed. Dr. Ostrup was contacted and would be happy to follow up with the patient in his office. He felt



DOL 000418

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 19

better after treatment that included Toradol IM, Decadron and Benadryl. **Diagnostic impression:** Acute exacerbation of chronic neck pain; cervical facet degenerative arthrosis; cervical degenerative disc disease. He was discharged home in good condition.

**03/01/2017** - Medical Progress Report from Michael Moon, M.D. He was last seen on 01/11/2017. He had chronic left sided neck pain with burning and electrical sensations radiating into the left upper arm that was 7/10. He had low back pain associated with bilateral sciatic pain and paresthesias radiating down his leg posteriorly. Exam noted mild bilateral lumbar paraspinal tenderness, limited cervical and lumbar motion. He was permanent and stationary and was seen under the provisions for future medical care. **Diagnoses:** Chronic neck pain; cervical fusion at C5-C6; cervical radiculopathy; chronic low back pain; lumbar spondylosis; lumbar degenerative disc disease; lumbar radiculopathy. Urine drug screen was obtained. Plan was for Dilaudid, Valium, physical therapy, and extension of the cervical epidural steroid injection.

**03/06/2017** - Report from Richard Ostrup, M.D. He had neck pain and left cervical trapezius paresthesias with some possible C5 weakness. Exam noted some tenderness. Dr. Ostrup did not take him through a full range of motion. **Assessment:** Cervical radiculopathy; degenerative disc disease cervical; spinal stenosis. Plan was to consider an injection with Dr. Moon. He needed an up to date lumbar MRI for consideration of lumbar decompression.

**03/13/2017** - Operative Report from Surgical Center of San Diego, dictated by Michael Moon, M.D. **Preoperative and postoperative diagnoses:** Chronic neck pain; cervical fusion at C5-C6; cervical disc extrusion C6-C7; cervical radiculopathy. **Operation:** Cervical translaminar epidural steroid injection cervical epidurogram. The body of the report indicated that C7-T1 interlaminar space was identified and marked.

**03/29/2017** - Medical Progress Report from Michael Moon, M.D. He did not obtain any significant relief from the cervical epidural steroid injection. He continued to have left sided neck pain with burning and electrical sensations radiating to the left shoulder and upper arm that was 7/10. His left arm would be completely numb at times. His low back pain with associated bilateral lower extremity radicular pain, left greater than right, was 9/10. Plan was for Dilaudid, Valium, physical therapy and new MRI of the lumbar spine.



Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 20

**05/16/2017** - Report from Richard Ostrup, M.D. Since his last visit, he had some persistent left shoulder pain and numbness. He was to think about traction. Lumbar MRI was reviewed. Exam noted no significant changes; exam was not documented. **Assessment:** Spinal stenosis; cervical radiculopathy; degenerative disc disease cervical. He was felt to be fairly stable and plan was to consider a two level ACDF at C4-C5 and C3-C4 for his left sided cervical radicular problems. He was not eager for that now and wanted to try some cervical traction. For his lumbar spine, if he developed leg symptoms, he would be a candidate for a lumbar decompression at L3-L4.

**05/31/2017** - Medical Progress Report from Michael Moon, M.D. He had severe low back pain with associated bilateral lower extremity radicular pain to the calves, 7/10. He had left sided neck pain with burning and electrical sensation into the left shoulder and upper arm that was 7/10. Plan was for Nucynta, Valium, physical therapy. Dr. Moon was reluctant to perform a lumbar epidural at L5-S1 interlaminar space due to the previous laminectomy increasing his risk for an inadvertent dural puncture and spinal headache. Authorization was requested for a bilateral S1 transforaminal lumbar epidural injections.

**09/20/2017** - Medical Progress Report from Michael Moon, M.D. He had 6-7/10 neck pain radiating to both trapezii with numbness and tingling in both hands, and 7-8/10 lower back pain radiating to both lower extremities to the calves. Plan was for Nucynta, Valium, cervical epidural steroid injection and physical therapy.

**11/22/2017** - Medical Progress Report from Michael Moon, M.D. His neck pain radiating to both trapezii with numbness and tingling in the hands was 7-8/10. His low back pain radiating to both lower extremities was 6-7/10. Plan was for Nucynta, Valium, cervical epidural steroid injection and physical therapy.

**01/31/2018** - Medical Progress Report from Michael Moon, M.D. His neck pain radiating to both trapezii with numbness and tingling in both hands was 9/10. His low back pain radiating to both lower extremities to the calves was 7/10. Urine drug screen was done. Plan was to continue Nucynta, taper Valium from 10 mg to 5 mg, and for physical therapy. He was authorized for a cervical epidural.

**05/16/2018** - Medical Progress Report from Michael Moon, M.D. He had chronic neck pain radiating to the left shoulder and both trapezii with paresthesias in both hands, with symptoms significantly increased. He received two left shoulder cortisone injections by Dr. Dubois, with significant relief lasting two months after the first



Exhibit R, 20

**DOL 000420**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 21

injection, and no relief after the second injection.  His neck pain was 7/10.  His low back pain was also 7/10 and radiated to both lower extremities to his calves.  Plan was for Nucynta, physical therapy and updated cervical MRI.

**07/11/2018** - Medical Progress Report from Michael Moon, M.D.  His neck and back pain was 7/10.  His neck symptoms were significantly increased and radiated into the left shoulder and both upper trapezii with paresthesias in both hands.  His low back pain radiated to both lower extremities to the calves.  Plan was for Nucynta.  He discontinued Valium.  He was to continue physical therapy.  A new cervical MRI was requested.

**12/12/2018** - Medical Progress Report from Michael Moon, M.D.  His low back pain bothered him more than neck pain.  His pain was 7-8/10.  His low back pain radiated to both lower extremities to the knees and his neck pain radiated into both shoulders and arms. Plan was for Nucynta, Valium and physical therapy.  He wanted to hold off on any cervical or lumbar epidurals.

**02/06/2019** - Medical Progress Report from Michael Moon, M.D.  He had neck pain radiating to the right shoulder with paresthesias in both hands.  He had low back pain radiating to the right gluteal and posterior thigh region.  Pain was 7-8/10.  He underwent a urine drug screen.  He was to continue Nucynta and Valium and physical therapy.  He wanted to hold off on cervical and lumbar epidurals.

**04/03/2019** - Medical Progress Report from Michael Moon, M.D.  He experienced an acute myocardial infarction five weeks ago, underwent a workup by his cardiologist and underwent a stent placement.  He continued to have neck pain radiating to bilateral upper trapezius with paresthesias in both hands and low back pain radiating to his right greater than left gluteals and posterior thighs.  Pain was 7/10.  He was to continue Nucynta and Valium and was not a candidate for epidurals as long as he was on anticoagulation for six months.

**06/26/2019** - Medical Progress Report from Michael Moon, M.D.  He had neck pain radiating to both upper trapezii and right biceps muscle with paresthesias in both hands, and low back pain radiating into his right greater than left bilateral gluteals and posterior thighs.  Pain was 5/10.  He was told he had to continue on his 12 month regimen of Brilinta, Coreg and aspirin.  Plan was for Nucynta and Valium.

**08/21/2019** - Medical Progress Report from Michael Moon, M.D.  He reported a flare up of neck and low back pain.  He denied radicular pain from his neck.  He felt



Exhibit R, 21

**DOL 000421**

July 21, 2021

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 22

numbness and tingling in both hands. His low back pain radiated into his buttocks with no numbness or tingling. Pain was 7/10. Plan was for Nucynta, Valium and Dexilant. He was recommended physical therapy.

**11/06/2019** - Medical Progress Report from Michael Moon, M.D. His neck pain was 7/10 and radiated to both upper trapezii with paresthesias in both hands. His low back pain was 7/10 and radiated to both buttocks. Nucynta was discontinued due to severe nausea. He was placed on a trial of Dilaudid. He was to continue Valium and Dexilant. His physical therapy was recently approved.

**01/15/2020** - Medical Progress Report from Michael Moon, M.D. His neck pain was 6-7/10 and he reported worsening radicular symptoms to both upper trapezii and bilateral upper extremities, right greater than left, with associated paresthesias in both hands. His low back pain was 6/10 and radiated intermittently to both buttocks. He had not yet filled his prescription for Dilaudid. He was to continue Valium and Dexilant and additional physical therapy was requested. An updated cervical MRI might be considered in the future.

**03/04/2020** - Medical Progress Report from Michael Moon, M.D. He had a flare up of his neck pain 2-3 weeks ago. He had 7-8/10 neck pain that radiated to the right upper extremity with associated paresthesias in both hands. His low back pain was 6-7/10 and denied any radicular symptoms but his low back pain had been gradually worsening over the past month. Plan was to continue Valium and Dexilant. MRI scans of the cervical spine and lumbar spine were requested. He was to continue physical therapy.

**04/08/2020** - Medical Progress Report from Michael Moon, M.D. His neck pain was 8-9/10 and radiated to both upper extremities with paresthesias in both hands. He had low back pain that was significantly worse in the past month with 9/10 pain radiating the posterior aspect of the right lower extremity with paresthesias in the sole of the right foot and numbness over the dorsum of the left foot. His newest MRI scans were reviewed. He underwent urine drug screen. He was to fill his prescription for Dilaudid. He was to continue Valium and Dexilant. He wanted to hold off on any epidurals due to his myocardial infarction. His physical limitations were interfering with his ability to perform the duties of an ophthalmologist and he was to medically retire on 04/30/2020.

**05/06/2020** - Medical Progress Report from Michael Moon, M.D. His neck pain was 8/10 and radiated to both upper trapezii and upper extremities with paresthesias in



Exhibit R, 22

DOL 000422

Case No: 130679763          Page No: 3735          Rec'd Date: 07/21/2021

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 23

both hands.  He had low back pain that was 7/10 and radiated to the posterior aspect of the right lower extremity with paresthesias in the sole of the right foot and numbness in the dorsum of the left foot.  He was counseled on the use of alcohol that was seen on his latest urine drug screen.  Plan was for Dilaudid, Valium and Dexilant. He was to medically retire at the end of the month.

**06/02/2020** - Medical Progress Report from Michael Moon, M.D.  His neck pain was 8.5/10 and radiated to both upper trapezii, right greater than left, and both upper extremities with paresthesias in both hands.   His low back pain was 8/10 with radiation in the posterior aspect of the right lower extremity with paresthesias in the sole of the right foot and numbness in the dorsum of the left foot.  He was to continue Dilaudid, Valium and Dexilant.  Physical therapy was requested.  He was to medically retire soon.

**06/30/2020** - Medical Progress Report from Michael Moon, M.D.  His pain was 8/10. Neck pain radiated to both upper trapezii, right greater than left, and upper extremities, with paresthesias in both hands.  His low back pain radiated to the posterior aspect of the right lower extremity with paresthesias in the sole of the right foot and numbness over the dorsum of the left foot.  He had a flare up of his low back pain this past week.  He was to start physical therapy the next day.  He was to continue Dilaudid, Valium and Dexilant and start physical therapy.

**09/14/2020** - Medical Progress Report from Michael Moon, M.D.  He returned on an urgent basis due to a severe flare up of his symptoms since last night.  He bent over and "heard a pop" in the lower back and was experiencing severe low back symptoms since that time.  Low back pain was 9/10.  He had numbness and tingling in the 2nd, 3rd and 4th toes of the left foot.  His neck pain was 8/10 with radiation to both upper trapezii, right greater than left, and upper extremities with associated paresthesias in both hands.  He received Toradol IM and Medrol Dosepak was prescribed.  He was to continue Dilaudid, Valium and Dexilant.  He was to start physical therapy.

**09/16/2020** - Handwritten prescription from Michael Moon, M.D. for physical therapy x 12 sessions for acute low back flare up.

**09/28/2020** - Medical Progress Report from Michael Moon, M.D.  His pain was 8/10 in the neck and low back.  He continued to recover from the flare up of low back pain. He recently began to notice increasing numbness in the left lower extremity and foot and sciatica into both legs.  His neck pain radiated into both upper trapezii, right greater than left, and both upper extremities with paresthesias in both hands.  After



Exhibit R, 23

**DOL 000423**

tfoot

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 24

completing Medrol Dosepak, his symptoms had mildly improved. He was to continue Dilaudid, Valium and Dexilant, and continue physical therapy.

