Daniel W. Maguire (SBN 120002)
E-mail: dmaguire@bwslaw.com
Michael B. Bernacchi (SBN 163657)
E-mail: mbernacchi@bwslaw.com
Keiko J. Kojima (SBN 206595)
E-mail: kkojima@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA 90071-2953
Tel: 213.236.0600 | Fax: 213.236.2700

Attorneys for Defendant Unum Life
Insurance Company of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. LEUNG, MD,<br><br>    Plaintiff,<br><br>    v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 to 10, inclusive,<br><br>    Defendant. | Case No. 3:22-cv-00767-W-JLB<br><br>**DEFENDANT UNUM LIFE INSURANCE COMPANY OF AMERICA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Filed concurrently with Declarations of Shannon Cartier and Michael B. Bernacchi; and [Proposed] Judgment]*<br><br>Date: September 18, 2023<br>Ctrm: 3C<br><br>**NO ORAL ARGUMENT PURSUANT TO LOCAL RULE** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on September 18, 2023, or as soon thereafter as the

matter may be heard in Courtroom 3C of the above-referenced Court, located at 221

West Broadway, San Diego, CA 92101, Defendant Unum Life Insurance Company of America ("Unum") will and does move for an order granting summary judgment in favor of Unum on all causes of action in the Complaint or, alternatively partial summary judgment of the causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing ("bad faith"), and claim for punitive damages.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure. There are no triable issues of material fact as to the alleged causes of action asserted in the Complaint against Unum. There has been no breach of the insurance contracts under which Plaintiff seeks benefits, and thus no breach of the implied covenant of good faith and fair dealing or basis for punitive damages. In the alternative, Unum will move for partial summary judgment under Rule 56(b) on the following issues:

(1)    The first cause of action for breach of contract must fail because no benefits are payable under the disability insurance contracts. Plaintiff has not sustained his burden to prove that his claimed disability is due to accident as opposed to sickness.

(2)    The second cause of action for "bad faith" must fail because no benefits are payable under the insurance contracts. The claim must also fail because there has been no unreasonable withholding of insurance benefits and, at the very least, a legitimate issue of Unum's liability existed when the decision was made to deny further benefits.

(3)    Plaintiff's claim for punitive damages fails as a matter of law because there is no evidence that Unum acted maliciously, fraudulently or despicably toward him, let alone the clear and convincing evidence required by California Civil Code Section 3294(a).

///

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

2

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Motion will be based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities; the Declarations of Shannon Cartier ("Cartier Decl.") and Michael B. Bernacchi ("Bernacchi Decl."), and the exhibits attached thereto; the pleadings and papers on file with the Court; any matter of which this Court may take judicial notice; argument of counsel; and such other matters this Court finds relevant at the time of hearing.

Dated: July 24, 2023

BURKE, WILLIAMS & SORENSEN, LLP

By: *s/ Michael B. Bernacchi*
Daniel W. Maguire
Michael B. Bernacchi
Keiko J. Kojima
Attorneys for Defendant Unum Life
Insurance Company of America

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

3

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ............................................................................... 1

II. STATEMENT OF FACTS ................................................................. 2

    A.  The Coverage ............................................................................ 2

    B.  The 1980's and the Original Lumbar Spine Issue .................... 4

    C.  The 1990s and the New Cervical Issue ................................... 5

    D.  The 2000s and the Surgery for Cervical Degenerative Disc Disease ...................................................................................... 6

    E.  The 2010s and Leung's Decision to Sell His Company and Go to Work for NVISION, Inc. ................................................. 7

    F.  2020, COVID, and the Opportunistic And Inconsistent Disability Claims ....................................................................... 8

    G.  The Specific Disability Claim to Unum ................................... 9

        1.  The Initial Disability Claim Approval ............................ 9

        2.  The Medical Reviews as to Etiology ............................ 10

        3.  Unum's Determination That Disability Was Due to Sickness ...................................................................... 12

        4.  Leung's Initial Appeal Without Medical Support .......... 12

        5.  The Claim of Financial Hardship and the Second Appeal ........ 13

    H.  The Lawsuit ............................................................................ 14

III. THE STANDARD FOR SUMMARY JUDGMENT ...................... 14

IV. DISCUSSION ................................................................................. 15

    A.  Unum is Entitled to Summary Judgment on the Breach of Contract Claim ...................................................................... 15

    B.  Plaintiff's Bad Faith Claim Fails Because At Best, a Genuine Dispute Existed as to Unum's Liability ................................. 19

        (a)  Standards for Bad Faith Claims ..................................... 19

        (b)  There Is a Genuine Dispute as to Unum's Liability Under the Contract ...................................................... 20

    C.  The Punitive Damages Claim Fails as a Matter of Law ......... 23

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

i

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

V.    CONCLUSION ............................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Federal Cases

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................... 15

*Cox v. Paul Revere Life Ins. Co.*,
  No. 08CV1353-LAB (WMC), 2010 WL 11508572 (S.D. Cal. July
  29, 2010) ........................................................................................................ 16

*Cranmore v. UnumProvident Corp.*,
  430 F.Supp.2d 1143 (D. Nev. 2006) .............................................................. 17

*Davis v. Unum Life Ins. Co. of Am.*,
  444 F.3d 569 (7th Cir. 2006) ......................................................................... 23

*Glenn C. Chasteen*,
  42 ECAB 493 (1991) ...................................................................................... 22

*Guebara v. Allstate Ins. Co.*,
  237 F.3d 987 (9th Cir. 2001) ......................................................................... 19

*Johnson v. Minnesota Mut. Life Ins. Co.*,
  799 F.Supp. 75 (N.D. Cal. 1992) ................................................................... 15

*Lunsford v. American Guarantee & Liability Ins. Co.*,
  18 F.3d 653 (1994) ......................................................................................... 23

*Nolan v. Heald College*,
  745 F. Supp. 2d 916 (N.D. Cal. 2010) ........................................................... 23

*Phelps v. Provident Life & Acc. Ins. Co.*,
  60 F.Supp.2d 1014 (C.D. Cal. 1999) ............................................................. 19

*Porsandeh v. Prudential Prop. & Cas. Ins. Co.*
  (C.D. Cal. Apr. 30, 2004) .............................................................................. 24

*Schar v. Hartford Life Ins. Co.*,
  242 F.Supp.2d 708 (C.D. Cal. 2003) ............................................................. 15

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

iii

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

**State Cases**

*Beck v. State Farm Mut. Auto. Ins. Co.*, 54 Cal.App.3d 347 (1976).......................24

*Blake v. Aetna Life Ins. Co.*,
    99 Cal.App.3d 901 (1979) ...................................................................15

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*,
    90 Cal. App. 4th 335 (2001). ........................................................19, 20

*Fraley v. Allstate Ins. Co.*,
    81 Cal.App.4th 1282 (2000) .........................................................19, 20

*Garvey v. State Farm Fire & Cas. Co.*,
    48 Cal. 3d 395 (1989) ...........................................................................15

*Kendall Yacht Corp. v. United California Bank*,
    50 Cal.App.3d 949 (1975) .....................................................................24

