# TABLE OF EXHIBITS TO SHANNON CARTIER DECLARATION

| Exh. | Description | Pages |
|---|---|---|
| 1 | Policy No. LAN661286 (5/5/82 effective date) | 12-25 |
| 2 | Policy No. LAD016015 (5/11/87 effective date) | 26-49 |
| 3 | Policy No. LAN780636 (5/5/90 effective date) | 50-61 |
| 4 | Policy No. LAN782020 (5/5/93 effective date) | 62-74 |
| 5 | Policy No. LAN782990 (5/5/96 effective date) | 75-87 |
| 6 | Leung's initial claim forms (individual disability claim form, his authorizations, the Attending Physician Statement from Michael Moon, M.D., dated June 17, 2020, Leung's narrative statement, and photos) | 88-116 |
| 7 | Claim note of June 30, 2020 call | 117-121 |
| 8 | Unum's July 7, 2020 letter | 122-129 |
| 9 | Unum's August 27, 2020 letter to Leung approving disability claim | 130-134 |
| 10 | Unum's September 21, 2020 letter to Leung regarding typographical error | 135-137 |
| 11 | October 19, 2020 claim note regarding Unum's request for documents from Leung | 138-139 |
| 12 | Leung's letter to Unum, dated October 20, 2020, enclosing medical records, including from his worker's compensation claim | 140-142 |
| 13 | Dr. Lahey's On-Site Physician ("OSP") review dated November 11, 2020. | 143-146 |
| 14 | Dr. Lahey's letter to Dr. Moon, dated November 13, 2020 | 147-149 |
| 15 | Dr. Milos's Designated Medical Officer (DMO) Review Response, dated December 7, 2020 | 150-152 |
| 16 | Dr. Moon's letter to Unum, dated February 16, 2021 | 153-155 |

| Exh. | Description | Pages |
|---|---|---|
| 17 | Dr. Lahey's Addendum, dated February 20, 2021 | 156-159 |
| 18 | Dr. Milo's Designated Medical Officer (DMO) Review Response, dated February 23, 2021 | 160-161 |
| 19 | March 24, 2021 claim note | 162-165 |
| 20 | Unum letter to Leung, March 24, 2021, re disability due to sickness | 166-174 |
| 21 | Leung's letter to Unum, dated April 8, 2021 | 175-176 |
| 22 | Dr. Friedlander's Paper Independent Medical Exam (IME) Review Response, dated May 28, 2021 | 177-185 |
| 23 | Leung's letter, dated June 16, 2021, to Unum | 186-188 |
| 24 | Unum's June 16, 2021 letter upholding its original decision | 189-204 |
| 25 | Leung's letter, dated September 2, 2021, enclosing Dr. Ostrup's letter dated July 30, 2021 | 205-209 |
| 26 | Dr. Friedlander's Paper Independent Medical Exam (IME) Review Response, dated September 16, 2021. | 210-212 |
| 27 | Unum's letter, dated September 23, 2021, upholding decision on second appeal | 213-218 |
| 28 | Claim notes re Leung's call to Unum on January 4, 2022 regarding his return-to-work inquiry | 219-223 |
| 29 | Leung's February 17, 2022 letter to Unum requesting another appeal of his claim | 224-226 |
| 30 | Unum's letter to Leung, dated February 18, 2022 | 227-229 |
| 31 | Spreadsheet of monthly payments that Unum has made to Leung under the Policies. | 230-235 |

# Exhibit 1



unum
Better benefits at work.

DUPLICATE

unum.com

CS-1085 (06-08)

EXH. 1-001

Insured
Owner
Policy Number
DUPLICATE
Policy Date
Effective Date

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

**Examine This Policy For Ten Days**

You have ten days to decide if this policy meets your needs. If you are not fully satisfied, give it back to us within ten days of the day you receive it. Mail or deliver it to the Home Office or to the agent you bought it from. We will cancel the policy from the beginning and refund the premium paid.

A few words about this policy:

We have tried to write this policy so you can understand it. Of course, we have to write it within the framework that the insurance laws allow. Therefore, you may find some words or statements that you do not understand. If you do, please write to us. We will be happy to clarify for you, in writing, anything you do not understand.

"You" and "your" refer to the person insured. "We," "our" and "us" refer to Unum Life Insurance Company of America.

This policy provides disability income benefits under stated conditions while you are **totally disabled**. Please refer to the policy provisions where we tell you what amounts we will pay and when we will pay. You will find an index of these provisions on Page 2.

This policy may also provide additional benefits, or contain other provisions which have been added by means of Riders. If the policy includes any Riders, you will find them listed in the Policy Schedule on Page 3. To determine your benefits, please refer to the Riders as well as the basic policy provisions.

This policy is effective on the Effective Date shown on page 3.

Secretary

President

UNUMPROVIDENT

**Unum Life Insurance Company of America**

Home Office:
2211 Congress Street
Portland, Maine 04122

## Index of Policy Provisions

3   **Policy Schedule**

4   **Endorsements** (if any)

5   **Renewal and Premium Provision**
      Premiums.
      Renewal Before Age 65.
      Renewal After Age 65.
      Reinstatement.

5   **Definitions**

6   **Benefit Provisions**
      Total Disability Benefit.
      Loss of Use Benefit After Total Disability.
      Successive Disabilities.
      Transplant Donor Benefit.
      Rehabilitation Benefit.
      Waiver of Premium.

6   **Exclusions and Limitations**
      Preexisting Conditions Excluded.

6   **The Contract**
      Incontestable.

7   **Claim Information**
      How to File a Claim.
      How and When We Pay Benefits.

7   **General Provisions**
      Owner.
      Military Service Provision.
8     Legal Actions.
      Misstatement of Age.
      Conformity with State Statutes.

Application and any riders follow page 8.



LA N661286 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

POLICY CHANGE STATEMENT

THIS STATEMENT REPLACES PAGE 3 OF THE POLICY AND ANY PRIOR POLICY CHANGE STATEMENT. THE POLICY NOW PROVIDES THE FOLLOWING COVERAGE.

INSURED RICHARD J LEUNG MD

05-05-1982 POLICY DATE

12-19-1998 EFFECTIVE DATE OF CHANGE

OWNER THE INSURED

POLICY NUMBER LA N661286

SUMMARY OF PREMIUMS*

PREMIUMS ARE PAYABLE AS FOLLOWS

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
|---|---|---|---|
| 12-19-1998 | $ 669.00 | $ 341.19 | $ 173.94 |
| 05-05-2021 | COMPANY RATES THEN IN EFFECT. | | |

* PREMIUM GUARANTEED TO AGE 65

SUMMARY OF COVERAGE

POLICY FORM- D1-80 ANNUAL PREMIUM- $ 669.00 UNTIL 05-05-2021

ACCIDENT ELIMINATION PERIOD- 30 DAYS. SICKNESS ELIMINATION PERIOD- 30 DAYS.

MAXIMUM MONTHLY BENEFIT FOR TOTAL DISABILITY-
ACCIDENT-
$ 1,500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.
$ 1,500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL DISABILITY BEGAN PRIOR TO AGE 65 POLICY ANNIVERSARY.
SICKNESS-
$ 1,500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.
$ 1,500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL DISABILITY BEGAN PRIOR TO AGE 55 POLICY ANNIVERSARY.

| RIDER FORM | DESCRIPTION | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|
| DR2-80 | LIFETIME LOSS OF USE BENEFIT | $ 1,500.00 | $ .00 | 05-05-2021 |

RIDER PREMIUMS FOR THE PREMIUM TERM ARE INCLUDED IN THE SUMMARY OF PREMIUMS.

COVERAGE HAS BEEN MODIFIED IN CONSIDERATION OF THE REQUEST FOR POLICY CHANGE AND PAYMENT OF THE PREMIUM OR OTHER CHARGE REQUIRED BY THE COMPANY.

396-75

EXH. 1-004

LA N661286 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

ENDORSEMENTS

(ENDORSEMENTS MAY BE MADE ONLY BY US AT OUR HOME OFFICE)

## RENEWAL AND PREMIUM PROVISION

**Premiums.** Premiums are due in advance and, after the first, are payable as stated on page 3. Each premium will continue this policy for the term shown. If you do not pay a premium on or before its due date, we will keep this policy in force and continue coverage for 31 days beyond that date. This is a **grace period.** If you don't pay the premium during those 31 days, this policy and all coverage will terminate.

If we accept your premium, we will continue coverage until the end of the period for which we accept the premium.

If any premium has been paid beyond the policy month in which you die, we will refund the amount of the extra premium paid.

Premiums must be paid in United States dollars.

**Renewal Before Age 65.** You may continue this policy until the policy anniversary when your age is 65 by paying each premium on or before its due date.

Until the policy anniversary when your age is 65, we cannot cancel this policy, increase your premiums, reduce the benefits specified in this policy, or add any restrictions to this policy.

**Renewal After Age 65.** Beginning with the policy anniversary when your age is 65, you can renew this policy until the policy anniversary when your age is 75 if:

(1) you are gainfully employed and performing all the important or productive tasks of your business or profession on a full-time basis; and

(2) you pay us the premium which we then charge for your age on each policy anniversary; and

(3) when we require it, you give us proof that you are still employed as required in Item (1) above.

You must pay premiums based on our table of rates then in effect for your age. We may change those rates at any time. However, the change will only apply to premiums due after the date of change. Any change of premiums applies to all insureds of the same age and rating classification who are covered under policies of this form.

**Reinstatement.** If this policy terminates for non-payment of premiums, you may reinstate it by paying the first overdue premium within 31 days of the date it was due. After that, until that first premium is six months overdue, you may apply to reinstate this policy under the following conditions:

1. You must complete an application and furnish evidence of current insurability;
2. All overdue premiums must be paid; and we will issue a conditional receipt for the payment;
3. If your application is approved, the policy will be reinstated as of the approval date. However, if we have neither approved nor disapproved your application by the 45th day after the date of the receipt, the policy will be reinstated on that date. If we disapprove your application, we will promptly refund the premium payment.

The reinstated policy will not cover **total disability** which results from:

1. An accident which occurred after the policy terminated and before the reinstatement date;
2. A **sickness** which begins before 10 days after the date of reinstatement; or
3. Any disease or condition which is excluded by name or description on the date disability begins.

## DEFINITIONS

These are some of the terms that we use in this policy and any riders:

**"Total disability"** and **"totally disabled"** mean that, as a result of **sickness** or **injury,** you are unable to perform the material and substantial duties of **your occupation. Your occupation** means your regular occupation at the time disability commences.

**"Sickness"** means sickness which is diagnosed or treated while this policy is in force.

**"Injury"** means accidental bodily injury which occurs while this policy is in force.

**"Elimination period"** means the number of days, at the beginning of a period of disability, for which **no benefit is payable.** All elimination periods are shown on page 3.

**"Preexisting Condition"** means a medical condition which exists on the Effective Date and, during the past five years, either:

(1) caused you to receive medical advice or treatment; or

(2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

## BENEFIT PROVISIONS

**Total Disability Benefit.** While you are **totally disabled** and under the care of a physician other than yourself, we will pay a monthly benefit beginning at the end of the applicable Elimination Period as follows:

(1) We will pay the Monthly Benefit for Total Disability for each month of **total disability** from Accident or from **Sickness,** whichever caused that disability.

(2) We will stop paying this benefit when:

(a) You are no longer **totally disabled;** or

(b) you have been paid benefits for the maximum benefit period shown on page 3 for the cause of that disability.

(3) If, in any month, your disability is the result of concurrent causes for which a Monthly Benefit is payable, we will pay the Monthly Benefit which is more favorable to you. We will not pay more than one Monthly Benefit for any one month of **total disability.**

**Loss of Use Benefit After Total Disability.** We will pay the Monthly Benefit for Total Disability while an accident or **sickness** causes the total loss of:

(1) the use of your hands, your feet, or one hand and one foot, or

(2) your speech; or

(3) the hearing in both of your ears; or

(4) the sight of both eyes.

The amount payable each month is the amount we would have paid if you were still **totally disabled.** We will pay you this benefit whether or not you are working. This benefit is payable for only one loss at a time. If you are disabled from another cause while this benefit is payable, you will be paid this benefit or the Total Disability Benefit. You cannot receive both benefits at the same time.

**Successive Disabilities.** A successive period of **total disability** is a new disability if:

(1) it results from a different cause or causes; or

(2) the two periods of **total disability** are separated by at least six months during which you are continuously working on a full-time basis.

Each new disability will be subject to separate **elimination periods** and separate benefit periods.

All other **total disability** will be considered an extension of the prior period of **total disability.**

**Transplant Donor Benefit. Total disability** which results from the transplant of a part of your body to another person's body will be considered a **sickness.** However, such **total disability** will not be covered before this policy has been in force for six months.

**Rehabilitation Benefit.** While you are receiving the Total Disability Benefit, we will consider participating in a rehabilitation program. The program may be at your request or we may suggest it. We will continue benefits to you based upon the terms of the written plan upon which we mutually agree.

**Waiver of Premium Benefit.** If you become **totally disabled** before the policy anniversary when your age is 65, we will waive premiums that are due:

(1) after **total disability** has continued for ninety consecutive days; and

(2) while you are **totally disabled** or receiving the Loss of Use Benefit.

We will also refund any premium due and paid during the first ninety days of **total disability.** Following a period when we have waived premiums, this policy will remain in force to the next premium due date. Beginning with that date, you may continue this policy in force by paying premiums as they are due.

## EXCLUSIONS AND LIMITATIONS

**Exclusions.** This policy does not cover disability or loss caused by:

(1) war, or an act of war, whether declared or undeclared; or

(2) normal pregnancy or childbirth.

**Preexisting Condition Limitation.** This policy does not cover disability or loss caused by a **preexisting condition** which is not disclosed in the application if the disability begins or the loss occurs during the first two years after the Effective Date.

## THE CONTRACT

The application and any other papers that are attached are part of this policy. The policy is the complete contract. Statements by agents and brokers are not part of our contract.

Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you something else, years, months and anniversaries that we refer to are figured from the Policy Date shown on page 3.

**Incontestable.** Statements made in the application for this policy are incontestable after the policy has been in force during your lifetime for two years from the Effective Date.

If a disability begins or loss occurs after the policy has been in effect for two years, we will not reduce or deny a claim for benefits because of a **preexisting condition** unless the condition is excluded by name or description.

## CLAIM INFORMATION

**How to File A Claim.** If you have a claim, the following steps must be taken:

(1) someone must notify us that you are disabled **(notice of claim);**

(2) we will furnish you **claim forms;**

(3) you and your attending physician must complete the claim form and give it to us (file **proof of loss);**

(4) then, we will determine if the claim is valid and either:

(a) pay the benefits to which you are entitled, or

(b) notify you that you do not qualify for benefits and why. If we need more information, we will tell you what we need. If we require you to have a physical examination, we will pay for it;

(5) we may send you other forms as necessary to complete our file with the information we need to process your claim.

There are some conditions and time limits which each of us must meet. They are:

(1) We must be given the **notice of claim** within thirty days after the disability begins, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

(2) We will furnish the **claim forms** within fifteen days after we receive the written notice of claim. If we do not furnish the forms within fifteen days, send us proof of what caused the disability, when and how it happened, and the extent of the **sickness** or **injury.**

(3) The claim forms or other **proof of loss** must be furnished to us within 90 days after each month for which the benefit is payable. However, if it is not reasonably possible to do so within the 90 days, failure to furnish such proof will not nullify or reduce your claim if proof is furnished as soon as reasonably possible but no more than one year after the 90 days except if you are legally unable to notify us.

**How and When We Pay Benefits.** We will pay the benefits of this policy from our Home Office in United States dollars. We will not pay any benefit until we have sufficient proof of loss to do so. When we have determined that your claim is valid, we will pay the benefits provided in this policy. We will pay them in the amounts and at the times described in the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

While you are living, we will pay all benefits to you, the Insured. If any amount is payable after you die, we will pay it to your estate. If any premium has been paid beyond the policy month in which you die, we will pay the unearned premium to your estate.

## GENERAL PROVISIONS

**Owner.** You own this policy. You have all the rights and privileges granted by this policy while you are living.

Some of your ownership rights are:

1. the right to continue or terminate this policy;
2. the right to name someone else to receive the benefits of this policy;
3. the right to suspend this policy while you are in military service; and
4. the right to assign any or all rights under this policy.

**Change of beneficiary.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. If you do assign any rights, the terms of the assignment must specify the rights which are assigned and the term of the assignment. The right to receive benefits will remain with you, the Insured, unless that right is expressly assigned. When an assignment is in effect, "you" and "your" refer to the assignee in provisions which describe ownership rights.

An assignment will not be binding on us until we receive the original or an acceptable copy of it at our Home Office. We are not responsible for the validity of an assignment or for the effects of an assignment.

**Military Service Provision.** If you join any military force or a civilian unit serving such a force, you may continue or suspend this policy. When you notify us to suspend this policy, we will refund any premium paid for time after the date we receive the notice.

You are not covered for a disability or loss which is caused by an accident which occurs or a **sickness** which is first treated or diagnosed while this policy is suspended until you have worked full-time for six months.

If you terminate full-time active duty before this policy has been suspended for five years, we will reinstate it, without evidence of insurability, when we receive:

(1) your written request to reinstate; and

(2) the premium for the period from the date you terminate full-time active duty to the next premium due date.

If we don't receive both the request and the premium within ninety days after you terminate full-time active duty, you may still apply for reinstatement. In this case you must comply with the Reinstatement provision.

**Legal Actions.** No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, we will pay the amounts which the premium paid would have bought for the correct age.

If we accept premium for coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you live on the Effective Date, it is amended to conform with the minimum requirements of those statutes.

LEG

PART I 1366,35 **Unionmutual**
Health Insurance Application to
UNIONMUTUAL STOCK LIFE INSURANCE CO. OF AMERICA
Portland, Maine

1. Print Proposed Insured's Legal Name ☒ Male ☐ Female
Leung Richard J. 26
(Last) (First) (Mid. Init.) Age

2. Birthdate [redacted]
Birthplace New Jersey

3. Residence Address:
336 Bonair St.
No. & Street/No. & Bldg. Name
Apartment No./Suite No./Box No./RFD No.
La Jolla California 92037
City and State Zip Code

4a. Employer How long? 1 yrs.
Name Univ. of Calif. San Diego University Hospital
225 Dickinson St
No. & Street/No. & Bldg. Name Taxpayer Ident. No.
Apartment No./Suite No./Box No./RFD No.
San Diego, Ca. 92103
City and State Zip Code

b. Occupation (Give exact duties):
Physician: Resident – Surgery

5a. Who will pay premiums? ☒ Proposed Insured ☐ Employer

b. Send Premium Notices To: ☒ Residence Address ☐ Employer's Address ☐ Other (Specify)
Name
Address
No. & Street/No. & Bldg. Name
Apartment No./Suite No./Box No./RFD No.
City and State Zip Code

6. Plan 1-80 * Step Rate? ☒ Yes ☐ No

| Benefit Period | Amount | Elimination Period |
|---|---|---|
| Lifetime Sickness / Lifetime Accident | $1,500 | 30 Days |

(If benefit period is Lifetime, any amount applied for above our lifetime limit will be issued with a benefit period to age 65.)

Optional Benefits:
☐ Residual Disability Rider
☐ Cost of Living Rider: ☐ 6% ☐ 10%; ☐ 1 yr. W.P. ☐ 2 yr. W.P.
☒ Future Insurance Option $500
☐ Lifetime Loss of Use-Sickness
☐ Nondisabling Injuries
☐ One Year Additional Benefit, ______ days E.P.
Other:

*Complete Supplementary Application for Overhead Expense or Business Purchase Policy.

7. Premiums Payable: ☒ Ann. ☐ Semi-Ann. ☐ Quar.
☐ PAC: ☐ New Acct. ☐ Current Acct. No.
☐ List Billed: ☐ Ann. ☐ Semi-Ann. ☐ Quar. ☐ Mo.
☐ New Acct. ☐ Current Acct. No.
no money ward

8. Earned Income: Salaried — $20,000 per year
Nonsalaried — Gross Income $______ minus Expenses $______ EQUALS Net Income $______

If Unearned Income (Net investment income from securities, banks or real estate and any other income not dependent on ability to work) is more than $[illegible],000 give sources and amounts:

9a. List all life and disability insurance, group or individual, which is now in force on Proposed Insured. (Include Unionmutual. If more space is needed, please use back page of this application. If none, write "none.")

| Insurance Co. | Type of Coverage Dis. Inc., O.E., Buy/Sell | Year Issued | DISABILITY Mo. Ben. | DISABILITY Ben. Per. | LIFE |
|---|---|---|---|---|---|
| | | | $ | | $ |
| NONE | | | $ | | $ |
| | | | $ | | $ |
| | | | $ | | $ |
| | | | $ | | $ |
| | | | $ | | $ |

b. Does the employer offer any group disability insurance not listed above? ☐ Yes ☒ No
(If yes, explain eligibility, amount offered and why Proposed Insured is not covered.)

348-81 (1)

10a. Will the insurance applied for replace or change any now in force under a policy or a policy application? ☐ Yes ☒ No

b. If "yes", identify company, policy number or application number, and date other insurance will be terminated. Explain any other changes.

| Company | Amount | Plan of Ins. | Policy or Application No. | Termination Date |
|---|---|---|---|---|
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |

| 11. HAVE YOU: | Yes | No | Full Details of Each "Yes" Answer — Include dates (Identify answer by its number) |
|---|---|---|---|
| a. Any application for any other Life or Health Insurance on your life now pending or contemplated in this or any other company? | ☐ | ☒ | |
| b. Received or claimed indemnity, benefits or a pension for any injury, sickness, or impairment during the past 10 years? | ☐ | ☒ | |
| c. Flown or do you contemplate flying as a pilot, student pilot, or crew member in any type of aircraft? | ☐ | ☒ | |
| d. Engaged in or do you plan to engage in parachuting, motor vehicle racing, underwater diving, or any other hazardous activities? | ☐ | ☒ | |
| e. Received counseling or treatment regarding the use of alcohol or drugs? | ☐ | ☒ | |
| f. Any expectation of military service within 6 months? | ☐ | ☒ | |
| g. Had your driver's license suspended or revoked during the past 5 years? | ☐ | ☒ | |
| 12. a. Are you a U.S. citizen (If not, explain) | ☒ | ☐ | |
| b. Have you any intention of traveling or residing outside the U.S.A. and Canada in the next two years? | ☐ | ☒ | |

13. THIS SPACE FOR HOME OFFICE USE ONLY.

14. SPECIAL REQUESTS: ☐ Date to save age

**AGREEMENT: I UNDERSTAND AND AGREE THAT:** (1) I have reviewed this application. The statements and answers in the above Part I and in any Part II are true, complete and correctly recorded to the best of my knowledge and belief. The Company can rely on them as the basis for issuing a policy. (2) No agent, broker or medical examiner, and no employee except an authorized Home Office employee can: (A) determine if I am eligible for a policy; (B) promise, make or modify any policy of insurance; or (C) waive any of the Company's requirements. (3) If a premium deposit has not been paid with this application, no insurance will be in force until the full first premium has been paid and the policy has been delivered to me and then only if my health, activities and occupation are substantially the same as stated in the application. (4) If a premium deposit has been made, insurance will become effective only as provided by the terms of the "RECEIPT" numbered the same as this application. (5) No change in plan or amount of insurance, issue age, classification or benefits will be effective unless I agree to the change in writing. Changes to correct technical or administrative errors on this application are ratified by acceptance of the policy that is issued provided the changes are permitted where the application is signed. (6) If I do not replace existing insurance as stated in Question 10, benefits under any policy issued will be reduced by the amount payable under such existing insurance. (7) I will be the owner of any policy issued.

Signed at San Diego, California Date Signed April 22, 1982

[signature] Witness: Signature of Agent or Broker

[signature] Signature of Applicant (Proposed Insured) N661286

[signature] General Agent or Manager SAN DIEGO 27

020392 Policy not prepaid. Application receipt not used - detached from application at Home Office

*Insurance Application to*

**Unionmutual**

☐ Union Mutual Life Insurance Company - Portland, Maine

☐ Unionmutual Stock Life Insurance Co. of America — Portland, Maine

**PART II**

*To be completed by Agent, if non-medical basis, or by Medical Examiner if on medical basis*

1. Full name of Proposed Insured: Richard J. Leung — 1a. Birthdate: [redacted]-55

2. HAVE YOU EVER: (Yes / No)
   a. applied for insurance which was declined, postponed, rated or modified in any way? — No
   b. been rejected, deferred, or discharged from military service for physical or mental reasons? — No
   c. changed occupation or residence because of health? — No
   d. used narcotics or sedatives habitually or been treated for alcoholism or a drug habit? — No
3. Have any of your parents, brothers or sisters had diabetes? — No
4. Have you any deformity, amputation or impairment of sight or hearing? — No
5. a. Have you had a physical check-up within 5 years? (Give names of physicians, dates and reason for last examination.) — Yes
   b. Did any complaints or symptoms prompt the examination? — No
   c. Were you given any treatment, prescription or advice? — No
6. HAVE YOU EVER HAD:
   a. a surgical operation? — Yes
   b. surgery advised and not yet performed? — No
7. HAVE YOU EVER BEEN TREATED FOR OR HAD ANY KNOWN INDICATION OF:
   a. high blood pressure? — No
   b. pain, pressure or discomfort in the chest, palpitation, heart murmur, rheumatic fever or other disorder of the heart? — No
   c. anemia, varicose veins or other disorder of the blood or blood vessels? — No
   d. asthma, pleurisy, tuberculosis or other disorder of the lungs or respiratory system? — No
   e. epilepsy, convulsions, recurrent dizziness, fainting spells, paralysis, mental illness, nervous breakdown or other disorder of brain or nervous system? — No
   f. hernia, ulcer or other disorder of the stomach, gallbladder, liver, intestines or rectum? — No
   g. diabetes, thyroid or other glandular disorder? — No
   h. arthritis, back trouble, gout or other disorder of the skin, bones or joints? — Yes
   i. a polyp, tumor or cancer? — No
   j. sugar, albumin or blood in your urine? — No
   k. nephritis, kidney stones, prostatitis or other disorder of the genitourinary system? — No
   l. any disorder of eyes or ears? — No
8. OTHER THAN AS MENTIONED ABOVE, HAVE YOU IN THE LAST 5 YEARS:
   a. consulted or been treated by a doctor? — No
   b. had an x-ray, electrocardiogram or other special test? — No
   c. had any disease, illness, injury or impairment? — No
   d. had treatment or observation in a hospital, clinic or sanitarium? — No

FULL DETAILS OF EACH "YES" ANSWER
*(Include dates, duration, results and names and addresses of physicians and hospitals — identify answer by its number.)*

5a. MED. School P.E. School of Medicine
Univ. of Maryland
Baltimore, M.D.
All Findings W.N.L.

5a. Employment P.E.
Univ. of Calif. San Diego
University Hospital
1981
All Findings W.N.L.

6a. Repair of Deviated Septum
1977 Hackensack Hospital
Hackensack, New Jersey
No Complications or Residuals.

7h. Tendinitis — R. Foot.
1 Month
Jan 1981
Motrin for 2 wks.
Resolved - No Recurrances.
(After Training and Competing in Marathon)
Self treated

9. FAMILY RECORD

| | Living Age | Living Health | Dead Age | Cause of Death |
|---|---|---|---|---|
| Father | 58 | Good | | |
| Mother | 53 | | | |
| Brothers No. Living 1 No. Dead Ø | 32 | Excellent | | |
| Sisters No. Living 4 No. Dead Ø | 30 24 21 16 | Excellent | | |
| Spouse | | | | |

10. ~~a. If pregnant, give expected date of delivery~~
~~b. Have you ever had any disease or disorder of the generative organs or breasts? (If "yes," give details above)~~

11. Complete if non-medical
a. Height 5 ft. 9 in.
b. Weight 160 lbs.
c. Weight change during past year Ø lbs. Gain ☐ Loss ☐
d. Cause N/A

I hereby declare that all the statements and answers to the above questions are complete and true to the best of my knowledge and belief, and I agree that they shall form a part of the contract of insurance applied for.

N661286

Signed at San Diego, Ca. this 22nd Day of April 82

Craig R. Appelfield — Witness (Agent - Medical Examiner)

(X) Richard J. Leung MD — Signature of Proposed Insured

**MEDICAL EXAMINER'S VOUCHER**

*Detach and mail direct to the Medical Director, Unionmutual, Box 54.., Portland, Maine 04112*

If not an appointed examiner of UNIONMUTUAL please complete the following:
Graduate of ________ Medical School 19___
Names of Companies for which you examine:

Name of person examined ________
Date of examination ________
Agent requesting examination ________
Medical Examiner ________
Address ________

**USE OTHER SIDE FOR CONFIDENTIAL REMARKS OR INFORMATION**

EXH. 1-012

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

## Unum Life Insurance Company of America

Home Office
2211 Congress Street
Portland, Maine 04122

# Exhibit 2



unum
Better benefits at work.

DUPLICATE

unum.com
CS-1085 (06-08)

Insured **RICHARD J LEUNG MD** **05-11-1987** Policy Date

Policy Number **LAD016015** **05-11-1987** Effective Date

**DISABILITY INCOME POLICY**
**NONCANCELLABLE TO AGE 65 AT GUARANTEED PREMIUM RATE**
**THEREAFTER UNTIL AGE 75, RENEWABLE ON EACH POLICY ANNIVERSARY ON WHICH THE INSURED IS EMPLOYED AT LEAST 30 HOURS PER WEEK**
**AFTER AGE 65, PREMIUM RATE IS BASED ON THE INSURED'S AGE ON EACH RENEWAL DATE**

This policy provides disability income benefits under stated conditions. Please refer to the policy provisions where we tell you when and how we will pay benefits. You will find an index of these provisions on Page 2.

**TWENTY DAY RIGHT TO EXAMINE POLICY**

Within 20 days after this policy is delivered to you or your representative, you may cancel the policy for any reason. To cancel this policy, you or your representative must mail or deliver the policy to our Home Office or to one of our authorized representatives. If this is done, the policy will be cancelled from the beginning and all of the premium paid will be refunded.

**RENEWAL**

You may renew this policy on each policy anniversary until the policy anniversary when the Insured's age is 65 by paying each premium before its Grace Period ends. Beginning with the policy anniversary when his age is 65, you may renew this policy until the policy anniversary when his age is 75 by paying the appropriate premium on each premium due date on which he is employed in a regular occupation at least 30 hours a week.

This policy becomes effective on the Effective Date shown on page 3.

Secretary President

unum[sm] DUPLICATE

**UNUM Life Insurance Company of America**
A Stock Insurance Company
Home Office: 2211 Congress Street, Portland, Maine 04122
1-800-227-8138

**TO86**

**Copyright 1986 UNUM Life Insurance Company of America**
Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries

**Index of Policy Provisions**

1 **Twenty Day Right to Examine Policy**

1 **Renewal**

3 **Policy Schedule**

4 **Endorsements** (if any)

5 **Premiums**

5 **Reinstatement**

6 **Definitions**

7 **Benefits**
Disability Benefit.
Benefit for Loss of Use.
Successive Disabilities.
Waiver of Premium.
8 Benefit Indexing Provision.
Indexed Amount.
Transplant Donor Benefit.
Rehabilitation.

8 **Exclusions and Limitations**
Preexisting Condition Limitation.
Multiple Benefits.

9 **Claim Information**
How to File a Claim.
Conditions and Time Limits.
How and When We Pay Benefits.

9 **General Provisions**
The Contract.
10 Incontestable.
Conformity with State Statutes.
Legal Actions.
Misstatement of Age.
Owner.
Loss Payee.
Assignment.

Application and any riders follow page 10.

**POLICY SCHEDULE**

Insured RICHARD J LEUNG MD

05-11-1987 Policy Date

05-11-1987 Effective Date

Policy Number LAD016015

**Summary of Premium***

The premium mode at issue is SEMIANNUAL
Premiums are payable as follows

| Beginning | Annual | Semiannual | Quarterly |
|---|---|---|---|
| 05-11-1987 | $727.65 | $371.10 | $189.19 |
| 05-11-1989 | $917.74 | $468.04 | $238.61 |
| 05-11-1990 | $1,069.44 | $545.41 | $278.05 |
| 05-11-1991 | $1,251.51 | $638.27 | $325.40 |
| 05-11-1992 | $1,412.34 | $720.29 | $367.21 |
| 05-11-1993 | $1,474.61 | $752.05 | $383.40 |
| 05-11-1994 | $1,542.05 | $786.45 | $400.93 |
| 05-11-1995 | $1,615.32 | $823.82 | $419.99 |
| 05-11-1996 | $1,695.84 | $864.89 | $440.92 |
| 05-11-1997 | $1,784.28 | $910.00 | $463.91 |
| 05-11-1998 | $1,881.61 | $959.64 | $489.21 |
| 05-11-1999 | $1,988.74 | $1,014.27 | $517.06 |
| 05-11-2000 | $2,106.70 | $1,074.43 | $547.73 |
| 05-11-2021 | COMPANY RATES THEN IN EFFECT | | |

* Premium Guaranteed to age 65.

**Summary of Coverage - Group 01**

Form- T086 - TOTAL ONLY

Elimination Period- 60 Days

Maximum Benefit Period-TO THE LATER OF (A) AGE 65 POLICY ANNIVERSARY OR (B) 24 MONTHS AFTER DISABILITY PAYMENTS BEGIN

| Description | Effective Date | Maximum Disability Benefit | Annual Premium | Premium Cease Date |
|---|---|---|---|---|
| **TOTAL SUMMARY** | | $5,930 | $1,983.92 | 05-11-2021 |
| | | THEN COMPANY | RATES THEN | IN EFFECT |
| Original | 05-11-1987 | $3,500 | $1,078.35 | |
| Automatic Increase | 05-11-2000 | $228 | $110.37 | |
| Automatic Increase | 05-11-1999 | $219 | $100.32 | |
| All Prior Increases | | $1,983 | $694.88 | |

Policy Schedule, Page 3, Continued

| Rider Form | Description | Rider Date | Benefit Amount | Annual Premium | Premium Cease Date |
|---|---|---|---|---|---|
| LA86 | Lifetime Monthly Accident Benefit For Total Disability Maximum Benefit Period- Lifetime | | | | |
| | **TOTAL SUMMARY** | | $5,930 | $122.78 | 05-11-2021 |
| | Original | 05-11-1987 | $3,500 | $60.90 | |
| | Automatic Increase | 05-11-2000 | $228 | $7.59 | |
| | Automatic Increase | 05-11-1999 | $219 | $6.81 | |
| | All Prior Increases | | $1,983 | $47.48 | |
| SR86 | Step Rate Premium Rider | | | | See rider provisions |

Rider Premiums for the Premium Term are included in the Summary of Premium.

**UNUM LIFE INSURANCE COMPANY OF AMERICA**

**ENDORSEMENTS**
**(Endorsements may be made only by the Company at its Home Office.)**

**UNUM LIFE INSURANCE COMPANY OF AMERICA**

**ENDORSEMENTS**
**(Endorsements may be made only by the Company at its Home Office.)**

In the "Definitions" section on page 6, the definition of "Regular Occupation" has been changed to:

> "Regular Occupation" means the Insured's occupation at the time the Elimination Period begins. If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty.

Signed for us at our Home Office.

Secretary

**UNUM LIFE INSURANCE COMPANY OF AMERICA**

**ENDORSEMENTS**
**(Endorsements may be made only by the Company at its Home Office.)**

In the **"DEFINITIONS"** section, the fourth paragraph of the definition of "Elimination Period" has been changed to:

If the impairment ceases before the Insured satisfies the Elimination Period and he becomes impaired again from the same cause within 12 months, we will combine those periods of impairment to determine when benefits begin.

In the **"BENEFITS"** section, Item 2 of **"Successive Disabilities"** has been changed to:

2. separated from the past period of disability by at least twelve months during which the Insured is able to return to work full time in his regular occupation.

Signed for us at our Home Office.

Secretary

EXH. 2-008

## PREMIUMS

All premiums except the first premium are due on or before the due date. They are payable as stated on page 3.

Each premium will keep this policy in effect and continue coverage for the term shown.

As long as all premiums are paid before the end of their Grace Period, we will not increase the premium rate for this policy before the policy anniversary when the Insured's age is 65. On and after the policy anniversary when his age is 65, the premium is the rate then in effect for his age on each policy anniversary.

The Grace Period is the 31 consecutive days that begin with the day a premium is due. We will keep this policy in effect and continue coverage during that time. If the premium is not paid during those 31 days, this policy and all coverage under this policy will terminate.

If we accept premium after the policy anniversary when the Insured's age is 65, we will keep this policy in effect and continue coverage until the end of the period for which we accept it.

If any premium is paid beyond the month in which the Insured dies or this policy terminates for some other reason, we will refund the amount of the unearned premium paid.

Premiums must be paid in United States dollars.

## REINSTATEMENT

If this policy terminates because a premium is not paid by the end of the Grace Period, you may apply to reinstate this policy at any time until the first unpaid premium is six months overdue.

In order to reinstate this policy, two requirements must be met. They are:

1. a reinstatement application must be completed (to complete a reinstatement application means you submit the reinstatement application with evidence of the Insured's insurability and the full amount of overdue premium); and

2. we approve the reinstatement application.

A reinstatement application must be prepaid, and we will issue a prepayment agreement. The date of the prepayment agreement will be the date the reinstatement application has been completed.

If we approve the reinstatement application, this policy will be reinstated on the approval date. If the overdue premium is paid without submitting a reinstatement application and we keep the premium without requesting a reinstatement application within a reasonable time, this policy will be reinstated the date we receive the premium. If we issue a prepayment agreement and do not approve or disapprove the reinstatement application within 45 days from the date of the prepayment agreement, this policy will be reinstated on that 45th day.

If this policy is reinstated, it will only cover:

1. injury that occurs on or after the date this policy is reinstated; or

2. sickness which is first diagnosed or is first treated more than 10 days after this policy is reinstated.

It WILL NOT cover:

1. any injury or sickness which is excluded by name or description; and

2. any preexisting condition excluded by the reinstatement application.

## DEFINITIONS

"Policy" means the contract of insurance between you and us. This form, all applications and any riders, endorsements, or amendments that are attached to it make up the entire contract.

"Coverage" means a type or amount of benefit provided by this policy. Each benefit, each modification of that benefit for which we require evidence of insurability, and each reinstatement of that benefit is a separate coverage. For purposes of the Incontestable provision, an increase provided by the Benefit Indexing provision is part of the coverage that was indexed unless evidence of insurability is required for that increase.

"You" and "your" refer to the owner of this policy. The owner is the Insured unless ownership rights have been assigned.

"We," "our" and "us" refer to UNUM Life Insurance Company of America.

"Insured" means the person named on page 3. It is the person whom we are insuring. The Insured can not be changed.

"Injury" means bodily harm caused by an accident.

"Sickness" means a mental or physical illness or condition which has been diagnosed or treated.

"To work full time in his regular occupation means the Insured works approximately the same number of hours in the same regular occupation as he was working before disability began.

"Maximum Disability Benefit" means the amount shown on page 3.

"Maximum Benefit Period" means the period shown on page 3.

"Elimination Period" means the number days stated on page 3, preceding the date benefits become payable (other than the Loss of Use Benefit), during which injury or sickness impairs the Insured.

The Elimination Period begins on the first day that the Insured is impaired.

Different Elimination Periods may apply to different coverages under this policy. The Elimination Period for each coverage is described on page 3.

If the impairment ceases before the Insured satisfies the Elimination Period and he becomes impaired again from the same cause within 6 months, we will combine those impairments to determine when benefits begin.

"Impairment," "impairs" and "impaired" mean: (1) injury or sickness totally disables the Insured; and (2) the Insured is receiving medical care from someone other than himself which is appropriate for the injury or sickness.

"Total disability" and "totally disabled" mean injury or sickness restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation.

"Disability" and "disabled" mean the period while the Insured is satisfying the Elimination Period, or while the Disability Benefit or Loss of Use Benefit is payable.

"Regular occupation" means the Insured's occupation at the time the Elimination period begins.

"Preexisting condition" means an injury or sickness suffered by the Insured which exists on the effective date of the coverage and, during the past five years, either:

1. was diagnosed;
2. caused the Insured to receive medical advice or treatment; or
3. caused symptoms for which an ordinarily prudent person would have sought medical advice or treatment.

"CPI-U" means the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics or its successor. We may choose another nationally published index if the CPI-U is replaced or changed. If the new or revised index is proportionate to the CPI-U, we will use the new index. Otherwise, we will choose the index which, in our judgment, most closely reflects the change in the cost of living in the United States. If the change is subject to government approval, we will obtain it before we use the new or revised index.

## BENEFITS

**Disability Benefit.** We will pay the Maximum Disability Benefit in any month after the Insured has satisfied the Elimination Period that:

1. the Insured is totally disabled as a result of the injury or sickness which caused him to satisfy the Elimination Period;

2. the Insured is receiving medical care from someone other than himself which is appropriate for that injury or sickness; and

3. benefits under the Disability Benefit and the Loss of Use Benefit combined have not been paid for the Maximum Benefit Period.

After disability ceases, resumption of this Disability Benefit is subject to the preceding requirements and those stated in the Successive Disabilities Provision.

**Benefit for Loss of Use.** Limited by the Maximum Benefit Period, we will pay the Maximum Disability Benefit monthly while an injury or sickness causes the Insured the total loss of use of:

1. speech, hearing in both ears, or sight in both eyes; or

2. one hand and one foot; or

3. both hands; or

4. both feet.

We will pay this benefit from the date of loss.

After disability ceases, resumption of this Loss of Use Benefit is subject to the preceding requirements and those stated in the Successive Disabilities Provision.

**Successive Disabilities.** A period of disability which follows a past period of disability will be considered a separate period of disability only if the subsequent period of disability is:

1. caused by a different injury or sickness than the one which caused the past period of disability; or

2. separated from the past period of disability by at least six months during which the Insured is able to return to work full time in his regular occupation.

Any such separate period of disability will be considered a new disability; it will be subject to its own Elimination Period and Maximum Benefit Period. Any other subsequent period of disability will be considered an extension of the past period of disability.

**Waiver of Premium.** After disability has lasted for ninety days while this policy is in effect, we will waive the premium as long as the Insured is unable to return to work full time in his regular occupation as a result of the injury or sickness which caused the disability. We will refund premium already paid for that period on a pro rata basis.

EXH. 2-011

**Benefit Indexing Provision.** On each policy anniversary until the policy anniversary when the Insured's age is 55, except during disabiltity, you will automatically have the opportunity to increase the Maximum Disability Benefit by the Indexed Amount provided that:

1. on each fifth policy anniversary, we determine based on evidence submitted that the Insured's coverage then in effect does not exceed our issue and participation limits for the income which he is then earning; and

2. you have not refused the opportunity to increase the Insured's coverage in two consecutive years.

If you can not automatically increase the Maximum Disability Benefit because the Insured did not satisfy provision (1) above, you still may increase the Maximum Disability Benefit by the Indexed Amount on any subsequent policy anniversary until the policy anniversary when his age is 55, except during disability, if on that date the income which he is then earning qualifies him for the increase.

When the opportunity is made available, you may increase the Insured's Maximum Disability Benefit by paying the premium for the increased amount. The premium will be based on his age on that policy anniversary and the premium rate then in effect for this plan. The Maximum Benefit Period, Elimination Period and plan will be the same as for the coverage which is indexed.

**Indexed Amount.** The increase available each year will be the per cent change in the CPI-U between November 30 of the previous calendar year and November 30 of the calendar year before that one or 8%, whichever is smaller, times the current Maximum Disability Benefit for the policy. If the change in the CPI-U is less than 4%, the increase available will be 4% of the current Maximum Disability Benefit.

**Transplant Donor Benefit.** Disability which results from the transplant of a part of the Insured's body to another person's body will be considered caused by a sickness.

**Rehabilitation.** While the Insured is receiving the Disability Benefit, you may request or we may suggest participation in a rehabilitation program designed to help him return to work. If we determine that such a program is appropriate, we will pay reasonable expenses for such items as tuition, books, training programs, or additional living expenses. The actual expenses covered and the terms of the plan will be subject to mutual agreement. Our agreement will be outlined in a written plan of rehabilitation. Benefits will continue as provided by this policy except if they are modified by the plan of rehabilitation.

## EXCLUSIONS AND LIMITATIONS

This policy does not pay benefits which are based on injury or sickness caused by war or an act of war, whether declared or undeclared.

**Preexisting Condition Limitation.** This policy does not pay benefits which are based on a preexisting condition if:

1. the preexisting condition is not disclosed or is misrepresented in the application; and

2. the preexisting condition impairs the Insured or causes a loss of use or other loss during the first two years after the effective date of the coverage.

Benefits will not be paid if they are based on impairment or loss of use or other loss that began before the effective date of the coverage.

**Multiple Benefits.** The Disability Benefit or Loss of Use Benefit payable in any month shall not exceed the Maximum Disability Benefit. In any month that the Loss of Use Benefit is paid, no Disability Benefit will be paid.

## CLAIM INFORMATION

**How to File a Claim.** To make a claim under this policy, the following steps must be taken:

1. give Notice of Claim (someone must notify us that disability has started as defined in this policy);
2. file Proof of Loss (the Insured, or someone acting in his behalf, and his attending physician must complete and return the claim form provided by us);
3. promptly complete and return any other forms we require; and
4. the Insured undergoes a medical examination or a personal interview as often as we reasonably request while the claim is pending. We reserve the right to select the examiner. We will pay for the examination.

We will evaluate the claim and either:

1. pay the benefits specified in the policy; or
2. notify the Insured and any Loss Payee that benefits are not payable and why. If we need more information, we will tell the Insured and any Loss Payee what we need.

**Conditions and Time Limits.** In order for benefits to be payable, there are some conditions and time limits which each of us must meet. They are:

1. We must be given the Notice of Claim within 30 days after the Elimination Period begins, or as soon as reasonably possible.
2. We will furnish claim forms within 15 days after we receive the written Notice of Claim. If the forms are not received within 15 days, send us proof of what happened and the extent of the sickness or injury.
3. The claim forms and other information requested by us (Proof of Loss) must be furnished to us within 90 days after each month for which a benefit is payable. However, failure to furnish such proof within 90 days will not reduce or nullify the claim if proof is furnished as soon as reasonably possible within one year after the 90 days. If the Insured is legally unable to notify us, the one year limit does not apply.
4. We must be given the information which we need to determine if a benefit is payable and how much that benefit should be. We may require relevant portions of income tax returns for the Insured or his business, income statements, vouchers for overhead expenses, and other statements or reports of receipts and payments. We may also require evidence that the Insured was liable for an overhead expense before disability began.

**How and When We Pay Benefits.** We will pay benefits due under this policy in United States dollars. We will not pay any benefit until we have sufficient Proof of Loss. When we have determined that the claim is payable, we will pay according to the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

We will pay all benefits to the Loss Payee if living; otherwise we will pay you. If you die while you are entitled to receive benefits, we will pay any remaining benefit and any unearned premium to your estate.

## GENERAL PROVISIONS

**The Contract.** This policy represents the entire contract between you and us. Statements by agents or brokers are not part of our contract. Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and be endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you something else, years, months and anniversaries that we refer to are calculated from the Policy Date shown on page 3.

**Incontestable.** We will not contest a coverage provided under this policy based on information given in the application for that coverage after that coverage has been in effect during the Insured's lifetime for two years from the effective date of that coverage, excluding any period during which the Insured is impaired or suffers a loss of use or other loss. In no event will we contest a coverage more than three years from the effective date of that coverage.

If impairment or loss of use or other loss begins after a coverage has been in effect during the Insured's lifetime for two years from the effective date of that coverage, we will not reduce or deny a claim which is based on that impairment or loss of use or other loss because of a preexisting condition unless the condition is excluded from coverage by name or description.

"Contest" means that we question the validity of coverage under this policy by letter to you. This contest is effective on the date we mail the letter and refund the premium to you.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where the Insured resides on the effective date of that provision, it is amended to conform with the minimum requirements of those statutes.

**Legal Actions.** No one may start legal action to recover on this policy until 60 days after written Proof of Loss has been given to us. Legal action must be started within three years after the written Proof of Loss is required to be furnished.

**Misstatement of Age.** If the Insured's age has been misstated, any benefit payable will be changed to the amount which the premium paid would have bought for the correct age.

If we accept premium for a coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

**Owner.** You own this policy. You have all of the rights and privileges granted by this policy while it is in effect. Some of your ownership rights are:

1. the right to continue or terminate this policy;

2. the right to name someone else (a Loss Payee) to receive the benefits of this policy;

3. the right to suspend this policy while the Insured is in military service; and

4. the right to assign any or all rights under this policy.

You may reduce the Maximum Disability Benefit at any time. Premium will be recomputed for the reduced amount based on the Insured's age and premium class on the effective dates of the coverages. The reduction will be effective on the date we receive your written request at our Home Office.

**Loss Payee.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. The assignment must be in writing and must specify the rights which are assigned and for how long. The Loss Payee is not changed by an assignment unless the assignment specifically names a new Loss Payee.

No assignment is binding on us until the original or an acceptable copy is received at our Home Office. We are not responsible for the validity or effect of any assignment.



**UNUM Life Insurance Company of America**
**A Stock Insurance Company**
**Portland, Maine 04122**

## LIFETIME ACCIDENT BENEFIT RIDER

This rider is part of the policy to which it is attached. This benefit is subject to the terms and conditions of this rider and the rest of this policy.

This rider becomes effective on the later of the Effective Date of the policy or the Rider Date shown on Page 3 of the policy.

Premiums for this benefit are shown in the rider description on Page 3 of the policy. They are payable until the policy anniversary when the Insured's age is 65 at the same time and under the same conditions as premiums for the policy.

## DEFINITIONS

When used in this rider only:

"Total disability" and "totally disabled" mean

1. injury restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation; and
2. the Insured is receiving medical care from someone other than himself which is appropriate for that injury

Except for "total disability" and "totally disabled," all terms used in this rider which are defined in this policy shall have the meaning given to them in the policy.

## BENEFITS

On the later of the policy anniversary when the Insured's age is 65 or the end of the Maximum Benefit Period, the Disability Benefit Provision is amended to read as follows:

> We will pay the Maximum Disability Benefit in any month after the Insured has satisfied the Elimination Period that:
>
> 1. the Insured is totally disabled; and
> 2. that total disability:
>    a. is the result of injury which occurred before the policy anniversary when his age was 65 and while this rider was in effect; and
>    b. began before the policy anniversary when his age was 65 and has been continuous until the month for which this benefit is payable.

**LA86**

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

**TERMINATION**

Coverage terminates on the policy anniversary when the Insured's age is 65.  However, if the Insured is totally disabled at that time, the Benefit provision of this rider will apply on that date or at the end of the Maximum Benefit Period if later.


Signed for us at our Home Office on the effective date of this rider.


Secretary


**LA86**



**UNUM Life Insurance Company of America**
**A Stock Insurance Company**
**Portland, Maine 04122**

**STEP RATE PREMIUM RIDER**

This rider is part of the policy to which it is attached. It is subject to the terms and conditions of this policy except to the extent the policy's premium terms are modified below.

This rider becomes effective on the later of the Effective Date of the policy or the Rider Date shown on page 3 of the policy.

**PREMIUMS**

Beginning on the second policy anniversary, the premium for this policy will increase annually for four years. Thereafter, the premium will remain level until the policy anniversary when the Insured's age is 65. The premium payable in each policy year is guaranteed at the rate shown on page 3.

**Level Premium Privilege.** At any time after the second policy anniversary, you may change to a level premium. The level premium will be the premium for your age on the policy anniversary one year before the change and based on our rates in effect on the Policy Date.

**TERMINATION**

This rider will terminate at the earliest of:

1. the date you change to level premiums;
2. the fifth policy anniversary; or
3. the date this policy terminates.

Signed for us at our Home Office on the effective date of this rider.

Secretary

**SR86**

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.



Unionmutual Stock Life Insurance Co. of America
Portland, Maine 04122

# APPLICATION FOR DISABILITY INSURANCE – PART I

A103407

***NOTE: "You" and "Your" within this application refer to the proposed insured. PLEASE PRINT ALL ENTRIES.***

**PERSONAL**

1. a) Your Full Name (Last, First, Middle): Leung Richard J., M.D.
   b) Birthdate: [redacted] 55
   c) Age Last Birthday: 31
   d) Social Security No.:
   e) Sex: ☑ Male ☐ Female
   f) Birthplace (State, Country): U.S.
   g) Are you a U.S. or Canadian citizen? ☑ Yes ☐ No — # years worked/resided in U.S. ____ YRS.

2. a) Residence Address: Street 1750 Manhattan Apt # ____
   City Manhattan Beach State CA. Zip 90266

   Mailing Address If Other Than Residence: Box No./Street ____ Apt # ____
   City ____ State ____ Zip ____

   b) Business Name and Address: Employer Name Calif. Eye Medical & Surgical
   Street 1127 Wilshire Blvd. Ste. # 1400
   City Los Angeles State CA. Zip 90017

**OCCUPATION**

***Answer EITHER 3a or 3b, AND 3c below.***

3. a) If you are an Accountant, Attorney, Trial Attorney, Controller, Dentist*, Optometrist, Pharmacist, (Physician*) [circled], Podiatrist*, or Psychologist (Ph.D.), **CIRCLE** your occupation.
   * If Dentist, Physician or Podiatrist, please provide specialty, if any: Opthamologist
   (If None, Please Write "NONE.")

**OR**

b) If you are engaged in an occupation not listed in 3a above, please **COMPLETE** b1 through b4 below:

b1) Occupation and title or professional designation ____

b2) Length of time employed in this occupation ____ YRS.

b3) Please describe the duties of your occupation: ____

b4) Are you an: ☐ Owner* ☐ Partner* ☐ Employee
* If owner or partner, how many years has your firm/business been in existence? ____ YRS.
Number of full-time year round employees in this firm/business ____

c) What is the number of hours you usually work per week in the occupation given above? 40+ HRS.

**EARNINGS**

4. a) Annual earned income from personal services (after business expenses, if any) as reported on your Federal Income Tax Return:

| | Last Year | Current Year (est.) |
|---|---|---|
| Salary, Draw, Professional Fees | $ 28,700 | $ 120-125,000 |
| Other (describe): | NONE | NONE |

b) List your unearned income from investments or other sources (e.g., dividends, interest, net rental income, etc.):

| | Last Year | Current Year (est.) |
|---|---|---|
| Taxable & Tax Exempt Dividends & Interest | $ NONE | $ NONE |
| Rental Income (Gross income less expenses, not including depreciation) | NONE | NONE |
| Other (describe): | | |

c) Does your net worth exceed $4,000,000? ☐ Yes ☑ No If "Yes," complete question 4d.

635-85

d) **To Be Completed Only If N--- Worth Exceeds $4,000,000:**

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash, Savings, Stocks, Bonds | $ ______ | Mortgage on Residence | $ ______ |
| Residence | ______ | Mortgage on Other Properties | ______ |
| Other Real Estate | ______ | Other Loans | ______ |
| Personal Property | ______ | Miscellaneous Payables | ______ |
| Other: ______ | ______ | Other: ______ | ______ |

OTHER INSURANCE

5 a) List below all **disability** insurance currently in force or that you have applied for in the last six months.
☐ **If None**, check here, and go directly to 5c.

| # | COMPANY NAME | TYPE OF COVERAGE* | BENEFIT AMOUNT | BENEFIT PERIOD | ELIM. PERIOD | STATUS: Applied For | STATUS: In Force Standard | STATUS: In Force Substandard |
|---|---|---|---|---|---|---|---|---|
| 1 | UnionMutual | IND | 1500 | L/L | 30 | ☐ | ☑ | ☐ |
| 2 | | | | | | ☐ | ☐ | ☐ |
| 3 | | | | | | ☐ | ☐ | ☐ |
| 4 | | | | | | ☐ | ☐ | ☐ |

*Individual (including Soc. Sec. Rider), Group, Association, Overhead, Key Person, Buy-Sell or Salary Continuation.

b) Which of the above will be changed, terminated, not taken, or replaced by the coverage(s) that you are applying for on this application. ☑ **If None**, check here, and go directly to 5c.

| # FROM 5a | DATE OF CHANGE OR TERMINATION | DETAILS – IF CHANGE |
|---|---|---|
| | | |
| | | |

c) Do you have in force or have you applied for any individual life insurance?
☐ Yes – If "Yes," what is the total amount? $ ______
☑ No

MEDICAL

| | YES | NO |
|---|---|---|
| 6 a) During the last 30 days, have you worked in your regular occupation (stated in section 3) less than your usual number of hours per week because of sickness or injury? | ☐* | ☑ |
| b) In the past 12 months, have you had any indication of, been told you had, or been treated for cancer, a stroke, any heart disease or disorder or any psychological or emotional disorder? | ☐* | ☑ |

***IF EITHER 6a or 6b ARE ANSWERED "YES," PREPAYMENT CANNOT BE ACCEPTED.**

***SECTIONS 7-10 NEED NOT BE COMPLETED IF UNIONMUTUAL PARTS II & III WILL BE COMPLETED.***

| 7 **Have you ever had any indication of, been told you had, or been treated for:** | YES | NO |
|---|---|---|
| a) high blood pressure or any disease or disorder of the heart, blood, blood vessels, lungs or bronchi, liver or the digestive, urinary, reproductive or immune system? | ☐ | ☑ |
| b) diabetes, a tumor, cancer, arthritis, neck or back trouble, depression, or any emotional, brain or nervous system disorder? | ☐ | ☑ |
| c) any physical impairment or deformity, loss of vision or hearing, or disease or disorder of the eyes or ears? | ☐ | ☑ |
| 8 **Other than as already mentioned above, have you in the past five years** consulted or been advised to consult a physician, psychiatrist, psychologist, counselor, chiropractor or other practitioner? (Include regular check-ups.) | ☑ | ☐ |
| 9 Do you regularly use prescription or nonprescription drugs? | ☐ | ☑ |

10 Height 5 ft. 10 in. Weight 165 lbs. Weight change last year n/a lbs. ☐ Gain ☐ Loss

EXH. 2-019

MEDICAL CONT

Give details by Question Number f[illegible]y "Yes" answers to questions 6-9:

| QUES. # | DATE | NAME AND ADDRESS OF PHYSICIAN AND/OR HOSPITAL | REASON | TREATMENT/ ADVICE | RESULT/ DIAGNOSIS |
|---|---|---|---|---|---|
| 8 | 2/83 | John Alksney UCSD Med. | Back Surgery | | Complete Recovery- |
| | | La Jolla, CA. 92037 | | | No Residua |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SPECIAL

11 SPECIAL REQUESTS
- ☐ Date to Save Age
- ☐ Add to existing policy # ________
- ☐ Other – please explain:

PLAN DESIGN

12 a) Have you smoked any cigarettes in the past twelve months? ☐ Yes ☑ No

b) Occupational Class AAA*

13 a) Individual Disability Policies:
- ☐ 1. Owner - Professional:
  Overhead Rider (Dollar for Dollar):
  ☐ Yes* ☐ No
- ☐ 2. Owner - Manager:
  Overhead Rider (Total Disability):
  ☐ Yes* ☐ No
- ☐ 3. Executive/Professional
- ☑ 4. Total Disability:
  Overhead Rider (Total Disability):
  ☐ Yes* ☑ No
- ☐ 5. AA
- ☐ 6. Other: ________
- ☐ 7. Other: ________

Business Disability Policies:
- ☐ 8. Buy Sell – complete Supplemental App.
- ☐ 9. Key Person – complete Supplemental App.
- ☐ 10. Overhead Expense as a Separate Policy*
  - ☐ Dollar for Dollar
  - ☐ Total Disability
- ☐ 11. Other: ________

* Also complete Section 15.

***IF YOU ARE APPLYING FOR A SEPARATE OVERHEAD EXPENSE POLICY ONLY, GO DIRECTLY TO SECTION 15.***

**IF PREMIUMS ARE ALLOCATED TO MORE THAN ONE PERSON, THE OWNER IS STILL RESPONSIBLE FOR PREMIUMS FOR ALL COVERAGES.**

b) How will premiums be allocated for the Individual Disability Policy applied for? (Exclusive of O.E. Coverage)
- ☑ Insured (Owner) will pay 100% - Go directly to c1 & d1 (the shaded sections) on the next page.
- ☐ Employer/Business/Practice will pay 100% – Go directly to c2 & d1 on the next page.
- ☐ Both will pay premiums. Costs will be allocated by:
  - ☐ Plan design – complete c1 & c2 and d1 & d2 on the next page.
  - ☐ % of total premium – indicate ________% paid by Employer/Business/Practice and complete c1 & d1 on the next page (the shaded sections). (Indicate the total monthly benefit amount applied for.)

EXH. 2-020

PLAN DESIGN CONT

c1) Proposed Insured Will Pay Premiums For:
Monthly Benefit Amount: $ 2500.
Benefit Period: ☒ 65/65 ☐ 5/5 ☐ 2/2
Elimination Period: ☐ 30 ☒ 60 ☐ 90 ☐ 120
☐ 180 ☐ 360 ☐ 720 ☐ 780* ☐ 810* ☐ Other: ______
If buying additional coverage with a different BP or EP:*
Monthly Benefit $______
Benefit Period ______
Elimination Period ______
*SEE INSTRUCTIONS

c2) Employer/Business/Practice Will Pay Premiums For:
Monthly Benefit Amount: $ ______
Benefit Period: ☐ 65/65 ☐ 5/5 ☐ 2/2
Elimination Period: ☐ 30 ☐ 60 ☐ 90 ☐ 120
☐ 180 ☐ 360 ☐ 720 ☐ 780* ☐ 810* ☐ Other: ______
If buying additional coverage with a different BP or EP:*
Monthly Benefit $______
Benefit Period ______
Elimination Period ______
*SEE INSTRUCTIONS

d1) Optional Benefits for Individual Disability Policies:

d2) Premiums for Optional Benefits Will Be Paid By: Proposed Insured / Employer/Bus./Practice — "x" the appropriate box(es)

| d1) Optional Benefit | Proposed Insured | Employer/Bus./Practice |
|---|---|---|
| ☐ DI Supplement Age 55 $______ EP______ | ☐ $______ EP______* | ☐ $______ EP______* |
| ☐ Retirement | ☐ $______* | ☐ $______* |
| ☐ COLA/GIF: ☐ Simple ☐ Compound | ☐ $______* | ☐ $______* |
| COLA: ___% (4-15%)* GIF: ___% (0-11%)* | | |
| *Combination of COLA & GIF cannot exceed 15% | | |
| ☐ Retirement Recovery COLA (Applicable only if Retirement Benefit is chosen) | | |
| ☐ Future Insurance Option $______ | ☐ OR | ☐ |
| ☐ College: | ☐ OR | ☐ |
| Name / Birthdate / Amt. | | |
| Child 1 ______ __/__/__ $______ | | |
| Child 2 ______ __/__/__ $______ | | |
| Child 3 ______ __/__/__ $______ | | |
| ☐ NDI (only one benefit per Proposed Insured) | ☐ OR | ☐ |
| ☒ Lifetime Accident | ☐ $______* | ☐ $______* |
| ☒ Lifetime Sickness ☐ Age 55 ☒ Age 60 | ☐ $______* | ☐ $______* |
| ☐ Other: ______ | ☐ | ☐ |
| ☒ Step Rate | | |
| ☐ Occupational Rehabilitation | | |

COMPLETE THIS SECTION ONLY FOR SPLIT FUNDING BY PLAN DESIGN

*SEE INSTRUCTIONS

e) If you want us to increase your personal DI benefit amount (annual benefit indexing) in a special month other than your policy anniversary month, please specify: ______ (Month)
(NOTE: this will determine your billing date.)

f) Loss Payee (To whom should benefits be paid):

☒ Proposed Insured

☐ Employer/Business/Practice (as shown on page 1) – Tax ID# ______

☐ Other: Name ______ Soc. Sec. or Tax ID# ______

Address ______

City ______ State ______ Zip ______

BILLING

14 a) Premium notices for the Ind. Dis. Policy (and Overhead Rider, if chosen) are to be sent to: ("x" only one box*)
☒ Proposed Insured at: ☒ Residence ☐ Business
☐ Employer/Business/Practice (as shown on page 1) – Tax ID# ______
☐ Other: Name ______ Soc. Sec. or Tax ID# ______
Address ______
City ______ State ______ Zip ______
*If duplicate premium notices should be sent elsewhere, please indicate in Special Requests, Section 11.

b) Premium Mode: ☐ 2 Year Advance Annual — 20% discount applicable to 2nd annual premium
☐ Annual
☐ Semi-Annual
☒ Quarterly
☐ Monthly – Available only for Automatic Payment Plans or FlexBill Cases

☐ FlexBill:
☐ New Account
☐ Current FlexBill # ______

☐ Automatic Payment Plan ("A.P.P."):
☐ New Account – Complete attached A.P.P. Authorization.
☐ Current Account # ______

EXH. 2-021

OVERHEAD EXPENSE

**15 TO BE COMPLETED IF APPLYING FOR OVERHEAD EXPENSE COVERAGE**

| a) Monthly Benefit Amount | b) Elimination Period | c) Benefit Period |
|---|---|---|
| $ | ☐ 30 ☐ 60 ☐ 90 | ☐ 6 mos.* ☐ 12 mos. ☐ 18 mos. ☐ 24 mos.<br>*Available only if Overhead Expense is applied for as a rider |

d) Optional Benefits for Overhead Expense Coverage

☐ Business Continuance:
$______ EP: ☐ 30 ☐ 60 ☐ 90
BP: ☐ 6 mos. ☐ 12 mos.*
*Available only if the Benefit Period for Overhead Expense Coverage is 12 mos. or longer

☐ Partial Disability**: ☐ 30% ☐ 60%
☐ Future Insurance Option: $______
☐ Other: ______
**Partial **not available** on Dollar for Dollar Coverage

e) Loss Payee (To whom should benefits be paid):

☐ Proposed Insured

☐ Employer/Business/Practice (as shown on page 1) – Tax ID# ______

☐ Other: Name ______ Soc. Sec. or Tax ID# ______

Address ______

City ______ State ______ Zip ______

f) List below the total monthly expenses of the business entity for which **you are liable:**

| | | | |
|---|---|---|---|
| Rent or Mortgage Payment | $______ | Utilities | $______ |
| Employee Salaries* | ______ | Maintenance | ______ |
| Employee Benefits* | ______ | Accounting/Legal Fees | ______ |
| Malpractice Insurance | ______ | Professional Dues | ______ |
| Property and Casualty Insurance | ______ | Subscriptions | ______ |
| Property Taxes | ______ | Postage/Stationery | ______ |
| Equipment Payments | ______ | Other Miscellaneous | ______ |
| Auto Lease Payments | ______ | **TOTAL MONTHLY EXPENSES** | $______ |

* Do not include salaries, drawing accounts, profits, benefits and other forms of remuneration which are payable to you or to anyone employed in your business who performs the same regular occupation as you do EXCEPT: ON DOLLAR FOR DOLLAR COVERAGE salaries and other forms of remuneration may be included for you or anyone else employed in your business if all income generated by that person is included in your gross revenue.

g) If Overhead Expense is issued as a rider, who will be the premium payor for the Overhead Expense Coverage?
☐ Proposed Insured ☐ Employer/Business/Practice – Tax ID# ______

**IF YOU ARE APPLYING FOR A SEPARATE OVERHEAD EXPENSE POLICY ONLY, ALSO COMPLETE h THROUGH j BELOW:**

h) If you want us to increase your monthly Overhead Expense benefit amount (annual benefit indexing) in a special month other than your policy anniversary month, please specify: ______ (Month)
(NOTE: This will determine your billing date.)

i) Premium notices for the Overhead Expense Policy are to be sent to: ("x" only one box*)

☐ Proposed Insured at: ☐ Residence ☐ Business

☐ Employer/Business/Practice (as shown on page 1) – Tax ID# ______

☐ Other: Name ______ Soc. Sec. or Tax ID# ______

Address ______

City ______ State ______ Zip ______

***If duplicate premium notices should be sent elsewhere, please indicate in Special Requests, Section 11.**

j) Premium Mode for Overhead Expense Policy: ☐ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly – Available only for Automatic Payment Plans or FlexBill cases

☐ FlexBill:
☐ New Account
☐ Current FlexBill Account # ______

☐ Automatic Payment Plan ("A.P.P."):
☐ New Account – Complete attached A.P.P. Authorization.
☐ Current Account # ______

EXH. 2-022

PREPAY

16 Prepayment of Policy(ies)
List from Section 13a the corresponding #(s) of the plans which are to be prepaid:

#______ $______; #______ $______; #______ $______; #______ $______

Prepayment Amount: $__________

NOTE: Prepayment must equal or exceed 1/6 of the total annual premium for all plans listed.

## AGREEMENT

A103407

*I (each of the undersigned) have **carefully read** this application and I **understand** and **agree** that:*

1. all of the statements made in this application must be and are true, complete and correctly recorded to the best of my knowledge and belief;
2. the Company will rely on the information provided in this application and any supplemental applications, medical exams or tests, and other questionnaires to determine whether to provide the requested coverage; those completed documents shall form a part of my contract of insurance; and any coverage provided based on such information is contestable in accordance with the provisions of the policy providing such coverage;
3. no information concerning any matter asked about in the application shall be considered known to the Company unless stated in the application;
4. no agent, broker, medical examiner or other person, except an authorized Home Office employee, may:
   a. change or waive questions asked or answers given in the application or the medical exam;
   b. determine if I am eligible for a policy;
   c. make, or promise that I will be issued a policy of insurance; or
   d. change or waive any rights or requirements of the Company;
5. a. If I do not qualify for the coverage I applied for, the Company may offer a policy with changes in the plan, amount, coverage, premium, classification or benefits. I will have the opportunity to approve those changes and no coverage will be effective without my written agreement;
   b. changes made by the Company to correct technical or administrative errors on this application will be considered ratified by me if I accept the policy that is issued **unless** the changes are prohibited in the State in which the application is signed;
6. if I did not prepay premium with this application, insurance will be effective when a policy has been delivered to me and I have paid the first premium, provided that, on the later of the delivery date or payment date, the answers in the application and in any supplemental application, medical exam or other questionnaire are then still true and complete;
7. if I prepaid premium with this application, insurance will become effective only as provided by the Premium Prepayment Agreement;
8. Effective Date is the date coverage begins; Policy Date is the date the Company uses to determine my age for premium payment and the date from which premiums will be paid. There is no coverage until the Effective Date, even if the Policy Date is earlier;
9. if I stated in response to question 5b on page 2 of this application that I would replace or change existing insurance and I have not done so when a disability begins:
   a. any benefits payable by the Company as a result of this application will be **reduced** by the amount of existing coverage which I said I would terminate; and
   b. my premium will be changed to reflect the actual benefits received;
10. payment of all premium is my responsibility as owner of the policy. If my employer, broker, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company. If the Company does not receive premium as due, the policy will lapse.

Signed at *San Diego, Ca.* on *Mar. 9*, 19*87*

*Wayne A. Waskowiak* — Witness (Broker)

*Donald J. Leung MD.* — Proposed Insured

__________ Applicant (if other than Proposed Insured)

LAD016015

EXH. 2-023

# Exhibit 3



unum
Better benefits at work.

DUPLICATE

unum.com

CS-1085 (06-08)

UA-POL-IDI (LAN780636)-000001
**EXH. 3-001**



Insured
Owner
Policy Number
DUPLICATE
Policy Date
Effective Date

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

**Examine This Policy For Ten Days**

You have ten days to decide if this policy meets your needs. If you are not fully satisfied, give it back to us within ten days of the day you receive it. Mail or deliver it to the Home Office or to the agent you bought it from. We will cancel the policy from the beginning and refund the premium paid.

A few words about this policy:

We have tried to write this policy so you can understand it. Of course, we have to write it within the framework that the insurance laws allow. Therefore, you may find some words or statements that you do not understand. If you do, please write to us. We will be happy to clarify for you, in writing, anything you do not understand.

"You" and "your" refer to the person insured. "We," "our" and "us" refer to Unum Life Insurance Company of America.

This policy provides disability income benefits under stated conditions while you are **totally disabled**. Please refer to the policy provisions where we tell you what amounts we will pay and when we will pay. You will find an index of these provisions on Page 2.

This policy may also provide additional benefits, or contain other provisions which have been added by means of Riders. If the policy includes any Riders, you will find them listed in the Policy Schedule on Page 3. To determine your benefits, please refer to the Riders as well as the basic policy provisions.

This policy is effective on the Effective Date shown on page 3.

Secretary

President

UNUMPROVIDENT

**Unum Life Insurance Company of America**
Home Office:
2211 Congress Street
Portland, Maine 04122

## Index of Policy Provisions

3    **Policy Schedule**

4    **Endorsements** (if any)

5    **Renewal and Premium Provision**
        Premiums.
        Renewal Before Age 65.
        Renewal After Age 65.
        Reinstatement.

5    **Definitions**

6    **Benefit Provisions**
        Total Disability Benefit.
        Loss of Use Benefit After Total Disability.
        Successive Disabilities.
        Transplant Donor Benefit.
        Rehabilitation Benefit.
        Waiver of Premium.

6    **Exclusions and Limitations**
        Preexisting Conditions Excluded.

6    **The Contract**
        Incontestable.

7    **Claim Information**
        How to File a Claim.
        How and When We Pay Benefits.

7    **General Provisions**
        Owner.
        Military Service Provision.
8    Legal Actions.
        Misstatement of Age.
        Conformity with State Statutes.

Application and any riders follow page 8.



LA N780636 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

POLICY CHANGE STATEMENT

THIS STATEMENT REPLACES PAGE 3 OF THE POLICY AND ANY PRIOR POLICY CHANGE STATEMENT. THE POLICY NOW PROVIDES THE FOLLOWING COVERAGE.

INSURED RICHARD J LEUNG MD — 05-05-1990 POLICY DATE

OWNER THE INSURED — 12-19-1998 EFFECTIVE DATE OF CHANGE

POLICY NUMBER LA N780636

SUMMARY OF PREMIUMS*

PREMIUMS ARE PAYABLE AS FOLLOWS

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
|---|---|---|---|
| 12-19-1998 | $ 441.00 | $ 224.91 | $ 114.66 |
| 05-05-2021 | COMPANY RATES THEN IN EFFECT. | | |

* PREMIUM GUARANTEED TO AGE 65

SUMMARY OF COVERAGE

POLICY FORM- D1-80 ANNUAL PREMIUM- $ 441.00 UNTIL 05-05-2021

ACCIDENT ELIMINATION PERIOD- 30 DAYS. SICKNESS ELIMINATION PERIOD- 30 DAYS.

MAXIMUM MONTHLY BENEFIT FOR TOTAL DISABILITY-
ACCIDENT-
$ 1,000.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.
$ 1,000.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL DISABILITY BEGAN PRIOR TO AGE 65 POLICY ANNIVERSARY.
SICKNESS-
$ 1,000.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.
$ 1,000.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL DISABILITY BEGAN PRIOR TO AGE 55 POLICY ANNIVERSARY.

| RIDER FORM | DESCRIPTION | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|
| DR2-80 | LIFETIME LOSS OF USE BENEFIT | $ 1,000.00 | $ .00 | 05-05-2021 |

RIDER PREMIUMS FOR THE PREMIUM TERM ARE INCLUDED IN THE SUMMARY OF PREMIUMS.

COVERAGE HAS BEEN MODIFIED IN CONSIDERATION OF THE REQUEST FOR POLICY CHANGE AND PAYMENT OF THE PREMIUM OR OTHER CHARGE REQUIRED BY THE COMPANY.

396-75

LA   N780636      1                                          05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

ENDORSEMENTS

(ENDORSEMENTS MAY BE MADE ONLY BY US AT OUR HOME OFFICE)

PAGE 4

UA-POL-IDI (LAN780636)-000005

EXH. 3-005

## RENEWAL AND PREMIUM PROVISION

**Premiums.** Premiums are due in advance and, after the first, are payable as stated on page 3. Each premium will continue this policy for the term shown. If you do not pay a premium on or before its due date, we will keep this policy in force and continue coverage for 31 days beyond that date. This is a **grace period.** If you don't pay the premium during those 31 days, this policy and all coverage will terminate.

If we accept your premium, we will continue coverage until the end of the period for which we accept the premium.

If any premium has been paid beyond the policy month in which you die, we will refund the amount of the extra premium paid.

Premiums must be paid in United States dollars.

**Renewal Before Age 65.** You may continue this policy until the policy anniversary when your age is 65 by paying each premium on or before its due date.

Until the policy anniversary when your age is 65, we cannot cancel this policy, increase your premiums, reduce the benefits specified in this policy, or add any restrictions to this policy.

**Renewal After Age 65.** Beginning with the policy anniversary when your age is 65, you can renew this policy until the policy anniversary when your age is 75 if:

(1) you are gainfully employed and performing all the important or productive tasks of your business or profession on a full-time basis; and

(2) you pay us the premium which we then charge for your age on each policy anniversary; and

(3) when we require it, you give us proof that you are still employed as required in Item (1) above.

You must pay premiums based on our table of rates then in effect for your age. We may change those rates at any time. However, the change will only apply to premiums due after the date of change. Any change of premiums applies to all insureds of the same age and rating classification who are covered under policies of this form.

**Reinstatement.** If this policy terminates for non-payment of premiums, you may reinstate it by paying the first overdue premium within 31 days of the date it was due. After that, until that first premium is six months overdue, you may apply to reinstate this policy under the following conditions:

1. You must complete an application and furnish evidence of current insurability;
2. All overdue premiums must be paid; and we will issue a conditional receipt for the payment;
3. If your application is approved, the policy will be reinstated as of the approval date. However, if we have neither approved nor disapproved your application by the 45th day after the date of the receipt, the policy will be reinstated on that date. If we disapprove your application, we will promptly refund the premium payment.

The reinstated policy will not cover **total disability** which results from:

1. An accident which occurred after the policy terminated and before the reinstatement date;
2. A **sickness** which begins before 10 days after the date of reinstatement; or
3. Any disease or condition which is excluded by name or description on the date disability begins.

## DEFINITIONS

These are some of the terms that we use in this policy and any riders:

**"Total disability"** and **"totally disabled"** mean that, as a result of **sickness** or **injury,** you are unable to perform the material and substantial duties of **your occupation. Your occupation** means your regular occupation at the time disability commences.

**"Sickness"** means sickness which is diagnosed or treated while this policy is in force.

**"Injury"** means accidental bodily injury which occurs while this policy is in force.

**"Elimination period"** means the number of days, at the beginning of a period of disability, for which **no benefit is payable.** All elimination periods are shown on page 3.

**"Preexisting Condition"** means a medical condition which exists on the Effective Date and, during the past five years, either:

(1) caused you to receive medical advice or treatment; or

(2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

## BENEFIT PROVISIONS

**Total Disability Benefit.** While you are **totally disabled** and under the care of a physician other than yourself, we will pay a monthly benefit beginning at the end of the applicable Elimination Period as follows:

(1) We will pay the Monthly Benefit for Total Disability for each month of **total disability** from Accident or from **Sickness,** whichever caused that disability.

(2) We will stop paying this benefit when:

(a) You are no longer **totally disabled;** or

(b) you have been paid benefits for the maximum benefit period shown on page 3 for the cause of that disability.

(3) If, in any month, your disability is the result of concurrent causes for which a Monthly Benefit is payable, we will pay the Monthly Benefit which is more favorable to you. We will not pay more than one Monthly Benefit for any one month of **total disability.**

**Loss of Use Benefit After Total Disability.** We will pay the Monthly Benefit for Total Disability while an accident or **sickness** causes the total loss of:

(1) the use of your hands, your feet, or one hand and one foot, or

(2) your speech; or

(3) the hearing in both of your ears; or

(4) the sight of both eyes.

The amount payable each month is the amount we would have paid if you were still **totally disabled.** We will pay you this benefit whether or not you are working. This benefit is payable for only one loss at a time. If you are disabled from another cause while this benefit is payable, you will be paid this benefit or the Total Disability Benefit. You cannot receive both benefits at the same time.

**Successive Disabilities.** A successive period of **total disability** is a new disability if:

(1) it results from a different cause or causes; or

(2) the two periods of **total disability** are separated by at least six months during which you are continuously working on a full-time basis.

Each new disability will be subject to separate **elimination periods** and separate benefit periods.

All other **total disability** will be considered an extension of the prior period of **total disability.**

**Transplant Donor Benefit. Total disability** which results from the transplant of a part of your body to another person's body will be considered a **sickness.** However, such **total disability** will not be covered before this policy has been in force for six months.

**Rehabilitation Benefit.** While you are receiving the Total Disability Benefit, we will consider participating in a rehabilitation program. The program may be at your request or we may suggest it. We will continue benefits to you based upon the terms of the written plan upon which we mutually agree.

**Waiver of Premium Benefit.** If you become **totally disabled** before the policy anniversary when your age is 65, we will waive premiums that are due:

(1) after **total disability** has continued for ninety consecutive days; and

(2) while you are **totally disabled** or receiving the Loss of Use Benefit.

We will also refund any premium due and paid during the first ninety days of **total disability.** Following a period when we have waived premiums, this policy will remain in force to the next premium due date. Beginning with that date, you may continue this policy in force by paying premiums as they are due.

## EXCLUSIONS AND LIMITATIONS

**Exclusions.** This policy does not cover disability or loss caused by:

(1) war, or an act of war, whether declared or undeclared; or

(2) normal pregnancy or childbirth.

**Preexisting Condition Limitation.** This policy does not cover disability or loss caused by a **preexisting condition** which is not disclosed in the application if the disability begins or the loss occurs during the first two years after the Effective Date.

## THE CONTRACT

The application and any other papers that are attached are part of this policy. The policy is the complete contract. Statements by agents and brokers are not part of our contract.

Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you something else, years, months and anniversaries that we refer to are figured from the Policy Date shown on page 3.

**Incontestable.** Statements made in the application for this policy are incontestable after the policy has been in force during your lifetime for two years from the Effective Date.

If a disability begins or loss occurs after the policy has been in effect for two years, we will not reduce or deny a claim for benefits because of a **preexisting condition** unless the condition is excluded by name or description.

## CLAIM INFORMATION

**How to File A Claim.** If you have a claim, the following steps must be taken:

(1) someone must notify us that you are disabled **(notice of claim);**

(2) we will furnish you **claim forms;**

(3) you and your attending physician must complete the claim form and give it to us (file **proof of loss);**

(4) then, we will determine if the claim is valid and either:

(a) pay the benefits to which you are entitled, or

(b) notify you that you do not qualify for benefits and why. If we need more information, we will tell you what we need. If we require you to have a physical examination, we will pay for it;

(5) we may send you other forms as necessary to complete our file with the information we need to process your claim.

There are some conditions and time limits which each of us must meet. They are:

(1) We must be given the **notice of claim** within thirty days after the disability begins, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

(2) We will furnish the **claim forms** within fifteen days after we receive the written notice of claim. If we do not furnish the forms within fifteen days, send us proof of what caused the disability, when and how it happened, and the extent of the **sickness** or **injury.**

(3) The claim forms or other **proof of loss** must be furnished to us within 90 days after each month for which the benefit is payable. However, if it is not reasonably possible to do so within the 90 days, failure to furnish such proof will not nullify or reduce your claim if proof is furnished as soon as reasonably possible but no more than one year after the 90 days except if you are legally unable to notify us.

**How and When We Pay Benefits.** We will pay the benefits of this policy from our Home Office in United States dollars. We will not pay any benefit until we have sufficient proof of loss to do so. When we have determined that your claim is valid, we will pay the benefits provided in this policy. We will pay them in the amounts and at the times described in the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

While you are living, we will pay all benefits to you, the Insured. If any amount is payable after you die, we will pay it to your estate. If any premium has been paid beyond the policy month in which you die, we will pay the unearned premium to your estate.

## GENERAL PROVISIONS

**Owner.** You own this policy. You have all the rights and privileges granted by this policy while you are living.

Some of your ownership rights are:

1. the right to continue or terminate this policy;
2. the right to name someone else to receive the benefits of this policy;
3. the right to suspend this policy while you are in military service; and
4. the right to assign any or all rights under this policy.

**Change of beneficiary.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. If you do assign any rights, the terms of the assignment must specify the rights which are assigned and the term of the assignment. The right to receive benefits will remain with you, the Insured, unless that right is expressly assigned. When an assignment is in effect, "you" and "your" refer to the assignee in provisions which describe ownership rights.

An assignment will not be binding on us until we receive the original or an acceptable copy of it at our Home Office. We are not responsible for the validity of an assignment or for the effects of an assignment.

**Military Service Provision.** If you join any military force or a civilian unit serving such a force, you may continue or suspend this policy. When you notify us to suspend this policy, we will refund any premium paid for time after the date we receive the notice.

You are not covered for a disability or loss which is caused by an accident which occurs or a **sickness** which is first treated or diagnosed while this policy is suspended until you have worked full-time for six months.

If you terminate full-time active duty before this policy has been suspended for five years, we will reinstate it, without evidence of insurability, when we receive:

(1) your written request to reinstate; and

(2) the premium for the period from the date you terminate full-time active duty to the next premium due date.

If we don't receive both the request and the premium within ninety days after you terminate full-time active duty, you may still apply for reinstatement. In this case you must comply with the Reinstatement provision.

**Legal Actions.** No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, we will pay the amounts which the premium paid would have bought for the correct age.

If we accept premium for coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you live on the Effective Date, it is amended to conform with the minimum requirements of those statutes.

 UNUM Life Insurance Company of America
HOME OFFICE — PORTLAND, MAINE

JUN 19 1990

APPLICATION FOR A HEALTH INSURANCE POLICY PURSUANT TO OPTION PROVIDED BY RIDER ATTACHED TO POLICY NUMBER LAN661286

I hereby elect to exercise an option granted under Rider Form Number DRS-80 contained in the above numbered policy and hereby apply for a Health Insurance Policy (the "option policy") as follows:

1. OPTION POLICY SPECIFICATIONS

a. Proposed Insured (Print last name, first, mid. init.) Leung, Richard, J.

b. Amount of Monthly Benefit $ 1,000.00

c. Premiums Payable ☑ A ☐ SA ☐ Q ☐ PAC ☐ SS

d. The Elimination Periods and the Maximum Benefit Periods shall be the same as in the Policy containing the Rider.

2. Your annual earned and unearned income for your last tax year:
Earned Income: If salaried, indicate salary, otherwise indicate gross income derived from services provided less business and professional expenses incurred $ 190,000 / year.
Unearned Income: Indicate net investment income from securities, banks, real estate, or other similar items or other income not dependent on ability to work. $ —0—.

3. OTHER INSURANCE: Is any disability income now in force or is an application now pending for disability income under any life, health, or group policy other than the policy containing the Rider or any option policy issued thereunder?

☐ YES ☑ NO If "yes", give:

| Company | Type of Policy | Amount of Monthly Indemnity | Elimination Period | Maximum Benefit Period |
|---|---|---|---|---|
| UNUM | I | 1,500 | 30 D | Lifetime |
| UNUM | I | 3,500 | 60 D | LT |
| UNUM | O.E | 7,500 | 90 D | 12 Mo. |
| | | | | |

4. Amount paid with this application $ —0—. (Cash or check must accompany this form.)

IT IS UNDERSTOOD AND AGREED THAT (1) the statements and answers given herein are, to the best of my/our knowledge and belief, true, complete and correctly recorded; and, together with the statements and answers given in the application(s) for the above numbered policy, shall be the basis for the option policy. (2) No agent, broker, medical examiner or employee except an authorized Company employee at its Home Office has authority to make or modify any contract of insurance, or to waive any requirement of the Company. (3) If issued, the option policy shall become effective on the earliest day within the period defined in the rider on which both the application and the premium payment requirements have been met. (4) The option policy shall be subject to the terms of the Rider under which this option is being exercised. (5) The option policy will exclude only those pre-existing conditions which are excluded by the original policy on the effective date of the option policy. (6) Benefits will not be payable under the option policy for disability that commences prior to its effective date unless the Insured resumes full-time work for a continuous period of six months while the option policy is in force.

N780636

Signed at San Diego, C.A. Date signed 5/31/90

David Wahl [signature]
*Witness*

[signature] Richard J Leung MD
*Signature of Applicant*

San Diego 0302E Michael McCormick
*Agency*

Quoted Premium $ 314—
DSC Name and # Mike McCormick 029563
San Diego 0302E
SSR Name Stephanie Kurovich

Form 777-72

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

UNUMPROVIDENT

**Unum Life Insurance Company of America**

Home Office
2211 Congress Street
Portland, Maine 04122

UA-POL-IDI (LAN780636)-000011
**EXH. 3-011**

# Exhibit 4



unum
Better benefits at work.

DUPLICATE

unum.com

CS-1085 (06-08)



Insured
Owner
Policy Number
DUPLICATE
Policy Date
Effective Date

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

**Examine This Policy For Ten Days**

You have ten days to decide if this policy meets your needs. If you are not fully satisfied, give it back to us within ten days of the day you receive it. Mail or deliver it to the Home Office or to the agent you bought it from. We will cancel the policy from the beginning and refund the premium paid.

A few words about this policy:

We have tried to write this policy so you can understand it. Of course, we have to write it within the framework that the insurance laws allow. Therefore, you may find some words or statements that you do not understand. If you do, please write to us. We will be happy to clarify for you, in writing, anything you do not understand.

"You" and "your" refer to the person insured. "We," "our" and "us" refer to Unum Life Insurance Company of America.

This policy provides disability income benefits under stated conditions while you are **totally disabled**. Please refer to the policy provisions where we tell you what amounts we will pay and when we will pay. You will find an index of these provisions on Page 2.

This policy may also provide additional benefits, or contain other provisions which have been added by means of Riders. If the policy includes any Riders, you will find them listed in the Policy Schedule on Page 3. To determine your benefits, please refer to the Riders as well as the basic policy provisions.

This policy is effective on the Effective Date shown on page 3.

Secretary

President

UNUMPROVIDENT

**Unum Life Insurance Company of America**

Home Office:
2211 Congress Street
Portland, Maine 04122

## Index of Policy Provisions

3    **Policy Schedule**

4    **Endorsements** (if any)

5    **Renewal and Premium Provision**
        Premiums.
        Renewal Before Age 65.
        Renewal After Age 65.
        Reinstatement.

5    **Definitions**

6    **Benefit Provisions**
        Total Disability Benefit.
        Loss of Use Benefit After Total Disability.
        Successive Disabilities.
        Transplant Donor Benefit.
        Rehabilitation Benefit.
        Waiver of Premium.

6    **Exclusions and Limitations**
        Preexisting Conditions Excluded.

6    **The Contract**
        Incontestable.

7    **Claim Information**
        How to File a Claim.
        How and When We Pay Benefits.

7    **General Provisions**
        Owner.
        Military Service Provision.
8        Legal Actions.
        Misstatement of Age.
        Conformity with State Statutes.

Application and any riders follow page 8.



LA N782020 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

POLICY CHANGE STATEMENT

THIS STATEMENT REPLACES PAGE 3 OF THE POLICY AND ANY PRIOR POLICY CHANGE STATEMENT. THE POLICY NOW PROVIDES THE FOLLOWING COVERAGE.

INSURED RICHARD J LEUNG MD 05-05-1993 POLICY DATE

12-19-1998 EFFECTIVE DATE
OWNER THE INSURED OF CHANGE

POLICY NUMBER LA N782020

SUMMARY OF PREMIUMS*

PREMIUMS ARE PAYABLE AS FOLLOWS

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
|---|---|---|---|
| 12-19-1998 | $ 258.00 | $ 131.58 | $ 67.08 |
| 05-05-2021 | COMPANY RATES THEN IN EFFECT. | | |

* PREMIUM GUARANTEED TO AGE 65

SUMMARY OF COVERAGE

POLICY FORM- D1-80 ANNUAL PREMIUM- $ 258.00 UNTIL 05-05-2021

ACCIDENT ELIMINATION PERIOD- 30 DAYS. SICKNESS ELIMINATION PERIOD- 30 DAYS.

MAXIMUM MONTHLY BENEFIT FOR TOTAL DISABILITY-
ACCIDENT-
$ 500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.

EXH. 4-004

$ 500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL
DISABILITY BEGAN PRIOR TO AGE 65 POLICY ANNIVERSARY.

SICKNESS-

$ 500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS
AFTER DISABILITY PAYMENTS BEGIN.

$ 500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL
DISABILITY BEGAN PRIOR TO AGE 55 POLICY ANNIVERSARY.

| RIDER FORM | DESCRIPTION | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|
| DR2-80 | LIFETIME LOSS OF USE BENEFIT | $ 500.00 | $ .00 | 05-05-2021 |

RIDER PREMIUMS FOR THE PREMIUM TERM ARE INCLUDED IN THE SUMMARY OF PREMIUMS.

COVERAGE HAS BEEN MODIFIED IN CONSIDERATION OF THE REQUEST FOR POLICY CHANGE AND PAYMENT OF THE PREMIUM OR OTHER CHARGE REQUIRED BY THE COMPANY.

396-75

UNUM LIFE INSURANCE COMPANY OF AMERICA

ENDORSEMENTS

(ENDORSEMENTS MAY BE MADE ONLY BY US AT OUR HOME OFFICE)

## RENEWAL AND PREMIUM PROVISION

**Premiums.** Premiums are due in advance and, after the first, are payable as stated on page 3. Each premium will continue this policy for the term shown. If you do not pay a premium on or before its due date, we will keep this policy in force and continue coverage for 31 days beyond that date. This is a **grace period.** If you don't pay the premium during those 31 days, this policy and all coverage will terminate.

If we accept your premium, we will continue coverage until the end of the period for which we accept the premium.

If any premium has been paid beyond the policy month in which you die, we will refund the amount of the extra premium paid.

Premiums must be paid in United States dollars.

**Renewal Before Age 65.** You may continue this policy until the policy anniversary when your age is 65 by paying each premium on or before its due date.

Until the policy anniversary when your age is 65, we cannot cancel this policy, increase your premiums, reduce the benefits specified in this policy, or add any restrictions to this policy.

**Renewal After Age 65.** Beginning with the policy anniversary when your age is 65, you can renew this policy until the policy anniversary when your age is 75 if:

(1) you are gainfully employed and performing all the important or productive tasks of your business or profession on a full-time basis; and

(2) you pay us the premium which we then charge for your age on each policy anniversary; and

(3) when we require it, you give us proof that you are still employed as required in Item (1) above.

You must pay premiums based on our table of rates then in effect for your age. We may change those rates at any time. However, the change will only apply to premiums due after the date of change. Any change of premiums applies to all insureds of the same age and rating classification who are covered under policies of this form.

**Reinstatement.** If this policy terminates for non-payment of premiums, you may reinstate it by paying the first overdue premium within 31 days of the date it was due. After that, until that first premium is six months overdue, you may apply to reinstate this policy under the following conditions:

1. You must complete an application and furnish evidence of current insurability;
2. All overdue premiums must be paid; and we will issue a conditional receipt for the payment;
3. If your application is approved, the policy will be reinstated as of the approval date. However, if we have neither approved nor disapproved your application by the 45th day after the date of the receipt, the policy will be reinstated on that date. If we disapprove your application, we will promptly refund the premium payment.

The reinstated policy will not cover **total disability** which results from:

1. An accident which occurred after the policy terminated and before the reinstatement date;
2. A **sickness** which begins before 10 days after the date of reinstatement; or
3. Any disease or condition which is excluded by name or description on the date disability begins.

## DEFINITIONS

These are some of the terms that we use in this policy and any riders:

**"Total disability"** and **"totally disabled"** mean that, as a result of **sickness** or **injury,** you are unable to perform the material and substantial duties of **your occupation. Your occupation** means your regular occupation at the time disability commences.

**"Sickness"** means sickness which is diagnosed or treated while this policy is in force.

**"Injury"** means accidental bodily injury which occurs while this policy is in force.

**"Elimination period"** means the number of days, at the beginning of a period of disability, for which **no benefit is payable.** All elimination periods are shown on page 3.

**"Preexisting Condition"** means a medical condition which exists on the Effective Date and, during the past five years, either:

(1) caused you to receive medical advice or treatment; or

(2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

EXH. 4-007

## BENEFIT PROVISIONS

**Total Disability Benefit.** While you are **totally disabled** and under the care of a physician other than yourself, we will pay a monthly benefit beginning at the end of the applicable Elimination Period as follows:

(1) We will pay the Monthly Benefit for Total Disability for each month of **total disability** from Accident or from **Sickness,** whichever caused that disability.

(2) We will stop paying this benefit when:

  (a) You are no longer **totally disabled;** or

  (b) you have been paid benefits for the maximum benefit period shown on page 3 for the cause of that disability.

(3) If, in any month, your disability is the result of concurrent causes for which a Monthly Benefit is payable, we will pay the Monthly Benefit which is more favorable to you. We will not pay more than one Monthly Benefit for any one month of **total disability.**

**Loss of Use Benefit After Total Disability.** We will pay the Monthly Benefit for Total Disability while an accident or **sickness** causes the total loss of:

(1) the use of your hands, your feet, or one hand and one foot, or

(2) your speech; or

(3) the hearing in both of your ears; or

(4) the sight of both eyes.

The amount payable each month is the amount we would have paid if you were still **totally disabled.** We will pay you this benefit whether or not you are working. This benefit is payable for only one loss at a time. If you are disabled from another cause while this benefit is payable, you will be paid this benefit or the Total Disability Benefit. You cannot receive both benefits at the same time.

**Successive Disabilities.** A successive period of **total disability** is a new disability if:

(1) it results from a different cause or causes; or

(2) the two periods of **total disability** are separated by at least six months during which you are continuously working on a full-time basis.

Each new disability will be subject to separate **elimination periods** and separate benefit periods.

All other **total disability** will be considered an extension of the prior period of **total disability.**

**Transplant Donor Benefit. Total disability** which results from the transplant of a part of your body to another person's body will be considered a **sickness.** However, such **total disability** will not be covered before this policy has been in force for six months.

**Rehabilitation Benefit.** While you are receiving the Total Disability Benefit, we will consider participating in a rehabilitation program. The program may be at your request or we may suggest it. We will continue benefits to you based upon the terms of the written plan upon which we mutually agree.

**Waiver of Premium Benefit.** If you become **totally disabled** before the policy anniversary when your age is 65, we will waive premiums that are due:

(1) after **total disability** has continued for ninety consecutive days; and

(2) while you are **totally disabled** or receiving the Loss of Use Benefit.

We will also refund any premium due and paid during the first ninety days of **total disability.** Following a period when we have waived premiums, this policy will remain in force to the next premium due date. Beginning with that date, you may continue this policy in force by paying premiums as they are due.

## EXCLUSIONS AND LIMITATIONS

**Exclusions.** This policy does not cover disability or loss caused by:

(1) war, or an act of war, whether declared or undeclared; or

(2) normal pregnancy or childbirth.

**Preexisting Condition Limitation.** This policy does not cover disability or loss caused by a **preexisting condition** which is not disclosed in the application if the disability begins or the loss occurs during the first two years after the Effective Date.

## THE CONTRACT

The application and any other papers that are attached are part of this policy. The policy is the complete contract. Statements by agents and brokers are not part of our contract.

Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you something else, years, months and anniversaries that we refer to are figured from the Policy Date shown on page 3.

**Incontestable.** Statements made in the application for this policy are incontestable after the policy has been in force during your lifetime for two years from the Effective Date.

If a disability begins or loss occurs after the policy has been in effect for two years, we will not reduce or deny a claim for benefits because of a **preexisting condition** unless the condition is excluded by name or description.

## CLAIM INFORMATION

**How to File A Claim.** If you have a claim, the following steps must be taken:

(1) someone must notify us that you are disabled **(notice of claim);**

(2) we will furnish you **claim forms;**

(3) you and your attending physician must complete the claim form and give it to us (file **proof of loss);**

(4) then, we will determine if the claim is valid and either:

(a) pay the benefits to which you are entitled, or

(b) notify you that you do not qualify for benefits and why. If we need more information, we will tell you what we need. If we require you to have a physical examination, we will pay for it;

(5) we may send you other forms as necessary to complete our file with the information we need to process your claim.

There are some conditions and time limits which each of us must meet. They are:

(1) We must be given the **notice of claim** within thirty days after the disability begins, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

(2) We will furnish the **claim forms** within fifteen days after we receive the written notice of claim. If we do not furnish the forms within fifteen days, send us proof of what caused the disability, when and how it happened, and the extent of the **sickness** or **injury.**

(3) The claim forms or other **proof of loss** must be furnished to us within 90 days after each month for which the benefit is payable. However, if it is not reasonably possible to do so within the 90 days, failure to furnish such proof will not nullify or reduce your claim if proof is furnished as soon as reasonably possible but no more than one year after the 90 days except if you are legally unable to notify us.

**How and When We Pay Benefits.** We will pay the benefits of this policy from our Home Office in United States dollars. We will not pay any benefit until we have sufficient proof of loss to do so. When we have determined that your claim is valid, we will pay the benefits provided in this policy. We will pay them in the amounts and at the times described in the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

While you are living, we will pay all benefits to you, the Insured. If any amount is payable after you die, we will pay it to your estate. If any premium has been paid beyond the policy month in which you die, we will pay the unearned premium to your estate.

## GENERAL PROVISIONS

**Owner.** You own this policy. You have all the rights and privileges granted by this policy while you are living.

Some of your ownership rights are:

1. the right to continue or terminate this policy;
2. the right to name someone else to receive the benefits of this policy;
3. the right to suspend this policy while you are in military service; and
4. the right to assign any or all rights under this policy.

**Change of beneficiary.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. If you do assign any rights, the terms of the assignment must specify the rights which are assigned and the term of the assignment. The right to receive benefits will remain with you, the Insured, unless that right is expressly assigned. When an assignment is in effect, "you" and "your" refer to the assignee in provisions which describe ownership rights.

An assignment will not be binding on us until we receive the original or an acceptable copy of it at our Home Office. We are not responsible for the validity of an assignment or for the effects of an assignment.

**Military Service Provision.** If you join any military force or a civilian unit serving such a force, you may continue or suspend this policy. When you notify us to suspend this policy, we will refund any premium paid for time after the date we receive the notice.

You are not covered for a disability or loss which is caused by an accident which occurs or a **sickness** which is first treated or diagnosed while this policy is suspended until you have worked full-time for six months.
If you terminate full-time active duty before this policy has been suspended for five years, we will reinstate it, without evidence of insurability, when we receive:

(1) your written request to reinstate; and

(2) the premium for the period from the date you terminate full-time active duty to the next premium due date.

If we don't receive both the request and the premium within ninety days after you terminate full-time active duty, you may still apply for reinstatement. In this case you must comply with the Reinstatement provision.

**Legal Actions.** No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, we will pay the amounts which the premium paid would have bought for the correct age.

If we accept premium for coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you live on the Effective Date, it is amended to conform with the minimum requirements of those statutes.



UNUM Life Insurance Company of America
HOME OFFICE — PORTLAND, MAINE

**APPLICATION FOR A HEALTH INSURANCE POLICY PURSUANT TO OPTION PROVIDED BY RIDER ATTACHED TO POLICY NUMBER** LAN661286

I hereby elect to exercise an option granted under Rider Form Number DI 5-80 contained in the above numbered policy and hereby apply for a Health Insurance Policy (the "option policy") as follows:

1. OPTION POLICY SPECIFICATIONS

a. Proposed Insured (Print last name, first, mid. init.) LEUNG, RICHARD J.

b. Amount of Monthly Benefit $ 500.00

c. Premiums Payable

☐ A ☐ SA ☑ Q ☐ PAC ☐ SS

d. The Elimination Periods and the Maximum Benefit Periods shall be the same as in the Policy containing the Rider.

2. Your annual earned and unearned income for your last tax year:
Earned Income: If salaried, indicate salary, otherwise indicate gross income derived from services provided less business and professional expenses incurred $ 500,000.
Unearned Income: Indicate net investment income from securities, banks, real estate, or other similar items or other income not dependent on ability to work. $ 0.

3. OTHER INSURANCE: Is any disability income now in force or is an application now pending for disability income under any life, health, or group policy other than the policy containing the Rider or any option policy issued thereunder?

☑ YES ☐ NO If "yes", give:

| Company | Type of Policy | Amount of Monthly Indemnity | Elimination Period | Maximum Benefit Period |
|---|---|---|---|---|
| UNUM | I.D. | 4,334.00 | 60 Day | L/L 60 |
| UNUM | I.D. | 1,000 | 30 Day | L/L 60 |
| UNUM | I.D. | 1,500 | 30 Day | L/L |
| UNUM | G.S. | 8,268 | 90 D. | 12 m. |

4. Amount paid with this application $ 0. (Cash or check must accompany this form.)

IT IS UNDERSTOOD AND AGREED THAT (1) the statements and answers given herein are, to the best of my/our knowledge and belief, true, complete and correctly recorded; and, together with the statements and answers given in the application(s) for the above numbered policy, shall be the basis for the option policy. (2) No agent, broker, medical examiner or employee except an authorized Company employee at its Home Office has authority to make or modify any contract of insurance, or to waive any requirement of the Company. (3) If issued, the option policy shall become effective on the earliest day within the period defined in the rider on which both the application and the premium payment requirements have been met. (4) The option policy shall be subject to the terms of the Rider under which this option is being exercised. (5) The option policy will exclude only those pre-existing conditions which are excluded by the original policy on the effective date of the option policy. (6) Benefits will not be payable under the option policy for disability that commences prior to its effective date unless the Insured resumes full-time work for a continuous period of six months while the option policy is in force.

Signed at San Diego CA Date signed 5-4-93

[signature]
*Witness*

[signature]
*Signature of Applicant*

CLIENT:
QUOTED PREMIUM $

N782020
*Agency*

DSC NAME AND # Erich Wronski #085106
SAN DIEGO 0302E
SSR NAME Annette Ryan

Form 777-72 (11/86)

EXH. 4-011

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

UNUMPROVIDENT

**Unum Life Insurance Company of America**

Home Office
2211 Congress Street
Portland, Maine 04122

# Exhibit 5



unum
Better benefits at work.

DUPLICATE

unum.com

CS-1085 (06-08)

UA-POL-IDI (LAN782990)-000001
**EXH. 5-001**



Insured
Owner
Policy Number
DUPLICATE
Policy Date
Effective Date

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

**Examine This Policy For Ten Days**

You have ten days to decide if this policy meets your needs. If you are not fully satisfied, give it back to us within ten days of the day you receive it. Mail or deliver it to the Home Office or to the agent you bought it from. We will cancel the policy from the beginning and refund the premium paid.

A few words about this policy:

We have tried to write this policy so you can understand it. Of course, we have to write it within the framework that the insurance laws allow. Therefore, you may find some words or statements that you do not understand. If you do, please write to us. We will be happy to clarify for you, in writing, anything you do not understand.

"You" and "your" refer to the person insured. "We," "our" and "us" refer to Unum Life Insurance Company of America.

This policy provides disability income benefits under stated conditions while you are **totally disabled**. Please refer to the policy provisions where we tell you what amounts we will pay and when we will pay. You will find an index of these provisions on Page 2.

This policy may also provide additional benefits, or contain other provisions which have been added by means of Riders. If the policy includes any Riders, you will find them listed in the Policy Schedule on Page 3. To determine your benefits, please refer to the Riders as well as the basic policy provisions.

This policy is effective on the Effective Date shown on page 3.

Secretary — President

UNUMPROVIDENT

**Unum Life Insurance Company of America**
Home Office:
2211 Congress Street
Portland, Maine 04122

D1-80 341-81 (6/03)

## Index of Policy Provisions

3   **Policy Schedule**

4   **Endorsements** (if any)

5   **Renewal and Premium Provision**
    Premiums.
    Renewal Before Age 65.
    Renewal After Age 65.
    Reinstatement.

5   **Definitions**

6   **Benefit Provisions**
    Total Disability Benefit.
    Loss of Use Benefit After Total Disability.
    Successive Disabilities.
    Transplant Donor Benefit.
    Rehabilitation Benefit.
    Waiver of Premium.

6   **Exclusions and Limitations**
    Preexisting Conditions Excluded.

6   **The Contract**
    Incontestable.

7   **Claim Information**
    How to File a Claim.
    How and When We Pay Benefits.

7   **General Provisions**
    Owner.
    Military Service Provision.
8   Legal Actions.
    Misstatement of Age.
    Conformity with State Statutes.

Application and any riders follow page 8.



LA N782990 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

POLICY CHANGE STATEMENT

THIS STATEMENT REPLACES PAGE 3 OF THE POLICY AND ANY PRIOR POLICY CHANGE STATEMENT. THE POLICY NOW PROVIDES THE FOLLOWING COVERAGE.

INSURED RICHARD J LEUNG MD 05-05-1996 POLICY DATE

12-19-1998 EFFECTIVE DATE OF CHANGE

OWNER THE INSURED

POLICY NUMBER LA N782990

SUMMARY OF PREMIUMS*

PREMIUMS ARE PAYABLE AS FOLLOWS

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
| --- | --- | --- | --- |
| 12-19-1998 | $ 291.50 | $ 148.67 | $ 75.79 |
| 05-05-2021 | COMPANY RATES THEN IN EFFECT. | | |

* PREMIUM GUARANTEED TO AGE 65

SUMMARY OF COVERAGE

POLICY FORM- D1-80 ANNUAL PREMIUM- $ 291.50 UNTIL 05-05-2021

ACCIDENT ELIMINATION PERIOD- 30 DAYS. SICKNESS ELIMINATION PERIOD- 30 DAYS.

MAXIMUM MONTHLY BENEFIT FOR TOTAL DISABILITY-
ACCIDENT-
$ 500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS AFTER DISABILITY PAYMENTS BEGIN.

$ 500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL
DISABILITY BEGAN PRIOR TO AGE 65 POLICY ANNIVERSARY.
SICKNESS-
$ 500.00 TO THE LATER OF (A)AGE 65 POLICY ANNIVERSARY OR (B)24 MONTHS
AFTER DISABILITY PAYMENTS BEGIN.
$ 500.00 THEREAFTER FOR AS LONG AS TOTAL DISABILITY CONTINUES, IF TOTAL
DISABILITY BEGAN PRIOR TO AGE 55 POLICY ANNIVERSARY.

| RIDER FORM | DESCRIPTION | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|
| DR2-80 | LIFETIME LOSS OF USE BENEFIT | $ 500.00 | $ .00 | 05-05-2021 |

RIDER PREMIUMS FOR THE PREMIUM TERM ARE INCLUDED IN THE SUMMARY OF PREMIUMS.

COVERAGE HAS BEEN MODIFIED IN CONSIDERATION OF THE REQUEST FOR POLICY CHANGE AND PAYMENT OF THE PREMIUM OR OTHER CHARGE REQUIRED BY THE COMPANY.

396-75

LA N782990 1 05/04/2022

UNUM LIFE INSURANCE COMPANY OF AMERICA

ENDORSEMENTS

(ENDORSEMENTS MAY BE MADE ONLY BY US AT OUR HOME OFFICE)

PAGE 4

UA-POL-IDI (LAN782990)-000006

EXH. 5-006

## RENEWAL AND PREMIUM PROVISION

**Premiums.** Premiums are due in advance and, after the first, are payable as stated on page 3. Each premium will continue this policy for the term shown. If you do not pay a premium on or before its due date, we will keep this policy in force and continue coverage for 31 days beyond that date. This is a **grace period.** If you don't pay the premium during those 31 days, this policy and all coverage will terminate.

If we accept your premium, we will continue coverage until the end of the period for which we accept the premium.

If any premium has been paid beyond the policy month in which you die, we will refund the amount of the extra premium paid.

Premiums must be paid in United States dollars.

**Renewal Before Age 65.** You may continue this policy until the policy anniversary when your age is 65 by paying each premium on or before its due date.

Until the policy anniversary when your age is 65, we cannot cancel this policy, increase your premiums, reduce the benefits specified in this policy, or add any restrictions to this policy.

**Renewal After Age 65.** Beginning with the policy anniversary when your age is 65, you can renew this policy until the policy anniversary when your age is 75 if:

(1) you are gainfully employed and performing all the important or productive tasks of your business or profession on a full-time basis; and

(2) you pay us the premium which we then charge for your age on each policy anniversary; and

(3) when we require it, you give us proof that you are still employed as required in Item (1) above.

You must pay premiums based on our table of rates then in effect for your age. We may change those rates at any time. However, the change will only apply to premiums due after the date of change. Any change of premiums applies to all insureds of the same age and rating classification who are covered under policies of this form.

**Reinstatement.** If this policy terminates for non-payment of premiums, you may reinstate it by paying the first overdue premium within 31 days of the date it was due. After that, until that first premium is six months overdue, you may apply to reinstate this policy under the following conditions:

1. You must complete an application and furnish evidence of current insurability;
2. All overdue premiums must be paid; and we will issue a conditional receipt for the payment;
3. If your application is approved, the policy will be reinstated as of the approval date. However, if we have neither approved nor disapproved your application by the 45th day after the date of the receipt, the policy will be reinstated on that date. If we disapprove your application, we will promptly refund the premium payment.

The reinstated policy will not cover **total disability** which results from:

1. An accident which occurred after the policy terminated and before the reinstatement date;
2. A **sickness** which begins before 10 days after the date of reinstatement; or
3. Any disease or condition which is excluded by name or description on the date disability begins.

## DEFINITIONS

These are some of the terms that we use in this policy and any riders:

**"Total disability"** and **"totally disabled"** mean that, as a result of **sickness** or **injury,** you are unable to perform the material and substantial duties of **your occupation. Your occupation** means your regular occupation at the time disability commences.

**"Sickness"** means sickness which is diagnosed or treated while this policy is in force.

**"Injury"** means accidental bodily injury which occurs while this policy is in force.

**"Elimination period"** means the number of days, at the beginning of a period of disability, for which **no benefit is payable.** All elimination periods are shown on page 3.

**"Preexisting Condition"** means a medical condition which exists on the Effective Date and, during the past five years, either:

(1) caused you to receive medical advice or treatment; or

(2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

## BENEFIT PROVISIONS

**Total Disability Benefit.** While you are **totally disabled** and under the care of a physician other than yourself, we will pay a monthly benefit beginning at the end of the applicable Elimination Period as follows:

(1) We will pay the Monthly Benefit for Total Disability for each month of **total disability** from Accident or from **Sickness,** whichever caused that disability.

(2) We will stop paying this benefit when:

  (a) You are no longer **totally disabled;** or

  (b) you have been paid benefits for the maximum benefit period shown on page 3 for the cause of that disability.

(3) If, in any month, your disability is the result of concurrent causes for which a Monthly Benefit is payable, we will pay the Monthly Benefit which is more favorable to you. We will not pay more than one Monthly Benefit for any one month of **total disability.**

**Loss of Use Benefit After Total Disability.** We will pay the Monthly Benefit for Total Disability while an accident or **sickness** causes the total loss of:

(1) the use of your hands, your feet, or one hand and one foot, or

(2) your speech; or

(3) the hearing in both of your ears; or

(4) the sight of both eyes.

The amount payable each month is the amount we would have paid if you were still **totally disabled.** We will pay you this benefit whether or not you are working. This benefit is payable for only one loss at a time. If you are disabled from another cause while this benefit is payable, you will be paid this benefit or the Total Disability Benefit. You cannot receive both benefits at the same time.

**Successive Disabilities.** A successive period of **total disability** is a new disability if:

(1) it results from a different cause or causes; or

(2) the two periods of **total disability** are separated by at least six months during which you are continuously working on a full-time basis.

Each new disability will be subject to separate **elimination periods** and separate benefit periods.

All other **total disability** will be considered an extension of the prior period of **total disability.**

**Transplant Donor Benefit. Total disability** which results from the transplant of a part of your body to another person's body will be considered a **sickness.** However, such **total disability** will not be covered before this policy has been in force for six months.

**Rehabilitation Benefit.** While you are receiving the Total Disability Benefit, we will consider participating in a rehabilitation program. The program may be at your request or we may suggest it. We will continue benefits to you based upon the terms of the written plan upon which we mutually agree.

**Waiver of Premium Benefit.** If you become **totally disabled** before the policy anniversary when your age is 65, we will waive premiums that are due:

(1) after **total disability** has continued for ninety consecutive days; and

(2) while you are **totally disabled** or receiving the Loss of Use Benefit.

We will also refund any premium due and paid during the first ninety days of **total disability.** Following a period when we have waived premiums, this policy will remain in force to the next premium due date. Beginning with that date, you may continue this policy in force by paying premiums as they are due.

## EXCLUSIONS AND LIMITATIONS

**Exclusions.** This policy does not cover disability or loss caused by:

(1) war, or an act of war, whether declared or undeclared; or

(2) normal pregnancy or childbirth.

**Preexisting Condition Limitation.** This policy does not cover disability or loss caused by a **preexisting condition** which is not disclosed in the application if the disability begins or the loss occurs during the first two years after the Effective Date.

## THE CONTRACT

The application and any other papers that are attached are part of this policy. The policy is the complete contract. Statements by agents and brokers are not part of our contract.

Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you something else, years, months and anniversaries that we refer to are figured from the Policy Date shown on page 3.

**Incontestable.** Statements made in the application for this policy are incontestable after the policy has been in force during your lifetime for two years from the Effective Date.

If a disability begins or loss occurs after the policy has been in effect for two years, we will not reduce or deny a claim for benefits because of a **preexisting condition** unless the condition is excluded by name or description.

## CLAIM INFORMATION

**How to File A Claim.** If you have a claim, the following steps must be taken:

(1) someone must notify us that you are disabled **(notice of claim);**

(2) we will furnish you **claim forms;**

(3) you and your attending physician must complete the claim form and give it to us (file **proof of loss);**

(4) then, we will determine if the claim is valid and either:

(a) pay the benefits to which you are entitled, or

(b) notify you that you do not qualify for benefits and why. If we need more information, we will tell you what we need. If we require you to have a physical examination, we will pay for it;

(5) we may send you other forms as necessary to complete our file with the information we need to process your claim.

There are some conditions and time limits which each of us must meet. They are:

(1) We must be given the **notice of claim** within thirty days after the disability begins, if that is possible. If that is not possible, we must be notified as soon as it is reasonably possible to do so.

(2) We will furnish the **claim forms** within fifteen days after we receive the written notice of claim. If we do not furnish the forms within fifteen days, send us proof of what caused the disability, when and how it happened, and the extent of the **sickness** or **injury.**

(3) The claim forms or other **proof of loss** must be furnished to us within 90 days after each month for which the benefit is payable. However, if it is not reasonably possible to do so within the 90 days, failure to furnish such proof will not nullify or reduce your claim if proof is furnished as soon as reasonably possible but no more than one year after the 90 days except if you are legally unable to notify us.

**How and When We Pay Benefits.** We will pay the benefits of this policy from our Home Office in United States dollars. We will not pay any benefit until we have sufficient proof of loss to do so. When we have determined that your claim is valid, we will pay the benefits provided in this policy. We will pay them in the amounts and at the times described in the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

While you are living, we will pay all benefits to you, the Insured. If any amount is payable after you die, we will pay it to your estate. If any premium has been paid beyond the policy month in which you die, we will pay the unearned premium to your estate.

## GENERAL PROVISIONS

**Owner.** You own this policy. You have all the rights and privileges granted by this policy while you are living.

Some of your ownership rights are:

1. the right to continue or terminate this policy;
2. the right to name someone else to receive the benefits of this policy;
3. the right to suspend this policy while you are in military service; and
4. the right to assign any or all rights under this policy.

**Change of beneficiary.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. If you do assign any rights, the terms of the assignment must specify the rights which are assigned and the term of the assignment. The right to receive benefits will remain with you, the Insured, unless that right is expressly assigned. When an assignment is in effect, "you" and "your" refer to the assignee in provisions which describe ownership rights.

An assignment will not be binding on us until we receive the original or an acceptable copy of it at our Home Office. We are not responsible for the validity of an assignment or for the effects of an assignment.

**Military Service Provision.** If you join any military force or a civilian unit serving such a force, you may continue or suspend this policy. When you notify us to suspend this policy, we will refund any premium paid for time after the date we receive the notice.

You are not covered for a disability or loss which is caused by an accident which occurs or a **sickness** which is first treated or diagnosed while this policy is suspended until you have worked full-time for six months.

If you terminate full-time active duty before this policy has been suspended for five years, we will reinstate it, without evidence of insurability, when we receive:

(1) your written request to reinstate; and

(2) the premium for the period from the date you terminate full-time active duty to the next premium due date.

If we don't receive both the request and the premium within ninety days after you terminate full-time active duty, you may still apply for reinstatement. In this case you must comply with the Reinstatement provision.

**Legal Actions.** No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, we will pay the amounts which the premium paid would have bought for the correct age.

If we accept premium for coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you live on the Effective Date, it is amended to conform with the minimum requirements of those statutes.

LAN782990

UNUM Life Insurance Company of America
HOME OFFICE — PORTLAND, MAINE

**APPLICATION FOR A HEALTH INSURANCE POLICY PURSUANT TO OPTION PROVIDED BY RIDER ATTACHED TO POLICY NUMBER** AN666286.

RECEIVED MAR 1996 By

I hereby elect to exercise an option granted under Rider Form Number DR580 contained in the above numbered policy and hereby apply for a Health Insurance Policy (the "option policy") as follows:

1. OPTION POLICY SPECIFICATIONS

a. Proposed Insured (Print last name, first, mid. init.) LEUNG RICHARD J.

b. Amount of Monthly Benefit $ 500

c. Premiums Payable

☐ A ☐ SA ☒ Q ☐ PAC ☐ SS

d. The Elimination Periods and the Maximum Benefit Periods shall be the same as in the Policy containing the Rider.

2. Your annual earned and unearned income for your last tax year:
Earned Income: If salaried, indicate salary, otherwise indicate gross income derived from services provided less business and professional expenses incurred $ 413,094.
Unearned Income: Indicate net investment income from securities, banks, real estate, or other similar items or other income not dependent on ability to work. $ 24,073.

3. OTHER INSURANCE: Is any disability income now in force or is an application now pending for disability income under any life, health, or group policy other than the policy containing the Rider or any option policy issued thereunder?

☒ YES ☐ NO If "yes", give:

| Company | Type of Policy | Amount of Monthly Indemnity | Elimination Period | Maximum Benefit Period |
|---|---|---|---|---|
| Northwestern | Disability | $5000 | 90 day | To Age 65 |
| | | | | |
| | | | | |

4. Amount paid with this application $ ______. (Cash or check must accompany this form.)

IT IS UNDERSTOOD AND AGREED THAT (1) the statements and answers given herein are, to the best of my/our knowledge and belief, true, complete and correctly recorded; and, together with the statements and answers given in the application(s) for the above numbered policy, shall be the basis for the option policy. (2) No agent, broker, medical examiner or employee except an authorized Company employee at its Home Office has authority to make or modify any contract of insurance, or to waive any requirement of the Company. (3) If issued, the option policy shall become effective on the earliest day within the period defined in the rider on which both the application and the premium payment requirements have been met. (4) The option policy shall be subject to the terms of the Rider under which this option is being exercised. (5) The option policy will exclude only those pre-existing conditions which are excluded by the original policy on the effective date of the option policy. (6) Benefits will not be payable under the option policy for disability that commences prior to its effective date unless the Insured resumes full-time work for a continuous period of six months while the option policy is in force.

Signed at San Diego California Date signed 2-27-96

Wayne G. Mashkoviak [signature]
*Witness* *Signature of Applicant*

*Agency* N782990

777-72

**Disability Income Policy**
**Noncancellable To Age 65 Then Conditionally Renewable To Age 75**
**Premiums Guaranteed To Age 65, Then**
**At Our Rates Being Used For Your Age**

**Unum Life Insurance Company of America**

Home Office
2211 Congress Street
Portland, Maine 04122

# Exhibit 6

002582-515-23-2-2020/06/19**-074416-6-PORT_Sdx_Prod

**Richard J. Leung, M.D.**
**1388 Kettner Boulevard**
**Unit 2801**
**San Diego, CA 92101-2915**
**Mobile: 619-993-2888**
**Email: richardjleung@gmail.com**

RECEIVED
JUN 19 2020
25

**UNUM**
**Individual Disability Claims**
**The Benefits Center**
**828 Bistline Dr. #100**
**West Columbia, SC 29172**

TOTAL DISABILITY BEGINNING 05/29/2020

RE: Policy # LAD016015, LAN661286, LAN780636, LAN782990, LAN782020

June 17, 2020

To whom it may concern:

Enclosed please find the following documents:

Individual Disability Claim Form pages 4-10
Authorization to Disclose Information to Third Parties page 11
Individual Authorization
Attending Physician Statement pages 12-14
Disability Narrative

Thank you for your kind consideration.

Sincerely,

Richard J. Leung, M.D.



002582-516-23-3-2020/06/19**-074416-6-PORT_Sdx_Prod

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

## INDIVIDUAL STATEMENT (PLEASE PRINT)

**A. Information About You**

Last Name: LEUNG, M.D.
Suffix:
First Name: RICHARD
MI: J

Date of Birth (mm/dd/yy): [redacted] 55
Social Security Number: [redacted]
Gender: ☒ Male ☐ Female
Policy Number: LAD01601 5 etc.

Home Address: 1388 KETTNER BLVD. UNIT 2801
City: SAN DIEGO
State: CA
Zip: 92101-2915

Home Telephone Number:
Cellular Telephone Number: 619 993 2888

The state in which you work: CA
Preferred e-mail address (for confirmation purposes only): richardjleung@gmail.com

Employer Name: THOMAS S. TOOMA, MD-PROF. CORP.

Employer Address: 3501 JAMBOREE RD NEWPORT BEACH, CA 92660
Employer Telephone Number: 949 854 7400

Language Preference ☒ English ☐ Spanish

Please check all types of coverage you have with Unum. UNUM LAD01601 5, LAN661286, LAN 780636, LAN 782990

☐ Short Term Disability Policy #: ______ ☒ Long Term Disability Policy #: LAN 782020 ☐ Life Insurance Policy #: ______

**B. Information About Your Disability Date**

| Date you are claiming your disability began (mm/dd/yy): | Date last worked (mm/dd/yy): | Number of hours worked on date last worked: |
|---|---|---|
| 05/29/20 | 05/28/20 | 7.5 hours |

**C. Information About the Condition(s) Causing Your Disability**

1. For **sickness**, answer the following questions then go to #4:

| What is the name of your medical condition? | What were your first symptoms? |
|---|---|
| | |

| When did you first notice the symptoms? | Date your illness began (mm/dd/yy): | Date you were first treated (mm/dd/yy): |
|---|---|---|
| | | |

2. For an **injury/accident**, answer the following questions then go to #4:

What is the name of your medical condition? lumbar: herniated disc at L4-5, scar tissue, multi level disc degeneration, spinal stenosis, nerve impingement, cervical: herniated disc C5-6, multi level disc degeneration, spinal stenosis and nerve impingement

Date the injury/accident occurred (mm/dd/yy): 05/23/82 (lumbar) 11/xx/93 cervical

Where and how did the injury/accident occur? lumbar: injury occured at VA Medical Center in ICU while lifting 300lb. patient during medical emergency cervical: occured at 8010 Frost St. San Diego while strengthening back with personal trainer

What are the symptoms related to your injury/accident? * pain in spine, loss of mobility, numbness in hands

When did you first notice the symptoms? 5/23/82 and thereafter

Date you were first treated (mm/dd/yy): 05/31/82 estimate

If related to a motor vehicle accident, was an accident report filed? ☐ Yes ☐ No If yes, in what state was the report filed? N/A

* see supplemental narrative with details



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-517-23-4-2020/06/19**-074417-6-PORT_Sdx_Prod

**INDIVIDUAL STATEMENT (Continued)** Please print your name and date of birth below for identification purposes

Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J.
Date of Birth (mm/dd/yy): [redacted] 55

3. For **pregnancy**, answer the following questions then go to Section D:

What is your expected delivery date? (mm/dd/yy)

Were there any complications causing you to stop work prior to your expected delivery date? ☐ Yes ☐ No | If yes, please explain:

Have you already delivered? ☐ Yes ☐ No | If yes, what type of delivery? ☐ Vaginal ☐ C-Section | If yes, date of delivery (mm/dd/yy):

4. For **all medical conditions except pregnancy**, answer the following questions:

Is your condition related to your occupation? ☒ Yes ☐ No | If yes, please explain how: lumbar: injury occurred while lifting patient. cervical: injury occurred while strengthening with trainer, details in narrative.

Have you filed a Workers' Compensation claim? ☒ Yes ☐ No | If no, do you intend to file a Workers' Compensation Claim? ☐ Yes ☐ No

Name of Workers' Compensation Carrier: U.S. Department of Labor | Telephone Number: 415-241-3300

**D. Information About Your Day-to-Day Activities**

Please describe your current activities (for example, household chores, reading, computer use, driving, caring for family members/children, etc.): reading, computer, driving, watching television, various household and outside activities all within my limitations. exercise and aerobic activity all with my limitations, but ~~more recently stopped due to corona virus, exercise bike at home.~~

Please describe your current activities before your disability began: reading, computer, driving, watching television, ability to lift some weight, ability to bend more easily, ability to sit for longer periods of time working as a surgical ophthalmologist.

Does your current condition prevent you from caring for yourself? ☐ Yes ☒ No
Does someone provide you with assistance in your daily activities? ☒ Yes ☐ No
Do you use an assistive device(s) such as a cane, walker, hearing aid, etc.? ☐ Yes ☒ No
If you answered yes to any of these questions, please provide details: I require assistance with lifting anything heavier than approximately 15 lbs, or anything bulky.

**E. Information About Your Return to Work**

Have you returned to work? ☐ Yes ☒ No | If yes, please indicate the date: N/A
Part-Time (mm/dd/yy): | Full-Time (mm/dd/yy): | Hours Per Week:

If yes, in your previous occupation? ☐ Yes ☐ No
If no, when do you expect to return? (mm/dd/yy) N/A
What is your monthly income before taxes? $ 63,114 projected 2019 tax return

What duties of your occupation are you able to perform and how long are you able to perform them? I cannot perform the material and substantial duties of a surgical ophthalmologist with reasonable continuity, in the usual and customary way.

What duties of your occuption are you unable to perform? ← same

**F. Information About Your Family**

Marital Status: ☐ Single ☐ Married ☐ Widowed ☐ Divorced ☐ Domestic Partner ☐ Separated

Spouse/Partner's Name | Spouse/Partner's Date of Birth (mm/dd/yy) | Is he/she employed? ☐ Yes ☐ No

Claimant Name: Richard J Leung Claim #: 17839700



002582-518-23-5-2020/06/19**-074417-6-PORT_Sdx_Prod

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

**INDIVIDUAL STATEMENT (Continued)** Please print your name and date of birth below for identification purposes

Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J.
Date of Birth (mm/dd/yy): [redacted] 55

**G. Information About Other Disability Income.** This information is important to ensure the accuracy of your disability benefit calculation.

You may be receiving income from other sources that could impact your benefit from Unum. Please indicate what other income benefits you are eligible to receive or are receiving as a result of your disability.

| Source of Income: | Name of Insurance Carrier (if applicable) | Policy or ID No. | Benefit Amount Weekly/Monthly | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|---|
| Other Disability Insurance | Northwestern Mutual | D1143564 | 5850/month | pending | | |
| Social Security/Disability | | | | | | |
| Social Security/Other | | | | | | |
| Unemployment | | | | | | |
| Workers' Compensation | | | | | | |
| State Disability Plan (CA, HI, NJ, NY, PR, RI) | | | | | | |

**H. Information About Physicians, Hospitals and Medications**

Please provide the following information about all your current medical treatment providers (physicians, hospitals, physical therapists, etc.). If you are being treated by more than three, please share the following information for each provider on a separate sheet of paper and include it with this form.

1. Provider Name: Michael Moon, MD
Mailing Address: 5348 Carroll Canyon Rd #101
Telephone No.: (858) 202-1546
Specialty: pain management
City: San Diego State: CA Zip: 92121
Fax No.: (858) 202-1548
Date of Last Visit (mm/dd/yy): 05/06/20
Date of Next Visit for this Condition (mm/dd/yy): 06/30/20

2. Provider Name: Lindy First, PT, DPT
Mailing Address: 5030 Camino De la Siesta #220
Telephone No.: (619) 260-0750
Specialty: Doctor of physical therapy
City: San Diego State: CA Zip: 92108
Fax No.: (619) 260-0201
Date of Last Visit (mm/dd/yy): 03/11/20
Date of Next Visit for this Condition (mm/dd/yy): none

3. Provider Name: Ehtisham Mahmud, MD
Mailing Address: 9434 Medical Center Drive
Telephone No.: 858-657-8029
Specialty: Cardiology
City: La Jolla, State: CA Zip: 92037
Fax No.: (858) 657-8028
Date of Last Visit (mm/dd/yy): 01/09/20
Date of Next Visit for this Condition (mm/dd/yy): 07/09/20

See supplemental list of medical providers

Please list any hospital emergency room visits/admissions you have had in the last 12 months. If you have had more than two, provide the following information for each emergency room visit/admission on a separate sheet of paper and include it with this form.

1. Hospital/Facility Name: ______ Address: ______ Date of Visit/Admission (mm/dd/yy): ______
Procedure: ______ City: ______ State: ______ Zip: ______ Date of Discharge (mm/dd/yy): ______

2. Hospital/Facility Name: ______ Address: ______ Date of Visit/Admission (mm/dd/yy): ______
Procedure: ______ City: ______ State: ______ Zip: ______ Date of Discharge (mm/dd/yy): ______

002582-519-23-6-2020/06/19*f-07418-6-PORT_Sdx_Prod

UNUM Supplemental Page 6
Individual Disability Claim Form
Individual Statement

LEUNG, M.D., RICHARD J.

Date of Birth 10/14/55

| Provider name | Specialty | Mailing address | City | St | Zip | Telephone | Fax | Last visit | Next visit |
|---|---|---|---|---|---|---|---|---|---|
| Ben Frishberg, MD | Neurology | 6010 Hidden Valley Road #200 | Carlsbad | CA | 92011 | 760-631-3000 | 760-631-3016 | 5/12/2020 | 9/15/2020 |
| Thomas Savides, MD | Gastroenterology | 9300 Campus Point Drive | La Jolla | CA | 92037 | 858-657-6882 | 858-657-7266 | 3/6/2020 | none |
| Michael Keefe, MD | Otolaryngology | 2929 Health Center Drive # | San Diego | CA | 92123 | 858-939-6621 | 858-874-2348 | 2/29/2020 | none |
| Aleksandr Itkin, MD | Dermatology | 7565 Mission Valley Road #200 | San Diego | CA | 92108 | 619-245-2350 | 619-245-2895 | 12/13/2019 | none |
| Rolf Ehlers, MD | Internal Medicine | 8765 Aero Drive #130 | San Diego | CA | 92123 | 858-541-0181 | 858-637-9305 | 10/1/2019 | none |
| Keith Jackson, MD | Otolaryngology | 8010 Frost Street #503 | San Diego | CA | 92123 | 858-279-4221 | 858-279-4223 | 9/9/2019 | none |
| Brian Dicks, MD | Urology | 4060 Fourth Avenue #310 | San Diego | CA | 92103 | 619-297-4707 | 858-429-7927 | 4/17/2019 | none |
| Benjamin Dubois, MD | Orthopedics | 5565 Grossmont Center Dr #256 | La Mesa | CA | 91942 | 619-462-3131 | 619-462-1731 | 8/24/2018 | none |
| Daniel Einhorn, MD | Endocrinology | 9850 Genesee Avenue #415 | La Jolla | CA | 92037 | 858-622-7200 | 858-622-7211 | 6/1/2018 | none |
| Jan Fronek, MD | Orthopedics | 10710 N. Torrey Pines Rd. | La Jolla | CA | 92037 | 858-554-9753 | 858-554-6052 | 3/13/2018 | none |

002582-521-23-8-2020/06/19**-074419-6-PORT_Sdx_Prod

UNUM Supplemental page 7

Individual Disability Claim Form/ Individual Statement

| Name | Date of Birth |
|---|---|
| LEUNG, M.D., RICHARD J. | [redacted]/55 |

| Prescription Name | Dosage | Prescribing Physician | Pharmacy |
|---|---|---|---|
| 6. Carvedilol | 12.5 mg twice a day | Ehtisham Mahmud, M.D. | CVS |
| 7. Repatha | 140mg/ml every two weeks | Ehtisham Mahmud, M.D. | UCSD |
| 8. Baby aspirin | 81 mg once a day | Ehtisham Mahmud, M.D. | Target OTC |



002582-520-23-7-2020/06/19**-074418-6-PORT_Sdx_Prod

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

**INDIVIDUAL STATEMENT (Continued)**

Employee/Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J.

Date of Birth (mm/dd/yy): [redacted] 55

Please list all current medications. If you are taking more than five, provide this information for each prescription on a separate sheet of paper and include it with this form.

| | Prescription Name | Dosage | Prescribing Physician | Pharmacy Name |
|---|---|---|---|---|
| 1. | Dilaudid | 2mg every 6 hrs prn | Michael Moon MD | CVS |
| 2. | Valium | 10mg qhs prn | Michael Moon MD | CVS |
| 3. | Sulindac | 200mg BID prn | Michael Moon MD | CVS |
| 4. | Clopidogrel | 7.5mg q day | Ehtisham Mahmud MD | CVS |
| 5. | Lisinopril | 2.5mg q day | Ehtisham Mahmud MD | CVS |

See additional supplemental page

**Fraud Warning:** For your protection, Arizona law requires the following to appear on this claim form:

Any person who knowingly and with the intent to injure, defraud or deceive an insurance company presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud Warning:** For your protection, New York law requires the following to appear on this claim form:

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**I. Signature of Employee/Individual**

I have read and understand the fraud notices listed on pages 2 and 3 of this form. I also acknowledge that should my claim be overpaid for any reason it is my obligation to repay any such overpayment. The above statements are true and complete to the best of my knowledge and belief. **(Your signature is required for benefit consideration.)**

X [signature]
**Signature**

06/17/20
**Date**

**Reminder:** Please sign and date the Authorization (last page of this claim form).



002582-522-23-9-2020/06/19**-074419-6-PORT_Sdx_Prod

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

**OCCUPATION DESCRIPTION** Please provide the following information about your occupation.

**A. Information About You**

Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J.
Date of Birth (mm/dd/yy): [redacted] 55

**B. Information About Your Occupation**

Job Title: Ophthalmologist
Nature of Business: Medical

Years with current employer: 0.5
Years in Occupation: 34
Annual Income: $ 757,379

Please advise the name, title, and telephone number of the person we should contact for additional information about your occupational duties.

Name: Bryan Yatale
Title: V.P. Operations
Telephone Number: 310-529-9812

Are you currently self-employed? ☐ Yes ☒ No
If yes, employer name:
Telephone Number:

Do you work for another employer? ☒ Yes ☐ No
If yes, employer name: Thomas S. Tooma, MD, Professional Corp.
Telephone Number: 949-854-7700

**C. Information About Premium Funding for the Policy Year of Disability.** The following information will ensure your benefit is taxed appropriately according to Federal and State regulations

Does your employer have any involvement (direct payment, payroll deduction, cafeteria plans, etc.) with the premium payment(s) for your Individual Disability coverage? ☐ Yes ☒ No

Are you an owner of the above business? ☐ Yes ☒ No

If yes, which tax form do you file:
- ☐ Form Schedule C
- ☐ Form 1065 (ownership % ___)
- ☐ Form 1120 (ownership % ___)
- ☐ Form 1120S (ownership % ___)

Answers to these questions may impact taxability of benefits received.

**List and describe your occupational duties.**

**Duty** Ophthalmologist examining patients in office
Hours Spent Each Week: 32

Description: taking patient histories, visual acuity measurement, slit lamp exam, tonometry, gonioscopy, retinal examination, insertion punctal plugs, removal trichiasis, refraction, interpretation of testing, ultrasonography, preparation for surgery

**Duty** Ophthalmologist surgical procedures
Hours Spent Each Week: 12

Description: Cataract surgery, lens implants, laser surgery, refractive surgery with eximer laser and femtosecond laser, YAG laser capsulotomy, selective laser trabeculoplasty for glaucoma, oculoplastic procedures

**Duty**
Hours Spent Each Week:

Description:
Total weekly hours: 44
Total weekly days: 5

Does your occupation require travel (other than to and from work)? ☐ Yes ☒ No
If yes, how many hours do you travel per week?

Do you supervise others? ☐ Yes ☒ No
If yes, how many people do you supervise? 0

How has your medical condition impacted your ability to perform these occupational duties? pain, decreased mobility, numbness in extremities (both legs and hands), inability to use required equipment, unable to bend or lift as required.

CL-1020 (02/16)

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000284

**EXH. 6-008**



**INDIVIDUAL DISABILITY CLAIM FORM**

The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-523-23-10-2020/06/19**-074420-6-PORT_Sdx_Prod

**OCCUPATION DESCRIPTION (Continued)** Please print your name and date of birth below for information purposes

Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J

Date of Birth (mm/dd/yy): [redacted] 55

**In an 8 hour workday the job requires:**

**Physical Requirements:**

| (% of time performed) | Never | Occasionally (1 - 33%) | Frequently (34 - 66%) | Constantly (67 - 100%) | Item | Weight |
|---|---|---|---|---|---|---|
| Sitting | ☐ | ☐ | ☐ | ☒ | | |
| Standing | ☐ | ☒ | ☐ | ☐ | | |
| Walking | ☐ | ☒ | ☐ | ☐ | | |
| Climbing | ☒ | ☐ | ☐ | ☐ | | |
| Balancing | ☐ | ☐ | ☐ | ☒ | | |
| Bending/Stooping | ☐ | ☐ | ☐ | ☒ | | |
| Kneeling | ☒ | ☐ | ☐ | ☐ | | |
| Squatting/Crouching | ☒ | ☐ | ☐ | ☐ | | |
| Crawling | ☒ | ☐ | ☐ | ☐ | | |
| Reaching | ☐ | ☐ | ☐ | ☒ | | |
| Using Foot Controls | ☐ | ☐ | ☒ | ☐ | | |
| Twisting | ☐ | ☐ | ☒ | ☐ | | |
| Carrying | ☒ | ☐ | ☐ | ☐ | | |
| Pushing/Pulling | ☐ | ☒ | ☐ | ☐ | | |
| Lifting | ☐ | ☒ | ☐ | ☐ | | |
| Hand Use -Simple Grasping | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |
| Hand Use -Fine Manipulation | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |
| Hand Use- Repetitive Motion | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |

Dominant Hand ☒ Right ☐ Left

Are there any other physical requirements of your occupation that you are unable to do as a result of your medical condition? ☒ Yes ☐ No
If yes, please explain: sitting at the operating microscope, wearing necessary head piece to do retinal examination; elevation of arms to do various exams, procedures and refraction. I can no longer work effectively or safely as a surgical ophthalmologist.

Does your occupation require the performance of repetitive tasks? ☒ Yes ☐ No If yes, please describe: Examination at the slit lamp, small motor tasks, tasks during cataract and laser surgery that require fine motor skills, reaching and extended sitting.

**Cognitive Requirements:** Does the job require (check all that apply):

- ☒ working under emergency, critical or dangerous situations.
- ☒ meeting deadlines.
- ☒ attention to detail.
- ☒ day-to-day contact with others (co-workers and/or the public).
- ☒ making independent decisions.

Are there any other cognitive requirements of your occupation that you are unable to do as a result of your medical condition? ☐ Yes ☒ No
If yes, please explain:

**Equipment:** Describe all equipment used to perform your occupation: slit lamp, tonometer, gonioscopy lens, phoropter, indirect ophthalmoscope, retinal lenses, jewelers forceps, surgical blades, operating microscope, surgical instruments, YAG laser, Femtosecond laser, Excimer laser, SLT laser

**Environmental Conditions:** Please check the amount of time you are exposed to the following elements:

| | Never | Occasionally (1 - 33%) | Frequently (34 - 66%) | Constantly (67 - 100%) | |
|---|---|---|---|---|---|
| Heat | ☒ | ☐ | ☐ | ☐ | Temperature: |
| Cold | ☒ | ☐ | ☐ | ☐ | Temperature: |
| Dust, Fumes, Gases | ☐ | ☒ | ☐ | ☐ | |
| Vibrations | ☒ | ☐ | ☐ | ☐ | |
| Any Other | ☒ | ☐ | ☐ | ☐ | Description: |

Noise Intensity ☒ Quiet ☐ Moderate ☐ Loud



002582-524-23-11-2020/06/19**-074420-6-PORT_Sdx_Prod

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

**OCCUPATION DESCRIPTION (Continued)** Please print your name and date of birth below for information purposes

Individual's Name (Last Name, Suffix, First Name, MI): LEUNG, M.D., RICHARD J.

Date of Birth (mm/dd/yy): [redacted]

**D. Information About Your Previous Work Experience**

Please list any previous employment including any other positions held with your current employer.

| Occupational Title | Employer Name | Dates Employed |
|---|---|---|
| Ophthalmologist | Richard J. Leung, M.D. | 11/1/88 – 10/31/19 |
| | | |
| | | |
| | | |

**E. Information About Your Education and Licenses**

Please check highest level of education completed.

☒ Post Graduate – Years completed 8

☐ College – Years completed ________

☐ Trade/Vocational School – Years completed ________

☐ GED – Date received ________

☐ High School – Years completed ________

Please list all degrees, diplomas, certificates and licenses obtained. License holders should indicate the states of licensure and the expiration date of the licenses.

| Degrees, diplomas, certificates and licenses. | State of Licensure | Expiration Date of License |
|---|---|---|
| Bachelors degree | Maryland | none |
| Doctor of Medicine | Maryland | none |
| Board Certified, American Board of Ophthalmology | All states | none |
| Physician and Surgeon - Medical Board of California | California | 10/31/21 |
| | | |

**F. Signature of Individual**

The above statements are true and complete to the best of my knowledge and belief.

X [signature] M.D.
**Signature**

06/17/20
**Date**

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000286

**EXH. 6-010**



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-525-23-12-2020/06/19**-074421-6-PORT_Sdx_Prod

You are not required to sign this Optional Authorization. However, if you would like us to communicate with a family member, friend or other third party about your claim, we recommend completing the information below. Please sign and date the form as indicated and mail or fax it to the address or fax number indicated above.

## Optional Authorization to Disclose Information to Third Parties

To assist in the evaluation or administration of my claim(s), I authorize Unum Group, its subsidiaries and duly authorized representatives ("Unum") to share personal health and financial information relating to my claim with the family members, friends, and/or other third parties listed below:

My Spouse: ______________________________
(Name) (Telephone Number)

Other Family Member: ______________________________
(Name / Relationship) (Telephone Number)

Other person: ______________________________
(Name / Relationship) (Telephone Number)

I authorize Unum to leave messages about my claim on my voicemail / answering machine.
☒ Yes ☐ No

I understand that information about my claim may include information about my health and that such information about my health may be related to any disorder of the immune system including, but not limited to, HIV and AIDS; use of drugs and alcohol; and mental and physical history, condition, advice or treatment, but does not include psychotherapy notes.

I do not wish the following information about my claim to be shared (leave blank if not applicable):

______________________________

I further understand that the information is subject to redisclosure and might not be protected by certain federal regulations governing the privacy of health information.

I may revoke this authorization in writing at any time except to the extent Unum or the authorized recipient of my information has relied on it prior to receiving my notice of revocation. I may revoke this Authorization by sending written notice to the address above.

This authorization is valid for the shorter of two (2) years or the duration of my claim. I may request a copy of the Authorization and a copy shall be as valid as the original.

[signature] MD. 06/17/20
Individual's Signature Date

Richard J. Leung, M.D. [redacted]
Printed Name Social Security Number

I signed on behalf of the claimant as ______________________ (indicate relationship). If Power of Attorney Designee, Personal Representative, Guardian, or Conservator, please attach a copy of the document granting authority.

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries, Unum Life Insurance Company of America, Provident Life and Accident Insurance Company, and The Paul Revere Life Insurance Company.



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center • P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-526-23-13-2020/06/19**-074421-6-PORT_SdX_Prod

Please sign and return this authorization to The Benefits Center at the address above. You are entitled to receive a copy of this authorization. This authorization is designed to comply with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule.

## Authorization to Collect and Disclose Information
## *(Not for FMLA Requests)*

**I authorize the following persons:** health care professionals, hospitals, clinics, laboratories, pharmacies and all other medical or medically related providers, facilities or services, rehabilitation professionals, vocational evaluators, health plans, insurance companies, third party administrators, insurance producers, insurance service providers, consumer reporting agencies including credit bureaus, GENEX Services, LLC, The Advocator Group and other Social Security advocacy vendors, professional licensing bodies, employers, attorneys, financial institutions and/or banks, and governmental entities;

**To disclose information,** whether from before, during or after the date of this authorization, about my health, including HIV, AIDS or other disorders of the immune system, use of drugs or alcohol, mental or physical history, condition, advice or treatment (except this authorization does not authorize release of psychotherapy notes), prescription drug history, earnings, financial or credit history, professional licenses, employment history, insurance claims and benefits, and all other claims and benefits, including Social Security claims and benefits ("My Information");

**To Unum Group and its subsidiaries,** Unum Life Insurance Company of America, Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and persons who evaluate claims for any of those companies ("Unum");

**So that Unum may evaluate and administer my claims, including providing assistance with return to work.** For such evaluation and administration of claims, this authorization is valid for two years, or the duration of my claim for benefits, whichever is shorter. I understand that once My Information is disclosed to Unum, any privacy protections established by HIPAA may not apply to the information, but other privacy laws continue to apply. Unum may then disclose My Information only as permitted by law, including, state fraud reporting laws or as authorized by me.

**I also authorize Unum to disclose My Information to the following persons** (for the purpose of reporting claim status or experience, or so that the recipient may carry out health care operations, claims payment, administrative or audit functions related to any benefit, plan or claim): any employee benefit plan sponsored by my employer; any person providing services or insurance benefits to (or on behalf of) my employer, any such plan or claim, or any benefit offered by Unum; or, the Social Security Administration. Unum will not condition the payment of insurance benefits on whether I authorize the disclosures described in this paragraph. For the purposes of these disclosures by Unum, this authorization is valid for one year or for the length of time otherwise permitted by law.

**Information authorized for use or disclosure may include information which may indicate the presence of a communicable or non-communicable disease.**

If I do not sign this authorization or if I alter or revoke it, except as specified above, Unum may not be able to evaluate or administer my claim(s), which may lead to my claim(s) being denied. I may revoke this authorization at any time by sending written notice to the address above. I understand that revocation will not apply to any information that Unum requests or discloses prior to Unum receiving my revocation request.

[signature] MD — Insured's Signature

06/17/20 — Date Signed

Richard J. Leung, M.D. — Printed Name

[redacted] — Social Security Number

I signed on behalf of the Insured as ______________________ (Relationship). If Power of Attorney Designee, Guardian, or Conservator, please attach a copy of the document granting authority.

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

CL-1020-AUTH (02/16)



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-527-23-14-2020/06/19**-074422-6-PORT_sdx_Prod

## ATTENDING PHYSICIAN STATEMENT (PLEASE PRINT)

**BE COMPLETED BY PHYSICIAN OR TREATING PROVIDER**

Name of Patient (Last Name, Suffix, First Name, MI): LEUNG, M.D. RICHARD J.

Social Security Number: [redacted]

Date of Birth (mm/dd/yy): 10 14 55

Home Telephone Number: 619 993 2888

**Instructions:** Please complete, sign and date this form. The purpose of this form is to assist us in making a disability determination. Please complete all questions on this form and provide copies of supporting reports, such as office notes, medical records, medication logs, consultations and/or testing. Be sure to sign and date this form in Section F.

**A. Complete this section for normal pregnancy, then go to section C**

| Expected Delivery Date (mm/dd/yy): | Actual Delivery Date (mm/dd/yy): | Delivery Type: ☐ Vaginal ☐ C-Section | | Date First Unable to Work (mm/dd/yy): | Date Hospitalized (mm/dd/yy): |
|---|---|---|---|---|---|
| Diagnosis Code | ICD Code: | Height: | Weight: | | Blood Pressure: |

**B. Complete this section for all conditions except normal pregnancy**

| Date of first visit for this current condition(s) (mm/dd/yy): | Date of last office visit (mm/dd/yy): | Date of next office visit (mm/dd/yy): | Did you advise your patient to stop working? |
|---|---|---|---|
| 10/30/14 | 06/02/20 | | ☒ Yes If yes, effective when? (mm/dd/yy): 05/29/20 ☐ No |

Has the patient been treated for the same/similar condition in the past? ☐ Yes ☒ No ☐ Unknown

none prior to lumbar and cervical injury

If yes, please provide treatment dates (mm/dd/yy): From 05/31/82 per pt. Through current + continuing

| Is the patient's condition work related? ☒ Yes ☐ No ☐ Unknown | Patient's Height: | Patient's Weight: |
|---|---|---|
| cont. worker's comp. claim | 5'9" | 165 lbs |

Is the patient's condition due to a sickness or accident? Sickness ☐ Yes ☒ No Accident ☒ Yes ☐ No

What is the primary diagnosis that may impact your patient's functional capacity?

Multilevel degenerative disc and facet degenerative changes, severe central stenosis @ L3-4, severe foraminal stenosis @ C3-4 and C6-7 w/ compression of exiting nerve roots s/p cervical fusion @ C5-6.

ICD Code:

M51.36, M47.812, M43.22, M54.2, M54.5, M54.12, M54.16

Please provide data which supports current DSM Diagnoses.

N/A

What are the other diagnoses that may impact your patient's functional capacity? ☒ NA

| Secondary Diagnosis: | ICD Code: |
|---|---|
| Secondary Diagnosis: | ICD Code: |

Has the patient been hospitalized? ☒ Yes ☐ No If yes, date hospitalized (mm/dd/yy): through (mm/dd/yy):

① 02/15/83 - 02/24/83 ② ~~01/04~~ per patient for 4 days (01/19/04 - 01/22/04)

Was surgery performed? ☒ Yes ☐ No If yes, what procedure was performed? CPT Code: Date Surgery Performed (mm/dd/yy):

① Lumbar laminectomy, lumbar discectomy at L4-5, L4-5 and S1 foraminotomy 02/16/83

② cervical discectomy at C5-6, decompression, fusion, titanium plate 01/?/04

③ Injections (Dr. Moon, Dr. Meywood, Dr. Kortman)



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-528-23-15-2020/06/19**-074422-6-PORT_Sdx_Prod

**ATTENDING PHYSICIAN STATEMENT (Continued)**

Patient's Name: L E U N G , M.D. , R I C H A R D J.

Date of Birth (mm/dd/yy): [redacted] 5 5

**C. Functional Capacity**

If your patient ***does not*** have physical and/or behavioral health RESTRICTIONS (activities patient should not do) and/or LIMITATIONS (activities patient cannot do), please initial here _______________ and go to ***SECTION D.***

**Please note:** When considering a standard 8 hour workday with breaks (approximately every two hours) please quantify terms that may not be uniformly understood such as "prolonged", "repetitive", "light-duty", "heavy lifting", or "stressful situations". In addition, never means not at all, occasional means more than never but less than 33% of the time; frequent means 34-66% of the time, and constant means 67-100% of the time.

**Physical Restrictions**

If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

NO Bending, lifting, turning, examination of patients, and other procedures performed by a surgical ophthalmologist whose duties involve sitting/leaning in forward position w/ arms extended, using hands repetitively for extended periods of time.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): 05/29/20 To (mm/dd/yy): Permanent

**Physical Limitations**

If your patient has CURRENT PHYSICAL LIMITATIONS (activities patient cannot do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

- same as above
+ patient should not be working as a surgical ophthalmologist b/c of chronic pain causing safety issues for his patients and further damage to spine of patient

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): 05/29/20 To (mm/dd/yy): Permanent

**Behavioral Health Restrictions**

If your patient has CURRENT BEHAVIORAL HEALTH RESTRICTIONS (activities patient should not do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

N/A

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____________ To (mm/dd/yy): _____________

**Behavioral Health Limitations**

If your patient has CURRENT BEHAVIORAL HEALTH LIMITATIONS (activities patient cannot do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

N/A.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____________ To (mm/dd/yy): _____________



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959 Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

002582-529-23-16-2020/06/19**-074423-6-PORT_SDX_Prod

## ATTENDING PHYSICIAN STATEMENT (Continued)

Patient's Name: L E U N G , M.D. , R I C H A R D J.

Date of Birth (mm/dd/yy): [redacted] 5 5

What diagnostic or clinical findings support your patient's restrictions and/or limitations as noted above?

Lumbar spine MRI; cervical spine MRI
Diagnostic exam: decreased range of motion, tenderness, spasms, diminished sensation in both hands.

What is your treatment plan? Please include all medications.

Patient has had surgery and extensive conservative treatment over many years and continues to do so. He takes medication as needed.

**D. Prognosis**

Do you expect improvement in the patient's functional abilities? ☐ Yes ☒ No

If yes, when do you expect improvement (mm/dd/yy)?

**E. Other Treating Providers, Facilities, Hospitals or Recent Referrals**

Please provide complete name, contact information and specialty of any other treating physicians, facilities or hospitals.

| Name | Specialty | Address |
|---|---|---|
| Lindy First PT DPT | Physical Therapy | 5030 Camino de la Siesta #220, San Diego, CA 92108 |
| | | |
| | | |
| | | |

FRAUD NOTICE: Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Attending Physician portions of the claim form.

**F. Signature of Attending Physician**

The above statements are true and complete to the best of my knowledge and belief.

Physician Name (Last Name, First Name, MI, Suffix) Please Print: Moon, Michael, MD

Medical Specialty: Physical Medicine and Rehabilitation

Degree: Medical

Address: 5348 Carroll Canyon Rd. Ste 101

City: San Diego | State: CA | Zip: 92121

Telephone Number: ~~(714)~~ (858) 202-1546 | Fax Number: (858) 202-1548 | Physician's Tax ID Number: 330992123

Are you related to this patient? ☐ Yes ☒ No
If yes, what is the relationship?

**Signature of Physician** [signature] **Date** 6/17/2020

Claimant Name: Richard J Leung Claim #: 17839700

002582-530-23-17-2020/06/19**-074423-6-PORT_SdX_Prod

Richard J. Leung, M.D.

Total Disability beginning May 29, 2020

Narrative

Since 1982 I have seen six different neurosurgeons, one orthopedic spine specialist, two neurologists, three chiropractors, two acupuncturists, nine physical therapists and three specialists in pain. I have attended back school and went through the Egoscue chronic pain and posture therapy clinics twice. I have undergone therapies including traction, manipulation, electrostimulation, ultrasound, laser, ice, and heat. Over the years I have had two major spine surgeries requiring hospitalization. I have had eight epidural injections by three different doctors. I have had several emergency room visits for unbearable pain. I have had five CAT scans and a total of sixteen MRI scans. I have had nerve conduction testing four times. I have had countless appointments with doctors and in the case of one neurologist, I saw him at my count 106 times from 1991 to 2014. During numerous flare ups, I have been placed on steroid medication including Medrol dose packs and prednisone. I have been placed on at least seven different non-steroidal medications for pain and at least another seven narcotic medications for pain. At one point these medications caused secondary high blood pressure. I take Valium for spasms to get to sleep and the current pain medication is Dilaudid.

I am told that the discs in the back swell when you sleep. When I wake up in the morning, it is necessary to immediately stretch and go through at least 10 light core exercises to loosen up and to activate my core. Without this I would immediately throw my back out and this could last for days. When the back goes out, I end up with a major shift of my upper torso to one side. The only relief for this is physical therapy, pain medications, Valium, and rest.

Over the years, these episodes have become more frequent. My former attending physician neurologist Charles K. Jablecki, M.D. recorded approximately twenty-five flare ups of the lower back and approximately nineteen of the neck from 2002 to 2014. I need to be careful with things such as simple as reaching over to flush the toilet when standing. I cannot lift weight that someone my age should be able to lift. Simple things like which shoes I wear can affect my back. Certain shoes, especially dress shoes will throw my low back out. Prolonged standing or sitting will also do it. I cannot sit flat on a floor for more than a few minutes. Even after a minute or two, I have difficulty standing back up. For footwear, I have resorted to wearing Asics running shoes with special insoles to support the back.

What is worse is the baseline pain that I have constantly. Even after stretching and doing the core exercises, I have continuous pain up both sides of my back. More recently it is worse on the right side but is also on the left side. The muscles on the whole lower back are hard like a rock and cannot get loose. I have difficulty bending. I cannot run, jump, or even get into a car normally. There is shooting pain into my legs which are worse when even the smallest exertion occurs such as when coughing, sneezing, or going to the bathroom. I have deep pain in the lower back in the region of the Piriformis and also in the sciatic notch area. The pain in the legs are accompanied by numbness and tingling that go down to my feet. My left hip flexor is very tight and I cannot stretch this out very well.

I have similar pain in my neck and upper back. With the neck I have difficulty turning my head and the neck constantly cracks bone on bone. My hands are both numb in the region of the thumb and

002582-531-23-18-2020/06/19**-074424-6-PORT_Sdx_Prod

index fingers. I have pain radiating down my right arm and feel like I am beginning to lose strength in that right arm. I cannot sleep at night due to the spine and neck pain and I find that when I lie down that both my hands are going numb.

My work as an ophthalmologist places huge demands on my back. To examine patients at the slit lamp, I need to lean forward and this places stress on my lower back. Some patients have unusual body types or older patients with curvature of the spine in which in order to examine them, I have to hunch over. To get a complete exam when looking at the retinal with an indirect ophthalmoscope, it is necessary to bend and flex at the back to create the correct angles to see the structures properly. Cataract surgery requires sitting on a hard stool at strange angles for hours upon hours. All of these affect the lower back as well as the upper back. Other things that create stress on the back are doing refraction (what is better one or two) exam for glasses as it is necessary to stand and hold our arm up for several minutes. Gonioscopy and laser treatments also require reaching out for extended periods putting stress on the neck and lower back.

There were days when I left the operating room totally unable to turn my head or feel my hands. Flare ups of the neck cause an increase in the numbness and tingling in the index and thumb. In ophthalmology, surgery requires extreme dexterity and touch. I was worried that due to the numbness and reduced tactile sense, that I could no longer perform surgery safely. I have had more recent episodes of dropping instruments during surgery which had me very concerned.

Before I get too far ahead, let me go back and reveal the whole story.

I graduated from the University of Maryland School of Medicine in 1981 and was fortunate in getting my first choice of internship at the University of California San Diego. During medical school I was interested in a career that involved surgery and after taking several electives at Johns Hopkins I decided that I loved Ophthalmology the most. Internships are usually either in medicine or surgery and my internship at UCSD was in general surgery.

During orientation, the program assigned ½ of the interns to be employees of UCSD and the other ½ to be employees under the VA Medical Center in La Jolla, California. I drew the latter. During our internship we rotated monthly between the specialties at either the University Hospital in Hillcrest or the V.A. Medical Center. The internship was amazing but a lot of hard work and we were on call in the hospital at least every third night and for some rotations even every other night.

In May of 1982, I was assigned the rotation at the V.A. Medical Center in general surgery. One night that I was on call, a patient with a life-threatening emergency came into the I.C.U. There was an unfortunate Veteran who was suffering a gastrointestinal (GI) bleed. He was vomiting up streams of blood all over the place. In this population, this is often due to cirrhosis of the liver which caused high blood pressure in the veins near the liver. The veins in the esophagus get dilated due to the back up of pressure and often rupture causing massive bleeding where patients are vomiting huge amounts of blood. This patient was on a stretcher and had lost consciousness. Because of this emergency situation, we had to quickly move him from the stretcher onto the bed in the Intensive Care Unit. The patient was a huge man and weighed well over 300 pounds. I recall that there were about 4 of us and I was on the patient's right side. The ICU bed was on his left. On the count of three all of us lifted him onto the ICU bed. Because I had to reach across the stretcher it put strain on my lower back and I felt a "pop" in that region.

002582-532-23-19-2020/06/19**-074424-6-PORT_Sdx_Prod

Over the next few days, I suffered increased pain and tightness in the lower back. Within several days, I developed pain in the left leg and numbness of the outside aspect and bottom of the left foot. The pain increased with coughing. It was made worse with standing. The only thing that improved the pain was lying in bed. I sought care in the emergency room and the doctor ordered a scan. In those days, MRI scans were not available and even CAT scans were new. I was referred to the CAT scan at the office of Charles Kerber, M.D. who had one of the first CAT scanners in the country.

On June 17, 1982 I saw Kenneth Ott, M.D. a well-respected neurosurgeon in private practice near Mercy Hospital in San Diego. He concluded that due to the bulging of the L4-5 or L5-S1 disc that there was compression of a nerve exiting my spinal column. Dr. Ott recommended conservative therapy and followed my clinical course for the next 6-7 months.

The pain progressed as well as the numbness in my leg. I began feeling weak on the left had difficulty in walking ½ block. I noticed a slight "foot drop" on the left side where I could not flex my foot at the ankle due to loss of strength. It became apparent that I was going to need surgery. During the first week of January in 1983 I had a consultation with John Alksne, M.D., chief of neurosurgery at UCSD. I had the chance to work closely with Dr. Alksne during my two rotations in neurosurgery and had great confidence in him. On January 8, 1983 I requested to change doctors to him as I preferred to have surgery by him at the University Hospital.

I was admitted to University Hospital on February 15, 1983. The surgery was scheduled for late morning on February 16. I was the third case in Dr. Alksne's schedule. On the day of the surgery I waited for many hours beyond the planned start time. Later I found out that Dr. Alksne had a difficult case earlier in doing a "Janetta" procedure. I underwent the surgery but there were several complications. During the surgery, Dr. Alksne slipped with the drill and tore the lining of the spinal cord known as the dura mater. This caused a leak of spinal fluid which had to be repaired. My back muscles were so tight that the anesthesiologist had to give me extra muscle relaxants and at the end of the procedure I did not breathe right away due to an overload of the medication. The procedure lasted much longer than expected and I did not have a catheter placed to remove urine from the bladder. My bladder got distended to the point where the bladder muscles stretched resulting in an inability to urinate for many weeks post-operatively. The operative note mentions that they found a large bulging herniated disc which was removed. The official procedure done was lumbar laminectomy, lumber L4-5 diskectomy, and L4-5, S-1 foraminotomy.

The post-operative course in the hospital was not easy. I had extreme pain for which Morphine was prescribed. This caused me to hallucinate so badly that I asked them to stop the pain medication. I developed a wound infection and fever. I was in the hospital for a total of 10 days and was discharged on February 24, 1983.

Dr. Alksne followed me and on June 14, 1983 wrote a letter to the U.S. Department of Labor as it related to my workers compensation case stating "I have counseled him to avoid strenuous activities and heavy lifting. A follow-up CT scan shows *"an adequate decompressive laminectomy, but some significant encroachment on the nerve root foramina by hypertrophied facets. This was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date"*. On June 27, 1983 Evelyn

002582-533-23-20-2020/06/19**-074425-6-PORT_sdx_Prod

Gong, Claims Examiner for the U.S. Department of Labor, wrote back "Authorization is given for further surgery, if it becomes necessary".

On July 15, 1983 I wrote Ms. Gong "Following the surgery, I have had continued pain, stiffness and spasms. These symptoms warrant restriction of activities which were once everyday activities for me. My ability to bear weight has been markedly reduced. The maximum weight which I can now lift is 10 pounds. I was once able to participate actively in running, tennis, and other sports with vigor and enthusiasm. Following this injury, I am quite sedentary. I have had difficulty sleeping due to the pain and often medication does not give me any relief. By the end of the day, the pain is very intense and I have difficulty sitting or standing in the operating room even for the shortest operation."

I moved to Los Angeles for my residency in Ophthalmology at the Los Angeles County-U.S.C. Medical Center and was referred to an orthopedic back specialist Leon L. Wiltse, M.D. in Long Beach. On March 8, 1984 I began seeing Dr. Wiltse. In February of 1985 Dr. Wiltse recommended "back school" a formal program with physical therapists.

On March 15, 1985 an MRI of lumbosacral spine was performed at Huntington Medical Corporation "*decreased height and signal intensity L4-5 disc consistent with degeneration and previous surgery, moderate posterior disc bulge with impression on the anterior aspect of the thecal sac, more pronounced on the left than the right, obliteration of normal fat in the proximal left L4 and L5 neural foramina, most likely secondary to scarring*".

On August 5, 1988 Dr. Wiltse suggested "Chymopapain injection". Following a scan and the radiologist reporting "he's got a return of trouble at L-4 on the left", he was considering doing a "percutaneous discectomy". In a letter dated January 25, 1989 the diagnosis was "Left posterolateral disc herniation at L4-5" and he recommended doing one of the two procedures, preferably the injection. Because of the reports in the literature of complications from Chymopapain which could cause paralysis known as transverse myelitis, I elected not to have another procedure.

In an attempt to get some pain relief, I received treatment from a chiropractor in the office of Leroy R. Perry, Jr. from October 1987 to June 1988. The treatment included iontophoresis, ultrasound, Transcutaneous Electrical Nerve Stimulation (TENS), interferometry and gentle manipulation. Unfortunately, none of these fully succeeded.

I relocated to San Diego in November of 1988 to open a medical practice. One frightening episode occurred on February 8, 1992 when my back went out with significant spasm and midline shift of the upper torso. This required an emergency visit at Sharp Memorial Hospital Emergency Room where I was treated with I.V. valium and pain medication. I had an MRI scan and it showed "residual and or recurrent central and left-sided disc herniation at L4-5". SEE EXHIBIT A PHOTOS.

Getting back to 1988 when I first moved back to San Diego, I was able to start my practice sharing office space with several orthopedic surgeons. In that same building there was a physical therapy and sports center. In 1993, I began seeing one of the physical therapy assistants, John Bolan. While there, I met one of the trainers, Char Self, and began training with her to strengthen my back. In mid-to-late November 1993, she put me on a rowing machine and instructed me to do a full set of repetitions. From my vantage point I could not see where she had set the weights. When I tried to lift the weight, it seemed very heavy and on the first and only repetition I felt a pop in my neck. That very

002582-534-23-21-2020/06/19**-074425-6-PORT_sdx_Prod

night I developed severe neck pain radiating into my upper back and scapular area. On the next day I went back to the center and had Mr. Bolan do some light treatment with heat and massage. Over the ensuing weeks the pain increased in intensity and I began having tingling in my right hand. Being right-handed I became worried.

I ran into a friend, colleague, and renowned pediatric cardiac surgeon, John Lamberti, M.D., and told him my story. He suggested that I see Charles K. Jablecki, M.D. Dr. Jablecki is a neurologist and specialist in electromyelography who was formerly at UCSD but then in private practice. I requested to have him to be appointed as treating physician.

I saw Dr. Jablecki for the first time on January 4, 1994. He diagnosed a right C6 radiculopathy and ordered an x-ray and MRI scan of the neck. He also diagnosed lumbosacral spine disease and on exam noted that I had lost reflexes in my lower extremities. He was concerned enough to schedule a "stat" scan and on the next day, MRI scan of the cervical spine revealed "bi-lobed C5-6 disc herniation extending into the right C5-6 foramen causing moderate stenosis". Dr. Jablecki notified me of the diagnosis almost immediately.

On January 18, 1994 Dr. Jablecki wrote "I feel that it is more probable than not that your cervical spine problem at this time is an indirect complication of your original work injury in 1982 for which you underwent surgery". He recommended physical therapy, non-steroidal anti-inflammatory medication, and possible referral to neurosurgeon.

For physical therapy, I was referred to Gunnar T. Mossberg, P.T. beginning January 11, 1994. He recommended neck care education, nerve root decompression positioning, soft tissue mobilization, traction, ice massage, and gradual introduction of exercise therapy. He stated, "the patient's condition apparently has worsened, however I am hopeful that we can reverse this trend with the treatment program as described".

On February 3, 1994 during follow up with Dr. Jablecki, he explained about two-point discrimination and felt that this was a way to follow any loss of sensation. He recognized that because of my career in ophthalmology, that it is very important to monitor sensation in my hands for any possible further loss. This is a key point as I would always want to provide care for my patients in the safest possible way and never to risk anything due to my lower back or neck issues.

At this point Dr. Jablecki was concerned enough to refer me to a neurosurgeon for consultation. On May 27, 1994, I saw Joel West Ray, M.D. He concurred with Dr. Jablecki's diagnosis on January 4, 1994. I saw Dr. Ray for several visits through September 25, 1995 and he concluded with diagnoses of degenerative cervical spine disease and lumbosacral spine disease. Fortunately, I was able to avoid another surgery at that time.

On November 2, 1995 a repeat MRI scan of the cervical spine was performed. This was reviewed by Dr. Ray whose impression was that the C4-5 disc had worsened. On January 5, 1996 Dr. Ray examined me and wrote "he has continued with is physical therapy and changed the ergonomics of his work place. The specific changes in ergonomics have included special attention to the positioning of the microscope, limiting the time that he uses the indirect ophthalmoscope, and assuring optimal positioning of the chair when using the slit lamp. His residual symptoms are mainly neck pain especially

002582-535-23-22-2020/06/19**-074426-6-PORT_Sdx_Prod

with any significant lifting (greater than 10 lbs.) especially to the shoulder level, or sleeping incorrectly (although this has improved with use of an orthotic pillow) and prolonged positioning at work."

On January 7, 1997 the US Department of Labor authorized physical therapy sessions with T.H.E. Clinic with Peter Egoscue. The clinic specialized in pain control and posture therapy. I continued in under their care in 1997 and again in 2001

On October 28, 1998 Dr. Jablecki wrote a letter to me after examining me to reconfirm that the cervical accident was an indirect complication of the lumbar accident. The letter reads as follows:

*"Dear Dr. Leung:*

*This letter is to reiterate the position stated in my letter of January 18, 1994. In that letter, I indicated it was more probable than not that your cervical spine problem which is symptomatic at this time is an indirect complication of your original work injury in 1982 for which you underwent surgery.*

*After that surgery, you continued to have episodes of back spasms which caused your trunk to tilt to the right which you compensated for by tilting your head to the left. This would provide pressure in the mid-cervical area and force the disc to move to the right, the site of your major disc protrusion, as confirmed by MRI scan on January 5, 1994.*

*In addition, you were carrying out exercises in a gym, rowing activities, to strengthen the muscles of your back, as instructed as a form of home therapy for treatment of your low back injury when the disc protrusion in the neck became symptomatic at the end of 1993.*

*Since your initial evaluation in 1994, you have had flare-ups of the cervical spine disease with radicular symptoms in the right arm. Based on this information, I conclude it is appropriate that you receive care for this problem under your workers' compensation carrier.*

*I recommend that you contact your workers' compensation carrier to ask for a review of your claim should they disagree with this analysis and deny coverage for my recent recommendations for physical therapy and medications. As we discussed, you may also need another MRI scan of the cervical spine, with the possibility of nerve root sleeve injections, and even surgery, if your current flare-up does not improve with conservative treatment.*

*Sincerely,*

*Charles K. Jablecki, M.D."*

During the numerous flare ups it was necessary for Dr. Jablecki to order repeat scans and on April 28, 1999 MRI of cervical spine and cord showed *"C4-5 facet joint hypertrophy and mild right sided neural foraminal narrowing, C5-6 disc herniation with uncovertebral spondylosis and bilateral neural foraminal narrowing right greater than left"*.

In 2001, I was referred to Sam Maywood, M.D. Dr. Maywood was an anesthesiologist and pain specialist. At the Coast Surgery Center, I had the first of three spinal injections on April 11, 2001. Dr. Maywood did a second spinal injection on April 25, 2001 and third one on June 13, 2001.

002582-536-23-23-2020/06/19**-074426-6-PORT_Sdx_Prod

On September 22, 2002 MRI of the cervical spine and cord showed *"interval progression of a left posterior paramedian focal disk protrusion at C4-5, stable degenerative changes at C3-4 and C5-6"*.

On November 22, 2003 MRI of the cervical spine and cord showed *"slight worsening of moderate C4-5 left paracentral broad disk protrusion, which flattens the left ventral cord surface and causes a mild spinal canal narrowing. Uncovertebral and facet hypertrophy with slight right C4-5 neural foraminal narrowing, minimal improvement in the moderate C5-6 broad-disk osteophyte complex with associated mild to moderate spinal stenosis. Uncovertebral and facet hypertrophy with moderate to severe right and mild to moderate left neural foraminal narrowing"*.

Due to flare ups, numerous MRI scans were done over the years. On June 24, 2005 and September 2, 2006 MRI scans of both the lumbar and cervical spine areas were performed. On May 19, 2010 an MRI of the cervical spine done due to another flare-up.

On February 3, 2011 I began physical therapy with Innovative Physical Therapy with Dr. Lindy First.

April 20, 2011 MRI of lumbar spine *"previous bilateral L4-5 posterior decompressive surgery and hemilaminectomies. There is mild left and moderate right enhancing scar tissue in the lateral recesses with involvement of the traversing right L5 nerve root. There is a persistent moderate annular disc osteophyte complex with slight increase in size of 5 mm, anteroposterior moderate central right paracentral and foraminal disc extrusion. There is slight impingement of the exiting right L4 nerve root, and significant impingement of the bilateral traversing L5 nerve roots, right worse than left. Worsening L3-4 degenerative disc disease with mild to moderate annular disc building and a small left foraminal disc protrusion impinging the exiting left L3 nerve root, and the bilateral traversing L4 nerve roots. There is moderate L3-4 spinal stenosis. Moderate L3-4 degenerative facet arthropathy."*

Because of persistent low back pain, on May 26, 2011 and October 27, 2011 I underwent two lumbar paravertebral injection under the guidance of CT scan with Keith Kortman, M.D. at San Diego Imaging.

On September 22, 2014 Dr. Jablecki writes "your problems with your cervical and lumbosacral spine disease have been a frequent source of neck and back pain, and numbness and tingling in the limbs for many years. You have had two spine surgeries only to have the pain and numbness and tingling to recur. The continuous physical demands of your work aggravate your underlying cervical and lumbosacral spine disease and caused increased neck and back pain and pain, numbness and tingling in your limbs."

My final appointment with Dr. Jablecki was on October 3, 2014 due to his retirement from practice. I was referred to the capable hands of Michael Moon, M.D., of Paincare of San Diego.

September 21, 2015 MRI scan of lumbar and cervical spines showed *"progression L3-4 disc degeneration with secondary spinal canal, neural foraminal, lateral recess stenosis" and "progressive uncovertebral spondylosis and facet joint degeneration at other levels with secondary neural foraminal narrowing"*.

002582-537-23-24-2020/06/19**-074427-6-PORT_Sdx_Prod

On October 19, 2015 Dr. Moon performed an epidural steroid injection at the Surgical Center of San Diego. On October 3, 2016 Dr. Moon performed another epidural steroid injection at the Surgical Center of San Diego.

On November 22, 2016 I was seen in the emergency room of Sharp Memorial Hospital with sudden, severe neck pain. I presented with several days of pain in the back of my neck and woke up in excruciating pain. I had pain on both sides but left more than right and it radiated into my left arm. I could hardly move my head and had limited range of motion. The attending physician in the Emergency Room was Kirk Burgamy. He ordered a stat MRI scan.

The MRI scan of the cervical spine was performed. This one was read by a neuro-radiologist, Nathaniel Chuang, M.D. He writes *"previous anterior and interbody fusion at C5-6. There was mild edema seen in the posterior atlantooccipital membrane and interspinous ligaments between C1-2 and C5-6 consistent with strain or recent trauma. Increasing assymetric moderate left and mild right C3-4 and minimal bilateral C4-5 facet joint fluid raises the possibility of a recent distraction injury. Facet degenerative arthrosis may have a similar appearance, especially give the presence of developing 6 mm posterior left C3-4 facet synovial cyst. Infection and facet septic arthritis are considered unlikely. Persistent C6-7 moderate 6mm left paracentral and foraminal disc extrusion and moderate-severe left C7 neuroforaminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neuroforaminal narrowing. Moderate C3-4 and mild-moderate C4-5 spinal stenosis. Mild spinal cord compression ad C3-4. No convincing spinal cord edema."*

The diagnosis was acute exacerbation of chronic neck pain, cervical facet degenerative arthrosis and cervical degenerative disk disease. I received a copy of the emergency department report and forwarded it to neurosurgeon, Richard Ostrup, M.D.

On March 3, 2017 Dr. Moon performed a cervical epidural steroid injection at the Surgical Center of San Diego.

On March 6, 2017 I had a consult with Dr. Ostrup who concluded "he clearly has significant stenosis on the MRI done in September 2015....it is probable that the stenosis will progress with time.....if he does become more disabled particularly with regards to his leg symptoms I do think he should be evaluated with a more up-to-date lumbar MRI with possible consideration for lumbar decompression".

On April 17, 2017 another MRI scan of the lumbar spine was performed. Dr. Chuang writes *"previous L5-S1 posterior decompression laminectomies. Previous post-contrast study better demonstrates mild-moderate epidural scar tissue at L4-5 with involvement of the exiting right L4 and bilateral traversing L5 nerve roots, right more than left. L4-5 with mild posterior broad disc extrusion, severe facet hypertrophy and possible increase in mild impingement of the left L4 nerve root. Otherwise, persistent significant impingement of the bilateral traversing L5 nerve roots at this level, and mild impingement of the right L4 nerve root. L3-4 with persistent moderate-severe spinal stenosis and impingement of the bilateral traversing L5 nerve roots, left more than right and to a much lesser degree, the bilateral exiting L4 nerve roots."*

002582-538-23-25-2020/06/19**-074427-6-PORT_sdx_Prod

On August 30, 2018 another MRI scan of the cervical spine was performed. Interventional radiologist, Keith Kortman, M.D. read this scan as *"multilevel disc degeneration with uncovertebral spondylosis, facet joint hypertrophy, mild canal stenosis and bilateral neural foraminal narrowing."*

On February 17, 2020 I had a busy day in clinic. I ended the day with severe low back and neck pain with total stiffness. I took non-steroidal anti-inflammatory medication and tried to rest. During surgery on February 19, 2020 I had extreme difficulty getting comfortable with the operating room microscope. My low back and neck were in extreme pain and tightness. I noticed increased numbness in my hands. I saw Dr. Lindy First that day for physical therapy treatment at Innovative Physical Therapy. I returned there on February 26, 2020 for additional treatment. Just the next day on February 27, 2020, I developed severe low back pain that necessitated treatment with high doses of Valium and pain medication. Fortunately, Dr. First was able to see me on February 28, 2020 for additional low back treatment but just 4 days later the low back pain escalated again.

On March 4, 2020 I performed cataract surgery at Sharp Memorial Hospital. I had several difficult cases and patients with bad curvature of the spine. This required for me to operate in a very uncomfortable position which caused the low back and neck to flare up. I sent a text message to Dr. Moon and he was able to see me that day. During the testing he noted the low back issues and also some decreased strength in my right arm, of which I had become aware. I believe that this was the first time that Dr. Moon could appreciably notice motor function loss from the cervical problem. He immediately ordered the repeat MRI of the lumbar and cervical regions.

On April 3, 2020 MRI scans of both cervical and lumbar regions were performed at Imaging Healthcare Specialists and read by Gregory Anderson, M.D. Dr. Anderson writes for the cervical and lumbar scans *"Stable ACDF C5-6, mild improvement in central stenosis at C3-4 with stable severe left sided foraminal stenosis at this level with compression of the exiting left C4 nerve root, stable severe foraminal stenosis at C4-5 and C6-7 bilaterally with compression of the exiting nerve roots". "Slight progression of severe central stenosis at L3-4. Remainder of multilevel degenerative disc and facet degenerative changes and postoperative changes are stable".*

The MRIs of the lumbar and cervical region were submitted to neuroradiologist, Nathaniel Chuang, M.D. for his expert opinion. The MRI of the lumbar region was read by Dr. Chuang as follows:

*"Previous posterior decompression and laminectomies at L5-S1. Abnormal T1-hypointense signal is seen in the epidural space at adjacent L4-5 level, especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral traversing L5 nerve roots.*

*Moderate L3-4 and moderate-severe L4-5 disc degeneration.*

*Severe L3-4 spinal stenosis.*

*L3-4 with mild posterior disc extrusion, left paracentral annular fissure, facet and ligamentum flavum hypertrophy, and severe impingement of the bilateral traversing L4 nerve roots. Bilateral neuroforaminal narrowing and impingement of the bilateral L3 nerve roots.*

*L4-5 with mild posterior and right foraminal broad disc extrusion, and left paracentral annular fissure. Moderate-severe facet hypertrophy, narrowing of the lateral recesses, and impingement of the bilateral*

002582-539-23-26-2020/06/19**-074428-6-PORT_Sdx_Prod

*traversing L5 nerve roots, right more than left. Bilateral neuroforaminal narrowing with impingement of the bilateral L4 nerve roots, left greater than right."*

Dr. Chuang also read the MRI of the cervical region as follows:

*"Previous anterior and interbody spinal fusion at C5-6 with associated susceptibility artifact.*

*Straightening of normal cervical lordosis may reflect patient positioning and/or muscle spasm. Mild apparent T2-hyperintensity in the posterior atlantooccipital membrane, and interspinous ligaments at C2-3 through C7-T1, may reflect cervical strain or trauma.*

*Moderate-severe C4-5 and severe C6-7 disc degeneration.*

*Mild-moderate C4-5 spinal stenosis.*

*Considerable bilateral neuroforaminal narrowing and nerve root impingement at C3-4, C4-5 and C6-7, as described above."*

Over the past months my condition has deteriorated. I wake up in the morning with pain in the lower back which is constant throughout the day. I have lost mobility. In the cervical region I have difficulty turning my head and have increased numbness in my hands. I sleep perhaps only two hours at a time due to pain. Some nights I might even only get two hours. I dislike taking medications as the Valium makes me sleepy for over a day and the pain medications make me very nauseated.

Although my lumbar and cervical pain had worsened to a point whereby I was working "on the edge" I knew I was compromising my patient's health. I continued to see patients during the coronavirus period beginning March 27, 2020 on an emergency basis only as mandated by the state of California....and was seeing approximately 5 patients per week. I'm sure I was in denial but even with the reduced work schedule I found that my pain had not improved and I was putting my patients at risk and could no longer deliver safe ophthalmological care. I finally realized that I could no longer function normally anymore and as a result I was forced to stop working as a surgical ophthalmologist as of May 29, 2020 with my decision supported by my medical providers.

[signature] 06-17-20

Richard J. Leung, M.D. Date

002582-540-23-27-2020/06/19**-074428-6-PORT_Sdx_Prod

EXHIBIT A

photos from February 8, 1992

002582-541-23-28-2020/06/19**-074429-6-PORT_SdX_Prod

Feb 8, 1992

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000307

**EXH. 6-027**





002582-542-23-29-2020/06/19**-074429-6-PORT_SdX_Prod

Feb 8, 1992

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000308

**EXH. 6-028**

# Exhibit 7

Activity

---

Checked/Unchecked Indicator: No
Type: Phone Call Name: Phone Call Details
Status: Completed
Original Notify Date: 06/30/2020
Notify Date: 06/30/2020
Due Date:
Subject: TPC 6/30/20
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Sullo, Lisa
Action:

Request Fields

---

Request: Sullo, Lisa 06/30/2020 12:23:11: TPC 6/30/20

Created By: Sullo, Lisa
Created Date: 06/30/2020 12:23:11 Create Site: Worcester

Response Fields

---

Call Type: Placed Call To
Person Contacted: Claimant (Employee, Insured)
Reason for Call: Initial Contact
Call Outcome: Contact Successful
Comments: Sullo, Lisa 06/30/2020 12:23:11: Claimant Information

Claimant Name: Dr. Richard Leung
Date & Time of call: 11am 6/30/20
NaviLink #: 141387998
DBS: lisa sullo
Confirm the phone # at which the claimant was reached:
Confirmation of address, DOB, SS#, Attorney & need for 3rd party authorization:

SPECIAL HANDLING/STAR PRODUCER/M FINANCIAL/NFP

Do you want the company to share non-confidential with the broker?

MEDICAL UPDATE (SX, ACtivities, Tx Plan, Providers, etc)

Symptoms (What are they? What illness/injury is causing sx? What sx prevent the claimant from performing his/her occupation? In what way?)

I called and spoke with IN, I asked if now was still a good time to speak. He confirmed it was. We went over his DOB, SSN and address. All information on NL was correct.

IN informed that he provided a narrative that was very descriptive. I confirmed it was received, however, I still wanted to go over some information and contact him as I feel it is more personal to reach out to my claimants. He said he respects that.

I asked the IN if he could briefly describe what was going on, he said in short that he has always had back and neck problems. but the last 3-4 months it has gotten worse, that he has lost strenth in his right arm, and he had and MRI done. He said his back is in knots and he keeps losing feelings in his hands and he cannot feel his instruments. IN said there was no initial accident that onset anything.

IN informed he had lower back surger 1983 which there were complications, he was informed from his colleague who assisted during the surgery that the surgeon slipped the drill during the procedure. In addition he almost did not wake up from the surgery bc they provided him with too much valuum and they did not give him a catheter. He had a back up of urine which provided severe complications and infections.

INs most recent surger was on his neck in 2004. He said recently Dr. Moon discussed that surgery again and informed they would have to fuce 3-4 levels of his neck. IN informed that he has spoke to several people and at this time it is not something he is interest in doing.

He has had 8 injections, 3 different doctors have given him injections. His current treatment includes PT which was very difficlut to get the US dept of labor to approve. He said it is not a cure, it is like taking an aspirin. He said he takes dilotin, but it makes him feel ill, and he takes a valuum at night to try and sleep.

I asked the IN about his workers comp claim. I asked when that was approved? He said about 1983.

I asked about his premiums, he confirmed he has always pd them except 1. He said 1 of his employers use to pay it, but he pays it now.

**Providers What provider(s) is/are tx for illness/injury? What provider(s) has/have identified functional limitations? What provider(s) has/have restricted the claimant from performing work activities? Detail for each provider name, specialty and address; R or L; cx for which provider is treating the claimant, FOV, LOV, NOV, frequency of visits any referrals including timing and rationale)**

| Name/ Contact Info | Specialty | FOV/LOV/NOV | Tx Conditions / R&Ls |
|---|---|---|---|

**Tx Plan (What tx is claimant currently receiving? What is tx plan? What does claimant think will help him/her get better?)**
**DOD assessment (Verify LDW, accommodations, any days missed prior to LDW)**

**Diagnosis Specific Call Questions (link includes BH specific questions)**

**Change in medication since claim forms completed? Yes No**

**(Free Form)**

**Discuss cause of disability to assess if any exclusions (self-inflicted, felony, etc.) / offsets apply:**

**Did your injury / illness occur or get worse while at work? Yes No**
**If yes, obtain detail (report filed with ER? Worker's Compensation application? Status of WC claim (carrier, claim#, phone #, address, adjuster name, payment details) :**

Is your injury the result of a motor vehicle accident?        Yes        No
If yes, obtain detail (date, time, location, cause of accident; MV insurance
carrier, claim# phone#, address, adjuster name, responsible party; loss of wage
benefits?) :


(Free Form)


Duration / Recovery Discussion
EE's RTW plans and goals    Discuss Regular & App Care expectations.
Share Unum understanding of medical recovery/expected duration

(Free Form)


Activities Discussion
How are symptoms impacting day-to-day life? What sort of activities are you able to
do and what activities are difficult or impossible?  What is a typical day like for
you? Able to drive? Changes due to impairment / any need for household assistance?
ADLs (Dis+)?    Activities/hobbies, inside/outside of the house and how often
(church, volunteer, educational pursuits, computer activities, sports, errands,
grocery shopping, attending appointments)?


(Free Form)


VOCATIONAL

Job title, duties, typical work schedule    If working, are there duties you cannot
perform?
Discuss a typical work day, related tasks/demands    If EE, status of position at
ER RTW goals and expectations Travel requirements

(Free Form)


FINANCIAL

How were the premiums paid for this policy? Taxable?


Are you currently receiving Social Security benefits?        Yes        No
If yes, obtain detail (Disability vs. retirement, monthly benefit amount, SSDI DOD)
:


Does EE's policy provide SSI offset?        Yes        No
If yes, obtain additional details (Spouse work status, DOB; youngest dependent DOB;
application status; SSDI atty; applied for FSS?) :


Are you receiving any additional disability benefits (PERS/STRS, state dis,
STD/Group/IDI/BOE?        Yes        No
If yes, obtain details (amount of benefit, time frame) :


(Free Form)


Contractual Discussion

Consider policy specific questions (REI, LOE):

Policy Provisions
Definition of disability

EP

Benefit: amount / schedule

Pre-ex / contestable

Exclusions / limitations

Other benefits / riders

Offsets / financial recap (worker's comp / SSDI)

(Free Form)

Mail/ Email copy of the dup pol. Confirm Email address:

Other/ Next Steps

DBS to discuss next steps and questions / comments from claimant. Recap any information requests discussed above.

I informed the IN that we will be reviewing his claim to clarify what may be needed. I thanked him for providing such thorough details in his letter. I confirmed he has only been with this current employer for a half of a year. IN agreed to 30 day ext until MRs from dr. moon and Dr. lindy first and all requested occupation information is received. I informed that the 30 day ext will begin as of the date the last piece of information is recd. we reviewed all the physicians he provided, he said the dr. moon and first would be the physicians he sees for his neck and back. i mentioned his neurologist, and he said he does not see the neuro anymore. I informed him if our CC needs to request any other records I will be in contact with him. He requested I email him. I confirmed the email we have on NL is correct. pleasantries exchanged and call ended.

Completed By: Sullo, Lisa
Completed Date: 06/30/2020 15:59:38 Complete Site: Worcester

# Exhibit 8

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: **1-866-562-4794**
www.unum.com

July 7, 2020

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Claim Numbers: CLA200415, CLA200416, CLA200417, CLA200418, CLA200419,
Unum Life Insurance Company of America

Dear Dr. Leung:

Thank you for speaking with me on June 30, 2020 about the status of your Individual Disability claims. This letter confirms the details of our conversation and contains important information about your benefits. My contact information is listed below.

**Contact Us**

**Direct:**
Lisa Sullo
1-888-226-7959 extension, 77178
lsullo@unum.com

**Call Center:**
1-888-226-7959
8 a.m. - 8 p.m. EST, Mon-Fri

Fax Number: 1-866-562-4794

I have completed my initial review. This letter, which contains the following sections, will help you understand your coverage and the current status of your claim.

- Summary of Your Claim
- Summary of Your Policy Benefits
- Explanation of Current Status
- Information Needed
- Policy Provisions/Definitions

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

**Summary of Your Claim**

You are claiming Total Disability from your occupation as an ophthalmologist as of May 29, 2020 due to lumbar herniated disc, scar tissue, multi-level disc degeneration, spinal stenosis, and nerve impingement. During our conversation, you report you have had spinal problems since 1982. You underwent surgery in 1983 and 2004. You report you were approved for your worker's compensation claim in 1983.

Your Attending Physician Statement form was completed by Dr. Michael Moon on June 17, 2020. Dr. Moon provided a primary diagnosis of multi-level degenerative disc and facet degenerative changes, severe central stenosis at L3-4, severe foraminal stenosis at C3-4 at C3-4 and C6-7 with compression of exiting nerve roots s/p cervical fusion at C5-6. Dr. Moon provided the following restrictions and limitations: "No bending, lifting, turning, examination of patients, and other procedures performed by surgical ophthalmologist whose duties involve sitting/leaning in forward position w/ arms extended , using hands repetitively for extended periods of time. Patient should not be working as a surgical ophthalmologist b/c of chronic pain causing safety issues for his patients and further damage to opine of patient." The duration of these restrictions and limitations are from May 29, 2020 to permanent.

During our conversation you report after your surgery in 2004 you were able to continue to work your occupational duties and demands, however, the last few months it has become very difficult. You have lost strength in your right arm and you have lost feeling in your hands.

**Summary of Your Policies' Benefits**
Your policies provide benefits for Total Disability, Waiver of Premium, Lifetime Accident

**<u>Policy LAD016015; Claim CLA200415:</u>**

Monthly Benefit Amount: $5,930.00

Elimination Period: 60 Days

Maximum Benefit Period:
Due to Sickness 24 Months
Due to Accident Lifetime Benefits

Rider Details:
Waiver of Premium
Lifetime Accident

How benefits are paid: Benefits are paid monthly in arrears

**Policy LAN661286; Claim CLA200416:**

Monthly Benefit Amount Totaling: $1,500.00

Elimination Period: 30 Days

Maximum Benefit Period:
Due to Sickness 24 Months
Due to Accident Lifetime Benefits

Rider Details:
Waiver of Premium
Lifetime Accident
Loss of Use - Sickness

How benefits are paid: Benefits are paid monthly in arrears

**Policy LAN780636; Claim CLA200417:**

Monthly Benefit Amount: $1,000.00

Elimination Period: 30 Days

Maximum Benefit Period:
Due to Sickness 24 Months
Due to Accident Lifetime Benefits

Rider Details:
Waiver of Premium
Accident Extension
Loss of Use - Sickness

How benefits are paid: Benefits are paid monthly in arrears

**Policy LAN782020; Claim CLA200418:**

Monthly Benefit Amount: $500.00

Elimination Period: 30 Days

Maximum Benefit Period:
Due to Sickness 24 Months
Due to Accident Lifetime Benefits

Rider Details:
Waiver of Premium
Lifetime Accident
Loss of Use - Sickness
How benefits are paid: Benefits are paid monthly in arrears

**Policy LAN782990; Claim CLA200419:**

Monthly Benefit Amount Totaling: $500.00

Elimination Period: 30 Days

Maximum Benefit Period:
Due to Sickness 24 Months
Due to Accident Lifetime Benefits

Rider Details:
Waiver of Premium
Lifetime Accident
Loss of Use – Sickness

How benefits are paid: Benefits are paid monthly in arrears

**Explanation of Current Status**

Your policies provide monthly disability benefits when you are determined to be disabled as defined under the policies and you meet all other policy requirements.

We are unable to make a decision without additional information.  Please see the "Information Needed" section of this letter.

**Information Needed**

- Please provide a summary of all CPT codes for the period(s) indicated in the enclosed instructions.

- Please provide a copy of your Worker's Compensation File – This information will assist us in reviewing your claim as an accident or sickness.

Please provide the requested information as soon as possible.  Privacy is important to everyone; please be sure you are faxing to 1-866-562-4794 to eliminate the potential for misdirected information.  If the information cannot be faxed, please mail to the address provided at the top of this letter.

We are contacting Dr. Michael Moon and Dr. Lindy First to request medical information needed to continue our evaluation.

We will provide you with a status update every 30 days.

**Policy Provisions/Definitions**

**Individual Disability Policies #LAD016015, LAN661286, LAN780636, LAN782020, LAN782990**

We have included a copy of your Individual Disability Policies #LAD016015, LAN782020, and LAN782990 for your reference.  The policy provisions and/or definitions referred to in this letter

can be found in the copies. Once copies of policies LAN661286 and LAN780636 are available, we will forward those copies to you.

**Policy LAD016015; Claim CLA200415:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN661286; Claim CLA200416:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider
- Loss of Use Benefit

**Policy LAN780636; Claim CLA200417:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN782020; Claim CLA200418:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN782990; Claim CLA200419:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

As a result of direction from the California Department of Insurance, we will administer your claims for disability benefits with reference to the following:

> You are totally disabled when you are rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

The claim evaluation in the "own occupation period" assesses if there are restrictions and limitations that render you physically and/or mentally unable to perform the substantial and material duties necessary to perform your usual occupation in the usual and customary way and with reasonable continuity. Your occupation is defined in your policies as:

**Policy LAD016015:**
Regular Occupation means the Insureds Occupation at the time the Elimination Period begins. If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty.

**Policy LAD016018:**
Your Occupation means your regular occupation at the time disability commences.

**Policy LAN782990:**
Your Occupation means your regular occupation at the time disability commences.

Our claim review process is designed to ensure that your claim for disability benefits receives a thorough, fair, and objective evaluation. In order to complete the claim evaluation, and to determine if you meet the policy definition of disability, we need to understand in detail the following:

- Your restrictions and limitations arising from your medical condition;
- the duties you performed in your occupation before your claimed disability began; and
- the duties you cannot perform as a result of your claimed disability; and
- if you are currently working, we also need to understand what duties you are presently performing and how often you perform them.

Our assessment of your medical restrictions and limitations includes a review of your medical records. As we perform our review of your claim, it is your right, or the right of your attending physician, either directly or through your representative, to request an "independent medical examination" should opinions differ on the degree of medical impairment. Any such request will be evaluated in conjunction with our IME guidelines, to include whether the medical condition is a relevant component of a particular claim decision.

To determine your pre-disability material and substantial duties, we will perform a detailed assessment of the work you performed. After determining the duties that are material to the performance of your pre-disability occupation, we evaluate the usual and customary way you performed those duties. We further assess whether the usual and customary way you performed a particular material duty precludes your actual ability to execute that material duty, or is solely a reflection of personal or employer preference unrelated to ability. Consideration is given to the amount of time necessary to perform a material duty with reasonable continuity.

If you are performing, or have the capability to perform, a substantial portion of your pre-disability occupation, you are not totally disabled.

Richard Leung, if you have additional questions, please call us using the contact information provided on the first page. Our experienced representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Lisa Sullo*

Lisa Sullo
Benefits Specialist

Enclosures: Policy: Contract
Policy: Contract
Policy: Contract
Instructions for Providing CPT-HCPCS or ADA codes

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875008371072101

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000676

**EXH. 8-007**

# Exhibit 9

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: **1-866-562-4794**
www.unum.com

August 27, 2020

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Claim Numbers: CLA200415, CLA200416, CLA200417, CLA200418 CLA200419
Unum Life Insurance Company of America

Dear Dr. Leung:

Your Individual Disability claim has been approved. We have completed a review of the available information. Please read the following letter carefully as it contains important information regarding next steps and additional information that may be needed for the ongoing administration of your claim. My contact information is listed below.

| **Contact Us** |
|---|
| Contact Center: 1-888-226-7959, 8 a.m. to 8 p.m. EST, Monday through Friday<br><br>Disability Benefits Specialist Phone Number: Lisa Sullo, 1-888-226-7959 extension, 77178<br><br>Fax Number: 1-866-562-4794<br><br>Disability Benefits Specialist Email: lsullo@unum.com |

**Your Disability Claims At A Glance**

| **Important Dates** | **Benefit Information** |
|---|---|
| Last Day of Work: May 28, 2020<br><br>Date of Disability: May 29, 2020<br><br>Elimination Period: 30 days and 60 days | You are totally disabled due to a sickness.<br><br>Your Maximum Benefit Period is currently pending as we are in need of additional information. |

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

Claimant Name: Leung, Richard J
Claim Number: CLA200415

August 27, 2020
Page 2 of 4

**Policy LAD016015 Claim CLA200415:**

Monthly Benefit Amount: $5,930.00

Date of Payment: August 27, 2020

Amount of Payment: $5,930.00

Payment Period: July 28, 2020 to August 28, 2020

Your next payment is due for consideration on September 28, 2020.

**Policy LAN661286 Claim CLA200416:**

Monthly Benefit Amount: $1,500.00

Date of Payment: August 27, 2020

Amount of Payment: $3,000.00

Payment Period: May 29, 2020 to August 28, 2020

Your next payment is due for consideration on September 28, 2020.

**Policy LAN780636 Claim CLA200417:**

Monthly Benefit Amount: $1,000.00

Date of Payment: August 27, 2020

Amount of Payment: $2,000.00

Payment Period: June 28, 2020 to August 28, 2020

Your next payment is due for consideration on September 28, 2020.

02875008521239202

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-000860

**EXH. 9-002**

**Policy LAN782020 Claim CLA200418:**

Monthly Benefit Amount: $500.00

Date of Payment: August 27, 2020

Amount of Payment: $1,000.00

Payment Period: June 28, 2020 to August 28, 2020

Your next payment is due for consideration on September 28, 2020.

**Policy LAN782990 Claim CLA200419:**

Monthly Benefit Amount: $500.00

Date of Payment: August 27, 2020

Amount of Payment: $1,000.00

Payment Period: June 28, 2020 to August 28, 2020

Your next payment is due for consideration on September 28, 2020.

**Taxability of Benefits**

We are considering your Individual Disability benefits non-taxable based on the information we have about your business structure. If this information is not correct, please provide written correspondence documenting the correct taxability of these benefits.

**Waiver of Premium Benefit**

Your Individual Disability policy provides a Waiver of Premium Benefit. If you are eligible for a refund, you will receive a check from our Client Services department. You may contact Client Services with questions at 1-800-227-8138. The Waiver of Premium will continue while you remain disabled under the terms of your policy.

**Next Steps**

As noted above, the medical information we have received to date supports your inability to perform your occupational duties in the manner in which they were performed prior to disability. We will contact you in October to obtain an update and request any applicable medical records.

We have enclosed copies of policies LAN661286 and LAN780636, as stated in our letter dated July 7, 2020, we would provide you a copies once available.

**What We Need From You**

At this time the etiology of your claim is unclear we will need additional information regarding your automobile accident to determine if that has any impact on your benefit period.

**Information About Direct Deposit**

To help ensure your benefit payment reaches you as efficiently as possible, we offer direct deposit. Unum Life Insurance Company of America will electronically transfer the money to your financial institution for deposit into your checking or savings account on the second business day after the date of release with the exception of a Federal Reserve Bank Holiday. We offer several methods for submitting direct deposit information:

1. Telephonic – please contact us at 1-888-226-7959 to enroll telephonically.
2. Direct Deposit Form enclosed - Complete the enclosed Direct Deposit Form and follow the instructions on the form. The form can be mailed or faxed to us at 1-866-562-4794 and must contain all applicable documentation.

**How to Contact Us**

Richard Leung, if you have additional questions, please call us using the contact information provided on the first page. Our experienced representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

Lisa Sullo

Lisa Sullo
Benefits Specialist

Enclosures: Policy: Contract
Policy: Contract
Direct Deposit Form (CS-1089)

# Exhibit 10

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: **1-866-562-4794**
www.unum.com

September 21, 2020

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Claim Number: CLA200415; CLA200416; CLA200417; CLA200418; CLA200419
Unum Life Insurance Company of America

I am writing to introduce myself as your new Benefits Specialist. Periodically, we adjust our workloads to serve our customers better and I am now responsible for your claim.

As your Benefits Specialist, I am committed to providing you with prompt, accurate and courteous service. In the future please send all information concerning your claim to my attention. My contact information is listed below.

**Contact Us**

**Benefits Specialist:**
Emi Tanga
1-888-226-7959 extension, 75252
etanga@unum.com

**Call Center:**
1-888-226-7959
8 a.m. – 8 p.m. EST, Mon-Fri

Fax Number: 1-866-562-4794

You can securely submit information about your claim by email by using our encryption portal. Please contact your Benefits Specialist to request an encrypted email. To securely submit information through the portal, you may respond to the email that was sent to you through the encryption portal.

Submitting documentation through the portal will ensure the information will be sent securely into your claim file for review. You will receive an automatic reply to confirm that your email has been received.

Information can also be sent by email to the following address: IDBenefitsEmail@UNUM.com. Please ensure the subject of the email is: 17839700. However, please note that emailing to this address without using the encryption portal may not be secure.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

We have received your September 11, 2020 letter requesting additional clarification regarding our determination of the etiology of your medical condition. Our evaluation of the etiology of your medical conditions in ongoing. Please disregard the potion of our August 27, 2020 letter that indicates "your are totally disabled due to a sickness." This is a typographical error and we apologize for any confusion it may have caused. We are continuing our evaluation to determine etiology of your medical conditions causing your restrictions and limitations. Once our evaluation is complete, we will provide you with our determination. In the event that you are not agreeable with our determination you are, at that time we will provide you with information regarding the next steps that are available to you.

Richard Leung,if you have additional questions, please call us using the contact information provided on the first page. Our experienced representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

Emi Tanga

Emi Tanga
Senior Benefit Specialist

# Exhibit 11

Activity

---

Checked/Unchecked Indicator: No
Type: Phone Call Name: Phone Call Details
Status: Completed
Original Notify Date: 10/19/2020
Notify Date: 10/19/2020
Due Date:
Subject: TPC with IN reg etiology evaluation
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Tanga, Emi
Action:

Request Fields

---

Request: Tanga, Emi 10/19/2020 18:18:32: TPC with IN reg etiology evaluation

Created By: Tanga, Emi
Created Date: 10/19/2020 18:18:32 Create Site: Worcester

Response Fields

---

Call Type: Placed Call To
Person Contacted: Claimant (Employee, Insured)
Reason for Call: Ongoing Contact
Call Outcome: Contact Successful
Comments: Tanga, Emi 10/19/2020 18:18:32: TPC with IN at 1PM EST. We discussed it was great to finally speak. We discussed the status o f IN claim and that IL had been completed and benefits are being provided on a monthly basis. We discussed WOP had been requested and etiology evaluation was ongoing. We discussed based on the MRs etiology was unclear and we needed more details from him regarding his injuries. IN had two injuries: May 23, 1982 injury- he was an intern and was required to lift a patient in the ICU from stretcher onto a bed bcz he was throwing up blood. As a result he ruptured a disc in the lower back. Sx in 1983. Went back to school 1983-86 for residency training. During that period underwent treatment with therapy.
In the course of strengthening back, he suffered injury to the neck November of 1993. He ruptured disc in neck. Sx for the cervical disc herniation, IN had disc removed and input plate and fused disc. The PT put too much weight than he could handle and it resulted in an immediate rupture to the neck.
IN went through WC. US department of labor determined that it happened at work. IN did not file a lawsuit. IN has sent in a detailed letter with the occurrences. Since stopped working in May 2020. He filed a workers compensation claim with them. They are still deciding what to do with it. Need more information with respect to that. He has not worked for them for a long time.
Back in 1982 when IN occurred, in received treatment and has been able to work throughout the years while also seeking treatment. He reached a point in May 2020 where IN was no longer able to continue. He cant bend over to reach, lean forward, stand, hands go numb, instruments are tiny and hands both go numb from the neck and do not feel safe. It has been since 1993 that he experiences the numbness in hands but to the lesser effect. Since the injury with the neck but have since worsened to the point that IN no longer feels safe performing sx.
Insured inquired about an MVA referenced in Lisa's letter. IN indicated he has a MVA about 5 yrs ago, where he struck a smaller vehicle going like 5 mph. Nothing came of that. IN was fine and this is not the injury that caused his medical condition and R&Ls.
IN confirmed he has received a refund check- Waiver of Premiums and thanked us for processing this. We discussed we did not have the MRs that indicated the injuries back in 1982 and 1993. IN indicated he had this information and agreed to send it in. Mutual thanks.
-ETanga SBS

# Exhibit 12

011478-7-2-3-2020/10/21**-120303-5-PORT_sdx_Prod

RICHARD J. LEUNG, M.D.
1388 Kettner Boulevard
Unit 2801
San Diego, CA 92101-2915
Mobile 619-993-2888

UNUM The Benefits Center
828 Bistline Drive
Suite 100
W. Columbia, SC 29172

Attn: Emi Tanga
Senior Benefits Specialist

RE:
Richard J. Leung, M.D.
CLA 200415, CLA200416, CLA200417, CLA200418, CLA200419

October 20, 2020

Dear Emi,

I am writing in follow up to our conversation yesterday in which you have requested additional documentation substantiating accident of my lumbar spine on May 23, 1982 and accident of my cervical spine in November of 1993. As we discussed, some of the information that you were requesting was in the 15 page "supplemental disability narrative" submitted to UNUM on June 17, 2020 with the individual disability claim form. It was my understanding from our conversation that you have not had the opportunity to review the "supplemental disability narrative" and other documents in my file prior to yesterday.

Per your request, I am enclosing copies of the following so that you have as much information and have every opportunity to review the findings that support my claim that the proximate cause of my disability are the accidents in 1982 and 1993.

Enclosed are copies of the following:

1. Medical records of neurosurgeon Kenneth Ott, M.D., neurosurgeon and chairman of the UCSD department of neurosurgery John F. Alksne, M.D., neurosurgeon Joel West Ray, M.D., neurosurgeon Randall W. Smith, M.D. and interventional radiologist Keith E. Kortman, M.D. from June 17, 1982 to October 27, 2011. Please note that Dr. Alksne performed surgery on my lumbar spine, operative note enclosed.
2. Medical records of neurologist and treating physician Charles K. Jablecki, M.D. from January 4, 1994 to October 3, 2014.
3. Medical records of neurosurgeon Richard C. Ostrup, M.D. from September 14, 2001 to May 16, 2017. Please note that Dr. Ostrup performed surgery on my cervical spine, operative note enclosed.
4. Medical records of radiological studies pertaining to lumbar and cervical injuries from March 15, 1985 to June 8, 2020.

011478-8-2-4-2020/10/21**-120304-5-PORT_Sdx_Prod

Please let me know in writing when you have had the opportunity to review everything that I have sent contained in this package and everything that is in my file that I have sent previously. You mentioned that you might have an answer for me in the next week or so. I look forward to hearing from you soon that UNUM recognizes the proximate cause of my disability are the accidents in 1982 and 1993 that are well-documented in the files contained.

Should you have any questions, please feel free to contact me any time.

Sincerely,

Richard J. Leung, M.D

# Exhibit 13

Activity

---

Checked/Unchecked Indicator: No
Type: CVM Name: Doctoral Review
Status: Completed
Original Notify Date: 11/09/2020
Notify Date: 11/09/2020
Due Date:
Subject: Doctoral Review- Etiology
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Lahey, Philip
Action: R/L's Supported

Request Fields

---

Claim Overview: Tanga, Emi 11/09/2020 13:04:42: IN is a 64 yr old ophthalmologist on claim due to lumbar, herniated disc, scar tissue, multi level disc, degeneratation spinal stenosis, nerve impairment, cervical herniated disc. IN indicates his medical condition is due to injuries from 5/23/82 and 11/xx/93. Medical information has been received from IN and reviewed in CA and Forum with OSP and doctotal review was recommended. Per APS, IN AP indicates his condition is due to accident.

Medical Issue to be addressed: What is the etiology of the medical condition(s) causing IN's R&Ls that are precluding him from working?

Created By: Tanga, Emi
Created Date: 11/09/2020 13:04:42 Create Site: Worcester

Response Fields

---

Response: Lahey, Philip 11/11/2020 10:13:04: OSP OPINION - Referral and Response Form

SECTION 2 - Completed by OSP
Claimant Name: Richard J Leung
Claimant Number: 17839700

Completion Date: 11/11/20

Name of reviewing operations physician (OSP): Philip Lahey MD

Specialty of reviewing operations physician: Orthopedic Surgery

R & L as stated by AP(s): Restrictions: 6/17/20 APS- no bending, lifting, turning, examination of patients, and other procedures performed by a surgical ophthalmologist whose duties involve sitting/leaning in forward position with arms extended, using hands repetitively for extended periods of time. Duration 5/29/20-permanent.
Limitations: same as above. Patient should not be working as a surgical ophthalmologist b/c of chronic pain causing safety issues for his patients and further damage to spine of patient.
Assessment: ongoing back pain, treatment plan includes medications and PT.
States R&Ls are a result of an accident.

Medical Issue: What is the etiology of the insured's current R&Ls?

Conclusions:
R & L Supported

Analysis/Rationale:

I have completed a full review of the medical record, including the report clinical consultant Kimberly Doxstader, RN. prepared on 10/29/20 I will not repeat the data summarized in the clinical consultant's report here, but I incorporate that summary by reference. While I have reviewed the records, summaries, and opinions others have prepared, I have performed my own independent analysis and formed my own conclusions. My analysis and conclusion follow.

The insured is a 65 year old Ophthalmologist who was working as a surgical intern in May of 1082 when he was lifting a patient and injured his low back. He eventually developed left leg pain. A CT scan revealed a congenitally slightly narrowed central canal and a disc bulge at L4-5 on the left. There were also changes at L5-S1. His symptoms persisted and the insured underwent a lumbar laminectomy with lumbar L4-5 discectomy and L4-5, S1 foraminotomy on 2/16/83. Over the course of the next several years he continued to complain of back and left leg pain despite conservative therapy consisting of PT, ESIs and medication. In 1992 the insured had been performing exercises in order to rehab his lumbar spine when he lifted a weight and felt a "pop" in his neck. He then developed pain radiating to the right trapezius and eventually numbness in the right thumb and index finger. Because of persistent symptoms and radicular complaints on 1/5/94 an MRI of the cervical spine was completed demonstrating a bilobed C5-6 disc herniation, the largest component of which extended into the right C5-6 foramen causing moderate stenosis. There was minimal ventral cord impingement present but no cord compression was clearly identified. The insured experienced chronic cervical complaints characterized by chronic pain with intermittent severe flareups following this event. He was treated nonoperatively but followed closely. The insured received multiple cervical MRI's that showed possible progression of the disc herniation and on 1/19/04 he underwent a C5-6 ACDF. The surgery went well, the fusion incorporated, but the insured continued to experience, along with his lumbar spine, episodes of severe neck pain with radicular symptoms. The insured has continued to work despite the worsening of the complaints until 2020. Serial MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. The insured is being followed by Pain Management and receives prescriptions for Valium and Dilaudid for management of his pain. The level of symptoms and the intensity of treatment leads to support for his R&Ls.

The etiology of the current condition that leads to the R&Ls is degenerative disc disease of the cervical and lumbar spine. The insured's symptoms started with a lumbar disc herniation at L4-5 and have continued since that time. The disc herniation was resected and the insured now has multiple level involvement. It is a diffuse process in his lumbar spine and not localized to L4-5. Discectomy is associated with an increased risk of degenerative changes progressing through life. It is not proven that this progression is caused by the herniation, the surgery or other factors. His current condition is diffuse and multilevel.

The same can be said for the cervical spine. The insured herniated the C5-6 disc when lifting a weight. This herniation was eventually excised and the level fused. His current diagnosis is degenerative disc disease. It involves multiple levels of the cervical spine.

The lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. One could not reasonably conclude that

if these events did not occur, the insured would not be suffering from degenerative disc disease with its associated R&Ls. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current R&Ls.

I have considered any potential comorbid conditions individually and collectively and they do not impinge upon the insured's claimed impairment.

Referral Questions and Answers:
What is the etiology of the insured's R&Ls?
Degenerative disc disease of the cervical and lumbar spine.

Next Steps:
AP contact

OSP Signature Block:
Name: Philip Lahey MD
State of Licensure: Massachusetts
Board Certification: American Board of Orthopaedic Surgeons

Unum
I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment for which I am by training and experience capable to assess.

Completed By: Lahey, Philip
Completed Date: 11/11/2020 13:06:26

Complete Site: Worcester

# Exhibit 14

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: **1-866-562-4794**
www.unum.com

November 13, 2020

MICHAEL MOON MD
PAIN CARE OF SAN DIEGO
5348 CARROLL CANYON ROAD STE 101
SAN DIEGO, CA 92121

RE: Leung, Richard J
Claim Number: CLA200415
Unum Life Insurance Company of America

Phone (858) 202-1546 Fax (858) 202-1548

**PATIENT:** Richard Leung
**DOB:** October 14, 1955

I am an Orthopedic Surgeon at Richard Leung's disability insurance carrier, Unum Life Insurance Company of America. The purpose of this letter is to gain a better understanding of your medical opinion and discuss questions I have regarding my interpretation of the available medical data.

I attempted to contact you on November 12, 2020; however, I was unsuccessful in reaching you by telephone. In an effort to obtain your input, I would appreciate your responses to my questions below regarding Richard Leung's condition. Enclosed is a signed Authorization for release of this information.

I have reviewed his medical record and have concluded that I agree with you regarding his restrictions and limitations. However, I would disagree with you when you state that his current condition results from accident.
I recognize that Dr Leung's back pain started when he herniated his L4-5 disc (lifting a patient during his internship) and had subsequent surgery to remove the herniation in 1993 and that his neck symptoms began when he herniated his C5-6 disc (lifting a weight while rehabbing his low back problem) and subsequently had surgical discectomy and fusion.

I have concluded that his current condition of degenerative disc disease of the cervical and lumbar spine is diffuse and that the etiology of his diagnosis of degenerative disc disease is not a result of the cervical and lumbar disc herniations.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

I would appreciate your thoughts and any rationale that you may provide that leads you to the conclusion that his current condition is caused by accident.

Signature ______________________________ Date ______________
**_Michael Moon, M.D._**

We are committed to making a timely claim decision in accordance with certain timeframes and governing laws. To ensure that your response is included in our evaluation, we would appreciate your comments within 10 business days of the date of this letter. If you prefer, you may contact me at 1-774-437-5274 to discuss Richard Leung's condition or you may fax your written response to me at 1-866-562-4794. Privacy is important to everyone. Please ensure that you are faxing this information to 1-866-562-4794 to eliminate potential for any misdirected information.

We appreciate your time in providing this information and analysis to assist in our claim evaluation efforts. We are willing to reimburse you for your time on a pro-rata basis at your customary office consultation rate. Please attach a statement including to whom the check should be made payable, as well as the tax ID number.

Thank you for your time and assistance.

Sincerely,

Phil Lahey, M.D.

Phil Lahey, M.D.
Medical Consultant
Board Certified Orthopedic Surgery
Medical Licensure: MA

PL/ms

Enclosures: Claim Form: Authorization

# Exhibit 15

## Designated Medical Officer (DMO) Review Response

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of DMO Review:** 12/07/2020

**Conclusion**

Concur with OSP opinion.

**DMO Analysis**

The insured is a 65-year-old Ophthalmologist who was working as a surgical intern in May of 1982 when he was lifting a patient and injured his low back. He eventually developed left leg pain. A CT scan revealed a congenitally slightly narrowed central canal and a disc bulge at L4-5 on the left. There were also changes at L5-S1. His symptoms persisted and the insured underwent a lumbar laminectomy with lumbar L4-5 discectomy and L4-5, S1 foraminotomy on 02/16/1983. Over the course of the next several years he continued to complain of back and left leg pain despite conservative therapy consisting of PT, ESIs and medication. In 1992 the insured had been performing exercises in order to rehab his lumbar spine when he lifted a weight and felt a "pop" in his neck. He then developed pain radiating to the right trapezius and eventually numbness in the right thumb and index finger. Because of persistent symptoms and radicular complaints on 01/05/1994 an MRI of the cervical spine was completed demonstrating a bilobed C5-6 disc herniation, the largest component of which extended into the right C5-6 foramen causing moderate stenosis. There was minimal ventral cord impingement present but no cord compression was clearly identified. The insured experienced chronic cervical complaints characterized by chronic pain with intermittent severe flareups following this event. He was treated nonoperatively but followed closely. The insured received multiple cervical MRI's that showed possible progression of the disc herniation and on 01/19/2004 he underwent a C5-6 ACDF. The surgery went well, the fusion incorporated, but the insured continued to experience, along with his lumbar spine, episodes of severe neck pain with radicular symptoms. The insured has continued to work despite the worsening of the complaints until 2020. Serial MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. The insured is being followed by Pain Management and receives prescriptions for Valium and Dilaudid for management of his pain. The level of symptoms and the intensity of treatment leads to support for his R&Ls.

The OSP has supported R&Ls. The question regards the etiology of the insured's current condition. The OSP has stated "The lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. One could not reasonably conclude that if these events did not occur, the insured would not be suffering from degenerative disc disease with its associated R&Ls. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current R&Ls." The AP has stated that the current condition is a result of an accident.

The cervical MRI performed on 01/05/1994 revealed C5-6 bilobed disk herniation and disc bulges at C3-4 and C4-5.

The cervical MRI performed on 11/02/1995 revealed mild disc bulging at C3-4 and C4-5 with resolution of the C5-6 disc herniation.

The cervical MRI performed on 04/28/1999 revealed C4-5 facet hypertrophy and C5-6 disc herniation with spondylosis.

MRI of the cervical spine on 09/22/2002 revealed disc protrusion at C4-5 and stable degenerative changes at C3-4 and C5-6.

MRI of the lumbar spine on 09/02/2006 revealed degenerative changes at L3-4 and L4-5.

MRI of the cervical spine on 05/19/2010 revealed C5-6 ACDF and multilevel facet arthritis with C4-5 spurring.

MRI of the lumbar spine on 04/20/2011 revealed degenerative changes at L3-4 and L4-5.

MRI of the lumbar spine on 01/14/2013 revealed L4-5 bilateral facet arthropathy.

MRI of the lumbar spine performed on 09/21/2015 revealed degenerative changes at L3-4 and L4-5.

MRI of the cervical spine on 09/21/2015 revealed stable post-op changes at C5-6 and multilevel degenerative changes at other levels.

MRI of the lumbar spine performed on 04/17/2017 revealed previous L5-S1 decompression, L3-4 and L4-5 degeneration with severe L3-4 spinal stenosis.

MRI of the lumbar spine performed on 04/03/2020 revealed previous L5-S1 decompression, L3-4 and L4-5 degeneration with severe L3-4 spinal stenosis.

The MRI of the cervical spine performed on 04/03/2020 revealed previous C5-6 fusion with moderate-to-severe degeneration at C4-5 and C6-7 with C4-5 spinal stenosis.

The lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back.  However, one cannot reasonably conclude that if these events did not occur that the insured would not develop degenerative disease with its associated restrictions and limitations.  It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations.  Therefore, I agree with the OSP opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

**DMO Signature Block:**

Name:    Steven Milos  M.D.
State of Licensure:    IL#036113850
Board Certification:    Orthopedic Surgery
Unum

# Exhibit 16



MICHAEL MOON, M.D.
SAIYUN HOU, M.D., PH.D.

5348 Carroll Canyon Road, Suite 101
San Diego, CA 92121
(858) 202-1546 • Fax (858) 202-1548
www.paincarerehab.com

February 16, 2021

Phil Lahey, M.D., Medical Consultant
Unum Life Insurance Company of America
Fax: (866) 562-4794

RE: Richard J. Leung
Claim number: CLA200415

Dear Phil Lahey, M.D.:

I am in review of your November 13, 2020 letter in which you stated that the purpose of your letter was to gain a better understanding of my medical opinion and discuss questions you have regarding your interpretation of the available medical data.

You stated in your letter that, after reviewing Dr. Leung's medical records, you have agreed with the restrictions and limitations given to him by me. **However, you disagreed that his current condition is a result of the accident.**

You stated in your letter that you recognized the claimant's lifting injury, in which he herniated the L4-5 disc requiring discectomy, as well as the lifting injury, in which he herniated his C5-6 disc requiring surgical discectomy and fusion. You stated in the 2nd to last paragraph of the letter, **"I have concluded that his current condition of degenerative disc disease of the cervical and lumbar spine is diffuse and that the etiology of his diagnosis of degenerative disc disease is not a result of the cervical and lumbar disc herniations."**

You have requested a response with my thoughts and rationale which leads me to the conclusion that his current condition is caused by the accident.

Thank you for your letter. I apologize for the delay in responding. It appears from your letter that the level of Dr. Leung's disability and impairment regarding his cervical and lumbar spine injuries is not in question. **It is "causation" of the claimant's current cervical and lumbar spine pathology that you are disputing.**

I respectfully disagree with your opinion that the cause of the claimant's current cervical spine and lumbar spine disabilities & impairments are due to diffuse degenerative disc disease and not due to the industrial injuries of 1982 and 1993. Dr. Leung has continued to be symptomatic in both the cervical spine and lumbar spine since the initial dates of injuries receiving extensive ongoing medical treatment on a consistent basis until the present. The surgeries he underwent

to both the cervical and lumbar spine were not curative and he continued to have ongoing symptoms requiring medical treatment. His neurosurgeons, at the time, also anticipated the need for future surgeries to both the cervical spine and lumbar spine. The ongoing medical treatment he has received, since the industrial injuries occurred until the present, have been well documented.

Dr. Leung has been my patient since 10/30/2014, referred to me by his Neurologist, Charles Jablecki, M.D. He was seen by me for a comprehensive pain management consultation regarding his chronic neck pain and chronic low back pain at that time and has continued to be treated by me under his workers compensation claim for his ongoing symptoms.

Dr. Leung sustained 2 separate industrial-related injuries to his cervical spine and lumbar spine. These were specific lifting injuries resulting in herniation of the L4-5 disc in 1982 and herniation of the C5-6 disc in 1993. Both injuries were accepted and recognized by the U.S. Department of Labor as workers compensation injuries dating back to 1982.

Dr. Leung was diagnosed with lumbar stenosis and a lumbar herniated disc at L4-5 prior to undergoing a lumbar laminectomy, L4-5 diskectomy, and L4-5 & S1 foraminotomy surgery on 2/16/1983 performed by John Alksne, M.D. who was chief of Neurosurgery at UCSD at the time.

I reviewed the 6/14/1983 letter by Dr. Alksne to the claims examiner for the U.S. Department of Labor, Evelyn Gong in which he notes Dr. Leung to report experiencing a moderate amount of low back pain and leg pain with activity. He documents reviewing a post-operative CT scan which shows an adequate decompressive laminectomy, but some significant encroachment on the nerve root foramina by hypertrophied facets. He states, **"This was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date."**

Dr. Leung was diagnosed with a C5-6 disc herniation with cervical stenosis and bilateral upper extremity radiculopathies prior to undergoing an anterior cervical discectomy at C5-6 and arthrodesis at C5-6 with instrumentation on 1/19/2004 performed by Neurosurgeon, Richard Ostrup, M.D. at Scripps Memorial Hospital. I reviewed Dr. Ostrup's admission History and Physical report from 1/19/2004 in which he documents a discussion with the claimant noting that the MRI scan showed primarily disc disease at C5-6 but there is evidence of a small disc at C4-5. He noted in the report, **"He is fully aware of the fact that he may require further surgery at C4-5 depending on his progress."**

Dr. Leung's most recent cervical spine MRI from 4/3/2020 shows a stable fusion at C5-6, however there is severe bilateral foraminal stenosis at C4-5 and C6-7 with compression of the exiting nerve roots. The claimant has clearly developed adjacent segment disease (ASD) at both the levels immediately above and below his cervical fusion as it has been more than 17 years since his surgery. This complication of cervical fusions is well-documented in medical literature and is due to the increased biomechanical stress placed on the adjacent disc levels.

Dr. Leung's most recent lumbar spine MRI from 6/5/2020 shows a previous posterior decompression and laminectomies at L5-S1 as well as an abnormal T1-hypointense signal that is seen in the epidural space at the adjacent L4-5 level, especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral L5 nerve roots. There is evidence of a disc extrusion and annular fissure at L4-5. There is evidence of a disc extrusion and annular

fissure at L3-4 as well as severe spinal stenosis at that level. Dr. Leung clearly has ongoing pathology at the original L4-5 disc surgical level. He has extensive scar tissue at that level which may contribute to his lower extremity radicular symptoms. There is pathology at the L3-4 disc level which I believe is likely due to adjacent segment disease (ASD). The cumulative incidence of ASD requiring reoperation after lumbar laminectomy is 10% over a mean of 4 years. It has been 38 years since his lumbar spine surgery.

It is my opinion that causation for Dr. Leung's cervical spine and lumbar spine injuries as well has ongoing chronic pain and disability are the direct result of the industrial injuries that he sustained in 1982 and 1993. He continued to remain symptomatic in both the neck and low back despite undergoing surgery to the cervical and lumbar spine. He has since required ongoing medical treatment to manage his pain which has been extensively documented. He continues to have extensive pathology seen on MRI of the originally herniated disc at L4-5 as well as what I believe to be adjacent segment disease (ASD) at L3-4. He has adjacent segment disease (ASD) at C4-5 and C6-7 which are the levels immediate above and below his C5-6 fusion.

Lumbar spine decompression surgeries are most effective in alleviating a person's lower extremity radicular pain rather than the axial low back pain. Clearly, Dr. Leung's residual axial low back was discogenic as documented by the original L4-5 disc herniation which continued to persist to this day. Ultimately treatment of lumbar discogenic pain that has failed conservative treatment is a fusion which his Neurosurgeon, Dr. Alksne anticipated.

I respectfully disagree with your opinion that the cause of the claimant's current cervical spine and lumbar spine disabilities & impairments are due to diffuse degenerative disc disease and not due to the industrial injuries of 1982 and 1993. The patient was determined to be permanent & stationary for his workers compensation injuries with permanent disabilities as it pertains to both the cervical spine and lumbar spine. He was provided future medical care to manage his neck and low back condition for life. It is extremely unlikely, given the patient's long history of ongoing neck and low back pain, spine surgeries, and need for ongoing medical treatment, that the degenerative findings seen in the patient's cervical spine and lumbar spine are unrelated to his industrial injuries and subsequent surgeries. **It is my opinion that Dr. Leung's current pain and disability as well as the degenerative findings seen on MRI of both the cervical spine and lumbar spine are indeed directly related to his industrial injuries, residual L4-5 disc injury, and complications related to the cervical and lumbar spine surgeries.**

Sincerely,

Michael Moon, M.D.
Board Certified in Physical Medicine & Rehabilitation
Board Certified in Pain Management
Qualified Medical Examiner, State of California

# Exhibit 17

Activity

---

Checked/Unchecked Indicator: No
Type: CVM Name: Addendum-Doctoral
Status: Completed
Original Notify Date: 02/19/2021
Notify Date: 02/19/2021
Due Date:
Subject: Doc Addendum- Etiology
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Lahey, Philip
Action: Other: Acc/Sick; Pre-Ex, Clarification

Request Fields

---

Brief Summary / History of File: IN is a 65 yr old ophthalmologist claiming TD due to lumbar, herniated disc, scar tissue, multi level disc, degeneratation spinal stenosis, nerve impairment, cervical herniated disc. IN indicates his conditions are a result of injury.

Per your review of the medical information, the etiology of IN's medical condition causing R&Ls are Degenerative disc disease of the cervical and lumbar spine.

IN's AP has reponded to your OSP letter.

Statement of Issue: Does the new information available change your opinion regarding etiology?
If no, next steps.

Created By: Tanga, Emi
Created Date: 02/19/2021 10:32:49 Create Site: Worcester

Response Fields

---

Response: Lahey, Philip 02/20/2021 13:55:37:
SECTION 2 - Completed by OSP

Addendum

Claimant: Richard J Leung
Claim #17839700
Date: 2/20/21
Name of reviewing operations physician (OSP):
Specialty of reviewing OSP physician:
DBS: Emi Tanga

I have received and reviewed the AP response from doctor moon. The AP disagrees with me in my opinion that the insurance current spine disabilities and impairments which have been supported are a result of diffuse degenerative disc disease and not due to the industrial injuries of 1982 and 1993. He justifies his opinion on the fact that he has continued to be symptomatic in both the cervical and lumbar spine since the initial dates of injuries receiving extensive ongoing medical treatment on a consistent basis until the present. He goes on to state that the surgeries to both the cervical and lumbar spine were not curative and he continued to have ongoing symptoms requiring medical treatment. He states that both the injury of 1982 and the herniated disc of 1993 were accepted and recognized as workers compensation injuries dating back to 1982. Dr Moon refers to a 1983 letter sent by

the surgeon stating that "this was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly requiring a subsequent Fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date." He also refers to his neurosurgeon in 2004 stating that he is fully aware of the fact that he may require further surgery at C 4-5 depending on his progress. He states that the MRI of April 3rd 2020 shows a stable fusion however there is severe bilateral foraminal stenosis at C-4-5 and C6-7 with compression of the exiting nerve roots. He states unequivocally that this complication of adjacent segment disease at both levels immediately above and below his fusion is well documented in medical literature and is due to the increased biomechanical stress placed on the adjacent disc levels. He states that the most recent MRI of the lumbar spine on June 5th 2020 shows a previous posterior decompression and laminectomies at L5-S1 as well as an abnormal signal seen in the epidural space at the adjacent L4-5 level especially in the lateral recesses, likely reflecting a component of scar tissue involving the bilateral L5 nerve roots. There is evidence of a disc extrusion and annular fissure at L4-5. There is evidence of an annular fissure at L3-4 as well as severe spinal stenosis at that level. It is his opinion that the causation of the insured's cervical spine and lumbar spine injuries as well as ongoing chronic pain and disability are the direct result of the industrial injuries that he sustained in 1982 in 1993. He states that he continued to remain symptomatic in both the neck and low back despite ongoing surgery to the cervical and lumbar spine. He states further "it is my opinion that Dr Leung's current pain and disability as well as the degenerative finding seen on MRI of both the cervical spine and lumbar spine are indeed directly related to his industrial injuries, residual L 4-5 disc injury, and complications related to the cervical and lumbar spine surgeries."
My opinion remains unchanged. The insured's preoperative CT scan in 1982 revealed congenital changes of spinal stenosis associated with a trefoil shaped canal. Additionally, within the neurosurgeon's operative note it is mentioned " laterally there was considerable compression from the medial placed facets." Is my opinion that when the surgeon stated in his letter that "this was not adequately decompressed at the time of his original surgery," he is referring to the fact that the facets were anatomically narrowing the canal and to fully decompress the medially placed facets this would potentially destabilize the segment and potentially lead to the necessity of a fusion. The record does not indicate that a fusion has been required. The dura was torn during surgery but the tear was recognized and repaired.
Adjacent segment disease is well recognized. I do believe that this plays a role in the insured's progressive degeneration of the spine. I am not able to conclude that it is the sole cause or even the major cause. For example, there is evidence of preexisting disc degeneration: 1/5/94 MRI cervical spine, "The intervertebral discs show varying degrees of degenerative desiccation throughout the cervical spine…Axial sections beginning at C3-4 show mild symmetric bulging of the C3-4 disc. Minimal C 4-5 disc bulging is seen which is symmetric." There was mild foraminal narrowing on the right of C3-4, C5-6 and C6-7. There is evidence of congenital abnormalities that can predispose to symptomatic degenerative disc disease (congenital spinal stenosis in the lumbar spine.)
Nevertheless, the insured did have progression of his degenerative disc disease over the years which is well documented in the record with multiple MRI's. He was able to work until the degeneration became so severe that his R&Ls prevented him from performing the demands of his profession. The periodic episodes of increased low back pain are typical of those who suffer from degenerative disc disease.
My opinion remains that the etiology of the current R&Ls is degenerative disc disease of the cervical and lumbar spine.

Next Steps: DMO addendum

Signature Block:

Name: Philip Lahey MD
Licensure: MA
Board Certification: American Board of Orthopedic Surgery

I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment for which I am by training and experience capable to assess.

Completed By: Lahey, Philip
Completed Date: 02/20/2021 13:55:37 Complete Site: Worcester

*Claimant Name: Richard J Leung Claim #: 17839700*
UA-CL-IDI-001689
**EXH. 17-003**

# Exhibit 18

**Designated Medical Officer (DMO) Review Response**

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of DMO Review:** 02/23/21

**Conclusion**

Concur with OSP opinion.

**DMO Analysis**

The additional records were reviewed.

The OSP is of the opinion that the insured's restrictions and limitations are caused by degenerative disc disease of the cervical and lumbar spine.

The AP is of the opinion that the insured's current pain and disability as well as the degenerative
findings seen on MRI of both the cervical spine and lumbar spine are directly related to his industrial
injuries, residual L 4-5 disc injury, and complications related to the cervical and lumbar spine surgeries.

The lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur that the insured would not develop degenerative disease with its associated restrictions and limitations. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. Therefore, I agree with the OSP opinion. The additional information did not change that opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

**DMO Signature Block:**

Name: Steven Milos M.D.
State of Licensure: IL#036113850
Board Certification: Orthopedic Surgery
Unum

# Exhibit 19

Activity

---

Checked/Unchecked Indicator: No
Type: Management Name: Other
Status: Completed
Original Notify Date: 03/19/2021
Notify Date: 03/19/2021
Due Date:
Subject: Adverse Etiology Review- MGMT Reivew
Upon Completion Notify: Activity Creator
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Stimson, Adam P
Action: Agree

Request Fields

---

Request: Tanga, Emi 03/19/2021 15:20:15: Adam,

Please review the information below. Thank you,

Claim Overview: 65 yr old ophthalmologist claiming TD due to lumbar, herniated disc, scar tissue, multi level disc, degeneratation spinal stenosis, nerve impairment, cervical herniated disc. Injuries 5/23/82 and 11/xx/93, at this time under review to confirm if there are an exclusions.

We accepted liability for a disability beginning May 29, 2020 and have been providing benefits under the Total Disability provision. Our physician determined additional information was necessary to evaluate the etiology of your medical conditions causing your restrictions and limitations that are precluding you from working.

IN provided us with medical records consisting of his treatment from 1982 through 2020.

This information was reviewed by OSP and lumbar spine. This physician indicated MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. While OSP noted IN's symptoms started with a lumbar disc herniation at L4-5 and have continued since that time, the disc herniation was resected and IN currently has multiple level involvement, a diffuse process not localized to L4-5. OSPnoted while discectomy is associated with an increased risk of degenerative changes progressing through life, it is not proven that this progression is caused by the herniation, the surgery or other factors. OSP noted IN's current condition is diffuse and multilevel.

OSP noted IN's cervical condition is similar. IN herniated the C5-6 disc when lifting a weight. This herniation was eventually excised and the level fused. OSP identified IN's current diagnosis as degenerative disc disease which involves multiple levels of the cervical spine. OSP opined that the lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. He noted it is unreasonable to conclude that if these events did not occur, IN would not be suffering from degenerative disc disease with its associated restrictions and limitations. OSP also opined that it would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. OSP concluded the etiology of your medical condition is degenerative disc disease, thus sickness.

Our physician attempted to reach Dr. Moon to discuss the etiology of IN's medical condition on November 11, 2020 and November 12, 2020. He was unsuccessful in speaking with him. He sent Dr. Moon a letter requesting clarification on November

13, 2020.

IN'sr file was referred to DMO for additional review. DMO reviewed the available medical information and determined he was in agreement that the etiology of IN's medical condition causing his restrictions and limitations is degenerative disc disease; sickness. DMO opined the lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur, IN would not have developed degenerative dis disease with its associated restrictions and limitations. He also noted it is unreasonable to conclude that the L4-5  and C5-6 disc herniations caused the diffuse process that have led to IN's current restrictions and limitations.

A response to OSP's November 13, 2020 letter to Dr. Moon was received on February 16, 2021. Dr. Moon noted he disagreed with OSP's opinion that the cause of In's current cervical and spine disabilities and impairments are due to diffuse degenerative disc disease and not due to industrial injuries of 1982 and 1993. He indicated since these injuries, IN has continued to be symptomatic in both the cervical spine and lumbar spine receiving extensive ongoing medical treatment on a consistent basis to the present. He indicated IN has clear pathology at the original L4-5 disc surgical level with extensive scar tissue that may contribute to IN's lower extremity radicular symptoms. Dr. Moon opined that IN's chronic pain and disability are the direct result of the industrial injuries he sustained in 1982 and 1993 given he continued to remain symptomatic in both the neck and lower back and have required ongoing medical treatment to manage pain. Dr. Moon noted that he believes adjacent segment disease (ASD) is the result of the extensive pathology seen in your lumbar spine at L4-5 and L3-4, and C4-5 and C6-7 which is immediately above and below the C5-6 fusion and above the L4-5 lumbar discectomy. Dr. Moon opined that it is unlikely given IN's extensive ongoing neck and low back pain, spine surgeries and need for ongoing treatment, that the degenerative findings seen in his cervical spine and lumbar spine are unrelated to the industrial injuries and subsequent surgeries. Dr. Moon noted he believes the degenerative process of the cervical and lumbar spine are indeed directly related to IN's industrial injuries, residual L4-5 disc injury, and complications related to the cervical and lumbar spine surgeries.

OSP reviewed this information and noted his opinion remained unchanged. He explained IN's  preoperative CT scan in 1982 revealed congenital changes of spinal stenosis associated with a trefoil shaped canal. Additionally, within the neurosurgeon's operative note it is mentioned " laterally there was considerable compression from the medial placed facets." OSP explained that when the surgeon stated in his letter that "this was not adequately decompressed at the time of his original surgery," he is referring to the fact that the facets were anatomically narrowing the canal and to fully decompress the medially placed facets this would potentially destabilize the segment and potentially lead to the necessity of a fusion. The record does not indicate that a fusion has been required. The dura was torn during surgery but the tear was recognized and repaired. OSP noted that he recognizes that adjacent segment disease and believes this plays a role in the insured's progressive degeneration of the spine, however, is not able to conclude that it is the sole cause or even the major cause.

OSP noted there is evidence of pre-existing disc degeneration noted in the 1994 MRI cervical spine:

"The intervertebral discs show varying degrees of degenerative desiccation throughout the cervical spine…Axial sections beginning at C3-4 show mild symmetric bulging of the C3-4 disc. Minimal C 4-5 disc bulging is seen which is symmetric."

He epxlained there was mild foraminal narrowing on the right of C3-4, C5-6 and C6-7. There is evidence of congenital abnormalities that can predispose to symptomatic degenerative disc disease (congenital spinal stenosis in the lumbar spine.) OSP noted IN did have progression of his degenerative disc disease over the years and was able to work until the degeneration became so severe that his restrictions and

limitations prevented him from performing the demands of his profession. OSP indicated the periodic episodes of increased low back pain are typical of those who suffer from degenerative disc disease and his opinion of the etiology of your restrictions and limitations is degenerative disc disease of the cervical and lumbar spine remains unchanged.

IN's file was referred to DMO to determine who he agreed with; OSP or Dr. Moon. DMO noted that the lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, he cannot reasonably conclude that if these events did not occur, IN would not have developed degenerative disc disease with it's associated restrictions and limitations. He opined that it is unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that have led to IN's current restrictions and limitations.

IN is SSDI approved as of 5/29/2020. We are in agreement with SSDI determination that IN is TD beginning 5/29/2020. SS File not requested, therefore unclear if etiology determination is different from ours. Etiology does not impact IN's SSDI benefits.

As a result, the etiology of IN R&Ls is sickness. As a result the maximum benefit period for benefits under IN's policies is 24 months.

-Etanga SBS

Created By: Tanga, Emi
Created Date: 03/19/2021 15:20:15 Create Site: Worcester

Response Fields

---

Response: Stimson, Adam P 03/24/2021 09:22:00: Emi

In review, I am in agreement with your analysis and conclusions/recommendations that the basis of the supported R/Ls is the result of a Sickness and not an Accident, as defined by the Insured's policies. This conclusion has been reached after review of the available medical records and after communicating with the AP (who is not in agreement). Multiple OSP and DMO reviews have been completed and your analysis and recommendations are consistent with those reviews and opinions. Claims will remain open as R/Ls remain supported and the maximum benefit period/dates are to be communicated in the letter of explanation to the Insured, with appeals language. Please proceed.

A Stimson, Dtr, 3/24/21

Completed By: Stimson, Adam P
Completed Date: 03/24/2021 09:22:00 Complete Site: Worcester

# Exhibit 20



Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: **1-866-562-4794**
www.unum.com

March 24, 2021

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Claim Number: CLA200415; CLA200416; CLA200417; CLA200418; CLA200419
Unum Life Insurance Company of America

I attempted to reach you on March 24, 2021 about the decision we made on your claim for Individual Disability benefits.

We have completed our review of your Individual Disability claims and have determined the etiology of your medical condition providing restrictions and limitations to be sickness. Please review this entire letter as it will help you understand how we reached this decision.

| **Contact Us** |
|---|
| **Benefit Specialist:**<br>Emi Tanga<br>1-888-226-7959 extension, 75252 |
| **Call Center:**<br>1-888-226-7959<br>8 am to 8 pm EST, Monday-Friday |
| **Fax:** 1-866-562-4794 |

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875009124257901

**Information That Supports Our Decision**

Our records reflect we received your claim forms on June 19, 2021 requesting disability benefits beginning May 29, 2020 due to lumbar herniated disc at L4-5, scar tissue, multi-level disc degeneration, spinal stenosis, nerve impingement, cervical herniated disc C5-6, multi-level disc degeneration, spinal stenosis and nerve impingement. You indicated your medical conditions are a result of injuries. The lumbar spine injury occurred at VA Medical Center ICU while lifting a 300 pound patient. As a result of this injury, you underwent surgery on February 16, 1983. You noted the cervical spine injury occurred in mid-to-late November 1993 while you were strengthening back with personal trainer. You noted you have been in ongoing treatment with different specialists and therapies throughout the years for these conditions. You indicated your medical conditions precluded you from performing your occupational duties as an ophthalmologist.

Dr. Michael Moon completed an Attending Physician Statement on June 17, 2020. He noted your primary diagnosis as multilevel degenerative disc and facet degenerative changes, severe central stenosis at L3-4, severe foraminal stenosis at C3-4 and C6-7 with compression of exiting nerve roots status post cervical fusion at C5-6. Dr. Moon noted you had undergone a lumbar laminectomy, lumbar discectomy at L4-5, L4-5 and S1 foraminotomy on February 16, 1983 and a cervical discectomy at C5-6, decompression, fusion and titanium plate in January 2004. He also noted you have been treating with injections and that he advised you to stop working on May 29, 2020. Dr. Moon opined your medical conditions are due to an accident.

We accepted liability for a disability beginning May 29, 2020 and have been providing benefits under the Total Disability provision. Our physician determined additional information was necessary to evaluate the etiology of your medical conditions causing your restrictions and limitations that are precluding you from working.

You provided us with medical records consisting of your treatment from 1982 through 2020.

This information was reviewed by our physician (orthopedic surgery) who determined the etiology of the medical conditions that are causing your restrictions and limitations is degenerative disc disease of the cervical and lumbar spine. This physician indicated MRI's of the cervical and lumbar spine have shown persistent and progressive degenerative changes consistent with the diagnosis of degenerative disc disease. These changes involve multiple levels of the cervical and lumbar spine. While our physician noted your symptoms started with a lumbar disc herniation at L4-5 and have continued since that time, the disc herniation was resected and you currently have multiple level involvement, a diffuse process not localized to L4-5. Our physician noted while discectomy is associated with an increased risk of degenerative changes progressing through life, it is not proven that this progression is caused by the herniation, the surgery or other factors. Our physician noted your current condition is diffuse and multilevel.

Our physician noted your cervical condition is similar. You herniated the C5-6 disc when lifting a weight. This herniation was eventually excised and the level fused. Our physician identified your current diagnosis as degenerative disc disease which involves multiple levels of the cervical spine. Our physician opined that the lumbar and cervical disc herniations play a role in the development of the degenerative process of the neck and back. He noted it is unreasonable to conclude that if these events did not occur, you would not be suffering from degenerative disc

disease with its associated restrictions and limitations. Our physician also opined that it would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. Our physician concluded the etiology of your medical condition is degenerative disc disease, thus sickness.

Our physician attempted to reach Dr. Moon to discuss the etiology of your medical condition on November 11, 2020 and November 12, 2020. He was unsuccessful in speaking with him. He sent Dr. Moon a letter requesting clarification on November 13, 2020.

Your file was referred to a second physician (orthopedic surgery) for additional review. This physician reviewed the available medical information and determined he was in agreement that the etiology of your medical condition causing your restrictions and limitations is degenerative disc disease; sickness. This physician opined the lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur, you would not have developed degenerative dis disease with its associated restrictions and limitations. He also noted it is unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that have led to your current restrictions and limitations.

A response to our physician's November 13, 2020 letter to Dr. Moon was received on February 16, 2021. Dr. Moon noted he disagreed with our physician's opinion that the cause of your current cervical and spine disabilities and impairments are due to diffuse degenerative disc disease and not due to industrial injuries of 1982 and 1993. He indicated since these injuries, you have continued to be symptomatic in both the cervical spine and lumbar spine receiving extensive ongoing medical treatment on a consistent basis to the present. He indicated you have clear pathology at the original L4-5 disc surgical level with extensive scar tissue that may contribute to your lower extremity radicular symptoms. Dr. Moon opined that your chronic pain and disability are the direct result of the industrial injuries you sustained in 1982 and 1993 given you continued to remain symptomatic in both the neck and lower back and have required ongoing medical treatment to manage pain. Dr. Moon noted that he believes adjacent segment disease (ASD) is the result of the extensive pathology seen in your lumbar spine at L4-5 and L3-4, and C4-5 and C6-7 which is immediately above and below the C5-6 fusion and above the L4-5 lumbar discectomy. Dr. Moon opined that it is unlikely given you extensive ongoing neck and low back pain, spine surgeries and need for ongoing treatment, that the degenerative findings seen in your cervical spine and lumbar spine are unrelated to the industrial injuries and subsequent surgeries. Dr. Moon noted he believes the degenerative process of the cervical and lumbar spine are indeed directly related to your industrial injuries, residual L4-5 disc injury, and complications related to the cervical and lumbar spine surgeries.

Our physician reviewed this information and noted his opinion remained unchanged. He explained your preoperative CT scan in 1982 revealed congenital changes of spinal stenosis associated with a trefoil shaped canal. Additionally, within the neurosurgeon's operative note it is mentioned " laterally there was considerable compression from the medial placed facets." Our physician noted that when the surgeon stated in his letter that "this was not adequately decompressed at the time of his original surgery," he is referring to the fact that the facets were anatomically narrowing the canal and to fully decompress the medially placed facets this would potentially destabilize the segment and potentially lead to the necessity of a fusion. The record does not indicate that a fusion has been required. The dura was torn during surgery but the tear was recognized and repaired. Our physician noted that he recognizes that adjacent segment disease and believes this plays a role in the insured's progressive degeneration of the spine, however, is not able to conclude that it is the sole cause or even the major cause.

Our physician noted there is evidence of pre-existing disc degeneration noted in the 1994 MRI cervical spine:

> "The intervertebral discs show varying degrees of degenerative desiccation throughout the cervical spine…Axial sections beginning at C3-4 show mild symmetric bulging of the C3-4 disc. Minimal C 4-5 disc bulging is seen which is symmetric."

Our physician noted, there was mild foraminal narrowing on the right of C3-4, C5-6 and C6-7. There is evidence of congenital abnormalities that can predispose to symptomatic degenerative disc disease (congenital spinal stenosis in the lumbar spine.) Our physician noted you did have progression of your degenerative disc disease over the years and were able to work until the degeneration became so severe that your restrictions and limitations prevented you from performing the demands of your profession. Our physician noted the periodic episodes of increased low back pain are typical of those who suffer from degenerative disc disease and his opinion of the etiology of your restrictions and limitations is degenerative disc disease of the cervical and lumbar spine remains unchanged.

Your file was referred to a second physician (orthopedic surgery) to determine who he agreed with: our physician or Dr. Moon. This physician noted that the lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back. However, he cannot reasonably conclude that if these events did not occur, you would not have developed degenerative disc disease with it's associated restrictions and limitations. He opined that it is unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that have led to your current restrictions and limitations. He concluded the medical condition causing your restrictions and limitations is degenerative disc disease, thus, etiology is sickness.

Therefore, upon the completion of the above doctoral analysis, we have concluded that you are Totally Disabled as a result of Sickness, as defined by your policies and not from Accident. As a result, the maximum benefit period of your policies is 24 months.

Thus, provided you continue to meet the terms and conditions of your policies:

- The Maximum Benefit Period for policy LAD016015 (CLA200415) is to July 28, 2022.
- The Maximum Benefit Period for policy LAN661286 (CLA200416) is to June 28, 2022.
- The Maximum Benefit Period for policy LAN780636 (CLA200417) is to June 28, 2022.
- The Maximum Benefit Period for policy LAN782020 (CLA200418) is to June 28, 2022.
- The Maximum Benefit Period for policy LAN782990 (CLA200419) is to June 28, 2022.

**Policy Provisions**

A copy of your policies# LAD016015, LAN661286, LAN780636, LAN782020 and LAN782990 was sent to you on July 7, 2020.

We relied upon your policy when making our decision, including provisions listed below, and the Company reserves its right to enforce other provisions of the policy.

**Policy LAP016015: Claim CLA200415:**

Claimant Name: Leung, Richard J
Claim Number: CLA200415

March 24, 2021
Page 5 of 8

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN661286; Claim CLA2Q0416:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider
- Loss of Use Benefit

**Policy LAN780636; Claim CLA200417:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN782020; Claim CLA200418:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

**Policy LAN782990; Claim CLA200419:**

- Total Disability
- Sickness
- Accident
- Waiver of Premium
- Lifetime Accident Benefit Rider

As a result of direction from the California Department of Insurance, we will administer your claims for disability benefits with reference to the following:

> You are totally disabled when you are rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

**Next Steps Available to You**

**What if you disagree with the decision and you have *new information* to submit?**

02875009124257902

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-001704

**EXH. 20-005**

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Benefits Specialist who made the initial decision.

**How much time do you have to request a reevaluation of your claim?**

Please submit your written request within 180 days from the date you receive this letter.

**How does the reevaluation process work?**

If you have new information you want us to consider, please send it to us as soon as possible. The Benefits Specialist who made the initial decision will review the claim again taking the new information into consideration. The Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision you will have the option to request an additional independent review by our Appeals Department.

**What information is available to you?**

Upon your written request and without charge, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for reevaluation and new information?**

Reevaluation Request
PO Box 9548
Portland, ME 04122-5058
Fax Number: 1-866-562-4794

**What if you disagree with the decision, but *don't have new information* to submit?**

If you disagree with our decision, but don't have new information to submit you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

**How much time do you have to request an Appeal?**

Please submit your written request for appeal within 180 days from the date you receive this letter.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeals Specialist will make an independent decision on your claim.

**How much time does the Appeal review take?**

We want you to know that our Appeals Unit is committed to completing their review as soon as possible and will provide you with status updates every thirty days until a decision is reached.

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for Appeal?**

The Appeals Unit
PO Box 9548
Portland, ME 04122-5058
Fax Number: 207-575-2354

We will send you a letter acknowledging receipt of your request within 7 days.

**To All California Residents and Policyholders**

To the extent California law applies to your claim, you may also contact the California Department of Insurance if you wish to have them review your claim.

If you wish to write to the Insurance Department, your letter should be addressed to:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013

If you wish to contact the Department by telephone, you should ask for the Claims Services Bureau at 1-800-927-HELP (1-800-927-4357) or 213-897-8921 or the TDD Number at 1-800-482-4TDD (1-800-482-4833).

You may also contact the California Department of Insurance at www.insurance.ca.gov.

The policy under which you are insured has a provision which states, in part, that no lawsuit or legal action shall be brought to recover on the policy after 3 years from the date proof of claim is required.

Richard Leung, if you have additional questions, please call us using the contact information provided on the first page. Our representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

| | |
|---|---|
| Spanish: To obtain assistance in Spanish, call 1-800-858-6843. | Para obtener asistencia en Español, llame al 1-800-858-6843. |
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843. |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Claimant Name: Leung, Richard J
Claim Number: CLA200415

March 24, 2021
Page 8 of 8

Sincerely,

Emi Tanga

Emi Tanga
Senior Benefit Specialist

Enclosures: IDI Return Envelope-Columbia (ST-1019)

02875009124257902

Claimant Name: Richard J Leung Claim #: 17839700

UA-CL-IDI-001707

**EXH. 20-008**

# Exhibit 21

RECEIVED
APR 13 2021
BCCPORTAPPEALS

Richard J. Leung, M.D.
1388 Kettner Boulevard
Unit 2801
San Diego, CA 92101
619-993-2888

UNUM
The Appeals Unit
P.O. Box 9548
Portland, ME 04122-5058

April 8, 2021

RE: CLA200415, CLA200416, CLA200417, CLA200418, CLA200419

To whom it may concern:

I am writing in response to the letter dated March 24, 2021 from Emi Tanga regarding the determination of the etiology of my medical condition to be sickness. I disagree with this decision as this is contrary to the opinions of my attending physicians Michael Moon, M.D. and neurosurgeon Richard C. Ostrup, M.D. who both are of the opinion that the proximate cause of my disability is accident related. The purpose of this letter is to formally request an appeal of your decision.

It is my understanding that serious sanctions were levied by the California State Insurance Commissioner some years ago against UNUM for improper claim practices. UNUM was also advised by the commissioner at the time that they "shall give significant weight to an attending physician's opinion if the attending physician is properly licensed and claimed medical condition falls within the attending physician's customary area of practice unless the attending physician's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for the attending physician's opinion to be rejected, the claim file must include specific reasons why the opinion is not well-supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record."

I have attached the 34 page document from Insurance Commissioner of the State of California entitled California Settle Agreement, please see pages 9-10 item III D Attending Physician's Opinion (highlighted in green).

As a UNUM policy holder for 39 years who has always paid premiums on time, I am greatly disappointed in the obvious efforts to deny my claim based on it being accident-related which is supported by my attending physicians and well-documented in the medical record. I look forward to your timely response to my request for appeal.

Sincerely,

Richard J. Leung, M.D.

Richard J. Leung, M.D.

# Exhibit 22

**Paper Independent Medical Exam (IME) Response**

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of Paper IME:** 05/28/2021

**Response to Questions:** From your review of the records provided, please respond to the following questions, including your rationale for each response.

Provider Questions: Please review the medical file and reply to the following

**1. What is the etiology of the insureds current impairing lumbar conditions?**

In a June 17, 1982 note by Dr. Kenneth OTT, the medical record initially reported that the claimant injured his back while lifting a patient as an intern. He reported a CT of the Lumbar spine showing an L4/5 disc bulge. On February 16, 1983 the claimant underwent an L4/5 and L5/S1 laminectomy. A report from Dr. Alksne, the surgeon on June 14, 1983 reported that the claimant did well. There are three MRI studies without clinical accompaniment from 1985, 1988, and 1992. All studies show an essentially similar study. There are post-operative findings, always seen, and a reported disc bulge or herniation at L4/5. There is no other pathology mentioned.

Dr. Charles Jablecki, M.D first evaluated the claimant on January 4, 1994. He evaluated him on a regular, at times almost a monthly basis, until October 3, 2014, when the doctor closed his practice. In the initial evaluation, he stated that there was of residual low back pain which can flair up. There were episodes of spasms and increased pain. The initial examination with Dr. Jablecki found that the left gastrocnemius reflex was reduced. It is most likely that this reflex change was related to the prior disc herniation and surgery. An absent reflex is not an impairing condition. The reports from Dr. Jablecki over the next ten years of treatment most commonly reflects the continued bouts of back pain and spasm the claimant has, however for the most part the examination remains the same with limited motion in the lower back with tenderness and spasm, and an absent reflex. The motor and sensory and gait examinations were almost always reported as normal and there are periods where there is a positive straight or crossed straight leg raise test which coincides with the degree of pain the claimant is reporting.

After Dr. Jablecki closed his office, the claimant's care was taken over by Dr. Moon. The last evaluation by Dr. Moon in the record is June 2, 2020, however, there is a February 2021 letter written by him. Over this period of time, the claimant's low back complaints are reported as becoming more constant and severe. He is treated with chronic opioid medications for this, as well as an attempt at interventional pain management. The constant examination findings during this period are decreased range of motion in the lower back and a slow unassisted gait.

Review and comparison of the claimant's MRI testing is necessary.

1- An MRI of the lumbar spine was performed on March 15, 1985, that demonstrated decreased disc height at L4-5 consistent with previous surgery, some epidural fibrosis at the left L4-5 neural foramen, and a moderate posterior disc bulge compressing the thecal sac
2- MRI was performed on August 27, 1992, showing residual and/or recurrent central and left-sided disc herniation at L4-5 without significant change from the August 8, 1988 (not included in record)

3- January 14, 2013 repeat MRI of the lumbar spine was performed.  L3/4 stable degenerative changes, mild to moderate central and foraminal stenosis; Reported new inflammatory changes at both L4-5 facet joints and right-sided epidural space endplates.  At L4-5 the thecal sac is relatively capacious, the right lateral recess is narrowed.  There is left perineural scarring at L5.  The left L4 neural foramen is widely patent. L5/S1 normal.

4- September 21, 2015 MRI of the lumbar spine, progressive L3-4 disc degeneration, moderate to severe central canal and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots  Stable degenerative and postop changes at L4-5 with lateral recess stenosis worse on right and fibrosis of left L5 root. L5/S1 mild bulge no stenosis.

5- The MRI of the lumbar spine on April 17, 2017 reports previous L5-S1 decompression, previous L5-S1 laminectomy, evidence of epidural fibrosis, L4-5 mild posterior disc extrusion, severe facet hypertrophy, L3-4 persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots.

6- MRI of the lumbar spine done on 04/03/2020 shows L3/4 progression of severe central stenosis; Remainder of degenerative disc and facet changes are unchanged and stable.

When comparing the MRI  studies it is important to realize that the MRIs were done at different times, perhaps on different machines, and read by different radiologists.

The MRI findings show that there were expected post-operative changes at L4/5 after the 1982 surgery. There were boney defects from the laminectomies, degenerative changes, and loss of disc height due to the discectomy. There was expected epidural fibrosis at the laminectomy site and involved nerve roots. The significant analysis at L4/5 was that the changes were for the most part although reported as stable, there was a pattern of slow degeneration causing the development of foraminal stenosis and impingement of the L4 and L5 nerve roots, which can also be commonly seen over many years.

There is no significant pathology noted at L5/S1 on any study.

The L3/4 disc space however shows a constant progression of degeneration and developing stenosis. The January 14, 2013 repeat MRI of the lumbar spine demonstrated  L3/4 stable degenerative changes, mild to moderate central and foraminal stenosis. The September 21, 2015 MRI of the lumbar spine, progressive L3-4 disc degeneration, moderate to severe central canal, and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots.

The MRI of the lumbar spine on April 17, 2017 at  L3-4 thee is persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots.

The MRI of the lumbar spine done on 04/03/2020 shows L3/4 progression of severe central stenosis.

Based on the medical reports and the MRI findings the etiology of the claimant's impairment is progressive degenerative changes at the L3/4 and L4/5  disc spaces.

**2. Is there a medical relationship between the insureds current impairing lumbar conditions and the May 1982 reported injury?**

The injury which resulted in the operation performed in 1982 does not contribute to the current impairing condition. There has been a degeneration of the lumbar spine at both L3/4 and L4/5 as a result of aging, and what is generally called wear and tear. There is no indication based on the medical record that the initial herniation in 1982 or the surgery played a part in accelerating the degeneration.  The degeneration at L3/4 was rapidly progressive and that at L4/5 was fairly slow. If the prior injury had contributed to the current condition there would have been a more rapid degeneration at L4/5 than L3/4. In further support of this opinion, it should be noted that there was a laminectomy at L5/S1 as a result of the 1982 injury, but there was no progression of degeneration at that level.

If the injury and surgery accelerated the degeneration at L4/5 it should have also done so at L5/S1. It is a very common pattern that natural degeneration occurs at L3/4 and L4/5 and spares L5/S1.

**3. What is the etiology of the insured's current impairing cervical conditions?**

The claimant's neck complaints appear to start as the result of an event while at the gym at the end of 1993. The record does not specifically offer a date. As a result of this, the claimant began treatment with Dr. Charles Jablecki, M.D. who evaluated the claimant for the first time on January 4, 1994. This 1994 report stated that there was a six-week history of pain in the neck, on the right side of the neck, and posterior shoulder that occurred while exercising in the gym. He saw a physical therapist. He then developed numbness and tingling in the right thumb and index finger, which was related to head and neck motion. Significant examination findings were normal sensation throughout except for reduced sensation along the tips of the thumb and index finger on the right. There is a positive Phalen's sign and Tinel sign at the wrist on the right, suggesting carpal tunnel syndrome. An EMG of the right upper extremity was performed on January 4, 1994, which was reported as normal. MRI of the cervical spine done on January 5, 1994, reported a large disc herniation at C5-6; at C3/4 there is a mild disc bulge no compression, and at C4/5 there is disc bulge no compression. It further reported varying degrees of degeneration throughout the spine. Cervical spine x-rays on January 5, 1994 showed disc space narrowing at C5-6 and mild foraminal narrowing at C3-4, C5-6, and C6-7 on the right. The claimant was referred for physical therapy to his neck.

Dr. Jablecki evaluated him on a regular, at times almost monthly basis until October 3, 2014, when the doctor closed his practice. Multiple follow-up visits with Dr. Jablecki took place, and there were periods of exacerbation of pain including pain developing in the left arm. A course of conservative care was initiated. Examination always remained significant for decreased sensation in the thumb and index finger on the right. The claimant's treatment history is summarized, listing dates, complaints MRI results, and examination findings from a sampling of the approximate 16 years of treatment.

The claimant was referred to Dr. Phil Lahey for a neurosurgical evaluation on May 27, 1994. No surgery was planned or undertaken.

The November 18, 1994 note from Dr. Jablecki states that this claimant has been attending physical therapy for the neck for over 10 months. The claimant's examination has not changed over this period of time.

On January 26, 1995, the claimant reported to Dr. Jablecki that he developed severe pain radiating down the left arm. There was no other change in complaints and the examination remained unchanged.

Evaluation by Dr. Jablecki occurred on August 18, 1998, there was a report of aggravation of the cervical spine pain by a motor vehicle accident on February 27, 1997. There were intermittent physical therapy sessions during this entire period. His examination at that point continued to show decreased sensation along the length of the volar aspect of the right thumb and index finger and his reflexes were all reported normal in the lower extremities.

An MRI of the cervical spine was performed on 11/02/1995, it showed mild disc bulging at C3-4, C4-5 unchanged, and interval resolution of the disc herniation at C5-6 with a mild asymmetric bulging present.

There is a December 1st, 1995 note written by Dr. Jablecki stating that the original MRI showed a C5-6 improved but the C4-5 disc worsened.

On August 12th, 1997, Dr. Jablecki wrote that during an ophthalmologic examination, the claimant's head was tilted and his right hand went numb. The examination found that there was decreased sensation in the volar aspect of the right thumb and index finger, however, normal sensation on the corresponding digits on the left.

The October 20th, 1998 visit with Dr. Jablecki indicated, he had several flare-ups of his pain. Examination remains unchanged with a normal left-hand sensation.

On October 28, 1998, Dr. Jablecki wrote this letter is to reiterate the position stated in my letter of January 18, 1994. In that letter it indicated there it is more probable than not that the cervical spine problem which is symptomatic at this time is an indirect complication of the original work injury of 1982, for which the claimant underwent surgery. He further states that the reason for this is that of compensative hip tilt due to back spasm.

April 27, 1999, evaluation by Dr. Jablecki notes that symptoms remain aggravated by various head positions. Examination again remains unchanged.

Dr. Jablecki had performed a repeat EMG on August 27, 1999, of the right and left upper extremities, they were read as normal.

MRI of the cervical spine was performed on April 28, 1999, the impression is C4-5 facet hypertrophy, mild disc bulge, mild right-sided neural foraminal narrowing, at C5-6 small disc herniation with uncovertebral spondylosis, and bilateral neural foraminal narrowing, right greater than left.

On January 9, 2001 repeat physical with Dr. Jablecki noted recurrent flare-ups of pain in his neck. The examination finds that there was a very mild limitation of range of motion of his neck, with some limitation of motion of his lower back. There were no Tinel signs at the wrists. Straight leg raising was unremarkable. Reflexes in the upper extremities were normal. Strength was normal. Again, there was a fixed decreased sensation in the right thumb and index finger and now again noted reduced sensation in the left thumb and index finger.

March 28, 2002 reevaluation by Dr. Jablecki finds limitation of motion in his cervical spine. No spasms in the cervical musculature. The range of motion in his lumbar spine is slightly restricted. Spasms in the right lumbosacral paraspinal muscles. Strength in the upper extremities was normal. Strength in the lower extremities was normal.

The MRI report of the cervical spine performed on September 22, 2002, finds interval progression of the left posterior paramedian focal disc protrusion at C4-5. At C3-4 present minimal right posterior paramedian focal disc protrusion without stenosis. At C5-6 a stable posterior disc bulge with uncovertebral spondylosis and facet joint hypertrophy, more pronounced on the right than on the left. Moderate narrowing of the right foramen at C6.

On October 23rd, 2003 Dr. Jablecki notes in the examination, this was essentially unchanged from all the previous examinations. He notes an MRI done on September 22, 2002, of the cervical spine, impression reported as interval progression of the left posterior focal disc herniation at C4-5, stable degenerative changes at C3-4, C5-6 from the prior examinations.

MRI of the cervical spine done on November 22, 2003, C3-4 disc bulge and mild neural foraminal narrowing; C4/5 minimal if any worsening if left paracentral disc protrusion, which flattens the left ventral cord without significant stenosis. Slight right foraminal narrowing; C5/6 slight improvement in moderate disc osteophyte complex with mild to moderate spinal stenosis and moderate to severe left foraminal narrowing.

On December 9, 2003, the claimant was re-evaluated by Dr. Ostrup, a neurosurgeon.  No examination is noted, but a surgical recommendation was made. The claimant underwent a cervical discectomy and fusion at C5-6 on January 19, 2004, by Dr. Ostrup.  The initial note by Dr. Ostrup says that the patient is fully aware of the fact that he could require at treatment at C4-5 level.  We talked about doing two levels at this time, but he is not eager for that.

On May 6, 2004, Dr. Ostrup writes that the claimant is three and a half months status post his cervical fusion.  He is doing well.  His x-rays look good.  The fusion is not completely incorporated.  He still complains of some paresthesias, but he is definitely better.  He still complains of neck pain and the claimant has reached MMI from this surgery.

CT of the cervical spine was performed on July 15, 2004.  It shows interval discectomy at C5-6, moderate central stenosis due to the osteophytes narrowing, moderately severe on the right.  There is also mild neuroforaminal narrowing at C4-5 on the left.

On January 12, 2006 evaluation by Dr. Jablecki notes neck pain, bilateral shoulder pain, paresthesias in both hands, flare-ups of pain in the back and neck.  His examination finds limited motion in his cervical and lumbar spine with tenderness.  Motor, sensory and reflex examinations were unchanged from the previous.

In the March 25, 2010 evaluation, Dr. Jablecki finds no change in his examination, but he again continues to complain of recurrent flare-ups of his back and neck problems.

MRI of his cervical spine was performed on May 19, 2010, the report, indicates at the time, alignment and bone incorporation of the C5-6 ADCF,  C3/4  mild bilateral foraminal narrowing; C4/5 andular bulging moderate central and mild bilateral foraminal narrowing; C5/6 no stenosis, C6/7 early degenerative disease no stenosis.

October 3, 2014, Dr. Jablecki reports there have been several flare-ups with his neck pain and associated numbness and tingling in the upper extremities.  There was limited motion in all directions of the cervical and lumbar spines.  The upper extremity, sensory-motor, and reflex examination are unchanged as is the lower extremity examination and he reports that the claimant can walk on his heels and toes.

The last note written by Dr. Jablecki was October 3, 2014. In that note, Dr. Jablecki writes that the current complaints are flare-ups of neck pain, numbness and tingling in the upper extremities, and low back pain.  Examination of the cervical spine was limited in all directions. Upper extremity coordination was normal.  The reflexes were normal.  Strength was normal. The sensation had the fixed deficit in the thumb and index finger and two-point-discrimination again remains normal.

The claimant's care was taken over by Dr. Moon,  who evaluated the claimant on 08/19/2015, the report states that this was a re-evaluation.  He states he has neck pain radiating into the right scapula.  He uses Valium to sleep.  Objective findings are cervical paraspinal musculature spasms, decreased range of motion in the neck, decreased sensation of digits one, two, three bilaterally.

MRI of the cervical spine done on September 21, 2015, C3/4 bilateral facet degeneration with foraminal narrowing;  progressive spondylosis at C4-5 with facet degeneration and hypertrophy.  Moderate narrowing of both C5 neural foramen, worse on the right; stable postoperative changes at C5-6;  C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left.  Moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen.

On 04/27/16, Dr. Moon notes that the patient is now using Dilaudid for his flare-ups. He has increasing difficulty doing his surgery as an ophthalmologist. Examination finds that he is in mild discomfort, in addition to decreased range of motion of the cervical and lumbar spines.

MRI of the cervical spine done on 11/22/16 shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4.

On 11/28/2016, the claimant returns to Dr. Moon on an emergent basis. He was treated in the emergency department and re-evaluated after the claimant experienced a flare-up of the neck pain radiating down his arms bilaterally to the elbows. There is no report of any trauma in this report. The exam notes decreased range of motion in his neck. Limited extension and flexion of the lower back. Tenderness of the paraspinal muscles. Normal reflexes and strength in the lower extremities.

The claimant was evaluated by Dr. Ostrup, neurosurgeon on March 6, 2017. The physical exam noted there is tenderness to palpation over the neck. He was not taken through a full range of motion. He did not detect any weakness. There was a diminished right biceps reflex. There were no pathologic reflexes, or atrophy or sensory loss.

On 03/29/17 Dr. Moon reports that the claimant had a cervical epidural and did not receive any benefit. The examination appears to be essentially unchanged.

On May 16, 2017, Dr. Ostrup evaluated the claimant. Examination reports no significant changes. The recommendation is cervical discectomy and fusion C4-5, C3-4, and a lumbar decompression at L3-4.

January 15, 2020, the claimant reports to Dr. Moon he is experiencing constant chronic neck pain, he continues to experience chronic back pain. The examination is essentially unchanged. The treatment plan continues to be narcotic analgesics.

MRI of the cervical spine done on 04/03/2020 shows C2/3 broad-based disc bulge flattening thecal sac; C3/4 broad-based posterior disc bulge slightly improved severe left and mod right foraminal stenosis compression left C4 root; C4/5 Disc osteophyte complex severe bilateral foraminal stenosis compressing both C5 roots; stable ACDF C5-6, no stenosis; C6/7 disc osteophyte complex effacing thecal sac. Compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left-sided foraminal stenosis compressing the existing left C4 nerve roots. Stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots.

In summary the impairment of the claimant's cervical spine is chronic discogenic neck pain with a radicular component, related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. The major complaint has always been axial neck pain. The constant examination findings have always been cervical tenderness/spasms with decreased range of motion, and decreased sensation in the right first and second digit. Although MRI findings have continually worsened over time, the examination did not, and the complaint of pain slowly increased until it became constant.

**4. Is there a medical relationship between the insured's current impairing cervical conditions and the November 1993 reported injury?**

The MRI findings have shown progressive disc bulging and arthritic changes from the initial 1994 through 2020 studies. The 1994 study showed a disc bulge at C3/4 and C4/5 with a herniation at C5/6 and with varying degrees of degeneration throughout the cervical spine. It was presumed that the accident at the gym caused the herniations, however, it is equally probable that the bulges and herniations were present and were exacerbated by the event. The progression of degeneration at C3/4 and C4/5 took place both prior to and after the C5/6 fusion. The MRI findings at C5/6 really did not progress and remained stable with no significant neural compression. There was a reported motor vehicle accident on February 27, 1997, which Dr. Jablecki reported caused an aggravation of the cervical spine pain, which is a likely occurrence.

There is a drastic change in the MRI of the cervical spine done on 11/22/16. It shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4. Although there is no documentation of trauma this study is consistent with a recent event that caused edema in the ligaments. This is usually from a flexion/extension injury which was recent.

On October 28, 1998, Dr. Jablecki wrote this letter is to reiterate the position stated in letter of January 18, 1994. In that letter, it indicated there it is more probable than not that the cervical spine problem which is symptomatic at this time is an indirect complication of the original work injury of 1982, for which the claimant underwent surgery. He further states that the reason for this is that of compensative hip tilt due to back spasm. This opinion has no real scientific basis. The claimant might have pain due to this reasoning, but it would be muscular and not cause discogenic and osteogenic changes in the spine.

The injury of 1994 apparently caused the herniation at C5/6. The claimant eventually underwent surgery for this in 2004. There are findings of disc bulges at C3/4 and C4/5 with varying degrees of degeneration throughout the cervical spine at the time of the original 1994 MRI. The changes at C3/4 and C4/5 were pre-existing to the injury. The MRI studies showed progressive changes and worsening at these levels prior to the 2004 surgery, so to imply that the changes were not due to adjacent level disease. The degenerative changes at C6/7 were not noted on MRI until 2010 which was six years after the surgery. This period of time would also not be considered as adjacent level degeneration, as the span was so long. There was also an intervening motor vehicle accident in 1997 which was documented as exacerbating the cervical spine condition. The 2016 MRI indicates that there was some other non-documented event that caused the worsening of the MRI findings. Finally, there were no significant progressive MRI changes at C5/6 the operated level.

Within reasonable medical probability, there was no significant contribution from the injury on November 1993 to the current impairing conditions.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

Marvin Friedlander  M.D.
Board Certified Neurological Surgery
NJ#25MA05251300

# Exhibit 23

BY E-mail and Certified U.S. Postal Service

Richard J. Leung, M.D.
1388 Kettner Boulevard
Unit 2801
San Diego, CA  92101
619-993-2888

RE:  CLA200415, CLA200416, CLA200417, CLA200418, CLA200419

Shannon L Cartier
E-mail:slcartier@unum.com
Lead Appeals Specialist
UNUM
Worcester Benefits Center
Appeals Unit
P.O. Box 9548
Portland, ME 04122-5058

June 16, 2021

Dear Ms. Cartier,

We had the pleasure of speaking on May 17, 2021 at which time you informed me that my file was sent to an independent neurosurgeon not employed by UNU and that you were awaiting the report.  You informed me that you expected to have an update by the next week. It is now one month later and I still have no response from you.  Can you tell me when can I expect to have their neurosurgeon review my file and when can I expect a response back from you?

I think that you can understand the stress that this is causing me.  I have not worked in over a year and the uncertainty of my financial future hinges upon UNUM.  It is clear that my injury and disability has it proximate cause related to an accident which is supported by my physicians.  UNUM has taken the position that my disability is illness-related.  I would ask the question: since when a patient is injured by lifting that this is illness?

I am greatly disappointed in UNUM as I have been a client for almost 40 years and have always paid my premiums on time.  The purpose of insurance is to "insure" and I feel that UNUM has really let me down, causing stress and making my future uncertain. The lack of communication, frequent changes in representatives and general attitude is also quite disturbing.

I am requesting and expect that you will send me the following:

- Copy of UNUM's neurosurgeon's report
- Confirmation in writing what documents UNUM will be sending to the neurosurgeon in order for that physician to form an opinion. I would like copies of these documents to be sent to me either in printed or digital format as I would like to have the same documents available for my physicians
- Confirmation in writing that you have read my ENTIRE claim file from the very beginning and not just specific pages.

Thank you for your time and consideration. I look forward to your response.

With best regards,

Richard J. Leung, M.D.

(signature on file/signed copy sent via USPS)

# Exhibit 24

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 9548
Portland, ME 04122-5058
Phone: **1-888-226-7959**
Fax: **1-207-575-2354**
www.unum.com

June 16, 2021

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Policy Number: LAD016015; LAN661286; LAN780636; LAN782020; LAN782990
Claim Number: CLA200415; CLA200416; CLA200417; CLA200418; CLA200419
Unum Life Insurance Company of America

Unum Life Insurance Company of America has completed the appeal review on your Individual Disability claims.

Please read the following pages carefully, as they will help you understand how we reached our decision.

This letter includes the following:

- Initial Claim Decision
- The Appeal Decision
- Information that Supports the Appeal Decision
- Our Response to your Concern(s)
- Policy Provisions that Apply to the Appeal Decision
- Next Steps Available to you

**Initial Claim Decision:**

You originally claimed Total Disability beginning May 29, 2020 and reported you were unable to work in your occupation as an ophthalmologist due to lumbar and cervical spine conditions. You reported your lumbar and cervical spine conditions were due to injuries, and made claim under all five of your Individual Disability income policies.

In regard to the lumbar spine condition, you reported in May 1982 while working as a surgical intern, you lifted a 300 lb. patient and injured your low back resulting in a lumbar disc herniation at L4-5. You underwent a lumbar laminectomy with lumbar L4-5 discectomy and L4-5, S1

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

foraminotomy on February 16, 1983 performed by Dr. John Alksne (neurosurgery). Only policy LAN661286 issued on May 5, 1982 was in force at that time.

In regard to the cervical spine condition, you reported in mid to late November 1993 you were doing exercises to rehab your lumbar spine when you lifted a weight and felt a "pop" in your neck. You eventually underwent a C5-6 anterior cervical discectomy and fusion (ACDF) on January 19, 2004 performed by Dr. Richard Ostrup (neurosurgery).

Review of your medical records by completed by the Benefit Center supported you were unable to perform with reasonable continuity the material and substantial acts of your occupation as an ophthalmologist in the usual and customary way beginning May 29, 2020 and the Benefit Center determined you were eligible for Total Disability benefits. A letter outlining details of the approval was sent to you on August 27, 2020.

Further reviews completed by two physicians board certified in orthopedic surgery did not support the etiology (cause) of your lumbar and cervical spine conditions was due to injuries but rather due to degenerative disc disease of the cervical and lumbar spine. As outlined in the letter dated March 24, 2021, the Benefit Center determined your lumbar and cervical spine conditions resulting in Total Disability were considered a Sickness under the terms of the policies and payable for a maximum period of 24 months provided you continue to meet all terms and provisions of the policies.

**Appeal Decision:**

We have determined the decision on your claims are correct.

**Information that Supports our Decision:**

On appeal, we conducted a full, fair and independent review of your claims which considered all of the information contained in the claim file. This appeal decision letter will not restate the entirety of the file contents; however, all documentation has been considered in reaching the appeal decision.

On appeal, we asked an independent physician board certified in neurological surgery to review your claim to assess the etiology of your current impairing lumbar and cervical spine conditions and also assess if there was any medical relationship between your current impairment due to lumbar and cervical spine conditions and the injuries you reported in May 1982 and November 1993.

**Decision regarding the etiology of your current impairing lumbar spine condition**

At the post-operative follow-up visit with Dr. Alksne on June 14, 1983 it was noted you were doing well. You first sought treatment with Dr. Charles Jablecki on January 4, 1994 and reported residual low back pain. You reported flare-ups with episodes of spasms and increased pain. The initial examination noted a reduced left gastrocnemius reflex, however, this reflex change is most likely due to the prior disc herniation and surgery which is not an impairing condition.

You continued to treat with Dr. Jablecki until October 3, 2014 which is around the time he closed his practice. During the course of your treatment with Dr. Jablecki, you reported back pain and spams, however, your examinations remained the same with limited motion in the lower back

with tenderness and spasm and an absent reflex. Your motor, sensory and gait examinations were almost always reported as normal. There were periods where a positive straight or crossed straight leg test coincided with the degree of pain you were reporting.

After Dr. Jablecki closed his practice, you sought treatment with Dr. Michael Moon who specializes in physical medicine and rehabilitation pain management. Your medical records from this provider reflect ongoing and severe low back complaints which has been treated with chronic opioid medications and an attempt at interventional pain management. The examination findings continually reflect decreased range of motion in the lower back and a slow unassisted gait.

Following lumbar surgery, the file reflects three lumbar spine MRI studies without clinical accompaniment from 1985, 1988 and 1992 which are all essentially similar. The MRIs show post-operative findings which are always seen and a reported disc bulge or herniation at L4-5. There is no other pathology mentioned.

Specifically, the lumbar spine MRI performed on March 15, 1985 noted decreased disc height at L4-5 consistent with previous surgery, some epidural fibrosis at the left L4-5 neural foramen, and a moderate posterior disc bulge compressing the thecal sac.

The lumbar spine MRI performed on August 27, 1992, showed residual and/or recurrent central and left-sided disc herniation at L4-5 without significant change from the August 8, 1988 (not included in the records).

The lumbar spine MRI performed on January 14, 2013, showed L3-4 stable degenerative changes and mild to moderate central and foraminal stenosis. New inflammatory changes at both L4-5 facet joints and right-sided epidural space endplates was noted. At L4-5, the thecal sac was relatively capacious and the right lateral recess was narrowed. There was also left perineural scarring at L5 and the left L4 neural foramen is widely patent. L5-S1 was normal.

The lumbar spine MRI performed on September 21, 2015 showed progressive L3-4 disc degeneration, moderate to severe central canal and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots. Stable degenerative and post-operative changes at L4-5 with lateral recess stenosis worse on right and fibrosis of left the L5 root was noted. At L5-S1 there was a mild bulge, no stenosis.

The lumbar spine MRI performed on April 17, 2017 reports previous L5-S1 decompression, previous L5-S1 laminectomy with evidence of epidural fibrosis, L4-5 mild posterior disc extrusion, severe facet hypertrophy, L3-4 persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots.

The lumbar spine MRI performed on April 3, 2020, shows L3-4 progression of severe central stenosis. The remainder of degenerative disc and facet changes are unchanged and stable.

The independent reviewer notes when comparing the MRI studies it is important to realize that the MRIs were done at different times, perhaps on different machines and read by different radiologists.

The MRI findings show there were expected post-operative changes at L4-5 after the 1982 surgery. There were boney defects from the laminectomies, degenerative changes and loss of disc height due to the discectomy. There was expected epidural fibrosis at the laminectomy

site and involved nerve roots. The significant analysis at L4-5 was that the changes were for the most part although reported as stable, reflects a pattern of slow degeneration causing the development of foraminal stenosis and impingement of the L4 and L5 nerve roots, which can also be commonly seen over many years.  There is no significant pathology noted at L5-S1 on any study.

However, the L3-4 disc space showed a constant progression of degeneration and developing stenosis. The January 14, 2013 repeat lumbar spine MRI demonstrated L3-4 stable degenerative changes and mild to moderate central and foraminal stenosis. The September 21, 2015 lumbar spine MRI showed progressive L3-4 disc degeneration, moderate to severe central canal and neuroforaminal lateral recess stenosis with impingent of the L3 and L4 roots. The lumbar spine MRI performed on April 17, 2017 at L3-4 showed persistent moderate to severe spinal stenosis with impingement of bilateral traversing L5 nerve roots. The lumbar spine MRI performed on April 3, 2020 showed L3-4 progression of severe central stenosis.

The medical reports and the MRI findings support the etiology of your current impairing lumbar spine condition is due to progressive degenerative changes at the L3-4 and L4-5 disc spaces and not due to the injury you reported in May 1982 that occurred while lifting a patient. Additionally, the injury which resulted in the operation performed in 1982 does not contribute to your current impairing lumbar spine condition.

There has been a degeneration of the lumbar spine at both L3-4 and L4-5 as a result of aging, and what is generally called wear and tear. There is no indication based on the medical record that the initial herniation in 1982 or the surgery played a part in accelerating the degeneration.

The degeneration at L3-4 was rapidly progressive and that at L4-5 was fairly slow.  According to the independent reviewer, if the prior injury had contributed to the current condition there would have been a more rapid degeneration at L4-5 than L3-4.  In further support of this opinion, he also states it should be noted that there was a laminectomy at L5-S1 as a result of the 1982 injury, but there was no progression of degeneration at that level.

**Decision regarding the etiology of your current impairing cervical spine condition**

In addition to the lumbar spine issues you reported to Dr. Jablecki on January 4, 1994, you also reported a six week history of pain in the right side of the neck and posterior shoulder which you attributed to an injury occurring in November 1993 while you were at the gym exercising.  You reported numbness and tingling in the right thumb and index finger which was related to head and neck motion.

Significant examination findings included normal sensation throughout except for reduced sensation along the tips of the thumb and index finger on the right. There was a positive Phalen's sign and Tinel sign at the wrist on the right, suggesting carpal tunnel syndrome.

An EMG of the right upper extremity was performed on January 4, 1994, which was reported as normal.  The cervical spine MRI performed on January 5, 1994, showed a large disc herniation at C5-6 and a mild disc bulge with no compression at C3-4.  At C4-5 there was a disc bulge with no compression.  The MRI noted varying degrees of degeneration throughout the spine.

Cervical spine x-rays also performed on January 5, 1994 showed disc space narrowing at C5-6 and mild foraminal narrowing at C3-4, C5-6 and C6-7 on the right.  You were referred to physical therapy for your neck.

Your treatment history with Dr. Jablecki reflects your reports of exacerbation of pain including pain developing in the left arm for which you were treated conservatively. Your examinations remained significant for decreased sensation in the thumb and index finger on the right.

You were referred to Dr. Phil Lahey for a neurosurgical evaluation on May 27, 1994, however, no surgery was planned or undertaken.

By the time you saw Dr. Jablecki at the neurological evaluation performed on November 18, 1994 you had been attending physical therapy for your neck for over 10 months. Your examination had not changed during that period of time.

At the evaluation with Dr. Jablecki on January 26, 1995, you reported development of severe pain radiating down your left arm (evaluation notes right arm), however, your examination remained unchanged.

A cervical spine MRI performed on November 2, 1995 showed mild disc bulging at C3-4, C4-5 unchanged and interval resolution of the disc herniation at C5-6 with a mild asymmetric bulging present.

At the evaluation with Dr. Jablecki on August 12, 1997, you reported while performing an ophthalmologic examination, your head was tilted and your right hand went numb. The examination found decreased sensation in the volar aspect of the right thumb and index finger, however, there was normal sensation on the corresponding digits on the left.

At the evaluation with Dr. Jablecki on August 18, 1998, you reported aggravation of cervical spine pain due to a prior motor vehicle accident which occurred on February 27, 1997. During this period, you attended physical therapy intermittently. Examinations at that time documented decreased sensation along the length of the volar aspect of the right thumb and index finger. Your reflexes were all reported as normal in the lower extremities.

You were evaluated by Dr. Jablecki on October 28, 1998, and reported several flare-ups of pain. Your examination remained unchanged with a normal left-hand sensation. On the same date, Dr. Jablecki wrote a letter addressed to you and indicated the letter was to reiterate the position stated in his letter of January 18, 1994. In that letter he indicated it was more probable than not the cervical spine problem which was symptomatic at that time was an indirect complication of the original work injury of 1982, for which you underwent surgery. Dr. Jablecki further stated this was caused by compensative hip tilt due to back spasm.

At the evaluation with Dr. Jablecki on April 27, 1999, you reported symptoms remained aggravated by various head positions. The examination performed on this date was unchanged.

A cervical spine MRI was performed on April 28, 1999 which showed C4-5 facet hypertrophy, mild disc bulge, mild right-sided neural foraminal narrowing and at C5-6 small disc herniation with uncovertebral spondylosis and bilateral neural foraminal narrowing, right greater than left.

On August 27, 1999, Dr. Jablecki performed a repeat EMG of the right and left upper extremities which was normal.

You were evaluated by Dr. Jablecki on January 9, 2001 and reported recurrent flare-ups of pain in your neck. The examination found a very mild limitation of range of motion of your neck, with some limitation of motion of your lower back. There were no Tinel signs at the wrists. Straight leg raising was unremarkable and reflexes in the upper extremities were normal. Your strength was also normal. Again, there was a fixed decreased sensation in the right thumb and index finger and reduced sensation in the left thumb and index finger.

The examination performed by Dr. Jablecki on March 28, 2002 noted limitation of motion in your cervical spine. There were no spasms in the cervical musculature. The range of motion in your lumbar spine was slightly restricted. There was spasm of the right lumbosacral paraspinal muscles. Strength in the upper and lower extremities was normal.

A cervical spine MRI was performed on September 22, 2002 which showed interval progression of the left posterior paramedian focal disc protrusion at C4-5. At C3-4 there was minimal right posterior paramedian focal disc protrusion without stenosis. At C5-6 a stable posterior disc bulge with uncovertebral spondylosis and facet joint hypertrophy was noted more pronounced on the right than on the left. Moderate narrowing of the right foramen was also noted at C6.

The examination performed by Dr. Jablecki on October 24, 2003 was essentially unchanged from all the previous examinations. He noted the cervical MRI performed on September 22, 2002 showed interval progression of the left posterior focal disc herniation at C4-5 and stable degenerative changes at C3-4, C5-6 from the prior examinations.

A cervical spine MRI was then performed on November 22, 2003 which showed C3-4 disc bulge and mild neural foraminal narrowing; C4-5 minimal if any worsening of left paracentral disc protrusion which flattens the left ventral cord without significant stenosis. Slight right foraminal narrowing was noted. At C5-6 there was slight improvement in moderate disc osteophyte complex with mild to moderate spinal stenosis and moderate to severe left foraminal narrowing.

You were then reevaluated by Dr. Ostrup on December 9, 2003. No examination was noted but a surgical recommendation was made. Dr. Ostrup indicated you were fully aware of the fact you could require treatment at the C4-5 level. He discussed surgery for two levels but you did not wish to pursue this. You then underwent a cervical discectomy and fusion at C5-6 on January 19, 2004 performed by Dr. Ostrup.

At a follow-up evaluation with Dr. Ostrup on May 6, 2004, he indicated you were doing well. Dr. Ostrup indicated your x-rays looked good but the fusion had not completely incorporated. You reported some paresthesias, however you were doing better. Dr. Ostrup indicated you still reported neck pain and you reached maximum medical improvement from the surgery.

A cervical spine CT scan was performed on July 15, 2004 which showed interval discectomy at C5-6, moderate central stenosis due to the osteophytes narrowing, moderately severe on the right. There was also mild neuroforaminal narrowing at C4-5 on the left.

At the evaluation with Dr. Jablecki on January 12, 2006, you reported neck pain, bilateral shoulder pain, paresthesias in both hands and flare-ups of pain in the back and neck. The examination found limited motion in your cervical and lumbar spine with tenderness. Motor, sensory and reflex examinations were unchanged from the previous.

At the evaluation with Dr. Jablecki on March 25, 2010, you continued to report recurrent flare-ups of back and neck problems.  There was no change in your examination.

A cervical spine MRI was performed on May 19, 2010, which showed alignment and bone incorporation of the C5-6 ADCF, C3-4 mild bilateral foraminal narrowing, C4-5 andular bulging moderate central and mild bilateral foraminal narrowing, C5-6 no stenosis and C6-7 early degenerative disease with no stenosis.

At the evaluation with Dr. Jablecki on October 3, 2014, you reported several flare-ups with neck pain and associated numbness and tingling in the upper extremities. There was limited motion in all directions of the cervical and lumbar spines. The upper extremity, sensory-motor, and reflex examination were unchanged as was the lower extremity examination and Dr. Jablecki indicated you could walk on your heels and toes.

The last note written by Dr. Jablecki was on October 3, 2014. In that note, Dr. Jablecki indicated that the current complaints were flare-ups of neck pain, numbness and tingling in the upper extremities and low back pain.  Examination of the cervical spine was limited in all directions. Upper extremity coordination was normal.  Reflexes and strength was also normal. The sensation had the fixed deficit in the thumb and index finger and two-point-discrimination again remained normal.

Treatment was taken over by Dr. Moon who evaluated you on August 19, 2015.  The report indicated it was a re-evaluation and you reported neck pain radiating into the right scapula. You were also reportedly using Valium to sleep. Objective findings noted by Dr. Moon included cervical paraspinal musculature spasms, decreased range of motion in the neck and decreased sensation of digits one, two, three bilaterally.

A cervical spine MRI was performed on September 21, 2015 which showed C3-4 bilateral facet degeneration with foraminal narrowing, progressive spondylosis at C4-5 with facet degeneration and hypertrophy. There was also moderate narrowing of both C5 neural foramen, worse on the right.  Stable postoperative changes was noted at C5-6 in addition to C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left.  There was also moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen.

At the reevaluation with Dr. Moon on April 27, 2016, you were reportedly using Dilaudid for flare-ups and reported increasing difficulty performing surgery as an ophthalmologist.  On exam, you were noted to be in mild discomfort with decreased range of motion of the cervical and lumbar spines.

A cervical spine MRI was performed on November 22, 2016 which showed previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain or recent trauma.  It was noted there was increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid which raised the possibility of recent distraction injury, however, the MRI report notes facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Imaging also showed persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion and moderate-to-severe left C7 nerve root foraminal narrowing.  Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing was also noted and moderate C3-4 and moderate C4-5 spinal stenosis. There was also mild spinal cord compression at C3-4.

On November 28, 2016 you saw Dr. Moon on an emergent basis. You were treated in the emergency department prior to this visit and reported a flare-up of the neck pain radiating down your arms bilaterally to the elbows. There is no mention of any trauma in this report. The exam noted decreased range of motion in your neck with limited extension and flexion of the lower back. Tenderness of the paraspinal muscles was noted. Findings also noted normal reflexes and strength in the lower extremities.

You were evaluated by Dr. Ostrup, on March 6, 2017 and reported bilateral neck pain and low back pain. The physical exam noted there was tenderness to palpation over the neck. You were not taken through a full range of motion and no weakness was detected. There was a diminished right biceps reflex, however, there was no pathologic reflexes, atrophy or sensory loss.

At the evaluation with Dr. Moon on March 29, 2017 you were noted to have had a cervical epidural steroid injection on March 13, 2017 which you reported no significant relief. The examination performed on this date appears to be essentially unchanged.

You were evaluated by Dr. Ostrup again on May 16, 2017. The examination did not reflect any significant changes. Dr. Ostrup recommended a cervical discectomy and fusion C4-5, C3-4 and a lumbar decompression at L3-4. You informed Dr. Ostrup you would see how you did for a few months before you returned.

You were reevaluated by Dr. Moon on January 15, 2020 and reported constant chronic neck pain and chronic back pain. Your examination was essentially unchanged your treatment plan was to continue narcotic analgesics.

A cervical spine MRI performed on April 3, 2020 showed C2-3 broad-based disc bulge flattening thecal sac, C3-4 broad-based posterior disc bulge slightly improved and severe left and moderate right foraminal stenosis compression of the left C4 root. At C4-5 there was disc osteophyte complex with severe bilateral foraminal stenosis compressing both C5 roots. The imaging showed stable ACDF C5-6 with no stenosis. At C6-7 there was disc osteophyte complex effacing thecal sac and compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left-sided foraminal stenosis compressing the existing left C4 nerve roots was also noted. There was also stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots.

The medical data reviewed supports the etiology of your current impairing cervical spine conditions is chronic discogenic neck pain with a radicular component related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. The major complaint has always been axial neck pain.

The examination findings have consistently noted cervical tenderness/spasms with decreased range of motion and decreased sensation in the right first and second digit. Although MRI findings have continually worsened over time, your examinations did not, and your reports of pain slowly increased until it became constant.

The MRI findings have shown progressive disc bulging and arthritic changes from the initial 1994 through 2020 studies. The 1994 study showed a disc bulge at C3-4 and C4-5 with a herniation at C5-6 and with varying degrees of degeneration throughout the cervical spine. The independent reviewer noted it was presumed that the accident at the gym caused the

herniations, however, it is equally probable that the bulges and herniations were present and were exacerbated by the event. The progression of degeneration at C3-4 and C4-5 took place both prior to and after the C5-6 fusion.

The MRI findings at C5-6 really did not progress and remained stable with no significant neural compression. There was a reported motor vehicle accident on February 27, 1997, which Dr. Jablecki reported caused an aggravation of the cervical spine pain, which is a likely occurrence.

There is a drastic change in the MRI of the cervical spine performed on November 22, 2016. It showed previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. The increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, however as previously noted, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Although there is no documentation of trauma this study is consistent with a recent event that caused edema in the ligaments. The independent reviewer notes this is usually from a flexion/extension injury which was recent.

On October 28, 1998, Dr. Jablecki wrote a letter to reiterate the position stated in letter of January 18, 1994. In that letter, he indicated it was more probable than not that the cervical spine problem which was symptomatic at that time was an indirect complication of the original work injury of 1982, for which you underwent surgery. He further stated the reason for this was because of the compensative hip tilt due to back spasm. The independent reviewer notes this opinion has no real scientific basis. While you may have pain due to this reasoning, it would be muscular and not cause discogenic and osteogenic changes in the spine.

The review notes the injury of 1994 [sic 1993] apparently caused the herniation at C5-6 and you eventually underwent surgery for this in 2004. There are findings of disc bulges at C3-4 and C4-5 with varying degrees of degeneration throughout the cervical spine at the time of the original 1994 MRI. The changes at C3-4 and C4-5 were pre-existing to the injury. The independent reviewer notes the MRI studies showed progressive changes and worsening at these levels prior to the 2004 surgery which implies the changes were not due to adjacent level disease. He also notes the degenerative changes at C6-7 was not noted on MRI until 2010 which was six years after the surgery and this period of time would also not be considered as adjacent level degeneration as the span was so long. Thus, there was no significant contribution from the injury in November 1993 to the current impairing cervical spine conditions.

**Conclusion**

The medical data reviewed supports the etiology of your current impairing lumbar spine condition is caused by progressive degenerative changes at the L3-4 and L4-5 disc spaces and is not related to the injury you reported in May 1982 that occurred while lifting a patient.

The medical data reviewed also supports the etiology of your current impairing cervical spine conditions is chronic discogenic neck pain with a radicular component related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. Your current impairing cervical spine conditions are not related to the injury you reported in November 1993 while exercising.

We understand you were involved in a motor vehicle accident in 1997 which was documented as exacerbating your cervical spine condition.

You reported to Dr. Jablecki at the evaluation on March 4, 1997 that you were involved in a motor vehicle accident on February 27, 1997. You reported you were driving out of your office parking lot completing a left turn and the back of your car was struck by another oncoming car. You stated you saw the car at the last second before being struck. You stated you tried to accelerate and steer your car out of the way of the oncoming car, however, your car was struck on the left rear causing the car to move.

You reportedly felt a jolt or twist to the head and neck at the time of the impact. You informed Dr. Jablecki you were more concerned about the other driver than yourself and quickly pulled over and went to inquire about the other driver. You stated the other driver was shaken up emotionally and you both went over to Children's Hospital where she was an employee. You indicated the other driver called her husband and contacted police and determined that a police report did not need to be filed at that time.

You reported that evening you were aware of pain in the neck and more paresthesias on the back of the right hand which was constant in contrast to previous episodes where they would come and go. You contacted Dr. Jablecki's office on February 28, 1997 and he recommended you start Medrol dose pack and apply ice to the back of the neck which you did. You also reported over that weekend there was a decrease in neck pain and paresthesias. At the beginning of the following week you tapered the Medrol and reported being aware of some pain in the right posterior neck and return of intermittent paresthesias in the right hand.

While Jablecki indicated the motor vehicle accident caused an aggravation of the cervical spine pain, you did not require an emergency department visit and no police report was filed. Dr. Jablecki specifically refers to this exacerbation in the March 4, 1997 office visit note as a flare up of pain. Thus, there is no evidence this motor vehicle accident caused or is related to your current impairing cervical spine conditions; rather the motor vehicle accident exacerbated and caused a flare up of pain to your already existing cervical spine condition.

The independent reviewer also notes the cervical spine MRI performed in November 2016 showed some other non-documented event that caused the worsening of the MRI findings. He added although there was no documentation of trauma, the study is consistent with a recent event that caused edema in the ligaments which is usually from a recent flexion/extension injury. At the evaluation with Dr. Moon on November 28, 2016 you reported a flare-up of chronic neck discomfort for which you were treated in the emergency department on November 22, 2016. You did not report any trauma or event to Dr. Moon that caused the exacerbation of cervical pain.

Likewise, Dr. Ostrup notes in the visit on March 6, 2017 that you were doing well until October/November 2016 when you developed some increasing neck pain and some paresthesias involving the left shoulder area. He indicated you tried physical therapy with some exercises. He then noted in November 2016 you had severe neck pain which prompted an evaluation in the emergency room. Dr. Ostrup indicated you tried Medrol Dosepak with some improvement.

Your medical records do not reflect nor did you report any trauma or event to explain the worsening shown on the November 2016 cervical spine MRI. As outlined in the MRI report, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst which is not related to trauma or injury.

There is no evidence the worsening of your cervical spine condition documented in the November 2016 cervical spine MRI was caused by an injury but a worsening of your already existing cervical spine condition possibly due to facet degeneration arthrosis with the presence of the left C3-4 synovial cyst.

Your current impairing lumbar spine condition due to progressive degenerative changes at the L3-4 and L4-5 disc spaces and your current impairing cervical spine conditions due to chronic discogenic neck pain with a radicular component related to degenerative changes causing multifocal cervical stenosis, both central and foraminal rendered you Totally Disabled beginning May 29, 2020 which is considered a Sickness under the terms of the policies.

Since your lumbar and cervical spine conditions are not due to Injury, but due to Sickness, your claims will continue to be administered under the Sickness provision of the policies.

You became Totally Disabled on May 29, 2020 at which time you were age 64; therefore, you are eligible for Total Disability benefits under claim numbers CLA200416, CLA200417, CLA200418 and CLA200419 until the 24 month maximum benefit period on June 28, 2022 as long as you continue to meet all the terms and provisions in the policies.

In regard to claim number CLA200415, you are eligible for Total Disability benefits until the 24 month maximum benefit period on July 28, 2022 as long as you continue to meet all the terms and provisions in the policy.  Since your current impairing lumbar and cervical spine conditions are not due to Injury, you are not eligible for Lifetime benefits under the Lifetime Accident Benefit Rider.

To the extent you allege your disability stems from the 1982 lifting injury, only policy LAN661286 was in force at the time.  Therefore, claims under your other, subsequently-issued policies would not be covered.

**Our Response to Your Concerns:**

In your appeal letter dated April 8, 2021 you stated the company's decision is contrary to the opinions of your attending physicians Dr. Michael Moon and neurosurgeon Dr. Richard Ostrup who both are of the opinion the proximate cause of your disability is accident related. You also included documentation from the California Settlement Agreement and specify pages 9-10 regarding Attending Physician's Opinion.

We are well aware of the requirements outlined in the California Settlement Agreement which are incorporated into our claims evaluation and processes and your claim has been evaluated in accordance with this agreement.

Significant weight was given to the opinion of Dr. Moon.  The Benefit Center physician who is board certified in orthopedic surgery sent written correspondence to Dr. Moon to clarify the medical basis for his opinions regarding the etiology of your lumbar and cervical spine conditions.  Since he disagreed with Dr. Moon's opinion, your file was reviewed by a second physician also board certified in orthopedic surgery who agreed with the opinion provided by the Benefit Center physician.

On appeal we asked an independent physician board certified in neurological surgery to review your claim.  This reviewer also gave significant weight to the opinions of your physicians.

While you indicate Dr. Ostrup has opined the proximate cause of your disability is accident related, there is no documentation of this. During our conversation on May 17, 2021, you advised that you saw your neurosurgeon in January and asked him to review the case. You stated this doctor was going to write a letter to submit to us and you were waiting to hear back from him. I attempted to reach you by telephone on June 1, 2021 but was unable to reach you and left a voicemail message to follow-up on this letter. You did not return my call or provide any additional information; therefore we completed the appeal review.

The file clearly reflects the claims have been handled in good faith and in accordance with the provisions of your policies. A reasonable and thorough investigation was done which included review of your medical records, in addition to contact with Dr. Moon and reviews completed by two physicians board certified in orthopedic surgery in addition to another independent physician on appeal who is board certified in neurological surgery. We are confident that the company's handing of your claims have been in accordance with the facts, the applicable policy language and its obligations to you.

**Policy Provisions that Apply to the Appeal Decision:**

We relied upon your policy when making our decision, including the provisions listed below, and the Company reserves its right to enforce other provisions of the policies.

As a result of direction from the California Department of Insurance, we have administered your claims for disability benefits with reference to the following:

> You are totally disabled when you are rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

**Policy Numbers LAN661286, LAN780636, LAN782020 and LAN782990:**

The above policies contain identical policy provisions as outlined below.

**The Policy Schedule notes the following Maximum Monthly Benefit for Total Disability –**

**Accident –** To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin. Thereafter for as long as Total Disability continues, if Total Disability began prior to age 65 policy anniversary.

**Sickness –** To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin. Thereafter for as long as Total Disability continues, if Total Disability began prior to age 55 policy anniversary.

"**Injury** means accidental bodily injury which occurs while this policy is in force."

"**Sickness** means sickness which is diagnosed or treated while this policy is in force."

"'**Total Disability**' and '**totally disabled**' means that, as a result of sickness or injury, you are unable to perform the material and substantial duties of your occupation. Your occupation means your regular occupation at the time disability commences.

"**Your occupation** means your regular occupation at the time disability commences."

"**Total Disability Benefit.** While you are totally disabled and under the care of a physician other than yourself, we will pay a monthly benefit beginning at the end of the applicable Elimination Period as follows:

1) We will pay the Monthly Benefit for Total Disability for each month of total disability from Accident or from Sickness, whichever caused that disability.

2) We will stop paying this benefit when:

   a) You are no longer totally disabled; or
   b) you have been paid benefits for the maximum benefit period shown on page 3 for the cause of that disability.

3) If, in any month, your disability is the result of concurrent causes for which a Monthly Benefit is payable, we will pay the Monthly Benefit which is more favorable to you. We will not pay more than one Monthly Benefit for any one month of total disability."

**Policy Number LAD016015:**

**The Policy Schedule notes the following Maximum Benefit Period –**

Maximum Benefit Period - To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin.

"Injury means bodily harm caused by an accident."

"Sickness means a mental or physical illness or condition which has been diagnosed or treated."

"Total disability and totally disabled mean injury or sickness restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation."

"Regular occupation means your occupation at the time the Elimination period begins. If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty."

"Maximum Disability Benefit means the amount shown on page 3."

"Maximum Benefit Period means the period shown on page 3."

"**Lifetime Accident Benefit Rider**

Total disability and totally disabled mean

1. injury restricts the Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation; and
2. the Insured is receiving medical care from someone other than himself which is appropriate for that injury

Except for total disability and totally disabled, all terms used in this rider which are defined in this policy shall have the meaning given to them in the policy.

**BENEFITS**
On the later of the policy anniversary when the Insured's age is 65 or the end of the Maximum Benefit Period, the Disability Benefit Provision is amended to read as follows:

We will pay the Maximum Disability Benefit in any month after the Insured has satisfied the Elimination Period that:

1. the Insured is totally disabled; and
2. that total disability:
    a. is the result of injury which occurred before the policy anniversary when his age was 65 and while this rider was in effect; and
    b. began before the policy anniversary when his age was 65 and has been continuous until the month for which this benefit is payable.

**Next Steps Available to you:**

**To All California Residents and Policyholders**

To the extent California law applies to your claim, you may also contact the California Department of Insurance if you wish to have them review your claim. If you wish to write to the Department, your letter should be addressed to:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013

If you wish to contact the Department by telephone, you should ask for the Claims Services Bureau at 1-800-927- HELP (1-800-927-4357) or 1-213- 897-8921 or the TDD number at 1-800-482-4TDD (1-800-482-4833).

You may also contact the California Department of Insurance at www.insurance.ca.gov.

The policy under which you are insured has a provision which states, in part, that no lawsuit or legal action shall be brought to recover on the policy after 3 years from the date proof of claim is required.

If you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. Any of our experienced representatives have access to your claim documentation and will be able to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 77377.

| Spanish: To obtain assistance in | Para obtener asistencia en Español, llame al 1-800- |
|---|---|

| Spanish, call 1-800-858-6843. | 858-6843. |
|---|---|
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843. |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Sincerely,

*Shannon L Cartier*

Shannon L Cartier
Lead Appeals Specialist

# Exhibit 25



RECEIVED
SEP 07 2021

BCCPORTAPPEALS

Richard J. Leung, M.D.
1388 Kettner Boulevard Unit 2801
San Diego, CA 92101
619-993-2888

Shannon L. Cartier
Lead Appeals Specialist
UNUM
Worcester Benefits Center-Appeals Unit
P.O. Box 9548
Portland, ME 04122-5058

September 2, 2021

RE: Leung, Richard J
Policy Numbers: LAD016015, LAN661286, LAN780636, LAN782020, LAN782990
Claim Numbers: CLA200415, CLA200416, CLA200417, CLA200418, CLA200419

Dear Shannon,

I am in receipt of your letter dated June 16, 2021 regarding the appeal review. I am writing to request that you reopen my appeal as I now have the long-anticipated letter from Dr. Ostrup. You were aware that this letter was forthcoming as per the discussion on page 12 of 15 of your letter. In the same paragraph, you mention an attempt to contact me by phone on June 1, 2021 of which I never received that call and there was no record on my mobile phone log. When I brought this up, you subsequently found that you had an incorrect phone number for me. I appreciate your attempt to close the appeal in a timely fashion, but the rush to close my appeal with the opinion of your neurosurgeon and without the opinion of Dr. Ostrup and without reaching me is disconcerting. I have enclosed a copy of Dr. Ostrup's letter dated July 30, 2021 for your review and to reopen the appeal.

The reasons that I request for you to reopen the appeal are as follows:

- Dr. Ostrup has been involved in my care since December 9, 2003
- Dr. Ostrup performed cervical spine surgery on me on January 19, 2004
- Dr. Ostrup trained at UCSD in neurosurgery under Dr. Alksne who performed lumbar spine surgery on me on February 16, 1983
- Dr. Ostrup personally re-reviewed my case for the purpose of the enclosed letter. His review included viewing the recent cervical and lumbar MRI scans and his opinion is not just based on the report of the radiologist. With this, he is able to clinically coordinate my past and present history, recent in-person exam, and the actual MRI scans
- Dr. Friedlander's (DMO) IME report, contains inconsistencies, omissions and errors that are even too numerous to count.

September 2, 2021
Page 2 of 2
RE: Leung, Richard
Claim Numbers: CLA200415, CLA200416, CLA200417, CLA200418, CLA200419

Upon reading Dr. Ostrup's report, he is of the opinion that my disability is accident-related as opposed to illness-related. This is in concert with the opinion of my other treating physician, Dr. Michael Moon, so in essence two of my attending physician's support my disability claim as being accident-related.

In response to serious sanctions levied against UNUM several years ago, the California Settlement Agreement with UNUM and the California Department of Insurance states on page 11 item D: **"Attending Physician's Opinion. Respondent shall give significant weight to an attending physician's opinion, if the attending physician is properly licensed and the claimed medical condition falls within the attending physician's customary area of practice, unless the attending physician's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for the attending physician's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record."**

I look forward to your positive response to my request to reopen the appeal and for UNUM to accept the opinions of my attending physician's that my disability is accident-related.

With best regards,

Richard J. Leung, M.D.



Sam Assam, M.D., Founder

Kenneth H. Ott, M.D., Emeritus
Lance L. Altenau, M.D., Emeritus

Richard Ostrup, M.D., F.A.C.S.
Sohaib Kureshi, M.D., F.A.C.S.
Gunjan Goel, M.D.
Sassan Keshavarzi, M.D., F.A.A.N.S.
Vamsidhar Chavakula, M.D.

Rachel Anderson, F.N.P.-B.C.

Jenni Hart
Office Administrator

Tom Abbas, C.P.A.
Controller

Main Office

3750 Convoy Street
Suite 301
San Diego, CA 92111

(619) 297-4481
Fax (858) 810-7307

www.sd-neurosurgeon.com

July 30, 2021:

Patient: Richard Leung, M.D.

DOB: October, 14, 1955

To Whom It May Concern:

Dr. Richard Leung is a 65-year-old ophthalmologist who has 2 issues related to his spine.

The first issue is the cervical spine. In 2004, he had an industrial related anterior cervical discectomy and fusion at C5-6. This was performed on a Worker's Compensation basis because of a herniated disc at the C5-6 level which he sustained in 1993. He has been followed for cervical pain over the ensuing 17 years. Treatment has included cervical epidurals as well as other MRIs. A recent MRI shows disc disease with moderate stenosis at C3-4 and to a lesser degree at C4-5. The fusion at C5-6 looks good without significant cord or root compression. Currently, he complains of bilateral upper extremity paresthesias associated with neck motion.

The concern regarding his cervical complaints is whether or not it is related to the prior C5-6 fusion or more likely to be genetic in origin. Although I suspect genetics are playing a significant role, I also suspect there is a component of adjacent segment disease. He feels that his hand symptoms have been present since the time that he injured the disc and are not likely to be related to the development of the adjacent disc disease at C3-4 and C4-5. I have not seen any recent electrical studies that provided a diagnosis for his hand symptoms. I do not see the need for further surgery at the C5-6 region.

The second issue is related to his lumbar spine.  In 1982, he had a ruptured disc at L4-5 while lifting a 300lb patient onto an ICU bed while working at the V.A. Medical Center, and underwent surgical intervention with a laminectomy and discectomy.  Following that operation, he has been dealing with approximately 40 years of back pain. Treatment has included physical therapy, multiple injections, home exercise program, core strengthening etc. The United States Department of Labor has continued to provide his care under a worker's compensation claim since 1982.

As an ophthalmologist, he does operations which require prolong sitting involving delicate work around eyes. In the past, he has been able to tolerate the back pain.  However, now he feels the back pain has progressed. He has developed sitting intolerance and does not feel that he can currently do his job safely.

I have reviewed the MRI studies, the most recent lumbar MRI from April 2020 showed degenerative disease and stenosis at L3-4 and degenerative disease at the surgical site at L4-5. Given the nature of his symptoms, he is a candidate for surgical intervention; likely requiring a 2 level lumbar fusion at L3-4 and L4-5 followed by a posterior decompression. He understands the issues but does not want to proceed with a lumbar fusion even though conservative treatments have not been helpful.

In light of his history (provided by Dr. Leung) of 40 years of back pain and the fact that individuals with discectomies can develop a post laminectomy syndrome, within reasonable medical probability, a large extent of his ongoing back pain is likely to be related to his prior surgery.  Although the progression of his lumbar stenosis at L3-4 is likely to be genetic, this is not responsible for the decades of back pain. More likely than not, his back pain has been present since the discectomy in 1982.

If he elected to have a fusion at the L4-5 level, within reasonable medical probability, the need for that surgery is more likely than not associated with the 1982 injury.

Sincerely,

Richard C. Ostrup, M.D., F.A.C.S.

# Exhibit 26

**Paper Independent Medical Exam (IME) Response**

**Claimant Name:** Richard J Leung

**Claim Number:** 17839700

**Date of Paper IME:** 09/16/21

**Response to Questions:** From your review of the records provided, please respond to the following questions, including your rationale for each response.

**On 09/02/21, the Insured submitted a letter from Dr. Ostrup dated 07/30/2021. Does this information change your prior opinion(s)? Please explain**

I have reviewed the letter summited by Dr. Ostrup, as well as the letter of appeal.

With regard to the comments in the second and third paragraph of Dr. Ostrup's letter, regarding the cervical spine, the doctor indicates that "Although I suspect genetics are playing a significant role, I also suspect there is a component of adjacent level disease." The claimant believes the symptoms have been present since the time of his original injury, and not related to the possibility of adjacent level disease. The doctor further states that there is no diagnosis for the cervical complaints and no treatment is in order. The doctor comments on a recent (but undated) magnetic resonance imaging (MRI) finding that there is moderate stenosis at C3/4 and to a lesser degree at C4/5. This gives the indication that there is less weight to the concept of normal degenerative changes or perhaps that the claimant had another, later, injury to the neck that is causing the current problem. It is their contention that the current problem is due to the original injury. To be clear adjacent level disease usually occurs either one level above or below a prior fusion. It would be extremely rare for the disc two levels above the fusion would deteriorate to a greater extent than the one immediately adjacent to the fusion, as suggested by Dr. Ostrup.

A review of the original documentation submitted finds that this reported MRI finding, assuming there are no other findings present on this MRI which were not disclosed by Dr. Ostrup, was most likely from the May 2010 MRI.

There is an MRI of the cervical spine done on 09/21/2015 indicating C3/4 bilateral facet degeneration with foraminal narrowing; progressive spondylosis at C4-5 with facet degeneration and hypertrophy. Moderate narrowing of both C5 neural foramen, worse on the right; stable postoperative changes at C5-6; C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left. Moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen. This study indicates that there is a slow degenerative process that has occurred now eleven years after the surgery and over 20 years from the original accident.

More importantly, an MRI of the cervical spine done on 11/22/2016 shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. Increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury, facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. Persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion, moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing. Moderate C3-4 and moderate C4-5 spinal stenosis. Mild spinal cord compression at C3-4.

This MRI gives the indication that there has been some undisclosed injury to the neck that has occurred to cause these findings. The claimant, according to Dr. Moon, on 04/27/2016 had begun using opioid pain medications and is now having problems working. It is unclear how long the claimant was using Dilaudid and if there was any non-documented event to cause this and to explain the MRI findings.

The most recent MRI documented done on 04/03/2020 shows C2/3 broad-based disc bulge flattening thecal sac; C3/4 broad-based posterior disc bulge slightly improved severe left and mod right foraminal stenosis compression left C4 root; C4/5 Disc osteophyte complex severe bilateral foraminal stenosis compressing both C5 roots; stable ACDF (anterior cervical discectomy and fusion) C5-6, no stenosis; C6/7 disc osteophyte complex effacing thecal sac. Compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left-sided foraminal stenosis compressing the existing left C4 nerve roots. Stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots. These findings are consistent with degenerative disc disease, are so temporally removed from both the original surgery and the original accident to be considered as being related to those events.

With regard to the assertion that the claimant has failed back syndrome as a result of the original injury and the subsequent surgery, this opinion is unfounded. Failed back is a condition in which there is continued back or radicular pain even though there is no definable pathology to explain this. This clearly is not the case. I refer you to the original report I wrote on 05/28/2021, bottom of page one, where I perform a Polk analysis on the MRI studies that the claimant had. These studies show the progression of the degenerative changes at L4/5 and L5/S1. There is recurrent disc herniation seen at L4/5 in 1992( referenced to being seen in 1988). This disc herniation cannot be ascribed to the prior injury or surgery due to the time interval.  These changes cannot be attributed to adjacent level disease, as there was no fusion performed in the past.  Dr. Ostrup does report that there currently is surgical pathology present in the claimant's lumbar spine. There are defined progressive changes in the lumbar spine that have been developing over this long period of time which explains the chronic back pain. It is not realistic to consider that the current condition is related to the original surgery and accident.

Although I do respect Dr. Ostrup's opinion, I respectfully disagree with it, and it has not changed my opinion.

**Certification:** I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) for which I am by training and experience capable to assess.

Marvin Friedlander  M.D.
Board Certified Neurological Surgery
NJ#25MA05251300

# Exhibit 27

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 9548
Portland, ME 04122-5058
Phone: **1-888-226-7959**
Fax: **1-207-575-2354**
www.unum.com

September 23, 2021

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Policy Number: LAD016015; LAN661286; LAN780636; LAN782020; LAN782990
Claim Number: CLA200415; CLA200416; CLA200417 CLA200418; CLA200419
Unum Life Insurance Company of America

This letter is to notify you that the additional information you submitted does not change our prior appeal decision concerning your Individual Disability claim. A copy of our June 16, 2021 letter that explains our original decision is enclosed for your reference.

Please read the following information carefully, as it will help you understand how we reached this decision.

This letter includes the following:

- The re-appeal decision/reason
- Information that supports our re-appeal decision
- Our response to your concerns

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875009665736701

**Re-Appeal Decision/Reason**

The additional information you provided on September 2, 2021 does not change the prior appeal decision communicated to you on June 16, 2021.

**Information That Supports Our Re-Appeal Decision**

On appeal, we conducted a full, fair and independent review of your claim which considered all of the information on file including the letter from Dr. Richard Ostrup received on September 2, 2021.

As outlined in the appeal decision letter dated June 16, 2021 we advised the medical data reviewed supports the etiology of your current impairing lumbar spine condition is caused by progressive degenerative changes at the L3-4 and L4-5 disc spaces and is not related to the injury you reported in May 1982 that occurred while lifting a patient.

Additionally, we advised the medical data reviewed also supports the etiology of your current impairing cervical spine conditions is chronic discogenic neck pain with a radicular component related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. We advised your current impairing cervical spine conditions are not related to the injury you reported in November 1993 while exercising.

The additional information you provided was reviewed by the same physician (board certified in neurological surgery) who previously reviewed your file.

In regard to your lumbar spine condition, Dr. Ostrup indicated you have failed back syndrome as a result of the original injury and the subsequent surgery, however, this opinion is unfounded.

The independent reviewer notes failed back is a condition in which there is continued back or radicular pain even though there is no definable pathology to explain this. He states this is clearly not the case in your situation and the Polk analysis on the MRI studies previously performed in the original report shows the progression of the degenerative changes at L4-5 and L5-S1. There is recurrent disc herniation seen at L4-5 in 1992 (referenced to being seen in 1988). This disc herniation cannot be ascribed to the prior injury or surgery due to the time interval. These changes cannot be attributed to adjacent level disease, as there was no fusion performed in the past. Dr. Ostrup does report that there currently is surgical pathology present in your lumbar spine. There are defined progressive changes in the lumbar spine that have been developing over this long period of time which explains the chronic back pain. It is not realistic to consider that the current condition is related to the original surgery and accident.

In regard to your cervical spine condition Dr. Ostrup states in his letter in part that "Although I suspect genetics are playing a significant role, I also suspect there is a component of adjacent level disease." Dr. Ostrup indicates you believe the symptoms have been present since the time of your original injury, and not related to the possibility of adjacent level disease. Dr. Ostrup further states that there is no diagnosis for the cervical complaints and no treatment is in order. He comments on a recent (but undated) magnetic resonance imaging (MRI) finding that there is moderate stenosis at C3-4 and to a lesser degree at C4-5. The independent reviewer notes this gives the indication that there is less weight to the concept of normal degenerative changes or perhaps you had another, later, injury to the neck that is causing the current problem. While you believe the current problem is due to the original injury, adjacent level

disease usually occurs either one level above or below a prior fusion and it would be extremely rare for the disc two levels above the fusion would deteriorate to a greater extent than the one immediately adjacent to the fusion, as suggested by Dr. Ostrup.

A review of the original documentation submitted finds that this reported MRI finding, assuming there are no other findings present on this MRI which were not disclosed by Dr. Ostrup, was most likely from the May 2010 MRI.

The cervical spine MRI performed on September 21, 2015 showed C3-4 bilateral facet degeneration with foraminal narrowing; progressive spondylosis at C4-5 with facet degeneration and hypertrophy. Moderate narrowing of both C5 neural foramen, worse on the right; stable postoperative changes at C5-6 in addition to C6-7 progressive uncovertebral spondylosis and facet degeneration both worse on the left as noted. The study also showed moderate narrowing of the right C7 neural foramen and marked narrowing of the left C7 foramen. This study indicates that there is a slow degenerative process that has occurred now eleven years after the surgery and over 20 years from the original accident.

More importantly, the cervical spine MRI performed on November 22, 2016 shows previous cervical fusion at C5-6, mild edema in the posterior atlantooccipital membranes leading to spinous ligaments between C1-2 and C5-6 consistent with strain, sprain, or recent trauma. There was increased moderate left and right C3-4 minimal bilateral C4-5 joint fluid raises the possibility of recent distraction injury in which facet degeneration arthrosis may have a similar appearance, especially given the presence of the developing 6 mm posterior left C3-4 synovial cyst. The study also showed persistent C6-7 moderate 6 mm left paracentral and foraminal disc extrusion and moderate-to-severe left C7 nerve root foraminal narrowing. Additional moderate left C3-4 and bilateral C4-5 neural foraminal narrowing was noted as well. There was also moderate C3-4 and moderate C4-5 spinal stenosis noted in addition to mild spinal cord compression at C3-4.

This MRI gives the indication that there has been some undisclosed injury to the neck that has occurred to cause these findings. On April 27, 2016 you reported to Dr. Moon, that you had begun using opioid pain medications and were having problems working. It is unclear how long you were using Dilaudid and if there was any non-documented event to cause this and to explain the MRI findings.

The most recent cervical spine MRI performed on April 3, 2020 shows C2-3 broad-based disc bulge flattening thecal sac; C3-4 broad-based posterior disc bulge slightly improved severe left and moderate right foraminal stenosis compression left C4 root. At C4-5 there was disc osteophyte complex severe bilateral foraminal stenosis compressing both C5 roots. The imaging showed stable ACDF (anterior cervical discectomy and fusion) C5-6 with no stenosis. At C6-7 there was disc osteophyte complex effacing thecal sac and compression of both C7 roots. Mild improvement in central stenosis at C3-4 with stable left- sided foraminal stenosis compressing the existing left C4 nerve roots was also noted. There was also stable severe foraminal narrowing at C4-5 and C6-7 bilaterally compressing the exiting nerve roots. These findings are consistent with degenerative disc disease, are so temporally removed from both the original surgery and the original accident to be considered as being related to those events.

We have concluded the additional information you provided from Dr. Ostrup does not change the prior appeal decision communicated to you on June 16, 2021.

Since your lumbar and cervical spine conditions are not due to Injury, but due to Sickness, your claims will continue to be administered under the Sickness provision of the policies.

You became Totally Disabled on May 29, 2020 at which time you were age 64; therefore, you are eligible for Total Disability benefits under claim numbers CLA200416, CLA200417, CLA200418 and CLA200419 until the 24 month maximum benefit period on June 28, 2022 as long as you continue to meet all the terms and provisions in the policies.

In regard to claim number CLA200415, you are eligible for Total Disability benefits until the 24 month maximum benefit period on July 28, 2022 as long as you continue to meet all the terms and provisions in the policy. Since your current impairing lumbar and cervical spine conditions are not due to Injury, you are not eligible for Lifetime benefits under the Lifetime Accident Benefit Rider.

**Our Response to Your Concerns:**

In your appeal letter dated September 2, 2021 you stated we were aware a letter was forthcoming from Dr. Ostrup and while you appreciate our attempt to close the appeal in a timely fashion, the rush to close your appeal with the opinion of our neurosurgeon and without the opinion of Dr. Ostrup and without reaching you is disconcerting.

In your original appeal letter dated April 8, 2021 and received by the company on April 13, 2021, you did not advise any additional information was forthcoming. It was not until our conversation on May 17, 2021, which is more than one month after the appeal review began, that you indicated Dr. Ostrup was going to review your case. You stated he was going to try and write a letter and you were waiting to hear back from him.

Despite not including this information with your appeal, we note that Dr. Ostrup's letter is dated July 30, 2021 which you did not submit until September 2, 2021, which is almost five months after your original appeal request was submitted.

There was no rush to close your appeal as you have alleged. We are committed to completing a full, fair, thorough and timely appeal review. You did not submit any additional information with your appeal request nor did you notify the company additional information was forthcoming until more than one month after the appeal review began. Further, you could have submitted your appeal request at a later date once you received the letter from Dr. Ostrup. Nonetheless, we have still considered and reviewed this information.

You again cite requirements outlined in the California Settlement Agreement.

As previously stated, we are well aware of the requirements outlined in the California Settlement Agreement which are incorporated into our claims evaluation and processes and your claim has been evaluated in accordance this agreement.

Significant weight was given to the opinion of Dr. Moon and Dr. Ostrup. The appeal decision letters are clear and include specific reasons outlining the medical basis for the decision.

**To All California Residents and Policyholders**

To the extent California law applies to your claim, you may also contact the California Department of Insurance if you wish to have them review your claim. If you wish to write to the Insurance Department, your letter should be addressed to:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013

If you wish to contact the Department by telephone, you should ask for the Claims Services Bureau at 1-800-927- HELP (1-800-927-4357) or (213) 897-8921 or the TDD number at 1-800-482-4TDD (1-800-482-4833).

You may also contact the California Department of Insurance at www.insurance.ca.gov.

The policy under which you are insured has a provision which states, in part, that no lawsuit or legal action shall be brought to recover on the policy after 3 years from the date proof of claim is required.

If you have questions about this re-appeal decision, please call me toll-free at 1-888-226-7959 extension, 77377.

| | |
|---|---|
| Spanish: To obtain assistance in Spanish, call 1-800-858-6843. | Para obtener asistencia en Español, llame al 1-800-858-6843. |
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843. |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Sincerely,

Shannon L Cartier

Shannon L Cartier
Lead Appeals Specialist

Enclosures: -Claimant: Appeal

02875009665736702

# Exhibit 28

Activity

---

Checked/Unchecked Indicator: No
Type: Management Name: General
Status: Completed
Original Notify Date: 01/04/2022
Notify Date: 01/04/2022
Due Date:
Subject: Review - possible rtw-1 day/wk work
Upon Completion Notify: Activity Creator
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Griffin, Joseph
Action:

Request Fields

---

Request: Alford, Susan M 01/04/2022 13:46:51: Insured called 01/04/22 and inquired if he were to go back to work one half or one full day a week, would his benefits be affected? Insured stated that he would be seeing his physician to see if this was possible.
I advised insured to contact us of the outcome of your doctor visit. Insured stated he would be working in his previous position.
I noticed there was an appeal review.
Please advised at this time if claim needs to be transferred for review.

Created By: Alford, Susan M
Created Date: 01/04/2022 13:46:51 Create Site: Worcester

Response Fields

---

Response: Griffin, Joseph 01/04/2022 16:13:50: File transferred for DBS review.

Completed By: Griffin, Joseph
Completed Date: 01/04/2022 16:13:50 Complete Site: Worcester

Activity

---

Checked/Unchecked Indicator: No
Type: Phone Call Name: Phone Call Details
Status: Completed
Original Notify Date: 01/04/2022
Notify Date: 01/04/2022
Due Date:
Subject: tpc
Upon Completion Notify: Claim Owner
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: Yes
Activity Owner: Alford, Susan M
Action:

Request Fields

---

Request: Alford, Susan M 01/04/2022 13:29:40: tpc

Created By: Alford, Susan M
Created Date: 01/04/2022 13:29:40 Create Site: Worcester

Response Fields

---

Call Type: Received Call From
Person Contacted: Claimant (Employee, Insured)
Reason for Call: Ongoing Contact
Call Outcome: Contact Successful
Comments: Alford, Susan M 01/04/2022 13:29:40: Insured called 01/04/22, 1:17 PM, 619-993-2888 - Insured stated that he was dying to get back to work, but I do not know what my doctor would say. I will be contacting him soon.
Insured wanted to know that if he went back to work 1 day a week, would my benefit need to be adjusted?
I advised insured once you contact your doctor, please let me know what he says, then If the answer is yes, I will need to have this reviewed for you, then contact you back. I asked if he would be returning in his previous position. Insured stated, yes I would be.

---

Alford, Susan M 01/04/2022 13:31:09: Insured knew of his MBP for both claims in June & July 2022.

Completed By: Griffin, Joseph
Completed Date: 01/04/2022 16:14:36 Complete Site: Worcester

Activity

---

Checked/Unchecked Indicator: No
Type: Phone Call Name: Phone Call Details
Status: Completed
Original Notify Date: 01/20/2022
Notify Date: 01/20/2022
Due Date:
Subject: TPC w/EE RE: work possibility
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Laflamme, Debra A
Action:

Request Fields

---

Request: Laflamme, Debra A 01/20/2022 16:46:36: TPC w/EE RE: work possibility

Created By: Laflamme, Debra A
Created Date: 01/20/2022 16:46:36 Create Site: Worcester

Response Fields

---

Call Type: Returned Call From
Person Contacted: Claimant (Employee, Insured)
Reason for Call: Provided Information
Call Outcome: Contact Successful
Comments: Laflamme, Debra A 01/20/2022 16:46:36: 01/20/22
12:15 PM
EE LVM saying he had missed call earlier and was RTPC. 619-993-2888
*********************************
4:30 PM
RTPC to EE. Advised my schedule did not allow for me to call him sooner and he had no problem with that.

I told him his claim had been assigned to me given he had asked about impact to benefits should he work one day week. He said he knew and thanked me for the message I had left him. He said that is not going to happen. He said his doctor will not allow him to try and work one day a week. EE said he has had recent flare ups and the need for add'l treatment and MRIs scans and will be having a surgical consult. He said the question was purely hypothetical as he wondering if he could ever go back and do something what would happen, noting that had been his whole life. He said that is not happening and he does not know if it will ever be a possibility. He thanked me for calling. I said if we were pursuing the topic, there was add'l information I would need, noting his policies provide for TD only, but since that now is a mute point, nothing additional is needed. I told him I was sorry to learn of his worsening condition and the challenges he will be facing; He thanked me for my honest concern. We ended our conversation with mutual goodbyes and well wishes.

Completed By: Laflamme, Debra A
Completed Date: 01/20/2022 16:46:36 Complete Site: Worcester

**Activity**

---

**Checked/Unchecked Indicator: No**
**Type: Phone Call        Name: Phone Call Details**
**Status: Cancelled**
**Original Notify Date: 01/13/2022**
**Notify Date: 01/24/2022**
**Due Date:**
**Subject: TPC to EE RE: Work duties**
**Upon Completion Notify Linked Claim Owner(s): No**
**Mark As Priority: No**
**Activity Owner: Laflamme, Debra A**
**Action:**

**Request Fields**

---

**Request: Laflamme, Debra A 01/13/2022 09:19:23: TPC to EE RE: Work duties**

**Created By: Laflamme, Debra A**
**Created Date: 01/13/2022 09:19:23        Create Site: Worcester**

**Response Fields**

---

**Call Type: Placed Call To**
**Person Contacted: Claimant (Employee, Insured)**
**Reason for Call: Requested Information**
**Call Outcome: Left Message**
**Comments: Laflamme, Debra A 01/18/2022 15:15:42: 01/18/2022**
**3:08 PM**
**619-993-2888**

**My call went to VM. I LVM for EE advising I was calling to obtain some details on the question he asked earlier in the month regarding working 1 day week and its' impact on benefits. I advised I needed some additional information from him regarding how many hours per day would he be working, what would he be doing, for whom would he be working, etc. I advised his policies provide for TD only and so it would be helpful to have a better understanding of whether this is something he is thinking of or if he has an employer lined up. I provided my direct line and asked for a call back to discuss and if I was unavailable when he called, for him to leave a message letting me know the best day and time I could reach him.**

**Completed By: Laflamme, Debra A**
**Completed Date: 01/20/2022 16:55:04        Complete Site: Worcester**

# Exhibit 29

**BY Email and U.S. Mail**

Richard J. Leung, M.D.
1388 Kettner Boulevard, Unit 2801
San Diego, CA 92101
619-993-2888

Shannon L. Cartier
Lead Appeals Specialist
UNUM
Worcester Benefits Center-Appeals Unit
P.O. Box 9548
Portland, ME 04122-5058

RE: Leung, Richard J
Policy number: LAD016015, LAN661286, LAN780636, LAN782020, LAN782990
Claim number: CLA200415, CLA200416, CLA200417, CLA200418, CLA200419

February 17, 2022

Dear Ms. Cartier,

I am writing in response to your letter dated September 23, 2021. I apologize for the delay but I have been involved with a terminally-ill family member. I am writing to request you to re-appeal the decision by UNUM taking the position that my disability is disease-related as opposed to accident-related.

The reason for my request to re-appeal the decision is that new MRI scans of both cervical and lumbar areas were performed on December 15, 2021. Neuro-radiologist Nathaniel Chuang, M.D. read the MRIs and determined for the cervical area there is **adjacent level disc degeneration** at C4-5 and C6-7 related to the original surgery and accident. For the lumbar MRI, he notes the **pathology at the surgical site** L4-5. I have enclosed copies of these reports.

To further support that my disability is accident-related, the U.S. Department of Labor has recognized and supported the ongoing work-compensation claim based on accidents in 1982 and 1993. The U.S. Department of Labor would not provide care based on an illness.

I have carefully read through Dr. Friedlander's report and with all due respect, Dr. Friedlander's report is missing key information and he seems to pick and choose to support his opinion. To my knowledge he is also basing his report without ever actually viewing the MRI scans. There is a difference of medical opinion between Dr. Friedlander and my four treating physicians. As previously noted, it is the California law to give greater weight to a treating physician or physicians over an outside consultant.

Dr. Friedlander appears to have based his opinion that because the lumbar spine is more rapidly progressive at L3/4 as opposed to L4/5 that the disability is disease related. He fails to take into consideration that the lumbar problem was never adequately treated per the original neurosurgeon, John Alksne, M.D (6/14/1983). The pathology of disc protrusion, scarring, impingement on nerve roots and foraminal narrowing are at the level of the injury. In addition, biomechanics of the spine are such that the accident/injury at L4-5 also affects other levels regardless of aging and disease. Dr. Ostrup clearly states in his letter that in his opinion, the disability is related to the 1982 injury.

For the cervical area Dr. Friedlander has taken the position that adjacent level disease has some sort of time interval or expiration date. It is also clear that Dr. Moon, Dr. Ostrup and now Dr. Chuang all feel that I have adjacent level disease related to the accident.

In your letter you mentioned Dr. Ostrup indicated that I have "failed back syndrome" and "the independent reviewer notes that failed back is a condition where there is continued back or radicular pain even though there is no definable pathology to explain this." I do not see in Dr. Ostrup's report that I have failed back syndrome without identifiable pathology. There is obvious pathology to explain my symptoms.

Your letter states "A review of the original documentation submitted finds that this reported MRI finding, assuming there are no other findings present on this MRI which were not disclosed by Dr. Ostrup, was most likely from the May 2010 MRI". For the record, Dr. Ostrup viewed the then most current, actual MRI scans from 4/3/2020 during his appointment with me prior to submitting his report.

Your letter also states "This MRI gives the indication that there has been some undisclosed injury to the neck that has occurred to cause these findings. On April 27, 2016 you reported to Dr. Moon, that you had begun using opioid pain medications and were having problems working. It is unclear how long you were using Dilaudid and if there was any non-documented event to cause this and to explain the MRI findings." Frankly, I am unsure of the intention behind this inference. My extensive medical record with Dr. Jablecki and others would indicate that I have always reported anything related to the back or neck. I have never withheld information about an undisclosed injury nor has my reporting or judgement been affected by taking pain medication.

You commented on the timing of Dr. Ostrup's letter and of when I submitted it to you. The letter was dated July 30, 2021 I assume that is because it is when he began to write the letter. He did not re-date the final version. On September 2, I was called by Dr. Ostrup's secretary that the letter was finished and I received the final copy. I picked it up in his office and forwarded it to you without delay.

I have been a policy-holder with UNUM since 1982. I am asking for UNUM to do the obvious right thing, and that is to allow the claim based on accident/injury. I have had not only one but two accidents, all of which have been recognized by the U.S. Department of Labor. I have complete support from Drs. Moon, Ostrup, Chuang and Jablecki for the disability claim based on accident.

I realize that I am very fortunate to have compiled a team of medical specialists all of whom are reputable within the community and have the highest of standards with respect to care and medical ethics.

Sincerely, Richard J. Leung, M.D.

Richard J. Leung, M.D.

# Exhibit 30

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 9548
Portland, ME 04122-5058
Phone: **1-888-226-7959**
Fax: **1-207-575-2354**
www.unum.com

February 18, 2022

RICHARD J LEUNG MD
1388 KETTNER BLVD UNIT 2801
SAN DIEGO, CA 92101-2915

RE: Leung, Richard J
Policy Number: LAD016015; LAN661286; LAN780636; LAN782020; LAN782990
Claim Number: CLA200415; CLA200416; CLA200417 CLA200418; CLA200419 Unum Life Insurance Company of America

We are writing in response to the letter and additional information you submitted via email on February 17, 2022.

In your letter you outlined your disagreements with the prior appeal decisions and requested another appeal review. You also included copies of a lumbar spine and cervical spine MRI reports performed on December 15, 2021.

The original appeal decision was communicated to you on June 16, 2021. We completed another appeal review on September 23, 2021.

As outlined in the appeal decision letters we advised the medical data reviewed supports the etiology of your current impairing lumbar spine condition is caused by progressive degenerative changes at the L3-4 and L4-5 disc spaces and is not related to the injury you reported in May 1982 that occurred while lifting a patient.

Additionally, we advised the medical data reviewed also supports the etiology of your current impairing cervical spine conditions is chronic discogenic neck pain with a radicular component related to degenerative changes causing multifocal cervical stenosis, both central and foraminal. We advised your current impairing cervical spine conditions are not related to the injury you reported in November 1993 while exercising.

The lumbar spine MRI performed on December 15, 2021 is almost 40 years after the injury you reported in May 1982 and is not time relevant to the period of time when you allege the injury occurred. Likewise, the cervical spine MRI performed on December 15, 2021 is 28 years after the injury you reported in November 1993 and is not time relevant to the period of time when you allege the injury occurred.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03
02875010097918801

We acknowledge that you continue to disagree with the decision regarding the duration of your disability benefits; however, the additional information you have provided is not relevant to the periods of time you allege the injuries occurred. We are unable to render a different decision and we are declining your request for a third appeal review.

If you have any questions, please contact me at 1-888-226-7959, extension 77377.

Sincerely,

Shannon L Cartier

Shannon L Cartier
Lead Appeals Specialist

# Exhibit 31

**CAPS Payment History Report**

As of 8/1/2022

Claimant: LEUNG*RICHARD J
Claim Number: CLA200415
Claim Status: OPEN
Payment System: CAPS

Benefit Period: 5/29/2020 through 7/27/2022
Total Benefit: $142,320.00
Total Checks: $142,320.00
Total Withholdings: $0.00

| Check Date | Check Number | Check Amount | Payment Status | Benefit Begin Date | Benefit End Date | ROR | Pay Code | Currrent MNEI | Current COLA | Reduction / Addition Type | Reduction / Addition Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2020 | 0025681518 | $5,930.00 | NONP | 5/29/2020 | 7/27/2020 | NO | TO86 | $0.00 | 0 | | $0.00 |
| 8/27/2020 | 0025681518 | $5,930.00 | PAID | 7/28/2020 | 8/27/2020 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 9/28/2020 | 0000033134 | $5,930.00 | PAID | 8/28/2020 | 9/27/2020 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 10/26/2020 | 0000035074 | $5,930.00 | PAID | 9/28/2020 | 10/27/2020 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 11/24/2020 | 0000037663 | $5,930.00 | PAID | 10/28/2020 | 11/27/2020 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 12/21/2020 | 0000039912 | $5,930.00 | PAID | 11/28/2020 | 12/27/2020 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 1/25/2021 | 0000043108 | $5,930.00 | PAID | 12/28/2020 | 1/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 2/25/2021 | 0000046345 | $5,930.00 | PAID | 1/28/2021 | 2/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 3/25/2021 | 0000049297 | $5,930.00 | PAID | 2/28/2021 | 3/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 4/26/2021 | 0000049956 | $5,930.00 | PAID | 3/28/2021 | 4/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 5/25/2021 | 0000049957 | $5,930.00 | PAID | 4/28/2021 | 5/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 6/25/2021 | 0000049958 | $5,930.00 | PAID | 5/28/2021 | 6/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 7/26/2021 | 0000049959 | $5,930.00 | PAID | 6/28/2021 | 7/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 8/25/2021 | 0000049960 | $5,930.00 | PAID | 7/28/2021 | 8/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 9/24/2021 | 0000049961 | $5,930.00 | PAID | 8/28/2021 | 9/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 10/25/2021 | 0000049962 | $5,930.00 | PAID | 9/28/2021 | 10/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 11/24/2021 | 0000049963 | $5,930.00 | PAID | 10/28/2021 | 11/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 12/23/2021 | 0000049964 | $5,930.00 | PAID | 11/28/2021 | 12/27/2021 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 1/24/2022 | 0000049965 | $5,930.00 | PAID | 12/28/2021 | 1/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 2/24/2022 | 0000049966 | $5,930.00 | PAID | 1/28/2022 | 2/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 3/24/2022 | 0000049967 | $5,930.00 | PAID | 2/28/2022 | 3/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 4/21/2022 | 0000076622 | $5,930.00 | PAID | 3/28/2022 | 4/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 5/24/2022 | 0000076623 | $5,930.00 | PAID | 4/28/2022 | 5/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 6/23/2022 | 0000076624 | $5,930.00 | PAID | 5/28/2022 | 6/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |
| 7/21/2022 | 0000076625 | $5,930.00 | PAID | 6/28/2022 | 7/27/2022 | NO | TO86 | $0.00 | 0 | | $5,930.00 |

**CAPS Payment History Report**

As of 8/1/2022

| | | | |
|---|---|---|---|
| Claimant: | LEUNG*RICHARD J | Benefit Period: | 5/29/2020 through 7/27/2022 |
| Claim Number: | CLA200416 | Total Benefit: | $36,000.00 |
| Claim Status: | OPEN | Total Checks: | $36,000.00 |
| Payment System: | CAPS | Total Withholdings: | $0.00 |

| Check Date | Check Number | Check Amount | Payment Status | Benefit Begin Date | Benefit End Date | ROR | Pay Code | Currrent MNEI | Current COLA | Reduction / Addition Type | Reduction / Addition Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2020 | 0025681518 | $3,000.00 | NONP | 5/29/2020 | 6/27/2020 | NO | D180 | $0.00 | 0 | | $0.00 |
| 8/27/2020 | 0025681518 | $3,000.00 | PAID | 6/28/2020 | 8/27/2020 | NO | D180 | $0.00 | 0 | | $3,000.00 |
| 9/28/2020 | 0000033134 | $1,500.00 | PAID | 8/28/2020 | 9/27/2020 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 10/26/2020 | 0000035074 | $1,500.00 | PAID | 9/28/2020 | 10/27/2020 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 11/24/2020 | 0000037663 | $1,500.00 | PAID | 10/28/2020 | 11/27/2020 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 12/21/2020 | 0000039912 | $1,500.00 | PAID | 11/28/2020 | 12/27/2020 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 1/25/2021 | 0000043108 | $1,500.00 | PAID | 12/28/2020 | 1/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 2/25/2021 | 0000046345 | $1,500.00 | PAID | 1/28/2021 | 2/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 3/25/2021 | 0000049297 | $1,500.00 | PAID | 2/28/2021 | 3/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 4/26/2021 | 0000049956 | $1,500.00 | PAID | 3/28/2021 | 4/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 5/25/2021 | 0000049957 | $1,500.00 | PAID | 4/28/2021 | 5/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 6/25/2021 | 0000049958 | $1,500.00 | PAID | 5/28/2021 | 6/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 7/26/2021 | 0000049959 | $1,500.00 | PAID | 6/28/2021 | 7/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 8/25/2021 | 0000049960 | $1,500.00 | PAID | 7/28/2021 | 8/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 9/24/2021 | 0000049961 | $1,500.00 | PAID | 8/28/2021 | 9/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 10/25/2021 | 0000049962 | $1,500.00 | PAID | 9/28/2021 | 10/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 11/24/2021 | 0000049963 | $1,500.00 | PAID | 10/28/2021 | 11/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 12/23/2021 | 0000049964 | $1,500.00 | PAID | 11/28/2021 | 12/27/2021 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 1/24/2022 | 0000049965 | $1,500.00 | PAID | 12/28/2021 | 1/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 2/24/2022 | 0000049966 | $1,500.00 | PAID | 1/28/2022 | 2/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 3/24/2022 | 0000049967 | $1,500.00 | PAID | 2/28/2022 | 3/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 4/21/2022 | 0000076622 | $1,500.00 | PAID | 3/28/2022 | 4/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 5/24/2022 | 0000076623 | $1,500.00 | PAID | 4/28/2022 | 5/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 6/23/2022 | 0000076624 | $1,500.00 | PAID | 5/28/2022 | 6/27/2022 | NO | D180 | $0.00 | 0 | | $1,500.00 |
| 7/21/2022 | 0000076625 | $0.00 | NONP | 6/28/2022 | 7/27/2022 | NO | D180 | $0.00 | 0 | | $0.00 |

**CAPS Payment History Report**

As of 8/1/2022

| | | | |
|---|---|---|---|
| Claimant: | LEUNG*RICHARD J | Benefit Period: | 5/29/2020 through 7/27/2022 |
| Claim Number: | CLA200417 | Total Benefit: | $24,000.00 |
| Claim Status: | OPEN | Total Checks: | $24,000.00 |
| Payment System: | CAPS | Total Withholdings: | $0.00 |

| Check Date | Check Number | Check Amount | Payment Status | Benefit Begin Date | Benefit End Date | ROR | Pay Code | Currrent MNEI | Current COLA | Reduction / Addition Type | Reduction / Addition Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2020 | 0025681518 | $2,000.00 | NONP | 5/29/2020 | 6/27/2020 | NO | D180 | $0.00 | 0 | | $0.00 |
| 8/27/2020 | 0025681518 | $2,000.00 | PAID | 6/28/2020 | 8/27/2020 | NO | D180 | $0.00 | 0 | | $2,000.00 |
| 9/28/2020 | 0000033134 | $1,000.00 | PAID | 8/28/2020 | 9/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 10/26/2020 | 0000035074 | $1,000.00 | PAID | 9/28/2020 | 10/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 11/24/2020 | 0000037663 | $1,000.00 | PAID | 10/28/2020 | 11/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 12/21/2020 | 0000039912 | $1,000.00 | PAID | 11/28/2020 | 12/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 1/25/2021 | 0000043108 | $1,000.00 | PAID | 12/28/2020 | 1/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 2/25/2021 | 0000046345 | $1,000.00 | PAID | 1/28/2021 | 2/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 3/25/2021 | 0000049297 | $1,000.00 | PAID | 2/28/2021 | 3/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 4/26/2021 | 0000049956 | $1,000.00 | PAID | 3/28/2021 | 4/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 5/25/2021 | 0000049957 | $1,000.00 | PAID | 4/28/2021 | 5/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 6/25/2021 | 0000049958 | $1,000.00 | PAID | 5/28/2021 | 6/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 7/26/2021 | 0000049959 | $1,000.00 | PAID | 6/28/2021 | 7/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 8/25/2021 | 0000049960 | $1,000.00 | PAID | 7/28/2021 | 8/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 9/24/2021 | 0000049961 | $1,000.00 | PAID | 8/28/2021 | 9/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 10/25/2021 | 0000049962 | $1,000.00 | PAID | 9/28/2021 | 10/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 11/24/2021 | 0000049963 | $1,000.00 | PAID | 10/28/2021 | 11/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 12/23/2021 | 0000049964 | $1,000.00 | PAID | 11/28/2021 | 12/27/2021 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 1/24/2022 | 0000049965 | $1,000.00 | PAID | 12/28/2021 | 1/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 2/24/2022 | 0000049966 | $1,000.00 | PAID | 1/28/2022 | 2/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 3/24/2022 | 0000049967 | $1,000.00 | PAID | 2/28/2022 | 3/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 4/21/2022 | 0000076622 | $1,000.00 | PAID | 3/28/2022 | 4/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 5/24/2022 | 0000076623 | $1,000.00 | PAID | 4/28/2022 | 5/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 6/23/2022 | 0000076624 | $1,000.00 | PAID | 5/28/2022 | 6/27/2022 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 7/21/2022 | 0000076625 | $0.00 | NONP | 6/28/2022 | 7/27/2022 | NO | D180 | $0.00 | 0 | | $0.00 |

**CAPS Payment History Report**

As of 8/1/2022

| | | | |
|---|---|---|---|
| Claimant: | LEUNG*RICHARD J | Benefit Period: | 5/29/2020 through 7/27/2022 |
| Claim Number: | CLA200418 | Total Benefit: | $12,000.00 |
| Claim Status: | OPEN | Total Checks: | $12,000.00 |
| Payment System: | CAPS | Total Withholdings: | $0.00 |

| Check Date | Check Number | Check Amount | Payment Status | Benefit Begin Date | Benefit End Date | ROR | Pay Code | Currrent MNEI | Current COLA | Reduction / Addition Type | Reduction / Addition Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2020 | 0025681518 | $1,000.00 | NONP | 5/29/2020 | 6/27/2020 | NO | D180 | $0.00 | 0 | | $0.00 |
| 8/27/2020 | 0025681518 | $1,000.00 | PAID | 6/28/2020 | 8/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 9/28/2020 | 0000033134 | $500.00 | PAID | 8/28/2020 | 9/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 10/26/2020 | 0000035074 | $500.00 | PAID | 9/28/2020 | 10/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 11/24/2020 | 0000037663 | $500.00 | PAID | 10/28/2020 | 11/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 12/21/2020 | 0000039912 | $500.00 | PAID | 11/28/2020 | 12/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 1/25/2021 | 0000043108 | $500.00 | PAID | 12/28/2020 | 1/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 2/25/2021 | 0000046345 | $500.00 | PAID | 1/28/2021 | 2/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 3/25/2021 | 0000049297 | $500.00 | PAID | 2/28/2021 | 3/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 4/26/2021 | 0000049956 | $500.00 | PAID | 3/28/2021 | 4/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 5/25/2021 | 0000049957 | $500.00 | PAID | 4/28/2021 | 5/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 6/25/2021 | 0000049958 | $500.00 | PAID | 5/28/2021 | 6/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 7/26/2021 | 0000049959 | $500.00 | PAID | 6/28/2021 | 7/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 8/25/2021 | 0000049960 | $500.00 | PAID | 7/28/2021 | 8/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 9/24/2021 | 0000049961 | $500.00 | PAID | 8/28/2021 | 9/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 10/25/2021 | 0000049962 | $500.00 | PAID | 9/28/2021 | 10/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 11/24/2021 | 0000049963 | $500.00 | PAID | 10/28/2021 | 11/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 12/23/2021 | 0000049964 | $500.00 | PAID | 11/28/2021 | 12/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 1/24/2022 | 0000049965 | $500.00 | PAID | 12/28/2021 | 1/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 2/24/2022 | 0000049966 | $500.00 | PAID | 1/28/2022 | 2/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 3/24/2022 | 0000049967 | $500.00 | PAID | 2/28/2022 | 3/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 4/21/2022 | 0000076622 | $500.00 | PAID | 3/28/2022 | 4/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 5/24/2022 | 0000076623 | $500.00 | PAID | 4/28/2022 | 5/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 6/23/2022 | 0000076624 | $500.00 | PAID | 5/28/2022 | 6/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 7/21/2022 | 0000076625 | $0.00 | NONP | 6/28/2022 | 7/27/2022 | NO | D180 | $0.00 | 0 | | $0.00 |

**CAPS Payment History Report**

As of 8/1/2022

| | | | |
|---|---|---|---|
| Claimant: | LEUNG*RICHARD J | Benefit Period: | 5/29/2020 through 7/27/2022 |
| Claim Number: | CLA200419 | Total Benefit: | $12,000.00 |
| Claim Status: | OPEN | Total Checks: | $12,000.00 |
| Payment System: | CAPS | Total Withholdings: | $0.00 |

| Check Date | Check Number | Check Amount | Payment Status | Benefit Begin Date | Benefit End Date | ROR | Pay Code | Currrent MNEI | Current COLA | Reduction / Addition Type | Reduction / Addition Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2020 | 0025681518 | $1,000.00 | NONP | 5/29/2020 | 6/27/2020 | NO | D180 | $0.00 | 0 | | $0.00 |
| 8/27/2020 | 0025681518 | $1,000.00 | PAID | 6/28/2020 | 8/27/2020 | NO | D180 | $0.00 | 0 | | $1,000.00 |
| 9/28/2020 | 0000033134 | $500.00 | PAID | 8/28/2020 | 9/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 10/26/2020 | 0000035074 | $500.00 | PAID | 9/28/2020 | 10/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 11/24/2020 | 0000037663 | $500.00 | PAID | 10/28/2020 | 11/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 12/21/2020 | 0000039912 | $500.00 | PAID | 11/28/2020 | 12/27/2020 | NO | D180 | $0.00 | 0 | | $500.00 |
| 1/25/2021 | 0000043108 | $500.00 | PAID | 12/28/2020 | 1/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 2/25/2021 | 0000046345 | $500.00 | PAID | 1/28/2021 | 2/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 3/25/2021 | 0000049297 | $500.00 | PAID | 2/28/2021 | 3/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 4/26/2021 | 0000049956 | $500.00 | PAID | 3/28/2021 | 4/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 5/25/2021 | 0000049957 | $500.00 | PAID | 4/28/2021 | 5/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 6/25/2021 | 0000049958 | $500.00 | PAID | 5/28/2021 | 6/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 7/26/2021 | 0000049959 | $500.00 | PAID | 6/28/2021 | 7/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 8/25/2021 | 0000049960 | $500.00 | PAID | 7/28/2021 | 8/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 9/24/2021 | 0000049961 | $500.00 | PAID | 8/28/2021 | 9/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 10/25/2021 | 0000049962 | $500.00 | PAID | 9/28/2021 | 10/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 11/24/2021 | 0000049963 | $500.00 | PAID | 10/28/2021 | 11/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 12/23/2021 | 0000049964 | $500.00 | PAID | 11/28/2021 | 12/27/2021 | NO | D180 | $0.00 | 0 | | $500.00 |
| 1/24/2022 | 0000049965 | $500.00 | PAID | 12/28/2021 | 1/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 2/24/2022 | 0000049966 | $500.00 | PAID | 1/28/2022 | 2/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 3/24/2022 | 0000049967 | $500.00 | PAID | 2/28/2022 | 3/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 4/21/2022 | 0000076622 | $500.00 | PAID | 3/28/2022 | 4/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 5/24/2022 | 0000076623 | $500.00 | PAID | 4/28/2022 | 5/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 6/23/2022 | 0000076624 | $500.00 | PAID | 5/28/2022 | 6/27/2022 | NO | D180 | $0.00 | 0 | | $500.00 |
| 7/21/2022 | 0000076625 | $0.00 | NONP | 6/28/2022 | 7/27/2022 | NO | D180 | $0.00 | 0 | | $0.00 |