# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

RICHARD J. LEUNG, M.D.,

                                    Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

                                    Defendant.

Case No.:  22-CV-0767 W (JLB)

**ORDER (1) GRANTING MOTIONS TO SEAL [DOCS. 59, 67];
(2) OVERRULING PLAINTIFF'S OBJECTIONS [DOC. 63];
(3) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 57] AND (3) GRANTING IN PART & DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY-JUDGMENT [DOC. 58]**

This is an insurance-coverage dispute between Plaintiff Richard J. Leung, M.D., and Defendant Unum Life Insurance Company of America ("Unum"). The dispute arises out of Dr. Leung's claim for disability insurance benefits in June 2020, just after the start of the COVID-19 pandemic and approximately four months before his sixty-fifth birthday. There is no dispute that Dr. Leung is disabled. Instead, the dispute centers on whether he is disabled as a result of a sickness or an injury. Resolution of this dispute will determine if Dr. Leung receives disability benefits for 24 months or for life.

1    Dr. Leung contends his disability is the result of lower back and neck problems
2    from accidents in 1982 and 1993. Unum, however, determined that his disability resulted
3    from congenital issues and degenerative changes to his spine, which are considered a
4    sickness under the policies. Thus, Unum approved his disability claim for 24 months, and
5    Dr. Leung filed this lawsuit for breach of contract and breach of the covenant of good
6    faith and fair dealing (i.e., bad faith).

7    The parties have now filed cross motions for summary judgment.  Dr. Leung seeks
8    an order that Unum engaged in bad faith by (1) allegedly failing to obtain his worker's
9    compensation file before determining that his disability was due to sickness and (2)
10   refusing to reconsider its determination after receiving allegedly new information during
11   this litigation.  Unum seeks summary judgment of the breach of contract and bad faith
12   causes of action.  The parties have also submitted unopposed motions to file certain
13   documents under seal.  Additionally, Dr. Leung has filed objections to certain evidence.

14   The Court decides the motions on the papers, and without oral argument. <u>See</u>
15   Civ.L.R. 7.1.d.1. For the reasons that follow, the Court **GRANTS** the motions to seal
16   [Docs. 59, 67], **OVERRULES** Dr. Leung's objections [Doc. 66-3], **DENIES** Dr.
17   Leung's motion [Doc. 57] and **GRANTS IN PART** and **DENIES IN PART** Unum's
18   motion [Doc. 58].

19

20   **I.   <u>MOTIONS TO SEAL</u>**

21   Defendant Unum moves to seal Exhibits 49, 50(a) and 50(b) attached to the
22   Declaration of Michael B. Bernacchi and filed in support of its summary-judgment
23   motion.  (*See Def's Mot. to Seal* [Doc. 59] 1:21–26.)  The basis for the request is that the
24   exhibits include or refer to proprietary business information related to Dr. Leung's sale of
25   his medical practice to NVISION Laser Eye Centers, Inc.  (*Id.* at 2:11–19.)  Dr. Leung's
26   motion seeks an order sealing an unredacted version of his opposition to Unum's
27   summary-judgment motion, as well as Exhibit AP attached to the Supplemental
28   Declaration of Michael Horrow.  (*See Pl's Mot. to Seal* [Doc. 67] 2:9–17.)

2

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n. 7 (1978)). Although access to judicial records is not absolute, there is a "narrow range" of documents that have traditionally been kept secret for policy reasons: "grand jury transcripts and warrant materials in the midst of a preindictment investigation." *Id.* (citing *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)). The importance of this narrow range is that "[u]nless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Id.* (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

"[T]he strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments." *Kamakana*, 447 F.3d at 1179. This is "because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Id.* (quoting *Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1294 (9th Cir. 1986)). "Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion." *Id.* (citing *Foltz*, 331 F.3d at 1136). This standard applies "even if the dispositive motion, or its attachments, were previously filed under seal or protective order." *Id.*

Here, Unum has demonstrated that the exhibits it seeks to seal include confidential information relating to NVISION Laser Eye Centers, Inc.'s and Dr. Leung's business, the disclosure of which is likely to be commercially detrimental. *See Mezzadri v. Med. Depot, Inc.*, 2015 WL 12564223, at *2 (S.D. Cal. Dec. 18, 2015) (sealing defendant's customer lists and sales information); *Finjan, Inc. v. Cisco Sys. Inc.*, 2019 WL 4168952, *2 (N.D. Cal. 2019) (sealing material revealing operation of proprietary products). Accordingly, the Court grants Unum's motion to seal.

As for Dr. Leung's request, he has not sufficiently established Exhibit AP should be sealed. Dr. Leung's sole basis for sealing the document is the protective order entered in this case. Requests to seal based on a protective order are insufficient. *Kamakana*, 447 F.3d at 1183 (relying on "a blanket protective order is unreasonable and is not a 'compelling reason' that rebuts the presumption of access. [Citation omitted.]").

Nevertheless, as explained in *Kamakana*, the compelling reason standard stems from the "interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Id.* 447 F.3d at 1179. As will be demonstrated below, this interest is not implicated because this order does not refer to or rely on Exhibit AP. Therefore, the contents of Exhibit AP are unnecessary for the resolution of the pending motions. Moreover, in reviewing Exhibit AP, it is unclear whether public disclosure of the information will injure Unum's business interests. Under these circumstances, the Court grants Dr. Leung's motion to seal.[1]

## II.   DR. LEUNG'S OBJECTIONS

Dr. Leung raises a number of objections to evidence discussed in Unum's motion and opposition. The Court's analysis does not refer to or rely on any of the evidence to which Dr. Leung objects. Accordingly, his objections are overruled as moot.

Dr. Leung also objects to "any reference to COVID" as being highly prejudicial. (*Pl's Obj.* [Doc. 66-3] at 5:21–23.) There is no dispute that Dr. Leung's disability claim was made shortly after the start of the COVID-19 pandemic. Dr. Leung makes no effort to explain how this undisputed fact is "highly prejudicial." Accordingly, the objection is overruled.

//

//

---

[1] The motion is granted without prejudice to later reconsider whether the exhibit should be made public.

4

III.   **BACKGROUND**

A.   **The insurance policies.**

Plaintiff Richard J. Leung, M.D., is a retired ophthalmologist who purchased five disability insurance policies from Defendant Unum between 1982 and 1993.[2] (*Jt. State.* [Doc. 72] Undisputed Fact 1.) There is no dispute between the parties over the interpretation of the policies, which provide a combined benefit of approximately $9,430 per month if Dr. Leung is unable to perform the material and substantial duties of his occupation. (*See Policies.*) If his disability is due to a sickness, benefits are limited to 24 months. (*Jt. State.* Undisputed Facts 1, 2.) If Dr. Leung's disability was caused by an accident, benefits are for life assuming he became disabled before the first policy anniversary date after he turned 65 years of age. (*Id.*)

B.   **Dr. Leung's 1982 back injury.**

After graduating from Medical School in 1981, Dr. Leung interned at the University of California San Diego in the Veteran's Administration Hospital (the "VA"). (*Leung Decl.* [Doc. 57-2] ¶ 3.)  In May of 1982, Dr. Leung felt a "pop" in his back while assisting other staff transfer a large patient from a stretcher onto an ICU bed.  (*Id.* ¶ 4; *Def's Ex. 32*.[3])  Although his pain was initially "very mild," over the next 5 to 7 days, Dr. Leung's pain increased, he experienced tightness in his lower back, and he developed pain in his left leg and numbness in his left foot.  (*Id.* ¶ 5; *Def's Ex. 32*.)  He eventually went to the emergency room, where a CAT scan was ordered. (*Id.*)

On June 17, Dr. Leung saw Dr. Kenneth Ott, M.D. (*Leung Decl.* ¶ 6.) After the appointment, Dr. Ott sent Dr. Leung a letter stating that his "CT scans" showed

---

[2] The policies are attached to Dr. Leung's Declaration [Doc. 57-2] as Exhibits A–E [Docs. 57-2] and to Shannon Cartier's Declaration [Doc. 58-1] as Exhibits 1–5 [Docs. 58-2].