**10/27/2020** - Medical Progress Report from Michael Moon, M.D. His low back pain was 8/10 and radiated into posterior aspect of both lower extremities. His neck pain was 7/10 with continued radiation and paresthesias. He was to continue Dilaudid, Valium and Dexilant, continue physical therapy, and was referred to neurosurgery or orthopedic spine surgery for a consultation for the neck and low back pain.

**11/24/2020** - Medical Progress Report from Michael Moon, M.D. His low back pain was 7/10 with continued radiation into lower extremities. He had 8/10 neck pain with a flare up and continued radiation and paresthesias. He was scheduled to see by Dr. Kim in orthopedic spine surgery the following week. Plan was to continue Dilaudid, Valium and Dexilant, keep the appointment with Dr. Kim, and was referred for acupuncture.

**12/21/2020** - Medical Progress Report from Michael Moon, M.D. His low back pain was 7-8/10 with continued radiation and paresthesias. His neck pain was 7-8/10 with a recent flare up, with continued radiation and paresthesias. His symptoms were gradually worsening. He requested a second opinion consultation in neurosurgery. He was to see Dr. Ostrup in neurosurgery. He was to continue Dilaudid, Valium and Dexilant and was to continue holding off on the epidurals.

**12/21/2020** - Report from Richard Ostrup, M.D.; this report was brought in by the patient  Chief complaint listed low back pain, bilateral leg pain, neck pain with discomfort in the trapezius and rhomboid region bilaterally. Exam noted decreased cervical motion, decreased sensation in both hands, tends in the lumbar area, limited lumbar extension, mild weakness of the left EHL. **Assessment:** Cervical spine degeneration; cervicalgia; lumbar degenerative disc disease; lower back pain; spinal stenosis. Based on the exam, Dr. Ostrup did not believe that surgery was indicated at C4-C5 but that should be followed. For his back, he was to avoid activities that triggered his symptoms such as prolonged standing, sitting or extension. Unfortunately, he was on Plavix and aspirin because of his cardiac issues and these had to be stopped before any intervention. His legs symptoms would be monitored. Surgical intervention for the leg symptoms would eventually be needed. Flexion and extension views of the lumbar spine were recommended. Dr. Ostrup doubted that surgery with a multilevel fusion would help the patient and would be reluctant to recommend it. Due to his neck and back symptoms, he would be limited with some of his work activities. He was not recommended prolonged standing or sitting or neck



Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 25

flexion.  Surgical intervention at L3-L4 was a good option to help his leg pain but it was not realistic due to his cardiac medications.  He was to follow up in 3-6 months.

**02/15/2021** - Medical Progress Report from Michael Moon, M.D.; this report was brought in by the patient.  His low back pain was constant and 8/10 with radiation to the posterior aspect of both lower extremities with paresthesias in the same distribution.  He had an ongoing flare up of his neck pain that was 9/10 and radiated into both upper trapezii, currently left greater than right, and bilateral upper extremities with associated paresthesias in both hands.  His condition was gradually worsening.  On exam, his gait was slowed.  Cervical flexion was 25 degrees, extension 10 degrees, right lateral rotation 30 degrees and left lateral rotation 10 degrees.  There was moderate bilateral cervical paraspinal and upper trapezii tenderness.  Empty beer can and impingement signs were positive on the left.  Spurling was positive bilaterally.  Pinprick sensation was diminished over digits 2 and 3 in both hands.  There was slight weakness of the right triceps and right grip.  He had loss of lumbar lordosis.  Lumbar motion was limited in all planes.  There was mild right greater than left bilateral lumbar paraspinal tenderness.  Sensation was diminished to pinprick over the dorsum of the left foot.  There was 4/5 weakness of plantar flexion of the left foot.  **Diagnoses:** Chronic neck pain; cervical fusion at C5-C6; cervical radiculopathy; chronic low back pain; lumbar spondylosis; lumbar degenerative disc disease; lumbar radiculopathy.  He remained permanent and stationary.  He was stable on his current regimen.  Plan was for continued MS IR (started on his last visit), begin physical therapy, continue Valium and Dexilant, and hold off on epidurals.

**02/18/2021** - Physical Therapy Reexamination Addendum from Innovative Physical Therapy San Diego; this report was brought in by the patient.  Visit #1.  He had constant pain in the neck and low back.  History was reviewed.  Last few months the pain had intensified to the neck right greater than left, and he felt symptoms down the upper extremity and into his fingers.  He had intermittent severe pain to the left greater than right low back radiating to the gluteus.  There was some weakness to the left lower extremity with numbness and tingling.  Only relief he got was from physical therapy.  Plan was for therapy at 1-2 times a week for six weeks.

**03/18/2021** - Daily Note/Billing Sheet from Innovative Physical Therapy San Diego.  Visit #10; this report was brought in by the patient.  He continued to get a couple of good days post physical therapy and then pain returned.  He wakes up in the a.m. very still and had difficulty moving the back around.  He was to continue therapy.

This concludes the review of available medical records.



Exhibit R, 25

**DOL 000425**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 26

## PHYSICAL EXAMINATION:

HEIGHT:  5 feet, 9 inches          WEIGHT:  162 pounds per the patient

The patient is right-hand dominant.

On today's examination, the patient has tenderness in his lumbar spine.  There is a healed surgical scar on his low back.  There is a healed anterior scar on his neck with tenderness diffusely in his neck and the right and left trapezius.

## NECK AND UPPER EXTREMITIES:

Range of motion of the neck:  The patient can touch his chin to his chest on forward flexion.  Extension is 40 degrees; normal is 60 degrees.  He turns his neck to the right 70 degrees, to the left 65 degrees; normal is 80 degrees.  Lateral tilts are 50 degrees to the right and 40 degrees to the left; normal is 65 degrees.

Cervical compression test is negative.  Spurling test is negative.

The patient has full range of motion of both shoulders, elbows, wrists, and hands. Shoulder abduction is 180 degrees.  Shoulder forward flexion is 180 degrees. Shoulder extension is 50 degrees. Shoulder external rotation is 90 degrees. Shoulder internal rotation is 80 degrees. Shoulder adduction is 40 degrees. Elbow flexion is 150 degrees.  Elbow extension is 0 degrees.  Elbow supination and pronation is 90 degrees.  Wrist dorsiflexion is 60 degrees.  Wrist palmar flexion is 60 degrees.  Wrist ulnar deviation is 30 degrees.  Wrist radial deviation is 20 degrees.

Reflexes:  Biceps, triceps, and brachioradialis reflexes are 2/4, bilaterally.

The patient has decreased sensation over his right thumb, index, long and ring fingers both dorsally and volarly.  He has decreased sensation over his left thumb, index, long and ring fingers dorsally and volarly.  Sensation of the upper extremities is otherwise intact.

The patient shows no evidence of motor weakness of the deltoids, biceps, triceps, wrist dorsi or volar flexors.  Radial pulses are palpable and equal, bilaterally.  Adson's test is negative.



Exhibit R, 26

**DOL 000426**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 27

## CIRCUMFERENTIAL MEASUREMENTS OF THE UPPER EXTREMITIES:

|                | RIGHT      | LEFT       |
|----------------|------------|------------|
| Upper arm:     | 27.0 cm    | 26.0 cm    |
| Elbow:         | 24.0 cm    | 26.0 cm    |
| Forearm:       | 25.5 cm    | 25.5 cm    |

| **JAMAR:** | Right: | 36/32/32 kg |
|            | Left:  | 38/36/34 kg |

## BACK AND LOWER EXTREMITIES:

Range of motion of the back:  The patient lacks 12 inches fingertips to toes on forward flexion. He extends himself 20 degrees. Right and left lateral bending is 20 degrees. Rotation of the back is to 50 degrees, right and left.

The patient has a normal gait and can walk on his heels and toes.

The patient has full range of motion of both hips, knees and ankles. Hip flexion is 110 degrees. Hip internal rotation is 20 degrees. Hip external rotation is 45 degrees. Hip abduction is 50 degrees. Hip adduction is 20 degrees. Knee extension is 0 degrees. Knee flexion is 135 degrees.  Ankle extension is 15 degrees.  Ankle flexion is 40 degrees.  Ankle inversion is 25 degrees. Ankle eversion is 15 degrees.

Straight leg-raising is positive at 75 degrees, right and left.

Reflexes:  Patellar and Achilles reflexes are 2/4, bilaterally.

The patient has decreased sensation over the dorsum of his left foot. He otherwise has intact sensation in both lower extremities.

The patient has good femoral, popliteal, dorsalis pedis and posterior tibialis pulses, bilaterally. The patient has normal strength in both quadriceps, hamstrings, plantar flexors/extensors, and extensor hallucis longus muscles. Patrick's sign is negative, bilaterally.



Exhibit R, 27

**DOL 000427**

Physician:    Michael J. Einbund, M.D.
RE:           LEUNG, RICHARD, M.D.
FILE #:       130679763
DOS:          03/29/2021
Page 28

## CIRCUMFERENTIAL MEASUREMENTS OF THE LOWER EXTREMITIES:

|         | RIGHT    | LEFT     |
|---------|----------|----------|
| Thigh:  | 41.0 cm  | 41.0 cm  |
| Knee:   | 38.0 cm  | 38.0 cm  |
| Calf:   | 35.5 cm  | 37.0 cm  |

## X-RAY FINDINGS:

A cervical spine series reveals no evidence of fracture or dislocation. There is a fusion with a plate in place between C5 and C6.

An AP view of the pelvis reveals no evidence of fracture, dislocation, or degenerative changes.

A lumbosacral spine series reveals no evidence of fracture or dislocation. There is moderate narrowing between L5 and S1 and degeneration at L4-L5.

## RECOMMENDATIONS AND COMMENTS:

I was asked to answer the following questions:

*1.   Summarize the history of injury/onset of illness.*

The history of injury/onset of illness is as detailed above.

*2.   Describe both the objective and subjective findings from examination. Do the subjective complaints correspond with the objective findings?*

Cervical spine:

> Subjectively, the patient reports experiencing continuous neck pain with radiation to both arms. He is losing strength in the right worse than left arm. He has numbness and tingling in both hands and fingers. He has associated headaches. There is severe morning neck stiffness. He does get constant cracking and locking sensations.



Exhibit R, 28

**DOL 000428**

July 21, 2021

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 29

Objectively, there is healed anterior scar on his neck with corresponding operative report dated 01/19/04 detailing anterior cervical discectomy at C5-C6, arthrodesis C5-C6 and instrumentation. The most recent MRI scan of the cervical spine is dated 04/03/20 which revealed previous anterior and interbody spinal fusion at C5-C6, as well as moderate to severe C4-C5 and severe C6-C7 disc degeneration, mild to moderate C4-C5 spinal stenosis, bilateral neural foraminal narrowing and nerve root impingement at C3-C4, C4-C5 and C6-C7. X-rays obtained today reveals fusion with a plate in place between C5 and C6. There is some limited range of motion of the cervical spine. There is decreased sensation over the right thumb, index, long and ring fingers. There is decreased sensation over the left thumb, index, long and ring fingers.

Lumbar spine:

Subjectively, the patient reports experiencing continuous mid and lower back pain, with pain over the piriformis and sciatic notch region, with radiation of shooting pain to the bilateral legs, feet and toes. He has numbness and tingling in both legs and feet, equally. His left hip flexors are very tight and he has difficulty stretching.

Objectively, there is healed surgical scar over the low back. History of laminectomy and discectomy 1983. The most recent MRI scan of the lumbar spine is 04/03/20 there were findings consistent with scar tissue at the L4-L5 involving the bilateral traversing L5 nerve roots. Severe L3-L4, moderate to severe L4-L5 disc degeneration, severe L3-L4 spinal stenosis. L3-L4 disc extrusion with severe impingement of the bilateral traversing L4 nerve roots, bilateral neural foraminal narrowing and impingement of the bilateral L3 nerve roots. L4-L5 disc extrusion with impingement of the bilateral L5 and L4 nerve roots. There is limited range of motion, positive straight leg raising at 75 degrees, bilaterally. There is decreased sensation over the dorsum of his left foot. X-rays obtained today reveal moderate narrowing between L5 and S1 and degeneration at L4-L5.