*Love v. Fire Ins. Exch.*,
    221 Cal.App.3d 1136 (1990) .................................................................19

*Mock v. Michigan Millers Mut. Ins. Co.*,
    4 Cal.App.4th 306 (1992) ......................................................................24

*Nat'l Life & Accident Ins. Co. v. Edwards*,
    119 Cal. App. 3d 326 (1981) ...........................................................15, 16

*Rappaport-Scott v. Interinsurance Exch. of the Auto. Club*,
    146 Cal.App.4th 831 (2007) .........................................................19, 20

*San Diego Hous. Comm. v. Indus. Indem. Co.*,
    68 Cal. App. 4th 526 (1998) .................................................................15

*Schilk v. Benefit Trust Life Ins. Co.*,
    273 Cal.App.2d 302 (1969) ...................................................................17

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*,
    78 Cal.App.4th 847 (2000) ...................................................................24

*Stewart v. Truck Ins. Exch.*,
    17 Cal.App.4th 468 (1993) ...................................................................24

*Tomaselli v. Transamerica Ins. Co.*,
    25 Cal.App.4th 1269 (1994) .........................................................19, 24

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

iv

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

*Willden v. Wash. Nat'l Ins. Co.*,
  18 Cal.3d 631 (1976) ............................................................................... 16

**Federal Statutes**

5 U.S.C. 8101 et seq. ................................................................................ 22

Federal Employees' Compensation Act ("FECA") ..................................... 22

**State Statutes**

California Civil Code
  Section 3294(a) ..................................................................................... 24
  section 3295(c) ..................................................................................... 24

**Rules**

Federal Rules of Civil Procedure
  Rule 56(a) ............................................................................................. 14
  Rule 56(c) ............................................................................................. 15

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

v

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiff Richard Leung ("Leung") is a retired ophthalmologist who applied for and received coverage under five individual disability policies issued by Unum between 1982 and 1993.  The policies provide a combined benefit of approximately $10,000 per month if he is unable to perform the material and substantial duties of his occupation.  Disabilities caused by a *sickness* provide a limited period of benefits (e.g., 24 months) while disabilities caused by an *accident* are potentially payable for life if the insured becomes disabled before the first policy anniversary date after the insured turns age 65.  At issue in this case is the etiology of Leung's disability (injury vs. sickness).

In May of 2020, at the age of 64, Leung submitted a disability claim to Unum asserting an inability to work as an ophthalmologist due to lower back and neck problems.  Leung attributed these problems to alleged accidents he sustained back in 1982 and 1993.  He sought lifetime benefits.  Unum determined that Leung's disability resulted from congenital issues and degenerative changes to his spine — a sickness under the policies.  Unum thus approved his disability claim but limited benefits to 24 months.  This litigation followed.

Unum seeks summary judgment on the entire Complaint.  First, the breach of contact claim fails because Leung cannot meet his burden to prove Unum breached the insurance contracts.  All benefits payable under the policies have been paid.  Although the parties dispute *medical* causation, Unum is entitled to judgment under the legal issue of causation.  As a matter of law, Leung's claim that his 1982 and 1993 back and neck injuries were "proximate" causes of his total disability nearly 30-40 years later, does not withstand scrutiny.  Leung worked his entire career as an ophthalmologist after sustaining these injuries.  As Leung himself admitted in his application for the 1987 Unum policy, he had a "complete recovery" from his 1983 back surgery with "no residual" symptoms.  His 1993 neck injury resolved

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

spontaneously. In the interim decades between the accidents and Leung's claim at age 64, Leung was not struggling to work. Rather, he was an extremely high functioning professional who: (1) built his ophthalmology practice into one of the most successful practices in the San Diego area; (2) consistently traveled both domestically and internationally (e.g., safaris, ski trips, etc.); and (3) worked out at the gym 5-7 days a week and engaged in a variety of physically demanding extra-curricular activities such as tennis, skiing, golf and scuba diving.

The "process of nature" rule under California law rule requires an insurer to relate the onset of a disability back to the time of the accident whenever "***justice***" and "***logic***" dictate that the ***natural*** *process of nature* following the accident "rendered the person affected to a state of total disability." Here, Leung made his disability claim 30-40 years after these accidents, at the normal retirement age of 65, after he sold his practice for nearly $10 million dollars and after his remaining opportunities to earn further income had evaporated due to the COVID pandemic.

Second, Plaintiff's bad faith claim fails because a genuine issue existed as to Unum's liability at the time of its claim denial. The undisputed facts establish that Unum properly reviewed and decided the disability claim. It promptly investigated the claim upon submission, and promptly paid benefits while investigating the etiology issue. In assessing etiology, it conducted seven medical reviews and provided Leung and his physicians many opportunities to comment on those reviews before ultimately determining that his disability was due to a sickness.

Finally, Plaintiff's punitive damages claim fails because there is no evidence, let alone the required clear and convincing evidence, that Unum acted with malice, oppression or fraud.

## II. __STATEMENT OF FACTS__

### A. __The Coverage__

From 1982 to 1996, Unum issued five disability income policies to Leung, which provide benefits to age 65 or 24 months of benefits, whichever is later.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

2

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

[Cartier Decl. ¶ 2; Exhs. 1-004 (5/5/82 effective date); 2-015 (5/11/87); 3-004 (5/5/90); 4-004 – 5 (5/5/93); 5-004–5 (5/5/96).]   Beyond that date, continuing total disability benefits are available for an insured's lifetime, if total disability is due to an accident, rather than a sickness.  [*Id.*]  For Policy LAD016015 (5/11/87 effective date), the Lifetime Accident Benefit Rider provides in relevant part:

"BENEFITS

On the later of the policy anniversary when the lnsured's age is 65 or the end of the Maximum Benefit Period, the Disability Benefit Provision is amended to read as follows:

We will pay the Maximum Disability Benefit in any month after the Insured has satisfied the Elimination Period that:

1. the Insured is totally disabled; and

2. that total disability:

a. is the result of injury which occurred before the policy anniversary when his age was 65 and while this rider was in effect; and

b. began before the policy anniversary when his age was 65 and has been continuous until the month for which this benefit is payable."

[Exh. 2-015]

Similarly, Policy Numbers LAN661286, LAN780636, LAN782020 and LAN782990 provide the following Maximum Monthly Benefit duration for Total Disability:

"Accident – [] To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin.  [] Thereafter for as long as Total Disability continues, if Total Disability began prior to age 65 policy anniversary.

Sickness - [] To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin. [] Thereafter for as long as Total Disability continues, if Total Disability began prior to age 55 policy anniversary."