[3] Defendant's Exhibits 1–31 [Doc. 58-2] are attached to Shannon Cartier's Declaration [Doc.58-1] and Exhibits 32–56 [Doc. 58-4] are attached to Michael B. Bernacchi's Declaration [Doc. 58-3].

"congenital narrowing of the canal with a trefoil-shaped canal in the lower lumber elements" and that there "may be a very slight bulge at the L4-5 or L5-S1 level on the left." (*Def's Ex. 33* at 33-002.) The letter also stated that "[m]ost likely, a slight bulging of the L4-5 or L5-S1 disk is compressing the S1 nerve root beneath the posterior joint. Seeing the overall outlook, we concluded that a period of two weeks of bedrest was indicated." (*Id.*)  Over the next six to seven months, Dr. Leung's pain increased, as did the numbness in his leg.  (*Id.* ¶ 7.)  He had difficulty walking, and it "became apparent that conservative therapy was not working and that [he] needed surgery."  (*Id.*)

Because Dr. Leung was working at the VA, he filed a claim for federal worker's compensation through the Department of Labor ("DOL"). On December 27, 1982, the DOL sent a letter to Dr. Ott, which began by noting that the "diagnosis is congenital lumbar stenosis." (*Def's Ex. 37* at 37-001.) The letter went on to ask whether the "surgery being considered [is] due to the preexisting congenital lumbar stenosis or to the injury of 5/23/82?" (*Id.*)

In January 1983, Dr. Leung consulted with a surgeon, Dr. John Alksne, Chief of Neurosurgery at UCSD. (*Leung Decl.* ¶ 8.) Approximately one week before the surgery, the DOL contacted Dr. Leung and informed him that the "surgery could not be authorized without file because clarification is needed on whether surgery is necessitated by injury or spinal stenosis." (*Def's Ex. 37* at 37-002.) The DOL stated that a verbal explanation and follow-up written report from the surgeon would suffice. (*Id.*)

On February 16, 1983, Dr. Alksne performed the surgery. (*Leung Decl.* ¶ 9.) On June 14, Dr. Alksne reported to the DOL that Dr. Leung

> is making satisfactory recovery following his decompressive lumbar laminectomy, but he continues to have a moderate amount of back and leg pain, aggravated by activity and relieved by rest. For that reason, I have counseled him to avoid strenuous activities and heavy lifting. A follow-up CT scan shows an adequate decompressive laminectomy, but some significant encroachment on the nerve root foramina by hypertrophied facets. This was not adequately decompressed at the time of the original surgery, because of the fear of making his spine unstable and possibly

requiring a subsequent fusion. Nevertheless, if his symptoms should continue or increase in severity, it might be necessary to perform further surgery at a later date.

(*Pl's Ex. N* at 1.[4]) Evelyn Gong, the DOL's claims examiner, responded that "[a]uthorization is given for further surgery, if it becomes necessary." (*Id.* at 2.)

## C.   Dr. Leung resumes recreational activity.

In May of 1983, Dr. Leung moved to Los Angeles and resumed recreational activity. In 1984 and 1985, Dr. Leung played tennis on occasion. (*Def's Ex. 53* at 53-007.) Additionally, from then through 2000, he golfed approximately once a month and skied every three to four years. (*Id.*)

In February of 1985, Dr. Leung was examined by his orthopedic back specialist, Dr. Wiltse, for low back pain. (*Def's Ex. 39(a)* at 39(a)-001.) Dr. Leung also brought along an authorization that his pain was related to his 1982 work injury. (*Id.*) Dr. Wiltse's letter to the DOL stated that Dr. Leung was "doing quite well," and "was even skiing recently, but during the moving of his baggage at the airport, he began having low back pain which has now progressed to sciatica." (*Id.*) Dr. Wiltse also reported that his x-rays "showed no change since the previous x-rays" and recommended that Dr. Leung begin a "Back School" program to be covered by "Workmans' Comp." (*Id.* at 39(a)-002.)

As part of the Back School program, Dr. Leung was given exercises to perform at home. (*Leung Decl.* ¶ 14.) From 1985 to 1988, Dr. Leung continued to receive treatment from Dr. Wiltse and a chiropractor.  (*Id.* at ¶¶ 15, 16.)

On May 9, 1987, Dr. Leung submitted another application for disability insurance with Unum. (*See Def's Ex. 39(c).*) Among the questions asked were whether Dr. Leung had consulted a physician or chiropractor in the past five years. (*Id.* at 93(c)-002.) Dr.

---

[4] Plaintiff's Exhibits A–H [Doc. 57-2] are attached to Dr. Leung's Declaration [Doc.57-2] and Exhibits I–Z [Doc. 57-3] are attached to Michael Horrow's Declaration [Doc. 57-3].

7

Leung responded "yes." (*Id.*) It then asked for further information, to which Dr. Leung identified "John Alksney, UCSD Med." for "back surgery" on "2/83." (*Id.* at 39(c)-003.) Under "result/Diagnosis," Dr. Leung stated: "complete recovery – no residua." (*Id.*)

### D.    Dr. Leung suffers a spine injury in 1993.

In November 1988, Dr. Leung relocated to San Diego to open his practice as an Ophthalmologist. (*Leung Decl.* ¶18.) He states that he continued to have pain in his lumbar spine, which radiated down his left leg. (*Id.*)

On February 8, 1992, Dr. Leung went to the emergency room after his back went out and he was given valium. (*Leung Decl.* ¶ 18.) An MRI showed the cause of his symptoms was disc herniation at L4-5. (*Id.*)

After the February episode, Dr. Leung engaged in substantial physical therapy for his back. (*Leung Decl.* ¶ 19.) In the summer of 1993, he attended physical therapy with the goal of strengthening his lower back. (*Id.*; *Def's Ex. 41* at 41-001.) His physical therapy included using a rowing machine, free weights and resistive exercises on machines. (*Def's Ex. 41* at 41-001.) After engaging in physical therapy for several months, he was ready to begin advanced training and to engage a professional trainer. (*Id.* at 41-002.)