The subjective complaints correspond with the objective findings.

**3.** *Discuss the results of any diagnostic tests performed.*

The results are as noted above under objective findings. Essentially, there are multilevel degenerative disc disease spanning both spine segments the cervical and lumbar spine. There is nerve root impingement in the cervical and lumbar spine. The results also reveal post surgical changes.



Exhibit R, 29

DOL 000429

Case No: 130679763          Page No: 3728          Rec'd Date: 07/21/2021

Physician: Michael J. Einbund, M.D.
RE: LEUNG, RICHARD, M.D.
FILE #: 130679763
DOS: 03/29/2021
Page 30

4. *List all current diagnoses and provide a well-rationalized explanation to confirm or negate a causal relationship between any condition(s) found and the accepted work injury or employment factors (as described in the Statement of Accepted Facts). Also, please provide your reasoned medical opinion as to whether the work injury or employment factors caused, aggravated, accelerated, or precipitated the diagnosed condition(s).*

1. CERVICAL DISC DISPLACEMENT STATUS POST DISCECTOMY AND FUSION A THE C5-C6 LEVEL, 01/19/04.

2. CERVICAL DEGENERATIVE DISC DISEASE.

3. LUMBAR DEGENERATIVE DISC DISEASE WITH ASSOCIATED DISC DISPLACEMENT; STATUS POST LAMINECTOMY AND DISCECTOMY, L4-L5 1983.

The mechanism of injury while lifting a heavy client/patient who weight approximately 300 lbs., with the assistance of a colleagues is consistent with the diagnosis of disc displacement which is the accepted work related condition. The natural progression of this condition as well as having been treated with fusion at the C5-C6 and having put added stress to the adjoining levels has in part resulted in the noted degeneration. Therefore, diagnosis #1 is considered a direct cause and the development of diagnosis #2 is considered consequential.

As relates to diagnosis #3, notably the original accepted condition was degenerative lumbar disc. Degeneration is not considered the result of any one specific incident rather it would appear this was an aggravation injury of the underlying degeneration. This aggravation of injury would be consistent with the stated mechanism of injury.

5. *If the work injury aggravated an underlying/preexisting condition, is such aggravation temporary or permanent? If temporary, has the condition now returned to the pre-injury status and has the aggravation ceased? If permanent, please explain how the work related aggravation has materially worsened the underlying/preexisting condition such that it will not revert to its previous level of severity.*



Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 31

As relates to diagnosis #3 is considered a permanent aggravation noted the structural changes occurring as a result of the 1983 laminectomy and discectomy, as well as the scar tissue formation noted in recent MRI scans which as made a material worsening of the underlying condition.

**6.      Has the work related condition(s) resolved? If not, is there evidence to support that the above work related condition(s) is still active and causing objective findings? Provide a clear, rationalized explanation as to how you arrived at your opinion, including the specific findings from your examination/evaluation. If the work-related condition(s) has not resolved, please explain when recovery should be expected.**

The work related conditions have not resolved.  There is evidence to support that the above work related conditions are still active and causing objective findings.  The objective findings are as previously noted.  Full recovery is not expected noting the degenerative nature of his cervical and lumbar spine conditions.

**7.      Based on clinical presentation, is Richard J. Leung currently capable of returning to his date of injury job a Physician?  Please explain the basis for your opinion.**

Mr. Richard J. Leung is not currently capable of returning to his date of injury job as a physician.  He has limitations of function as well as cognitive concerns noting his use of narcotic medications as prescribed by Dr. Moon.

**8.      If Richard J. Leung is unable to return to his date of injury Job, are work restrictions/limitations medically warranted? Is the present level of disability a direct result of the accepted work-related conditions as outlined above? Please explain the medical basis for your opinion and complete the attached Form OWCP-5 outlining the claimant's work capabilities.**

His disability is a direct result of the accepted work-related conditions.  His work related conditions have persisted, as well as worsened due to the natural progression of the degeneration of the spine.

He is limited to sedentary work duties.

**9.      Discuss the prognosis and whether there is a need for any further treatment. Please provide the basis for your opinion and outline any treatment recommendations.**



Exhibit R, 31

**DOL 000431**

Physician:   Michael J. Einbund, M.D.
RE:          LEUNG, RICHARD, M.D.
FILE #:      130679763
DOS:         03/29/2021
Page 32

The prognosis is guarded.  He will require ongoing treatment by his pain management specialist with provisions for repeat cervical and/or lumbar epidural injections. Surgical consideration for cervical and lumbar spine cannot be ruled out. However, noting the multilevel of involvement and prior spinal surgeries, it is guarded if he will significantly improve.  Surgical option should be reserved as a last option noting he is also at increased risk due to history of cardio myo infarction.

Thank you for the opportunity to be of assistance in the care of this patient.  If you have any questions, please do not hesitate to contact my office.

Sincerely,

**MICHAEL J. EINBUND, M.D.**
**Board Certified Orthopaedic Surgeon, License #C30384**

MJE:en



EXHIBIT S

U.S. DEPARTMENT OF LABOR

DFELHWC-FECA, PO Box 8311
LONDON, KY 40742-8311
Phone: (202) 513-6860

**Want Faster Service?**
**Upload a document at <u>ecomp.dol.gov</u>**

July 21, 2021

Date of Injury: 05/23/1982
Employee: RICHARD J. LEUNG

DEPARTMENT OF VETERANS AFFAIRS
VETERANS HEALTH ADMINISTRATION
SAN DIEGO HEALTHCARE SYSTEM
3350 LA JOLLA VILLAGE DRIVE
SAN DIEGO, CA 92161

Dear Sir/Madam:

We have determined that the weight of the medical evidence in this employee's case rests with Dr. Michael Einbund who has provided work restrictions as outlined in the attached medical report dated 03/29/2021.

If possible, please offer this employee a job within these restrictions.

Any job offer you make must be in writing and include:

1. A description of the duties to be performed;
2. The specific physical requirements of the position and any special demands of the workload or unusual working conditions;
3. The organizational and geographical location of the job;
4. The date on which the job will first be available;
5. The claimant's work schedule (including telework);
6. The rate of pay for the position;
7. The date by which a response to the job offer is required.

Additional guidelines for light duty job offers are attached.

A copy of the job offer should be forwarded to this office. If your agency is unable to accommodate this employee with light duty, please advise within the next 30 days.

Thank you for your assistance.



*If you have a disability and are in need of communication assistance (such as alternate formats or sign language interpretation), accommodation(s) and/or modification(s), please contact OWCP.*

Exhibit S                                                                DOL 000398

EXHIBIT T

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. LEUNG, M.D., | ) |
| | ) |
| Plaintiff, | ) Case No. |
| vs. | ) 3:22-cv-00767-W-JLB |
| | ) |
| UNUM LIFE INSURANCE COMPANY | ) |
| OF AMERICA; and DOES 1-10, | ) |
| inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

VIDEOTAPED DEPOSITION OF LISA SULLO

APPEARING REMOTELY FROM

WHITINSVILLE, MASSACHUSETTS

FEBRUARY 23, 2023

1:00 P.M. PST

REPORTED BY:

Mary E. Collins

CSR No. 12763

APPEARING REMOTELY FROM KOOTENAI COUNTY, IDAHO

Exhibit T, 1

1   REMOTE APPEARANCES:

2

3           For Plaintiff:

4           DONAHUE & HORROW

5             MICHAEL B. HORROW

6           1960 East Grand Avenue, Suite 1215

7           El Segundo, California 90245

8           mhorrow@donahuehorrow.com

9

10          For Defendant:

11          BURKE WILLIAMS & SORENSEN

12            MICHAEL B. BERNACCHI

13          444 South Flower Street, Suite 2400

14          Los Angeles, California 90071

15          mbernacchi@bwslaw.com

16

17          Also present:

18          ROB DENOS, videographer

19

20

21

22

23

24

25

Exhibit T, 2

1    A.    Right above that?  Okay.

2    Q.    Yeah.  Why don't we do this?  Why don't you

3    look at your note of July 7, 2020.  Read it carefully.

4    Take your time.  And when you are done reading the

5    note, let me know, and I'll ask you questions about

6    it.

7    A.    I see it.  It's fine.

8    Q.    Okay.  So on July 7, 2020, in Exhibit 4,

9    Document 851, you wrote, "Requested Workers' Comp file

10   to confirm accident versus sickness."  Is that right?

11   A.    That is correct.  Yep.

12   Q.    How would the Workers' Comp file assist you

13   in determining the etiology of Dr. Leung's claim as to

14   whether or not it was accident versus sickness?

15   A.    Because if he -- if a Workers' Comp claim is

16   filed and he's claiming something back to -- if I'm

17   looking at this, and he's reporting injuries

18   5/23/2000 -- excuse me, 1982 and another November of

19   1993, a Workers' Comp claim would assist us in

20   reviewing if the injuries are still there, what the

21   basis of that Workers' Comp claim was for, or if the

22   Workers' Comp claim was not approved, if it was

23   approved, if he had a -- if he had recovered.  Things

24   of that nature.

25   Q.    And how would an approved Workers' Comp claim

Exhibit T, 3

1              REPORTER'S CERTIFICATE

2              I, Mary E. Collins, CSR No. 12763, Certified
     Shorthand Reporter, certify:
3              That the foregoing proceedings were taken
     before me at the time and place therein set forth, at
4    which time the witness was put under oath by me;
               That the testimony of the witness, the
5    questions propounded, and all objections and
     statements made at the time of the examination were
6    recorded stenographically by me and were thereafter
     transcribed;
7              That a review of the transcript by the
     deponent was requested;
8              That the foregoing is a true and correct
     transcript of my shorthand notes so taken.
9              I further certify that I am not a relative or
     employee of any attorney of the parties, no
10   financially interested in the action.
               I declare under penalty of perjury under the
11   laws of California that the foregoing is true and
     correct.
12
               Dated March 9, 2023.
13

14   _____

15              Mary E. Collins, CSR 12763

16

17

18

19

20

21

22

23

24

25

Exhibit T, 4

EXHIBIT U

011478-16-2-12-2020/10/21**-120308-5-PORT_Sdx_Prod



## Joel West Ray, M.D.

FELLOW AMERICAN COLLEGE OF SURGEONS
DIPLOMATE AMERICAN BOARD OF NEUROLOGICAL SURGEONS

6367 ALVARADO COURT · SUITE 304
SAN DIEGO, CALIFORNIA 92120
(619) 287-7661    FAX 287-7663

May 27, 1994

Charles K. Jablecki, M.D.
550 Washington Street, Suite 221
San Diego, California 92120

and

U.S. Department of Labor
ATTN: Jolyne Mena
P.O. Box 3769
San Francisco, California 94119

## NEUROSURGICAL CONSULTATION

| | | |
|---|---|---|
| **RE:** LEUNG, M.D., RICHARD | **EMPLOYER:** | VA HOSPITAL (UCSD) |
| **DOB:** 10/14/55 | **OCCUPATION:** | INTERN/PHYSICIAN |
| **SSN:** 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 | **INS. CARRIER:** | U.S. DEPT. OF LABOR |
| **DOI:** 05/23/82 | **INS. ADJUSTER:** | JOLYNE MENA |
| **F#:** 92123-13-679763 | **CHART#:** | 1592 |

Dear Doctor Jablecki and Ms. Mena:

I appreciated the opportunity to see Richard Leung, M.D., in neurosurgical consultation. This report was dictated in his presence.

As you recall, this 38-year-old, right-handed, Caucasian male, presents regarding a work-related injury, which he sustained while working as an intern for the VA Hospital, affiliated with UCSD on 05/23/82. He has been found to have the following diagnoses:

### IMPRESSION:

A.    DIAGNOSES - His diagnoses are as listed by Dr. Charles K. Jablecki on January 4, 1994 and are repeated below.

1.    Right C6 radiculopathy, manifest by positional right neck/shoulder pain and paresthesias in the right thumb and index finger.

2.    Tinel's sign at the right median nerve at the wrist, of unknown significance.

3.  Lumbosacral spine disease.

    a.  Status post diskectomy at L4-5 in 1983.

    b.  Residual back and left buttock pain, frequent with episodes of spasm and increased pain, about every 3-4 weeks.

    c.  Residual loss of left external hamstring and Achilles reflex, and minimal weakness of the left gastrocnemius muscle, evident on toe lift exercises.