[Exhs. 1-004; 3-004; 4-004 – 5; 5-004–5]

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

## B. The 1980's and the Original Lumbar Spine Issue

In 1982 Leung was in medical school and performing his third-year rotation at the Veteran's Administration Hospital when he reportedly injured his back while lifting a patient out of bed. [Cartier Decl., ¶3, Exh. 6-017; Bernacchi Decl., ¶4; Exh. 32-001] CT scans taken shortly after the incident showed *congenital* deformities (stenosis) in the lumbar/sacral spine areas as well as some nerve route entrapment at L4-5 due to a herniated disc. [Bernacchi Decl., ¶4; Exh. 33-001, 002; 37-0001] After conservative treatment failed, Leung was informed that he needed a laminectomy to address the congenital spinal stenosis. His doctors were unsure if the disc would also need to be resected until the operation was actually performed. [Bernacchi Decl., ¶5; Exh. 34-001, 002] Leung underwent the laminectomy in February of 1983. [Exh. 35-001] During the operation, his surgeon also decided to resect a portion of the L4-5 disc. [Exh. 35]

Because Leung was working at the V.A. at the time, he sought coverage under the federal worker's compensation program through the Department of Labor (DOL). The claim was initially denied on the grounds that the primary reason for the surgery was spinal stenosis which was completely unrelated to the disc Leung allegedly herniated while lifting a patient. [Bernacchi Decl., ¶6; Exh. 37-0001, 002] However, following a letter from Leung's doctor indicating that the treatment and surgery were also for the herniated disc, the worker's compensation carrier decided to cover the claim. The year after the operation Leung wrote to the worker's compensation carrier and demanded a buy-out of his claim. [Bernacchi Decl., ¶7; Exh. 38-001, 002] In response, the DOL explained to Leung that while it did not offer "buy-outs," it would continue to cover any medical treatment associated with his lower back and he could always *resubmit* a claim for disability if he became unable to work due to his lower back at any age. [Exh. 38-003]

The disc dissection was successful, but the spinal stenosis remained after the operation, because it was congenital. Accordingly, Leung continued to *sporadically*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

treat for some low back pain throughout the 1980s and early 1990s.  [Bernacchi Decl., ¶8; Exh. 39(a); Exh. 39(b)]  However, pain did not limit his activities.[1]  After a short period of disability following the surgery, Leung resumed his regular gym workouts, playing tennis and even returning to skiing within two years.  [Bernacchi Decl., ¶¶8, 17; Exh. 39(a)-001; Exh. 46(a)-001]; He completed medical school, his residency in ophthalmology at U.S.C., and began working as an ophthalmologist in the Los Angeles area.  [Exh. 53-0002 (9:12-18, 9:22- 24, and 10:1-11)].

## C.  The 1990s and the New Cervical Issue

In the early 1990s Leung continued to use the worker's compensation system to sporadically treat for low back pain.  By this time, he had moved down to San Diego and started his own ophthalmology practice.  [Exh. 53-003 (10:7-11)]  He initially operated out of a room he rented from another physician, sharing his receptionist.  [Exh. 53-003 (11:9-21)]  By 2006, Leung had built his medical practice to employing a dozen individuals and generating over a million dollars in revenue each year.  [Exh. 53-002 (13:16-21); Exh. 40-001, 002]  Leung remained very active, playing tennis, skiing, scuba diving and golfing.  [Bernacchi Decl., ¶9; Exh. 53-007, 009 (28:3-30:25)]

Leung also exercised on a regular basis.  In 1993, he decided to join a gym near work.   He hired a young personal trainer named Char Self who prepared an exercise routine for Leung which included free weights, resistance machines, pull-ups, stair-master, and rowing machine work.  [Exh. 41-001, 002]  However, Leung felt she was not aggressive enough and told Self he needed to be '*pushed harder*.'  While he was working out on the rowing machine, he felt a pop in the back his neck and an onset of pain.  [Exh. 41-002]  A subsequent MRI showed a C5-C6 disc

---

[1] When Leung applied for the second disability policy from Unum in **1987** he reported that he had a "complete recovery" from his 1983 back surgery, with "no residual[s]."  [Cartier Decl., Exh. 2-020]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

5

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

herniation. [Exh. 41-007] Leung sued the personal trainer and the gym which employed her for causing the herniation. [Exh. 42(a)-001-7]

Several weeks before the November 1995 trial date, Leung submitted a motion for a continuance on the grounds he was about to undergo cervical surgery for the herniation. [Exh. 42(c)-001-3]. The case was then settled. However, Leung **never** underwent the surgery in October of 1995. In fact, he did not get surgery on his neck for another decade.[2] [Exh. 45-003]

Leung sought coverage under the worker's compensation system for his new cervical problem on the grounds that it only occurred because he was "rehabbing his lower back" at the gym. The worker's compensation carrier approved the claim and Leung was thereafter entitled to have treatment for his neck covered going forward.[3] [Exh. 6:-018, 19; Exh. 54-014 (55:4-20)]

### D.  The 2000s and the Surgery for Cervical Degenerative Disc Disease

Following the resolution of his lawsuit and into the early 2000s, Leung continued to treat for miscellaneous lower back and neck pain several times a year. However, there was no evidence he was functionally limited. He not only continued to work full-time, but was also actively traveling, working out at the gym, playing golf, scuba diving and engaging in a variety of other demanding extra-curricular activities. [Exh. 46(a), 46(b), 46(c)]

---

[2] When Leung returned to his doctor in late January of 1996, he was told that a new MRI showed that the C5-6 disc herniation (which was the basis for his lawsuit) had *internally resolved*. [Exh. 43-001] The new MRI report stated: "the central and right sided disc herniation previously noted at C5-6 has resolved and only mild bulging is present. He was further informed by his doctor that now "the C4-5 is perhaps more herniated." It is unknown whether Leung or his attorneys ever informed the defense counsel of this new finding prior to the settlement. [*Id.*]

[3] When applying for a disability policy with Northwestern Mutual in **1995**, Leung sent the company a letter stating that his lower back problems had resolved. [Bernacchi Decl., ¶15; Exh. 44(b)-001]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

Leung's principal worker's compensation treater during this time was neurologist Charles Jablecki, M.D. Leung also consulted with spine surgeon Richard Ostrup, M.D. for his neck complaints. Dr. Ostrup diagnosed Leung's condition as cervical stenosis at **C5-6** caused by *disc disease*. [Exh. 43-002; 45-005] Dr. Ostrup further noted issues at the C4-5 level and later C3-4, further supporting a degenerative process in the neck area, rather than an injury. [Exh. 43-001; Exh. 45-005] The 1993 rowing incident was not referenced as a cause of his problem. Dr. Ostrup ultimately performed a discectomy/fusion at C5-6 on Leung over a decade later, on January 19, 2004. [Exh. 45-003]

Leung was back in the gym up to 7 days per week within 2 months of the procedure. [Exh. 46(a)-001] In 2005 Leung also *trained for and ran the Honolulu marathon* at the age of 51. [Exh. 46(b)-001] While training, Leung had his sport massages paid through the worker's compensation system. [Exh. 46(c)-001]

E.     **The 2010s and Leung's Decision to Sell His Company and Go to Work for NVISION, Inc.**

Throughout the early 2010s, Leung continued to receive treatment from Dr. Jablecki several times a year. In late 2014, Dr. Jablecki retired, and Leung's care was transferred to pain management specialist Michael Moon, M.D. [Exh. 6-022] Leung saw Dr. Moon only about 5 times per year (plus an occasional epidural). Bernacchi Decl., ¶18; Exh. 47(a)]