In November 1993, Dr. Leung was working out on a rowing machine under the supervision of a trainer when he felt a "pop" in his neck. (*Leung Decl.* ¶ 19.) Later that night, he experienced severe neck pain radiating into his upper back and shoulder. (*Id.*) Over the ensuing weeks, the pain increased in intensity, and he started having tingling in his right thumb and index finger. (*Id.*)

Dr. Charles Jablecki, a Neurologist, opined that his injury caused a right C6 radiculopathy and diagnosed Dr. Leung with lumbosacral spine disease from his 1982 injury. (*Leung Decl.* ¶ 20.) An MRI showed a disc protrusion at C5-C6, which Dr. Jablecki stated was causing the pain in Dr. Leung's shoulder, and numbness and tingling in his right arm. (*Id.*) Dr. Jablecki referred Dr. Leung to Dr. Joel Ray, a neurosurgeon, to

8

evaluate whether he needed surgery on his cervical spine. (*Id.* ¶ 22.) Dr. Ray concurred with the diagnosis of a disc protrusion at C5-C6 and lumbosacral spine disease but opined that surgery was not needed at that time. (*Id.*)

On May 31, 1995, the DOL retained Dr. Mark Levine, a neurologist, to conduct an independent medical exam ("IME") of Dr. Leung and evaluate if the DOL was required to cover treatment for his cervical spine. (*Leung Decl.*, ¶ 24.) Dr. Levine ultimately determined that, because the injury occurred when Dr. Leung was receiving therapy for the work-related injury to his lumbar spine, the DOL should cover the treatment. (*Id.*)

On November 2, 1995, another MRI was performed on Dr. Leung. (*Def's Ex. 43.*) In comparing the MRI to the one taken on January 5, 1994, the report found the "central and right-sided disc herniation previously noted at C5-6 has resolved, and only mild bulging is present." (*Id.* at 43-001.) A review by Dr. Renee Glass on December 1, confirmed the "MRI scan of 2 November, 1995 demonstrates significant improvement of the C5-6 disk." (*Id.* at 43-002.) Dr. Glass also indicated the "C4-5 disk does appear more significantly herniated, obscuring the spinal fluid space centrally…." (*Id.*)

**E.      Dr. Leung contends that beginning in about 1997, the symptoms of his cervical and lumbar injuries waxed and waned.**

From 1997 through 2001, Dr. Leung received therapy from T.H.E. Clinic with Peter Egoscue for his lumbar and cervical spine. (*Leung Decl.*, ¶ 25.) He also continued his regular consultations with Dr. Jablecki. (*Id.*)

On March 27, 2001, Dr. Leung told Dr. Jablecki the lumbar spine symptoms had improved, but his cervical spine symptoms had not. (*Id.* ¶ 28.) He reported the pain flared up if he tried lifting anything heavy, and a buzzing sensation in his right hand. (*Id.*) Dr. Jablecki referred Dr. Leung to Dr. Sam Maywood, who diagnosed him with C5-6 radiculopathy and gave him three spinal injections in April and June of 2001. (*Id.* ¶ 29.) The injections provided temporary relief, but by August, the symptoms were increasing. (*Id.*) Dr. Jablecki then referred him to neurosurgeon Dr. Richard Ostrup. (*Id.*)

9

On September 14, 2001, Dr. Leung saw Dr. Ostrup, who opined that Dr. Leung's pain and numbness in his hand were caused by a damaged disc at C5-C6. (*Leung Decl.* ¶ 30.) Surgery was discussed but Dr. Leung wanted to hold off.  (*Id.*)

Over the next few years, Dr. Leung contends he continued to consult with Dr. Jablecki and received regular physical therapy. (*Leung Decl.* ¶ 31.) The symptoms of his cervical and lumbar injuries waxed and waned. (*Id.*) Then in October 2003, the symptoms of his cervical injury flared up and in November 2003, an MRI showed his condition was getting worse.  (*Id.* ¶ 32.)

On January 19, 2004, Dr. Ostrup performed a cervical diskectomy at C5-6 and a fusion of those two vertebrae. (*Leung Decl.* ¶ 33.) The surgery went well and Dr. Leung returned to work after about four months. (*Id.*) He still had numbness in his hands, but it improved. (*Id.*) Dr. Leung requested and received physical therapy to address the continuing symptoms of his cervical and lumbar injuries. (*Id.*)

Dr. Leung claims, however, that during the summer of 2004, he experienced increased pain radiating into his arm and numbness. (*Leung Decl.* ¶ 34.) He also experienced low back pain. (*Id.*) After a few weeks, the flare-up "resolved" and Dr. Leung returned to a "baseline" level of pain and stiffness. (*Id.*) This "became the pattern for the next decade or so." (*Id.* ¶ 35.) He had regular consultations with Dr. Jablecki, physical therapy, and periodic MRI or CT scans to monitor his spine. (*Id.*) Despite this, in 2005, Dr. Leung ran a marathon and a half-marathon. (*Def's Ex. 53* at 53-008.)

### F.    Dr. Leung sells his practice to NVISION in November 2019 and his condition begins to deteriorate in early 2020, as COVID-19 sets in.

In approximately January of 2018, Dr. Leung entered discussions with a national eye center company called NVISION, Inc. to sell his practice. (*Def's Ex. 49-Sealed* [Doc. 60].) On November 1, 2019, the sale was completed, and the employment agreement signed. (*Def's Ex. 53* at 53-005, 53-006.) As part of the deal, Dr. Leung agreed to continue working as an employee while NVISION transitioned the practice to another

doctor. (*Def's Exs. 50(a)-Sealed* [Doc. 60]; *Def's Ex. 50(b)-Sealed* [Doc. 60].) Under the agreement, if the practice's revenues met certain benchmarks during the transition period, Dr. Leung would receive an additional payment. (*Id.*)

Dr. Leung worked at NVISION through the start of the COVID-19 pandemic. However, his condition began to deteriorate in early 2020. On February 17, after a busy day in the clinic, he had severe low back and neck pain. (*Leung Decl.* ¶ 37.) Two days later, he experienced "extreme pain in [his] lower and upper back [and] was experiencing increased numbness in his hands." (*Id.*)

On March 19, California declared a health emergency and issued a statewide stay at home order.  At some point that same month, Dr. Leung states that he began experiencing some loss of motor function in his arm. (*Leung Decl.* ¶ 38.) By May 2020, Dr. Leung believed he could no longer function effectively as an ophthalmologist. (*Id.*)

### G.    Dr. Leung files his disability claim with Unum.

In June 2020, approximately four months before his sixty-fifth birthday, Dr. Leung submitted his claim for disability benefits with Unum. (*See Def's Ex. 6.*) Dr. Leung stated that his inability to work was due to lower back and neck problems caused by the accidents in 1982 and 1993. (*Id.* at 6-002.) The claim was supported by a statement from Dr. Moon and a narrative from Dr. Leung. (*Id.*) Dr. Leung's narrative discussed his worker's compensation case with the DOL. (*Id.* at 6-018–6-021.)

 On June 30, Lisa Sullo, Unum's benefits specialist, telephoned Dr. Leung to discuss his claim. (*See Def's Ex. 7*; *Def's Ex. 8*.) Dr. Leung then sent Sullo a follow-up email confirming their earlier conversation and stating, "I look forward to hearing from you after the meeting this Thursday so that I can provide you with the information that you need. … [¶] Since you will probably only require records from Dr. Moon and Dr.

First, let me know and I can ask them to expedite this." (*Def's Opp'n Ex. 57* p. 9.[5]) Two days later (July 2) Sullo responded:

> in regard to the *Worker Comp. file*, we did review whether it is needed and *we will need a copy* submitted. *If you would like me to request, that is fine as well*.