4.  Episode of numbness, left thumb, of uncertain origin.

### RECOMMENDATIONS:

A.  FUTURE MEDICAL CARE PLAN - The patient requests to continue in a nonsurgical course with the understanding that he may possibly have surgery.

1.  With regard to the discussion regarding surgical options, he will return within the next two weeks for further discussions. I have also asked that he return with his wife, so that she may be participating in this care plan development.

2.  I will also receive the x-rays from them so that I may go over them with radiology.

3.  I have recommended to him that, since he now does have bilateral symptoms and has had, at least, one episode of paresthesia over the top of his foot to his toe on the left side, he be reviewed by Dr. Jablecki on a preset basis to assure that his symptoms are not progressing, thus requiring, versus suggesting, surgical indications.

B.  DISCUSSION - This consultation was for the purpose of reviewing his record and his process towards decision making. As indicated above, the patient will return for follow-up with regards to his physical examination and final review.

We spent I spent considerable time reviewing the problems, alternatives, my recommendations, risks, prognosis, and lack of guarantees.

## NEUROSURGICAL CONSULTATION
LEUNG, M.D., RICHARD
MAY 27, 1994
PAGE THREE

Both nonsurgical and surgical risks were discussed including, but not restricted to, paralysis, requirement (especially with regards to his surgical career) for a significant job or lifestyle change, multiple operations, intraoperative decision making (including the use of grafts and other fusion materials/intrumentation), positioning and anesthetic difficulties, life threatening bleeding, infection, and even death.

He states understanding and, at this point, requests going forward with continued nonsurgical management, but, on the other hand, is being prepared should there be any worsening to go forward with anterior cervical fusion with or without graft/instrumentation at C5-6. He states understanding and concurs with the plan.

Thank you, again, for allowing me to participate in this patient's care. I will certainly keep your informed with regards to my clinical involvement.

AFFIDAVIT OF COMPLIANCE: Consistent with WCAB Rule 10606, I certify that this examiner took the history, reviewed the medical records, if any, and dictated this report. No one else performed any part of this examination. The report was typed by my transcriber.

With best regards.

Very sincerely yours,

Joel West Ray, M.D., F.A.C.S.
JWR/dfs

cc:     Richard Leung, M.D.

---

EXHIBIT V

**Braverman, Marcia - SOL**

| | |
|---|---|
| **From:** | Braverman, Marcia - SOL |
| **Sent:** | Friday, February 3, 2023 3:57 PM |
| **To:** | Kojima, Keiko J. |
| **Cc:** | Valdez, Rolando - SOL |
| **Subject:** | RE: Request for copies of Richard Leung's file (A13-679763) |

Keiko,

OWCP has been providing access to files through a program called Kiteworks. When the file is ready to be viewed, OWCP will send you a password with instructions on how to open an account with Kiteworks and view the file. You will be able to copy the file but the copy will also remain password protected, due to the Privacy Act.

-Marcia

Marcia Braverman | Senior Attorney
Division of Federal Employees'
 and Energy Workers' Compensation
Office of the Solicitor, US Department of Labor
200 Constitution Avenue, NW, Room N-2625
Washington, DC 20210

202-693-5359 (T)
braverman.marcia@dol.gov

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender immediately.

**From:** Kojima, Keiko J. <KKojima@bwslaw.com>
**Sent:** Friday, February 3, 2023 1:31 PM
**To:** Braverman, Marcia - SOL <Braverman.Marcia@dol.gov>
**Cc:** Valdez, Rolando - SOL <Valdez.Rolando@dol.gov>
**Subject:** Re: Request for copies of Richard Leung's file (A13-679763)

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Thank you very much. Do you know if they are being sent electronically? We can accept them that way.

-Keiko

**Keiko J. Kojima | Partner**
Pronouns: she, her, hers
**Burke, Williams & Sorensen, LLP**
444 South Flower Street, Suite 2400 | Los Angeles, CA 90071-2953
d - 213.236.2842 | t - 213.236.0600 | f - 213.236.2700
kkojima@bwslaw.com | vCard | bwslaw.com

1

Exhibit V                    DOL 000006

EXHIBIT W

# cda Cary D Alberstone MD FACS
NEUROLOGICAL SURGERY

August 9, 2022

Nichole D. Podgurski
Michael B. Horrow
Donahue Horrow
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245

RE:  **RICHARD LEUNG, M.D. v. UNUM LIFE INSURANCE CO. OF
AMERICA, ET AL.**

Dear Ms. Podgurski,

I have reviewed the materials you sent me, as outlined below, and, starting on page
24, I offer my opinions regarding the causation of Dr. Leung's disability.

## RECORDS REVIEWED

1. Flashdrive
   a. Complaint
   b. Insurance file documents
   c. Medical Records
2. Paper records
   a. Initial evaluation Paul Kim, M.D. (4/28/22)
   b. X-rays of the cervical and lumbar spine (6/8/22)
   c. Follow-up visit Paul Kim, M.D. (6/21/22)

1700 North Rose Avenue  Suite 250
Oxnard  California 93030
t 805 983 1700   f 805 983 7144

LEUNG 00016

## NEUROIMAGING REVIEWED

1. CDs (7)
   a. MRI Cervical Spine (9/21/15)
   b. MRI Lumbar Spine (9/21/15)
   c. MRI Cervical Spine (11/22/16)
   d. MRI Cervical spine (8/30/18)
   e. MRI Lumbar Spine (4/17/17)
   f. MRI Lumbar Spine (4/3/20)
   g. MRI Cervical Spine (4/3/20)
   h. MRI Lumbar Spine (4/20/11)
   i. MRI Lumbar Spine 1/14/13
   j. MRI Lumbar Spine (12/15/21)
   k. X-ray Lumbar Spine (6/8/22)
   l. X-ray Cervical Spine (6/8/22)

## RECORD REVIEW

Type of Encounter: C = Consult; H = Hospital; M = Medical visit; O = Operation; R= Report/Letter; P = PT/OT visit; D = Diagnostic study; X = X-ray (Imaging study); B = Billing; * = Other

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 2/16/83 | John Alksne, M.D. | O | Lumbar laminectomy, lumbar discectomy at L4-5, L4-5 and S1 foraminotomy |

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 6/14/83 | Alksne, M.D. | R | Letter to U.S. Dept. of Labor for work comp case: "I have counseled him to avoid strenuous activities and heavy lifting.  A follow-up CT showed 'an adequate decompressive laminectomy, but some significant encroachment on the nerve root foramina by hypertrophied facets.  This was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent fusion.  Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date."  In a response from the Claims Examiner for the US Dept. of Labor:  "Authorization is given for further surgery, if it becomes necessary." |
| 3/8/84 | --- | --- | Begins seeing Leon Wiltse, M.D., who recommends "back school." |

4

| Date | Provider | Type | Summary |
|---|---|---|---|
| 3/15/85 | Huntington Medical | X | MRI L spine.  IMP: Decreased height and signal intensity L4-5 disc consistent with degeneration and previous surgery, moderate posterior disc bulge with impression on the anterior aspect of the thecal sac, more pronounced on the left than the right, obliteration of normal fat in the proximal left L4 and L5 neural foramina, most likely secondary to scarring." |
| 11/xx/93 | --- | --- | Injured neck on rowing machine working with a trainer to strength back.  The pain radiated into the scapular and upper back area.  There was associated right hand tingling. |

5

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 1/4/94 | Charles Jablecki, M.D./ Flashdrive p. 238 | C | Neurology initial consultation. "About six weeks ago, while carrying out exercise in a gym, a rowing activity, he developed some pain in the right side of the neck and the posterior shoulder. He noted that if he tilted his head to the left, it increased the pain in the shoulder area . . . About three weeks ago, without any particular warning, he began to note a numb, tingling sensation in the right thumb and index finger . . . He has had recurrent episodes of back spasm, the pain in the back extending into the left buttock, but not into the leg, and no numbness or tingling. He is also aware of a sense of weakness in the left leg compared to the right, though he has not noted any atrophy." PLAN: X-ray and MRI of the cervical spine. Home cervical traction. |

6

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 1/5/94 | Sharp and Children's MRI Center/Flashdrive p. 823/889 | X | MRI C spine. IMP: Bi-lobed C5-6 disc herniation, the largest component of which extends into the right C5-6 foramen causing moderate stenosis. Minimal ventral cord impingement is present, but no cord compression is clearly identified. Minimal C4-5 disc bulging is seen which is symmetric. There is no cord compression or neural foraminal encroachment. |
| 1/5/94 | SDDR/ Flashdrive p. 824/889 | X | X-ray C spine. IMP: Mild disc space narrowing C5-6. Mild foraminal narrowing on the right at C3-4, C5-6, and C6-7. |
| 11/2/95 | Sharp and Children's MRI Center/Flashdrive p. 825/889 | X | MRI C spine. IMP: Mild bulging of the C3-4 and C4-5 discs without change. Interval resolution of the C5-6 disc herniation with mild asymmetric bulging now present. |
| 2/27/97 date of MVA | Charles Jablecki, M.D./ Flashdrive p. 305/889 | --- | Neurology visit dated 3/20/97 reports 2/27/97 MVA, which aggravated his "right C6 radiculopathy manifest by neck and right shoulder pain, numbness, and tingling in the right hand." |

7

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 10/28/98 | Jablecki, M.D./ Flashdrive p. 312/889 | M | Neurology visit. This neurologist writes a report linking the rowing incident to Leung's back claim arguing that the neck claim is indirectly due to the back injury and should be included as a new work comp claim. |
| 4/28/99 | Sharp and Children's MRI Center/ Flashdrive p. 825/889 | X | MRI C spine. IMP: C4-5 facet joint hypertrophy and mild right-sided neural foraminal narrowing. C5-6 disc herniation with uncovertebral spondylosis and bilateral neural foraminal narrowing right greater than left. |
| 9/22/02 | Sharp and Children's MRI Center/ Flashdrive p. 399/889 | X | MRI C spine. IMP: Interval progression of a left posterior paramedian focal disc protrusion at C4-5, stable degenerative changes at C3-4 and C5-6. |

8

| Date | Provider | Type | Summary |
|---|---|---|---|
| 11/22/03 | Sharp and Children's MRI Center/ Flashdrive p. 830/889 | X | MRI C spine.  IMP: Slight worsening of moderate C4-5 left paracentral broad disc protrusion which flattens the left ventral cord surface and causes a mild spinal canal narrowing.  Uncovertebral and facet hypertrophy with slight right C4-5 neural foraminal narrowing, minimal improvement in the moderate C5-6 broad disc osteophyte complex with severe right and mild to moderate left neural foraminal narrowing. |
| 12/9/03 | Richard Ostrup, M.D./ Flashdrive p. 793/889 | M | Neurosurgical follow-up.  "I think a C6-7 discectomy is indicated and the question is whether or not to incorporate the C4-5 level as well." |
| 1/19/04 | Ostrup,M.D./ Flashdrive p. 795/889 | O | C5-6 ACDF |
| 3/1/04 | Sharp Outpatient Pavilion Imaging Center/Flashdrive p. 827/889 | X | X-ray C spine.  IMP: Status post C5-6 interbody fusion.  Normal alignment. |

9

LEUNG 00024

| Date | Provider | Type | Summary |
|---|---|---|---|
| 7/15/04 | Flashdrive p. 449/889—cited by Jablecki, M.D. | X | CT C spine.  IMP: Evidence of discectomy at C5-6, but with "moderate central spinal stenosis at this level due to posterior osteophytes and bilateral NFN moderately severe on the right."  "There is also evidence of congenital fusion block at C4-5 and C6-7" |
| 9/2/06 | Sharp and Children's MRI Center/Flashdrive p. 832/889 | X | MRI L spine.  IMP: No change from 6/24/05.  Stable degenerative disc disease and posterior and left sided disc protrusion at L4-5.  Stable moderate central canal and lateral recess narrowing at L3-4 due to a broad disc bulge.  No epidural fibrosis. |