Leung's neck and back issues did not limit either his work or leisure activities. He increased the profitability of his business and also found time to engage in numerous extra-curricular activities and travel. This included a South African safari and a Vail ski trip in 2010; trips to Costa Rica, Europe, and the Northern California Coast in 2011; to the Northeast, Spain, and Myanmar/Cambodia in 2012; and to Disney World and Italy in 2012. [Exh. 48]

In 2018, Leung entered preliminary discussions with a national eye center company called NVISION, Inc. to sell his practice. A letter of intent was signed in

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1                7                Case No. 3:22-cv-00767-W-JLB
                                                    DEFENDANT'S MOTION FOR SUMMARY
                                                    JUDGMENT

April of 2019. [Exh. 49] As part of the deal, Leung agreed to sell his practice to NVISION and to continue to work at the practice while NVISION transitioned the practice to a younger doctor. [Exh. 50(a); 50(b)] On **November 1, 2019,** the sale of the practice was completed, and the employment agreement signed. [Exh. 53-005 (18:8-10)] Leung received $9,520,000 at the sale closing, with the potential for an additional payment of $4,000,000 over three years if the practice earned a certain amount while he was working there and transitioning it to the new doctor (an earn-out provision). [Exh. 53-006 (22:10-23:17)]

### F. 2020, COVID, and the Opportunistic And Inconsistent Disability Claims

Leung worked as an employee at NVISION through the end of 2019 and into early 2020 without issue. On March 19, 2020, California declared a health emergency and issued a statewide stay at home order. Following the COVID shut-down order, Leung approached Dr. Moon about going out on disability effective May 28, 2020. [Exh. 51(a)] At Leung's request, Dr. Moon thereafter <u>signed</u> forms and "wrote" letters certifying Leung's disability to Unum (which provided $9,430 per month in benefits); Northwestern Mutual (which provided $7,500 per month in benefits); the federal worker's compensation carrier (which provided $8,500 per month in benefits); and an ADA/FMLA claim with his employer NVISION, Inc. [Bernacchi Decl., ¶¶22, 27; Exh. 51(b); 51(c); 51(d); 56-003-7(56:7-73:25)]

It is undisputed that several attending physician's statements signed by Dr. Moon in support of disability and submitted to various entities (e.g., Northwestern Mutual and Leung's employer) were actually filled out by Leung and simply signed by Dr. Moon. [Bernacchi Decl., ¶23; Exh. 52(a); 52(b); 54-009(84:16-85:5)] Certain narrative letters submitted by Dr. Moon to various entities (e.g., the worker's compensation carrier) were ghost-written by Leung and simply placed on Dr. Moon's letterhead verbatim. [Bernacchi Decl., ¶23; Exh. 52(a)-001-4; 52(b)-001-9; Exh. 54-013(47:11-49:11)] Further, Dr. Moon admitted that at Leung's

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

urging, he informed the worker's compensation carrier that Leung was disabled from not just his "own occupation" as an ophthalmologist but from a sedentary occupation so that he could avoid having the Department of Labor "reduce my benefits to the level of an office worker." [Exh. 52(c)-001; 54-015-016(61:16-62:4)] Leung would now be eligible for a higher monthly disability benefit. [Bernacchi Decl., ¶23; Exh. 52(c)] Finally, at Leung's insistence, Dr. Moon took inconsistent positions with respect to his disability status. Specifically, while he told Unum, Northwestern, and the worker's compensation carrier that Leung was permanently disabled, he led NVISION to believe that Leung was temporarily disabled and hoping to return to work by signing an ADA/FMLA certification form.[4] [Compare Exh. 51(b)-002 ("permanent"); 51(c)-003 ("permanent"); 51(d) ("permanent") with Exh. 51(e)- 008 (estimated length of need for accommodation and return to work date "to be determined"); Exh. 53-017(291:16-293:4); Exh. 56]

### G.  The Specific Disability Claim to Unum

#### 1.  The Initial Disability Claim Approval

In May of 2020, shortly before his 65th birthday, Leung submitted a disability claim to Unum asserting that lumbar and cervical problems caused by accidents prevented him from continuing to work as an ophthalmologist. [Cartier Decl., ¶3; Exh. 6] He indicated he was an *employee* of a regional eyecare chain and did not mention he had recently sold his business to them for $10 million dollars. [Exh. 6-002] The claim was supported with an attending physician statement (APS) from his pain management specialist, Dr. Michael Moon. [Exh. 6-013-15]

In an accompanying narrative statement, Leung asserted his lumbar problems arose from a 1982 accident during his medical residency at a Veteran's

---

[4] If Leung was formally employed and not terminated, he could still be potentially eligible for the $4 Million earn-out payment if the company could manage to perform well during COVID. [Exh. 53-006(22:9-23:17)]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

Administration hospital.  [Cartier Decl., ¶3; Exh. 6-016-025]  Specifically, Leung reported he herniated a disc at L4-L5 while helping lift an obese patient out of bed.  [Exh. 6-017]  He underwent an L5-S1 laminectomy the following year which he attributed to the disc herniation.  [Exh. 6-018]  Additionally, Leung asserted that he had also herniated a disc at C5-C6 because of a rowing machine accident while he was rehabilitating his back in 1993.  [Exh. 6-019-020]  As a result, Leung reported he underwent a C5-C6 cervical fusion in 2004.  [Exh. 6-013]  Accordingly, because both his back and neck conditions were due to accidents, Leung made it clear that he felt entitled to lifetime disability benefits.  [Cartier Decl. ¶3; Exh. 6]

Unum obtained medical records from Dr. Moon and, following a nursing review and vocational assessment, approved Leung's disability claim on August 27, 2020.  However, the company deferred the etiology determination until gathering more information about his original injuries.  [Cartier Decl. ¶7; Exh. 9]

Unum sought worker's compensation records from Leung to determine etiology from Leung.  [Cartier Decl. ¶9; Exh. 11]  On October 20, 2020, Leung provide to Unum his relevant medical and diagnostic records associated with the worker's compensation action and original injuries.  This included well over five hundred pages of medical records, including records from his treating physicians and radiological studies pertaining to the lumbar and cervical spine from March 15, 1985, to June 8, 2020.  [Cartier Decl. ¶9; Exh. 12]

### 2. The Medical Reviews as to Etiology

Following a phone call with Leung to discuss the etiology of his claim, Unum conducted a clinical summary of the records by a registered nurse.  [Cartier Decl. ¶10]  That was followed by a medical review by a board-certified orthopedic surgeon, Dr. Philip Lahey, in November of 2020.  [Exh. 13]  Dr. Lahey concluded that Leung's disability was due to diffuse degenerative disc disease (a sickness).  While the 1982 and 1993 injuries may have played a role in cervical and lumbar problems that lead to Leung's disability claim in 2020, he found that the

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

primary reason Leung could no longer work was an aging/disease process. His opinion was supported by preexisting congenital findings noted in the records, the pattern of progressive degeneration reflected in the MRI scans over the years, and the course of the medical treatment. [Cartier Decl. ¶10; Exh. 13]