(*Id.* p. 8, emphasis added.) Dr. Leung responded the same day and asked her to specify what was needed. (*Def's Opp'n Ex. 58* at p.12.) On July 6, Sullo responded:

> we will be looking at any office visit/evaluations and any imaging tests (MRIs, CT scans etc.). If you have an award letter that will also be needed. [¶] *I can reach out to your case worker if that would be easier*.  Whatever you prefer just let me know.

(*Id.* at pp.11–12, emphasis added.) Dr. Leung then emailed Sullo a "US [DOL] postcard from 1982 regarding worker's compensation claim (front and back) [and] Letter from US [DOL] for second opinion from Dr. Levin in 1995." (*Def's Opp'n Ex. 58* at p. 14.) The email also stated that he did not have an "award letter" and,

> [r]egarding "office evaluations," Dr. Michael Moon is my treating physician and any office visits/evaluations or study results will be in his records. Additional records will be in the file from Lindy First, DPT, treating physical therapist. The USDL has requested a second opinion on only one occasion in 1995 by Dr. Levine. I am unsure if this is what you wanted but attached is a copy of the letter that I received regarding that request.

(*Id.*)

On July 7, Sullo sent a follow up letter to Dr. Leung providing a summary of his claim and the policies' benefits. (*Def's Ex. 8* at 8-004.) The letter also requested "a copy of your Worker's Compensation File" because the "information will assist us in reviewing your claim as an accident or sickness." (*Id.*)

//

//

---

[5] Unum's exhibits filed in support of its opposition ("Def's Opp'n Ex." [Doc. 69-1]) are attached to the Opposition Declaration of Michael B. Bernacchi [Doc. 69-1].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### H.     Unum approves Dr. Leung's claim but reserves on etiology.

On August 27, 2020, Unum approved Dr. Leung's disability claim. (*See Def's Ex. 9.*) The letter approving his claim, however, stated that "[a]t this time the etiology of your claim is unclear and we will need additional information…." (*Id.* at 9-004.) Unum began making disability payments on August 27, 2020. (*Id.* at 9-002–9-003.)

On October 19, Emi Tanga, Unum's senior benefits specialist, telephoned Dr. Leung and informed him that they did not have the "MRs [medical records] that indicated the injuries back in 1982 and 1983." (*See Def's Ex. 11* at 11-001.) The next day, Dr. Leung sent Tanga a letter enclosing "copies of the following:

> 1. Medical records of neurosurgeon Kenneth Ott, M.D., neurosurgeon and chairman of the UCSD department of neurosurgery John F. Alksne, M.D., neurosurgeon Joel West Ray, M.D., neurosurgeon Randall W. Smith, M.D. and interventional radiologist Keith E. Kortman, M.D. from June 17, 1982 to October 27, 2011. Please note that Dr. Alksne performed surgery on my lumbar spine, operative note enclosed.

> 2. Medical records of neurologist and treating physician Charles K. Jablecki, M.D. from January 4, 1994 to October 3, 2014.

> 3. Medical records of neurosurgeon from Richard C. Ostrup, M.D. from September 14, 2001 to May 16, 2017. Please note that Dr. Ostrup performed surgery on my cervical spine, operative note enclosed.

> 4. Medical records of radiological studies pertaining to lumbar and cervical injuries from March 15, 1985 to June 8, 2020."

(*Def's Ex. 12* at 12-001.)

Unum had a registered nurse perform a clinical summary of Dr. Leung's medical records. (*Cartier Decl.* [Doc. 58-1] ¶ 10.) Then in November 2020, Dr. Philip Lahey, a board-certified orthopedic surgeon, performed a review. (*See Def's Ex. 13.*) He concluded the etiology of Dr. Leung's disability was degenerative disc disease of the cervical and lumbar spine. (*Id.* at 13-002.) Two days later, on November 13, he sent a letter to Dr. Leung's treating physician, Dr. Michael Moon, stating, "[i]n an effort to obtain your input, I would appreciate your responses to my questions below regarding

13

Richard Leung's condition." (*Def's Ex. 14* at 14-001.[6]) Dr. Lahey reported that he had "concluded that [Dr. Leung's] current condition of degenerative disc disease of the cervical and lumbar spine is diffuse and that the etiology of his diagnosis of degenerative disc disease is not a result of the cervical lumbar disc herniations." (*Id.*) He then asked for Dr. Moon's "thoughts and any rationale that you may provide that leads you to the conclusion that his current condition is caused by accident." (*Id.*)

By December, Dr. Moon had not responded to Dr. Lahey, and Unum obtained a second opinion from Dr. Steven Milos, a designated medical officer. (*Cartier Decl.* ¶ 12.) Dr. Milos agreed that the etiology was disease rather than injury and explained:

> The lumbar and cervical disc herniation from the accident did play a role in the development of the degenerative process of the neck and low back. However, one cannot reasonably conclude that if these events did not occur that the insured would not develop degenerative disease with its associated restrictions and limitations. It would be unreasonable to conclude that the L4-5 and C5-6 disc herniations caused the diffuse process that has led to the current restrictions and limitations. Therefore, I agree with the OSP opinion.

(*Def's Ex. 15* at 15-002.)

On February 16, 2021, Dr. Moon responded to Dr. Lahey's letter. (*Def's Ex. 16* at 16-001.) After discussing Dr. Leung's medical history, Dr. Moon concluded:

> I respectfully disagree with your opinion that the cause of the claimant's current cervical spine and lumbar spine disabilities & impairments are due to diffuse degenerative disc disease and not due to the industrial injuries of 1982 and 1993. The patient was determined to be permanent & stationary for his workers compensation injuries with permanent disabilities as it pertains to both the cervical spine and lumbar spine. He was provided future medical care to manage his neck and low back condition for life. It is extremely unlikely, given the patient's long history of ongoing neck and low back pain, spine surgeries, and need for ongoing medical treatment, that the degenerative findings seen in the patient's cervical spine and lumbar spine are unrelated to his industrial injuries and subsequent surgeries. *It is my opinion that Dr. Leung's current pain and disability as well as the*

---

[6] In 2014, Dr. Leung's treating physician, Dr. Jablecki, retired. Dr. Leung began seeing Dr. Moon. (*Leung Decl.* ¶ 36.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> *degenerative findings seen on MRI of both the cervical spine and lumbar*
> *spine are indeed directly related to his industrial injuries, residual L4-5 disc*
> *injury, and complications related to the cervical and lumbar spine surgeries.*

(*Id.* at 16-002, emphasis in original.)

Based on Dr. Moon's response, Unum returned the file to Dr. Lahey and Dr. Milos for a response. (*Cartier Decl.* ¶ 14.) Dr. Lahey prepared a report addressing Dr. Moon's response. (*Def's Ex. 17.*) The report concluded that Dr. Lahey's "opinion remains that the etiology of the current R&Ls is degenerative disc disease of the cervical and lumbar spine." (*Id.* at 17-002.) Dr. Milos also reviewed Dr. Moon's response and the "lumbar and cervical disc herniations from the accident did play a role in the development of the degenerative process of the neck and low back." (*Def's Ex. 18* at 18-001.) However, he continued to opine that "it would be unreasonable to conclude that the… disc herniations caused the diffuse process that has led to the current restrictions and limitations" and therefore agreed with Dr. Lahey. (*Id.*)

## I.  <u>Unum notifies Dr. Leung of its etiology determination; Dr. Leung files</u> <u>two unsuccessful appeals and his request for a third appeal is denied.</u>

On March 24, 2021, Unum notified Dr. Leung that it had determined his disability was due to sickness rather than accidental injury. (*Def's Ex. 20* at 20-001.) Unum's letter explained that its physician

> opined that it is unreasonable to conclude that the L4-5 and C5-6 disc
> herniations caused the diffuse process that have led to your current
> restrictions and limitations. He concluded the medical condition causing
> your restrictions and limitations is degenerative disc disease, thus, etiology
> is sickness.