10

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 5/19/10 | Imaging Healthcare/Flashdrive p. 836/889 | X | MRI C spine. IMP: "Anatomic laignment and bony incorporation following C5-6 ACDF. Mil d to moderate multilevel facet osteoarthritis, with left-sided posterior bone spurring at C4-5. No focal disc protrusion or nerve impingement." "ADDENDUM" to compare the 9/16/04 MRI. Per the Radiologist: "The posterior and left-sided C4-5 annular disc bulging ,hypertrophic bone spurring and bilateral foraminal stenosis has increased. This is abutting the ventral surface of the spinal cord and displacing the cord posteriorly, new since the previou study." |

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 6/17/10 | Jablecki, M.D./ Flashdrive p. 602/889 | M | "It is not uncommon for cervical radiculopathy symptoms to develop 5 to 10 years after cervical spine surgery because of the increased stress at the levels both above and below the site of the surgery." "He has had several flare-ups of this condition manifest by neck pain and increased paresthesias in the arms since the surgery." He has a chronic problem with lumbosacral spine/disc disease for which he underwent surgery in 1993. He has intermittent flare-ups of this condition manifest by low back and left hip pain." |

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 4/20/11 | Sharp Memorial/Flashdrive p. 839/889 | X | MRI L Spine. IMP: Previous bilateral **L4-5** posterior decompressive surgery and hemilaminectomies. There is mild left and moderate right enhancing scar tissue in the lateral recesses with involvement of the traversing right L5 nerve root. There is a persistent moderate annular disc osteophyte complex with slight increase in size of 5 mm, anteroposterior moderate central right paracentral and foraminal disc extrusion. There is slight impingement of the exiting right L4 nerve root, and significant impingement of the bilateral traversing L5 nerve roots, right worse than left. Worsening **L3-4** degenerative disc disease with mild to moderate annular disc bulging and a small left foraminal disc protrusion impinging the exiting left L3 nerve root, and the bilateral traversing L4 nerve roots. There is moderate L3-4 spinal stenosis. Moderate L3-4 degenerative facet arthropathy. |

13

| Date | Provider | Type | Summary |
|---|---|---|---|
| 1/14/13 | Sharp Memorial/Flashdrive p. 840/889 | X | MRI L spine. IMP: New inflammatory changes involving both the L4-5 facet joints and the right sided epidural space, endplates, and paravertebral soft tissues. |
| 10/3/14 | Jablecki, M.D./Flashdrive 768/889 | M | Neurology visit. Jablecki's last visit. He retired in October 2014). He refers Leung to Dr. Moon (PM&R). |
| 9/21/15 | Sharp Memorial/Flasdrive p. 846/889 | X | MRI L spine. IMP: Progresiive L3-4 disc degeneration with secondary spinal canal, neural foraminal , lateral recess stenosis, and progressive uncovertebral spondylosis and facet joint degeneration at other levels with secondary neural foraminal narrowing. Stable degenerative and postoperative change at L4-5. |

14

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 9/21/15 | Sharp Memorial/Flashdrive p. 848/889 | X | MRI C spine. IMP: Stable postoperative changes at C5-6. Progressive uncovertebral spondylosis and facet joint degeneration at other levels with secondary neural foraminal narrowing. At C4-5 there is progressive uncovertebralspondylosis and facet joint degeneration/hypertophy. There is moderate narrowing of both C5 neural foramina, worse on the right. The anterior arachnoid space is attenuated. The spinal cord is not compressed. |

15

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 11/22/16 | Sharp Memorial/Flashdrive p. 846/889 | X | MRI C spine.  IMP: Previous anterior and interbody fusion at C5-6.  There was mild edema seen in the posterior atlantooccipital membrane and interspinous ligaments between C1-2 and C5-6 consistent with strain or recent trauma,.  Increasing asymmetric moderate left and mild right C3-4 and minimal bilateral C4-5 facet joint fluid raises the possibility of a recent distraction injury.  Facet degenerative arthrosis may have similar appearance, especially given the presences of developing 6 mm posterior left C3-4 fact synovial cyst. Infection and facet septic arthritis are considered unlikely. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion and moderate-severe left C7 neuroforaminal narrowing.  Additional moderate left C3-4 and bilateralC4-5 neuroforaminal narrowing.  Moderate C3-4 and mild-moderate C4-5 spinal stenosis.  Mild spinal cord compression at C3-4.  No convincing spinal cord edema. |

16

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 4/17/17 | Sharp Memorial/Flashdrive p. 854/889 | X | MRI L spine.  IMP: Previous **L5-S1** posterior decompression laminectomies. Previous post-contrast study better demonstrates mild-moderate epidural scar tissue at L4-5 with involvement of the exiting right L4 and bilateral traversing L5 nerve roots, right more than left.  **L4-5** with mild posterior broad-based disc extrusion, severe fact hypertrophy and possible increase in mild impingement of the left L4 nerve root.  Otherwise, persistent significant impingement of the bilateral traversing L5 nerve roots at his level, and mild impingement of the right L4 nerve root. **L3-4** with persistent moderate-severe spinal stenosis and impingement of the bilateral traversing L5 nerve roots, left more than right and to a much lesser degree, the bilateral exiting L4 nerve roots. |

17

LEUNG 00032

| Date | Provider | Type | Summary |
|---|---|---|---|
| 8/30/18 | Sharp Memorial/Flashdrive p. 852/889 | X | MRI C spine. Multilevel disc degeneration with uncovertebral spondylosis, facet joint hypertrophy, mild canal stenosis, and bilateral neural foraminal narrowing. At C4-5, there is slightly progressive uncovertebral spondylosis and facet joint hypertrophy, both worse on the left. The subarachnoid space is attenuated. The spinal cord is not compressed. There is moderate narrowing of both C5 neural foramina. |
| 4/3/20 | Imaging Healthcare/Flashdrive p. 864/889 | X | MRI C spine. Stable ACDF C5-6, mild improvement in central stenosis at C3-4 with stable severe left sided foraminal stenosis at this level with compression of the exiting left C4 nerve rot, stable severe foraminal stenosis at C4-5 and C6-7 bilaterally with compression of the exiting nerve roots. Slight progression of severe central stenosis at L3-4. Remainder of multilevel degenerative disc and facet degenerative changes and postoperative changes are stable. |

LEUNG 00033

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 4/3/20 | Imaging Healthcare/Flashdrive p. 866/889 | X | MRI L spine. Previous posterior decompression and laminectomies at L5-S1 Abnormal T1-hypointense signal is seen in the epidural space at adjacent L4-5 level, especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral traversing L5 nerve roots. Moderate L3-4 and moderate-severe L4-5 disc degneration. **Severe L3-4 spinal stenosis**. L3-4 with mild posterior disc extrusion, left paracetntral annular fissure, facet and ligamentum flavum hypertrophy and severe impingement of the bilateral traversing L4 nerve roots. Bilaterall neuroforaminal narrowing and impingement of the bilateral L3 nerve roots. L4-5 mild posterior and right foraminal broad disc extrusion and left paracentral annular fissure. Moderate-severe facet hypertrophy, narrowing of the lateral recesses, and impingement of the bilateral traversing L5 nerve roots, right more than left. CONT' |

19

LEUNG 00034

| Date | Provider | Type | Summary |
|---|---|---|---|
| 4/3/20 | Imaging Healthcare | X | CONT' |
| | | | Bilateral neuroforaminal narrowing with impingement of the bilateral L4 nerve roots, left greater than right. |
| | | | CONT' |
| 5/9/20 | --- | * | Diaability |
| 6/17/20 | Leung | R | Plaintiff completed initial claim forms confirming his disability as of May 29, 2020, due to PAIN, NUMBNESS AND LOSS OF MOBILITY DUE TO PREVIOUS ACCIDENTAL INJURIES TO HIS LUMBAR AND CERVICAL SPINE. [On this date Michael Moon (PM&R) completed Attending Physician Statement certifying total disability.] |
| 6/17/20 | Leung | R | Treatment leading up to disability:<br>• Since 1982, consulted 6 neurosurgeons, 1 ortho spine, 2 neurologist, 3 chiros, 2 acupuncturists, 9 PTs, and 3 PM<br>• RX: therapies, 2 spine surgeries, 8 ESI (by 3 MDs), CTs (5), MRIs (16), EMG (4) |

20

LEUNG 00035

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 6/17/20 | Leung | R | UNUM claim for disability benefits. "Lumbar herniated disc at L4-5, scar tissue, multi-level disc degeneration, spinal stenosis, nerve impingement, cervical herniated disc C5-6, multi-level disc degeneration, spinal stenosis. Lumbar injury occurred at VA Medical Center in ICU while lifting 300 lb patient during medical emergency. Cervical injury occurred at 8010 Frost St. San Diego while strengthening back with personal trainer. Date of injuries: 5/23/82 (lumbar); 11/XX/93 (cervical). Symptom began 5/23/82 and thereafter. Symptoms: Pain in spine, loss of mobility, numbness in hands. Date first treated 5/31/82 (estimate). |

21

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 6/17/20 | Moon | R | As part of the above claim, Moon completed the Attending Physician Attestation, stating the following PERMANENT RESTRICTIONS as of 5/29/10: "No bending, lifting, turning, examination of patient, and other procedures performed by a surgical opthalmologist whose duties involve sitting/leaning in forward position with arms extended, using hands repetitively for extended periods of time.  Patient should not be working as a surgical opthalmologist because of chronic pain causing safety issues for his patients and further damage to spine of patient." |
| 8/27/20 | --- | * | UNUM approves disability based on Plaintiff's "sickness."  [Sickness, as opposed to injury, does not qualify Plaintiff for lifetime disability payments.] |
| 1/9/21 | --- | * | Plaintiff receives approval for Social Security Disability benefits. |

Exhibit W, 22

LEUNG 00037

| Date | Provider | Type | Summary |
|------|----------|------|---------|
| 2/16/21 | Michael Moon, M.D. | R | Dr. Moon writes to UNUM stating disability and impairments are due to industrial injuries of 1982 and 1983, not diffuse degenerative disc disease. States symptoms have been ONGOING until the present as has treatment UNDER WORK COMP. Surgeries were not curative. Cervical and lumbar spine injuries as well as ongoing chronic pain and disability are the DIRECT RESULT OF INDUSTRIAL INJURIES THAT HE SUSTAINED IN 1982 AND 1983. |

## DISCUSSION

Underlying Dr. Leung's assertion in this dispute is a decades long history of injury, diagnostics, and treatment, all leading, inexorably, to the disability claim which forms the basis for this lawsuit. The principal facts by which Dr. Leung's claim should be judged, despite the profusion of documents that lie at its center, are not difficult to grasp: Dr. Leung is disabled because of spinal pathologies, whose origins reach back to the early 1980s. So far so good: this generic formulation, as I understand it, is not in dispute. The differences between the parties may be summarized in their opposing responses to two questions: first, what is the nature of Dr. Leung's pathologies that have caused his disability; and, second, what was their cause?

It is, it appears, the defendant's belief that Dr. Leung's disabling condition is diffuse degenerative disc disease, a condition that arises spontaneously absent specific injury. By contrast, Dr. Leung's contends, along with his treating physicians, that his current condition has arisen (in part) as a consequence of specific injuries, a conclusion which has long since been embraced by the U.S. Department of Labor who, as I understand it, accepted the doctor's claim of two specific worker's compensation injuries. It is curious, indeed, that the defendant's have opposed the conclusions of the U.S. Department of Labor, who, if nothing else, I would expect to be authorities on workplace injuries. And it is *injuries* that the government has agreed Dr. Leung suffered.

In sum, based on my review of the claimant's medical records and imaging studies, as outlined above, it is my opinion, to a reasonable degree of medical probability, that the condition disabling Dr. Leung is spinal stenosis, afflicting both his cervical spine at the level of C4-5, and his lumbar spine at the level of L3-4.

24

On what basis, specifically, do I support this opinion? I submit that one need only review Dr. Leung's current clinical complaints, as memorialized in his medical records, and his most recent spinal imaging, to appreciate that the ophthalmologist's spinal pathologies are not diffuse, as UNUM's medical consultants have opined, but rather due to spinal stenosis limited to the levels C4-5 and L3-4.

As it happens, these are the levels adjacent to the two spinal levels that were operated in the past based on specific injuries that are documented in the medical records: a 1982 lifting injury (which was the basis for the doctor's original accepted worker's compensation claim), and a 1994 rowing incident memorialized by his then treating physician (see Dr. Jablecki's 1/18/94 letter; Flashdrive p. 250), which, as I understand it, was appended to the original industrial lumbar claim.