Dr. Lahey twice tried to contact Dr. Moon to discuss his conclusions but received no call-back. [Cartier Decl. ¶11; Exh. 14] He then sent a letter to Dr. Moon on November 13, 2020, stating his position as to the cause of the disability and requested a response. The letter stated: "I would appreciate your thoughts and any rationale that you may provide that leads you to the conclusion that his current condition is caused by an accident." [Exh. 14-002] After Moon failed to respond to the letter, Unum referred the file to a designated medical officer (DMO) for a second opinion. [Cartier Decl. ¶12; Exh. 15] The DMO was assigned by Dane Street, a third party vendor, to orthopedist Dr. Steven Milos. On December 7, 2020, Dr. Milos concurred with Dr. Lahey's opinion stating that it would be "unreasonable to conclude that the L4-5 disc herniations caused the diffuse process that led to the current restrictions and limitations." [Exh. 15-002]

More than 3 months after receiving Unum's letter, Dr. Moon finally responded to Dr. Lahey. [Cartier Decl. ¶13; Exh. 16] In his February 16, 2021 response, Dr. Moon opined that Leung's lumbar injury site had degenerated due to the development of adjacent segment disc disease (a broad term encompassing many complications from spinal fusion). [Exh. 16] He felt adjacent segment disc disease was also the reason for his cervical problems. He noted that given Leung's long history of neck and back pain as well as his continuous treatment for those conditions, it was extremely unlikely that the degenerative findings in his cervical and lumbar spines were unrelated to his previous injuries and surgeries. He also noted that the worker's compensation carrier had approved Leung's medical claim for both injuries. [Exh. 16-002]

///

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

11

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

Following Dr. Moon's letter, Unum sent the file back to Dr. Lahey and Dr. Milos for review and comment. [Cartier Decl. ¶14; Exh. 17] Dr. Lahey opined that although adjacent segment disc disease may have played a role, the primary cause of Leung's problems was degenerative disc disease, based on the clinical records, the course of treatment, and the historical medical records. [Exh. 17-002] Dr. Lahey noted that the gradual progression of Leung's degenerative disc disease was well documented by multiple MRIs. Leung was also able to work full time for almost 40 years until the degeneration became so severe that it prevented him from performing the demands of his occupation. Finally, Dr. Lahey also noted that the congenital issues found on the 1982 CT scan also likely contributed to Leung's ongoing problems. [Id.] Following his review, the file was sent back to Dr. Milos who concurred that Leung's neck and back issues were due to degenerative disc disease and not accidents. [Cartier Decl. ¶ 15; Exh. 18]

### 3. Unum's Determination That Disability Was Due to Sickness

On March 19, 2021, the Unum claims representative reviewed the medical opinions and recommended the claim be determined to be a based on a sickness, limiting Leung's benefits to 24 months under the policies. On March 24, 2021, her supervisor agreed with the decision. [Cartier Decl. ¶16; Exh. 19]

On March 24, 2021, Unum wrote to Leung and informed him that his disability was deemed to be the result of a sickness. [Cartier Decl. ¶ 17; Exh. 20] The letter explained that the Unum reviewing physicians had determined the progression of his symptoms, as documented in the record and MRIs, was consistent with degenerative disc disease. It also noted that he was able to work for decades until the degeneration progressed to the point where it prevented him from performing the demands of his occupation. [Exh. 20-004-8] Unum offered Leung the right to appeal the decision. [Exh. 20-005-7]

### 4. Leung's Initial Appeal Without Medical Support

Leung appealed Unum's decision on April 8, 2021. [Cartier Decl. ¶18; Exh.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

12

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

21] He did not provide additional medical support but argued that a 20-year-old settlement agreement between Unum and the California Department of Insurance required Unum to defer to his treating physician. On May 14, 2021, Unum acknowledged the appeal and sent the file out to be reviewed by an independent physician who specializes in neurosurgery to be chosen by third party vendor Dane Street. [*Id*.; Bernacchi Decl., ¶26; Exh. 55-002 (15:19-16:4)]

Dane Street sent the medical file claim to board-certified neurosurgeon Marvin Friedlander, M.D. [Cartier Decl. ¶19; Exh. 22] In an 8-page, single spaced, highly detailed report, Dr. Friedlander opined that Leung's current impairing lumbar condition was progressive degenerative changes at L3/L4 and L4/L5 and found no significant relationship between the disc herniation 40 years earlier and Leung's current problems. [Exh. 22-002] He further opined that MRI findings did not follow the pattern of adjacent segment disease as the disc at L3-L4 degenerated much faster than L4-L5. [*Id*.] He reached a similar conclusion with respect to the cervical spine, stating that it was very unlikely that adjacent segment disease would have occurred in the pattern shown by Leung's cervical MRI scans. [Exh. 22-006-8] He thus concluded that with reasonable medical certainty, there was no significant contribution from either the 1982 injury/surgery or the 1993 injury to the current impairing conditions. [Exh. 22-002, 008]

On June 16, 2021, Unum upheld its original decision that the disability was due to a sickness. [Cartier Decl. ¶21; Exh. 24]

### 5. The Claim of Financial Hardship and the Second Appeal

On the same day Unum sent its appeal uphold letter, Leung wrote to Unum about the status of his claim. [Cartier Decl. ¶20; Exh. 23] Leung told Unum: "*I think you can understand the stress this is causing me. I have not worked in over a year and the uncertainty of my financial future hinges upon Unum.*" [Exh. 23-001] Leung also requested the claim file and an extension of time to get a letter from his neurosurgeon. [Exh. 23-001]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

13

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

On September 2, 2021, Leung re-appealed the decision and submitted a two-page report from the neurosurgeon who performed the cervical spine surgery, Dr. Richard Ostrup. [Cartier Decl. ¶22; Exh. 25] With respect to Leung's cervical spine issues, Dr. Ostrup opined that although he "suspected genetics were playing a significant role," he also felt there was a "component" of adjacent segment disease based on Leung's self-reports. [Exh. 25-003] With respect to his lumbar spine, (with which he was not involved as a treater) Dr. Ostrup detailed Leung's 40-year history and felt that a large part of his ongoing back pain was the result of his lumbar surgery (assuming Leung was an accurate historian). He thus added the caveat that his opinion was "in light of history (*provided by Leung*) of 40 years of back pain." [Exh. 25-004 (emphasis added)]

Unum obtained a supplemental review from Dr. Friedlander who stood by his original opinion. He opined that the MRI findings of the cervical and lumbar spine were consistent with degenerative disc disease. [Cartier Decl. ¶23; Exh. 26] On September 23, 2021, Unum denied the second appeal.[5] [Cartier Decl. ¶24; Exh.27]

## H. The Lawsuit

On April 25, 2022, Leung filed a complaint against Unum in San Diego Superior Court. The complaint contained two causes of action stemming from Unum's decision that Leung's disability was the result of a sickness and not an accident: (1) breach of contract; and (2) breach of the covenant of good faith and fair dealing. Unum removed the matter to this Court.