(*Id.* at 20-004.)

On April 8, 2021, Dr. Leung appealed the decision. (*Jt. State.* Undisputed Fact No. 8.) Dr. Leung's letter stated that he disagreed with Unum's decision "as this is contrary to the opinions of my attending physicians Michal Moon, M.D. and neurosurgeon Richard

C. Ostrup, M.D. who both are of the opinion that the proximate cause of my disability is accident related." (*Def's Ex. 21* at 21-001.)

On May 14, Unum sent the file to be reviewed by a third-party vendor, who sent the file to a neurosurgeon, Mark Friedlander, M.D. (*Cartier Decl.* ¶¶ 18, 19.) His report stated that "[b]ased on the medical reports and the MRI findings the etiology of [Dr. Leung's] impairment is progressive degenerative changes at L3/L4 and L4/L5 disc spaces." (*Def's Ex. 22* at 22-002.) He also opined that "the injury which resulted in the operation performed in 1982 does not contribute to the current impairing condition" and instead it was the "result of aging, and what is generally called wear and tear." (*Id.*) He also concluded that "within reasonable medical probability, there was no significant contribution from the injury on November 1993 to the current impairing conditions." (*Id.* at 22-007.) On June 16, Unum notified Dr. Leung that it was affirming its decision that the etiology of his disability was sickness. (*See Def's Ex. 24.*)

On September 2, Dr. Leung filed a second appeal of Unum's decision. (*Def's Ex. 25.*) The letter stated that he was requesting that Unum "reopen my appeal as I now have the long-anticipated letter from Dr. Ostrup," which was included with the letter. (*Id.* at 25-001, 25-003–25-004.) Dr. Ostrup's letter conceded that he "suspect[ed] genetics are playing a significant role" regarding his cervical complaints, but also "suspect[ed] there is a component of adjacent segment disease." (*Id.* at 25-003.) Dr. Ostrup's letter stated:

> In light of his history (provided by Dr. Leung) of 40 years of back pain and the fact that individuals with discectomies can develop a post laminectomy syndrome, within reasonable medical probability, a large extent of his ongoing back pain is likely to be related to his prior surgery. Although the progression of his lumbar stenosis at L3-4 is likely to be genetic, this is not responsible for the decades of back pain. More likely than not, his back pain has been present since the discectomy in 1982.

(*Id.* at 25-004.)

Unum forwarded Dr. Ostrup's letter to Dr. Friedlander. (*Def's Ex. 26* at 26-001.) After reviewing the letter, Dr. Friedlander issued a second report discussing Dr. Leung's

16

MRIs from September 21, 2015, November 22, 2016, and April 3, 2020. (*Id.* at 26-001–26-002.) Based on his analysis of the MRI studies, Dr. Friedlander explained the studies

> show[ed] the progression of degenerative changes at the L4/5 and L5/S1. There is recurrent disc herniation seen at the L4/5 in 1992 (referenced to being seen in 1988). This disc herniation cannot be attributed to adjacent level disease, as there was no fusion performed in the past. Dr. Ostrup does report that there currently is surgical pathology present in the claimant's lumbar spine. There are defined progressive changes in the lumbar spine that have been developing over this long period of time which explains the chronic back pain.  It is not realistic to consider that the current condition is related to the original surgery and accident.

(*Id.* at 26-002.) On September 23, Unum denied Dr. Leung's appeal. (*Def's Ex. 27.*)

On February 17, 2022, Dr. Leung sent another request to reopen the appeal based on December 15, 2021 MRI scans. (*Def's Ex. 28* at Ex. 29-001.) According to Dr. Leung, "Neuro-radiologist Nathaniel Chuang, M.D. read the MRIs and determined for the cervical area there is *adjacent level disc degeneration* at C4-5 and C6-7 related to the original surgery and accident.  For the lumbar MRI, he notes the *pathology at the surgical site L4-5*." (*Id.*, emphasis in original.) The letter also stated that as further support that his "disability is accident-related, the U.S. [DOL] has recognized and supported the ongoing work-compensation claim based on accidents in 1982 and 1993. The U.S. [DOL] would not provide care based on an illness." (*Id.*)

On February 18, Unum denied his request for a third appeal. (*Def's Ex. 30.*) The letter summarized its decision on his two previous appeals and concluded by acknowledging that "you continue to disagree with the decision regarding the duration of your disability benefits; however, the additional information you have provided is not relevant to the period of time you allege injuries occurred." (*Id.* at 30-002.)

### J.        During this case, the parties retain additional expert medical opinions.

After this lawsuit was filed, Dr. Leung retained Dr. Cary D. Alberstone as an expert witness to opine on the etiology of his disability and on Unum's physicians'

17

opinions. (*Horrow Decl.* [Doc. 57-3] ¶ 48; *Bernacchi Opp'n Decl.* [Doc. 69-1] ¶ 6.) Unum also retained two experts, Dr. Sten E. Kramer and Dr. Geoffrey A. Sigmund, to evaluate the etiology of Dr. Leung's disability and Dr. Leung's expert's opinion. (*Bernacchi Opp'n Decl.* ¶ 8.)

On August 9, 2022, Dr. Alberstone issued a report concluding that "to a reasonable degree of medical probability, Dr. Leung's 1982 and 1994 [sic] injuries are substantial factors in the cause of the disability he now claims." (*Pl's Ex. W* at W,28.)  He also opined that (1) Unum's determination (that Dr. Leung's injuries were the result of "diffuse degenerative changes") was inconsistent with his history of symptoms and the imaging evidence, and (2) there was "no evidence of a diffuse symptomatic condition." (*Id.*) On February 16 and April 29, Dr. Alberstone issued supplemental reports. (*Horrow Decl.* ¶ 49; *Bernacchi Opp'n Decl.* ¶ 6.)

Both of Unum's experts reviewed Dr. Leung's MRIs and Dr. Alberstone's reports, and both disagreed with Dr. Alberstone's conclusion that Dr. Leung's disability was caused by the 1982 and 1993 injuries.  (*Bernacchi Opp'n Decl.* ¶ 9; *Def's Opp'n Ex. 60(a)* at 042–043, *Def's Opp'n Ex. 60(b)* at 049.)

## IV.   STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an

essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Ford Motor Credit Co. v. Daugherty*, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing *Celotex*, 477 U.S. at 324). Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587.

## V.   DISCUSSION

### A.   Breach of contract.

Unum seeks summary judgment of the breach of contract cause of action on the basis that Dr. Leung cannot establish that his disability was caused by the "injuries that occurred 30 and 40 years ago…." (*Def's P&A* [Doc. 58] at 15:8–11.) In support of this argument, Unum relies on California's process of nature rule. (*Id.* at 15:11–19:2.)