It is those contemporaneous treating physicians whose opinions deserve their due. After all, they examined Dr. Leung around the time of his claimed injuries and were thus clearly well positioned to opine about causation.

Witness, for example, UNUM's 2/18/22 denial letter written in response to a third appeal, stating that "the etiology of [Dr. Leung's] current impairing lumbar spine condition is caused by progressive degenerative changes at the L3-4 and L4-5 disc spaces and is not related to the injury you reported in May 1982 that occurred while lifting a patient." (Flashdrive, p. 197) Alas this opinion is at odds with the claimant's then treating physician, orthopedic surgeon Kenneth Ott, M.D., who wrote in a 6/17/82 letter (Flashdrive, p. 201) that Dr. Leung's clinical complaints were due to "congenital narrowing of the canal with a trefoil-shaped canal," then referencing the lifting injury, essentially arguing that the claimant was an eggshell with an underlying

condition that was aggravated by a specific lifting injury.  Although not all of the
documents memorializing this claim have been made available to me it is evident that
Dr. Leung's claim of a specific injury would not have been accepted had he had a
prior history of back complaints or had the mechanism of a specific injury, for
whatever reason, not proved convincing to the U.S. Department of Labor.  The doctor
was, we should remember, then only 27 years old, and thus it is easier to square his
impairment with a specific injury than a claim of diffuse degenerative disc disease,
particularly given that his pathology (and surgery) were limited to a single spinal
level (L4-5).

One my speculate that Dr. Leung's underlying degenerative spine condition would
have eventually caused the same symptoms, need for treatment, and ultimately
disability, absent the specific lifting injury.  But this interpretation is a counter-
factual, and, what is more, it requires a leap of imagination since many individuals
with spinal stenosis live a life without symptoms, treatment, or disability.  It is also
the experience of every spinal surgeon that previously asymptomatic patients with
spinal stenosis often develop symptoms acutely (which often subsequently become
chronic) after a specific injury.

As for the cervical spine injury, a 1/18/94 letter published by neurologist Charles
Jablecki, M.D. specifically links the rowing incident to a back strengthening exercise
routine—thus providing a basis, albeit indirect, to link Dr. Leung's cervical condition
to his work-related lumbar injury (Flashdrive p. 250).  (See, too, Dr. Jablecki's
10/28/98 office visit note; Flashdrive 312.)  "Based on our conservation," the
neurologist wrote in his 1/18/94 letter to Dr. Leung, "I feel that it is more probable
than not that your cervical spine problem at this time is an indirect complication of
your original work injury in 1982, for which you underwent surgery."  He continued:

26

"You are carrying out exercises in a gym, rowing activities, to strengthen the muscles in your back, as instructed as a form of home therapy for treatment of your low back injury. It was while carrying out those exercises that the first symptoms related to your right C6 radiculopathy developed, that is pain in the right side of the neck and shoulder."

While Dr. Jablecki lays out his causation opinion in this elegant 1994 letter, the defendant's seem to say: That is all well and good . . . but it is ancient history. So what of the defendant's claim that too much time has elapsed to causally connect Dr. Leung's current disability to whatever injuries occurred decades ago? On that point, I say: spinal stenosis has no expiration date. If Dr. Leung's spinal stenosis was aggravated by an injury decades ago, with no significant prior history of symptoms, and the symptoms persist in a chronic intermittent fashion over the following decades, as the ophthalmologist's copious medical records reflect, the lapse of time does not vanquish the fact that the symptoms began after, and were thus substantially caused by, a specific injury. Adjacent segment conditions develop by definition over time without an end date; they correlate positively, in fact, with time, since the principal mechanism of adjacent segment disease *is time*. If a small nail punctures a car tire leading to a leak so slow that the tire only becomes noticeably flat one month after the car runs over the nail the nail is still the cause of the flat, no matter that the piercing and the flat are separated in time.

What is more, as regards the C4-5 stenosis, one need not wrap one's head around an expanse of time: when Dr. Ostrup performed his 2004 C5-6 fusion, he considered incorporating the C4-5 level (see his 12/9/03 note; Flashdrive p. 793), which had already begun to demonstrate pathology (see the 11/22/03 cervical spine MRI). As this pathology progressed, in the aftermath of the C5-6 fusion, as demonstrated by

27

several subsequent cervical spine MRIs, the condition eventually impaired the
ophthalmologist's hand sensation. That Dr. Leung's C4-5 stenosis--one level above
the segment fused by Dr. Ostrup--progressed over time is a textbook example of the
concept of adjacent segment disease in which a lever arm formed by the C5-6 fusion
stressed the adjacent levels, causally connecting the C4-5 pathology to the C5-6
fusion.

To put a bow on my opinion, which I hold to a reasonable degree of medical
probability, Dr. Leung's 1982 and 1994 injuries are substantial factors in the cause of
the disability he now claims, which disability, as I understand it, the defendant does
not dispute. It is to the areas that were operated for specific injuries, and those areas
immediately adjacent, that are responsible for Dr. Leung's current disability, and for
his long-standing symptoms, which have been chronic and intermittent ever since his
1982 and 1994 injuries. UNUM's argument that his injuries today are due to diffuse
degenerative changes and not consistent with Dr. Leung's history of symptoms,
which began on the date of injury, were not present before, and have not resolved
since. Nor is the defense's argument consistent with the imaging evidence, which
implicates only the originally affected levels and those immediately adjacent to them.
Dr. Leung's current symptoms and related disability are due to stenosis at C4-5 and
L3-4. There is no evidence of a diffuse symptomatic condition.

## DISCLOSURE STATEMENT

The above analysis is based upon the available information at this time. If more
information becomes available at a later date, such information may or may not
change the opinions rendered in this evaluation.

My opinions are based upon a reasonable degree of medical probability.  Comments on appropriateness of care are professional opinions based upon the specifics of the case and should not be generalized.

I declare under penalty of perjury that the information contained in this report and its attachments is true and correct, to the best of my knowledge and belief, except as to information that I have received from others. As to that information, I declare that this report accurately describes the information provided to me. Signed this 9th day of August 2022, in the County of Ventura, State of California.

CARY D. ALBERSTONE, M.D., F.A.C.S.
Diplomate of the American Board
of Neurological Surgery

29

LEUNG 00044

# Cary D. Alberstone, MD, FACS
## a Professional Corporation

*1700 North Rose Avenue, Suite 250 ▪ Oxnard, CA 93030*
*Phone 805-983-1700 ▪ FAX 805-983-71444 ▪ cdalberstone@verizon.net*

_____

*Specializing in Brain and Spinal Surgery*

## Postgraduate Education

UNIVERSITY OF NEW MEXICO MEDICAL CENTER  Albuquerque, NM
Chief Resident in Neurosurgery, 1998-1999

UNIVERSITY OF NEW MEXICO MEDICAL CENTER  Albuquerque, NM
Resident in Neurosurgery, 1994-1998

HARBOR-UCLA MEDICAL CENTER  Torrance, CA
Resident in General Surgery, 1993-1994

STANFORD UNIVERSITY MEDICAL CENTER  Stanford, CA
Resident in Neurology, 1992-1993

DUKE UNIVERSITY MEDICAL CENTER  Durham, NC
Intern in Internal Medicine, 1991-1992

## Graduate Education

ALBANY MEDICAL COLLEGE  Albany, NY
M.D. with Distinction in Research, 1991

HARVARD UNIVERSITY  Cambridge, MA
M.A., History of Science, 1989

UNIVERSITY OF SOUTHERN CALIFORNIA  Los Angeles, CA
M. A., Historical Musiclogy, 1986

## Undergraduate Education

UNIVERSITY OF CALIFORNIA  Riverside, CA
B.S., Biology, 1984

LEUNG 00045

# Certificates

**DIPLOMATE**
American Board of Neurological Surgery

**FELLOW**
American College of Surgeons

**DIPLOMATE**
National Board of Medical Examiners

**QUALIFIED MEDICAL EVALUATOR**
State of California

**CERTIFIED INDEPENDENT MEDICAL EXAMINER**
American Board of Independent Medical Examiners

# Hospital Affiliations

**ST. JOHN'S REGIONAL MEDICAL CENTER**
Oxnard, CA

**PLEASANT VALLEY HOSPITAL**
Camarillo, CA

**COMMUNITY MEMORIAL HOSPITAL**
Ventura, CA

**VENTURA COUNTY MEDICAL CENTER**
Ventura, CA

# Professional Appointments

**MEDICAL DIRECTOR** Neuroscience Institute
St. John's Regional Medical Center (2006-2008)

**CHAIRMAN** Neuroscience Task Force
St. John's Regional Medical Center (2005)

**CHAIRMAN** Department of Surgery
*St. John's Regional Medical Cener (2002-2004)*

**CO-CHAIRMAN** Education Committee
St. John's Regional Medical Center (2000-2002)

Exhibit W, 31

LEUNG 00046

## Community Services

**BOARD OF DIRECTORS**
United Way of Ventura County

**ADMINISTRATIVE COMMUNITY LEADERS ADVISORY PANEL**
Camarillo Health Care District

**BLUE RIBBON MEDICAL REVIEW COMMITTEE**
Camarillo Health Care District

## Licenses

**CALIFORNIA STATE MEDICAL LICENSE** (G76620)
California State Medical Board

**DRUG ENFORCEMENT AGENCY**
US Federal Government

**CALIFORNIA STATE FLUOROSCOPY SUPERVISOR AND OPERATOR PERMIT**
State of California

## Awards and Scholarships

**BENJAMIN FRANKLIN AWARD WINNER**
(*Anatomic Basis of Neurologic Diagnosis***, Thieme, 2009**)
*Independent Book Publishers Asscoiation, 2010.*

**PHYSICIAN OF THE YEAR**
*St. John's Regional Medical Center*, Oxnard, CA, 2004

**CLINICAL PAPER AWARD (First Prize)**
Johnson & Johnson Medical Inc., 1997

**WILLIAM OSLER MEDAL**
American Association for the History of Medicine, 1990

**ALPHA OMEGA ALPHA STUDENT ESSARY AWARD (First Prize)**
Alpha Omega Alpha Honor Medical Society, 1989

**AMERICAN OSLER SOCIETY FELLOWSHIP (Oxford University)**
American Osler Society, 1988

**OSLER LIBRAY FELLOWSHIP (McGill University)**
Osler Libray, McGill University, 1987

**RICHARD T. BEEBE FELLOWSHIP IN MEDICINE**
Albany Medical College, 1990-1991

3

LEUNG 00047

RAEBURN J. WHARTON SCHOLARSHIP (Harvard University)
Albany Medical College, 1998-1989

JACK SPITALNY FELLOWSHIP
Albanry Medical College, 1988

## Professional Societies

AMERICAN BOARD OF NEUROLOGICAL SURGEONS
CALIFORNIA ASSOCIATION OF NEUROLOGICAL SURGEONS
AMERICAN COLLEGE OF SURGEONS

## Publications

### Book

Alberstone CD, Benzel EC, Najm IM, Steinmetz MP: *Anatomic Basis of Neurlogic Diagnosis*. New York: Thieme, 2009. (Independent Book Publishers Association *Benjamin Franklin Award* winner, 2010). Translated into Japanese, Turkish, and Portuguese.

### Book Chapters

Alberstone CD, Storrs BB: Magnetoencephalography and Magnetic Source Imaging. *Pediatric Neurosurgery: Surgery of the Developing Nervous System.* Philadelphia: W.B. Saunders and Co. 2000.

Alberstone CD, Weller SJ, Benzel EC: Spinal Instability: Definitions and Management Strategies. In Grossman RG and Loftus CM, eds: *Principles of Neurosurgery.* Philadelphia: Lippincott-Raven, 1999.

Alberstone CD: History. In Benzel EC and Stillerman CB, eds: *The Thoracic Spine.* St. Louis: Quality Medical Publishing, 1999.

Alberstone CD, Anson JA, Crockard HA: Foramen Magnum Lesion. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management.* New York: Churchill Livingstone, 1999.