## III. THE STANDARD FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure authorizes a party pursuing

---

[5] On February 17, 2022, Leung wrote to Unum and requested a third appeal based on the new findings of a neuro-radiologist (Dr. Chuang) from Fall of 2021 MRIs. He enclosed the report. [Cartier Decl. ¶26; Exh. 29] However, Unum's appeal specialist responded that the MRI was of little value because it was after the injury date and the appeal was closed. [Cartier Decl. ¶26; Exh. 30]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

14

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

or defending a claim to move for summary judgment upon all or any part of that claim. On a motion for summary judgment, it is the moving party's burden to establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c). However, the moving party has no burden to negate or disprove matters on which the opposing party will have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Ultimately, the moving party is entitled to judgment as a matter of law if the opposing party fails to make a sufficient showing of an element of its case with respect to which it has the burden of proof. *See Celotex*, 477 U.S. at 325.

## IV.   DISCUSSION

### A.   Unum is Entitled to Summary Judgment on the Breach of Contract Claim

The elements required for breach of contract claim are: (1) the existence of a contract; (2) plaintiffs' performance or excuse of non-performance; (3) defendant's breach; (4) causation; and (5) resulting damages to plaintiff. *San Diego Hous. Comm. v. Indus. Indem. Co.,* 68 Cal. App. 4th 526, 536 (1998). Plaintiff has the burden of proving that his claim falls within the scope of coverage under the policies. *Schar v. Hartford Life Ins. Co*., 242 F.Supp.2d 708, 714 (C.D. Cal. 2003); *Blake v. Aetna Life Ins. Co*., 99 Cal.App.3d 901, 924 (1979) (burden on claimant). Plaintiff must provide "affirmative evidence" to establish that his disability was due to accident. *Johnson v. Minnesota Mut. Life Ins. Co*., 799 F.Supp. 75, 77 (N.D. Cal. 1992). The accident must directly cause the loss; a remote cause of a loss cannot be the proximate cause of the loss. *Garvey v. State Farm Fire & Cas. Co*., 48 Cal. 3d 395, 422, 770 P.2d 704 (1989). "If the passage of time obscures the cause of [loss], the claimant's burden becomes all the heavier." *Nat'l Life & Accident Ins. Co. v. Edwards*, 119 Cal. App. 3d 326, 336 (1981) ("A claim may be defeated by remoteness alone. . .") citing *INA Life Ins. Co. v. Com., Ins. Dep't*, 31 Pa. Cmwlth. 416, 423, 376 A.2d 670, 674 (1977). "To most people, too, the idea of being

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

involved in an accident implies that any disabling consequences are felt or experienced immediately or in close temporal proximity thereto, whereas Cox's claim is far more attenuated . . ." *Cox v. Paul Revere Life Ins. Co.*, No. 08CV1353-LAB (WMC), 2010 WL 11508572, at *7 (S.D. Cal. July 29, 2010) (noting attenuation where insured's eyesight was allegedly impacted while snowmobiling in 1994, he received medical attention, and a decade later, after his eyesight had worsened considerably, he finally became disabled and filed a claim for benefits).

Leung cannot establish the requisite causation based on injuries that occurred 30 and 40 years ago, during which time he continued to work and enjoyed incredible functionality until his retirement age, irrespective of whether a degenerative condition caused his disability.  Even California's "process of nature" rule imposes a *causation* test for disabilities occurring after an accident by limiting such claims to only those that occur as the result of the **natural** process of the body.  In other words, a disability claim will relate back to the time of the accident only within "such time as ***the process of nature*** consumes in bringing the person affected to a state of total [disability]."  *Willden v. Wash. Nat'l Ins. Co.*, 18 Cal.3d 631 (1976).

In *National Life & Accident Company v. Edwards*, 119 Cal.App.3d 326, the insurance policy included a provision providing double indemnity in the event that death occurred within 90 days from the date on which the injuries were sustained. *Id*. at 331. The insured was rendered quadriplegic in an automobile accident on March 2, 1974 and died on March 22, 1976.  In assessing the link between an accident and an injury, the court emphasized courts are required to apply what "justice and logic" dictate the natural process between the accident and the [disability] to be.  *Id*. at 336.  In other words, an insured is entitled to relate the onset of a disability back to the time of an accident only if the "natural process" of the human body in reaction to the accident finally rendered the person affected disabled.

Given the temporal limitations imposed by the process of nature rule, in virtually all of the reported cases the insureds filed for disability within a relatively

Burke, Williams &
Sorensen, LLP
Attorneys at Law
Los Angeles

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

short time after the accident, struggled with functionality during the interim period between the accident and disability claim, and only stopped working once they were medically unable to continue. In *Schilk v. Benefit Trust Life Ins. Co.*, 273 Cal.App.2d 302 (1969), the court allowed recovery from a whiplash injury which eventually led to total disability four months later, even though the policy stated benefits were only payable for injuries resulting in disability within 20 days of the accident. In *Cranmore v. UnumProvident Corp.,* 430 F.Supp.2d 1143 (D. Nev. 2006), the court allowed plaintiff's claim for disability from an auto accident 4 months earlier, where she had returned to work in the interim at only a lesser position, even though the policy barred such claims after 90 days following the accident. The facts of Leung's claim stand in stark contrast to these cases.

**First**, in the cases involving overt injuries the insureds sought disability within weeks, months or at most a few years after the accidents. Leung waited 40 and 30 years after his "accidents"[6] to file his disability claim. The insureds also were forced to seek disability during their prime working years. Leung made his claim at the age most people retire (age 65) due to the natural degeneration of his body, in the setting of his congenital, degenerative condition.

**Second,** in the cases involving an overt injury the insureds experienced impaired functionality in the interim period between the accident and the disability claim. They either could not work or struggled to work before being forced to go out on disability. In Leung's case, he had known lumbar and cervical problems for decades, yet he: (1) was an extremely high functioning professional who worked

---

[6] As noted above, Unum disputes the underlying etiology of the problems. The primary condition that led to his lumbar spine surgery was congenital stenosis (the disc portion of the surgery was a complete success, and Leung signed an insurance application to Unum in 1987 attesting to his recovery). There is no evidence the cervical herniation Leung claims, caused any lasting impairment as it resolved of internally without surgery. [Exhs. 13, 15, 17, 18, 22, 26, 2-0020]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

relentlessly to build his optometry practice into one of the most successful practices in the San Diego area; (2) consistently traveled both domestically and internationally (e.g., safaris in Africa, trips to Asia, Europe etc.); and (3) was extremely active -  working out at the gym 5-7  days a week and engaging in a variety of physically demanding extra-curricular activities such as tennis, skiing, golf and scuba diving.  Leung even trained for and ran a marathon while in his 50s.