The process of nature rule has been applied in insurance-coverage disputes involving policies that require the insured to become totally disabled either "immediately" or within a specified amount of time after the accident that caused the disability. *Cranmore v. Unumprovident Corp.*, 430 F.Supp.2d 1143, 1153 (D.Nev. 2006). For example, in *Schilk v. Benefit Trust Life Ins. Co.*, 273 Cal.App.2d 302, 306 (1969), the insured sustained a whiplash injury in an accident, and became completely disabled more than 100 days after the accident. Although there was no dispute the insured's disability was caused by the accident, the insurer denied the disability claim because the policy required the disability to occur within 20 days. The insured sued, and the trial court found he was entitled to benefits under the process of nature rule.  *Id.* at 305.

On appeal, the California Court of Appeal affirmed and explained that under the process of nature rule,

> when a disability follows from an accidental injury within such time as the processes of nature consume in bringing the affected person to the state of total incapacity to prosecute every kind of business pertaining to his occupation such disability is immediate under the terms of the policy.

> The rationale for the rule is set forth in *Rathbun v. Globe Indem. Co.*, 107 Neb 18…: "The injured part often lies dormant for an indefinite period, with but little or no consciousness of its existence by the person injured, although from the very moment of the accident, perhaps the processes of nature may be busily engaged in developing what may have seemed to be a slight hurt into a most serious and perhaps fatal injury." The weight of authority is that in such instances, the disability is held to be continuous from the date of the accident.

*Id.* at 306.

Here, Unum does not contend that Dr. Leung's policies require that his disability occur either "immediately" or within a specified amount of time after the accident. Nor has Unum cited any California case extending the process of nature rule to policies like the ones at issue here. Accordingly, Unum's causation argument based on the process of nature rule lacks merit. The Court, therefore, denies Unum's request for summary judgment of the breach of contract cause of action.

### B.   Bad faith cause of action.

Dr. Leung contends that Unum's etiology determination is not only incorrect but was made in bad faith. His motion seeks a determination that two specific acts by Unum constitute bad faith: (1) allegedly failing to obtain his DOL file before making an etiology determination; and (2) refusing to reconsider its determination after receiving new, "significant" information during litigation. Unum's motion seeks summary judgment of the bad faith cause of action under the genuine-dispute doctrine.

### 1.   Dr. Leung's motion is premature.

To establish a breach of the implied covenant of good faith and fair dealing, an insured must establish that "(1) benefits due under the insurance policy were withheld, and (2) the reason for withholding benefits was unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1151 (1990). "While an erroneous denial of a claim may constitute a breach of contract, it does not by itself support tort liability." *LG Infocomm U.S.A., Inc. v. Euler Am. Credit Indem. Co.*, 419 F.Supp.2d 1248, 1254 (S.D. Cal. 2005). Rather, bad faith exists "[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured." *Frommoethelydo v. Fire Ins. Exch.*, 42 Cal.3d 208, 214–215, 228 (1986).

Unum argues that Dr. Leung's request for summary judgment is premature because he has not established that it breached the policies. Dr. Leung responds that because he is not seeking summary judgment of the entire cause of action, only on distinct bad-faith theories or claims, he does not have to establish a breach. In support of this argument, Dr. Leung cites *United States v. Sterling Centrecorp Inc.*, 208 F.Supp.3d 1126 (E.D. Cal. 2016), which he contends "granted a partial summary judgment motion… limited to just the issue of damages." (*Pl's Reply* [Doc. 70] 2:14–21.) The Court is not persuaded by Dr. Leung's argument.

There is no dispute that a party may move for summary judgment of specific issues, such as damage claims, distinct legal theories, liability or particular defenses.

Federal Rule of Civil Procedure 56(a) specifically provides that "[a] party may move for summary judgment identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." The problem with Dr. Leung's motion is that Unum's alleged breach of the policy is a threshold issue for Dr. Leung's bad faith claim. *See California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 184 Cal.App.3d 1428, 1434 (explaining that at trial, "the trier of fact must find favorably for the plaintiff on the first breach of contract action before moving onto the second cause of action for bad faith."). For example, if Unum's etiology determination is correct, then its alleged failure to request the DOL file could not constitute bad faith because its investigation was necessarily reasonable. Similarly, if Unum's etiology determination is correct, its refusal to reconsider its etiology determination in light of Dr. Alberstone's reports is also reasonable. Because breach of the policy is a threshold issue, Dr. Leung's motion is procedurally flawed.

Moreover, Dr. Leung's reliance of *Sterling Centrecorp* is misplaced. The reason the damage issue was resolved on summary judgment was because the threshold issue of liability was previously decided at trial. *Id.* at 1129. Thus, *Sterling Centrecorp* does not assist Dr. Leung's argument.[7]

### 2. Even if Dr. Leung's motion is not premature, the evidence establishes Unum requested the DOL file.

Dr. Leung contends that Unum's failure to obtain the DOL file before making its etiology determination constitutes bad faith because the file contained evidence that "strongly supports that his disability is due to injury." (*Pl's P&A* [57-1] 12:5–14.)

---

[7] Dr. Leung also cites *Holguin v. City of San Diego*, 135 F.Supp.3d 1151 (S.D. Cal. 205). In *Holguin* the City defendant moved for summary adjudication of a Fourth Amendment unlawful arrest and detention claim based on three separate theories: (1) the claim was barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) the claims was barred under issue preclusion; and (3) the undisputed facts established the arrest was unlawful. (*Id.* at 1158.) Unlike Dr. Leung's motion, none of the defenses were dependent on first establishing threshold issues.

According to Dr. Leung, this evidence consisted of (1) Dr. Alksne's June 14, 1983 letter to the DOL regarding the February 1983 surgery on his lumbar spine; (2) Dr. Levine's May 31, 1995 IME to determine coverage for the 1993 injury; and (3) Dr. Einbund's March 29, 2021 IME to determine if Dr. Leung was disabled and, if so, whether it was due to the injury suffered while working at the VA in 1982. (*Pl's P&A* at 12:16–26.) Dr. Leung's theories lack merit for several reasons.

Dr. Leung's claim that Unum failed to request the DOL file is contradicted by the evidence. As discussed in the background section, on July 2, Sullo responded to Dr. Leung's email and stated,

> in regard to the *Worker Comp. file*, we did review whether it is needed and *we will need a copy* submitted. *If you would like me to request, that is fine as well*.

(*Def's Opp'n Ex. 57* at p. 8, emphasis added.) Rather than send the entire file, Dr. Leung responded the same day and asked her to specify what was needed. (*Def's Opp'n Ex. 58* at p.12.) On July 6, Sullo responded:

> we will be looking at any office visit/evaluations and any imaging tests (MRIs, CT scans etc.). If you have an award letter that will also be needed. [¶] *I can reach out to your case worker if that would be easier*.  Whatever you prefer just let me know."