Malone DG, Alberstone CD: Ventral Subaxial Cervical Fixation Techniques. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management* New York: Churchill Livingstone, 1999.

Alberstone CD, Benzel EC: History. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management.* New York: Churchill Livingstone, 1999.

Alberstone CD, Benzel EC: Clinical Decision-Making. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management.* New York: Churchill Livingstone, 1999.

4

LEUNG 00048

Zileli M, Naderi S, Benzel EC, Alberstone CD: Preoperative and Surgical Planning for Voiding Complications. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management.*
New York: Churchill Livingstone, 1999.

Zileli M, Benzel EC, Alberstone CD: Surgical Incisions, Positioning, and Retractors. In Benzel EC, ed: *Spine Surgery: Techniques, Complication Avoidance, and Management.*
New York: Churchill Livingstone, 1999.

Alberstone CD, Benzel EC: Cranioplasty Materials. In Rengachary SS,
Benzel EC, eds: *Calvarial and Dural Reconstruction.*
Park Ridge, Illinois: American Association of Neurological Surgeons, 1998.

Alberstone CD, Benzel EC: Polymethylmethacrylate Cranioplasty. In Rengachary SS, Benzel EC, eds: *Calvarial and Dural Reconstruction.*
Park Ridge, Illinois: American Association of Neurological Surgeons, 1998.

Alberstone CD, Benzel EC: Risk-Taking and Decision-Making. In Selman WR, Benzel EC, eds: *Geriatric Neurosurgery.*
Park Ridge, Illinois: American Association of Neurological Surgeons, 1999.

Alberstone CD, Benzel EC: The History of Thoracolumbar Decompression and Stabilization. In Dagi TF, ed: *Neurosurgery Clinics of North America.*
Philadelphia, PA: WB Saunders, 2001.

Eichbaum E, Alberstone CD, McCormack B: Posterior Fusion with Hook-Rod Instrumentation. In Fessler RG, Sekhar L, eds.; Atlas of Neurosurgeical Techniques: Spine. New York, NY: Thieme, 2006.

Eichbaum E, Alberstone CD, McCormack B:Posterior Fusion with Luque Instrumentation. In Fessler RG, Sekhar L, eds.; Atlas of Neurosurgeical Techniques: Spine. New York, NY: Thieme, 2006.


# Articles

Alberstone CD, Anson JA: Preoperative Evaluation and Management of Jugular Foramen Tumors. *Operative Techniques in Otolaryngology-Head and Neck Surgery* 7:106-112, 1996.

Alberstone CD, Benzel EC: The Control of Blood Loss during Spinal Surgery: Hemostasis and the Lateral Extracavitary Approach. *Contemporary Surgery*
52:33-40, 1998

Naderi S, Alberstone CD, Rupp FW, Benzel EC, and Baldwin NG: Cervical Spondylotic Myelopathy Treated with Corpectomy: Technique and Results in 44 Patients. *Neurosurgical Focus.* December 1996. Article 5.

Alberstone CD: The Use of Surgicel to Prevent Epidural Bleeding during Routine Craniotomy. *Contemporary Surgery for Residents* 5:19-21, 1997.

Alberstone CD, Rupp FW, Benzel EC: Holographic Imaging and Spine Surgery: Background and Clinical Applications. *Orthopedics & Sports Medicine,* 1998.

LEUNG 00049

Alberstone CD: The Use and Abuse of History. *The Pharos* 52:12-15, 1989.

Alberstone CD, Benzel EC, Garcia D: Neurosurgery in the Marketplace. *Bulletin of the American Association of Neurological Surgeons.* Spring, 1998.

Alberstone CD, Skirboll SS, Benzel EC, Sanders JA, et al: Magnetic Source Imaging and Brain Surgery: Presurgical and Intraoperative Planning in 26 Patients. *Journal of Neurosurgery* 92:79-90, 2000.

Alberstone CD, Benzel EC: The Control of Blood Loss during Spinal Surgery: Hemostasis and the Lateral Extracavitary Approach. *Contemporary Surgery for Residents* 5:5-12, 1997.

Alberstone CD, Benzel EC: The Surgical Management of Rheumatoid-Related Cervical Spine Pathology. Accepted for *Postgraduate Medicine* 107:199-207, 2000.

Alberstone CD, Benzel EC, Garcia D: Whither Neurosurgery? *Neurosurgical Focus.* August, 1998.

Alberstone CD, Rupp FW, Anson JA: Spinal Artery Aneurysm of the Lateral Sacral Artery: Case Report. *Journal of Neurosurgery* 92:101-104, 2000.

Whisenant SW, Alberstone CD, Benzel EC, Clevenger FW, Finnen NP: Risk Factors for Prolonged Mechanical Ventilation in Tracheotomized Traumatic Brain Injury Patients. Submitted for publication.

Alberstone CD: Repairing or Replacing the Dura: A History of Dural Grafts, Substitutes, and Closure. Submitted for publication.

Alberstone CD: Mind Your Spine. Healthy Attitudes. Camarillo Health Care District. May and June, 2001.

Alberstone CD: Brain Matters. Healthy Attitudes. Camarillo Health Care District. July and August 2001.

Alberstone CD: Geiratric Neurosurgery. Physician Practice. September, 2006.

## Letter

Eldridge R, Alberstone CD: Genetic Basis of Familial Amyotrophic Lateral Sclerosis. N Eng J Med 325:1382, 1991.

## Posters and Oral Presentations

Repairing or Replacing the Dura: A History of Dural Closure, Grafts, and Substitutes. Presented at the American Association of Neurological Surgeons annual meeting (paper #822). Minneapolis, April 1996. Alberstone CD, Anson JA.

Virchow among the Craniologists: His Contribution to the Problem of Craniosynostosis. Presented at the Joint Section on Pediatric Neurological Surgery of the American Association of Neurological Surgeons and Congress of Neurological Surgeons (paper #56). Charleston, December 1996. Alberstone CD.

6

LEUNG 00050

Role of Angiography in the Development of Early Modern Aneurysm Surgery. Presented at the Section on Cerebrovascular Surgery of the American Association of Neurological Surgeons and Congress of Neurological Surgeons (poster #31).
Anaheim, February, 1997. Alberstone CD.


The Caudal Epidural Space: An Anatomic Study of the Soft Tissue Structures Surrounding the Terminal Thecal Sac. Presented at the Section on Disorders of the Spine and Peripheral Nerves of the American Association of Neurological Surgeons and Congress of Neurological Surgeons (poster #73).
Newport Beach, February, 1997. Alberstone CD, Choi W, Abdallahian NP, Kornfeld M, Benzel EC.

Mozart and Neurosurgery: The Misadventures of a Composer's Cranium. Presented at the American Association of Neurological Surgeons annual meeting (paper #835).
Denver, April, 1997. Alberstone CD.

Magnetic Source Imaging for Cerebrovascular Surgery. Presented at the Section on Cerebrovascular Surgery of the American Association of Neurological Surgeons and Congress of Neurological Surgeons (paper #26). Orlando, February, 1998. Gross JD, Wecht DA, Alberstone CD, Lee R, Montgomery A, Tessman CL.

Intraoperative Doppler Ultrasonography to Assess Vertebral Artery Patency during Atlantoaxial Transarticular Screw Fixation. Presented at the Rocky Mountain Neurosurgical Society.
Vail, June, 1998. Alberstone CD, Baldwin NG

Magnetic Source Imaging and Brain Surgery: Presurgical and Intraoperative Planning in 26 Patients. Presented at the Rocky Mountain Neurosurgical Society.
Vail, June, 1998. Alberstone CD, Benzel EC, Saunders JA, et al.

Exhibit W, 36

LEUNG 00051

# EXHIBIT X

# cda Cary D Alberstone MD FACS

**NEUROLOGICAL SURGERY**

February 16, 2023

Nichole D. Podgurski
Michael B. Horrow
DONAHUE HORROW
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245

RE:    **RICHARD LEUNG, M.D. v. UNUM LIFE INSURANCE CO.**

## SUPPLEMENTAL REPORT

Dear Mr. Podgurski:

I have reviewed the following materials at your request:

### MATERIALS REVIEWED

1. Transcript of the deposition of Marvin Friedlander, M.D. taken December 8, 2022
2. Transcript of the deposition of Steven Milos, M.D. taken December 9, 2022
3. Transcript of the deposition of Philip Lahey, M.D. taken January 9, 2023
4. US Department of Labor (4157 pages)

1700 North Rose Avenue  Suite 250
Oxnard  California 93030
t 805 983 1700   f 805 983 7144

My comments are as follows:

- Without reviewing the films, I would submit that the doctors whose depositions I read are at a significant disadvantage to opine about this case.

- That Dr. Milos and Lahey are not spine surgeons makes one wonder how they are fit to offer expert opinions in this case, which is a case about spinal injury, spinal pathology, and spinal surgery.

- Without disputing that multiple levels of Dr. Leung's spine demonstrate degenerative changes—a normal finding in a patient his age--Dr. Leung's symptoms—the one's that preclude him from working—are *nerve related.* These symptoms were present at the time of his specific injuries, and have, unsurprisingly, become increasingly intolerable.

- It is true that a degenerative condition of the spine may provide a matrix for symptoms, such as pain, numbness, and tingling—the idea of an eggshell plaintiff captures this concept—but this is not the same as saying that a degenerative condition *caused* any symptoms, given that we know many people in the general population have degenerative spinal conditions in the absence of symptoms. Further, there is a particularly strong reason to doubt that spinal degeneration caused Dr. Leung's symptoms since they arose in the immediate aftermath of two admitted injuries. Identifying degenerative changes on imaging studies is not the same as proving causation.

- If we can agree that Dr, Leung developed symptoms due to specific injuries how is it that we intercalate a separate cause when the same symptoms persist, despite years of treatment, over decades? The persistence of those symptoms, despite surgical intervention, is abundantly documented in the thousands of

2

pages of medical records contained within the Department of Labor records I reviewed.

- Drs. Milos and Lahey's unawareness that Dr. Leung had been treated—for decades—under a worker's compensation claim diminishes their credibility to opine in this case: Treatment over decades, beginning immediately after, but not before, the specific injuries, constitute the most overwhelming evidence that Dr. Leung's current symptoms are due to specific injuries.

- On the other hand, Dr. Milos is correct in his testimony that abnormal mechanics of the spinal joints can cause abnormal spinal dynamics that lead to changes in adjacent motion segments. This is the concept of adjacent segment disease, which would explain Dr. Leung's focal abnormalities at the L3-4 level, and at the C4-5 and C6-7 levels.

- Dr. Milos also agrees, importantly, that the 1982 injury activated the events that ultimately led to the lumbar symptoms and lumbar radiculopathy that Dr. Leung had in May 2020—and that it *substantially contributed* to it.

- With prompting from his attorney, Dr. Milos retracted the word "substantial" from his opinion that the 1993 rowing incident contributed to Dr. Leung's 2020 cervical symptoms, though he agreed that the 1993 rowing accident herniated the C5-6 disc and that that set into motion the cervical symptoms and cervical radiculopathy that Dr. Leung had as of May 2020.

- Dr. Lahey opined that "the insured's symptoms started with a lumbar disc herniation at L4-5 and have continued since that time," though he somehow (contradictorily) concludes that Dr. Leung's current symptoms are due to "diffuse and multilevel.degenerative disc disease," despite the similarity of symptoms then and now. This conclusion seems to ignore the objective findings in this case. Take, for example, the opinion of orthopedic spine

Exhibit X, 3            LEUNG 00693

surgeon Paul Kim, M.D. who actually reviewed Dr. Leung's lumbar spine MRI in 2021 and concluded that it "demonstrates . . . severe central stenosis at L3-4 and foraminal stenosis at L4-5." These imaging findings are, moreover, consistent with the symptoms Dr. Leung described in 2021 in which prolonged standing, walking, and lumbar extension aggravated his back and radiating leg pain, symptoms typical of lumbar stenosis.

- Somehow Dr. Lahey suggests that Dr. Leung had neither cervical nor lumbar radiculopathy as of May 2020. This is difficult to reconcile, and certainly contradicts the evidence in this case. Witness, for example, Dr. Leung's 2022 consultation with the same Dr. Kim in which the orthopedist found bilateral C5-6 numbness. Equally inexplicable is Dr. Lahey's assertion that right hand tingling and numbness did not disable Dr. Leung, since this, too, contradicts the evidence. (See, for example, Dr. Leung's 6/17/20 letter to UNUMM specifically citing numbness in his hands as one of the symptoms that has disabled him.)