**Finally**, in virtually all cases involving disabilities from an accident, the decision to stop working was forced upon the insured either immediately or months later.  In Leung's case, his disability was carefully and strategically planned.  Leung submitted his claim occurred right after he sold his practice for $10 million dollars; right before the deadline to submit the claim to Unum to recover lifetime benefits (i.e., age 65); and only <u>after</u> COVID ruined his chances of further capitalizing on the sale of his business.  Indeed, until March of 2020, there was no indication that Leung was immediately planning on filing a disability claim because he expected to continue to earn money working at NVISION under the employment agreement and the lucrative earn-out provision in the sales agreement.  Once the COVID shutdown hit and he realized that was not going to happen, Leung pivoted and instructed Dr. Moon to declare him permanently disabled.  He then submitted claims to Unum, Northwestern Mutual and the worker's compensation carrier totaling approximately $25,000 per month, and ghost-wrote many of the forms and letters submitted to the disability insurers in support of those claims.[7]  [Exhs. 51(a) to 52(c)]

It is simply not possible that Leung would have such incredible functionality long after the "accidents" and then, suddenly, the natural process of those accidents would render him disabled when it was most financially advantageous for him.

---

[7] Even then, in hopes of qualifying for the earn-out, he repeatedly told NVISION that he was only temporarily disabled to remain employed and make him ***eligible*** to collect under the earn-out provision.  [Exhs. 51(e); 56-003-7(56:7-73:25)]]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

18

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

Leung's disability was not the result of the process of nature, but rather of his own calculation.

### B. Plaintiff's Bad Faith Claim Fails Because At Best, a Genuine Dispute Existed as to Unum's Liability

#### (a) Standards for Bad Faith Claims

If the contract claim is not payable, there can be no bad faith. *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1153 (1990). Under black-letter California law, bad faith liability cannot be imposed where there exists a legitimate dispute as to the insurer's liability. *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1280-81 (1994) ("mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability"). Where a genuine issue affecting liability exists, courts have not hesitated to summarily adjudicate causes of action alleging bad faith. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992-996 (9th Cir. 2001).

To establish a breach of the implied covenant, a plaintiff must show the insurer withheld benefits unreasonably and without proper cause. *See Rappaport-Scott v. Interinsurance Exch. of the Auto. Club,* 146 Cal.App.4th 831, 837 (2007); *Fraley v. Allstate Ins. Co.,* 81 Cal.App.4th 1282, 1292 (2000). This is because the implied covenant requires insurers to be reasonable, not flawless or prescient. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346-347 (2001).

It is well established that where, as here, there is a "genuine dispute" regarding either coverage or the amount of payment due, the insurer cannot be held liable for bad faith for advancing its side of the dispute. *Rappaport-Scott,* 146 Cal.App.4th at 837; *Fraley,* 81 Cal.App.4th at 1292. Put differently, "[i]t is not unreasonable for an insurer to resolve good faith doubts about the claim against the claimant." *Phelps v. Provident Life & Acc. Ins. Co.,* 60 F.Supp.2d 1014, 1022 (C.D. Cal. 1999). The implied covenant allows the insurer to "give its own interests

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

consideration equal to that it gives the interests of its insured." *Fraley,* 81 Cal.App.4th at 1293.

In deciding whether there is a genuine dispute, "the court does not decide which party is 'right' as to the disputed matter, but only that a reasonable and legitimate dispute actually existed." *Chateau Chamberay,* 90 Cal.App.4th at 347. Establishing a "genuine dispute" does not require a showing that the insurer was clearly right, or even that the insurance company's position was "more" correct than the insured's position. Instead, a "genuine dispute" simply means that reasonable minds could differ about the validity of the claim. *See Rappaport-Scott,* 146 Cal.App.4th at 839; *Chateau Chamberay,* 90 Cal.App.4th at 348.

### (b) There Is a Genuine Dispute as to Unum's Liability Under the Contract

Here, there is a genuine dispute over the application of a contractual provision to Leung's claim. Under the policies, if the disability is due to a sickness, benefits are payable for 24 months. If the disability is due to an injury which occurred before age 65, benefits could be payable for life. The following is indisputable:

Unum quickly approved Leung's claim as to the issue of disability and began paying benefits. [Exh. 9] At the same time, it informed Leung that it was investigating the claim to determine whether the disability was caused by an accident or a sickness and obtained his worker's compensation records dating back to 1982. [Exh. 10] At the time of the initial claim, the only physician supporting Leung's assertion that the cause of the disability was due to accidents 40 and 30 years ago was a pain management specialist (Dr. Michael Moon). [Exh. 6-004] Unum gave his opinion due consideration by having it reviewed by in-house orthopedic surgeon, Dr. Philip Lahey. [Exh. 13, 14]

Based on his review of records, MRI scans and x-ray reports, as well as Leung's course of treatment, Dr. Lahey opined that the cervical and lumbar problems were related to degenerative/congenital issues, not due to accidents. After

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

Dr. Lahey was unable to reach Dr. Moon to discuss his opinion, Unum sent the file to a third-party vendor, Dane Street, who appointed a board-certified orthopedic surgeon, Steven Milos, M.D., to review it. Dr. Milos arrived at the same conclusion as Dr. Lahey. [Exh. 15] Even then, Unum did not finalize its determination that the disability was due to sickness. Rather, it gave Dr. Moon a three-month extension to respond to ensure it was assessing all available information. When Dr. Moon finally submitted his letter in February of 2021 reaffirming his belief that disability was due to these distant accidents,[8] Unum sent the file back to both Dr. Lahey and Dr. Milos for yet additional reviews. Only then did it deny the claim. [Exh. 17, 18]

Leung then appealed the decision without submitting any additional medical evidence. [Exh. 21] Even so, Unum did not reject the appeal out of hand. Instead, it sent the file to Dane Street and requested it retain a neurosurgeon to review the file. Dane Street assigned Dr. Marvin Friedlander to the matter. After reviewing the records, Dr. Friedlander prepared a very detailed 8-page, single-spaced report explaining that based on the pattern of degeneration in both the cervical and lumbar spine, the only logical conclusion was that Leung suffered from degenerative disc disease.[9] [Exh. 22] Leung then appealed a second time (which is not provided for in Unum's protocols but was allowed in Leung's case) and this time submitted a 'lukewarm' 2 page letter from Dr. Ostrup. [Exh. 25] Dr. Ostrup agreed with Unum's position on the cervical spine (i.e., degeneration) but noted that Leung's current lumbar disability (which Dr. Ostrup never treated him for) was likely due to

---

[8] The evidence shows that most of the forms and letters submitted by Dr. Moon to the various carriers were being filled out or ghost-written by Leung himself. Unum believes this letter was no exception. [Bernacchi Decl., ¶23].

[9] Leung attacks Dr. Friedlander because six years before the review he received a stayed suspension of his medical license in New York and New Jersey arising out of his supervision of staff in a medical clinic he operated. Unum refers the Court to reports he authored during the claim which are some of the most comprehensive generated in the case to date, including those of plaintiff's experts. [Exhs. 22, 26]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

an accident 40 years earlier based on history "provided by Dr. Leung." [Exh. 25-004] Unum then sent the file back to Dr. Friedlander who reviewed the file yet again but stood by his opinion. Only then, did Unum uphold its decision on appeal.