(*Id.* at pp.11–12, emphasis added.) Dr. Leung then emailed Sullo a "US [DOL] postcard from 1982 regarding worker's compensation claim (front and back) [and] Letter from US [DOL] for second opinion from Dr. Levine in 1995." (*Def's Opp'n Ex. 58* at p. 14.)  The email also stated that he did not have an "award letter" and he asserted,

> [r]egarding "office evaluations," Dr. Michael Moon is my treating physician and any office visits/evaluations or study results will be in his records. Additional records will be in the file from Lindy First, DPT, treating physical therapist. The USDL has requested a second opinion on only one occasion in 1995 by Dr. Levine. I am unsure if this is what you wanted but attached is a copy of the letter that I received regarding that request.

(*Id.*)

1    In Dr. Leung's Reply, he argues these emails do not establish that Unum requested
2    the file because "[i]n neither of those emails did Ms. Sullo request Dr. Leung to provide
3    the DOL file." (*Pl's Reply* [Doc. 70] at 5:1–2.) This argument is meritless. Sullo's July 2
4    email explicitly stated that with regards to "the Worker Comp. file… we will need a copy
5    submitted." (*Id.* p. 8.) There is also no dispute Sullo's July 7 letter requested "a copy of
6    your Worker's Compensation File." These documents establish that Dr. Leung's
7    contention that Unum did not request the DOL file before making its etiology
8    determination is false.

9    Also undisputed is that on July 2 and July 6 Sullo offered to obtain the files
10   directly from the DOL. (*Def's Opp'n Ex. 57* at p. 8 ("[i]f you would like me to request,
11   that is fine as well"); *Def's Opp'n Ex. 58* at pp. 11–12 ("I can reach out to your case
12   worker if that would be easier").)  Instead of having Sullo obtain the files from the DOL,
13   Dr. Leung asked Sullo for specific documents—effectively asking her to narrow the
14   request for the entire DOL file—and then took it upon himself to determine what was
15   responsive to her request for "any office visit/evaluations and any imaging tests (MRIs,
16   CT scans etc.)."

17   In his Reply, Dr. Leung admits "the documents submitted by Dr. Leung do not
18   contain the key documents from" the DOL file. (*Pl's Reply* at 5:8–9.) The real issue is
19   why? Given Sullo's request for documents from the DOL file, it was unreasonable for Dr.
20   Leung to not provide the documents he now claims were "key" to establishing the
21   etiology of his disability. Regardless, in light of these undisputed facts, a reasonable jury
22   could not conclude that Unum did not request the DOL file.

23   Finally, in addition to Sullo's request for "office visits/consultations" from the
24   DOL file, there is no dispute Tanga requested medical records related to the 1982 and
25   1993 injuries and that Dr. Leung agreed to provide them. (*See Def's Ex. 11* at 11-001.)
26   Two of the three purportedly key documents related to the 1982 and 1993 injuries and
27   were, therefore, responsive to these requests—Dr. Alksne's June 14, 1983 letter and Dr.
28   Levine's IME for the 1993 injury. In fact, in responding to Tanga's request, Dr. Leung

sent "[m]edical records of neurosurgeon … John F. Alksne, M.D., … from June 17, 1982 to October 27, 2011." (*Def's Ex. 12* at 12-001.) Based on these undisputed facts, the Court finds Unum did not fail to request the allegedly "key" documents.[8]

In summary, the evidence establishes Unum requested the DOL file from Dr. Leung. The evidence also establishes that to the extent Unum did not have "key" documents from that file, it was not the result of Unum's failure to request them.  For all these reasons, Dr. Leung's theory is contrary to the evidence.

### 3.    Unum did not act unreasonably in not reconsidering its etiology determination during this lawsuit.

Dr. Leung contends Unum acted in bad faith by failing to reconsider its etiology determination after being provided with Dr. Albertstone's reports during this lawsuit. In support of this theory, Dr. Leung points out that while Unum's physicians only reviewed the radiologists' reports of his MRIs, Dr. Alberstone reviewed the actual MRI films. According to Dr. Leung, this review constitutes a "significant difference" in the opinions of the parties' physicians and obligated Unum to reconsider its coverage decision. (*Pl's P&A* at 18:12–25.) The Court is not persuaded for at least two reasons.[9]

First, the Court is not persuaded by Dr. Leung's contention that Unum's experts' reliance on the radiologists' reports and Dr. Alberstone's review of the films amounts to a "significant difference." Dr. Leung's argument assumes the radiologists' reports were inaccurate, perhaps omitting information on the films. But Dr. Leung fails to point out any such inaccuracies or omissions. For this reason, this theory is unpersuasive.

_____

[8] Regarding Dr. Einbund's IME, it was not performed until March 29, 2021. (*See Pl's Ex. Q*; *Pl's Ex. R* at R,1.) By then, Unum had made its etiology determination and notified Dr. Leung. (*Def's Ex. 20* at 20-001.) Thus, Unum did not act unreasonably in not requesting the second IME.

[9] The parties dispute whether California law required Unum to reconsider its coverage determination during litigation based on Dr. Leung's retained expert's opinion.  Although the Court is also dubious of Dr. Leung's argument, it need not decide the issue given the undisputed facts do not support his theory.

22-CV-0767 W (JLB)

Second, Dr. Leung's argument fails for a more fundamental reason.  It is undisputed that Unum's retained medical experts also reviewed the MRI films and Dr. Alberstone's reports. (*See Def's Opp'n Exs. 60(a)*, *60(b)*.) Significantly, both of Unum's experts disagree with Dr. Alberstone and agree with Unum's etiology determination. (*Id.*) Also important, nowhere in Dr. Leung's motion, opposition or reply does he provide any basis to conclude that Unum's two retained experts' opinions are unreasonable. Under these circumstances, the Court concludes Unum's alleged refusal to reconsider its coverage determination does not constitute bad faith.

### 4.    The genuine-dispute doctrine bars the bad-faith claim.

The genuine-dispute doctrine is an affirmative defense to a bad-faith claim.  Under the doctrine, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723 (2007) (citations omitted). The reasonableness of the insurer's decisions and actions must be evaluated objectively as of the time they were made. *Bosetti v. United States Life Ins. Co. in City of New York*, 175 Cal.App.4th 1208, 1239 (2009). While generally an issue for the jury, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Guerbara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).

Unum contends the undisputed evidence establishes a genuine dispute exists regarding the etiology of Dr. Leung's disability.  The Court agrees.

There is no dispute that Unum's initial etiology determination was based on the opinions of Dr. Lahey and Dr. Milos, both of whom reviewed Dr. Leung's medical records and the radiologists' reports. (*See Def's Exs. 13, 15*.) After issuing their initial reports, Dr. Lahey and Dr. Milos reviewed Dr. Moon's letter explaining his disagreement

with their findings, yet continued to conclude that Dr. Leung's disability was caused by sickness. (*See Def's Ex. 17, 18.*)

There is also no dispute that after Unum issued its etiology determination, Dr. Leung appealed. Unum then retained a third opinion from Dr. Friedlander, who also concluded Dr. Leung's disability was caused by sickness. (*See Def's Ex. 22.*) Dr. Leung again appealed the decision based on a "long-anticipated letter from Dr. Ostrup," which Unum provided to Dr. Friedlander. (*See Def's Exs. 25, 26.*) After considering Dr. Ostrup's letter, Dr. Friedlander affirmed his etiology determination and Unum denied Dr. Leung's appeal. (*Def's Exs. 26, 27.*) Based on these facts, the Court finds that when Dr. Leung filed this lawsuit, a genuine dispute existed regarding the etiology of his disability.