- Dr. Friedlander testified that adjacent segment disease was not the cause of Dr. Leung's "pain, numbness, weakness, and tingling that he experienced in May 2020" because, according to Friedlander, "the time proximity between the changes in the MRI and the time he underwent his surgery." This opinion (if I understand it) is curious given that adjacent segment disease, by definition, develops over time. His opinion, by the way, is at odds with that of Dr. Kim whose interpretation of the 12/15/21 Sharp cervical spine MRI went thus: the MRI "demonstrates C5 ACDF with adjacent segment disease at C4-5 and C6-7. There is severe foraminal stenosis at C4-5 ad C6-7." Dr. Kim's diagnoses were as follows: 1. L3-4 stenosis. 2. Neurgenic claudication. 3. Adjacent segment disease at C4-5 and C6-7.

4

- Dr. Friedlander testified that a fusion or destabilization of the spine by removing joints can cause abnormal mechanics of the spine, but not "a standard laminectomy or a standard discectomy," testifying further that a "standard laminectomy" does not require the surgeon to "take the facet joints." This, again, is contrary to fact: a standard laminectomy almost always requires taking a portion of the facet joints (in addition to the lamina and ligamentum flvaum) all of which contribute to spinal stability.

- Dr. Friedlander's testified that the specific injury in 1993 played no role in the development of cervical radiculopathy in 2020 except for the "fixed deficit of the numbness that he [Dr. Leung] complained about in his hand after surgery that he was able to function with." Here, Dr. Friedlander is conceding that a specific injury caused Dr. Leung's 2020 hand numbness, but seems to imply that it had not gotten worse, or harder to tolerate. The implication here is that Dr. Leung is not disabled. But even UNUMM, as I understand it, has granted Dr. Leung disability. If we can agree that Dr. Leung is disabled due to his hand numbness, and that the numbness is due to the 1993 injury, as Dr. Friedlander testified, then I think we are in agreement.

- Dr. Friedlander's testimony that Dr. Leung's cervical adjacent segment disease cannot be responsible for his cervical symptoms because this is a condition that develops early after surgery, not 40 years later, ignores the medical record, which reveals a long history of chronic neck pain, *progressively* worsening. Dr. Leung's neck symptoms have not resolved, nor has his adjacent segment disease ceased progressing.

- The slim odds of developing adjacent segment disease suggested by Dr. Friedlander—putting aside that I dispute his statistics—are moot after the condition has developed. If a particular risk materializes it makes little

5

LEUNG 00695

difference what the chance of it materializing was. Nor is it true that there is severe degeneration in Dr. Leung's cervical spine at every level.

- Dr. Friedlander's testimony that Dr. Leung's symptoms are due to aging and wear and tear over the decades since his injuries ignores the fact, evident in the voluminous medical records, that Dr. Leung's symptoms are not the product of old age since they were present when the doctor was young, and have never completely gone away. Has time aggravated these symptoms? You bet. But this does not obviate what caused them.

- Dr. Friedlander's method of applying the radiologist's interpretation of an MRI to the patient's symptoms is backward: the patient's symptoms are primary and the MRI is an adjunct in determining the specific cause of those symptoms. Diffuse degeneration of the spine does not cause tingling and numbness, and it is common among the general population, most of whom are asymptomatic. And since Dr. Leung's tingling and numbness developed after a specific injury, and has not resolved, it serves to reason that the injury is "still" responsible. If you lose your hair as a young man due to a toxic agent, and the hair never grows back, it is a stretch to argue that in late adulthood the man is hairless because of old age. More to the point, to review a radiologist's report and identify "diffuse degeneration" does not vanquish the patient's history. And it his history, not the MRI, which is determinative.

- In his 32 page 3/29/21 federal Worker's Compensation Second Opinion Orthopedic Evaluation, published less than a year after Dr. Leung's disability retirement, orthopedist Michael Einbund, M.D. opined that "as relates to the diagnosis of lumbar degenerative disc disease with associated disc displacement, status post laminectomy and discectomy, L4-5, 1983, the diagnosis is considered a *permanent aggravation*, the structural changes

6

*occurring as a result of the 1983 laminectomy and discectomy*, as well as the scar tissue foramation noted in recent MRI scans, which has made a material worsening of the underlying condition." He continues: "The work related conditions have not resolved. There is evidence to support that the above work related conditions are still active and causing objective findings." Concluding, Dr. Einbund writes: "His *[Dr. Leung's] disability is a direct result of the accepted work-related condition*. His work related conditions have persisted, as well as worsened due to the natural progression of the degeneration of the spine." [Emphasis mine.]

- In another evaluation, dated 1/21/21, this one by the neurosurgeon who performed Dr. Leung's 2004 cervical fusion, Richard Ostrup, M.D., Dr. Ostrup placed the cause of Dr. Leung's complaints squarely on the C4-5 area (adjacent to the C5-6 fusion) and the L3-4 area (adjacent to the L4-5 laminectomy). Such observations should not be controversial or surprising to anyone who has carefully reviewed Dr. Leung's voluminous medical records, including his most recent MRI scans. In the same vein, it should not be overlooked that at the time of his cervical injury, and his surgical evaluation for the same, the C4-5 disc was abnormal, and the surgeon contemplated incorporating it in his fusion. "The question is," Dr. Ostrup mused at the time, "whether or not to incorporate the C4-5 level as well." Dr. Ostrup ultimately chose not to, but obviously this disc would remain vulnerable to worsening due to the development of adjacent segment disease, which as history proved, transpired.

- Dr. Ostrup, like Dr. Einbund, of course, both had the additional advantage of examining Dr. Leung. Their opinions thus, should be given due respect, respect, which, the U.S. Department of Labor has unwaveringly granted them.

7

Exhibit X, 7

LEUNG 00697

Their opinions, by the way, are consistent with another treating physician's, Michael Moon, M.D., the pain management specialist who has likewise attributed Dr. Leung's ongoing symptoms to the specific injuries for which the Department of Labor has consistently insured his treatment.

- Should anyone question the persistence of Dr. Leung's symptoms over the years, this list of dates of cervical and lumbar imaging studies (assuredly incomplete) should disabuse them of any skepticism. (Note that on most of these dates multiple imaging studies were obtained.):

  o 3/15/85, 1/5/94, 4/28/99, 9/22/02, 11/22/03, 1/19/04, 3/1/04, 428/04, 7/14/04, 7/15/04, 9/16/04, 10/19/04, 9/2/06, 6/4/07, 5/19/10, 4/20/11, 9/2/11, 1/14/13, 9/21/15, 9/21/15, 11/2/16, 4/17/17, 8/30/18, 4/3/20, 12/15/21.

_____

CARY D. ALBERSTONE, M.D., F.A.C.S.
Diplomate of the American Board
of Neurological Surgery

# EXHIBIT Y



## Nichole D. Podgurski
**Partner | Donahue & Horrow LLP**
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245
t:  (310) 322-0300  f: (310) 322-0302
w:  DonahueHorrow.com

   

---

**From:** Kojima, Keiko J. <KKojima@bwslaw.com>
**Sent:** Monday, August 15, 2022 4:21 PM
**To:** Nichole Podgurski <npodgurski@donahuehorrow.com>; Maguire, Daniel W. <DMaguire@bwslaw.com>
**Cc:** Michael Horrow <mhorrow@donahuehorrow.com>; Barbara Jeong <bwjeong27@outlook.com>
**Subject:** Re: Leung v. Unum: Plaintiff's Supplemental Disclosures

Nichole,
We will provide Plaintiff's supplemental production to Unum Life per your request.   Yes, all documents that Plaintiff desires to submit to Unum Life should be sent to our firm for transmittal instead of any direct communication between your office and Unum Life itself.  Thank you.

- Keiko

**Keiko J. Kojima | Partner**
Pronouns: she, her, hers
**Burke, Williams & Sorensen, LLP**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2842 | t - 213.236.0600 | f - 213.236.2700
kkojima@bwslaw.com | vCard | bwslaw.com

---

**From:** Nichole Podgurski <npodgurski@donahuehorrow.com>
**Date:** Monday, August 15, 2022 at 3:40 PM
**To:** Daniel Maguire <DMaguire@bwslaw.com>, Keiko Kojima <KKojima@bwslaw.com>
**Cc:** Michael Horrow <mhorrow@donahuehorrow.com>
**Subject:** Leung v. Unum: Plaintiff's Supplemental Disclosures

[EXTERNAL]

---

Dan and Keiko,

Attached are Plaintiff's Supplemental Disclosures.

Please confirm that you are providing the supplemental production, which includes the report of Dr. Alberstone, to your client and that these documents are received by Unum and included in the claim file as part of ongoing litigation.

If not, we will send the supplemental production directly to your client Unum.

Thank you in advance,
Nichole



## Nichole D. Podgurski
**Partner | Donahue & Horrow LLP**
1960 E. Grand Avenue, Suite 1215
El Segundo, CA 90245
t:  (310) 322-0300  f: (310) 322-0302
w: <u>DonahueHorrow.com</u>

   

# EXHIBIT Z

3. Claimant provides more information than requested to facilitate claim processing. In addition to the initial claim form, Dr. Leung submitted a 10-page narrative that detailed his history from 1981 to the date of disability. Throughout the duration of the claim, he submitted multiple narratives both on the telephone and in writing.

4. Omission of material information. Dr. Leung failed to mention anything about the sale of his business on November 1, 2019. Dr. Leung did not mention that he had suffered a myocardial infarction with stent placement in early February 2019 [000257] nor did he submit a corresponding claim. In a disability claim this type of information is important.

5. Dr. Moon "certified" Dr. Leung as totally and permanently disabled for purposes of the worker's compensation carrier, Unum and Northwest Mutual.  Additionally, in his office visit dated April 8, 2020 Dr. Moon indicates that "the patient believe [sic] the physical limitations are interfering with his ability to perform his usual and customary duties as an Ophthalmologist. He will medically retire on April 30, 2020." First, it is highly unusual for an attending physician to use language that is used in an insurance policy. Dr. Moon submitted certifications to Worker's Compensation, Unum, and Northwestern that Dr. Leung was totally and permanently disabled. This is in stark contrast to the FMLA paperwork where "Dr. Moon" indicated Dr. Leung needed a "leave of absence to obtain a course of recommended treatment to include physical therapy, observation, and surgical options (once off blood thinners)". He estimated the length of the FMLA accommodation "To be determined based on response to treatment to include physical therapy, observation, and surgical options (once off blood thinners)." [Moon deposition exhibit, 1049]

### Cary Albertstone Report and Ongoing Duty of Good Faith

When a claim has been closed by an insurer and claimant has chosen to file a lawsuit, the ongoing duty of good faith may be satisfied through the process of litigation. Thus, once the claimant decides to pursue a decision from a court of competent jurisdiction it is not industry practice or appropriate for the claim department to reopen a closed claim and to actively manage a closed claim that is the subject of litigation. In this case Dr. Leung's attorneys submitted a Medical Report and a "Supplemental Report" by Cary D. Albertstone dated August 19, 2022 and February 16, 2023 respectively. I note the Complaint against Unum was filed on April 25, 2022 and his claim was closed on June 28, 2022.

The claim department does not typically manage or review these types of documents in a vacuum in litigation. In this case Unum sought to subpoena Dr. Albertstone's records. This request was met with a refusal to produce the documents. It is untenable that Unum is not allowed access to the information the report was based upon.  It is unclear, from a claim department perspective what Dr. Albertstone's role is in the production of his reports. The objection to the subpoena indicates he is one of Dr. Leung's "experts". It is not industry practice in this type of situation to review these types of records in litigation. The scope of discovery and expert disclosures in litigation is voluminous and is a part of the process of litigation. Unum has acted within industry standards and practices with respect to Dr. Albertstone's "expert" reports.

### Management Oversight

Management oversight through Management reviews was consistent throughout the claim.
Key decision points in the file were reviewed by Adam Stimson and Jamie Allard. Additionally, during the appeal an Appeal Quality Consultant was involved with the claim.