In short, Unum immediately approved benefits on the claim and arduously investigated the etiology issue. That investigation included seven different medical reviews (1 by a nurse, 2 by Dr. Lahey, 2 by Dr. Milos and 2 by Dr. Friedlander) over the course of three different levels of reviews (claim, first appeal and second appeal). During this time, Unum afforded Leung numerous extensions to submit additional information and never rejected his assertions out of hand, even when he failed to submit evidence in support of his claim. It only reached the conclusion that the disability was a sickness after all avenues were exhausted.

Nevertheless, Leung is expected to make two arguments in response to Unum's position that it acted in good faith. First, he will argue that his claim was approved by worker's compensation and thus it found his accidents lead to his disability. However, Unum is not required to rely on the worker's compensation findings, especially given Leung's own brazen admission that they "approve everything." [Exh. 52(c)-002] The Federal Employees' Compensation Act (FECA) as amended (5 U.S.C. 8101 et seq.) contains its own standards and causation tests. *See, e.g. Glenn C. Chasteen*, 42 ECAB 493, 1991 WL 639459 (1991) (employment factor that contributes to the aggravation of a pre-existing condition *"to any degree"* is compensable). Finally, Leung and Dr. Moon were clearly manipulating the worker's compensation process and at Leung's instruction, Dr. Moon declared him disabled from "any occupation" which enabled Leung to receive a higher monthly benefit award. [Exh. 52(c)]

Second, Leung will argue Dane Street's doctors were biased because they perform a lot of reviews for Dane Street. However, there is simply no evidence of bias. Wholesale numbers regarding reviews and payment to a medical review service provider are not relevant – all physicians, including Plaintiff's treating

Burke, Williams & Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

physicians, are paid for their time. "Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006). The mere fact that an insurer contracted with a service provider is insufficient by itself to establish bias. *See Nolan v. Heald College*, 745 F. Supp. 2d 916, 923 (N.D. Cal. 2010) (yearly amounts paid to medical vendor "are not probative of bias"). "When an administrator, like Unum here, opts to investigate a claim by obtaining an expert medical opinion—independent of its own lay opinion and that of the claimant's doctors—the administrator is going to pay a doctor one way or another." *Davis*, 444 F.3d 575. There is no evidence or indication that the business relationship impacted the quality of work the doctors did for Dane Street. **Again**, Dr. Friedlander generated the most comprehensive medical report in the claim (and even more comprehensive than Plaintiff's retained experts in this litigation).

Finally, there is nothing to suggest the opinions of the Dane Street physicians are wrong. They are consistent with the opinion by orthopedist Dr. Lahey who worked for Unum, as well as with common sense (see above). Moreover, in contrast to these opinions, Leung offered only up ghost-written opinions from a pain management specialist and a two-page letter from a prior surgeon which itself seemed to support Unum's position. [Exh. 52(a), (b), (c); Exh. 25]

In any event, whether Leung's cervical and lumbar problems are due to an accident or a sickness is irrelevant to the bad faith analysis. The issue is whether the dispute over the entitlement to benefits was genuine. *See Lunsford v. American Guarantee & Liability Ins. Co.,* 18 F.3d 653, 656 (1994) (Summary judgment on the bad faith claim was proper because the insurer had an objectively reasonable basis for its denial). Clearly, there was a legitimate dispute.

## C. The Punitive Damages Claim Fails as a Matter of Law

The standard for imposition of punitive damages under California law is significantly more stringent than the test for insurance bad faith. Pursuant to

Burke, Williams & Sorensen, LLP
Attorneys at Law
Los Angeles

LA #4858-4373-0026 v1

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

California Civil Code Section 3294(a), punitive damages are recoverable only when it is established by "clear and convincing" evidence that a defendant has acted with "malice," "oppression" or "fraud," as those terms are defined in section 3295(c).

Obviously, even evidence that an insurer has breached the implied covenant of good faith and fair dealing or has otherwise acted tortuously does not, in and of itself, satisfy the test for punitive damages. *See Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal.App.4th 306, 328 (1992). "[T]he evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.,* 78 Cal.App.4th 847, 909-10 (2000); *see also Beck v. State Farm Mut. Auto. Ins. Co.,* 54 Cal.App.3d 347, 355-56 (1976); *Stewart v. Truck Ins. Exch.,* 17 Cal.App.4th 468, 483 (1993).

To recover punitive damages, the insured must prove that the insurer is guilty of oppression, fraud, or malice. *Shade Foods,* 78 Cal.App.4th at 890-91. Moreover, the evidence must not be merely consistent with the theory of oppression, fraud, or malice. Rather, it must be *inconsistent* "with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such non-iniquitous human failing." *Tomaselli v. Transamerica Ins. Co.,* 25 Cal.App.4th 1269, 1287-88, n. 14 (1994).

"Oppression" requires a showing of despicable conduct, which is conduct 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' *Stewart,* 17 Cal.App.4th at 483 n. 29. Similarly, "malice" implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others." *Kendall Yacht Corp. v. United California Bank,* 50 Cal.App.3d 949, 958 (1975). "The party requesting punitive damages must come forward with "clear and convincing" evidence of fraud, oppression, or malice that is "sufficiently strong to command the unhesitant assent of every reasonable mind." *Porsandeh v. Prudential Prop. & Cas.*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1

24

Case No. 3:22-cv-00767-W-JLB
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

1 *Ins. Co.,* at *8 (C.D. Cal. Apr. 30, 2004) (citations omitted).

2    As a matter of law, Leung fails to meet the stringent standards for the

3 imposition of punitive damages. Unum immediately approved benefits on this claim

4 and then commissioned seven different medical reviews to determine etiology over

5 the course of three different stages of reviews. It never rejected Leung's assertions

6 out of hand and on more than one occasion held the claim process open for him for

7 weeks and sometimes months while he looked for additional information.

8    Leung is expected to allege Dane Street's purported bias and conduct as part

9 of his opposition to this motion. However, for the reasons described above, there no

10 evidence that Dane Street engaged in any improper conduct. Moreover, there is no

11 rationale as to why such conduct, even if it existed, should be attributed to Unum.

12 Dane Street is a third-party vendor.

13    In short, there is no "clear and convincing" evidence, that Unum is "guilty" of

14 "oppression, malice or fraud" so as to justify punitive damages. At best, Leung

15 raises a genuine issue of liability under the policies, which is insufficient to sustain

16 even the bad faith claim. The punitive damages claim must be dismissed as a matter

17 of law.

18 **V.    CONCLUSION**

19    For the reasons set forth herein, Defendants respectfully request that this

20 Court grant summary judgment on Plaintiff's claims for breach of contract, breach

21 of the covenant of good faith and fair dealing and punitive damages.

22 Dated: July 24, 2023          BURKE, WILLIAMS & SORENSEN, LLP

23

24                   By: *s/ Michael B. Bernacchi*
                        Daniel W. Maguire
25                      Michael B. Bernacchi
                        Keiko J. Kojima
26                      Attorneys for Defendant Unum Life
                        Insurance Company of America
27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4858-4373-0026 v1                25                Case No. 3:22-cv-00767-W-JLB
                                                       DEFENDANT'S MOTION FOR SUMMARY
                                                       JUDGMENT