There is also no dispute that after this lawsuit was filed, Unum retained additional medical experts, Dr. Kramer and Dr. Sigmund, who reviewed Dr. Alberstone's reports and Dr. Leung's MRI films. (*Def's Opp'n Exs. 60(a), 60(b).*) Consistent with Dr. Lahey's, Dr. Milos's and Dr. Friedlander's conclusions, Unum's experts also concluded that Dr. Leung's disability was caused by sickness. (*Id.*) These undisputed facts confirm the existence of a genuine dispute.

In his opposition, Dr. Leung points out that the genuine-dispute doctrine will not shield an insurer from bad faith where a jury finds "an insurer's investigation of a claim was biased," "'[t]he insurer dishonestly selected its experts' or 'the insurer's experts were unreasonable.'" (*Pl's Opp'n* [Doc. 66] at 20:8–17, citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1010 (9th Cir. 2004).) Dr. Leung argues that all three reasons apply here. (*Id.* at 19:1–22:15.) The Court disagrees.

Dr. Leung's contention that Unum's investigation was unreasonable is based on the allegation that Unum failed to request the DOL file. (*Pl's Opp'n* at 19:1–24.) For the reasons discussed above, this allegation not only lacks evidentiary support but is contradicted by the record.

Next, Dr. Leung asserts that Unum dishonestly selected Dr. Friedlander, who was suspended for three years by the New Jersey State Board of Medical Examiners and

27

ordered to pay an $80,000 civil penalty. (*Pl's Opp'n* at 21:1–22:15, *citing Pl's Ex. AK* at 12.) In support of this argument, Dr. Leung relies on *Hangarter*, 373 F.3d 998.

In *Hangarter*, the insured became disabled and began receiving disability benefits in July 1997. In 1999, the insurer retained an expert, Dr. Aubrey Swartz, to conduct an IME. Contrary to the insured's doctors' opinions, Dr. Swartz concluded the insured's condition was normal. As a result, in May 1999, the insurer terminated the insured's benefits and "attached her bank account for the insurance premiums, until the account was drained, at which point the company cancelled her policy." *Id.*, 373 F.3d at 1005. The insured sued for bad faith, among other things, and a jury returned a verdict in the insured's favor for over $7 million. On appeal, the Ninth Circuit found the genuine-dispute doctrine did not apply because the evidence supported a finding that the insurer's selection of its *only* expert was biased or dishonest. *Id.* at 1011.

Rather than support Dr. Leung, *Hangarter* highlights the problem with his argument. In contrast to the insurer in that case, Unum's etiology determination is supported by five physicians, only one of whom is alleged to have been dishonestly selected. Thus, assuming for the sake of argument that evidence suggested Dr. Friedlander's selection was biased or dishonest, there are no such allegations regarding Dr. Lahey, Dr. Milos, Dr. Kramer or Dr. Sigmund, all of whom support the position that Dr. Leung's disability was caused by sickness. For this reason, this argument lacks merit.

Finally, Dr. Leung argues Unum's experts were unreasonable. But this argument is based on the contention that Dr. Lahey and Dr. Milos failed to examine Dr. Leung and relied on the radiologists' reports, instead of the actual films. (*Pl's Opp'n* at 20:21–24.) As discussed above, this argument lacks merit for two reasons. First, Dr. Leung has failed to establish that Dr. Lahey's and Dr. Milos's reliance on the radiologists' reports was unreasonable. Second, assuming for the sake of argument that their reliance on the reports was unreasonable, there is no dispute that Unum's retained experts, Dr. Kramer and Dr. Sigmund, reviewed Dr. Leung's MRIs, and agree that Dr. Leung's disability is the result of sickness. For these reasons, Dr. Leung's argument lacks merit.

1    Because the undisputed evidence establishes that a genuine dispute exists

2    regarding the etiology of Dr. Leung's disability, the Court grants summary judgment in

3    favor of Unum on Dr. Leung's bad faith claim.

4

5         **C.    There is no evidence supporting the punitive damage claim.**

6         Unum seeks summary judgment against Dr. Leung's punitive damage claim

7    arguing that "there is no 'clear and convincing' evidence that Unum is 'guilty' of

8    'oppression, malice or fraud' so as to justify" an award. (*Def's P&A* at 25:13–17.)

9         Under California law, in order to recover punitive damages, the plaintiff must

10   establish by "clear and convincing" evidence that the defendant acted with "malice,"

11   "oppression" or "fraud." *Cal. Civ. Code* § 3294(a). As Unum points out, this standard is

12   more exacting than for the recovery of bad-faith damages. *See Mock v. Michigan Millers*

13   *Mut. Ins. Co.*, 4 Cal.App.4th 306, 328 (1992) (explaining that the evidence needed to

14   support an award of punitive damages "is 'of a different dimension' from that needed to

15   support a finding of bad faith.")

16        In his opposition, Dr. Leung contends there is sufficient evidence to show "UNUM

17   engaged in despicable conduct in conscious disregard of Dr. Leung's rights." (*Pl's Opp'n*

18   at 23:21–22.) In support of this argument, Dr. Leung contends the evidence establishes

19   Unum "performed a perfunctory review" because it only obtained medical records from

20   2015. (*Id.* at 23:22–28.) He also contends the evidence establishes that Unum relied on

21   "three perfunctory file reviews conducted by physicians who purported to interpret the

22   [sic] Dr. Leung's spinal scans without actually seeing Dr. Leung's spinal scans." (*Id.* at

23   24:1–6.)  Finally, he also repeats the theory that Unum failed to request the DOL file. (*Id.*

24   at 24:7–11.)

25        The evidence submitted with the parties' motions contradicts Dr. Leung's

26   arguments. The undisputed evidence establishes that Unum in fact sought Dr. Leung's

27   DOL file. This fact alone contradicts Dr. Leung's claim that Unum performed a

28   perfunctory review by only obtaining records from 2015. The claim that Unum's

physicians conducted a perfunctory review is also not supported by the evidence. This criticism appears to be based entirely on the notion that the physicians' reviews of the MRI reports (as opposed to the films) rendered their reports less reliable.  Given that Dr. Leung fails to point out any inaccuracies in the MRI reports, his criticism is unavailing. Moreover, beyond Dr. Leung's failure to adequately explain how Unum's three physicians' reviews were perfunctory, there is no dispute that their opinions were consistent with Unum's designated experts, both of whom reviewed Dr. Leung's MRI films.

For all these reasons, the Court finds Dr. Leung has failed to provide evidence supporting his claim for punitive damages. Accordingly, the Court grants Unum's motion for summary judgment on the punitive damage claim.

## VI.   CONCLUSION & ORDER

For the reasons stated above, the Court **GRANTS** the motions to seal [Docs. 59, 67], **OVERRULES** Plaintiff's objections [Doc. 63], **DENIES** Plaintiff's motion [Doc. 57] and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion [Doc. 58] as follows:  Summary judgment is granted in favor of Defendant and against Plaintiff with respect to the breach of the covenant of good faith and fair dealing cause of action and the request for punitive damages.

**IT IS SO ORDERED.**

Dated:  November 6, 2023

Hon. Thomas J. Whelan
United States District Judge

22-CV-0767 W (JLB)